The Huntington National Bank, et al vs.
R&R Express Properties, LLC, et al

# Exhibit "B"

PROPER FLORIDA DOCUMENTARY STAMP TAXES IN THE AMOUNT OF $21,000.00 ARE BEING PAID IN CONNECTION WITH THE INDEBTEDNESS EVIDENCED HEREIN.

# MORTGAGE NOTE

| | |
|---|---|
| Date of Note: | June 21, 2023 |
| Amount of Note: | SIX MILLION AND 00/100 DOLLARS ($6,000,000.00) |
| Maturity Date: | The earlier of (i) March 18, 2028 or (i) the Facility Termination Date set forth in the R&R Credit Agreement (as hereinafter defined) ("Maturity Date"), unless otherwise accelerated pursuant to and in accordance with the terms and conditions set forth in this Note. |

R&R EXPRESS PROPERTIES, LLC, a Pennsylvania limited liability company (the "Borrower"), does hereby covenant and promise to pay to the order of THE HUNTINGTON NATIONAL BANK, its successors and/or assigns (the "Lender"), at 200 Public Square CM64, Cleveland, Ohio 44114, SIX MILLION AND 00/100 DOLLARS ($6,000,000.00), together with all accrued interest, which shall be due and payable upon the following terms and conditions contained in this Mortgage Note (this "Note").

Reference is made to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 by and among the Lender, as administrative agent, the Lenders party thereto (as defined therein), and the Borrower and the other borrowers party thereto (as amended and as the same may hereafter be further amended, restated, modified or supplemented from time to time, the "R&R Credit Agreement").

## A. Interest Rate:

Amounts outstanding under this Note will bear interest at a per annum variable rate of 1.69% (the "Margin") above Daily Simple SOFR (the "Interest Rate"). In no event will the rate of interest hereunder exceed the maximum rate allowed by law.

For purposes hereof, the following terms shall have the following meanings:

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to the greater of (a) SOFR for the day (such day, the "SOFR Determination Date") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website, and (b) the Floor. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Date, the SOFR in respect of such SOFR Determination Date has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to Daily Simple SOFR has not occurred, then the SOFR for such SOFR Determination Date will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than ten (10) consecutive SOFR Rate Days. Any change in Daily

Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to Borrowers.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"Interest Payment Date" means the first day of each month, with the first such Interest Payment Date under this Note on July 1, 2023 and the final such Interest Payment Date on the Maturity Date.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

If at any time Lender determines, that SOFR is no longer readily available or is no longer appropriate for use in connection with its commercial loans generally, or that the current interest rate index is to be replaced, the terms and provisions set forth on the Rider to Mortgage Note attached hereto as Exhibit A shall prevail.

**B. Amortization; Payment Terms:**

(a) This Note shall amortize on a twenty (20) year amortization schedule over the balance of months of the term of this Note.

(b) Commencing on July 1, 2023 and continuing on each Interest Payment Date, Borrower shall make monthly payments of principal in the amount $25,000 plus accrued interest. Unless this Note is otherwise accelerated in accordance with the terms and conditions hereof, the entire outstanding principal balance of this Note plus all accrued interest shall be due and payable in full on the Maturity Date.

**C. Security:**

This Note is secured, in part, by (i) that certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of even date herewith from Borrower in favor of Lender (as the same may be amended or modified from time to time, the "Mortgage"), granting Lender a first priority lien and security interest in and to certain "Mortgaged Property" as more particularly described in the Mortgage, and (ii) all other security instruments executed in connection therewith.

**D. Loan Documents:**

This Note, Mortgage, a certain Guaranty Agreement dated of even date herewith entered into by R&R Express Holdco, Inc. and in favor of Lender, and all other documents and instruments executed in connection with this Note are hereinafter individually and/or collectively referred to as the "Loan Documents".

**E. Default Interest Rate:**

If any Event of Default shall occur, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the interest rate on this Note to two percent (2%) per annum in excess of the Interest Rate (the "Default Rate"). However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**F. Late Charges, Etc.:**

Lender may collect a late charge not to exceed an amount equal to five percent (5%) of any installment or a minimum of $100.00 which is not paid within ten (10) days of the date thereof, to cover the extra expense involved in handling delinquent payments provided that collection of said late charge shall not be deemed a waiver by Lender of any of its rights under this Note. Notwithstanding the foregoing, there shall be no grace period or late charges for payments due on the outstanding principal balance due on the Maturity Date or upon acceleration, as set forth in Section H below, but such outstanding balance shall accrue interest at the Default Rate. The late charge is intended to compensate the Lender for administrative and processing costs incident to late payments. The late charge payments are not interest. The late charge payment shall not be subject to rebate or credit against any other amount due. Any late charge shall be in addition to any other interest due.

**G. Default and Acceleration:**

If any of the "Events of Default" (as defined in the Mortgage) occur and are not cured within any applicable cure period set forth in the Mortgage, at the Lender's option, exercisable in its sole discretion, all sums of principal and interest under this Note shall be accelerated and become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character, except as specifically provided in the Loan Agreement.

In any such event, all sums of principal and interest under this Note shall automatically become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character. All persons now or at any time liable for payment of this Note hereby waive presentment, protest, notice of protest and dishonor. The Borrower expressly consents to any extension or renewal, in whole or in part, and all delays in time of payment or other performance which Lender may grant at any time and from time to time without limitation and without any notice or further consent of the undersigned.

The remedies of Lender as provided herein, or in the Mortgage or the other Loan Documents shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion therefor shall arise.

The Lender may, in the sole discretion of Lender, accept payments made by Borrower after any default has occurred, without waiving any of Lender's rights herein.

**H. Costs:**

In the event that this Note is collected by law or through attorneys at law, or under advice therefrom (whether such attorneys are employees of Lender or an affiliate of Lender or are outside counsel), Borrower and any endorser, guarantor or other person primarily or secondarily liable for payment hereof hereby, severally and jointly agree to pay all costs of collection, including reasonable attorneys' fees including reasonable charges for paralegals, appraisers, experts and consultants working under the direction or supervision of Lender's attorneys, whether or not suit is brought, and whether incurred in connection with collection, trial, appeal, bankruptcy or other creditors' proceedings or

otherwise.

**I. Loan Charges:**

Nothing herein contained, nor any transaction related thereto, shall be construed or so operate as to require Borrower or any person liable for the repayment of same, to pay interest in an amount or at a rate greater than the maximum allowed by applicable law. Should any interest or other charges paid by Borrower, or any parties liable for the payment of the Loan made pursuant to this Note, result in the computation or earning of interest in excess of the maximum legal rate of interest permitted under the law in effect while said interest is being earned, then any and all of such excess shall be and is waived by Lender, and all such excess shall be automatically credited against and in reduction of the principal balance, and any portion of the excess that exceeds the principal balance shall be paid by Lender to Borrower or any parties liable for the payment of the Loan made pursuant to this Note so that under no circumstances shall the Borrower, or any parties liable for the payment of the Loan hereunder, be required to pay interest in excess of the maximum rate allowed by applicable law.

**J. Swap Transaction.**

1. As used herein, a "**Swap**" and/or "**Swap Transaction**" shall mean one or more agreements between the Borrower and Lender with respect to any interest rate swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more interest rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk of value.

2. **Swap Transaction Documents.** As used herein, "**Swap Transaction Documents**" shall mean: any and all documents related to any Swap Transactions by and between the Borrower and Lender, including but not be limited to the following: **2002 version of the "ISDA" (International Swap and Derivatives Association, Inc.) Master Agreement, the Schedule to the Master Agreement, any Credit Support Annexes, any Swap Trade Confirmation, Risk Disclosure Statement, Financial Contracts**, and all such other related documents as Lender may require. All such Swap Transaction Documents shall be in form and content, and include such terms and conditions as required by Lender and/or its legal counsel.

As used herein "**Financial Contract**" shall mean (1) an agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, forward rate agreement, commodity swap, commodity option, equity or equity index swap, bond option, interest rate option, foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, and other similar agreement (including any option to enter into any of the foregoing; (2) any combination of the foregoing; or (3) a master agreement for any of the foregoing together with all amendments and supplements.

3. **Swap Cross-Default Provision.** The Borrower acknowledges and agrees that an Event of Default under this Note shall also constitute an event of default under all Swap Transactions. In addition to Lender's rights set forth herein, upon the occurrence of an Event of Default under this Note, the Lender has the right to demand payment of any indebtedness, liabilities, fees, costs, assessments, or obligations, now existing or hereafter arising, due or to become due, absolute or contingent, of the Borrower to the Lender under any Swap Transaction, Swap Transaction Documents, or Financial Contract (hereinafter "**Swap Indebtedness**"). Conversely, the Borrower acknowledges and agrees that an Event of Default under the Swap Indebtedness shall also constitute an Event of Default under this Note, the Mortgage and any of the other Loan Documents. Upon the occurrence of an Event of Default under the Swap Indebtedness, the Lender has the right to exercise all of its rights and remedies under the

Loan Documents, including acceleration of the Note.

**K. Jurisdiction:**

The laws of the Commonwealth of Pennsylvania shall govern the interpretation and enforcement of this Note without giving effect to the principles of conflict of law. In the event that legal action is instituted to collect any amounts due under, or to enforce any provision of, this instrument, Borrower and any endorser, guarantor or other person primarily or secondarily liable for payment hereof consent to, and by execution hereof submit themselves to, the jurisdiction of the courts of the Commonwealth, and, notwithstanding the place of residence of any of them or the place of execution of this instrument, such litigation may be brought in or transferred to a court of competent jurisdiction in and for Allegheny County, Pennsylvania.

**L. Miscellaneous:**

1. TIME IS OF THE ESSENCE OF THIS NOTE.

2. It is agreed that the granting to Borrower or any other party of an extension or extensions of time for the payment of any sum or sums due under this Note or under the Mortgage or for the performance of any covenant or stipulation thereof or the taking of other or additional security shall not in any way release or affect the liability of Borrower under this Note or any of the Loan Documents.

3. This Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

4. All parties to this Note, whether Borrower, principal, surety, guarantor or endorser, hereby waive presentment for payment, demand, notice, protest, notice of protest and notice of dishonor.

5. Anything herein to the contrary notwithstanding, the obligations of Borrower under this Note shall be subject to the limitation that payments of interest shall not be required to the extent that receipt of any such payment by Lender would be contrary to provisions of law applicable to Lender limiting the maximum rate of interest which may be charged or collected by Lender.

6. Borrower acknowledges that Lender shall have no obligation whatsoever to renew, modify or extend this Note or to refinance the indebtedness under this Note upon the maturity thereof, except as specifically provided herein.

