**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA**

THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent,

Plaintiffs,

v.

Case No.: 11-2026-CA-000170-00001-01

R&R EXPRESS PROPERTIES, LLC, RICHARD S. FRANCIS, KATHLEEN L. FRANCIS, and CENTENNIAL BANK,

Defendants.
_______________________________________/

**CENTENNIAL BANK'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM AND CROSSCLAIM**

Plaintiff/Counter-Plaintiff, Centennial Bank ("Centennial"), by and through its undersigned counsel, hereby files this answer and affirmative defenses to the Verified Complaint (the "Complaint") filed by plaintiffs The Huntington National Bank, as lender, and The Huntington National Bank, as Administrative Agent and Collateral Agent (together, "Huntington"), as well as its counterclaim against Huntington and crossclaim against R&R Express Properties, LLC ("R&R"), and Richard S. Francis and Kathleen L. Francis (together, the "Principals"), all three (3) of whom are collectively referred to herein as the "Cross-Defendants," and alleges:

**A. ANSWER**

For its answer, pursuant to Florida Rule of Civil Procedure 1.110(c), Centennial responds as follows to the correspondingly numbered paragraphs of the Complaint:

1. Centennial admits the allegations contained in paragraph 1, 2, and 3 of the Complaint for jurisdictional purposes only.

2. Centennial admits the allegations of paragraph 4, 5, 6, and 7 of the Complaint.

3. Centennial is without knowledge as to the allegations of paragraph 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 24, 25, 26, 27, 28, and 30 of the Complaint and demands specific proof thereof.

4. As to paragraph 22 of the Complaint, Centennial admits the authenticity of the copies of the documents referenced as Exhibits "E" and "F"; however, Centennial denies the characterization of the business activity described in the balance of the paragraph.

5. Centennial denies the allegations of paragraph 23, 29, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, and 43 of the Complaint.

6. As to paragraphs 31 and 38 of the Complaint, Centennial restates its responses to paragraphs 1 through 30, and paragraphs 33 through 37 of the Complaint.

## B. AFFIRMATIVE DEFENSES

Pursuant to Florida Rule of Civil Procedure 1.110(d), Centennial alleges the following affirmative defenses to the causes of action set forth in the Complaint:

### First Affirmative Defense: Failure to State a Cause of Action

For its first affirmative defense as to all of the allegations set forth in the Complaint, Centennial alleges that the Complaint fails to state a cause of action upon which relief can be granted, and relief is separately appropriate under Florida Rule of Civil Procedure 1.140(b)(6). Under the Uniform Fraudulent Transfer Act (the "UFTA"), as codified at Florida Statute §726.101 et seq., Huntington has made allegations in the Complaint as to conduct of one or more of the Cross-Defendants, that either violate loan documents or give rise to alleged claims against them under the UFTA. Succinctly put, Huntington contends that a parcel of improved residential property, consisting of a mansion located at 550 S. Barfield Dr., Marco Island, Florida 34145-5921 (the "Mansion"), was transferred by R&R to the Principals, who then mortgaged the Mansion in favor of Centennial in connection with a new extension of credit. Huntington claims that it is

prejudiced by this transaction because it has a set of loans outstandings to the Cross-Defendants (collectively, the "Huntington Obligations"), but in no way contests the fact that Centennial has its own loan outstanding to the Principals (the "Centennial Obligation"), that is primarily the result of lending the Principals money to pay down the Huntington Obligations. The Complaint contains a litany of bad acts attributable to the Cross-Defendants, that if true would likely trigger defaults under the loan documents evidencing the Huntington Obligations. However, there are no specific claims of any kind against Centennial, other than the fact that Centennial extended an arms-length credit relationship to the Cross-Defendants, secured by Mansion, with much of the credit extended going to reduce the outstanding balance of the Cross-Defendants' debt to Huntington. Among the glaring omissions in the Complaint are the following:

a. There is no allegation of objective or subjective fraudulent intent as required by the UFTA.

b. There is no effort by Huntington to remove the logical inference that Centennial's arms-length loan to the Cross-Defendants constitutes reasonably equivalent value under the UFTA.

c. The Complaint seems not to realize that Centennial is a good faith transferee under the UFTA and therefore not subject to any valid claim.

d. Huntington completely misses the obvious fact that Centennial's liens and security interests facilitated a payment to Huntington that consequently refutes any suggestion that Huntington was damaged as a result.

e. To the extent that Huntington continues to refuse to accept the wire transfer it received at closing to reduce the Huntington Obligations, and increase the Centennial Obligation in like amount, Huntington is the cause of any problem that it wishes to complain about, and certainly not Centennial.

**Second Affirmative Defense: No Fraudulent Intent**

As pled against Centennial, there are no objective elements of fraudulent intent alleged in the Complaint, which is understandable because Centennial had no fraudulent intent with respect to any of the transactions or occurrences in question. The UFTA contains a list of "badges of fraud," and Huntington lacks the temerity to insinuate much less plead that Centennial has somehow acted with intent to defraud. Assuming arguendo that the Huntington Obligations constitute a troubled credit relationship, Huntington should be thankful to Centennial for reducing their risk factor: But no good deed goes unpunished.

**Third Affirmative Defense: Reasonably Equivalent Value**

For its third affirmative defense, the Complaint alleges that Centennial obtained certain in rem and in personam rights against the Principals and in the Mansion at the time that it extended credit to or for the benefit of the Borrowers, with the Centennial Obligation increasing and the Huntington Obligations decreasing in like amount. Accordingly, Centennial gave reasonably equivalent value in exchange for the positions taken in the Mansion. The UFTA is therefore clear that there can be no cause of action against either the Cross-Defendants or Centennial based upon this fact pattern.

**Fourth Affirmative Defense: Good Faith Transferee**

For its fourth affirmative defense, Centennial notes that the Complaint alleges that the Mansion was transferred from R&R to the Principals, who then mortgaged the Mansion to Centennial to secure the Centennial Obligation. As a basic tenet of the UFTA, a good faith transferee is not liable for avoidance of a transfer, even assuming arguendo that it is fraudulent, if it is a good faith transferee of the initial transferee, which is what the Complaint alleges.

**Fifth Affirmative Defense: No Damages**

For its fifth affirmative defense, Huntington has no damage as a result of the attachment of a mortgage lien to the Mansion, because the transfer by R&R to the Principals was subject to whatever liens and security interests Huntington possessed, and Centennial underwrote, approved, documented, closed, and funded a loan that has produced a payment ready for Huntington to simply cash. While Centennial may have misgivings about the apparent integrity of the Principals in light of the allegations set forth in the Complaint, it cannot be gainsaid that Huntington is singularly the author of any prejudice it claims to experience at this time.

**Sixth Affirmative Defense: Unclean Hands**

For its sixth affirmative defense, Centennial contends that the doctrine of unclean hands precludes Huntington from any recovery on the Complaint, because one who requests equity must do equity. Huntington sues Centennial without any notice, any request, or any basis to bring a claim. Huntington appears at present to be holding the funds from a wire transfer generated at closing on the loan creating the Centennial Obligation. This position is unreasonable, and Huntington cannot invoke the equity jurisdiction of this Court to complain about a situation it can easily solve by accepting the wire: It would appear that this action has been commenced by Huntington to gain some sort of leverage over the Cross-Defendants, by interfering with the lending relationship between Centennial and the Principals. There is no good business reason apparent for asserting claims against Centennial, and Huntington's eagerness to cast aspersions against a market competitor like Centennial are not adequately explained by the allegations and claims set forth in the Complaint.

**COUNTERCLAIM AND CROSSCLAIM**

Pursuant to Florida Rule of Civil Procedure 1.170(a) and (g), Centennial sues Huntington and the Cross-Defendants, invoking all of the previously defined terms set forth above, and alleges:

## A. PRELIMINARY ALLEGATIONS

1. Centennial is a national banking association, doing business in Collier County, Florida, with its principal place of business in Arkansas.

2. Huntington, in both of its capacities referenced above, has subjected itself to the jurisdiction of this Court and has standing to sue and be sued as it has alleged in the Complaint.

3. R&R is a limited liability company with its principal place of business located in Pittsburg, Pennsylvania, and has at all times relevant hereto been doing business in Collier County, Florida.

4. The Principals are both individuals domiciled in the State of Florida and have at all times relevant hereto been residing or doing business in Collier County, Florida, and reside together as husband and wife.

5. Pursuant to Florida Statutes §26.012(2), and other applicable law, jurisdiction for each count alleged herein lies with this Court, because each count of this is an action for (a) damages in excess of $50,000, exclusive of attorneys' fees, court costs, and related expenses, (b) declaratory relief under Florida Statutes §86.011 et seq., or (c) related equitable relief.

6. Pursuant to Florida Statutes §47.011, and other applicable law, venue is proper in Collier County, Florida.

## B. SUBSTANTIVE ALLEGATIONS

7. Centennial and the Principals are parties to a lending relationship evidenced by a series of loan and security documents (the "Centennial Loan Documents"), evidencing the Centennial Obligation.

8. The Centennial Loan Documents include but are not limited to the following:

   a. "Centennial Note," dated December 24, 2025, a copy of which is attached hereto as Exhibit "A"; and

b. "Centennial Mortgage," dated December 24, 2025, a copy of which is attached hereto as Exhibit "B."

As originally conceptualized, the Centennial Obligation was intended to refinance existing debt encumbering the Mansion, that was subject to an existing mortgage lien held by Huntington to satisfy one of the Huntington Obligations, with Centennial taking over first lien position as Huntington would satisfy its lien on closing.

9. The Centennial Loan Documents evidencing the Centennial Obligation were executed by the Principals. They provide all material terms relating to the lending relationship. The signatures on the Centennial Loan Documents are authentic where indicated, the dates of execution are accurate, and all have been authorized by the Principals.