7. Lender shall have the right to accept and apply to the outstanding balance of this Note any and all payments or partial payments received from Borrower after the due date therefor, whether this Note has been accelerated or not, without waiver of any of Lender's rights to continue to enforce the terms of this Note and to seek any and all remedies provided for herein or in any instrument securing the same, including, but not limited to, the right to foreclose on such security.

8. The term "Borrower" as used herein, in every instance shall include the makers of this Note, and its heirs, executors, administrators, successors, legal representatives and assigns, and shall denote the singular and/or plural, the masculine and/or feminine, and

natural and/or artificial persons whenever and wherever the context so requires or admits.

9. If more than one party executes this Note, all such parties shall be jointly and severally liable for the payment of this Note.

**M. Waiver of Jury Trial:**

BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO EXTEND TO BORROWER THE LOAN EVIDENCED BY THIS NOTE.

Borrower has duly executed this Note effective as of the date set forth hereinabove as a document under seal.

**BORROWER:**
**R&R EXPRESS PROPERTIES, LLC**, a
Pennsylvania limited liability company

By:______________________________(SEAL)
Name: Richard S. Francis
Title: President

Exhibit A

Rider to Mortgage Note

**(A) Illegality; Inability to Determine Rates.**

Illegality. If Lender determines that any law, rule or regulation has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to SOFR or Daily Simple SOFR, or to determine or charge interest rates based upon SOFR or Daily Simple SOFR, then, upon notice thereof by Lender to Borrower, the accrual of interest on the Loans based upon Daily Simple SOFR shall be suspended until Lender shall notify Borrower that the circumstances causing such suspension no longer exist, and beginning on the date of such suspension, interest shall accrue thereon at a rate per annum equal to the Alternate Base Rate plus the Margin.

Inability to Determine Rates. Subject to Section B below, if Lender shall determine that (a) Daily Simple SOFR cannot be determined pursuant to the definition thereof (including because SOFR is not available or published on a current basis) or (b) for any reason Daily Simple SOFR does not adequately and fairly reflect the cost to Lender of making or maintaining the Loans, then Lender shall promptly give notice thereof to Borrower. In any such event, the accrual of interest based upon Daily Simple SOFR shall be suspended until Lender shall notify Borrower that the circumstances causing such suspension no longer exist, and beginning on the date of such suspension, interest shall accrue hereunder at a rate per annum equal to the Alternate Base Rate plus the Margin.

**(B) Effect of Benchmark Transition Event.**

Notwithstanding anything to the contrary herein or in any other Loan Document:

(a) Benchmark Transition Event. Following the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document on such date as may be determined by Lender, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document.

(b) Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Lender may make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c) Notices; Standards for Decisions and Determinations. Lender will promptly notify Borrower of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Any determination, decision or election that may be made by Lender pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party hereto.

"Alternate Base Rate" means, for any day, a fluctuating interest rate per annum equal to the highest of: (a) the Prime Rate, (b) the Fed Funds Rate in effect on such day plus 0.25%, (c) Daily Simple SOFR plus 0.25% per annum, and (d) the Floor. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Rate, respectively. Each change in the Alternate Base Rate shall automatically and immediately change the interest rate the Loan with respect to the Alternate Base Rate, without notice to Borrower, subject to any maximum or minimum interest rate limitation specified by applicable law, it being agreed that (i) such rate is not necessarily the lowest rate of interest then available from Agent on fluctuating rate loans and (ii) such rate may be established by Lender by public announcement or otherwise. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

"Benchmark" means, initially, Daily Simple SOFR; provided, that if a replacement of the Benchmark has occurred, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate and (b) the adjustment (which may be a positive or negative value or zero), in each case, that has been selected by Lender as the replacement for the then-current Benchmark giving due consideration to (x) any selection or recommendation by the Relevant Governmental Body or (y) any evolving or then-prevailing market convention for determining an alternate benchmark rate or adjustment (or method for calculating or determining such adjustment) for the replacement of the then-current Benchmark for dollar-denominated credit facilities; provided that, if such Benchmark Replacement would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Note and the other Loan Documents.

"Benchmark Transition Event" means (a) the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (i) such administrator has ceased or will cease on a specified date to provide such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark or (ii) such Benchmark is not, or as of a specified future date will not be, representative or (b) Lender determines that any law, rule or regulation has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for Lender to make, maintain or fund Loans whose interest is determined by reference to the then-current Benchmark or to determine or charge interest rates based upon the then-current Benchmark.

"Conforming Changes" means, with respect to either the use or administration of Daily Simple SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "U.S. Government Securities Business Day", timing and frequency of determining rates and making payments of interest, timing of borrowing requests or other notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of any such rate and to permit the administration thereof by Lender in such manner as Lender shall reasonably select.

"Floor" means a per annum rate of interest equal to 0.00%.

"Governmental Body" means any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the NYFRB, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the NYFRB, or any successor thereto.

# Exhibit "C"

Recorded Electronically
ID 6431916 OR 6271 Pg 57
COUNTY Collier
DATE 7-24-2023 TIME 12:47 PM

This instrument was prepared by
and after recording return to:

Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Attention: Sean Girdwood, Esquire

SPACE ABOVE THIS LINE FOR RECORDER'S USE

**DOCUMENTARY STAMP TAXES IN THE AMOUNT OF $21,000.00 AND INTANGIBLE TAXES IN THE AMOUNT OF $12,000.00 ARE BEING PAID UPON RECORDATION OF THIS INSTRUMENT.**

# MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

**(This Mortgage Secures Future Advances)**

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING ("Mortgage") is effective as of June 21, 2023, by **R&R EXPRESS PROPERTIES, LLC**, a Pennsylvania limited liability company, with an address at 100 Commerce Drive, Pittsburgh, Pennsylvania 15275 (the "Mortgagor"), in favor of **THE HUNTINGTON NATIONAL BANK**, a national banking association ("Mortgagee"), with an address at 200 Public Square CM64, Cleveland, Ohio 44114.

THIS MORTGAGE SECURES FUTURE ADVANCES

W I T N E S S E T H:

WHEREAS, Mortgagor is the owner in fee simple of certain tracts or parcels of land and situate in Collier County, Florida, as more fully described in Exhibit A attached hereto and made a part hereof, together with the improvements now or hereafter erected thereon as hereinafter described (the "Land"); and

WHEREAS, the Mortgagor is receiving a $6,000,000 mortgage loan from Mortgagee (the "Loan"). The Loan is evidenced by that certain Mortgage Note in the principal amount of $6,000,000 in favor of the Mortgagee (as amended and restated from time to time, the "Note");

WHEREAS, the Mortgagor, Mortgagee, other borrowers and lenders now or hereafter a party thereto, are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022, as amended by that certain First Amendment, Waiver and Joinder to Second Amended and Restated Credit and Security Agreement, dated as of

December 30, 2022, as further amended by that certain Second Amendment to Second Amended and Restated Credit and Security Agreement dated as of February 7, 2023, and as further amended by that Third Amendment and Joinder to Second Amended and Restated Credit and Security Agreement dated as of even date herewith (as the same may hereafter be amended, restated, modified or supplemented from time to time, as amended, the "R&R Credit Agreement") whereby Mortgagee has agreed to make certain loans to the Mortgagor; and

WHEREAS, in connection with the Loan and the Note, to evidence and secure the Loan and to further induce the Mortgagee to grant financial accommodations to the Mortgagor and Mortgagee, the Mortgagor shall execute and deliver this Mortgage to Mortgagee pursuant to the terms and conditions contained herein.

NOW, THEREFORE, for the purpose of securing the payment and performance of the following obligations (collectively called the "Secured Obligations"):

(a) the Note delivered by the Mortgagor in favor of Mortgagee, evidencing the Loan, together with all amendments, extensions, renewals, replacements, refinancings or refunds thereof; and

(b) any sums advanced by Mortgagee or which may otherwise become due pursuant to the provisions of this Mortgage including, without limitation, unpaid balances of advances made with respect to the Mortgaged Property for the payment of taxes, assessments, insurance premiums or costs incurred for the protection of the Mortgaged Property; and

(c) all other sums advanced by or recoverable by Mortgagee, and all other Obligations of Mortgagor or the Mortgagee under the Note, and all other instruments and documents now or hereafter given to evidence, secure or otherwise support the Loan (all of which instruments and documents being hereinafter sometimes collectively referred to as the "Loan Documents").

Mortgagor, intending to be legally bound hereby, does hereby give, grant, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, mortgage, hypothecate, deposit, pledge, set over and confirm unto Mortgagee and does agree that Mortgagee shall have a security interest in the following described property, all accessions and additions thereto, all substitutions therefor and replacements and proceeds thereof, and all reversions and remainders of such property (collectively, the "Mortgaged Property") now owned or held or hereafter acquired by Mortgagor, to wit:

(i) Mortgagor's fee simple estate in the Land described in Exhibit A, together with all of the easements, rights of way, privileges, liberties, hereditaments, gores, streets, alleys, passages, ways, waters, watercourses, rights and appurtenances thereunto belonging or appertaining and all of the estate, right, title, interest, claim and demand whatsoever of Mortgagor therein and in the public streets and ways adjacent thereto, either in law or in equity, in possession or expectancy (collectively, the "Realty");

(ii) the structures and buildings, and all additions and improvements thereto, now or hereafter erected upon the Realty (including all Equipment, as hereinafter defined, constituting fixtures) (collectively, the "Improvements");

(iii) all machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever, and regardless of whether the same may now or hereafter be attached or affixed to the Realty or Improvements, including, without limitation, all electrical, antipollution, heating, lighting, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating and communication machinery, apparatus, equipment, fittings, appliances and fixtures, and all engines, pipes, pumps, tanks, motors, conduits, ducts, compressors, elevators and escalators, and all articles of personal property and goods of every kind and nature whatsoever, including all shades, awnings and carpets now or hereafter affixed to, attached to, placed upon, or used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Realty or Improvements (collectively, the "Equipment");

(iv) all leases and other agreements now or hereafter in existence relating to the use, occupancy or possession of the Realty, Improvements or Equipment, or any part thereof, and all right, title and interest of Mortgagor thereunder, including cash and securities deposited thereunder to secure performance by the tenants of their obligations thereunder, and including further, the right to receive and collect the rents thereunder and all guaranties thereof (collectively, the "Leases");

(v) all revenues, income, rents, issues and profits of the Realty, Improvements, Equipment and Leases (collectively, the "Rents") including all proceeds of the conversion, voluntary or involuntary, of the Realty, Improvements and Equipment, or any part thereof, into cash or liquidated claims, including proceeds of insurance and condemnation awards;

(vi) all Mortgagor's rights and interests in all agreements now or hereafter in existence providing for or relating to the construction, maintenance, operation or management of the Mortgaged Property or any part thereof, including the plans and specifications therefor, and all copies thereof, (together with the right to amend or terminate the same or waive the provisions of the foregoing), and any amendments, renewals and replacements thereof; to the extent permitted by the relevant authorities, all licenses, permits and approvals for the ownership, construction, maintenance, operation, use and occupancy of the Mortgaged Property, or any part thereof and any amendments, renewals and replacements thereof; all Mortgagor's rights and interests in all warranties and guaranties from contractors, subcontractors, suppliers and manufacturers to the maximum extent permissible relating to the Mortgaged Property or any part thereof; all insurance policies covering or affecting the Mortgaged Property or any part thereof (collectively, the "Other Property"); and

(vii) subject to the terms hereof, all proceeds of insurance and condemnation awards arising out of the Mortgaged Property.