10. The amount of the Centennial Obligation was determined by the outstanding balance of the specific Huntington Obligation that was secured by the Mansion: This information was obtained from Huntington, who provided the payoff information in anticipation of being paid off.

11. On January 28, 2026, Centennial was served with initial process and a copy of the Complaint. In due course, Centennial's personnel reviewed the Complaint, and the allegations therein. The Complaint, and Huntington's version of events as articulated therein, came as a complete surprise to Centennial. In connection with obtaining credit information from the Principals, and payoff information from Huntington, Centennial was never informed of any of the problems described in the Complaint. Had Centennial been informed of any of these problems, Centennial would not have approved the loan ultimately evidenced by the Centennial Loan Documents.

12. After receiving the Complaint, Centennial conducted further investigation, and confirmed that Centennial effectuated a wire transfer to Huntington in connection with closing

under the Centennial Loan Documents (the "Huntington Wire"). There can be no doubt that Centennial remitted the Huntington Wire in the amount stated by Huntington in anticipation of receipt of the Huntington Wire, this being the objective of approving Centennial's loan to the Principals.

13. After reviewing materials submitted to Centennial by the Principals in order to obtain a credit approval from Centennial, and after fully considering the allegations set forth in the Complaint, Centennial reached the conclusion that it was necessary, appropriate, and feasible to "unwind" the lending relationship with the Principals.

14. On February 13, 2026, Centennial transmitted a demand letter (the "Recission Letter") to counsel for the Cross-Defendants, a copy of which is attached hereto as Exhibit "C," placing a deadline of close of business for Huntington to remit the balance of the Huntington Wire back to Centennial in order to credit the Centennial Obligation and effectively close out the lending relationship. Later on the same day, Centennial amplified the request with an e-mail to all known counsel for Huntington and the Cross-Defendants (the "Last Chance E-Mail"), that requested all counsel to join in dropping Centennial from this action, and enabling Centennial to effectively rescind so that Huntington and the Cross-Defendants could be placed in the status quo ante. A copy of the Last Chance E-Mail, with related attachments, is attached hereto as Exhibit "D."

15. As of the date of filing this responsive pleading, there has been no favorable response to the Recission Letter or the Last Chance E-Mail. Centennial has confirmed with Huntington that it was unwilling to satisfy its preexisting mortgage lien encumbering the Mansion, and yet is not confirming if/when it will return the Huntington Wire. Conversely, Centennial has also confirmed that the Principals wish to continue with a lending relationship with Centennial: These positions are not capable of being reconciled absent judicial intervention.

16. Assuming arguendo that the allegations by Huntington in the Complaint are

accurate, Centennial (and not Huntington) has been defrauded, embroiled in a lending relationship that creates credit problems, lien priority disputes, and legal fees that were never anticipated when the Principals requested a loan from Centennial. Assuming arguendo that the Complaint is nothing more than a power play by an out-of-state financial institution attempting to gain an upper hand on its borrower in connection with a troubled debt restructure, Huntington is liable to Centennial for tortious interference with the lending relationship. However, the present situation is untenable: Huntington holds onto the Huntington Wire, even as it floats the canard that Centennial intentionally embroiled itself in this embroglio. And all of this is the nub of a three-sided controversy (the "Controversy") that this Court must adjudicate.

17. Although the Principals may contest the allegations in the Complaint, it cannot be gainsaid that the onset of litigation commenced by Huntington constitutes an event of default under the Centennial Loan Documents. Moreover, the events transpiring as a matter of record cause Centennial to deem itself insecure, and provide a basis for acceleration. Additional events of default may exist in the context of events and circumstances more generally referenced above, and all present events of default, whether expressly alleged or hereafter revealed in the context of this litigation, provide a basis for the relief requested herein.

18. As of February 9, 2026, the amounts due under the Centennial Loan Documents are in the aggregate amount of no less than $5,313,889.33, analyzed as follows:

| | |
|---|---|
| Principal: | $5,327,740.52 |
| Interest Due: | $ 9,157.05 |
| Escrow Balance | $ 23,008.34 |
| **TOTAL AMOUNT DUE:** | **$5,313,889.33** |

Interest, late fees, attorneys' fees, and costs incurred by Centennial in addressing the default status of the lending relationship are a separate set of components of the Centennial Obligation. The balance of the Centennial Obligation is entitled to be computed at the Centennial's applicable

default interest rate under the Centennial Loan Documents, but in no event higher than the maximum interest allowed by law, pursuant to Florida Statutes §687.071 and other applicable law. Centennial is expressly reserving the right to seek default-rate interest from the referenced default date.

19. No notice is required to the Principals under the facts of this action, and the Centennial Loan Documents are clear and unambiguous that the impairment of collateral is an event of default, among others.

20. Centennial is the owner and holder of the Centennial Loan Documents, that have not been transferred, pledged, or encumbered.

21. All requirements and conditions precedent to the bringing of this cause have been satisfied, performed, and/or waived by Centennial and/or the applicable Cross-Defendants.

22. With respect to each cause of action set forth herein, the subject defaults, as hereafter alleged, have required Centennial to retain the undersigned law firm for purposes of initiating this cause. Centennial has agreed to pay the undersigned law firm a reasonable fee for its services rendered and costs incurred. With respect to the Centennial Obligation, the attorneys' fees and costs incurred by Centennial in connection herewith are additionally components of the same.

23. The allegations set forth in this Counterclaim and Crossclaim contain counts that are pled in the alternative, which is permitted as a matter of law.

## COUNT I: RECISSION

24. This is an action for recission against Huntington and the Cross-Defendants resulting from the pendency of this action in the aftermath of the lending transaction evidenced by the Centennial Loan Documents.

25. Centennial realleges and reincorporates paragraphs 1 through 23 of this

Counterclaim and Crossclaim as though fully set forth herein.

26. The Principals applied to Centennial for a loan, that Centennial underwrote, approved, documented, closed, and funded in reliance upon the truth and accuracy of the events as described by the Principals.

27. Huntington has made allegations in the Complaint that, if true, constitute garden variety fraud as against Centennial, but not Huntington.

28. Based upon the foregoing, the meeting of the minds as between Centennial and the Principals was illusory, because the Principals failed to disclose all of their business, legal, and financial activities to Centennial when obtaining credit. Moreover, the Centennial Loan Documents have consequently been in a state of default from inception, bracketing the fact that Centennial was completely uninformed of the situation until served with the Complaint. Finally, given that Huntington refuses to abandon any interest in the Mansion, the Centennial Loan Documents are not being adhered to as related to collateral management covenants.

29. Given that Huntington is continuing to hold the Huntington Wire, and obviously is attempting to interfere with the lending relationship between Centennial and the Principals, it is realistic to believe that Centennial, Huntington, the Principals, and R&R (collectively, the "Parties") can be placed in the status quo ante.

30. With respect to the relief requested herein, Centennial has responded rapidly so as to avoid undue delay or other prejudice to the Parties, and has demonstrated an abundance of good faith. Centennial has no adequate remedy at law, and recission is necessary to prevent manifest injustice at the expense of Centennial. Finally, Centennial has taken care to join all of the Parties, so that not only those in privity with Centennial but those who may be indirectly affected are also included for a just adjudication, whether or not legally required to be joined as parties.

WHEREFORE, Centennial requests judgment for recission of the Centennial Loan

Documents, as against the Principals, together with court costs, and reasonable attorneys' fees and costs, recoverable pursuant to the Centennial Loan Documents, and for such other and further relief as this Court deems just.

**COUNT II: TORTIOUS INTERFERENCE**

31. This is an action for damages against Huntington for tortious interference with the lending relationship as between Centennial and the Principals.

32. Centennial realleges and reincorporates paragraphs 1 through 23 of this Counterclaim and Crossclaim as though fully set forth herein.

33. Bracketing all of the allegations set forth in the Complaint, and all of the allegations and the prayer for relief set forth in Count I, the Principals applied to Centennial for a loan, that Centennial underwrote, approved, documented, closed, and funded in reliance upon the truth and accuracy of the events as described by the Principals.

34. Huntington has made allegations in the Complaint that, if false, constitute garden variety tortious interference with the business memorialized by the Centennial Loan Documents.

35. Based upon the foregoing, it is clear that there was a business relationship between Centennial and the Principals evidenced by the Centennial Loan Documents. Huntington sent a payoff to Centennial, for the purpose of getting a payment that would increase the Centennial Obligation and decrease the Huntington Obligations by like amount, such that Huntington irrefutably knew about the lending relationship.

36. Huntington engaged in intentional and unjustified interference in the lending relationship, and the Centennial Obligation is now steeped in default and constitutes a substandard asset of Centennial from inception.

37. As a result of all of the foregoing, Centennial has been harmed.

WHEREFORE, Centennial requests judgment for damages against Huntington, plus

interest, court costs, and reasonable attorneys' fees and costs, to the extent recoverable by law, and for such other and further relief as this Court deems just.

**COUNT III: PROMISSORY ESTOPPEL**

38. This is an action for damages and/or equitable relief against Huntington resulting from its conduct at the time that Centennial had approved but not closed the loan evidenced by the Centennial Loan Documents.

39. Centennial realleges and reincorporates paragraphs 1 through 23 of this Counterclaim and Crossclaim as though fully set forth herein.

40. One thing that is clear from the Complaint is that Huntington has a large criticized lending relationship with the Cross-Defendants, and has a great deal of executive involvement in managing the credit. Conversely, Centennial has little or no prior business involvement with the Principals.

41. The Principals came to Centennial for a home mortgage loan, and accurately explained that the Mansion consisting of a very nice residence was subject to a senior lien held by Huntington. Centennial then vetted the Principals, approved a loan, documented the transaction, and as part of this process obtained a payoff for the Huntington Obligations directly from Huntington. Centennial relied upon representations of Huntington in underwriting the loan to the Principals, and in setting the original principal balance.