TO HAVE AND TO HOLD the Mortgaged Property unto Mortgagee, its successors and assigns, to its own use forever in accordance with the provisions hereof.

This Mortgage shall be deemed to constitute a fixture financing statement. This Mortgage shall secure any additional obligations as well as any and all present or future advances and readvances under the Secured Obligations made by the Mortgagee to or for the benefit of the Mortgagor or the Mortgaged Property within twenty (20) years from the date hereof (whether such advances are obligatory or are made at the option of the Mortgagee or otherwise), up to a maximum principal amount of indebtedness outstanding at any time equal to double the face amount of the Note, plus accrued and unpaid interest, late charges, fees and other amounts due under the Secured Obligations or this Mortgage including, without limitation, advances for the payment of taxes and municipal assessments, maintenance charges, insurance premiums, advances for the construction, alteration or renovation on the Mortgaged Property, appraisal charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Mortgagee for the enforcement and protection of the Mortgaged Property or the lien of this Mortgage, all legal fees, costs and other expenses incurred by Mortgagee by reason of any default or otherwise in connection with the Secured Obligations, and for any other purpose, together with all other sums due hereunder or secured hereby.

Mortgagor agrees that if, at any time during the term of this Mortgage or following a foreclosure hereof (whether before or after the entry of a judgment of foreclosure), Mortgagor fails to perform or observe any covenant or obligation under this Mortgage including, without limitation, payment of any of the foregoing, Mortgagee may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide payment thereof. All amounts advanced by Mortgagee shall be added to the amount secured by this Mortgage and the other Loan Documents (and, if advanced after the entry of a judgment of foreclosure, by such judgment of foreclosure), and shall be due and payable on demand, together with interest at the Default Rate set forth in the Note, such interest to be calculated from the date of such advance to the date of repayment thereof.

## 1. REPRESENTATIONS AND WARRANTIES

Mortgagor represents and warrants to Mortgagee as follows:

1.1 Warranty of Title. Mortgagor has good and marketable title to a fee simple estate in the Land and has all right, title and interest in all other property constituting a part of the Mortgaged Property, in each case free and clear of all liens and encumbrances, except for the Permitted Encumbrances, and those matters of title described on Exhibit B attached hereto and incorporated herein. This Mortgage is a valid and enforceable first lien on the Land, and on any right, title and interest of the Mortgagor in and to any other Mortgaged Property (except as aforesaid), and Mortgagee shall, subject to Mortgagor's right of possession prior to an Event of Default, quietly enjoy and possess the Mortgaged Property. Mortgagor shall preserve such title

as it warrants herein and the validity and priority of the lien hereof and shall forever warrant and defend the same to Mortgagee against the claims of all persons and parties whomsoever.

1.2 Business Purpose. The Mortgagor hereby certifies and affirms that the Loan secured by this Mortgage are for business or commercial purposes.

## 2. AFFIRMATIVE COVENANTS

2.1 Payment and Performance of Secured Obligations. Mortgagor shall pay and perform all Secured Obligations when due as provided in the other Loan Documents.

2.2 Legal Requirements. Mortgagor shall promptly comply with and conform to all present and future laws, statutes, codes, ordinances, orders and regulations and all covenants, restrictions and conditions which may be applicable to Mortgagor or to any of the Mortgaged Property (collectively, the "Legal Requirements"), provided that it shall not be deemed to be a violation of this covenant if any failure to comply with Legal Requirements would not result in fines, penalties, other similar liabilities or injunctive relief which in the aggregate when combined with the failure of the Mortgagor would result in a Material Adverse Effect or materially adversely affect the Mortgagee's liens on the Mortgaged Property or the validity of this Mortgage.

2.3 Impositions.

(a) Mortgagor shall pay when due and payable all real estate taxes related to the Mortgaged Property an all other taxes of every kind and nature, all charges for any easement or agreement maintained for the benefit of any of the Mortgaged Property, all general and special assessments (including, without limitation, any condominium or planned unit development assessments, if any), levies, permits, inspection and license fees, all water and sewer rents and charges, and all other charges and liens, whether of a like or different nature, imposed upon or assessed against Mortgagor or any of the Mortgaged Property, except to the extent that such liabilities, including taxes, assessments or charges, are being contested in good faith and by appropriate and lawful proceedings diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by GAAP shall have been made, but only to the extent that failure to discharge any such liabilities would not result in any additional liability which would adversely affect to a material extent the financial condition of the Mortgagor which would affect the Mortgaged Property. The obligations referred to in this Section are hereinafter collectively referred to as the "Impositions". Within thirty (30) days after the payment of any Imposition, Mortgagor shall deliver to Mortgagee evidence reasonably acceptable to Mortgagee of such payment.

(b) If Mortgagor shall fail to timely pay any Imposition, Mortgagee may pay or perform any Imposition and add the amount so paid or the cost incurred to the Secured Obligations, and all such additional amounts shall on demand be due and payable.

2.4 Maintenance and Impairment of Security. Mortgagor shall maintain in good repair, working order and condition (ordinary wear and tear excepted) in accordance with the general practice of other businesses of similar character and size, the Mortgaged Property, and from time to time, Mortgagor will make or cause to be made all appropriate repairs, renewals or replacements thereof. Mortgagor shall not commit or suffer waste with respect to the Mortgaged Property, nor permit the Mortgaged Property to become deserted or abandoned. Mortgagor shall permit Mortgagee and its agents at any time, and from time to time, to enter upon and visit the Mortgaged Property for the purpose of inspecting and appraising the same. Mortgagor covenants and agrees not to take or permit any action with respect to the Mortgaged Property which will in any manner impair the security of this Mortgage.

2.5 Use of Mortgaged Property. Mortgagor shall use, and permit others to use, the Mortgaged Property only for uses permitted under applicable Legal Requirements.

2.6 Books and Records. Mortgagor shall maintain and Mortgagee shall have access to complete and adequate books of account and other records relating to the operation and use of the Mortgaged Property.

2.7 After-Acquired Property. All property of every kind acquired by the Mortgagor after the date hereof, which by the terms hereof would be included in the Mortgaged Property if acquired by the Mortgagor before the date hereof or which is reasonably necessary in the operation of the Mortgaged Property, is intended to be subject to the lien of this Mortgage and shall, immediately upon the acquisition thereof by the Mortgagor, and without further mortgage, conveyance or assignment, become subject to the lien of this Mortgage as fully as though now owned by the Mortgagor and specifically described herein. Nevertheless, the Mortgagor shall take such actions and execute and deliver such additional instruments as Mortgagee shall reasonably require to further evidence or confirm the subjection to the lien of this Mortgage of any such property.

## 3. NEGATIVE COVENANTS

Until all of the Secured Obligations shall have been fully paid, satisfied and discharged:

3.1 Sale of Mortgaged Property, Etc. Mortgagor shall not sell, assign, give, mortgage, pledge, hypothecate, encumber, lease or otherwise transfer the Mortgaged Property, or any part thereof or interest therein, voluntarily or involuntarily, without Mortgagee's prior written consent.

3.2 Other Financing; Liens. Except for the matters of title described on Exhibit B hereto, Mortgagor shall not create or cause or permit to exist any lien on, or security interest in, whether voluntary or involuntary, any part of the Mortgaged Property, other than in favor of Mortgagee.

(j) No Litigation. (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against any Loan Party or against the officers, directors or managers of any Loan Party, (A) in connection with the Loan Documents or any of the transactions contemplated thereby and which, in the sole discretion of Agent, is deemed material or (B) which Agent determines could have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Loan Party or the conduct of its business or inconsistent with the due consummation of the transactions contemplated by the Loan Documents shall have been issued by any Governmental Body;

(k) Credit Insurance. Agent shall have reviewed all credit insurance policies, coverages and limits;

(l) Beneficial Ownership. Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by Agent;

(m) Fees. Agent shall have received all fees payable to Agent, Issuer and each Lender and reimbursement of all expenses on or prior to the Closing Date, including, without limitation, those fees set forth in the Fee Letter;

(n) Financial Statements; Projections. Agent shall have received the consolidating and consolidated monthly financial statements set forth in Section 5.6(a) and such financial statements shall not in the reasonable judgment of Agent, reflect any material adverse change in the financial condition of any Loan Party. Agent shall have received a copy of projections which shall be satisfactory in all respects to Agent;

(o) Insurance. Agent shall have received, in form and substance satisfactory to Agent, evidence that each Loan Party has the insurance required by Section 4.11, listing Agent as lender loss payee, additional insured and mortgagee, as applicable;

(p) Payment Instructions. Agent shall have received written instructions from the Borrower Representative directing the application of proceeds of the initial Loans and other Advances made pursuant to this Agreement;

(q) Reserved.

(r) Consents. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by the Loan Documents; and, such Consents and Waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(s) No Adverse Material Effect. (i) Since December 31, 2020, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent shall have been proven to be inaccurate or misleading in any material respect;

(b) If the Mortgaged Property is located in an area which has been identified by any governmental agency, authority or body as a flood hazard area or the like and there are improvements located on the Mortgaged Property, then Mortgagor shall maintain a flood insurance policy covering the Land, and any right, title and interest of the Mortgagor in and to any other Mortgaged Property, in an amount not less than the full replacement value of the Land, and of any right, title and interest of the Mortgagor in and to any other Mortgaged Property, or the maximum limit of coverage available under the federal program, whichever amount is less.

(c) If Mortgagor shall not at any time comply with the terms of this Section, irrespective of the passage of any grace period, Mortgagee may cure such non-compliance and may purchase such insurance as it may elect. Mortgagor shall reimburse Mortgagee on demand for any costs incurred by Mortgagee in connection with any such actions, together with interest at the highest rates set forth in the Loan Documents. Any such actions by Mortgagee shall not constitute a waiver of any non-compliance of the terms of this Mortgage by Mortgagor.