42. As Centennial and the Principals advanced to closing, Centennial issued the Huntington Wire, the funds of which are currently in Huntington's possession. However, not only has Huntington refused to accept the Huntington Wire, it has also failed to execute a mortgage satisfaction on the Huntington Obligations formerly secured by the Mansion and now effectively paid off.

43. The Centennial Obligation arises as a result of Centennial issuing the Huntington

Wire, and the Centennial Loan Documents not surprisingly are predicated upon Centennial stepping into the shoes of Huntington in terms of collateral position. But instead, Huntington will neither accept the Huntington Wire, nor satisfy Huntington's mortgage. In the meantime, Centennial has substantially changed its position in reliance upon Huntington acting like a normal bank, taking its payoff, and moving on.

44. Centennial is without adequate remedy at law.

45. Centennial has come to this predicament in good faith, and with no inequitable conduct of its own.

46. It would be unjust for Huntington to exploit the circumstances described above to retain the Huntington Wire and refuse to release its mortgage lien encumbering the Mansion.

WHEREFORE, Centennial requests judgment for promissory estoppel against Huntington, with all relief that is necessary and appropriate to remedy the unjust situation described above.

**COUNT IV: SUIT ON CENTENNIAL LOAN DOCUMENTS**

47. This is an action for damages against the Principals for breach of the Centennial Loan Documents.

48. Centennial realleges and reincorporates paragraphs 1 through 23 of this Counterclaim and Crossclaim as though fully set forth herein.

49. The full amount of the Centennial Obligation is due and owing, and bears interest at the highest rate allowed by law, as set forth in Florida Statutes §687.071 and the Centennial Loan Documents.

WHEREFORE, Centennial requests judgment for damages against the Principals, jointly and severally, together with after-accruing interest, as well as attorneys' fees and costs, and all other relief consistent with the Centennial Loan Documents and applicable law, and all relief that is just.

## COUNT V: FORECLOSURE OF MANSION

50. This is an action to foreclose Centennial's mortgage lien upon the Mansion owned by the Principals, located in Collier County, Florida.

51. Centennial realleges and incorporates paragraphs 1 through 23 of this Counterclaim and Crossclaim as though fully set forth herein.

52. The Principals own the Mansion; however, their right, title, and interest in the Mansion is junior, inferior, and subject to the mortgage lien and related rights of Centennial.

53. For reasons set forth in the Complaint, R&R may claim some right, title, or interest in the Mansion; however, any such right, title, and interest in the Mansion is junior, inferior, and subject to the mortgage lien and related rights of Centennial.

54. For reasons set forth in the Complaint, Huntington may claim some right, title, or interest in the Mansion; however, any such right, title, and interest in the Mansion is junior, inferior, and subject to the mortgage lien and related rights of Centennial. Moreover, based upon principals of equitable subordination, Huntington's lien, whatever it may be, must be subordinated to that of Centennial. Finally, bracketing all of the foregoing, under the equitable doctrine of marshalling, Huntington is obligated to look to other collateral to solve the problems that it has created for itself by refusing to accept the Huntington Wire and release its lien.

WHEREFORE, Centennial requests judgment against Huntington and the Cross-Defendants foreclosing their mortgage lien upon the Mansion pursuant to the Centennial Loan Documents, and if the proceeds are insufficient to fully satisfy the Centennial Obligation, a deficiency judgment.

## COUNT VI: DECLARATORY RELIEF

55. This is an action by Centennial against Huntington and the Cross-Defendants for declaratory relief pursuant to Florida Statutes §86.011 et seq and other applicable law.

56. Centennial realleges and incorporates by reference paragraphs 1 through 23 of this Counterclaim and Crossclaim as though fully stated herein.

57. As reflected above, this Counterclaim and Crossclaim contains the preceding five (5) causes of action, that are each predicated upon a specific alternative set of facts, much of which are beyond the ken of Centennial given that it was simply providing a home mortgage loan for the Principals, and did not realize that it was entering a special assets battle zone between Huntington and the Cross-Defendants. As noted above, the Controversy and its outcome must be determined by (a) whether the Principals were honest, open, and forthright in dealing with Centennial, (b) whether Huntington was honest, open, and forthright in presenting a payoff for the Huntington Obligations to Centennial, (c) whether Centennial was within its rights to approve, document, and close a loan to the Principals secured by the Mansion, in reliance upon Huntington and the Principals, (d) whether Huntington can exploit its apparent leverage over the Cross-Defendants and disrupt financing by Centennial, (e) whether Huntington can hold the Huntington Wire while refusing to release its lien on the Mansion, and (f) whether it is fair for Centennial to hold the Centennial Obligation in abeyance when the entire predicate of the lending relationship is undermined, and at least one of the other two sides of this Controversy has engaged in monumental bad faith.

58. There is a <u>bona</u> <u>fide</u>, actual, present practical need for a declaration of the rights and duties of the Parties with respect to this Controversy.

59. The facts surrounding this Controversy are readily ascertainable and can be readily established.

60. The Parties require timely adjudication of this Controversy as the status of current business, financial, and legal affairs continue to create an unacceptable situation for all involved.

61. Accordingly, Centennial seeks declaratory relief regarding this Controversy.

62. The rights of the Parties, and other interested parties, are dependent upon the adjudication of this Controversy.

63. The Parties are all before this Court, and thus this is the correct forum in which to determine the rights of the Parties.

64. A range of equitable considerations, including a weighing of the relative burdens on the Parties to this proceeding, and the equitable nature and authority of this Court, dictate that declaratory relief regarding this Controversy is appropriate.

65. This Controversy presented in this count is ripe. The Parties are unsure as to their relative rights and remedies as to this Controversy. The Parties require this Court's declaratory relief in order to proceed.

WHEREFORE, Centennial respectfully request that this Court grant declaratory relief in favor of Centennial with respects to all aspects of the Controversy as defined above, and granting all other and further relief deemed just, equitable, and proper.

DATED this 17th day of February, 2026.

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQUIRE**
Florida Bar No. 731013
janthony@anthonyandpartners.com
**ANDREW J. GHEKAS, ESQUIRE**
Florida Bar Number: 0119169
aghekas@anthonyandpartners.com
**CHARLES D. PRESTON, ESQUIRE**
Florida Bar Number: 1059243
cpreston@anthonyandpartners.com
**ANTHONY & PARTNERS, PLLC**
Telephone: (813) 273-5616
Facsimile: (813) 221-4113
Attorneys for Centennial

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of February, 2026, a true and correct copy of the foregoing has been served via electronic means and/or U.S. Mail on the following parties:

John D. Emmanuel, Esquire
john.emmanuel@bipc.com
Alexandra M. Dragovich, Esquire
alexandra.dragovich@bipc.com
Tim Palmer, Esquire
timothy.palmer@bipc.com
Buchanan Ingersoll & Rooney PC
401 East Jackson Street, Suite 2400
Tampa, FL 33602
Counsel for Huntington

R&R Express Properties, LLC
c/o Richard S. Francis
4251 Breckenridge Court
Presto, PA 15142

Richard S. Francis
4251 Breckenridge Court
Presto, PA 15142

Kathleen L. Francis
4251 Breckenridge Court
Presto, PA 15142

Frank P. Terzo, Esquire
frank.terzo@nelsonmullins.com
Mark Raymond, Esquire
mark.raymond@nelsonmullins.com
Nelson Mullins Broad and Cassel
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
**COURTESY COPY**

Michael J. Roeschenthaler, Esq.
mroeschenthaler@raineslaw.com
Mark A. Lindsay, Esquire
mlindsay@raineslaw.com
Raines, Feldman, Littrell LLP
11 Stanwix Street, Suite 750
Pittsburgh, PA 15222
**COURTESY COPY**

/s/ John A. Anthony
**ATTORNEY**

# EXHIBIT

# "A"

Note

**Loan Number: 2125112363**

**Borrower Name: Richard Francis**

**Customer Information:**

**Foreign Tax ID (FTIN):**

**Residency Code:**

**Passport Number:**

**Country of Issuance:**

LOAN #: 212125112363
MIN: 1005652-0000362404-7

# FIXED/ADJUSTABLE RATE NOTE

**(One-Year Treasury Index – Rate Caps)**

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.**

| | | |
|---|---|---|
| **December 29, 2025** | **Conway,** | **Arkansas** |
| **[Date]** | **[City]** | **[State]** |

**550 S Barfield Dr, Marco Island, FL 34145-5921**
**[Property Address]**

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$5,336,300.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Centennial Bank, a Corporation.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.875 %.** The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the **1st** day of each month beginning on **February 1, 2026.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 1, 2056,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 966**
**Conway, AR 72033**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$35,055.69.** This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will then

**LOAN #: 212125112363**

round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not

exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____________________________ **(Seal)**
**RICHARD S FRANCIS**

_____________________________ **(Seal)**
**KATHLEEN L FRANCIS**

**Lender: Centennial Bank**
**NMLS ID: 466091**
**Loan Originator: Tatiana Zurita**
**NMLS ID: 1560619**

**PAY TO THE ORDER OF:**
**WITHOUT RECOURSE**
**Centennial Bank, a Corporation**

**BY:** _____________________________

**TITLE:** _____________________________

**[Sign Original Only]**

**LOAN #: 212125112363**
**MIN: 1005652-0000362404-7**

# FIXED/ADJUSTABLE RATE RIDER
## (One-Year Treasury Index – Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **29th** day of **December, 2025** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Centennial Bank, a Corporation**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **550 S Barfield Dr, Marco Island, FL 34145-5921.**

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of **6.875 %.** The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033,** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will

RSF

**LOAN #: 212125112363**

then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

RSF



**Initials:** VAF

**LOAN #: 212125112363**

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.