4.2 Condemnation. Mortgagor, immediately upon receipt of notice of the institution of any proceedings for the condemnation or taking by eminent domain of any of the Mortgaged Property, shall notify Mortgagee of the pendency of such proceedings. Mortgagee may participate in any such proceedings and Mortgagor shall deliver to Mortgagee all instruments requested by it to permit such participation. Any award or compensation for property taken or for damage to property not taken, whether as a result of such proceedings or in lieu thereof, is hereby assigned to and shall be received and collected directly by Mortgagee, and any such award or compensation shall be applied by Mortgagee, at its option, to any part of the Secured Obligations and in any order (notwithstanding that any of such Secured Obligations may not then be due and payable) or disbursed to Mortgagor for the repair and restoration of any of the Mortgaged Property. In the event of a partial taking resulting in proceeds of $100,000 or less, so long as no Event of Default of Default has occurred and is continuing, Mortgagor shall have the right to use such proceeds for the repair and restoration of the Mortgaged Property; provided further, any such proceeds not used for that purpose will be payable to Mortgagee to be applied toward the Secured Obligations. Mortgagee shall not be deemed to have elected such option until such option is elected specifically in writing. Until so elected, Mortgagee shall not in any circumstances be deemed to have waived it rights to make such election.

## 5. ASSIGNMENT OF LEASES AND RENTS

5.1 Granting of the Assignment. Mortgagor does hereby absolutely and unconditionally assign to Mortgagee all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only (the "Assignment"). This Assignment shall continue in full force and effect following any bankruptcy proceeding instituted by or against Mortgagor. Nothing herein shall be construed to bind Mortgagee to the performance of any of the covenants, conditions, or provisions contained in any of the Leases or otherwise to impose any obligation upon Mortgagee. Mortgagee is hereby granted the right to enter the Mortgaged Property for the purpose of enforcing

Mortgagee's interest in the Leases and the Rents, this Assignment constituting a present, absolute and unconditional assignment of the Leases and Rents. Nevertheless, subject to the terms hereof, Mortgagee grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to collect the Rents. Mortgagor shall hold the Rents for use in the payment of all current sums due on the Secured Obligations. Upon an Event of Default, the license granted to Mortgagor herein shall be automatically terminated and Mortgagee shall be immediately entitled to receive and apply all Rents, whether or not Mortgagee enters upon and takes possession or control of the Mortgaged Property. Mortgagee is hereby granted the right, at its option, upon the termination of the license granted Mortgagor herein to enter upon the Mortgaged Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the termination of the license herein granted may be applied toward payment of the Secured Obligations in such order and manner as Mortgagee, in its sole and absolute discretion, shall deem proper.

5.2 Indebtedness Secured. This Assignment is made for the purposes of securing:

(a) The payment of the Secured Obligations.

(b) The performance and discharge of each and every obligation, covenant and agreement of Mortgagor contained herein, and the each and every obligation of the Mortgagor contained in the Loan Documents.

5.3 Remedies of Mortgagee.

(a) Upon or at any time after an Event of Default, Mortgagee may, at its option, without waiving such Event of Default, without notice and without regard to the adequacy of the security for the Secured Obligations: (i) in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the Mortgaged Property and have, hold, manage, lease and operate the Mortgaged Property on such terms and for such period of time as Mortgagee may deem proper; (ii) with or without taking possession of the Mortgaged Property in its own name, demand, sue for or otherwise collect and receive all Rents, including those past due and unpaid, and (iii) make from time to time all alterations, renovations, repairs or replacements to the Mortgaged Property as Mortgagee deems proper.

(b) Mortgagee may apply any Rents obtained by it to the payment of the following in such manner and order as Mortgagee in its sole and absolute discretion may determine, any law, custom or use to the contrary notwithstanding: (i) all expenses of securing, managing, operating and maintaining the Mortgaged Property, including, without limitation, the salaries, fees and wages of a managing agent and such other employees or agents as Mortgagee may deem necessary or desirable; all taxes, charges, claims, assessments, water charges, sewer rents and any other liens; premiums for all insurance which Mortgagee may deem necessary or desirable; the cost of all alterations, renovations, repairs or replacements; and all expenses incident to taking and retaining possession of the Mortgaged Property; and (ii) the Secured

Obligations, together with all court costs and reasonable attorney fees, receiver fees and all other costs and expenses incurred by Mortgagee.

5.4 No Liability of Mortgagee.

Mortgagee shall not be liable for any loss sustained by Mortgagor resulting from Mortgagee's failure to let the Mortgaged Property after an Event of Default or from any other act or omission of Mortgagee in managing the Mortgaged Property after an Event of Default unless such loss is caused by the willful misconduct or bad faith of Mortgagee. Mortgagee shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or under or by reason of this Assignment. Unless arising out of the gross negligence or willful misconduct of Mortgagee, or its employees, agents, successors or assigns, Mortgagor hereby agrees to hold Mortgagee harmless from any and all liability, loss or damage (including reasonable attorney fees and the costs of defense) from any and all claims and demands whatsoever asserted against Mortgagee pursuant to the Leases or this Assignment, including, without limitation, any claims or demands related to any alleged obligations or alleged undertakings on Mortgagee's part to perform or discharge any of the terms, covenants or agreements contained in the Leases. This Assignment shall not obligate or make Mortgagee liable for (i) the control, care, management or repair of the Mortgaged Property, (ii) the carrying out of any of the terms and conditions of the Leases, (iii) any waste committed on the Mortgaged Property by the tenants or any other parties, (iv) any dangerous or defective condition of the Mortgaged Property, including without limitation the presence of any Hazardous Material (as defined below), or (v) any negligence in the management, upkeep, repair or control of the Mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

5.5 Other Remedies. Nothing contained in this Assignment and no act done or omitted by Mortgagee pursuant to the power and rights granted to Mortgagee hereunder shall be deemed to prejudice or waive Mortgagee's rights and remedies under the Note, this Mortgage or any Loan Document. Mortgagee's right to collect the Secured Obligations and to enforce any other security held by it may be exercised by Mortgagee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

## 6. DEFAULT

6.1 Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a) an Event of Default shall occur under any of the Loan Documents and shall continue unremedied beyond the expiration of the applicable cure or grace period, if any;

(b) Mortgagor shall fail to perform or observe any of the obligations in Section 2.3, or Articles 3 or 4 of this Mortgage;

(c) a failure by Mortgagor to duly perform and observe any other provision in this Mortgage, and such failure shall continue for a period of ten (10) Business Days;

(d) a default in the observance of any covenant, term or condition, or otherwise any "Event of Default, contained in the R&R Credit Agreement;

(e) Mortgagor or any other obligor or guarantor of any of the Secured Obligations, shall at any time record a notice pursuant to Section 697.04(b), *Florida Statutes* (or any successor or similar law, rule or regulation) electing to limit the indebtedness secured by this Mortgage; or

(f) Dissolution of the Mortgagor.

## 7. REMEDIES

7.1 Rights and Remedies of Mortgagee. If an Event of Default occurs, Mortgagee may, at its option and notwithstanding any contrary provisions in any Loan Document, without demand, notice or delay, do one or more of the following:

(a) Mortgagee may pursue any rights or remedies set forth in any Loan Document.

(b) Mortgagee may (i) institute and maintain any one or more actions of mortgage foreclosure against all or any part of the Mortgaged Property and the interests of the Mortgagor therein, including the right to elect to foreclose such of the Mortgaged Property as then comprise fixtures pursuant either to the law applicable to foreclosure of an interest in real estate or to that applicable to personal property under the Uniform Commercial Code, (ii) institute and maintain an action on any instruments evidencing the Obligations or any portion thereof, and (iii) take such other action at law or in equity for the enforcement of any of the Loan Documents as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the Secured Obligations, and in each such action the Mortgagee shall be entitled to all costs of suit and attorneys' fees. The unpaid balance of any judgment shall bear interest at the lesser of (a) the statutory rate provided for judgments, or (b) the Default Rate. Without limiting the foregoing, Mortgagee may foreclose this Mortgage and exercise its rights as a secured party for all or any portion of the Secured Obligations which are then due and payable, subject to the continuing lien of this Mortgage for the balance not then due and payable. In case of any sale of the Mortgaged Property by judicial proceedings, the Mortgaged Property may be sold in one parcel or in such parcels, manner or order as Mortgagee in its sole discretion may elect. Mortgagor, for itself and anyone claiming by, through or under it, hereby agrees that Mortgagee shall in no manner, in law or in equity, be limited, except as herein provided, in the exercise of its rights in the Mortgaged Property or in any other security hereunder or otherwise appertaining to the Secured Obligations or any other obligation secured by this Mortgage, whether by any statute, rule or precedent which may otherwise require said security to be marshaled in any manner and Mortgagor, for itself and others as aforesaid, hereby expressly waives and releases any right to or benefit thereof. The failure to make any tenant a defendant to a foreclosure proceeding shall not be asserted by Mortgagor as a defense in any proceeding instituted by

Mortgagee to collect the Secured Obligations or any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property.

(c) Mortgagee may, in its sole and absolute discretion, and without releasing Mortgagor from any obligation under any Loan Document, and without waiving any Event of Default: (i) collect any or all of the Rents, including any Rents past due and unpaid, (ii) perform any obligation or exercise any right or remedy of Mortgagor under any Lease, or (iii) enforce any obligation of any tenant of any of the Mortgaged Property. Mortgagee may exercise any right under this subsection (c), whether or not Mortgagee shall have entered into possession of any of the Mortgaged Property, and nothing herein contained shall be construed as constituting Mortgagee a "mortgagee in possession", unless Mortgagee shall have entered into and shall continue to be in actual possession of the Mortgaged Property. Mortgagor hereby authorizes and directs each and every present and future tenant of any of the Land, and of any right, title and interest of the Mortgagor in and to any other Mortgaged Property, to pay all Rents directly to Mortgagee and to perform all other obligations of that tenant for the direct benefit of Mortgagee as if Mortgagee were the landlord under the Lease with that tenant, immediately upon receipt of a demand by Mortgagee, to make such payment or perform such obligations. Mortgagor hereby waives any right, claim or demand it may now or hereafter have against any such tenant by reason of such payment of Rents or performance of obligations to Mortgagee, and any such payment or performance to Mortgagee shall discharge the obligations of the tenant to make such payment or performance to Mortgagor.

7.2 Sale of Parcels or Units. In case any sale under this Mortgage occurs by virtue of judicial proceedings, the Mortgaged Property may be sold in one parcel or unit and as an entity, or in such parcels or units, and in such manner or order, as Mortgagee in its sole discretion may elect.

7.3 Remedies Cumulative. All remedies contained in this Mortgage, the Note and the other Loan Documents are cumulative and Mortgagee also has all other remedies provided by law or in equity. No delay or failure by Mortgagee to exercise any right or remedy under this Mortgage will be construed to be a waiver of that right or remedy or a waiver of any Event of Default. Mortgagee may exercise any one or more of its rights and remedies without regard to the adequacy of its security.