RSF

**LOAN #: 212125112363**

If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

12/29/2025 (Seal)
**RICHARD S FRANCIS** **DATE**

12/29/2025 (Seal)
**KATHLEEN L FRANCIS** **DATE**

RSF

# EXHIBIT
# "B"

CERTIFIED TRUE AND CORRECT

**When recorded, return to:**
**Centennial Bank**
**Attn: Final Document Department**
**25 Nabco Drive**
**Conway, AR 72032**

**This document was prepared by:**
**Centennial Bank**
**25 Nabco Drive**
**Conway, AR 72032**

**LOAN #: 212125112363**

[Space Above This Line for Recording Data]

# MORTGAGE

**MIN 1005652-0000362404-7**
**MERS PHONE #: 1-888-679-6377**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **December 29, 2025,** together with all Riders to this document.

**(B) "Borrower"** is **RICHARD S FRANCIS AND KATHLEEN L FRANCIS, HUSBAND AND WIFE.**

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **Centennial Bank.**

Lender is **a Corporation,** organized and existing under the laws of **Arkansas.**
Lender's address is **P.O. Box 966, Conway, AR 72033.**

**(E) "Note"** means the promissory note signed by Borrower and dated **December 29, 2025.** The Note states that Borrower owes Lender **FIVE MILLION THREE HUNDRED THIRTY SIX THOUSAND THREE HUNDRED AND NO/100*** ******************************************************* Dollars (U.S. **$5,336,300.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **January 1, 2056.**

LOAN #: 212125112363

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] V.A. Rider
- [ ] 1-4 Family Rider
- [ ] Biweekly Payment Rider
- [ ] Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

**County** of **Collier**
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 57803040003**

which currently has the address of **550 S Barfield Dr, Marco Island,**
[Street] [City]

Florida **34145-5921** ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay

to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance

LOAN #: 212125112363

coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either

to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

Initials: RSF KLF

LOAN #: 212125112363

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**LOAN #: 212125112363**

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

[signature] 12/29/2025 **(Seal)**

**RICHARD S FRANCIS** **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

[signature] 12/29/2025 **(Seal)**

**KATHLEEN L FRANCIS** **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

LOAN #: 212125112363

**Signed, sealed and delivered in the presence of:**

________________________________

________________________________
Printed Name

________________________________
Witness Post Office (Mailing) Address 1

________________________________
Witness Post Office (Mailing) Address 2

________________________________

________________________________
Printed Name

________________________________
Witness Post Office (Mailing) Address 1

________________________________
Witness Post Office (Mailing) Address 2

State of Florida
County of COLLIER

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, this 29 day of Dec, 2025 by RICHARD S FRANCIS and KATHLEEN L FRANCIS, [ ] who is/are personally known to me or [ ] who has/have produced FL DL as identification.

Maryann Cavanagh
Signature

Maryann Cavanagh
Printed Name

Notary Public
Title or Rank

________________________
Serial Number, if any

NOTARY PUBLIC STATE OF FLORIDA
MARYANN CAVANAGH
MY COMMISSION # HH 372269
EXPIRES: April 4, 2027



Initials: RSF KLF

LOAN #: 212125112363

Lender: Centennial Bank
NMLS ID: 466091
Loan Originator: Tatiana Zurita
NMLS ID: 1560619

# EXHIBIT "A"

**Lot 5, Block 306, Marco Beach Unit Nine, a subdivision according to the plat thereof as recorded in Plat Book 6, pages 69 through 73, inclusive, Public Records of Collier County, Florida.**

PSF

Initials: ICLF

# EXHIBIT
# "C"

ANTHONY & PARTNERS
ATTORNEYS AT LAW
JANTHONY@ANTHONYANDPARTNERS.COM
813-273-5066

100 S. ASHLEY DRIVE
SUITE 1600
ANTHONYANDPARTNERS.COM
TAMPA, FL 33602
DIRECT: 813-273-5616
FAX: 813-221-4113

February 13, 2026

**VIA E-MAIL:** mroeschenthaler@raineslaw.com

Michael J. Roeschenthaler, Esquire
Raines, Feldman, Littrell LLP
11 Stanwix Street
Suite 750
Pittsburgh, PA 15222

**Re: The Huntington National Bank v. R&R Express Properties, LLC et. al.**
**Collier County Circuit Court Case Number: 2026-CA-000170**
**(the "Fraud Action")**

Dear Mr. Roeschenthaler:

Thank you for our discussion this morning. This letter is written on behalf of Centennial Bank ("Centennial"), and is directed to you as counsel for R&R Express Properties, LLC ("R&R"), and Richard S. Francis and Kathleen L. Francis (together, the "Principals"), collectively referred to herein as the "Obligors." This letter relates to the above-referenced Fraud Action initiated against Centennial and the Obligors by The Huntington National Bank, as lender, and The Huntington National Bank, as Administrative Agent and Collateral Agent (together "Huntington"). And as you might expect, the matter is significant and time-sensitive.

I trust you have in hand a copy of Huntington's complaint initiating the Fraud Action (the "Huntington Complaint"). As a courtesy, I provide herewith as Enclosure "A" a copy of a recent news article casting both Centennial and the Obligors in quite an unfavorable light with respect to transactions and occurrences described in the Huntington Complaint. Bracketing all journalistic hyperbole and aggressive pleading, it is clear that (a) the Obligors have a set of obligations to Huntington (the "Huntington Obligations"), (b) the Principals have a specific obligation to Centennial (the "Centennial Obligation"), and (c) Centennial has become embroiled in unwelcome and undeserved difficulties.

The Centennial Obligation is evidenced by the following:

a. "Centennial Note," dated December 24, 2025, a copy of which is attached hereto as Enclosure "B."

b. "Centennial Mortgage," dated December 24, 2025, a copy of which is attached hereto as Enclosure "C."

When the loan giving rise to the Centennial Obligation was applied for, underwritten, approved, documented, closed, and ultimately funded, Centennial was lacking all of the information and documentation that should in all fairness have been provided to Centennial by the Principals. In any event, Centennial funded a payoff to Huntington of an obligation owed by the Obligors to Huntington that was or is secured by the same collateral that now secures the Centennial Obligation, located at 550 South Barfield Drive, Marco Island, Florida 34145-521 (the "Disputed Collateral"). Huntington transmitted the payoff data to Centennial, which relied upon the payoff data, and transmitted the payment intended to satisfy this specific Huntington Obligation.

The Huntington Complaint contends that a transfer of title to the Disputed Collateral from R&R to the Principals constituted a fraudulent transfer as against Huntington with respect to the balance of the Huntington Obligations. Further, the Huntington Complaint contends that Centennial's funding of a loan to the Principals secured by the Disputed Collateral also constitutes a fraudulent transfer as against Huntington with respect to the balance of the Huntington Obligations, even though almost all of the Centennial Obligation stems from the funding of a payoff in like amount to reduce the Obligors' commitments to Huntington.

To be sure, Huntington's carelessness in irresponsibly suing Centennial without any legal basis whatsoever is disappointing to Centennial, and has required a predictable response. However, it cannot be gainsaid that the Obligors have not acted in good faith in seeking a credit relationship with Centennial. And whether or not the Principals are willing to accept responsibility for concealment of material facts that would have altered the credit review process for Centennial, the fact remains that Huntington retains $5,327,740.52 requested and received from Centennial, but has refused to release its pre-existing mortgage lien encumbering the Disputed Collateral for all of the reasons set forth in the Huntington Complaint.

Succinctly put, it is clear that the Obligors and Huntington are at a stage in their lending relationship that is wholly inconsistent with the continuation of any business as between Centennial and the Obligors. Accordingly, Centennial has demanded a return of the ACH transfer in the amount of $5,327,740.52 from Huntington, and provided Huntington's counsel with wire transfer information necessary to fund that payment today. If and when received, Huntington's return will be credited toward the outstanding balance of the Centennial Obligation. Provided that Huntington returns Centennial's funds today, and dismisses Centennial from the Fraud Action today, Centennial will consider its business with Huntington to be amicably concluded.

Assuming that Centennial receives a return of its money from Huntington as requested today, this will leave the Principals with a residual balance owed on the Centennial Obligation. Centennial anticipates that the projected residual balance owed will reflect (a) credits for escrow and other payments taken at closing by Centennial, (b) credits for any payments made by the Principals to date on the Centennial Obligation, (c) debits for closing costs associated with the failed transaction, and (d) attorneys fees and costs associated with responding to the Fraud Action. Although I do not presently have a reconciliation for the debits associated with this unfortunate situation, they are estimated to be in the neighborhood of $75,000, before adjusting for credits. While this process is ongoing, a deposit account opened by the Principals at Centennial will be subject to an administrative hold, so that the

entire banking relationship will remain in abeyance pending complete rescission. When the process concludes, which should be very rapid, Centennial will provide you with a reconciliation report on the Centennial Obligation, and the Principals' deposit account will be released from the administrative hold after Centennial has effectuated a setoff. At that time, when the recission is completed, Centennial will be prepared to satisfy its mortgage lien.

I would be pleased to respond to any questions you or your clients may have regarding the protocol outlined above. If for any reason your clients have any objection to Centennial's intended course of conduct, Centennial will act swiftly to take all measures you might likely expect, and Centennial will look to the Principals civilly to be made whole for all losses occasioned by this course of events.

Centennial regrets that it is unable to do business with the Principals as originally planned; however, I think you will agree that unwinding the lending relationship is in the best interests of Centennial, Huntington, and most obviously your clients. We trust that you and the Obligors will give this matter their prompt attention and cooperation so that the time, expense, and energy associated with the Fraud Action can be allocated to more productive endeavors. In closing, I would ask that you, and the Obligors refrain from contacting Centennial directly regarding the substance of this letter, because no other representatives of Centennial are authorized to comment on the subject matter or bind Centennial to any specific course of action.