7.4 Obligations Survive Judgment.

(a) All of the Secured Obligations then outstanding shall survive the entry of any judgment for foreclosure of this Mortgage and shall also survive the entry of any judgment on the Note or with respect to any of the Secured Obligations then outstanding. Without limiting the generality of the foregoing, despite the entry of any such judgment, Mortgagor shall continue to be bound by all of Mortgagor's covenants and promises contained in the and Loan Documents.

(b) It is the intention of Mortgagor and Mortgagee that none of the Secured Obligations then outstanding shall merge into or be extinguished by any judgment referred to in the above subsection (a), but that all of such Secured Obligations shall continue in full force and

effect notwithstanding the entry of any such judgment, and that all of such Secured Obligations shall continue to be secured by this Mortgage.

(c) Notwithstanding the entry of any judgment referred to in the above subsection (a), interest shall continue to accrue after the entry of any such judgment on all of the Secured Obligations then outstanding at the highest rate or rates provided for in the until paid despite any statutory provision with respect to interest rates on judgments and all such interest shall continue to be secured by the Mortgage.

## 8. ENVIRONMENTAL MATTERS

8.1 Environmental Warranty. Mortgagor hereby incorporates by reference and represents, covenants and warrants to Mortgagee, with respect to the Land, and any right, title and interest of the Mortgagor in and to any other Mortgaged Property, all matters set forth in the Loan Documents relating to compliance with environmental laws, as if fully set forth herein.

8.2 Environmental Indemnification. Mortgagor covenants and agrees, at its sole cost and expense, to indemnify, protect and hold Mortgagee harmless against and from all claims, damages, losses, liabilities, penalties, fines or judgments, including any attorneys' fees, expert fees or costs incurred, arising in any manner out of any of the matters set forth in Section 8.1 above, or otherwise arising under any environmental laws whether such matters arise before or after the exercise of any remedies by Mortgagee under this Mortgage, or the taking of title by Mortgagee to all or any portion of the Mortgaged Property. Indemnified matters shall include, without limitation, all of the following: (a) the costs of removal of any and all Hazardous Materials from all or any portion of the Mortgaged Property or any surrounding areas, (b) additional costs required to take necessary precautions to protect against the release of Hazardous Materials on, in, under or affecting the Mortgaged Property onto the land and into the air, any body of water, any other public domain or any surrounding areas and (c) costs incurred to comply, in connection with all or any portion of the Mortgaged Property or any surrounding areas, with all environmental laws with respect to Hazardous Materials. The indemnification obligations of this Section shall survive repayment of the Secured Obligations and satisfaction of this Mortgage. For the purposes of this Mortgage, "Hazardous Materials" shall include, without limitation, asbestos, polychlorinated biphynals, petroleum products, any flammable explosives, radioactive materials, hazardous materials, hazardous waste, hazardous or toxic substance or similar term defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, (42 USC § 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 USC § 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 USC § 6901, et seq.), the Toxic Substances Control Act, as amended (15 USC § 2601, et seq.) or in the regulations adopted and publications promulgated pursuant thereto or defined in any other present or future federal, state or local governmental law, ordinance, rule or regulation relating in whole or in part to environmental regulation.

## 9. ADDITIONAL RIGHTS AND OBLIGATIONS

9.1 Mortgagee's Right to Protect Security. Mortgagee is hereby authorized to do any one or more of the following, irrespective of whether an Event of Default has occurred: (a) appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Mortgagee hereunder; (b) take such action as Mortgagee may determine to pay, perform or comply with any Impositions or Legal Requirements, to cure any Events of Default and to protect its security in the Mortgaged Property. Mortgagee, at Mortgagee's option, is authorized and empowered to do all things provided to be done by a mortgagee under the Florida Uniform Commercial Code ("UCC") or other similar laws in effect including, and any present or future amendments or supplements thereto, for the protection of Mortgagee's interest in the Mortgaged Property.

9.2 Mortgagee's Costs and Expenses. In the event of an Event of Default or the exercise by Mortgagee of any of its rights hereunder, or if Mortgagee shall become a party, either as plaintiff or defendant or otherwise, to any suit or legal proceeding affecting any of the Mortgaged Property or the Secured Obligations, or if review and approval of any document, or any other matter related to any of the Secured Obligations, is required by, or requested of, Mortgagee, Mortgagor shall pay to Mortgagee on demand its costs, expenses and reasonable attorneys' fees incurred in connection therewith. If such amounts are not paid, they shall be added to the principal secured hereby, shall be included as part of the Secured Obligations and shall bear interest at the highest rate set forth in the Loan Documents from the date of demand.

9.3 Waivers by Mortgagor. Mortgagor, to the extent permitted by law, hereby waives all benefit of any present or future law, regulation or judicial decision in each case which, (a) exempts any of the Mortgaged Property or any other property, real or personal, or any part of the proceeds arising from any sale thereof from attachment, levy or sale under execution, or (b) provides for any stay of execution, marshaling of assets, exemption from civil process, redemption, extension of time for payment or valuation or appraisement of any of the Mortgaged Property.

9.4 Further Assurances. Mortgagor agrees to execute such further assurances, documents and instruments as may be deemed reasonably necessary by Mortgagee for the purposes of further evidencing, carrying out and/or confirming this Mortgage and for all other purposes intended by this Mortgage. On demand, Mortgagor will execute and deliver, and hereby authorizes Mortgagee to execute and file in the name of Mortgagor, one or more financing statements to evidence more effectively the lien hereof upon the fixtures and Equipment and the proceeds from the sale, lease or other disposition thereof. Without limiting the foregoing, if at any time Florida law shall provide for the perfection of a lien on the rents from the Premises by the filing of a document in the public records, Mortgagor shall execute and deliver such documents as Mortgagee shall request to perfect a lien on the rents pursuant to such law.

9.5 Guaranty Obligations. If this Mortgage secures an obligation of guaranty or suretyship or if this Mortgage is securing the obligation of another person or entity, then Mortgagor further agrees that:

(a) Mortgagee may do any of the following without notice to Mortgagor or to any other party obligated to Mortgagee with respect to any of the Secured Obligations, and without adversely affecting the validity or enforceability of this Mortgage or any of the Secured Obligations: (i) release, surrender, exchange, compromise or settle the Secured Obligations or any part thereof; (ii) change, renew or waive the terms of the Secured Obligations, or any part thereof; (iii) change, renew or waive the terms of any other note, instrument or agreement relating to the Secured Obligations, such rights in Mortgagee to include without limitation the right to change the rate of interest charged with respect to the Secured Obligations or any part thereof (in which event the obligations of Mortgagor shall be deemed also to include all interest at such changed rate); (iv) grant any extension or indulgence with respect to the payment or performance of the Secured Obligations or any part thereof; (v) enter into any agreement of forbearance with respect to the Secured Obligations, or any part thereof; (vi) release, surrender, exchange or compromise any security held by Mortgagee for any of the Secured Obligations; (vii) release any other person who is a guarantor or surety or other obligor of, or who has agreed to purchase, the Secured Obligations or any part thereof; and (viii) release, surrender, exchange or compromise any security or lien held by Mortgagee for the Secured Obligations or any part thereof. Mortgagor agrees that Mortgagee may do any of the above as Mortgagee deems necessary or advisable, in Mortgagee's sole discretion, without giving any notice to Mortgagor, and that Mortgagor will remain liable for full payment and performance of the Secured Obligations.

(b) Mortgagor waives and agrees not to enforce any of the rights of Mortgagee against any guarantor or other obligor of any of the Secured Obligations, or obligor of any obligations which the Secured Obligations secure, unless and until all Secured Obligations shall have been paid in full to Mortgagee including, but not limited to: (i) any right of Mortgagor to be subrogated in whole or in part to any right or claim with respect to any of the Secured Obligations or any portion thereof; and (ii) any right of Mortgagor to require the marshalling of assets which might otherwise arise from partial payment or performance by Mortgagor to Mortgagee on account of the Secured Obligations or any portion thereof.

9.6 Subordination to Leases. At the option of Mortgagee, which may be exercised in Mortgagee's sole discretion, this Mortgage shall become subject and subordinate, in whole or in part (but not with respect to the priority of entitlement to insurance proceeds or any award in condemnation or with respect to any option to purchase), to any and all Leases, upon the execution by Mortgagee and recording thereof, at any time hereafter, in the real estate records in and for the county wherein the Realty is situate, of a unilateral declaration to that effect.

9.7 Subrogation. If the proceeds of any loan or other credit extended by Mortgagee, the repayment of which is hereby secured, is used directly or indirectly to pay off, discharge or satisfy, in whole or in part, any prior lien or encumbrance upon the Mortgaged Property or any

part thereof, then Mortgagee shall be subrogated to any additional security held by the holder of such lien or encumbrance.

9.8 Security Agreement Under the Uniform Commercial Code.

(a) This Mortgage is a "security agreement" as defined in the UCC. Notwithstanding the filing of a financing statement covering any of the Mortgaged Property in the records normally pertaining to personal property, at Mortgagee's option all of the Mortgaged Property, for all purposes and in all proceedings, legal or equitable, shall be regarded (to the extent permitted by law) as part of the Realty, whether or not any such item is physically attached to the Realty or Improvements. The mention in any such financing statement of any of the Mortgaged Property shall not be construed as in any way altering any of the rights of Mortgagee, or adversely affecting the priority of the lien granted hereby, but such mention in the financing statement is hereby declared to be for the protection of Mortgagee in the event any court shall at any time hold that notice of Mortgagee's priority of interest, to be effective against any third party, must be filed in the UCC records. This Mortgage constitutes a fixture filing under the UCC.

(b) Mortgagor shall prepare and deliver to Mortgagee such financing statements, and shall execute and deliver to Mortgagee such other documents, instruments and further assurances, in each case in form and substance satisfactory to Mortgagee, as Mortgagee may, from time to time, reasonably consider necessary to create, perfect and preserve Mortgagee's security interest hereunder. Mortgagor hereby irrevocably authorizes Mortgagee to cause financing statements (and amendments thereto and continuations thereof) and any such documents, instruments and assurances to be recorded and filed, at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest. Mortgagor represents and warrants to Mortgagee that its jurisdiction of organization is the Commonwealth of Pennsylvania. After the date of this Mortgage, Mortgagor shall not change its name, type of organization, organizational identification number (if any), jurisdiction of organization or location (within the meaning of the UCC) without giving at least thirty (30) days' prior written notice to Mortgagee.