Very truly yours,

John A. Anthony

JAA/mn
Enclosures
cc: Centennial Bank

# Enclosure
# "A"

# Marco Island trucking founder sued over alleged fraud





*The six-bedroom waterfront home at 550 S. Barfield Drive on Marco Island is at the center of a fraud lawsuit filed by The Huntington National Bank against trucking executive Richard S. Francis and his wife, Kathleen.*
*Google Maps*

The founder of one of the nation's largest trucking and logistics firms and his wife are being sued by a bank that alleges the Marco Island couple fraudulently transferred the company's $10.4 million waterfront corporate retreat to themselves to shield it from creditors.

The lawsuit, filed Jan. 23 in Collier Circuit Court by The Huntington National Bank, alleges Richard S. Francis and Kathleen S. Francis transferred the six-bedroom, 6½-bathroom, 5,181-square-foot home on 0.53 acres at 550 S. Barfield Drive with the intent to move the equity into their personal ownership and claim a homestead exemption. Four days later, the bank filed a motion to void the Dec. 29 transfer and homestead filing, noting the property was transferred for "zero consideration."

The case, which also names R&R Express Properties LLC and Centennial Bank as defendants, is one of at least three lawsuits filed in recent weeks against Pittsburgh-based R&R Express, R&R Express Family of Companies and related affiliates as the parent company became insolvent after lenders warned it to wind down operations.

"R. Francis rushed to complete the transfer before year-end in an effort to claim a homestead exemption in the property in an attempt to further shield the property from creditors," the lawsuit states. "At the time of the transfer, R&R was insolvent."

Property appraiser records show that the couple, who sold their 1190 Osprey Court home on Marco Island for $2.41 million in May 2024, can port their prior $1.003 million homestead and get a $500,000 homestead exemption at Barfield Drive.

A North Carolina affiliate, Taylor Express, abruptly shut down Jan. 12, laying off all employees and leaving drivers stranded far from home, according to *FreightWaves,* a trucking industry publication.

Richard and Kathleen Francis did not return calls or text messages seeking comment.

Francis founded the company in 1983. It was named Pittsburgh's top workplace in 2022 and has appeared on national transportation rankings. R&R Family of Companies describes itself as an asset-based transportation and logistics provider offering freight brokerage, truckload, less-than-truckload, heavy haul, refrigerated and final-mile services through brands including R&R Express, RFX and REFE.

According to the lawsuit, The Huntington Bank and S&T Bank agreed on March 18, 2022, to provide R&R and affiliated borrowers with financing through a second-amended and restated credit and security agreement. The financing included a revolving credit facility of up to $85 million and a $3.675 million term loan. Huntington also issued a mortgage loan secured by the Marco Island property, which the lawsuit says has been appraised at $10.4 million.

The logistics industry was heavily impacted by supply chain disruptions during the COVID-19 pandemic, the lawsuit states. Freight prices surged and peaked in mid-2022, prompting rapid industry expansion.

"Due to these price spikes, the trucking industry rapidly expanded during the COVID crisis by adding trucks and drivers," the lawsuit states. "However, as supply chains later stabilized, the entire industry found itself with excess capacity," leading to a prolonged "freight recession."

The lawsuit alleges R&R's financial condition deteriorated steadily and worsened significantly in 2025.



*An aerial image highlights the Marco Island waterfront property outlined in yellow that The Huntington National Bank alleges was fraudulently transferred to shield equity from creditors amid the collapse of R&R Express.*
*Collier County Property Appraiser*

"During 2025, R&R and the other affiliated borrowers reported significant monthly operating losses," the lawsuit states, adding that net operating losses for the year totaled $25.9 million.

The bank alleges the losses may have been even higher due to improper accounting practices. In November, R&R engaged G2 Capital Advisors to develop a restructuring plan that called for at least $25 million in additional lender financing. A financial adviser retained by Huntington determined the plan was not viable.

By late 2025, the lawsuit states, R&R lacked sufficient liquidity to meet obligations, had accumulated about $65 million in trade payables and was advised by Huntington to wind down operations. The company allegedly refused and continued operating.

During that period, the lawsuit alleges Francis "executed a fraudulent scheme designed to transfer the equity in the property away from R&R" without the bank's consent, triggering a default under loan agreements.

The lawsuit further alleges the Francises simultaneously took out a $5.3 million mortgage on the property from Centennial Bank without notifying Huntington. It contends Centennial knew the property was already encumbered but failed to contact Huntington regarding the transfer or new mortgage.

As of Jan. 5, the lawsuit states, R&R's operating loan balance totaled $40.9 million. That day, Huntington received a $5.28 million wire transfer from the Marco Island law office of Ronald Stewart Webster, described as payment toward the remaining mortgage balance.

"The plaintiffs have yet to apply the funds to the FL loan, as fraud was immediately suspected," the lawsuit states, noting the operating loans were already in default.

Webster did not respond to a request for comment.

Additional litigation has followed. On Jan. 22, Florida-based Vantage Carrier LLC sued RFX LLC and R&R Express Inc. in U.S. District Court in Pennsylvania, alleging more than $1.34 million in unpaid freight invoices. On Jan. 23, Texas-based Jimenez Logistics LLC filed suit in Hidalgo County, Texas, alleging R&R Express Inc. and RFX Inc. failed to pay $264,650 for transportation services in 2025 and 2026.

# Enclosure
# "B"

Note

**Loan Number: 2125112363**

**Borrower Name: Richard Francis**

**Customer Information:**

**Foreign Tax ID (FTIN):**

**Residency Code:**

**Passport Number:**

**Country of Issuance:**

LOAN #: 212125112363
MIN: 1005652-0000362404-7

# FIXED/ADJUSTABLE RATE NOTE

**(One-Year Treasury Index – Rate Caps)**

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.**

| | | |
|---|---|---|
| **December 29, 2025** | **Conway,** | **Arkansas** |
| **[Date]** | **[City]** | **[State]** |

**550 S Barfield Dr, Marco Island, FL 34145-5921**
**[Property Address]**

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$5,336,300.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Centennial Bank, a Corporation.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.875 %.** The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the **1st** day of each month beginning on **February 1, 2026.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 1, 2056,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 966**
**Conway, AR 72033**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$35,055.69.** This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will then

round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**LOAN #: 212125112363**

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not

exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Richard S Francis ______________________________ **(Seal)**
**RICHARD S FRANCIS**

Kathleen L Francis ______________________________ **(Seal)**
**KATHLEEN L FRANCIS**

**Lender: Centennial Bank**
**NMLS ID: 466091**
**Loan Originator: Tatiana Zurita**
**NMLS ID: 1560619**

**PAY TO THE ORDER OF:**
**WITHOUT RECOURSE**
**Centennial Bank, a Corporation**

**BY:** ______________________________

**TITLE:** ______________________________

**[Sign Original Only]**

**LOAN #: 212125112363**
**MIN: 1005652-0000362404-7**

# FIXED/ADJUSTABLE RATE RIDER
## (One-Year Treasury Index – Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **29th** day of **December, 2025** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Centennial Bank, a Corporation**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **550 S Barfield Dr, Marco Island, FL 34145-5921.**

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of **6.875 %.** The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033,** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will

RSF

**LOAN #: 212125112363**

then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

RSF



**Initials:** VAF

**LOAN #: 212125112363**

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.

RSF

**LOAN #: 212125112363**

If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

12/29/2025 (Seal)
**RICHARD S FRANCIS** **DATE**

12/29/2025 (Seal)
**KATHLEEN L FRANCIS** **DATE**

RSF

# Enclosure
# “C”

CERTIFIED TRUE AND CORRECT

**When recorded, return to:**
**Centennial Bank**
**Attn: Final Document Department**
**25 Nabco Drive**
**Conway, AR 72032**

**This document was prepared by:**
**Centennial Bank**
**25 Nabco Drive**
**Conway, AR 72032**

**LOAN #: 212125112363**

[Space Above This Line for Recording Data]

# MORTGAGE

**MIN 1005652-0000362404-7**

**MERS PHONE #: 1-888-679-6377**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **December 29, 2025,** together with all Riders to this document.

**(B) "Borrower"** is **RICHARD S FRANCIS AND KATHLEEN L FRANCIS, HUSBAND AND WIFE.**

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **Centennial Bank.**

Lender is **a Corporation,** organized and existing under the laws of **Arkansas.**
Lender's address is **P.O. Box 966, Conway, AR 72033.**

**(E) "Note"** means the promissory note signed by Borrower and dated **December 29, 2025.** The Note states that Borrower owes Lender **FIVE MILLION THREE HUNDRED THIRTY SIX THOUSAND THREE HUNDRED AND NO/100*** ************************************************** Dollars (U.S. **$5,336,300.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **January 1, 2056.**

**LOAN #: 212125112363**

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) [specify]
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] V.A. Rider

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
**County** of **Collier**
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 57803040003**

which currently has the address of **550 S Barfield Dr, Marco Island,**
[Street] [City]
Florida **34145-5921** ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay

**LOAN #: 212125112363**

to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance

coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either

to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

Initials: RSF KLF

**LOAN #: 212125112363**

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**LOAN #: 212125112363**

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

[signature] 12/29/2025 **(Seal)**

**RICHARD S FRANCIS** **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

[signature] 12/29/2025 **(Seal)**

**KATHLEEN L FRANCIS** **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

RSF



**Initials:** KLF

LOAN #: 212125112363

**Signed, sealed and delivered in the presence of:**

______________________________

______________________________
**Printed Name**

______________________________
**Witness Post Office (Mailing) Address 1**

______________________________
**Witness Post Office (Mailing) Address 2**

______________________________

______________________________
**Printed Name**

______________________________
**Witness Post Office (Mailing) Address 1**

______________________________
**Witness Post Office (Mailing) Address 2**

**State of Florida**
**County of COLLIER**

**The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, this 29 day of Dec, 2025 by RICHARD S FRANCIS and KATHLEEN L FRANCIS, [ ] who is/are personally known to me or [ ] who has/have produced FL DL as identification.**