(c) This Mortgage shall also constitute a "fixture filing" for the purposes of the UCC against all of the Mortgaged Property which is or is to become fixtures related to the Land. The information provided in this Section 9.8(c) is provided so that this Mortgage shall comply with the requirements of the UCC for a mortgage instrument to be filed as a financing statement. Mortgagor is the "debtor" and its name and mailing address are set forth in the preamble of this Mortgage. Mortgagee is the "secured party" and its name and mailing address from which information concerning the security interest granted herein may be obtained are also set forth in the preamble of this Mortgage. A statement describing the portion of the Mortgaged Property comprising the fixtures hereby secured is set forth in the definition of the Secured Obligations. Mortgagor represents and warrants to Mortgagee that Mortgagor is the record owner of the applicable fee title or owner of the leasehold interest in the Mortgaged Property.

The employer identification number of Mortgagor, and its organizational identification number, are set forth on Schedule 1 hereto.

9.9 Indemnification. The Mortgagor will protect, indemnify and save harmless Mortgagee from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorney's fees and expenses, except as may be limited by law or judicial order or decision entered in any action brought to recover money under this Section) imposed upon, incurred by or asserted against Mortgagee by reason of: (a) ownership of any interest in the Mortgaged Property or any part thereof, (b) any accident, injury to or death of personal or loss of or damage to property occurring on or about the Mortgaged Property or any part thereof or the adjoining sidewalks, curbs, streets or ways, (c) any use, disuse or condition of the Mortgaged Property or any part thereof, or the adjoining sidewalks, curbs, streets or ways, (d) any failure on the part of the Mortgagor to perform or comply with any of the terms hereof, (e) any necessity to defend any of the rights, titles or interests conveyed by this Mortgage, or (f) the performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof. In case any action, suit or proceeding is brought against Mortgagee for any such reason, the Mortgagor, upon the request of Mortgagee, will, at the Mortgagor's expense, cause such action, suit or proceeding to be resisted and defended by legal counsel selected by the Mortgagor and approved by Mortgagee. Any amounts payable to Mortgagee under this Section 9.9 which are not paid within ten (10) days after demand therefor shall bear interest at the highest rate of interest then being charged on any Loan, and such amounts, together with such interest, shall be Secured Obligations secured by this Mortgage. The obligations of the Mortgagor under this Section 9.9 shall survive the satisfaction of the Mortgage.

## 10. MISCELLANEOUS MATTERS

10.1 Severability. If any one or more of the provisions contained in this Mortgage shall for any reason be held to be inapplicable, invalid, illegal, or unenforceable in any respect, such inapplicability, invalidity, illegality or unenforceability shall not affect any other provision of this Mortgage, but this Mortgage shall be construed as if such inapplicable, invalid, illegal or unenforceable provision had never been contained herein.

10.2 Successors and Assigns. All of the grants, covenants, terms, provisions and conditions herein shall run with the land and shall apply to, bind and inure to the benefit of the successors and assigns of Mortgagor and Mortgagee.

10.3 No Oral Modification. This Mortgage may be modified, amended, discharged or waived only by an agreement in writing, signed by all of the parties hereto.

10.4 Defeasance. If Mortgagor pays to Mortgagee in full the Secured Obligations and all commitments under the Loan Documents have expired, then this Mortgage shall become void, whereupon Mortgagee will execute and record a release or satisfaction of this Mortgage.

10.5 Governing Law and Jurisdiction. This Mortgage has been delivered to and accepted by the Mortgagee and will be deemed to be made in the State of Florida. THIS MORTGAGE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF STATE OF FLORIDA EXCLUDING ITS CONFLICT OF LAWS RULES, EXCEPT THAT THE LAWS OF THE STATE WHERE THE MORTGAGED PROPERTY IS LOCATED (IF DIFFERENT FROM THE STATE WHERE SUCH OFFICE OF THE MORTGAGEE IS LOCATED) SHALL GOVERN THE CREATION, PERFECTION AND FORECLOSURE OF THE LIENS CREATED HEREUNDER ON THE MORTGAGED PROPERTY OR ANY INTEREST THEREIN. The Mortgagor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court for the county or judicial district where the Mortgagee's office indicated above is located; provided that nothing contained in this Mortgage will prevent the Mortgagee from bringing any action, enforcing any award or judgment or exercising any rights against the Mortgagor individually, against any security or against any property of the Mortgagor within any other county, state or other foreign or domestic jurisdiction. The Mortgagee and the Mortgagor agree that the venue provided above is the most convenient forum for both the Mortgagee and the Mortgagor. The Mortgagor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Mortgage.

10.6 Intentionally Omitted.

10.7 Time of Essence. Time is of the essence as to all of Mortgagor's obligations hereunder and under any and all other documents relating in any manner to any of the Secured Obligations.

10.8 Section Headings. The section headings in this Mortgage are used only for convenience in finding the subject matters and are not part of this Mortgage or to be used in determining the intent of the parties or otherwise interpreting this Mortgage.

10.9 Performance by Mortgagee. Any act which Mortgagee is permitted to perform under any Loan Document may be performed at any time and from time to time by Mortgagee, or any person or entity designated by Mortgagee.

10.10 Attorney-in-Fact. Each appointment of Mortgagee as attorney-in-fact for Mortgagor in this Mortgage is irrevocable and coupled with an interest.

10.11 Joint and Several Obligations. If there is more than one party identified in this Mortgage as "Mortgagor", then each such party so identified shall be liable, jointly and severally, for all obligations of Mortgagor hereunder; and all references to "Mortgagor" herein shall refer to each such party individually and to all, or any two or more, of such parties collectively.

10.12 Intentionally Omitted.

10.13 Notices. Any notice or other communication required hereunder shall be in writing and shall be delivered in the manner and to the addresses as set forth in the Loan Documents.

10.14 WAIVER OF JURY TRIAL. MORTGAGOR WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS MORTGAGE. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY MORTGAGOR AND MORTGAGOR ACKNOWLEDGES THAT NEITHER MORTGAGEE NOR ANY PERSON ACTING ON BEHALF OF MORTGAGEE HAS OR HAVE MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. MORTGAGOR FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS MORTGAGE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

10.15 **Future Advances.** This Mortgage secures not only existing indebtedness but also future advances, whether obligatory or made at the option of Mortgagee, or otherwise. Advances may be made and indebtedness incurred from time to time hereafter, but each such advance or indebtedness made within twenty (20) years of the date hereof shall be secured hereby as if made on the date hereof. The total amount of indebtedness secured may decrease or increase from time to time but the total unpaid balance so secured at any one time shall not exceed Twelve Million Dollars ($12,000,000), which shall include the principal amount secured by the mortgage plus interest thereon and (i) all advances made by Mortgagee with respect to the Mortgage in addition to and not in limitation of any other provision in this Mortgage, it is understood and agreed that this Mortgage shall constitute security for the unpaid balance of advances made, with respect to the Mortgaged Property for the payment of real estate taxes, water and sewer rent, assessments, maintenance changes, insurance premiums or costs incurred for the protection of any of the Mortgaged Property or the lien of this Mortgage, (ii) all expenses incurred by Mortgagee by reason of an Event of Default hereunder, and (iii) all advances made by Mortgagee relating to the use and operation of the Improvements. This Mortgage shall constitute a lien on the Mortgaged Property from the time this Mortgage is left of record for, among other things, all such advances and expenses, plus interest thereon, regardless of the time when such advances are made or such expenses are incurred. Mortgagee is not obligated to make any future advances and expenses incurred by Mortgagee by reason of default under this Mortgage.

**[SIGNATURE PAGE FOLLOWS]**

**The Mortgagor acknowledges that it has read and understood all the provisions of this Mortgage, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.**

IN WITNESS WHEREOF, Mortgagor has caused this Mortgage to be duly executed and sealed the day and year first above written.

**R&R EXPRESS PROPERTIES, LLC**, a
Pennsylvania limited liability company

By: [signature]
Name: Richard S. Francis
Title: President

- STATE OF Pennsylvania )
- ) ss:

COUNTY OF Allegheny )

- On this, the 8th day of June, 2023, before me, a Notary Public, the undersigned officer, personally appeared, by means of [X] physical presence or [ ] online notarization, Richard S. Francis, the President of R&R EXPRESS PROPERTIES LLC, a Pennsylvania limited liability company, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument, and acknowledged that he executed the same for the purposes therein contained.

- IN WITNESS WHEREOF, I hereunto set my hand and official seal.

- [signature: Crystal Guiddy]
Notary Public

My commission expires: May 25th 2026
Print Name: Crystal Guiddy
County of Residence: Allegheny

Commonwealth of Pennsylvania - Notary Seal
Crystal Guiddy, Notary Public
Allegheny County
My commission expires May 25, 2026
Commission number 1419766
Member, Pennsylvania Association of Notaries

# EXHIBIT A

## Legal Description of the Realty

Lot 5, Block 306, Marco Beach Unit Nine, a subdivision according to the plat thereof as recorded in Plat Book 6, pages 69 through 73, inclusive, Public Records of Collier County, Florida.

# EXHIBIT B

## Title Matters

None.

**SCHEDULE 1**

Debtor: R&R Express Properties, LLC

Address: 100 Commerce Drive
Pittsburgh, Pennsylvania 15275

Employer Identification Number: 83-0755637

Organizational Identification Number: 6705383

# Exhibit "D"

INSTR 6768346 OR 6540 PG 1336 RECORDED 12/29/2025 3:44 PM PAGES 2
CRYSTAL K. KINZEL, CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.70 $0.70 REC $18.50
CONS $10.00

**THIS INSTRUMENT PREPARED BY:**
**RONALD S. WEBSTER**
**800 N. COLLIER BLVD. #203**
**MARCO ISLAND, FL 34145**
**PARCEL ID NO: 578903040003**

# SPECIAL WARRANTY DEED

**This indenture,** Made this 29th day of December, 2025 by **R&R EXPRESS PROPERTIES, LLC a Pennsylvania limited liability company,** as Grantor*, whose address is 100 Commerce Drive, Pittsburgh, PA 15275 and **RICHARD S. FRANCIS and KATHLEEN L. FRANCIS, Husband and Wife** as Grantees* , whose address is: 100 Commerce Drive, Pittsburgh, PA 15275.

**WITNESSETH,** That grantor, for and in consideration of the sum of ten dollars ($10.00) and other valuable considerations, to them in hand paid by grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to grantee, their heirs and assigns forever, the following described land, situated, and being in Collier County, Florida, to wit:

**Lot 5, Block 306, Marco Beach Unit Nine, a subdivision according to the plat thereof as recorded in Plat Book 6, pages 69 through 73, inclusive, Public Records of Collier County, Florida.**

And Grantors do hereby fully warrant the title to the land and will defend the same against the lawful claims of all persons whomsoever.