Maryann Cavanagh
**Signature**

Maryann Cavanagh
**Printed Name**

Notary Public
**Title or Rank**

______________________________
**Serial Number, if any**

NOTARY PUBLIC STATE OF FLORIDA
MARYANN CAVANAGH
MY COMMISSION # HH 372269
EXPIRES: April 4, 2027



Initials: RSF KLF
FLEDEED 1222
FLEDEED (CLS)
12/24/2025 09:30 AM PST

LOAN #: 212125112363

Lender: Centennial Bank
NMLS ID: 466091
Loan Originator: Tatiana Zurita
NMLS ID: 1560619

# EXHIBIT "A"

**Lot 5, Block 306, Marco Beach Unit Nine, a subdivision according to the plat thereof as recorded in Plat Book 6, pages 69 through 73, inclusive, Public Records of Collier County, Florida.**

RSF

Initials: ICLF

# EXHIBIT
# “D”

**Chase Preston**

**From:** John Anthony
**Sent:** Friday, February 13, 2026 1:09 PM
**To:** frank.terzo@nelsonmullins.com
**Cc:** Andrew Ghekas; Chase Preston; Carissa Fosdick; Mark Raymond; Mark A. Lindsay; Michael J. Roeschenthaler; Timothy Palmer; alexandra.dragovich@bipc.com; John Emmanuel
**Subject:** RE: The Huntington National Bank v. R&R Express Properties, LLC, et al. - Correspondence from John Anthony
**Attachments:** Centennial_Francis - Joint Stipulation for Dismissal.pdf; Centennial_Francis- LTR - Demand Letter to Francis Counsel - signed w encl [02.13.26].pdf

**Importance:** High

Frank,

I have done the best I can under the circumstances to copy all known counsel for Huntington, the Obligors, and Centennial on this e-mail string in hopes that we can move as efficiently as possible in light of instructions received from Centennial. Attached please find a joint stipulation for dismissal of Centennial that I would appreciate it if the other parties can execute and return to me for filing. Alternatively, I would be delighted to affix your signatures if all counsel so authorize, and file this from my office. I have also attached a copy of a letter sent earlier today to Mr. Roeschenthaler, that basically explains exactly where Centennial is today.

**John A. Anthony, Partner**
**Anthony & Partners, PLLC**
100 South Ashley Drive, Suite 1600
Tampa, Florida 33602
Main: 813-273-5616 | Fax: 813-221-4113
Direct: 813-273-5066 | Cell: 813-833-5066
Toll Free: 1-888-247-8909


God Bless Charlie Kirk

www.anthonyandpartners.com | A&P Biography | A&P Facebook | My LinkedIn | Super Lawyers Biography

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect

the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. Ã‚Â§2510-2521. If this communication was received in error, we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

Disclaimer under Circular 230: Any statements regarding tax matters made herein, including any attachments, are not formal tax opinions by this firm, cannot be relied upon or used by any person to avoid tax penalties, and are not intended to be used or referred to in any marketing or promotional materials.

---

**From:** Frank Terzo frank.terzo@nelsonmullins.com
**Sent:** Friday, February 13, 2026 11:09 AM
**To:** John Anthony <janthony@anthonyandpartners.com>; Michael J. Roeschenthaler <mroeschenthaler@raineslaw.com>
**Cc:** Carissa Fosdick <cfosdick@anthonyandpartners.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Mark A. Lindsay <mlindsay@raineslaw.com>
**Subject:** RE: The Huntington National Bank v. R&R Express Properties, LLC, et al. - Correspondence from John Anthony

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

John, let me know if you want to discuss either this afternoon or on Monday. I have a doctor's appt Monday morning but otherwise open. Thanks

NELSON MULLINS

FRANK P. TERZO SENIOR COUNSEL
frank.terzo@nelsonmullins.com
100 S.E. 3RD AVENUE | SUITE 2700
FORT LAUDERDALE, FL 33394
T 954.745.5231 F 954.761.8135
NELSONMULLINS.COM VCARD VIEW BIO

---

**From:** John Anthony <janthony@anthonyandpartners.com>
**Sent:** Friday, February 13, 2026 11:03 AM
**To:** Michael J. Roeschenthaler <mroeschenthaler@raineslaw.com>
**Cc:** Carissa Fosdick <cfosdick@anthonyandpartners.com>; Frank Terzo <frank.terzo@nelsonmullins.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Mark A. Lindsay <mlindsay@raineslaw.com>
**Subject:** Re: The Huntington National Bank v. R&R Express Properties, LLC, et al. - Correspondence from John Anthony

Thanks looking forward to working briefly with you all.

John A. Anthony

Sent from my iPhone 813-833-5066
In the interest of promptness, please excuse brevity, autocorrect, and voice dictate errors.
This email is never intended as the basis for a contract or implied contract for a client.

On Feb 13, 2026, at 11:01 AM, Michael J. Roeschenthaler
<mroeschenthaler@raineslaw.com> wrote:

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello John,

I can confirm receipt on behalf of R&R Express Properties, LLC. I am copying counsel for Mr. and Mrs. Francis on this email and encourage you to confer with them at your convenience.

Thank you,
Mike Roeschenthaler

**MICHAEL J. ROESCHENTHALER - Partner**
**Raines Feldman Littrell LLP**
11 Stanwix Street, Suite 750, Pittsburgh, PA 15222
www.raineslaw.com
mroeschenthaler@raineslaw.com
direct: (412) 899-6472 cell: (412) 726-4909

**Confidentiality Notice:** The information contained in this email and any attachment(s) to it is intended only for the use of the intended recipient and may be confidential and/or privileged. If any recipient of this communication is not the intended recipient; unauthorized use, disclosure or copying of this email and any accompanying attachment(s) or other information contained herein is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return email, and destroy the email, and any and all copies thereof, including any attachment(s), without reading them or saving them in any manner. Thank you.

**From:** John Anthony <janthony@anthonyandpartners.com>
**Sent:** Friday, February 13, 2026 10:52 AM
**To:** Michael J. Roeschenthaler <mroeschenthaler@raineslaw.com>
**Cc:** Carissa Fosdick <cfosdick@anthonyandpartners.com>
**Subject:** The Huntington National Bank v. R&R Express Properties, LLC, et al. - Correspondence from John Anthony
**Importance:** High

Good morning,

Please see attached correspondence from John Anthony, with enclosures.

Thank you,
Carissa Fosdick
On behalf of

**John A. Anthony, Partner**
**Anthony & Partners, PLLC**

100 South Ashley Drive, Suite 1600
Tampa, Florida 33602
Main: 813-273-5616 | Fax: 813-221-4113
Direct: 813-273-5066 | Cell: 813-833-5066
Toll Free: 1-888-247-8909

ANTHONY & PARTNERS 2025

RECOGNIZED BY

Best Lawyers

Chambe

SPOTLIGH

FL

2025

# Anthony and Pa



**God Bless Charlie Kirk**

[www.anthonyandpartners.com](www.anthonyandpartners.com) | A&P Biography | A&P Facebook | My LinkedIn | Super Lawyers Biography

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client

privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. Ã‚Â§2510-2521. If this communication was received in error, we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

Disclaimer under Circular 230: Any statements regarding tax matters made herein, including any attachments, are not formal tax opinions by this firm, cannot be relied upon or used by any person to avoid tax penalties, and are not intended to be used or referred to in any marketing or promotional materials.

This message is from an external sender. Please use caution when opening links & attachments.

**Confidentiality Notice**

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT**
**IN AND FOR COLLIER COUNTY, FLORIDA**

THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent,

Plaintiffs,

v.

Case No.: 11-2026-CA-000170-00001-01

R&R EXPRESS PROPERTIES, LLC, RICHARD S. FRANCIS, KATHLEEN L. FRANCIS, and CENTENNIAL BANK,

Defendants.
_____________________________________/

**JOINT STIPULATION FOR DISMISSAL WITH PREJUDICE OF CENTENNIAL**

Pursuant to Florida Rule of Civil Procedure 1.420(a)(1), comes now, The Huntington National Bank, as lender, and The Huntington National Bank, as Administrative Agent and Collateral Agent, (together, "Huntington"), R&R Express Properties, LLC ("R&R"), Richard S. Francis and Kathleen L. Francis (together, the "Principals"), and Centennial Bank ("Centennial"), by and through their respective undersigned counsel, hereby stipulate to the dismissal with prejudice as to Centennial, with respect to both counts of the Complaint initiating this cause.

DATED this 13th day of February, 2026.