Subject to restrictions and easements common to the subdivision, if any, and taxes for the year 2025 and subsequent years.

*"Grantor" and "Grantee" are used for singular or plural, as context requires.

NOT A CERTIFIED COPY

**IN WITNESS WHEREOF,** grantor has hereunto set grantor's hand and seal the date first above written.

Signed, sealed and delivered in our presence:

R&R EXPRESS PROPERTIES, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY

BY: Richard S Francis
RICHARD S. FRANCIS,
President of R&R EXPRESS, INC., a PA Corporation the sole Member of R&R EXPRESS PROPERTIES LLC

Francie Shadrick
Witness #1 as to all sign name
Print name: francie Shadrick

800 N. Collier Blvd. #203
Witness #1 address
marco Isl, Fl 34145

Maryann Cavanagh
Witness #2 as to all sign name
Print name: Maryann Cavanagh
800 N. Collier Blvd #203
Witness #2 address
Marco Island, FL 34145

STATE OF Florida
COUNTY OF Collier

The foregoing instrument was acknowledged before me by means of {X} physical presence or { } online notarization this 29 day of December, 2025 by RICHARD S. FRANCIS who is personally known to me or who has produced DL as identification.

My Commission Expires:

Maryann Cavanagh
Notary Public Maryann Cavanagh

MARYANN CAVANAGH

NOT A CERTIFIED COPY

# Exhibit "E"

INSTR 6772982 OR 6544 PG 1533 RECORDED 1/12/2026 2:32 PM PAGES 15
CRYSTAL K. KINZEL, CLERK OF THE CIRCUIT COURT AND COMPTROLLER, COLLIER COUNTY FLORIDA
DOC@.35 $18,677.05 INT@.002 $10,672.60 REC $129.00
OBLD $5,336,300.00 OBLI $5,336,300.00

When recorded, return to:
Centennial Bank
Attn: Final Document Department
25 Nabco Drive
Conway, AR 72032

This document was prepared by:
Centennial Bank
25 Nabco Drive
Conway, AR 72032

RSW 25-622

LOAN #: 212125112363

[Space Above This Line for Recording Data]

# MORTGAGE

MIN 1005652-0000362404-7
MERS PHONE #: 1-888-679-6377

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **December 29, 2025,** together with all Riders to this document.

**(B) "Borrower"** is **RICHARD S FRANCIS AND KATHLEEN L FRANCIS, HUSBAND AND WIFE.**

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **Centennial Bank.**

Lender is **a Corporation,** organized and existing under the laws of **Arkansas.**
Lender's address is **P.O. Box 966, Conway, AR 72033.**

**(E) "Note"** means the promissory note signed by Borrower and dated **December 29, 2025.** The Note states that Borrower owes Lender **FIVE MILLION THREE HUNDRED THIRTY SIX THOUSAND THREE HUNDRED AND NO/100*************************************************** Dollars (U.S. **$5,336,300.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **January 1, 2056.**

LOAN #: 212125112363

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] V.A. Rider
- [ ] 1-4 Family Rider
- [ ] Biweekly Payment Rider
- [ ] Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **County** of **Collier**
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 57803040003**

which currently has the address of **550 S Barfield Dr, Marco Island,**
[Street] [City]
Florida **34145-5921** ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

LOAN #: 212125112363

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property" Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S currency However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay

LOAN #: 212125112363

to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds

LOAN #: 212125112363

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjustors, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property If it has reasonable cause, Lender may inspect the interior of the improvements on the Property Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance

LOAN #: 212125112363

coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either

to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision

CSF

Initials: KAF

LOAN #: 212125112363

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Initials: ______

**LOAN #: 212125112363**

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

[signature] 12/29/2025 (Seal)

**RICHARD S FRANCIS** — **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

[signature] 12/29/2025 (Seal)

**KATHLEEN L FRANCIS** — **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

CERTIFIED COPY

RLF

Initials: KLF

OR 6544 PG 1542

LOAN #: 212125112363

**Signed, sealed and delivered in the presence of:**

______________________________

Printed Name

Witness Post Office (Mailing) Address 1

Witness Post Office (Mailing) Address 2

______________________________

Printed Name

Witness Post Office (Mailing) Address 1

Witness Post Office (Mailing) Address 2

NOT A CERTIFIED COPY

State of Florida
County of COLLIER

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, this 29 day of Dec, 2025 by RICHARD S FRANCIS and KATHLEEN L FRANCIS, [ ] who is/are personally known to me or [ ] who has/have produced FL DL as identification.

Maryann Cavanagh
Signature

Maryann Cavanagh
Printed Name

MARYANN CAVANAGH
MY COMMISSION # HH 372209
EXPIRES: April 4, 2027

Notary Public
Title or Rank

______________________________
Serial Number, if any

LOAN #: 212125112363

Lender: Centennial Bank
NMLS ID: 466091
Loan Originator: Tatiana Zurita
NMLS ID: 1560619

NOT A CERTIFIED COPY

# EXHIBIT "A"

**Lot 5, Block 306, Marco Beach Unit Nine, a subdivision according to the plat thereof as recorded in Plat Book 6, pages 69 through 73, inclusive, Public Records of Collier County, Florida.**

PSF

Initials: ICLF

**LOAN #: 212125112363**
**MIN: 1005652-0000362404-7**

# FIXED/ADJUSTABLE RATE RIDER
## (One-Year Treasury Index – Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **29th** day of **December, 2025** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Centennial Bank, a Corporation**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **550 S Barfield Dr, Marco Island, FL 34145-5921.**

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of **6.875 %.** The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033,** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will

KSF

**LOAN #: 212125112363**

then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

RSF

LOAN #: 212125112363

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.
>
> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.

RSF

**LOAN #: 212125112363**

If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

12/29/2025 (Seal)
RICHARD S FRANCIS — DATE

12/29/2025 (Seal)
KATHLEEN L FRANCIS — DATE

CERTIFIED COPY

RSF

# Exhibit "F"

# Closing Disclosure

*This form is a statement of final loan terms and closing costs. Compare this document with your Loan Estimate.*

**Closing Information**

| | |
|---|---|
| **Date Issued** | 12/29/2025 |
| **Closing Date** | 12/29/2025 |
| **Disbursement Date** | 1/5/2026 |
| **Settlement Agent** | Law Office of Ronald S |
| **File #** | 25-622 |
| **Property** | 550 S Barfield Dr<br>Marco Island, FL |
| Appraised Prop. Value | $8,950,000 |

**Transaction Information**

| | |
|---|---|
| **Borrower** | Richard S Francis and Kathleen L Francis<br>550 S Barfield Dr<br>Marco Island, FL 34145 |
| **Lender** | Centennial Bank |

**Loan Information**

| | |
|---|---|
| **Loan Term** | 30 years |
| **Purpose** | Refinance |
| **Product** | 7/1 Adjustable Rate |
| **Loan Type** | ☒ Conventional ☐ FHA ☐ VA ☐ ________ |
| **Loan ID #** | |
| **MIC #** | |

## Loan Terms

| Loan Terms | | Can this amount increase after closing? |
|---|---|---|
| **Loan Amount** | $5,336,300 | NO |
| **Interest Rate** | 6.875 % | YES • Adjusts every year starting in year 8<br>• Can go as high as 12.875% in year 10<br>• See AIR Table on page 4 for details |
| Monthly Principal & Interest<br>*See Projected Payments below for your Estimated Total Monthly Payment* | $35,055.69 | YES • Adjusts every year starting in year 8<br>• Can go as high as $54,460 in year 10 |
| | | **Does the loan have these features?** |
| **Prepayment Penalty** | | NO |
| **Balloon Payment** | | NO |

## Projected Payments

| Payment Calculation | Years 1-7 | Year 8 | Year 9 | Years 10-30 |
|---|---|---|---|---|
| Principal & Interest | $35,055.69 | $29,286 min<br>$41,307 max | $25,754 min<br>$47,796 max | $25,754 min<br>$54,460 max |
| Mortgage Insurance | + 0 | + 0 | + 0 | + 0 |
| Estimated Escrow<br>*Amount can increase over time* | + 8,780.06 | + 8,780.06 | + 8,780.06 | + 8,780.06 |
| Estimated Total Monthly Payment | $43,835.75 | $38,066–$50,087 | $34,534–$56,576 | $34,534–$63,240 |

| | | | |
|---|---|---|---|
| Estimated Taxes, Insurance & Assessments<br>*Amount can increase over time*<br>*See page 4 for details* | $8,780.06<br>Monthly | This estimate includes<br>☒ Property Taxes<br>☒ Homeowner's Insurance<br>☐ Other:<br>*See Escrow Account on page 4 for details. You must pay for other property costs separately.* | In escrow?<br>YES<br>YES |

## Costs at Closing

| | | |
|---|---|---|
| **Closing Costs** | $81,533.93 | Includes $18,384.12 in Loan Costs + $63,938.03 in Other Costs - $788.22 in Lender Credits. *See page 2 for details.* |
| **Cash to Close** | $11,273.13 | Includes Closing Costs. *See Calculating Cash to Close on page 3 for details.*<br>☒ From ☐ To Borrower |