/s/_________________________________
**JOHN D. EMMANUEL, ESQUIRE**
Florida Bar Number: 0475572
john.emmanuel@bipc.com
**ALEXANDRA M. DRAGOVICH, ESQUIRE**
Florida Bar Number: 1025374
alexandra.dragovich@bipc.com
**TIM PALMER, ESQUIRE**
Pennsylvania Bar Number: 86165
timothy.palmer@bipc.com
**BUCHANAN INGERSOLL & ROONEY PC**
401 East Jackson Street, Suite 2400
Tampa, Florida 33602
Attorneys for Huntington

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQUIRE**
Florida Bar Number: 0731013
janthony@anthonyandpartners.com
**ANDREW J. GHEKAS, ESQUIRE**
Florida Bar Number: 0119169
aghekas@anthonyandpartners.com
**ANTHONY & PARTNERS, PLLC**
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Attorneys for Centennial

/s/

**MICHAEL J. ROESCHENTHALER, ESQ.**
Pennsylvania Bar Number: 87647
mroeschenthaler@raineslaw.com
**MARK A. LINDSAY, ESQUIRE**
Pennsylvania Bar Number: 89487
mlindsay@raineslaw.com
**RAINES, FELDMAN, LITTRELL LLP**
11 Stanwix Street, Suite 750
Pittsburgh, PA 15222
Attorneys for R&R

/s/

**FRANK P. TERZO, ESQUIRE**
Florida Bar Number.: 906263
frank.terzo@nelsonmullins.com
**MARK RAYMOND, ESQUIRE**
Florida Bar Number: 373397
mark.raymond@nelsonmullins.com
**NELSON MULLINS BROAD AND CASSEL**
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
Attorneys for the Principals

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided via electronic mail transmission, U.S. Mail, and/or by personal service on February 13, 2026, to the following:

John D. Emmanuel, Esquire
john.emmanuel@bipc.com
Alexandra M. Dragovich, Esquire
alexandra.dragovich@bipc.com
Tim Palmer, Esquire
timothy.palmer@bipc.com
Buchanan Ingersoll & Rooney PC
401 East Jackson Street, Suite 2400
Tampa, Florida 33602
Attorneys for Huntington

Frank P. Terzo, Esquire
frank.terzo@nelsonmullins.com
Mark Raymond, Esquire
mark.raymond@nelsonmullins.com
Nelson Mullins Broad and Cassel
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
Attorneys for the Principals

Michael J. Roeschenthaler, Esquire
mroeschenthaler@raineslaw.com
Mark A. Lindsay, Esquire
mlindsay@raineslaw.com
Raines, Feldman, Littrell LLP
11 Stanwix Street, Suite 750
Pittsburgh, PA 15222
Attorneys for R&R

/s/ John A. Anthony

**JOHN A. ANTHONY, ESQ.**
Florida Bar No. 731013
janthony@anthonyandpartners.com
**ANTHONY & PARTNERS, PLLC**
Telephone: (813) 273-5616
Facsimile: (813) 221-4113

**ANTHONY & PARTNERS**
**ATTORNEYS AT LAW**
JANTHONY@ANTHONYANDPARTNERS.COM
813-273-5066

100 S. ASHLEY DRIVE
SUITE 1600
ANTHONYANDPARTNERS.COM
TAMPA, FL 33602
DIRECT: 813-273-5616
FAX: 813-221-4113

February 13, 2026

**VIA E-MAIL**: mroeschenthaler@raineslaw.com

Michael J. Roeschenthaler, Esquire
Raines, Feldman, Littrell LLP
11 Stanwix Street
Suite 750
Pittsburgh, PA 15222

**Re: The Huntington National Bank v. R&R Express Properties, LLC et. al.**
**Collier County Circuit Court Case Number: 2026-CA-000170**
**(the "Fraud Action")**

Dear Mr. Roeschenthaler:

Thank you for our discussion this morning. This letter is written on behalf of Centennial Bank ("Centennial"), and is directed to you as counsel for R&R Express Properties, LLC ("R&R"), and Richard S. Francis and Kathleen L. Francis (together, the "Principals"), collectively referred to herein as the "Obligors." This letter relates to the above-referenced Fraud Action initiated against Centennial and the Obligors by The Huntington National Bank, as lender, and The Huntington National Bank, as Administrative Agent and Collateral Agent (together "Huntington"). And as you might expect, the matter is significant and time-sensitive.

I trust you have in hand a copy of Huntington's complaint initiating the Fraud Action (the "Huntington Complaint"). As a courtesy, I provide herewith as Enclosure "A" a copy of a recent news article casting both Centennial and the Obligors in quite an unfavorable light with respect to transactions and occurrences described in the Huntington Complaint. Bracketing all journalistic hyperbole and aggressive pleading, it is clear that (a) the Obligors have a set of obligations to Huntington (the "Huntington Obligations"), (b) the Principals have a specific obligation to Centennial (the "Centennial Obligation"), and (c) Centennial has become embroiled in unwelcome and undeserved difficulties.

The Centennial Obligation is evidenced by the following:

a. "Centennial Note," dated December 24, 2025, a copy of which is attached hereto as Enclosure "B."

b. "Centennial Mortgage," dated December 24, 2025, a copy of which is attached hereto as Enclosure "C."

When the loan giving rise to the Centennial Obligation was applied for, underwritten, approved, documented, closed, and ultimately funded, Centennial was lacking all of the information and documentation that should in all fairness have been provided to Centennial by the Principals. In any event, Centennial funded a payoff to Huntington of an obligation owed by the Obligors to Huntington that was or is secured by the same collateral that now secures the Centennial Obligation, located at 550 South Barfield Drive, Marco Island, Florida 34145-521 (the "Disputed Collateral"). Huntington transmitted the payoff data to Centennial, which relied upon the payoff data, and transmitted the payment intended to satisfy this specific Huntington Obligation.

The Huntington Complaint contends that a transfer of title to the Disputed Collateral from R&R to the Principals constituted a fraudulent transfer as against Huntington with respect to the balance of the Huntington Obligations. Further, the Huntington Complaint contends that Centennial's funding of a loan to the Principals secured by the Disputed Collateral also constitutes a fraudulent transfer as against Huntington with respect to the balance of the Huntington Obligations, even though almost all of the Centennial Obligation stems from the funding of a payoff in like amount to reduce the Obligors' commitments to Huntington.

To be sure, Huntington's carelessness in irresponsibly suing Centennial without any legal basis whatsoever is disappointing to Centennial, and has required a predictable response. However, it cannot be gainsaid that the Obligors have not acted in good faith in seeking a credit relationship with Centennial. And whether or not the Principals are willing to accept responsibility for concealment of material facts that would have altered the credit review process for Centennial, the fact remains that Huntington retains $5,327,740.52 requested and received from Centennial, but has refused to release its pre-existing mortgage lien encumbering the Disputed Collateral for all of the reasons set forth in the Huntington Complaint.

Succinctly put, it is clear that the Obligors and Huntington are at a stage in their lending relationship that is wholly inconsistent with the continuation of any business as between Centennial and the Obligors. Accordingly, Centennial has demanded a return of the ACH transfer in the amount of $5,327,740.52 from Huntington, and provided Huntington's counsel with wire transfer information necessary to fund that payment today. If and when received, Huntington's return will be credited toward the outstanding balance of the Centennial Obligation. Provided that Huntington returns Centennial's funds today, and dismisses Centennial from the Fraud Action today, Centennial will consider its business with Huntington to be amicably concluded.

Assuming that Centennial receives a return of its money from Huntington as requested today, this will leave the Principals with a residual balance owed on the Centennial Obligation. Centennial anticipates that the projected residual balance owed will reflect (a) credits for escrow and other payments taken at closing by Centennial, (b) credits for any payments made by the Principals to date on the Centennial Obligation, (c) debits for closing costs associated with the failed transaction, and (d) attorneys fees and costs associated with responding to the Fraud Action. Although I do not presently have a reconciliation for the debits associated with this unfortunate situation, they are estimated to be in the neighborhood of $75,000, before adjusting for credits. While this process is ongoing, a deposit account opened by the Principals at Centennial will be subject to an administrative hold, so that the

entire banking relationship will remain in abeyance pending complete rescission. When the process concludes, which should be very rapid, Centennial will provide you with a reconciliation report on the Centennial Obligation, and the Principals' deposit account will be released from the administrative hold after Centennial has effectuated a setoff. At that time, when the recission is completed, Centennial will be prepared to satisfy its mortgage lien.

I would be pleased to respond to any questions you or your clients may have regarding the protocol outlined above. If for any reason your clients have any objection to Centennial's intended course of conduct, Centennial will act swiftly to take all measures you might likely expect, and Centennial will look to the Principals civilly to be made whole for all losses occasioned by this course of events.

Centennial regrets that it is unable to do business with the Principals as originally planned; however, I think you will agree that unwinding the lending relationship is in the best interests of Centennial, Huntington, and most obviously your clients. We trust that you and the Obligors will give this matter their prompt attention and cooperation so that the time, expense, and energy associated with the Fraud Action can be allocated to more productive endeavors. In closing, I would ask that you, and the Obligors refrain from contacting Centennial directly regarding the substance of this letter, because no other representatives of Centennial are authorized to comment on the subject matter or bind Centennial to any specific course of action.

Very truly yours,

John A. Anthony

JAA/mn
Enclosures
cc: Centennial Bank

# Enclosure
# "A"

# Marco Island trucking founder sued over alleged fraud





*The six-bedroom waterfront home at 550 S. Barfield Drive on Marco Island is at the center of a fraud lawsuit filed by The Huntington National Bank against trucking executive Richard S. Francis and his wife, Kathleen.*
*Google Maps*

The founder of one of the nation's largest trucking and logistics firms and his wife are being sued by a bank that alleges the Marco Island couple fraudulently transferred the company's $10.4 million waterfront corporate retreat to themselves to shield it from creditors.

The lawsuit, filed Jan. 23 in Collier Circuit Court by The Huntington National Bank, alleges Richard S. Francis and Kathleen S. Francis transferred the six-bedroom, 6½-bathroom, 5,181-square-foot home on 0.53 acres at 550 S. Barfield Drive with the intent to move the equity into their personal ownership and claim a homestead exemption. Four days later, the bank filed a motion to void the Dec. 29 transfer and homestead filing, noting the property was transferred for "zero consideration."

The case, which also names R&R Express Properties LLC and Centennial Bank as defendants, is one of at least three lawsuits filed in recent weeks against Pittsburgh-based R&R Express, R&R Express Family of Companies and related affiliates as the parent company became insolvent after lenders warned it to wind down operations.