## Closing Cost Details

| Loan Costs | | Borrower-Paid At Closing | Borrower-Paid Before Closing | Paid by Others |
|---|---|---|---|---|
| **A. Origination Charges** | | $1,420.00 | | |
| 01 % of Loan Amount (Points) | | | | |
| 02 Processing Fees | | $525.00 | | |
| 03 Technology Fee | | $395.00 | | |
| 04 Underwriting Fees | | $500.00 | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 | | | | |
| **B. Services Borrower Did Not Shop For** | | $16,964.12 | | |
| 01 Appraisal Fee | to Wayne & Dudley Appraisers | | $775.00 | |
| 02 Credit Report | to Certified Credit Reporting | $175.00 | | |
| 03 Flood Certification | to CoreLogic | $6.00 | | |
| 04 Second Apprlasal | to Appraisal Source LLC | | $850.00 | |
| 05 Title - Abstract or Title Search Fee | to Old Republic National Title | $195.00 | | |
| 06 Title - Courier/Overnight Fee | to FEDEX | $50.00 | | |
| 07 Title - Lender's Title Insurance | to Old Republic National Title Insurance | $11,702.60 | | |
| 08 Title - Settlement Fee | to Law Office of Ronald S Webster | $495.00 | | |
| 09 Title - Title Endorsement Fee | to Old Republic National Title | $2,365.52 | | |
| 10 Title - Title Service Fee | to Law Office of Ronald S Webster | $100.00 | | |
| 11 Title - Title Update | to Law Office of Ronald S Webster | $250.00 | | |
| **C. Services Borrower Did Shop For** | | | | |
| 01 | | | | |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 | | | | |
| **D. TOTAL LOAN COSTS (Borrower-Paid)** | | $18,384.12 | | |
| Loan Costs Subtotals (A + B + C) | | $16,759.12 | $1,625.00 | |

| Other Costs | | | Borrower-Paid At Closing | Borrower-Paid Before Closing | Paid by Others |
|---|---|---|---|---|---|
| **E. Taxes and Other Government Fees** | | | $29,506.35 | | |
| 01 Recording Fees | Deed: $19.20 | Mortgage: $137.50 | $156.70 | | |
| 02 State Tax/Stamps | to Clerk of Court | | $18,677.05 | | |
| 03 Transfer Taxes | to Clerk of Court | | $10,672.60 | | |
| **F. Prepaids** | | | $8,091.50 | | |
| 01 Homeowner's Insurance Premium ( mo.) | | | | | |
| 02 Mortgage Insurance Premium ( mo.) | | | | | |
| 03 Prepaid Interest ( $1,005.125 per day from 1/5/26 to 1/1/26 ) | | | -$4,020.50 | | |
| 04 Property Taxes ( mo.) | | | | | |
| 05 Flood Insurance (12 mo.) to Huntington Insurance Inc | | | | $12,112.00 | |
| **G. Initial Escrow Payment at Closing** | | | $26,340.18 | | |
| 01 Homeowner's Insurance | $1,872.69 | per month for 3 mo. | $5,618.07 | | |
| 02 Mortgage Insurance | | per month for mo. | | | |
| 03 Property Taxes | $5,898.04 | per month for 4 mo. | $23,592.16 | | |
| 04 Flood Insurance | $1,009.33 | per month for 13 mo. | $13,121.29 | | |
| 05 | | | | | |
| 06 | | | | | |
| 07 | | | | | |
| 08 Aggregate Adjustment | | | -$15,991.34 | | |
| **H. Other** | | | | | |
| 01 | | | | | |
| 02 | | | | | |
| 03 | | | | | |
| 04 | | | | | |
| 05 | | | | | |
| 06 | | | | | |
| **I. TOTAL OTHER COSTS (Borrower-Paid)** | | | $63,938.03 | | |
| Other Costs Subtotals (E + F + G + H) | | | $51,826.03 | $12,112.00 | |

| | Borrower-Paid At Closing | Borrower-Paid Before Closing | Paid by Others |
|---|---|---|---|
| **J. TOTAL CLOSING COSTS (Borrower-Paid)** | $81,533.93 | | |
| Closing Costs Subtotals (D + I) | $68,585.15 | $13,737.00 | |
| Lender Credits (Includes $788.22 credit for increase in Closing Costs above legal limit) | -$788.22 | | |

## Payoffs and Payments

Use this table to see a summary of your payoffs and payments to others from your loan amount.

| TO | AMOUNT |
|---|---|
| 01 Huntington Bank | $5,279,776.20 |
| 02 | |
| 03 | |
| 04 | |
| 05 | |
| 06 | |
| 07 | |
| 08 | |
| 09 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| **K. TOTAL PAYOFFS AND PAYMENTS** | $5,279,776.20 |

## Calculating Cash to Close

Use this table to see what has changed from your Loan Estimate.

| | Loan Estimate | Final | Did this change? | |
|---|---|---|---|---|
| Loan Amount | $5,350,000.00 | $5,336,300.00 | YES | · This Amount decreased. |
| Total Closing Costs (J) | -$112,642.00 | -$81,533.93 | YES | · See Total Loan Costs (D) and Total Other Costs (I).<br>· Increase exceeds legal limits by $788.22. See Lender Credits on page 2 for credit of excess amount. |
| Closing Costs Paid Before Closing | $0 | $13,737.00 | YES | · You paid these Closing Costs before closing. |
| Total Payoffs and Payments (K) | -$5,350,000.00 | -$5,279,776.20 | YES | · See Payoffs and Payments (K). |
| **Cash to Close** | $112,642.00<br>☒ From ☐ To Borrower | $11,273.13<br>☒ From ☐ To Borrower | Closing Costs Financed (Paid from your Loan Amount) $56,523.80 | |

# Additional Information About This Loan

## Loan Disclosures

**Assumption**
If you sell or transfer this property to another person, your lender
☐ will allow, under certain conditions, this person to assume this loan on the original terms.
☒ will not allow assumption of this loan on the original terms.

**Demand Feature**
Your loan
☐ has a demand feature, which permits your lender to require early repayment of the loan. You should review your note for details.
☒ does not have a demand feature.

**Late Payment**
If your payment is more than *15* days late, your lender will charge a late fee of *5% of the principal and interest overdue.*

**Negative Amortization** (Increase in Loan Amount)
Under your loan terms, you
☐ are scheduled to make monthly payments that do not pay all of the interest due that month. As a result, your loan amount will increase (negatively amortize), and your loan amount will likely become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.
☐ may have monthly payments that do not pay all of the interest due that month. If you do, your loan amount will increase (negatively amortize), and, as a result, your loan amount may become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.
☒ do not have a negative amortization feature.

**Partial Payments**
Your lender
☐ may accept payments that are less than the full amount due (partial payments) and apply them to your loan.
☒ may hold them in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.
☐ does not accept any partial payments.
If this loan is sold, your new lender may have a different policy.

**Security Interest**
You are granting a security interest in
*550 S Barfield Dr, Marco Island, FL 34145-5921*

You may lose this property if you do not make your payments or satisfy other obligations for this loan.

**Escrow Account**
***For now,*** your loan
☒ will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment.

| Escrow | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | $96,580.66 | Estimated total amount over year 1 for your escrowed property costs: *See attached page for additional information* |
| Non-Escrowed Property Costs over Year 1 | | Estimated total amount over year 1 for your non-escrowed property costs:<br><br>You may have other property costs. |
| Initial Escrow Payment | $26,340.18 | A cushion for the escrow account you pay at closing. See Section G on page 2. |
| Monthly Escrow Payment | $8,780.06 | The amount included in your total monthly payment. |

☐ will not have an escrow account because ☐ you declined it ☐ your lender does not offer one. You must directly pay your property costs, such as taxes and homeowner's insurance. Contact your lender to ask if your loan can have an escrow account.

| No Escrow | | |
|---|---|---|
| Estimated Property Costs over Year 1 | | Estimated total amount over year 1. You must pay these costs directly, possibly in one or two large payments a year. |
| Escrow Waiver Fee | | |

***In the future,***
Your property costs may change and, as a result, your escrow payment may change. You may be able to cancel your escrow account, but if you do, you must pay your property costs directly. If you fail to pay your property taxes, your state or local government may (1) impose fines and penalties or (2) place a tax lien on this property. If you fail to pay any of your property costs, your lender may (1) add the amounts to your loan balance, (2) add an escrow account to your loan, or (3) require you to pay for property insurance that the lender buys on your behalf, which likely would cost more and provide fewer benefits than what you could buy on your own.

## Adjustable Interest Rate (AIR) Table

| | |
|---|---|
| Index + Margin | UST1YW + 3.5% |
| Initial Interest Rate | 6.875% |
| Minimum/Maximum Interest Rate | 3.5%/12.875% |
| Change Frequency | |
| First Change | Beginning of 85th month |
| Subsequent Changes | Every 12th month after first change |
| Limits on Interest Rate Changes | |
| First Change | 2% |
| Subsequent Changes | 2% |

## Loan Calculations

| | |
|---|---|
| **Total of Payments.** Total you will have paid after you make all payments of principal, interest, mortgage insurance, and loan costs, as scheduled. | $12,843,195.29 |
| **Finance Charge.** The dollar amount the loan will cost you. | $7,490,832.17 |
| **Amount Financed.** The loan amount available after paying your upfront finance charge. | $5,337,999.50 |
| **Annual Percentage Rate (APR).** Your costs over the loan term expressed as a rate. This is not your interest rate. | 6.99 % |
| **Total Interest Percentage (TIP).** The total amount of interest that you will pay over the loan term as a percentage of your loan amount. | 140.332 % |

**Questions?** If you have questions about the loan terms or costs on this form, use the contact information below. To get more information or make a complaint, contact the Consumer Financial Protection Bureau at **www.consumerfinance.gov/mortgage-closing**

## Other Disclosures

Appraisal

If the property was appraised for your loan, your lender is required to give you a copy at no additional cost at least 3 days before closing. If you have not yet received it, please contact your lender at the information listed below.

Contract Details

See your note and security instrument for information about

- what happens if you fail to make your payments,
- what is a default on the loan,
- situations in which your lender can require early repayment of loan, and
- the rules for making payments before they are due.

Liability after Foreclosure

If your lender forecloses on this property and the foreclosure does not cover the amount of unpaid balance on this loan,

☒ state law may protect you from liability for the unpaid balance. If you refinance or take on any additional debt on this property, you may lose this protection and have to pay any debt remaining even after foreclosure. You may want to consult a lawyer for more information.

☐ state law does not protect you from liability for the unpaid balance.

Refinance

Refinancing this loan will depend on your future financial situation, the property value, and market conditions. You may not be able to refinance this loan.

Tax Deductions

If you borrow more than this property is worth, the interest on the loan amount above this property's fair market value is not deductible from your federal income taxes. You should consult a tax advisor for more information.

## Contact Information

| | Lender | Mortgage Broker | Settlement Agent |
|---|---|---|---|
| Name | Centennial Bank | | Law Office of Ronald S Webster |
| Address | 3021 Airport Pulling Rd N<br>Naples, FL 34105 | | 800 N Collier Blvd Ste 203<br>Marco Island, FL 34145 |
| NMLS ID | 466091 | | |
| FL License ID | | | [redacted]2972 |
| Contact | Tatiana Zurita | | Francie Shadrick |
| Contact NMLS ID | 1560619 | | |
| Contact FL License ID | | | P032972 |
| Email | [redacted]@my100bank.com | | [redacted]@ronwebster.com |
| Phone | [redacted]0440 | | [redacted]8999 |

## Confirm Receipt

By signing, you are only confirming that you have received this form. You do not have to accept this loan because you have signed or received this form.

Richard S Francis 12/29/25 Kathleen L Francis 12/29/25

Richard S Francis — Date — Kathleen L Francis — Date

# Addendum to Closing Disclosure

*This form is a continued statement of final loan terms and closing costs.*

Settlement Agent Law Office of Ronald S Webster

Property 550 S Barfield Dr
Marco Island, FL 34145-5921

## Additional Information About This Loan

### Loan Disclosures

Escrow Account

| Escrow | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | $96,580.66 | Estimated total amount over year 1 for your escrowed property costs: *Property Taxes, Homeowner's Insurance, Flood Insurance* . |