"R. Francis rushed to complete the transfer before year-end in an effort to claim a homestead exemption in the property in an attempt to further shield the property from creditors," the lawsuit states. "At the time of the transfer, R&R was insolvent."

Property appraiser records show that the couple, who sold their 1190 Osprey Court home on Marco Island for $2.41 million in May 2024, can port their prior $1.003 million homestead and get a $500,000 homestead exemption at Barfield Drive.

A North Carolina affiliate, Taylor Express, abruptly shut down Jan. 12, laying off all employees and leaving drivers stranded far from home, according to *FreightWaves,* a trucking industry publication.

Richard and Kathleen Francis did not return calls or text messages seeking comment.

Francis founded the company in 1983. It was named Pittsburgh's top workplace in 2022 and has appeared on national transportation rankings. R&R Family of Companies describes itself as an asset-based transportation and logistics provider offering freight brokerage, truckload, less-than-truckload, heavy haul, refrigerated and final-mile services through brands including R&R Express, RFX and REFE.

According to the lawsuit, The Huntington Bank and S&T Bank agreed on March 18, 2022, to provide R&R and affiliated borrowers with financing through a second-amended and restated credit and security agreement. The financing included a revolving credit facility of up to $85 million and a $3.675 million term loan. Huntington also issued a mortgage loan secured by the Marco Island property, which the lawsuit says has been appraised at $10.4 million.

The logistics industry was heavily impacted by supply chain disruptions during the COVID-19 pandemic, the lawsuit states. Freight prices surged and peaked in mid-2022, prompting rapid industry expansion.

"Due to these price spikes, the trucking industry rapidly expanded during the COVID crisis by adding trucks and drivers," the lawsuit states. "However, as supply chains later stabilized, the entire industry found itself with excess capacity," leading to a prolonged "freight recession."

The lawsuit alleges R&R's financial condition deteriorated steadily and worsened significantly in 2025.



*An aerial image highlights the Marco Island waterfront property outlined in yellow that The Huntington National Bank alleges was fraudulently transferred to shield equity from creditors amid the collapse of R&R Express.*
*Collier County Property Appraiser*

"During 2025, R&R and the other affiliated borrowers reported significant monthly operating losses," the lawsuit states, adding that net operating losses for the year totaled $25.9 million.

The bank alleges the losses may have been even higher due to improper accounting practices. In November, R&R engaged G2 Capital Advisors to develop a restructuring plan that called for at least $25 million in additional lender financing. A financial adviser retained by Huntington determined the plan was not viable.

By late 2025, the lawsuit states, R&R lacked sufficient liquidity to meet obligations, had accumulated about $65 million in trade payables and was advised by Huntington to wind down operations. The company allegedly refused and continued operating.

During that period, the lawsuit alleges Francis "executed a fraudulent scheme designed to transfer the equity in the property away from R&R" without the bank's consent, triggering a default under loan agreements.

The lawsuit further alleges the Francises simultaneously took out a $5.3 million mortgage on the property from Centennial Bank without notifying Huntington. It contends Centennial knew the property was already encumbered but failed to contact Huntington regarding the transfer or new mortgage.

As of Jan. 5, the lawsuit states, R&R's operating loan balance totaled $40.9 million. That day, Huntington received a $5.28 million wire transfer from the Marco Island law office of Ronald Stewart Webster, described as payment toward the remaining mortgage balance.

"The plaintiffs have yet to apply the funds to the FL loan, as fraud was immediately suspected," the lawsuit states, noting the operating loans were already in default.

Webster did not respond to a request for comment.

Additional litigation has followed. On Jan. 22, Florida-based Vantage Carrier LLC sued RFX LLC and R&R Express Inc. in U.S. District Court in Pennsylvania, alleging more than $1.34 million in unpaid freight invoices. On Jan. 23, Texas-based Jimenez Logistics LLC filed suit in Hidalgo County, Texas, alleging R&R Express Inc. and RFX Inc. failed to pay $264,650 for transportation services in 2025 and 2026.

# Enclosure
# "B"

Note

**Loan Number: 2125112363**

**Borrower Name: Richard Francis**

**Customer Information:**

**Foreign Tax ID (FTIN):**

**Residency Code:**

**Passport Number:**

**Country of Issuance:**

LOAN #: 212125112363
MIN: 1005652-0000362404-7

# FIXED/ADJUSTABLE RATE NOTE
(One-Year Treasury Index – Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.**

| | | |
|---|---|---|
| **December 29, 2025** | **Conway,** | **Arkansas** |
| [Date] | [City] | [State] |

**550 S Barfield Dr, Marco Island, FL 34145-5921**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$5,336,300.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Centennial Bank, a Corporation.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.875 %.** The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the **1st** day of each month beginning on **February 1, 2026.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 1, 2056,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 966**
**Conway, AR 72033**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. **$35,055.69.** This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will then

**LOAN #: 212125112363**

round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not

exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________________________________________ **(Seal)**
**RICHARD S FRANCIS**

_______________________________________________ **(Seal)**
**KATHLEEN L FRANCIS**

**Lender: Centennial Bank**
**NMLS ID: 466091**
**Loan Originator: Tatiana Zurita**
**NMLS ID: 1560619**

**PAY TO THE ORDER OF:**
**WITHOUT RECOURSE**
**Centennial Bank, a Corporation**

**BY:** ______________________________

**TITLE:** ______________________________

**[Sign Original Only]**

**LOAN #: 212125112363**
**MIN: 1005652-0000362404-7**

# FIXED/ADJUSTABLE RATE RIDER
## (One-Year Treasury Index – Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **29th** day of **December, 2025** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Centennial Bank, a Corporation**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **550 S Barfield Dr, Marco Island, FL 34145-5921.**

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of **6.875 %.** The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **January, 2033,** and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND ONE-HALF** percentage points ( **3.500 %** ) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will

RSF

then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.875 %** or less than **4.875 %.** Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000 %** ) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **12.875 %. My interest rate will never be less than the start rate or 3.500 %.**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

RSF

LOAN #: 212125112363

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.

RSF

**LOAN #: 212125112363**

If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

Richard S Francis 12/29/2025 (Seal)
**RICHARD S FRANCIS** DATE

Kathleen L Francis 12/29/2025 (Seal)
**KATHLEEN L FRANCIS** DATE

RSF

# Enclosure
# "C"

CERTIFIED TRUE AND CORRECT

**When recorded, return to:**
**Centennial Bank**
**Attn: Final Document Department**
**25 Nabco Drive**
**Conway, AR 72032**

**This document was prepared by:**
**Centennial Bank**
**25 Nabco Drive**
**Conway, AR 72032**

**LOAN #: 212125112363**

[Space Above This Line for Recording Data]

# MORTGAGE

**MIN 1005652-0000362404-7**

**MERS PHONE #: 1-888-679-6377**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **December 29, 2025,** together with all Riders to this document.

**(B) "Borrower"** is **RICHARD S FRANCIS AND KATHLEEN L FRANCIS, HUSBAND AND WIFE.**

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **Centennial Bank.**

Lender is **a Corporation,** organized and existing under the laws of **Arkansas.**
Lender's address is **P.O. Box 966, Conway, AR 72033.**

**(E) "Note"** means the promissory note signed by Borrower and dated **December 29, 2025.** The Note states that Borrower owes Lender **FIVE MILLION THREE HUNDRED THIRTY SIX THOUSAND THREE HUNDRED AND NO/100*** ****************************************************** Dollars (U.S. **$5,336,300.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **January 1, 2056.**

LOAN #: 212125112363

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] V.A. Rider
- [ ] 1-4 Family Rider
- [ ] Biweekly Payment Rider
- [ ] Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **County** of **Collier**

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 57803040003**

which currently has the address of **550 S Barfield Dr, Marco Island,**

[Street] [City]

Florida **34145-5921** ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security

Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay

**LOAN #: 212125112363**

to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance

coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either



**Initials:** ________

to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

RSF

Initials: KLF

LOAN #: 212125112363

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

LOAN #: 212125112363

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Richard S Francis 12/29/2025 (Seal)

**RICHARD S FRANCIS** — **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

Kathleen Francis 12/29/2025 (Seal)

**KATHLEEN L FRANCIS** — **DATE**
**550 S Barfield Dr**
**Marco Island, FL 34145**

RSF

**Initials:** KLF

LOAN #: 212125112363

**Signed, sealed and delivered in the presence of:**

______________________________

______________________________
**Printed Name**

______________________________
**Witness Post Office (Mailing) Address 1**

______________________________
**Witness Post Office (Mailing) Address 2**

______________________________

______________________________
**Printed Name**

______________________________
**Witness Post Office (Mailing) Address 1**

______________________________
**Witness Post Office (Mailing) Address 2**

**State of Florida**
**County of COLLIER**

**The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization, this 29 day of Dec, 2025 by RICHARD S FRANCIS and KATHLEEN L FRANCIS, [ ] who is/are personally known to me or [ ] who has/have produced FL DL as identification.**

Maryann Cavanagh
**Signature**

Maryann Cavanagh
**Printed Name**

Notary Public
**Title or Rank**

________________________
**Serial Number, if any**

NOTARY PUBLIC STATE OF FLORIDA
MARYANN CAVANAGH
MY COMMISSION # HH 372269
EXPIRES: April 4, 2027



**Initials:** RSF KLF

LOAN #: 212125112363

Lender: Centennial Bank
NMLS ID: 466091
Loan Originator: Tatiana Zurita
NMLS ID: 1560619

# EXHIBIT "A"

**Lot 5, Block 306, Marco Beach Unit Nine, a subdivision according to the plat thereof as recorded in Plat Book 6, pages 69 through 73, inclusive, Public Records of Collier County, Florida.**