Filing # 244608878 E-Filed 03/25/2026 04:44:31 PM

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR COLLIER COUNTY, FLORIDA**

THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent,

Plaintiffs,

v.

R&R EXPRESS PROPERTIES, LLC; RICHARD S. FRANCIS; KATHLEEN L. FRANCIS; and CENTENNIAL BANK;

Defendants,

**CASE NO. 2026-CA-000170**

**CIVIL DIVISION**

**DEFENDANTS RICHARD S. FRANCIS & KATHLEEN L. FRANCIS'S MOTION TO DISMISS COMPLAINT WITH PREJUDICE**

Defendants, RICHARD S. FRANCIS and KATHLEEN L. FRANCIS (collectively, the "Homeowners"), respectfully move this Honorable Court to dismiss all counts of the Complaint filed by Plaintiffs THE HUNTINGTON NATIONAL BANK, as lender, ("Huntington Individually") and THE HUNTINGTON NATIONAL BANK, as administrative and collateral agent ("Huntington as Agent" and collectively, "Huntington" or "Plaintiffs") with prejudice.[1] In support of dismissal, the Homeowners state as follows:

[1] Although there is only one Huntington entity, Huntington brought this suit in two capacities: The Huntington National Bank, as lender, and The Huntington National Bank, as administrative and collateral agent to Huntington Individually and S&T Bank, in relation to a credit agreement. Accordingly, the Homeowners are referencing those capacities respectively as Huntington Individually and Huntington as Agent.

FILED: COLLIER COUNTY, CRYSTAL K. KINZEL, CLERK, 03/25/2026 04:44:31 PM

## INTRODUCTORY STATEMENT

In this action, Huntington attempts to assert two fraudulent transfer claims against the Homeowners under Florida's Uniform Fraudulent Transfers Act (the "UFTA") relating to the Homeowners' purchase of that certain real property located at 550 S. Barfield Drive, Marco Island, Florida 34145 (the "Subject Property") from R&R Express Properties, LLC ("R&R") on December 29, 2025 (the "Purchase"). Huntington asserts that the Homeowners somehow enacted a fraudulent scheme in connection with the Purchase. However, as will be demonstrated, such claims are without merit.

In short, the Complaint asserts that Huntington Individually had a first mortgage lien (the "Huntington Mortgage") on the Subject Property.[2] In connection with the Purchase, Huntington issued a payoff quote (the "Payoff Quote"), which provided that the outstanding amount due on the Huntington Mortgage through December 24, 2025 was $5,268,792.08, with a per diem interest of $784.58.[3] On January 5, 2026, Huntington issued an updated payoff quote (the "Updated Payoff"), which provided that the outstanding amount due under the Huntington Mortgage was $5,227,329.48, with a per diem interest of $791.01.[4] That same day, January 5, 2026, Plaintiffs received a wire in the amount of $5,279,776.20 (the "Payoff Funds") from the Law Office of Ronald Webster as payment for the Huntington Mortgage.[5] Compl., ¶¶ 25, 27. The Payoff Funds are greater than the amount listed in the Updated Payoff Quote. Huntington admits it received, and declined to apply, the Payoff Funds to the Huntington Mortgage balance owed. Compl., ¶ 27

---

[2] The Huntington Mortgage with R&R, which was secured against the Subject Property, was for $6 Million USD. Compl., Ex. C (recorded Huntington Mortgage for $6 Million USD).

[3] A copy of the Payoff Quote is attached hereto as **Def. Ex. '1'**. The Plaintiff impliedly incorporated by reference the Payoff Quote by referencing that it received the Payoff Funds as payment for the Huntington Mortgage. Compl., ¶¶ 25, 27.

[4] A copy of the Updated Payoff Quote is attached hereto as **Def. Ex. '2'**.

[5] In December 2025, in accordance with the Payoff Quote, the Homeowners purchased the Subject Property from R&R utilizing a purchase money mortgage with Centennial Bank in the amount of $5,336,300.00 (the "Centennial Mortgage"). Compl., Ex. E.

(admitting it "received a wire in the amount of $5,279,776.20" from the closing agent – a law firm – on January 5, 2026 and that it has "yet to apply the funds to the FL Loan").

Separately, the Complaint alleges that Huntington as Agent provided R&R with a revolving loan commitment and term loan that was secured by "a lien and security interest in substantially all of [R&R and its affiliates] assets as collateral for the [loans]." Compl., ¶ 12 (the "Corporate Debt"). However, any assertion that the Subject Property was collateral for the Corporate Debt expressly contradicts the plain language of the governing loan documents, which excluded the Subject Property as a collateral asset on that loan. Seemingly, those loan documents were intentionally omitted from Plaintiffs' complaint.

Plaintiffs fail to state a cause of action upon which relief can be granted. Firstly, the UFTA does not apply to real property if it is subject to a lien. Therefore, to the extent Huntington's UFTA claims arise from its mortgage lien interest, the UFTA does not apply, and the claims fail. Secondly, to the extent Huntington alleges its UFTA claims arise from R&R's Corporate Debt with Huntington as Agent, those governing loan documents expressly excluded the Subject Property as a collateral asset for the loan. Accordingly, under either avenue of R&R's indebtedness to Huntington, the UFTA claims fail and these fatal defects cannot be cured by amendment. Lastly, a predicate to bring any suit is standing, and Huntington suffered no injury in fact and as a result lacks standing. In sum, dismissal with prejudice is appropriate and warranted.

## RELEVANT PROCEDURAL HISTORY

On January 23, 2026, Huntington filed a Complaint against R&R, the Homeowners, and Centennial Bank. The Complaint alleges two counts against Defendants for avoidance of the Purchase under Fla. Stat. §§ 726.105(1)(a) and (1)(b).

## ARGUMENT

### I. Motion to Dismiss Standard.

Fla. R. Civ. P. 1.140(b)(6) provides that a complaint may be dismissed for "failure to state a cause of action." Although for purposes of a motion to dismiss all well-pled facts are assumed to be true, the complaint must still allege ultimate facts that demonstrate that the plaintiff is entitled to the relief sought. *Nat'l Collegiate Student Loan Trust 2006-4 v. Meyer*, 265 So. 3d 715, 719 (Fla. 2d DCA 2019). A court's review in deciding a motion to dismiss is limited to the four corners of the complaint and any attachments thereto. *Precision Orthopedics v. Zimmer Us*, 341 So. 3d 458, 461 (Fla. 2d DCA 2022). However, in ruling on a motion to dismiss, courts may consider documents that are not attachments to the complaint when they are "impliedly incorporated by reference into the complaint." *One Call Prop. Servs. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) (finding that the trial court properly considered an insurance policy that was attached to a motion to dismiss when the complaint referred to the policy and standing to bring suit was premised on an assignment of the policy); *see also Veal v. Voyager Prop. & Cas. Ins. Co.*, 51 So. 3d 1246, 1249–50 (Fla. 2d DCA 2011) (finding that when a complaint impliedly incorporated terms of a settlement agreement by reference, the trial court was able to review the settlement agreement that was attached to a motion to dismiss).

### II. Huntington's UFTA Claims Fail.

#### A. Property encumbered by a lien is not an "asset" subject to the UFTA.

The Subject Property is encumbered by a lien and therefore is not an "asset" subject to the UFTA. UFTA "allows a creditor to unwind a transfer of the debtor's property to a third party—and thus to use the property to satisfy its claims against the debtor—when the act deems the transfer 'fraudulent' as to creditors." *Kapila v. CTS Equities Ltd. P'ship*, 421 So. 3d 748, 752 (Fla. 2d DCA

2025) (quoting *National Auto Serv. Ctrs., Inc. v. F/R 550, LLC*, 192 So. 3d 498, 504 (Fla. 2d DCA 2016)). Under UFTA, "'[t]ransfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." Fla. Stat. § 726.102(14). Of import, "[a]sset" is defined as "property of the debtor," except that the term does not include "[p]roperty **to the extent it is encumbered by a valid lien**[.]" Fla. Stat. § 726.102(2) (emphasis supplied). "Thus, for a transaction to be considered a fraudulent transfer under the UFTA, the property being transferred must qualify as an asset, but property does not qualify as an asset if it was encumbered by a valid lien at the time of the transfer." *Kapila*, 421 So. 3d at 752 (quoting *2-Bal Bay Props., LLC v. Asset Mgmt. Holdings, LLC*, 291 So. 3d 617, 620 (Fla. 2d DCA 2020)) (internal quotations omitted). Stated differently, Fla. Stat. § 726.102(2)(a) requires the asset to be "property of a debtor" that is not "encumbered by a valid lien." Whether property is encumbered by a valid lien and accordingly not an "asset" is determined prior to the transfer. *Kapila*, 421 So. 3d at 753. Such an interpretation is consistent with "Florida's longstanding rule that a creditor cannot challenge a conveyance as fraudulent when it could not have reached the subject property had it not been conveyed." *Id.* at 754 (quoting *Branch Banking & Tr. Co. v. Cohen*, Case No. 8:12-cv-3215-T-24AEP, 2014 WL 12783284, *5 (M.D. Fla. June 9, 2014)).

Here, it is undisputed that Huntington Individually has a mortgage lien against the Subject Property. Compl., ¶¶ 12–13, & Compl. Exs. B–C (the Note and recorded Mortgage). Consequently, the Subject Property does not qualify as an "asset" subject to UFTA because it was encumbered by Huntington Individually's first mortgage lien at the time the Subject Property was sold to the Homeowners. Accordingly, Huntington's claims under the UFTA fail as a matter of law and must be dismissed because the Subject Property is not an asset subject to UFTA relief.

B. R&R's Loan Documents with Huntington as Agent Expressly Excluded the Subject Property as a Collateral Asset for the Corporate Debt.

To the extent Huntington alleges it has an additional interest in the Subject Property via R&R's Corporate Debt with Huntington as Agent, that expressly contradicts the plain language of the governing loan documents, which excluded this specific real property as a collateral asset on that loan.

On March 18, 2022, R&R and Huntington entered into the Second Amended and Restated Credit and Security Agreement (the "Second Amended Security Agreement"). Compl., Ex. A. Therein, the parties agreed that R&R's Corporate Debt would be secured as follows:

> To secure prompt payment and performance of the Obligations, each Loan Party hereby grants to Agent, for the benefit of the Agent, each Lender, and the benefit of each of their respective affiliates, a continuing security interest in and pledge of all of its collateral…**In addition, to secure such prompt payment and performance of the Obligations, each Loan Party shall also assign, pledge, hypothecate and grant to agent, for the benefit of Agent and each Lender, a mortgage on its Owned Real Property, if any.**

*Id.* at § 4.1 (emphasis supplied). However, long before the Homeowners purchased the Subject Property, R&R and Huntington entered into the First Amendment to the Second Amended Security Agreement dated December 30, 2022 (the "First Amendment"). Therein, the parties expressly contracted in writing to exclude the Subject Property as additional security for R&R's Corporate Debts.[6] Specifically, the First Amendment[7] provides:

---

[6] It is unclear why Huntington failed to disclose, reference, or attach any these material portions of the governing loan agreement to its **Verified** Complaint to this Court, especially when it speaks directly to the exclusion of the very asset Huntington claims is collateral under penalty of perjury. *See* Compl., ¶ 12 (alleging "[p]ursuant to the Credit Agreement, R&R and the other affiliated Borrowers granted Agent, in its capacity as collateral agent for the Lenders, a lien and security interest **in substantially all of their assets as collateral for the Operating Loans**."(emphasis supplied). Under Florida's Rule of Completeness, a party is allowed to require the introduction of related writings or statements to avoid misleading impressions created by incomplete evidence. *See* Fla. Stat. § 90.108.

[7] All amendments to the loan agreement are attached hereto as **Def. Comp. Ex. '3'**. These amendments complete and relate to the *partial* exhibit Huntington attached to its Complaint as Exhibit 'A' (the "Second Amended and Restated Credit and Security Agreement").

> "Owned Real Property" means all Real Property set forth on Schedule 1.2(a); provided, however that **Owned Real Property shall exclude the Corporate Retreat Property**.
> ***
> **"Corporate Retreat Property" means the Real Property and improvements thereon located at 550 S. Barfield Drive, Marco Island, Florida.**

1st Am. ¶ 4, at p. 5. Thereafter, the Second Amended Security Agreement was amended various times and these amendments continued to exclude the Subject Property as additional security for R&R's Corporate Debt. *See* 6th Am., at p. 29 ("Owned Real Property means all Real Property set forth on Schedule 1.2(a); provided, however **that Owned Real Property shall exclude the Corporate Retreat Property**") (emphasis supplied); 7th Am., at p. 28 (same); 8th Am. at p. 28 (same).

Although the Plaintiffs did not attach any of the amendments to the Second Amended Security Agreement to the Complaint, the Court should consider such amendments as attached to the Complaint under Florida's rule of completeness.[8] When considering the Second Amended Security Agreement with all amendments thereto, the complete agreement contradicts any allegation in the Complaint by Huntington as Agent that its lien on substantially all of the assets of R&R includes a lien on the Subject Property. Indeed, the First Amendment expressly provides, and the subsequent amendments reinforce, that the Subject Property is excluded as collateral for R&R's Corporate Debt. *See Fladell v. Palm Beach County Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000) ("If an exhibit facially negates the cause of action asserted the document attached as an exhibit controls and must be considered in deciding a motion to dismiss."); *Appel v. Lexington Ins. Co.*, 29 So. 3d 377, 379 (Fla. 5th DCA 2010) ("Where a document on which the pleader relies

---

[8] Further, the Complaint identifies Credit Agreement as a defined term that is the Second Amended and Restated Credit and Security Agreement dated March 18, 2022 as amended from time to time. Compl., ¶ 8. By defining the Credit Agreement to include such amendments, the Complaint also impliedly incorporated by reference all amendments to the Credit Agreement. Accordingly, for this reason also, the Court should consider all amendments to the Second Amended Security Agreement as attached to the Complaint.

in the complaint directly conflicts with the allegations of the complaint, the variance is fatal and the complaint is subject to dismissal for failure to state a cause of action.”). As a result, to the extent Huntington’s UFTA claims arise from R&R’s outstanding Corporate Debt, the claims fail because the Subject Property is expressly excluded as a collateral asset in the loan documents.

## III. <u>HUNTINGTON LACKS STANDING</u>

“The Florida Supreme Court has stated that there are three requirements that constitute the irreducible constitutional minimum for standing. First, a plaintiff must demonstrate an injury in fact, which is concrete, distinct and palpable, and actual or imminent. Second, a plaintiff must establish a causal connection between the injury and the conduct complained of. Finally, a plaintiff must show a substantial likelihood that the requested relief will remedy the alleged injury in fact.” *Southam v. Red Wing Shoe Co.*, 343 So. 3d 106, 109 (Fla. 4th DCA 2022) (citing *State v. J.P.*, 907 So. 2d 1101, 1113 n.4 (Fla. 2004)) (internal quotations and citations omitted). The Complaint, on its face, fails to demonstrate that Huntington was injured in fact as Huntington suffered no concrete, distinct, and palpable injury nor any actual or imminent injury.

### A. <u>Huntington Individually lacks standing because it received payoff funds in excess of a payoff letter it issued for the Huntington Mortgage.</u>

Huntington Individually fails to demonstrate an injury in fact based on the assertions alleged in the Complaint. As mentioned, Huntington Individually has the Huntington Mortgage on the Subject Property. Huntington alleges that at the time of the Purchase the amount due on the Huntington Mortgage was approximately $5.3 million. Compl., ¶ 24. The Payoff Quote issued by Huntington in connection with the Purchase clarifies that the amount due on the Huntington Mortgage through December 24, 2025 was $5,268,792.08, with a per diem interest of $784.58. Def. Ex. ‘1’. The Updated Payoff further provided that the outstanding amount due under the Huntington Mortgage was $5,227,329.48 on January 5, 2026. Def. Ex. ‘2’. Huntington also alleges

that on January 5, 2026, Plaintiffs received a wire in the amount of $5,279,776.20 from the Law Office of Ronald Webster as payment for the Huntington Mortgage. Compl., ¶¶ 25, 27. Huntington admits[9] it received and declined to apply the Payoff Funds to the Huntington Mortgage balance owed. *Id.* at ¶ 27. Given that Huntington acknowledges receiving the Payoff Funds as payment for the Huntington Mortgage, which are in excess of the full amount due under the Huntington Mortgage, and UFTA excludes from its reach property to the extent it is encumbered by a valid lien, Huntington Individually suffered no injury in fact and therefore lacks standing.

B. Huntington as Agent lacks standing because the Complaint fails to demonstrate any relationship between the Subject Property and the Corporate Debt.

Additionally, Huntington as Agent fails to demonstrate an injury in fact based on the assertions alleged in the Complaint. As mentioned, Huntington as Agent characterizes its loans with R&R as a secured claim with "a lien and security interest in substantially all of [R&R and its affiliates] assets as collateral for the [loans]." Compl., ¶ 12. However, the First Amendment expressly provides and the subsequent amendments to the Second Amended Security Agreement reinforce that the Subject Property is excluded as collateral for the Corporate Debt. Given that Huntington as Agent characterizes the Corporate Debt as secured and the First Amendment expressly contradicts any claim that the Subject Property was collateral for the Corporate Debt, Huntington as Agent has not demonstrated any basis to assert a claim against the Subject Property. Accordingly, Huntington as Agent suffered no injury in fact and lacks standing to pursue its claim.

[9] Despite its admission that it received the Payoff Funds in satisfaction of the full amount owned under the Huntington Mortgage, Huntington Individually brings this suit claiming it was somehow harmed by the Purchase.

## CONCLUSION

Under either avenue of R&R's indebtedness to Huntington, Huntington's UFTA claims fail as a matter of law. These defects are fatal and cannot be cured via amendment. Accordingly, the Complaint should be appropriately dismissed with prejudice.

**WHEREFORE**, Defendants RICHARD FRANCIS and KATHLEEN FRANCIS respectfully move this Honorable Court to dismiss all counts of the Complaint with prejudice , to award the Homeowners their prevailing party attorney fees and costs against Plaintiffs, and to grant such further relief as the Court deems just and proper under the circumstances.

Dated this 25th day of March, 2026,

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH, LLP
*Attorneys for Defendants Richard & Kathleen Francis*

By: */s/ Frank P. Terzo*
Frank P. Terzo, Esq. | Fla. Bar No. 906263
Frank.Terzo@nelsonmullins.com
Rebecca A. Rodriguez, Esq. | Fla. Bar No. 104805
Rebecca.Rodriguez@nelsonmullins.com
Sophie M. Labarge, Esq. | Fla. Bar No. 1025145
Sophie.Labarge@nelsonmullins.com
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
Tel: 954.745.5231 | Fax: 954.761.8135

Andre Festekjian, Esq. | Fla. Bar No. 1059346
Andre.Festekjian@nelsonmullins.com
2 South Biscayne Blvd., 21st Floor
Miami, FL 33131
Tel: 305.373.9499 | Fax: 305.373.9443

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on March 25, 2026 a true and correct copy of the foregoing was filed using the Clerk of Court's E-Filing Portal which will send a notice of electronic filing of the same to all Parties and counsel of record.

By: *_/s/ Frank P. Terzo_*
Frank P. Terzo, Esq.
Florida Bar No. 906263

# DEFENDANT'S EXHIBIT 1

# Commercial Loan Payoff Request

Huntington

| | | | |
|---|---|---|---|
| **Borrower** | R & R EXPRESS PROPERTIES LLC | **Today's Date** | 12/18/2025 |
| **Obligor** | [redacted]9436 | **Payoff Date** | 12/24/2025 |
| **Obligation** | 18 | **Huntington Officer** | [redacted]8674 - NR674 Nelson Rauscher |

**There is an interest rate SWAP in connection with the Loan.**
**Please contact the SWAP desk for additional payoff information at 800-833-2706.**

The total amount outstanding, including principal, accrued interest, prepayment premium, and fees under the Loan through the Payoff Date is set forth below:

| Description | Amount Due | Per Diem |
|---|---|---|
| **Principal** | 5,250,000.00 USD | |
| **Interest** | 18,792.08 USD | 784.58 USD |
| **Total Payoff as of Payoff Date** | 5,268,792.08 USD | |

**The above information is subject to change if, after the date of this letter:**
(i) there are changes in variable interest rate to which the Loan is subject, (ii) any advances, protective advances or credits are made with respect to the Loan, (iii) any other amount, charges or expenses with respect to the Loan become due and payable to the Bank, or (iv) any payment previously made on the Loan is reversed for any reason.

You should confirm the payoff amount on the Payoff Date. Please contact (800) 480-2001 for updated information. Our fax number is (877) 234-5576.

Payment should be forwarded to the Bank no later than 3:00pm Eastern Time on the Payoff Date in immediately available funds by wire transfer as follows:
**The Huntington National Bank**
**ABA [redacted]0024**
**Account # 1[redacted]7777**
**Attn: Special Processing**
**Re: [redacted]**

A check may be mailed to the Bank at the following address:
The Huntington National Bank
Attn: GW1W34
5555 Cleveland Avenue
Columbus, OH 43231

If the Loan is a line of credit, the line will not be closed unless a written request to do so is received from the Borrower.

Notwithstanding the foregoing, the Borrower's obligations and liabilities under the Loan shall be reinstated with full force and effect, if at any time after the Payoff Date all or any portion of the payoff amount paid to the Bank is voided or rescinded or must otherwise be returned by the Bank to the Borrower or another party due to the Borrower's insolvency, bankruptcy or reorganization or otherwise, all as though such payment had not been made. Nothing contained herein shall be deemed to (i) terminate or otherwise impair those expense reimbursement, indemnification or other provisions in loan documents governing the Loan which by their express terms survive the repayment of the Loan, or (ii) terminate any other obligation or indebtedness of the Borrower to the Bank.

If the payoff does not occur by the Payoff Date, this letter shall be void and of no effect.

Commercial Loan Services
The Huntington National Bank

# DEFENDANT'S EXHIBIT 2

# Commercial Loan Payoff Request

Huntington

| | | | |
|---|---|---|---|
| **Borrower** | R & R EXPRESS PROPERTIES LLC | **Today's Date** | 01/05/2026 |
| **Obligor** | [redacted]9436 | **Payoff Date** | 01/05/2026 |
| **Obligation** | 18 | **Huntington Officer** | [redacted]2430 - MB430 Matthew Beatty |

**There is an interest rate SWAP in connection with the Loan.**
**Please contact the SWAP desk for additional payoff information at 800-833-2706.**

The total amount outstanding, including principal, accrued interest, prepayment premium, and fees under the Loan through the Payoff Date is set forth below:

| Description | Amount Due | Per Diem |
|---|---|---|
| **Principal** | 5,225,000.00 USD | |
| **Interest** | 2,329.48 USD | 791.01 USD |
| **Total Payoff as of Payoff Date** | 5,227,329.48 USD | |

**The above information is subject to change if, after the date of this letter:**
(i) there are changes in variable interest rate to which the Loan is subject, (ii) any advances, protective advances or credits are made with respect to the Loan, (iii) any other amount, charges or expenses with respect to the Loan become due and payable to the Bank, or (iv) any payment previously made on the Loan is reversed for any reason.

You should confirm the payoff amount on the Payoff Date. Please contact (800) 480-2001 for updated information. Our fax number is (877) 234-5576.

Payment should be forwarded to the Bank no later than 3:00pm Eastern Time on the Payoff Date in immediately available funds by wire transfer as follows:
**The Huntington National Bank**
**ABA [redacted]0024**
**Account # [redacted]7777**
**Attn: Special Processing**
**Re: [redacted]**

A check may be mailed to the Bank at the following address:
The Huntington National Bank
Attn: GW1W34
5555 Cleveland Avenue
Columbus, OH 43231

If the Loan is a line of credit, the line will not be closed unless a written request to do so is received from the Borrower.

Notwithstanding the foregoing, the Borrower's obligations and liabilities under the Loan shall be reinstated with full force and effect, if at any time after the Payoff Date all or any portion of the payoff amount paid to the Bank is voided or rescinded or must otherwise be returned by the Bank to the Borrower or another party due to the Borrower's insolvency, bankruptcy or reorganization or otherwise, all as though such payment had not been made. Nothing contained herein shall be deemed to (i) terminate or otherwise impair those expense reimbursement, indemnification or other provisions in loan documents governing the Loan which by their express terms survive the repayment of the Loan, or (ii) terminate any other obligation or indebtedness of the Borrower to the Bank.

If the payoff does not occur by the Payoff Date, this letter shall be void and of no effect.

Commercial Loan Services
The Huntington National Bank

# DEFENDANT'S COMP. EXHIBIT 3

# FIRST AMENDMENT, WAIVER AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS FIRST AMENDMENT, WAIVER AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of December 30, 2022 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX and Food Express, each, an "Original Borrower", and collectively, the "Original Borrowers"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa", and together with Load to Ride and One Stop, each a "New Borrower" and collectively, the "New Borrowers", and such New Borrowers together with the Original Borrowers, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking

association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Original Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, an Event of Default exists under the Credit Agreement as a result of the Loan Parties making or incurring Capital Expenditures or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $5,000,000 for the fiscal year ending December 31, 2022 in violation of Section 7.6 of the Credit Agreement, which constituted an Event of Default under Section 10.6 of the Credit Agreement (the "Existing Default").

WHEREAS, (a) Express Holdco desires to (i) acquire one hundred (100%) of the issued and outstanding membership interests of Load to Ride and One Stop, and (ii) subsequently join Load to Ride and One Stop, as co-borrowers pursuant to the terms of the Credit Agreement (the "LTR Transaction") and (b) RFX recently formed RFX Tampa, a new Subsidiary of RFX and, pursuant to the terms of the Credit Agreement, RFX Tampa must join the Credit Agreement as a co-borrower;

WHEREAS, the Borrowers have requested that the Lenders (a) waive the Existing Default, and (b) agree to amend the Credit Agreement to, among other things, (i) permit the LTR Transaction including joining Load to Ride and One Stop to the Credit Agreement, (ii) join RFX Tampa as co-borrower, and (iii) otherwise amend certain provisions of the Credit Agreement as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. Recitals. The foregoing recitals are hereby incorporated by this reference.

2. Amendment to the Cover Page of the Credit Agreement. The cover page of the Credit Agreement is hereby amended and restated in the form of Annex A, attached hereto and made a part hereof.

3. Amendment to Preamble of the Credit Agreement. The preamble of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

This **SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Agreement"), has been executed and is dated as of March 18, 2022 by and among **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING, LLC**, a Pennsylvania limited liability company, **(**"Equipment Leasing"), **R&R EXPRESS HOLDCO, INC.**, a Pennsylvania corporation ("Express Holdco"), **RxG&A, LLC**, a Pennsylvania limited liability company ("RxG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), and **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa", and together with Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, Express Holdco, RxG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop and any other Person who may hereafter become a borrower hereunder are each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and **THE HUNTINGTON NATIONAL BANK**, as Agent, Lender and Issuer.

4. Amendments to Section 1.2 of the Credit Agreement.

(a) The following definitions contained in Section 1.2 of the Credit Agreement are hereby deleted in their entireties and the following definitions are substituted in their place:

"Change of Control" means (a) the Permitted Holder shall cease to own, free and clear of all Liens (other than to Lender), 80% of the outstanding voting equity interests of Express Holdco on a fully diluted basis; (b) Richard S. Francis shall cease to hold a management position with Express Holdco; (c) any merger or consolidation of or with any Loan Party or sale of all or substantially all of the property or assets of any Loan Party (other than the R & R Ownership Restructure); (d) in respect of any Person, the replacement of a majority of the directors or managers who constituted the board of directors or the managing body on the date hereof for any reason other than death or disability, and such replacement shall not have been approved by such board of directors or managing body as constituted on the date hereof, (e) in respect of any Person, such Person shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting equity interests of any existing or future Subsidiary, (f) with respect to AAGEX Group, (x) Mike Williams shall cease to own, free and clear of all Liens or other encumbrances, at least 40% of the outstanding voting equity interest in AAGEX Group or (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interest in AAGEX Group, (g) with respect to TLogistics, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 51% of the outstanding voting equity interest in TLogistics, (h) with respect to American Group, (x) Michael C. Schember and Daniel P. Krivickas, Jr. shall cease to own, free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in American Group and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in American Group, (i) following the Employment Issuance, with respect to Paradigm, Paradigm Management, Final Mile and Final Mile Solutions, (x) John Gallardo shall cease to own, free and clear of all Liens and encumbrances, at least 20% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 80% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solution, (j) following the Employment Issuance, with respect to GT Logistics, (x) Kelly Armstrong shall cease to own, free and clear of all Liens and encumbrances, at least 10% of the outstanding voting equity interests in GT Logistics and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in GT Logistics or (k) with respect to New WLX Holdings (x) John Hein shall cease to own, free and clear of all Liens or encumbrances, at least 20% of the outstanding voting equity interests in New WLX Holdings, (y) Larry Catlett shall cease to own free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in New WLX Holdings, (z) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 70% of the outstanding voting equity interests in New WLX Holdings, (l) with respect to A.M. Transportation, (x) Mission Impossible Software, LLC

shall cease to own free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in A.M. Transportation, and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in A. M. Transportation, (m) with respect to RFX, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in RFX, and (y) RFX, Inc. shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in RFX unless Express Holdco's ownership in RFX, Inc. increases by any amount no longer owned by RFX, Inc., (n) with respect to Food Express, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Food Express, (o) with respect to Pioneer, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interest in Pioneer, (y) Kimberly Welby shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in Pioneer unless Express Holdco's ownership in Pioneer increases by any amount no longer owned by Kimberly Welby, (p) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Load to Ride and One Stop, and (q) RFX shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interests in RFX Tampa.

"Loan Documents" means this Agreement, each Note and Letter of Credit, any Guaranty, Fastport Pledge Agreement, security agreement, including any copyright security agreement, patent security agreement, trademark security agreement or domain name security agreement, collateral assignment, pledge agreement, lockbox agreement, account assignment, control agreement, letter of credit application and agreement or other reimbursement agreement, Perfection Certificate, officer's certificate, Waiver, Mortgage, Banking Service Agreement, Hedging Contract, American Group Seller Subordination Agreement, RFX Subordination Agreement, LTR Subordination Agreement, any Permitted Business Acquisition Subordination Agreement, any other subordination agreement, intercreditor agreement and any and all other agreements, instruments and documents, including powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Loan Party or Guarantor or delivered to Agent, Issuer or any Lender in connection with this Agreement.

"Owned Real Property" means all Real Property set forth on Schedule 1.2(a); provided, however that Owned Real Property shall exclude the Corporate Retreat Property.

(b) Section 1.2 of the Credit Agreement is hereby amended to insert the following new definitions in their appropriate alphabetical order therein:

"Corporate Retreat Property" means the Real Property and improvements thereon located at 550 S. Barfield Drive, Marco Island, Florida.

"Corporate Retreat Purchase" means the purchase by Express Properties of the Corporate Retreat Property.

"First Amendment Effective Date" means December 30, 2022.

"Load to Ride" means Load to Ride Transportation, LLC, a Pennsylvania limited liability company.

"LTR Acquisition" means Express Holdco's acquisition of one hundred (100%) of the issued and outstanding membership interests of Load to Ride and One Stop pursuant to the LTR Acquisition Documents.

"LTR Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, effective as of December 30, 2022, by and among Load to Ride Transportation, LLC, a Colorado limited liability company, One Stop Freightways, LLC, a Colorado limited liability company, LTR Seller, Load to Ride, One Stop, and Express Holdco (the "LTR MIPA"), (ii) the LTR Subordinated Note, (iii) the Contribution Agreements (as defined in the LTR MIPA), (iv) the Equipment Transfer Agreement (as defined in the LTR MIPA), (v) the Consulting Agreement for the LTR Seller (as described in the LTR MIPA), and (vi) all other documents and instruments delivered in connection with the LTR Acquisition.

"LTR Seller" means Marc Haney.

"LTR Subordinated Note" means that certain Subordinated Promissory Note, dated as of December 30, 2022 made by Express Holdco in favor of Load to Ride Transportation, LLC, a Colorado limited liability company in the amount of $1,725,000 being a portion of the purchase price in connection with the LTR Acquisition, bearing interest at 4% per annum, having a maturity of 36 months and otherwise payable on terms and conditions acceptable to Agent.

"LTR Subordination Agreement" means that certain Subordination Agreement, dated as of December 30, 2022, among the Agent, Load to Ride Transportation, LLC, a Colorado limited liability company, Load to Ride, One Stop and Express Holdco.

"One Stop" means One Stop Freightways, LLC, a Pennsylvania limited liability company.

5. Amendment to Section 2.12. Section 2.12 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"2.12 **Use of Proceeds**. Borrowers shall apply the proceeds of Advances and the other Loans (a) to repay existing Indebtedness owed to existing lenders, (b) to pay fees and expenses relating to the transaction contemplated by this Agreement, (c) for lawful corporate purposes, (d) to provide for working capital needs, (e) with respect to the Term Loan, to refinance the Existing Term Loan, (f) with respect to the Revolving Loans, to provide for all or a portion of the purchase price or consideration for any Permitted Business Acquisition, (g) with respect to the Revolving Loans, to finance the 2022 Real Estate Purchase, so long as the conditions to such purchase set forth herein have been satisfied, (h) with respect to the Revolving Loans, to provide for all or a portion of the purchase price in connection with the LTR Acquisition, and (i) with respect to the

Revolving Loans, to provide a portion of the purchase price in an amount not to exceed $2,000,000 in connection with the Corporate Retreat Purchase."

6. Amendment to Section 7.1(a). Section 7.1(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(a) Enter into any merger, division, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person except for in connection with and pursuant to the American Group Acquisition, the New WLX Holdings Acquisition, the A.M. Transportation Acquisition, the RFX Acquisition, the LTR Acquisition and any Permitted Business Acquisition or permit any other Person to consolidate with or merge with it."

7. Amendment to Section 7.3. Section 7.3 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"7.3 **Guarantees**. Become liable upon the obligations of any Person by assumption, endorsement or Guaranty thereof or otherwise (other than to Agent or Lender or any affiliate thereof) except (a) the endorsement of checks in the ordinary course of business, (b) guarantees made by a Loan Party with respect to the Obligations of another Loan Party, (c) with respect to American Group, the guaranty for payment and performance given by American Group in connection with the American Group Seller Subordinated Note, (d) with respect to RFX and Pioneer, the Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer in connection with the RFX Subordinated Note, (e) with respect to Load to Ride and One Stop, the Guarantee Joinder to Subordinated Promissory Note, dated as of December 30, 2022, executed by Load to Ride and One Stop in connection with the LTR Subordinated Note, and (f) the Guaranty made by Express Holdco of the obligations owing from Express Properties to Huntington or any direct or indirect subsidiary or affiliate of Huntington under any mortgage loan provided by Huntington or any direct or indirect subsidiary or affiliate of Huntington to Express Properties in connection with the Corporate Retreat Purchase."

8. Amendment to Section 7.6. Section 7.6 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"7.6 **Capital Expenditures**. Make or incur any Capital Expenditure or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $5,000,000 in each fiscal year (other than Capital Expenditures or commitments thereof made or incurred in connection with the New WLX Holdings Acquisition, the Corporate Retreat Purchase and the LTR Acquisition).

9. Amendment to Section 7.8. Section 7.8 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"7.8 **Indebtedness**. Create, incur, assume or suffer to exist any Indebtedness except in respect of:

(a) Indebtedness existing on the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 7.8) and set forth on Schedule 7.8 (including any extensions, renewals or refinancings thereof);

(b) Indebtedness to Agent, Lender or any of their respective affiliates, regardless of whether pursuant to the Loan Documents;

(c) Indebtedness incurred for Capital Expenditures permitted under Section 7.6;

(d) Indebtedness as permitted under Section 7.3 and 7.11;

(e) Indebtedness arising from Hedging Contracts required pursuant to Section 6.8;

(f) Indebtedness arising in connection with the American Group Seller Subordinated Note which Indebtedness is subject to the American Group Seller Subordination Agreement;

(g) Indebtedness arising in connection with the A.M. Transportation Subordinated Note which Indebtedness is subject to the A.M. Transportation Subordination Agreement;

(h) Permitted Business Acquisition Indebtedness;

(i) Indebtedness arising in connection with the RFX Subordinated Note which Indebtedness is subject to the RFX Subordination Agreement; and

(j) Indebtedness arising in connection with the LTR Subordinated Note which Indebtedness is subject to the LTR Subordination Agreement.

10. Supplemental Schedules. Each of the Schedules to the Credit Agreement listed in the below table is hereby supplemented, by the New Borrowers, as set forth on the respective correspondingly numbered Schedules attached hereto and made a part hereof:

| ***Schedules:*** |
|---|
| Schedule 1.2(b) – Liens |
| Schedule 4.3 – Deposit Accounts |
| Schedule 4.5 – Inventory Locations |
| Schedule 4.15(c) – Borrower's States of Organization and Chief Executive Offices |
| Schedule 5.2 – Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 – Officer's, Directors, Shareholders, Capitalization |
| Schedule 5.10 – Patents, Trademarks, Copyrights and Licenses |
| Schedule 5.19 – Material Business Agreements |

| Schedule 5.21 – Business and Property |
|---|

11. Borrower Joinder and Assumption. Each New Borrower hereby becomes a Borrower under the terms of the Credit Agreement and in consideration of the value of the synergistic and other benefits received by such New Borrower as a result of being affiliated with the Borrowers, each New Borrower hereby agrees that effective as of the date hereof it hereby is, and shall be deemed to be, and assumes the obligations of, a "Loan Party" and a "Borrower", jointly and severally under the Credit Agreement and each of the Notes, and a Borrower, Loan Party or other party, as the case may be, under each of the other Loan Documents to which the Borrowers or Loan Parties are a party, and each New Borrower hereby agrees that from the date hereof and so long as any Loan, Letter of Credit, or any commitment of any Lender shall remain outstanding and until the payment in full of the Obligations, the expiration of all Letters of Credit, and the performance of all other obligations of the Borrowers and/or the Loan Parties under the Credit Agreement and the other Loan Documents, each New Borrower shall perform, comply with, and be subject to and bound by each of the terms and provisions of the Credit Agreement, the Notes, and each of the other Loan Documents jointly and severally with the existing parties thereto. Without limiting the generality of the foregoing, each New Borrower hereby represents and warrants that: (i) each of the representations and warranties set forth in the Credit Agreement applicable to a Loan Party is true and correct as to such New Borrower on and as of the date hereof, and (ii) each New Borrower has heretofore received a true and correct copy of the Credit Agreement, the Notes, and each of the other Loan Documents (including any modifications thereof or supplements or waivers thereto). Each New Borrower hereby makes, affirms, and ratifies in favor of the Lender the Credit Agreement, the Notes, and each of the other Loan Documents given by the Borrowers to the Lender, and to secure the prompt payment and performance to the Lender of the Obligations, each New Borrower hereby assigns, pledges, and grants to the Lender, a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.

In furtherance of the foregoing, each New Borrower shall execute and deliver or cause to be executed and delivered at any time and from time to time such further instruments and documents and do or cause to be done such further acts, as may be necessary in the opinion of the Lender to carry out more effectively the provisions and purposes of the foregoing joinder and assumption and the other Loan Documents.

12. Waiver. The Lenders hereby waive the Existing Default. The foregoing waiver is limited to the Existing Default only and does not relate to any other Events of Default or other violations existing under the Credit Agreement or indicate an agreement on the part of the Lenders to grant any such waivers in the future.

13. Release; No Discharge. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity

which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

14. Conditions to Effectiveness. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment; Notes; Other Deliverables. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment, the amended and restated Notes, amendments to and/or amendment an restatement of the other Loan Documents, as applicable, and all other documentation necessary for the effectiveness of this Amendment to the satisfaction of the Agent as set forth in a closing agenda provided by the Agent and its counsel.

(b) Borrowing Base Certificate; Undrawn Availability. Agent shall have received an executed Borrowing Base Certificate from the Borrower Representative as of December 28, 2022, which shall demonstrate Undrawn Availability of at least $12,000,000 after giving effect to the LTR Acquisition and the Corporate Retreat Purchase.

(c) Insurance Policy. Borrowers shall deliver evidence, in form and substance acceptable to the Agent, that the New Borrowers' receivables have been added to the accounts receivable insurance policy of the Borrowers.

(d) Final December 31, 2021 Audit. Borrowers shall deliver a final audit and related deliverables all of which shall comply with all of the requirements of Section 9.5 of the Credit Agreement, and all of which shall be in form and substance satisfactory to the Agent and the Lenders.

(e) Schedules. The New Borrowers shall deliver all applicable supplemental Schedules to the Credit Agreement and any other applicable Loan Documents in form and substance satisfactory to the Agent.

(f) Acquisition Documents. The Borrowers shall deliver all acquisition documents related to the LTR Acquisition as set forth in the Credit Agreement and as otherwise required by the Agent.

(g) Equity Interest Certificates and Transfer Powers. To the extent applicable, Borrowers shall deliver to Agent original stock certificates and membership interest certificates, as the case may be, for the New Borrowers, together with corresponding transfer powers duly executed in blank, and otherwise in form and substance satisfactory to the Agent.

(h) Opinion. The Borrowers shall deliver a written opinion of counsel (including local counsel if necessary) for the Loan Parties, dated the date hereof in form and substance satisfactory to the Agent and its counsel.

(i) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(j) Payment of Fees and Expenses. The Borrowers shall pay to the Agent for the ratable benefit of the Lenders, an amendment and waiver fee equal to $20,000. The Borrowers shall also reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

15. Representations and Warranties. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and, other than the Existing Default, no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit,

or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

16. Post-Closing Obligations.

(a) Within thirty days (30) days of the Effective Date (or such later date as may be consented to by the Agent), the Borrowers shall deliver or cause to be delivered an updated property insurance certificate to include the properties of the New Borrowers in form and substance satisfactory to the Agent.

(b) Within ninety (90) days of the Effective Date (or such later date as may be consented to by the Agent), the Borrowers shall use commercially reasonable efforts to deliver or cause to be delivered a landlord waiver in form and substance satisfactory to the Lender for certain premises located at 3680 E 52nd Avenue, Denver, CO Colorado 80216 and 6675 E 48th Avenue, Commerce City, Colorado 80022 and leased by Load to Ride and One Stop pursuant to that lease entered into with Haney Properties, LLC, a Colorado limited liability company, as landlord.

17. Miscellaneous.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction,

discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

**[SIGNATURE PAGES FOLLOW]**

**[SIGNATURE PAGE – FIRST AMENDMENT, WAIVER AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC,**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC**
**AGX FREIGHT LOGISTICS, LLC**
**AGX FREIGHT INTERMODAL, LLC**
**RFX TAMPA, LLC**

By: Richard S Francis (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**[SIGNATURE PAGE – FIRST AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By: ______________________ (SEAL)
Name: Richard S. Francis
Title: Manager

**A.M. TRANSPORTATION SERVICES LLC**

By: ______________________ (SEAL)
Name: Richard S. Francis
Title: Director

**[SIGNATURE PAGE – FIRST AMENDMENT, WAIVER AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By: ______________________________

Name: Helen Lau

Title: Vice President

**[SIGNATURE PAGE – FIRST AMENDMENT, WAIVER AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: Gregory R Boyer
Name: Gregory R Boyer
Title: Senior Vice President

***Annex A***

**SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT**
**among**

**THE HUNTINGTON NATIONAL BANK**
**(as Administrative Agent, a Lender and issuer of Letters of Credit)**

**THE LENDERS PARTY HERETO**

**and**

**R&R EXPRESS HOLDCO, INC,**
**R & R EXPRESS, INC.,**
**GT WORLDWIDE TRANSPORT, INC.,**
**BORDER CONNECT FREIGHT SERVICES, INC.,**
**PARADIGM TRANSPORTATION, LLC,**
**FINAL MILE DEDICATED GROUP, LLC,**
**R & R EXPRESS LOGISTICS, INC.,**
**GT WORLDWIDE LOGISTICS, LLC,**
**BORDER CONNECT LOGISTICS, INC.,**
**PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC,**
**FINAL MILE SOLUTIONS GROUP, LLC,**
**AAGEX FREIGHT GROUP, LLC,**
**AGX FREIGHT CARRIERS, LLC,**
**AGX FREIGHT LOGISTICS, LLC,**
**AGX FREIGHT INTERMODAL, LLC,**
**R&R EXPRESS PROPERTIES, LLC,**
**R&R EQUIPMENT LEASING, LLC**
**RXG&A, LLC,**
**TLOGISTICS, LLC,**
**R & R DRIVER SOLUTIONS INC,**
**NEW AMERICAN GROUP LLC,**
**NEW WLX HOLDINGS, LLC,**
**NEW WLX, LLC,**
**NEW WLE, LLC,**
**A.M. TRANSPORTATION SERVICES LLC,**
**RFX, LLC,**
**REFRIGERATED FOOD EXPRESS, LLC,**
**PIONEER TRANSFER, LLC**
**LOAD TO RIDE TRANSPORTATION, LLC,**
**ONE STOP FREIGHTWAYS, LLC, and**
**RFX TAMPA, LLC**

**as Borrowers**

**March 18, 2022**

**Supplemental**

**Schedule 1.2(b)**

*Liens*

None.

**Supplemental**
**Schedule 4.3**

**Deposit Accounts**

| Company or Subsidiary that is the Owner of the Deposit Account | Name and Address of Depository Bank | Account Type | Average Balance Maintained | Control Agreement Requested |
|---|---|---|---|---|
| Load to Ride Transportation, LLC | The Huntington National Bank, 17 S. High Street, Columbus, OH | Business Checking (Check Writing) | $0.00 | No |
| Load to Ride Transportation, LLC | The Huntington National Bank, 17 S. High Street, Columbus, OH | Business Checking (ACH's/Wires) | $0.00 | No |
| Load to Ride Transportation, LLC | The Huntington National Bank, 17 S. High Street, Columbus, OH | Business Checking (Lockbox / Cash Concentration) | $0.00 | No |

**Supplemental**
**Schedule 4.5**

**Inventory Locations**

All inventory of Load to Ride and One Stop is located at 100 Commerce Drive, Pittsburgh, Pennsylvania; 3680 E 52nd Avenue, Denver, Colorado; and 6675 E. 48th Avenue, Commerce City, Colorado 80022

All inventory of RFX Tampa is located at 100 Commerce Drive, Pittsburgh, Pennsylvania.

**Supplemental**
**Schedule 4.15(c)**

**Borrowers' States of Organization and Chief Executive Offices**

| Loan Party | State of Incorporation | Address | Location of its CEO |
|---|---|---|---|
| Load to Ride Transportation, LLC | PA | 100 Commerce Drive Pittsburgh, PA 15275 | 100 Commerce Drive, Pittsburgh, PA 15275 |
| One Stop Freightways, LLC | PA | 100 Commerce Drive, Pittsburgh, PA 15275 | 100 Commerce Drive, Pittsburgh, PA 15275 |
| RFX Tampa, LLC | FL | 100 Commerce Drive, Pittsburgh, PA 15275 | 100 Commerce Drive, Pittsburgh, PA 15275 |

**Supplemental**
**Schedule 5.2**

**Incorporation/Organization/Foreign Qualification/Subsidiaries**

| Loan Party | State of Incorporation/Organization | States Qualified to do Business In |
|---|---|---|
| Load to Ride Transportation, LLC | PA | IL and CO (Colorado immediately upon closing) |
| One Stop Freightways, LLC | PA | CO (immediately upon closing) |
| RFX Tampa, LLC | FL | None. |

**Schedule 5.3**

**Officers, Directors, Shareholders, Capitalization**

| Loan Party | Name of Executive Officers/ Directors | Title | Equity Holder |
|---|---|---|---|
| Load to Ride Transportation, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| | | | |
| One Stop Freightways, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| | | | |
| RFX Tampa, LLC | Ryan Nolan | President | 100% owned by RFX, LLC |

**Schedule 5.10**

**Patents, Trademarks, Copyrights and Licenses**

None.

**Schedule 5.19**

**Material Business Agreements**

1. Lease by and between Haney Properties, LLC, as landlord, and load to Ride Transportation, LLC, and One Stop Freightways, LLC, as tenant, dated December 29, 2022, for real property located at 3680 E. 52nd Street, Denver Colorado, and 6675 E. 48th Avenue, Commerce City, Colorado.

2. Membership Interest Purchase Agreement by and among Load to Ride Transportation, LLC, a Colorado limited liability company; One Stop Freightways, LLC, a Colorado limited liability company; Marc Haney; Load to Ride Transportation, LLC, a Pennsylvania limited liability company; One Stop Freightways, LLC, a Pennsylvania limited liability company; and R&R Express Holdco, Inc, a Pennsylvania corporation, and dated December 29, 2022.

3. Guarantee Joinder to Subordinated Promissory Note by Load to Ride Transportation, LLC, a Pennsylvania limited liability company, and One Stop Freightways, LLC, a Pennsylvania limited liability company; in favor of Load to Ride Transportation, LLC, a Colorado limited liability company dated December 29, 2022.

**Schedule 5.21**

**Business and Property**

| Company | Nature of Business |
|---|---|
| Load to Ride Transportation, LLC | Provision of transportation freight carrier services. |
| One Stop Freightways, LLC | Provision of transportation freight carrier services. |
| RFX Tampa, LLC | Provision of transportation freight carrier services. |

# SECOND AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS SECOND AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of February 8, 2023, is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), and **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa", and together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, and One Stop, each, a "Borrower", and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent and collateral agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022, as amended by that certain First Amendment, Waiver and Joinder to Second Amended and Restated Credit and Security Agreement, dated as of December 30, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers have requested that the Lenders agree to amend the Credit Agreement to amend certain provisions of the Credit Agreement as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. Recitals. The foregoing recitals are hereby incorporated by this reference.

2. Amendments to Section 1.2 of the Credit Agreement.

(a) Section 1.2 of the Credit Agreement is hereby amended to insert the following new definition in its appropriate alphabetical order therein:

> "TUI Commission Rights Purchase Agreement" means that certain Commission Rights Purchase Agreement, dated as of January 1, 2023, by and between Transport Unlimited, Inc., a Pennsylvania corporation ("TUI") and Express Holdco, as buyer, whereby TUI will sell and assign to Express Holdco the rights of TUI to the Purchased Commission Rights (as defined therein), subject to the terms and conditions set forth therein.

3. Amendment to Section 7.4. Section 7.4 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

> "7.4 **Investments**. Purchase, hold, acquire or invest in the obligations or stock of, or any other interest in, or make or permit to exist any investment or any other interest in (including any option, warrant or other right to acquire any of the foregoing) any Person, except (a) investments existing on the Closing Date and set forth on Schedule 7.4, (b) obligations issued or guaranteed by the United States of America or any agency thereof, (c) commercial paper with maturities of not more than one hundred eighty (180) days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (d) certificates of time deposit and bankers' acceptances having maturities of not more than one hundred eighty (180) days and repurchase

agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, (e) U.S. money market funds (i) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc., or (ii) that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof, (f) investments by a Loan Party in a Loan Party, (g) investments made consisting of a Permitted Business Acquisition, or (h) investments in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional investments made in connection with the same so long as such additional investments are permitted by the Lenders in their sole discretion."

4. Amendment to Section 7.5. Section 7.5 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"7.5 **Loans**. Make advances, loans or extensions of credit to any Person, including without limitation any holder of an equity interest in any Borrower, any Subsidiary or Affiliate, other than another Loan Party, except with respect to (a) loans existing on the Closing Date (not including the extensions of credit set forth in clause (c) below) and set forth on Schedule 7.5 (including loans made prior to the Original Closing Date to the Permitted Holder), (b) the extension of commercial trade credit in connection with the sale of Inventory in the ordinary course of its business, (c) the extension of credit to agents, drivers and business affiliates that are not Affiliates of any Loan Party in the ordinary course of business and in amounts not to exceed $250,000 at any time with respect to each agent, driver or business affiliate and in an aggregate amount with respect to all such agents, drivers and business affiliates not to exceed $2,500,000 at any time, or (d) advances in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional advances made in connection with the same so long as such additional advances are permitted by the Lenders in their sole discretion."

5. Amendment to Section 7.18. Section 7.18 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"7.18 **Modification of Material Business Agreements**. Amend, waive or otherwise modify in any material respect the terms of any Material Business Agreement or the TUI Commission Rights Purchase Agreement without the prior written consent of Agent."

6. Release; No Discharge. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors

and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

7. Conditions to Effectiveness. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment; Other Deliverables. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment, and all other documentation necessary for the effectiveness of this Amendment to the satisfaction of the Agent.

(b) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(c) Payment of Fees and Expenses. The Borrowers shall also reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

(d) Miscellaneous. Such other documents, agreements, instruments, deliverables and items deemed reasonably necessary by the Agent.

8. Representations and Warranties. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all

covenants and conditions of the Credit Agreement and the other Loan Documents, and no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the First Amendment Effective Date.

9. Miscellaneous.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

**[SIGNATURE PAGES FOLLOW]**

**[SIGNATURE PAGE – SECOND AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC,**

By: ______________________(SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC**
**AGX FREIGHT LOGISTICS, LLC**
**AGX FREIGHT INTERMODAL, LLC**
**RFX TAMPA, LLC**

By: ______________________(SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**[SIGNATURE PAGE – SECOND AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By:____________________________(SEAL)
Name: Richard S. Francis
Title: Manager

**A.M. TRANSPORTATION SERVICES LLC**

By:____________________________(SEAL)
Name: Richard S. Francis
Title: Director

**[SIGNATURE PAGE – SECOND AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By:____________________________________
Name: Helen K. Lau
Title: Vice President

**[SIGNATURE PAGE – SECOND AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: ______________________
Name: Gregory R Boyer
Title: Senior Vice President

**THIRD AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT**

**THIS THIRD AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of June 21, 2023 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each, an "Original Borrower", and collectively, the "Original Borrowers"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation"), the "New Borrower", and such New Borrower together with the Original Borrowers, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and

**THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Original Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, (A) Express Holdco has acquired one hundred (100%) of the business assets of Taylor Transportation, Inc., a Delaware corporation, which such assets were transferred to the recently formed wholly owned subsidiary of Express Holdco, Taylor Transportation ("Acquisition"), and Express Holdco requests that the Lenders permit such Acquisition and desires to join Taylor Transportation, as a co-borrower pursuant to the terms of the Credit Agreement, and (B) Equipment Leasing desires to purchase certain rolling stock and purchase all of the equipment from Taylor Equipment Leasing LLC, a Delaware limited liability company (collectively, the "Taylor Transaction");

WHEREAS, the Borrowers have requested that the Lenders agree to amend the Credit Agreement to, among other things, (i) permit the Taylor Transaction, (ii) join Taylor Transportation as a co-borrower, and (iii) otherwise amend certain provisions of the Credit Agreement as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. Recitals. The foregoing recitals are hereby incorporated by this reference.

2. Amendment to the Cover Page of the Credit Agreement. The cover page of the Credit Agreement is hereby amended and restated in the form of Annex A, attached hereto and made a part hereof.

3. Amendment to Preamble of the Credit Agreement. The preamble of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

> This **SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Agreement"), has been executed and is dated as of March 18, 2022 by and among **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company

("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING, LLC**, a Pennsylvania limited liability company, **(**"Equipment Leasing"), **R&R EXPRESS HOLDCO, INC.**, a Pennsylvania corporation ("Express Holdco"), **RxG&A, LLC**, a Pennsylvania limited liability company ("RxG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), and **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", and together with Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, Express Holdco, RxG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, RFX Tampa and any other Person who may hereafter become a borrower hereunder are each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and **THE HUNTINGTON NATIONAL BANK**, as Agent, Lender and Issuer.

4. Amendments to Section 1.2 of the Credit Agreement.

(a) The following definitions contained in Section 1.2 of the Credit Agreement are hereby amended and restated in their entirety as follows:

"Change of Control" means (a) the Permitted Holder shall cease to own, free and clear of all Liens (other than to Lender), 80% of the outstanding voting equity interests of Express Holdco on a fully diluted basis; (b) Richard S. Francis shall cease to hold a management position with Express Holdco; (c) any merger or consolidation of or with any Loan Party or sale of all or substantially all of the property or assets of any Loan Party (other than the R & R Ownership Restructure); (d) in respect of any Person, the replacement of a majority of the directors or managers who constituted the board of directors or the managing body on the date hereof for any reason other than death or disability, and such replacement shall not have been approved by such board of directors or managing body as constituted on the date hereof, (e) in respect of any Person, such Person shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting equity interests of any existing or future Subsidiary, (f) with respect to AAGEX Group, (x) Mike Williams shall cease to own, free and clear of all Liens or other encumbrances, at least 40% of the outstanding voting equity interest in AAGEX Group or (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interest in AAGEX Group, (g) with respect to TLogistics, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 51% of the outstanding voting equity interest in TLogistics, (h) with respect to American Group, (x) Michael C. Schember and Daniel P. Krivickas, Jr. shall cease to own, free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in American Group and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in American Group, (i) following the Employment Issuance, with respect to Paradigm, Paradigm Management, Final Mile and Final Mile Solutions, (x) John Gallardo shall cease to own, free and clear of all Liens and encumbrances, at least 20% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 80% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solution, (j) following the Employment Issuance, with respect to GT Logistics, (x) Kelly Armstrong shall cease to own, free and clear of all Liens and encumbrances, at least 10% of the outstanding voting equity interests in GT Logistics and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in GT Logistics or (k) with respect to New WLX Holdings (x) John Hein shall cease to own, free and clear of all Liens or encumbrances, at least 20% of the outstanding voting equity interests in New WLX Holdings, (y) Larry Catlett shall cease to own free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in New WLX Holdings, (z) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 70% of the outstanding voting equity interests in New WLX Holdings, (l) with respect to A.M. Transportation, (x) Mission Impossible Software, LLC shall cease to own free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in A.M. Transportation, and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in A. M. Transportation, (m) with respect to RFX, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the

outstanding voting equity interests in RFX, and (y) RFX, Inc. shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in RFX unless Express Holdco's ownership in RFX, Inc. increases by any amount no longer owned by RFX, Inc., (n) with respect to Food Express, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Food Express, (o) with respect to Pioneer, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interest in Pioneer, (y) Kimberly Welby shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in Pioneer unless Express Holdco's ownership in Pioneer increases by any amount no longer owned by Kimberly Welby, (p) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Load to Ride and One Stop, (q) RFX shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interests in RFX Tampa, and (r) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Taylor Transportation.

"Loan Documents" means this Agreement, each Note and Letter of Credit, any Guaranty, Fastport Pledge Agreement, security agreement, including any copyright security agreement, patent security agreement, trademark security agreement or domain name security agreement, collateral assignment, pledge agreement, lockbox agreement, account assignment, control agreement, letter of credit application and agreement or other reimbursement agreement, Perfection Certificate, officer's certificate, Waiver, Mortgage, Banking Service Agreement, Hedging Contract, American Group Seller Subordination Agreement, RFX Subordination Agreement, LTR Subordination Agreement, Taylor Transportation Subordination Agreement, any Permitted Business Acquisition Subordination Agreement, any other subordination agreement, intercreditor agreement and any and all other agreements, instruments and documents, including powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Loan Party or Guarantor or delivered to Agent, Issuer or any Lender in connection with this Agreement.

"Permitted Encumbrances" means (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental Charges that (i) are not delinquent or (ii) are being contested in good faith by appropriate proceedings that stay the enforcement of such Liens and with respect to which proper reserves have been taken by the Loan Parties in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of Agent for the benefit of Agent and Lenders and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of any Loan Party's business; (e) mechanics, workers, materialmen's, warehousemen's, common carriers, landlord's or other like Liens arising in the ordinary course of any Loan Party's business with respect to

obligations which are not due or which are being contested in good faith by the applicable Loan Party; (f) Liens placed upon equipment and real estate assets acquired to secure a portion of the purchase price thereof including Liens for any such equipment and assets that are subject to specific equipment financing by a third party but which were initially purchased from proceeds of an Advance made hereunder, which purchase was subsequently reimbursed by the proceeds of the specific equipment financing, provided that (i) any such Lien shall not encumber any other property of the Loan Parties other than insurance and other proceeds of such equipment and real estate and (ii) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; (g) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the use of such Real Property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (h) attachment and judgment liens which do not constitute an Event of Default under Section 10.7; and (i) Liens disclosed on Schedule 1.2(b) provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien.

(b) The definition of "Collateral" in Section 1.1 of the Credit Agreement is hereby amended by amending and restating the last paragraph of such definition in its entirety to read as follows:

Notwithstanding anything to the contrary contained in clauses (a) through (j) above, the security interest created by this Agreement shall not extend to (i) Excluded Property and (ii) the certain 10% ownership interest in a HondaJet Elite HA-420 aircraft held and owned by Equipment Leasing, as evidenced by that certain HondaJet Elite HA-420 Fractional Interest Purchase Agreement executed by Equipment Leasing December 6, 2021.

(c) Section 1.2 of the Credit Agreement is hereby amended to insert the following new definitions in their appropriate alphabetical order therein:

"Corporate Retreat Property Mortgage Facility" means the mortgage facility consisting of (i) a mortgage granted by Express Properties in favor of Huntington with respect to the Corporate Retreat Property, (ii) a mortgage note made by Express Properties and payable to Huntington, (iii) a guaranty made by Richard S. Francis of the obligations owing from Express Properties to Huntington under the mortgage of the Corporate Retreat Property, in form and substance acceptable to Huntington and (iv) an interest rate swap transaction entered into by Express Properties and Huntington as of the closing of the aforementioned mortgage.

"Excluded Property" means specific equipment, accessions and related products and proceeds that are financed as Capital Expenditures by or through a third-party, including but not limited to, Huntington Equipment Finance or other leasing and/or equipment finance departments of the Agent.

"Taylor Transportation" means New Taylor Transportation, LLC, a Pennsylvania limited liability company.

"Taylor Transportation Acquisition" means (i) Express Holdco's acquisition of one hundred (100%) of the business assets of Taylor Transportation, Inc., a Delaware corporation, pursuant to the Taylor Transportation Acquisition Documents, which such assets are to be held by Express Holdco's newly formed subsidiary, Taylor Transportation, and (ii) Equipment Leasing's acquisition of certain rolling stock and all of the business equipment of Taylor Equipment Leasing LLC.

"Taylor Transportation Acquisition Documents" means, collectively, (i) the Asset Purchase Agreement, effective as of March 31, 2023, among Taylor Transportation, Inc. and Taylor Equipment Leasing LLC, as the seller and Express Holdco and Equipment Leasing, as the buyers, and the other parties thereto, (ii) the Taylor Transportation Subordinated Note, (iii) Bill of Sale and Assignment and Assumption Agreement- Assets, dated as March 31, 2023 among Taylor Transportation, Inc, and Express Holdco, (iv) Bill of Sale and Assignment and Assumption Agreement – Equipment, dated as of March 31, 2023, among Taylor Equipment Leasing LLC and Equipment Leasing, (v) Assignment and Assumption of Contracts, dated as of March 31, 2023, by and among Taylor Transportation, Inc. and Express Holdco, (vi) the Taylor Transportation Contribution Agreement, and (vii) all other documents and instruments delivered in connection with the Taylor Transportation Acquisition.

"Taylor Transportation Contribution Agreement" means, that certain Contribution Agreement entered into by Express Holdco and Taylor Transportation, whereby Express Holdco will transfer the assets purchased pursuant to the Taylor Transportation Acquisition to Taylor Transportation in exchange for all of the membership interests of Taylor Transportation.

"Taylor Transportation Subordinated Note" means that certain Subordinated Promissory Note, dated as of March 31, 2023 made by Express Holdco in favor of Taylor Transportation, Inc., a Delaware corporation in the amount of $2,500,000 being a portion of the purchase price in connection with the Taylor Transportation Acquisition, bearing interest at (i) 3% per annum in the first year and (ii) 9% annum in the second year, having a maturity of 24 months and otherwise payable on terms and conditions acceptable to Agent.

"Taylor Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of June 23, 2023, among the Agent, Taylor Transportation, Inc., a Delaware corporation and Express Holdco.

5. Amendment to Section 2.12. Section 2.12 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

2.12 **Use of Proceeds**. Borrowers shall apply the proceeds of Advances and the other Loans (a) to repay existing Indebtedness owed to existing lenders, (b) to pay fees and

expenses relating to the transaction contemplated by this Agreement, (c) for lawful corporate purposes, (d) to provide for working capital needs, (e) with respect to the Term Loan, to refinance the Existing Term Loan, (f) with respect to the Revolving Loans, to provide for all or a portion of the purchase price or consideration for any Permitted Business Acquisition, (g) with respect to the Revolving Loans, to finance the 2022 Real Estate Purchase, so long as the conditions to such purchase set forth herein have been satisfied, (h) with respect to the Revolving Loans, to provide for all or a portion of the purchase price in connection with the LTR Acquisition and the Taylor Transportation Acquisition, and (i) with respect to the Revolving Loans, to provide a portion of the purchase price in an amount not to exceed $2,000,000 in connection with the Corporate Retreat Purchase.

6. New Section 2.17. The following new Section 2.17 of the Credit Agreement is hereby added as a new section to immediately follow Section 2.16 of the Credit Agreement:

**2.18 Increase in Commitments.**

(a) Borrowers Request. The Borrowers may by written notice to the Agent elect to request (x) prior to the Facility Termination Date, an increase to the existing Revolving Commitments (the "Incremental Revolving Commitment"), by an aggregate amount not in excess of $20,000,000. The notice shall specify (i) the date (each, an "Increase Effective Date") on which the Borrowers propose that the Incremental Revolving Commitment shall be effective, which shall be a date not less than ten (10) Business Days after the date on which such notice is delivered to the Agent and (ii) the identity of each Person to whom the Borrowers propose any portion of the Incremental Revolving Commitment be allocated and the amounts of such allocations; provided, that (a) each new Lender providing all or a portion of the Incremental Revolving Commitments shall satisfy the requirements of 15.3(a) and shall be subject to the approval of the Agent (such approval not to be unreasonably withheld or delayed), (b) the consent of the Issuer shall be required for any Person providing any portion of the Incremental Revolving Commitment and (c) an existing Lender approached to provide all or a portion of the Incremental Revolving Commitment may elect or decline, in its sole discretion, to provide such Incremental Revolving Commitment.

(b) Conditions. No Incremental Commitments shall become effective as of the Increase Effective Date unless:

(i) no Event of Default or Default shall exist as of such date, and no Event of Default or Default shall occur on such date as a result of making any Advances on such date or from the application of the proceeds thereof;

(ii) the representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(iii) on a pro forma basis (assuming, in the case of Incremental Revolving Commitments, that such Incremental Revolving Commitments are fully drawn), the Borrowers shall be in compliance with the covenant set forth in Section 6.3 and each other financial covenant as of the end of the latest fiscal quarter of the Borrowers for which financial statements are available; and

(iv) the Borrowers shall deliver or cause to be delivered any officer's certificates, legal opinions or other documents reasonably requested by the Agent.

(c) Increase Joinder. The Incremental Commitments shall be effected by a joinder agreement (the "Increase Joinder") executed by the Borrowers, the Agent and each Lender making such Incremental Commitment, in form and substance reasonably satisfactory to each of them. Notwithstanding the provisions of Section 15.2, the Increase Joinder may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, to effect the provisions of this Section 2.17. Within a reasonable time after the effective date of any increase or joinder, the Agent shall distribute such Increase Joinder to each of the Lenders. In addition, unless otherwise specifically provided herein, all references in Loan Documents to Revolving Loans shall be deemed, unless the context otherwise requires, to include references to Revolving Loans made pursuant to Incremental Revolving Commitments made pursuant to this Agreement. This Section 2.17 shall supersede any provisions to the contrary. In connection with any Incremental Commitments pursuant to this Section 2.17, any Person becoming a Lender pursuant to an Increase Joinder shall (1) execute such additional documents and agreements as the Agent may reasonably request and (2) in the case of any new Lender that is organized under the laws of a jurisdiction outside of the United States of America, provide to the Agent, its name, address, tax identification number and/or such other information as shall be necessary for the Agent to comply with "know your customer" and anti-money laundering rules and regulations, including without limitation, the Patriot Act.

(d) Adjustment of Revolving Loans. Each Lender that is acquiring an Incremental Revolving Commitment on the Increase Effective Date shall make a Revolving Loan, the proceeds of which will be used to prepay the Revolving Loans of the other Revolving Lenders immediately prior to such Increase Effective Date, so that, after giving effect thereto, the Revolving Loans outstanding are held by the Lenders pro rata based on their Revolving Commitments after giving effect to such Increase Effective Date. If there is a new Advance of Revolving Loans on such Increase Effective Date, the Lenders after giving effect to such Increase Effective Date shall make such Revolving Loans in accordance with Section 2.1.

(e) Equal and Ratable Benefit. The Loans and Revolving Commitments established pursuant to this paragraph shall constitute Loans and Revolving Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Liens created by the Collateral Documents, except that the new Loans may be subordinated in right of payment or the Liens securing the new Loans may be subordinated, in each case,

to the extent set forth in the Increase Joinder. The Loan Parties shall take any actions reasonably required by the Agent to ensure and/or demonstrate that the Liens granted by the Loan Documents continue to be perfected under the Uniform Commercial Cord or otherwise after giving effect to the establishment of any such new Revolving Commitments.

7. Amendment to Section 7.1. Section 7.1 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

**7.1 Merger, Consolidation, Acquisition and Sale of Assets.**

(a) Enter into any merger, division, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person except for in connection with and pursuant to the American Group Acquisition, the New WLX Holdings Acquisition, the A.M. Transportation Acquisition, the RFX Acquisition, the LTR Acquisition, the Taylor Transportation Acquisition and any Permitted Business Acquisition or permit any other Person to consolidate with or merge with it.

(b) Sell, pledge, lease, transfer or otherwise dispose of any of its properties or assets, other than (i) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete, not to exceed in the aggregate the sum of $500,000 in any consecutive twelve (12) month period, (ii) sales of inventory to Account Debtors in the ordinary course of business, (iii) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other Intellectual Property rights in the ordinary course of business, and (iv) leases (including leases to own) of tractors and trailers entered into in the ordinary course of business where the applicable Loan Party or Subsidiary is the lessor and the lessee is an owner-operator, (v) in transfer of equity in connection with the Employment Issuance, and (vi) the transfer of assets pursuant to the Taylor Transportation Contribution Agreement.

8. Amendment to Section 7.3. Section 7.3 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

7.3 **Guarantees**. Become liable upon the obligations of any Person by assumption, endorsement or Guaranty thereof or otherwise (other than to Agent or Lender or any affiliate thereof) except (a) the endorsement of checks in the ordinary course of business, (b) guarantees made by a Loan Party with respect to the Obligations of another Loan Party, (c) with respect to American Group, the guaranty for payment and performance given by American Group in connection with the American Group Seller Subordinated Note, (d) with respect to RFX and Pioneer, the Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer in connection with the RFX Subordinated Note, (e) with respect to Load to Ride and One Stop, the Guarantee Joinder to Subordinated Promissory Note, dated as of December 30, 2022, executed by Load to Ride and One Stop in connection with the LTR Subordinated Note, (f) with respect to Taylor Transportation, the Guarantee Joinder to Subordinated Promissory Note, dated as of March 31, 2023, executed by Taylor Transportation in connection with the Taylor Transportation Subordinated Note, and (g) the Guaranty made by Express Holdco of the

obligations owing from Express Properties to Huntington or any direct or indirect subsidiary or affiliate of Huntington under any mortgage loan provided by Huntington or any direct or indirect subsidiary or affiliate of Huntington to Express Properties in connection with the Corporate Retreat Purchase.

9. Amendment to Section 7.6. Section 7.6 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

7.6 **Capital Expenditures**. Make or incur any Capital Expenditure or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $10,000,000 in each fiscal year (other than Capital Expenditures or commitments thereof made or incurred in connection with the New WLX Holdings Acquisition, the LTR Acquisition, and the Taylor Transportation Acquisition), provided that, solely for the fiscal year ending December 31, 2023, Capital Expenditures made or incurred or commitments thereof in such fiscal year shall not be in excess of $18,750,000 (which includes Capital Expenditures made or incurred in connection with the Corporate Retreat Purchase).

10. Amendment to Section 7.8. Section 7.8 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

7.8 **Indebtedness**. Create, incur, assume or suffer to exist any Indebtedness except in respect of:

(a) Indebtedness existing on the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 7.8) and set forth on Schedule 7.8 (including any extensions, renewals or refinancings thereof);

(b) Indebtedness to Agent, Lender or any of their respective affiliates, regardless of whether pursuant to the Loan Documents;

(c) Indebtedness incurred for Capital Expenditures permitted under Section 7.6;

(d) Indebtedness as permitted under Section 7.3 and 7.11;

(e) Indebtedness arising from Hedging Contracts required pursuant to Section 6.8;

(f) Indebtedness arising in connection with the American Group Seller Subordinated Note which Indebtedness is subject to the American Group Seller Subordination Agreement;

(g) Indebtedness arising in connection with the A.M. Transportation Subordinated Note which Indebtedness is subject to the A.M. Transportation Subordination Agreement;

(h) Permitted Business Acquisition Indebtedness;

(i) Indebtedness arising in connection with the RFX Subordinated Note which Indebtedness is subject to the RFX Subordination Agreement;

(j) Indebtedness arising in connection with the LTR Subordinated Note which Indebtedness is subject to the LTR Subordination Agreement; and

(k) Indebtedness arising in connection with the Taylor Transportation Subordinated Note which Indebtedness is subject to the Taylor Transportation Subordination Agreement;

11. Section 9.5. Section 9.5 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

9.5 **Annual Financial Statements**. Furnish to Agent within one hundred fifty (150) days after the end of each fiscal year (except with respect to the fiscal year ending December 31, 2022, within one hundred eighty (180) days after the end of such fiscal year (but not later than June 30, 2023), unless otherwise extended by the Agent in its sole discretion), audited financial statements of Express Holdco and its Subsidiaries on a consolidated basis, including statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, together with consolidating schedules, all prepared in accordance with GAAP, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent. In addition, the reports shall be accompanied by a Compliance Certificate of Borrowers signed by an Authorized Officer of the Borrower Representative, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such event, and such Compliance Certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11.

12. Amendment to Section 10.13. Section 10.13 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

10.13 **Cross Default; Cross Acceleration**. Any Loan Party shall (a) default in any payment of principal of or interest on any Indebtedness beyond any period of grace with respect to such payment or (b) default in the observance of any other covenant, term or condition contained in any agreement or instrument (including, but not limited to, any agreements or instruments executed in connection with Corporate Retreat Property Mortgage Facility)pursuant to which such Indebtedness is created, secured or evidenced, if the effect of such default is to permit the acceleration of any such Indebtedness (whether or not such right shall have been waived);

13. Amendment to Section 11.7. Section 11.7 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

11.7 **Allocation of Payments After Event of Default**. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of Agent in connection with enforcing the rights of Agent, Lenders and Issuer under this Agreement and the Loan Documents and to the payment of any protective advances made by Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FOURTH, to the payment of the outstanding principal amount of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FIFTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of Lenders and Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender or Issuer;

SIXTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents;

SEVENTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit) and arising under the Term Loan;

EIGHTH, to the payment of all Obligations owing to Agent in connection with Banking Services and Hedging Contracts;

NINTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "EIGHTH" above;

TENTH, to the payment of all obligations owing to Huntington in connection with the Corporate Retreat Property Mortgage Facility; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of Lenders and Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that then outstanding Advances held by such Lender or Issuer bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FIFTH", "SIXTH", "SEVENTH", and "NINTH" above; and (c) to the extent that any amounts available for distribution pursuant to clause "SEVENTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by Agent in a cash collateral account and applied (i) first, to reimburse Issuer from time to time for any drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "EIGHTH" and "NINTH" above in the manner provided in this Section 11.7. For avoidance of doubt, any amounts received and applied to the obligations of the type described in clause "TENTH" shall only be applied after all amounts are applied to the items and obligations of the types described in clauses "FIRST" through "NINTH", to the extent such amounts have not been exhausted.

14. Supplemental Schedules. Each of the Schedules to the Credit Agreement listed in the below table is hereby supplemented, by the New Borrower, as set forth on the respective correspondingly numbered Schedules attached hereto and made a part hereof:

| ***Schedules:*** |
|---|
| Schedule 1.2(b) – Liens |
| Schedule 4.3 – Deposit Accounts |
| Schedule 4.5 – Inventory Locations |
| Schedule 4.15(c) – Borrower's States of Organization and Chief Executive Offices |
| Schedule 5.2 – Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 – Officer's, Directors, Shareholders, Capitalization |
| Schedule 5.10 – Patents, Trademarks, Copyrights and Licenses |
| Schedule 5.19 – Material Business Agreements |
| Schedule 5.21 – Business and Property |

15. Borrower Joinder and Assumption. The New Borrower hereby becomes a Borrower under the terms of the Credit Agreement and in consideration of the value of the synergistic and other benefits received by the New Borrower as a result of being affiliated with the Borrowers, the New Borrower hereby agrees that effective as of the date hereof it hereby is, and shall be deemed to be, and assumes the obligations of, a "Loan Party" and a "Borrower", jointly and severally under the Credit Agreement and each of the Notes, and a Borrower, Loan Party or other party, as the case may be, under each of the other Loan Documents to which the Borrowers or Loan Parties are a party, and the New Borrower hereby agrees that from the date hereof and so long as any Loan, Letter of Credit, or any commitment of any Lender shall remain outstanding and until the payment in full of the Obligations, the expiration of all Letters of Credit, and the

performance of all other obligations of the Borrowers and/or the Loan Parties under the Credit Agreement and the other Loan Documents, the New Borrower shall perform, comply with, and be subject to and bound by each of the terms and provisions of the Credit Agreement, the Notes, and each of the other Loan Documents jointly and severally with the existing parties thereto. Without limiting the generality of the foregoing, the New Borrower hereby represents and warrants that: (i) each of the representations and warranties set forth in the Credit Agreement applicable to a Loan Party is true and correct as to the New Borrower on and as of the date hereof, and (ii) the New Borrower has heretofore received a true and correct copy of the Credit Agreement, the Notes, and each of the other Loan Documents (including any modifications thereof or supplements or waivers thereto). The New Borrower hereby makes, affirms, and ratifies in favor of the Lender the Credit Agreement, the Notes, and each of the other Loan Documents given by the Borrowers to the Lender, and to secure the prompt payment and performance to the Lender of the Obligations, the New Borrower hereby assigns, pledges, and grants to the Lender, a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.

In furtherance of the foregoing, the New Borrower shall execute and deliver or cause to be executed and delivered at any time and from time to time such further instruments and documents and do or cause to be done such further acts, as may be necessary in the opinion of the Lender to carry out more effectively the provisions and purposes of the foregoing joinder and assumption and the other Loan Documents.

16. Release; No Discharge. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

17. Conditions to Effectiveness. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment; Notes; Other Deliverables. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment, the amended and restated Notes, amendments to and/or amendment and restatement of the other Loan Documents, as applicable, and all other documentation necessary for the effectiveness of this Amendment to the satisfaction of the Agent as set forth in a closing agenda provided by the Agent and its counsel.

(b) Insurance Policy. Borrowers shall deliver evidence, in form and substance acceptable to the Agent, that the New Borrower's receivables have been added to the accounts receivable insurance policy of the Borrowers.

(c) Schedules. The New Borrower shall deliver all applicable supplemental Schedules to the Credit Agreement and any other applicable Loan Documents in form and substance satisfactory to the Agent.

(d) Acquisition Documents. The Borrowers shall deliver all acquisition documents related to the Taylor Transportation Acquisition as set forth in the Credit Agreement and as otherwise required by the Agent.

(e) Equity Interest Certificates and Transfer Powers. To the extent applicable, Borrowers shall deliver to Agent original stock certificates and membership interest certificates, as the case may be, for the New Borrower, together with corresponding transfer powers duly executed in blank, and otherwise in form and substance satisfactory to the Agent.

(f) Opinion. The Borrowers shall deliver a written opinion of counsel (including local counsel if necessary) for the Loan Parties, dated the date hereof in form and substance satisfactory to the Agent and its counsel.

(g) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(h) Payment of Fees and Expenses. The Borrowers shall pay to the Agent for the ratable benefit of the Lenders, an amendment and waiver fee equal to $15,000. The Borrowers shall also reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

18. Post-Closing Obligations. Within thirty (30) days of the Effective Date (or such later date as may be consented to by the Agent) the Borrowers shall deliver evidence that the agreement between Samsara Capital Finance and New Borrower (assumed as part of the Taylor Transportation Acquisition) has been terminated.

19. Representations and Warranties. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of

Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and, other than the Existing Default, no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

20. Miscellaneous.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

**[SIGNATURE PAGES FOLLOW]**

**[SIGNATURE PAGE – THIRD AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC,**

By: ______________________ (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC**
**AGX FREIGHT LOGISTICS, LLC**
**AGX FREIGHT INTERMODAL, LLC**
**RFX TAMPA, LLC. NEW TAYLOR TRANSPORTATION, LLC**

By: ______________________ (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**[SIGNATURE PAGE – THIRD AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By:____________________________(SEAL)
Name: Richard S. Francis
Title: Manager

**A.M. TRANSPORTATION SERVICES LLC**

By:____________________________(SEAL)
Name: Richard S. Francis
Title: Director

**[SIGNATURE PAGE – THIRD AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By: ______________________________

Name: Helen K. Lau
Title: Vice President

**[SIGNATURE PAGE – THIRD AMENDMENT AND JOINDER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: [signature]
Name: Greg Boyer
Title: Senior Vice President

*Annex A*

# SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**among**

**THE HUNTINGTON NATIONAL BANK**
**(as Administrative Agent, a Lender and issuer of Letters of Credit)**

**THE LENDERS PARTY HERETO**

**and**

**R&R EXPRESS HOLDCO, INC,**
**R & R EXPRESS, INC.,**
**GT WORLDWIDE TRANSPORT, INC.,**
**BORDER CONNECT FREIGHT SERVICES, INC.,**
**PARADIGM TRANSPORTATION, LLC,**
**FINAL MILE DEDICATED GROUP, LLC,**
**R & R EXPRESS LOGISTICS, INC.,**
**GT WORLDWIDE LOGISTICS, LLC,**
**BORDER CONNECT LOGISTICS, INC.,**
**PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC,**
**FINAL MILE SOLUTIONS GROUP, LLC,**
**AAGEX FREIGHT GROUP, LLC,**
**AGX FREIGHT CARRIERS, LLC,**
**AGX FREIGHT LOGISTICS, LLC,**
**AGX FREIGHT INTERMODAL, LLC,**
**R&R EXPRESS PROPERTIES, LLC,**
**R&R EQUIPMENT LEASING, LLC**
**RXG&A, LLC,**
**TLOGISTICS, LLC,**
**R & R DRIVER SOLUTIONS INC,**
**NEW AMERICAN GROUP LLC,**
**NEW WLX HOLDINGS, LLC,**
**NEW WLX, LLC,**
**NEW WLE, LLC,**
**A.M. TRANSPORTATION SERVICES LLC,**
**RFX, LLC,**
**REFRIGERATED FOOD EXPRESS, LLC,**
**PIONEER TRANSFER, LLC**
**LOAD TO RIDE TRANSPORTATION, LLC,**
**ONE STOP FREIGHTWAYS, LLC,**
**RFX TAMPA, LLC, and**
**NEW TAYLOR TRANSPORTATION, LLC**

**as Borrowers**

**March 18, 2022**

**Supplemental**

**Schedule 1.2(b)**

*Liens*

1. Trailer Lease Agreement, dated August 1, 2022, by and between Taylor Express and Diamond Leasing and Finance, LLC
2. Lease Agreement, dated February 4, 2022, by and between Taylor Express and Fleet Equipment Leasing, LLC
3. Equipment Lease Agreement, dated October 31, 2020, by and between Taylor Express and PACCAR Financial Corp., as amended by Equipment Lease Agreement Schedule A, dated February 28, 2022
4. Security Agreement Retail Installment Contract, by and between Taylor Equipment and Peterbilt of Atlanta, LLC, dated August 31, 2022
5. Master Trailer Lease and Service Agreement, dated January 28, 2022, by and between Taylor Express and Star Leasing Company, LLC
6. Equipment Lease Agreement, dated January 18, 2022, by and between Taylor Express and XTRA Lease LLC

**Supplemental**
**Schedule 4.3**

**Deposit Accounts**

| Company or Subsidiary that is the Owner of the Deposit Account | Name and Address of Depository Bank | Account Type | Average Balance Maintained | Control Agreement Requested |
|---|---|---|---|---|
| New Taylor Transportation, LLC | The Huntington National Bank, 17 S. High Street, Columbus, OH | Business Checking (Check Writing) | $0.00 | No |
| New Taylor Transportation, LLC | The Huntington National Bank, 17 S. High Street, Columbus, OH | Business Checking (ACH's/Wires) | $0.00 | No |

**Supplemental**
**Schedule 4.5**

**Inventory Locations**

All inventory of New Taylor Transportation, LLC is located at 100 Commerce Drive, Pittsburgh, Pennsylvania; 1707 N 5th St., Union City, TN; 5523 US 301 Service Rd, Hope Mills, North Carolina; and 5417 US 301 Service Rd., Hope Mills, North Carolina.

**Supplemental**
**Schedule 4.15(c)**

**Borrowers' States of Organization and Chief Executive Offices**

| Loan Party | State of Incorporation | Address | Location of its CEO |
|---|---|---|---|
| New Taylor Transportation, LLC | PA | 100 Commerce Drive Pittsburgh, PA 15275 | 5523 US 301 Service Rd, Hope Mills, NC 28348 |

**Supplemental**

**Schedule 4.20**

Commercial Tort Claims

None.

**Supplemental**
**Schedule 5.2**

**Incorporation/Organization/Foreign Qualification/Subsidiaries**

| Loan Party | State of Incorporation/Organization | States Qualified to do Business In |
|---|---|---|
| New Taylor Transportation, LLC | PA | TN<br>NC |

**Schedule 5.3**

**Officers, Directors, Shareholders, Capitalization**

| Loan Party | Name of Executive Officers/ Directors | Title | Equity Holder |
|---|---|---|---|
| New Taylor Transportation, LLC | David Golupski<br>David Wiebusch | CEO<br>President | 100% owned by R&R Express Holdco, Inc. |

**Schedule 5.10**

**Patents, Trademarks, Copyrights and Licenses**

None.

**Schedule 5.19**

**Material Business Agreements**

1. Lease by and between Taylor 1419 N. 5th Street, TN LLC, as landlord, and New Taylor Transportation, LLC, as tenant, dated March 31, 2023, for real property located at 1707 N 5th St., Union City, TN 38261.

2. Lease by and between Taylor 5523 S. US 301, NC LLC, as landlord, and New Taylor Transportation, LLC, as tenant, dated March 31, 2023, for real property located at 5523 US 301 Service Rd, Hope Mills, NC 28348.

3. Lease by and between Taylor 5417 S. US 301, NC LLC, as landlord, and New Taylor Transportation, LLC, as tenant, dated March 31, 2023, for real property located at 5417 US 301 Service Rd, NC 28348.

4. Asset Purchase Agreement by and among Taylor Transportation, Inc., a Delaware corporation; Taylor Equipment Leasing, LLC, a Delaware limited liability company, and R&R Express Holdco, Inc., a Pennsylvania corporation, R&R Equipment Leasing, LLC, a Pennsylvania limited liability company and New Taylor Transportation, LLC, a Pennsylvania limited liability company dated March 31, 2023.

5. Truckload Service Level Agreement (SLA# 186-U-TL) between New Taylor Transportation, LLC and shipper / carrier The Goodyear Tire & Rubber Company dated May 1, 2016 and amended June 22, 2021 and May 2, 2022.

6. Transportation Services Agreement between New Taylor Transportation, LLC and shipper / carrier Kohler Co. dated October 29, 2021.

7. Agreement for Motor Carriage Transportation between New Taylor Transportation, LLC and shipper / carrier Mann+Hummel Purolator Filters, LLC dated March 3, 2020.

8. Agreement between American Trucking and Transportation Insurance Company (ATTIC), a Risk Retention Group and its Class A Shareholders, including R&R Express Holdco, Inc. who acquired 2.152 shares in ATTIC from White Willow Holdings, LLC. The Agreement establishes collateral in support of Auto Liability coverage for Taylor Transportation, LLC.

9. Equipment Lease Agreement, dated October 31, 2020, by and between Taylor Transportation, Inc. and PACCAR Financial Corp., as amended by Equipment Lease Agreement Schedule A, dated February 28, 2022, and Security Agreement, dated August 31, 2022, by and between Taylor Equipment Leasing and Peterbilt of Atlanta, LLC, as assigned to PACCAR Financial Corp. by Peterbilt of Atlanta, LLC, each as assigned to New Taylor Transportation, LLC.

**Schedule 5.21**

**Business and Property**

| Company | Nature of Business |
|---|---|
| New Taylor Transportation, LLC | Provision of transportation freight carrier services. |

*Execution Version*

# FOURTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS FOURTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of September 1, 2023 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation" together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking

association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers failed to timely deliver the annual financial statements to the Agent for the fiscal year ending December 31, 2022, by June 30, 2023, in violation of Section 9.5 of the Credit Agreement, which such violation constitutes an Event of Default pursuant to Section 10.4(a) of the Credit Agreement (the "Existing Default");

WHEREAS, the Existing Default is continuing as of the date hereof, and the Agent and the Lenders have reserved their rights to exercise remedies with respect to the Existing Default pursuant to a certain letter to the Borrower dated August 10, 2023 and executed by the Agent on behalf of the Lenders; and

WHEREAS, the Borrowers have requested that the Lenders agree to amend the Credit Agreement to increase the Letters of Credit sublimit on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. Recitals. The foregoing recitals are hereby incorporated by this reference.

2. Amendment to Section 2.7 of the Credit Agreement. Section 2.7 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

> **2.7 Letters of Credit**. Subject to the terms and conditions hereof, Issuer shall (a) issue letters of credit (together with the Existing Letters of Credit, collectively, "Letters of Credit") for the account of Borrowers; provided, however, that Issuer will not be required to issue any Letters of Credit to the extent that the stated amount of such Letters of Credit would then cause the Revolving Exposure of Borrowers to exceed the Maximum Borrowing Amount. The maximum stated amount of Letters of Credit outstanding shall not exceed $2,000,000 in the aggregate at any time. Each drawing under any Letter of Credit shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

3. Amendment to Section 15.3(b) of the Credit Agreement. Section 15.3(b) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

(b) Transfer of Commitments. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the commitment to make Advances and Loans hereunder (which for this purpose includes Advances and Loans outstanding thereunder) or, if the applicable commitment to make Advances and Loans hereunder is not then in effect, the principal outstanding balance of the Advances and Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Advances and Loans, unless Agent otherwise consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances and Loans or the commitment to make Advances and Loans hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Advances and Loans on a non-pro rata basis; (iii) any assignment of a commitment to make Advances and Loans hereunder must be approved by Agent unless the Person that is the proposed assignee is itself a Lender with a commitment to make Advances and Loans hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500). Subject to acceptance and recording thereof by Agent pursuant to Section 15.3(b), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 15.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 15.3(d).

4. Release; No Discharge. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

5. Conditions to Effectiveness. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment; Notes; Other Deliverables. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment and all other documentation necessary for the effectiveness of this Amendment to the satisfaction of the Agent.

(b) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(c) Payment of Fees and Expenses. The Borrowers shall also reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

6. Representations and Warranties. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and (other than

the Existing Default) no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

7. Miscellaneous.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended

to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

*[Signature Page Follows]*

**[SIGNATURE PAGE – FOURTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC,**

By:____________________________(SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC**
**AGX FREIGHT LOGISTICS, LLC**
**AGX FREIGHT INTERMODAL, LLC**
**RFX TAMPA, LLC. NEW TAYLOR TRANSPORTATION, LLC**

By: ____________________________(SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**[SIGNATURE PAGE – FOURTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By:______________________(SEAL)
Name: Richard S. Francis
Title: Manager

**A.M. TRANSPORTATION SERVICES LLC**

By:______________________(SEAL)
Name: Richard S. Francis
Title: Director

**[SIGNATURE PAGE – FOURTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By:______________________________
Name: Helen K. Lau
Title: Vice President

**[SIGNATURE PAGE – FOURTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: [signature]
Name: Greg Boyer
Title: Senior Vice President

*Execution Version*

# WAIVER AND FIFTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS WAIVER AND FIFTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of May 28, 2024 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation" together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking

association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers failed to timely deliver the annual financial statements to the Agent for the fiscal year ending December 31, 2022, by June 30, 2023, in violation of Section 9.5 of the Credit Agreement, which such violation constitutes an Event of Default pursuant to Section 10.4(a) of the Credit Agreement (the "Existing Default");

WHEREAS, the Existing Default is continuing as of the date hereof, and the Agent and the Lenders reserved their rights to exercise remedies with respect to the Existing Default pursuant to a certain letter to the Borrower dated August 10, 2023 and executed by the Agent on behalf of the Lenders; and

WHEREAS, the Borrowers have requested that the Lenders (i) waive the Existing Default and (ii) agree to amend the Credit Agreement to extend the due date for the Borrowers' delivery of the audited financial statements for each of the fiscal years ending December 31, 2022 and December 31, 2023, on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. Recitals. The foregoing recitals are hereby incorporated by this reference.

2. Limited Waiver of Existing Default. Effective as of the Effective Date hereof, the Agent and the Lenders hereby waive the Existing Default. Nothing contained herein shall constitute a waiver or release of any other Events of Default other than the Existing Default or give rise to an agreement or obligation by the Agent and the Lenders to waive any future Events of Default.

3. Amendment to Section 9.5 of the Credit Agreement. Section 9.5 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

> **9.5 Annual Financial Statements**. Furnish to Agent within one hundred fifty (150) days after the end of each fiscal year (except with respect to (i) the fiscal year ending December 31, 2022, not later than May 31, 2024, and (ii) the fiscal year ending December 31, 2023, within two hundred forty (240) days after the end of

such fiscal year (but not later than August 31, 2024), unless otherwise extended by the Agent in its sole discretion), audited financial statements of Express Holdco and its Subsidiaries on a consolidated basis, including statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, together with consolidating schedules, all prepared in accordance with GAAP, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent. In addition, the reports shall be accompanied by a Compliance Certificate of Borrowers signed by an Authorized Officer of the Borrower Representative, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such event, and such Compliance Certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11.

4. Release; No Discharge. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

5. Conditions to Effectiveness. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment; Notes; Other Deliverables. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment and all other documentation necessary for the effectiveness of this Amendment to the satisfaction of the Agent.

(b) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(c) Payment of Fees and Expenses. The Borrowers shall pay to Agent for the benefit of the Lenders a fee in the amount of $5,000 and also reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

6. Representations and Warranties. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and (other than the Existing Default) no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

7. Miscellaneous.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

*[Signature Page Follows]*

**[SIGNATURE PAGE – WAIVER AND FIFTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC,**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC**
**AGX FREIGHT LOGISTICS, LLC**
**AGX FREIGHT INTERMODAL, LLC**
**RFX TAMPA, LLC. NEW TAYLOR TRANSPORTATION, LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**[SIGNATURE PAGE – WAIVER AND FIFTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By: Richard S Francis (SEAL)
Name: Richard S. Francis
Title: Manager

**A.M. TRANSPORTATION SERVICES LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: Authorized Signer Manager

**[SIGNATURE PAGE – WAIVER AND FIFTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By: [signature]
Name: HELEN K. LAU
Title: VICE PRESIDENT

**[SIGNATURE PAGE – WAIVER AND FIFTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: [signature]
Name: Greg Royer
Title: Senior Vice President

***Execution Version***

**SIXTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT**

**THIS SIXTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of July 31, 2024 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers have requested that the Lenders (i) make a new Term Loan to the Borrowers on the Effective Date to fund the purchase of certain new Owned Real Property located in North Carolina, and (ii) make certain other amendments and grant certain other accommodations all as hereinafter provided, on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. **Recitals**. The foregoing recitals are hereby incorporated by this reference.

2. **Amendments**.

(a) On the Effective Date, the Credit Agreement, is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text or double-underlined text) as set forth in a conformed copy of the Credit Agreement attached as Exhibit A hereto (the credit agreement attached hereto as Exhibit A being referred to herein as the "Composite Credit Agreement").

(b) Each of Schedule 1 [Commitments of Lenders], Schedule 1.2(a) [Owned Real Property], Schedule 1.2(b) [Liens], Schedule 4.5 [Inventory Locations], Schedule 5.2 [Incorporation / Organization / Foreign Qualification / Subsidiaries], Schedule 5.3 [Officers, Directors, Shareholders, Capitalization], and Schedule 5.19 [Material Business Agreements] of the Credit Agreement are hereby amended and restated in their entirety in the forms attached hereto as Exhibit B, respectively.

(c) Each of Exhibit A [Form of Borrowing Base Certificate] and Exhibit D [Form of Compliance Certificate] of the Credit Agreement are hereby amended and restated in their entirety in the forms attached hereto as Exhibit C, respectively.

(d) With the exception of the above noted schedules and exhibits, no other schedules or exhibits to the Credit Agreement are being amended or modified in connection with this Amendment.

3. **Release; No Discharge**. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

4. **Conditions to Effectiveness**. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment.

(b) Execution and Delivery of the Notes. The Borrowers shall have executed and delivered to the Agent a new Term Loan 2 Note (as defined in the Composite Credit Agreement), and a corresponding Disclosure for Confession of Judgment.

(c) Secretary's Certificates. The Agent shall have received a certificate dated as of the Effective Date and signed by the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each of the Loan Parties, in form and substance satisfactory to the Agent, certifying as appropriate as to: (i) all action taken by each Loan Party in connection with this Amendment and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated hereunder and under the Credit Agreement; (ii) the names of the Authorized Officers authorized to sign the Loan Documents and their true signatures; and (iii) copies of its Charter Documents as in effect on the date hereof certified by the appropriate state official where such documents are filed in a state office together with certificates from the appropriate state officials as to the continued existence and good standing of each Loan Party in each state where organized or qualified to do business (or to the extent previously delivered to the Agent, certification from each such Loan Party of no changes to its Charter Documents since last delivered to the Agent).

(d) Officer's Certificate. A certificate of each of the Borrowers signed by an Authorized Officer, dated as of the Effective Date, in form and substance satisfactory to the Agent, stating that: (i) each Borrower has complied with all duties and obligations required to date to be carried out and performed by it pursuant to the terms of the Credit Agreement or any other Loan Document, (ii) no Default or Event of Default has occurred and is continuing, or would result from the Loans to be made on the date hereof or from the application of the proceeds therefrom, (iii) all representations and warranties contained in the Credit Agreement, as supplemented by the revised schedules hereto, or any other Loan Document are true and correct as of the date hereof, and (iv) each Borrower is in compliance with all agreements and conditions under the Credit Agreement and the Loan Documents.

(e) Opinion. The Borrowers shall deliver a written opinion of counsel (including local counsel if necessary) for the Loan Parties, dated as of the Effective Date in form and substance satisfactory to the Agent and its counsel.

(f) Lien Searches. If not yet delivered in connection with the Revolving Commitment Increase Agreement (as defined in the in the Composite Credit Agreement), the Agent shall have received accurate and complete copies of any Lien, pending suit, title and other public record searches required by the Agent.

(g) KYC/AML/Beneficial Ownership. The Agent shall have received all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by the Agent.

(h) Real Estate Documents and Diligence. With respect to each new parcel of Owned Real Property, the Agent shall have received:

(i) a fully executed and notarized Mortgage;

(ii) a fully executed Environmental Indemnity Agreement;

(iii) ALTA mortgagee's title policy with endorsements as required by the Agent;

(iv) an appraisal (market value "as is") prepared by an appraiser acceptable to the Agent;

(v) environmental reports and/or other environmental diligence acceptable to the Agent;

(vi) surveys and zoning letters acceptable to the Agent, to the extent required by the Agent in its discretion; and

(vii) if any such parcel of Owned Real Property is determined by the Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to the Agent.

(i) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(j) Payment of Fees and Expenses. The Borrowers shall reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

(k) Miscellaneous. The Loan Parties shall have provided such other documents, agreements, instruments, deliverables and items deemed reasonably necessary by the Agent and shall have satisfied such other conditions as set forth in the closing agenda provided to the Loan Parties in connection with this Amendment.

5. **Representations and Warranties**. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been

obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

6. **Post-Closing Obligations**.

(a) Within sixty (60) days of the Effective Date (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall deliver all Waivers satisfactory to the Agent with respect to all new premises leased by the Loan Parties or at which Inventory is located, in accordance with the updates to Schedule 4.5 [Inventory Locations] hereto.

(b) Within thirty (30) days of the Effective Date (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall deliver all new foreign qualification good standing certificates not previously delivered to the Agent, in accordance with the updates to Schedule 5.2 [Incorporation/Organization/Foreign Qualification/Subsidiaries] hereto.

(c) Within the earlier of (i) sixty (60) days of the Effective Date, or (ii) the closing of the next amendment to the Credit Agreement (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall deliver an updated Schedule 5.10 [Patents, Trademarks, Copyrights and Licenses] along with any filings and/or documentation in connection thereto.

(d) Within forty-five (45) days of the Effective Date (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall deliver such evidence of the dissolution, in form and substance satisfactory to the Agent, of (i) Final Mile, and (ii) Final Mile Solutions.

(e) By September 30, 2024, the Borrowers shall have sold the Owned Real Property located at 1401 Iron St. in North Kansas City, MO 64116 (owned by Express Properties) and all proceeds thereto shall be subject to the terms and conditions of the Credit Agreement (the "Missouri Property Sale"); provided that, if the Missouri Property Sale does not occur by September 30, 2024, the Borrowers shall deliver, no later than by November 29, 2024 (or such later date as may be consented to by the Agent in its sole discretion), in form and substance satisfactory to the Agent (i) a fully executed and notarized Mortgage, (ii) a fully executed Environmental Indemnity Agreement, (iii) ALTA mortgagee's title policy with endorsements as required by the Agent, (iv) an appraisal, (v) environmental reports and/or other environmental diligence acceptable to the Agent, and (vi) such other information, documentation, and certifications as may be reasonably required by the Agent.

7. **Miscellaneous**.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any

provisions of the Credit Agreement except as expressly amended hereby. Each Loan Party hereby further confirms its guarantees, pledges and grants of security interests, as applicable, under each of the Loan Documents to which it is party. Each Loan Party reconfirms the prior grant of the security interest in and first priority, perfected lien in favor of the Agent for its benefit and the ratable benefit of each Lender, upon and to, all of its right, title and interest in and to the Collateral, whether now owned or hereafter acquired, created or arising and wherever located.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) Further Assurances. The Borrowers agree to execute such other documents, instruments and agreements and take such further actions reasonably requested by the Agent to effectuate the provisions of this Amendment.

(f) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

*[Signature Page Follows]*

**[SIGNATURE PAGE – SIXTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC, AGX FREIGHT LOGISTICS, LLC, AGX FREIGHT INTERMODAL, LLC, RFX TAMPA, LLC, NEW TAYLOR TRANSPORTATION, LLC, A.M. TRANSPORTATION SERVICES LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: Manager

**[SIGNATURE PAGE – SIXTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK,** a national banking association, as Agent, a Lender and Issuer

By:____________________________
Name: Nelson Rauscher
Title: Vice President

**[SIGNATURE PAGE – SIXTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: ______________________
Name: Jacob Breckstone
Title: Portfolio Manager

**<u>EXHIBIT A</u>**

<u>Composite Credit Agreement</u>

*Exhibit A – Sixth Amendment to Second A&R Credit and Security Agreement*

*First Amendment dated December 30, 2022*
*Incorporating Second Amendment dated February 7, 2023*
*Third Amendment and Joinder dated June 21, 2023*
*Fourth Amendment dated September 1, 2023*
*Fifth Amendment dated May 28, 2024*
*Revolving Credit Increase Agreement dated June 26, 2024*
*Sixth Amendment dated July 31, 2024*

# SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**among**

**THE HUNTINGTON NATIONAL BANK**
**(as Administrative Agent, a Lender and issuer of Letters of Credit)**

**THE LENDERS PARTY HERETO**

**and**

**R&R EXPRESS HOLDCO, INC,**
**R & R EXPRESS, INC.,**
**GT WORLDWIDE TRANSPORT, INC.,**
**BORDER CONNECT FREIGHT SERVICES, INC.,**
**PARADIGM TRANSPORTATION, LLC,**
**FINAL MILE DEDICATED GROUP, LLC,**
**R & R EXPRESS LOGISTICS, INC.,**
**GT WORLDWIDE LOGISTICS, LLC,**
**BORDER CONNECT LOGISTICS, INC.,**
**PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC,**
**FINAL MILE SOLUTIONS GROUP, LLC,**
**AAGEX FREIGHT GROUP, LLC,**
**AGX FREIGHT CARRIERS, LLC,**
**AGX FREIGHT LOGISTICS, LLC,**
**AGX FREIGHT INTERMODAL, LLC,**
**R&R EXPRESS PROPERTIES, LLC,**
**R&R EQUIPMENT LEASING, LLC**
**RXG&A, LLC,**
**TLOGISTICS, LLC,**
**R & R DRIVER SOLUTIONS INC,**
**NEW AMERICAN GROUP LLC,**
**NEW WLX HOLDINGS, LLC,**
**NEW WLX, LLC,**
**NEW WLE, LLC,**
**A.M. TRANSPORTATION SERVICES LLC,**
**RFX, LLC,**
**REFRIGERATED FOOD EXPRESS, LLC,**

**PIONEER TRANSFER, LLC**
**LOAD TO RIDE TRANSPORTATION, LLC,**
**ONE STOP FREIGHTWAYS, LLC,**
**RFX TAMPA, LLC, and**
**NEW TAYLOR TRANSPORTATION, LLC**

**as Borrowers**

**March 18, 2022**

# TABLE OF CONTENTS


Page

**ARTICLE 1 DEFINITIONS** **2**

1.1 Accounting Terms 2
1.2 General Terms 2
1.3 Uniform Commercial Code Terms ~~33~~36
1.4 General Matters of Construction ~~34~~36
1.5 Time References ~~34~~37
1.6 Lease Accounting Changes. ~~34~~37
1.7 Rates. ~~35~~37

**ARTICLE 2 ADVANCES, PAYMENTS** **~~35~~38**

2.1 Revolving Loans ~~35~~38
2.2 Procedure for Borrowing Advances. ~~35~~38
2.3 Disbursement of Loan Proceeds ~~36~~38
2.4 Repayment of Loans ~~36~~38
2.5 Mandatory Reduction or Prepayment of Loans. ~~37~~39
2.6 Statement of Account ~~37~~40
2.7 Letters of Credit ~~37~~40
2.8 Issuance of Letters of Credit. ~~38~~40
2.9 Requirements For Issuance of Letters of Credit. ~~39~~41
2.10 Term ~~Loan~~Loans. ~~40~~43
2.11 Additional Payments ~~41~~44
2.12 Use of Proceeds ~~41~~44
2.13 Joint and Several Obligations of Loan Parties ~~41~~45
2.14 Borrower Representative. ~~43~~46
2.15 Manner of Borrowing and Payment; Settlement. ~~43~~47
2.16 Defaulting Lender. ~~45~~48
2.17 Increase in Commitments. ~~46~~49

**ARTICLE 3 INTEREST AND FEES** **~~48~~51**

3.1 Interest. ~~48~~51
3.2 Letter of Credit Fees. ~~48~~52
3.3 Unused Facility Fee ~~49~~52
3.4 Reserved. ~~49~~52
3.5 Reserved ~~49~~52
3.6 Computation of Interest and Fees ~~49~~; Restatement; Conforming Changes 52
3.7 Maximum Charges ~~49~~53
3.8 Increased Costs; Losses ~~49~~53
3.9 ~~Indemnity; Benchmark Replacement Setting;~~ Illegality; Inability to Determine Rates. ~~50~~55
3.10 ~~Capital Adequacy~~ ~~52~~Effect of Benchmark Transition Event. 55
3.11 Taxes 56

3.12 Survival. 60

**ARTICLE 4 COLLATERAL; SECURITY AGREEMENT** **~~53~~60**

4.1 Security Interest in the Collateral ~~53~~60
4.2 Perfection of Security Interest ~~53~~61
4.3 Dominion of Funds, Lockbox, and Deposit Accounts ~~54~~61
4.4 Preservation and Disposition of Collateral ~~54~~62
4.5 Ownership of Collateral ~~55~~63
4.6 Defense of the Interests of Agent and Lenders ~~55~~63
4.7 Books and Records ~~56~~64
4.8 Financial Disclosure ~~56~~64
4.9 Compliance with Laws ~~56~~64
4.10 Inspection of Premises; Appraisals ~~57~~64
4.11 Insurance ~~57~~65
4.12 Failure to Pay Insurance ~~58~~66
4.13 Payment of Taxes ~~58~~66
4.14 Payment of Leasehold Obligations ~~58~~66
4.15 Accounts Receivable ~~59~~66
4.16 Maintenance of Equipment ~~60~~68
4.17 Exculpation of Liability ~~60~~68
4.18 Environmental Matters. ~~61~~68
4.19 Financing Statements ~~61~~69
4.20 Commercial Tort Claims. ~~61~~69
4.21 Pledged Securities. ~~62~~70

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES** **~~64~~71**

5.1 Authority ~~64~~71
5.2 Formation and Qualification; Subsidiaries ~~64~~72
5.3 Officers, Directors, Shareholders, Capitalization ~~64~~72
5.4 Governmental Approvals; No Conflicts ~~64~~72
5.5 Tax Returns ~~65~~72
5.6 Financial Statements. ~~65~~73
5.7 Organization Name ~~65~~73
5.8 OSHA and Environmental Compliance. ~~66~~73
5.9 Solvency; No Litigation, No Violation, ERISA. ~~66~~74
5.10 Patents, Trademarks, Copyrights and Licenses ~~67~~74
5.11 Licenses and Permits ~~67~~75
5.12 Default of Indebtedness ~~67~~75
5.13 No Burdensome Restrictions; No Default ~~67~~75
5.14 No Labor Disputes ~~67~~75
5.15 Margin Regulations ~~68~~75
5.16 Investment Company Act ~~68~~76
5.17 Disclosure ~~68~~76
5.18 Hedging Contracts ~~68~~76
5.19 Material Business Agreements ~~68~~76
5.20 Application of Certain Laws and Regulations ~~68~~76
5.21 Business and Property of the Loan Parties ~~68~~76

5.22 ~~Anti-Terrorism Laws~~ ~~68~~Reserved 76
5.23 Anti-Corruption Laws and Sanctions ~~68~~76
5.24 Beneficial Ownership Certificate. ~~69~~77

**ARTICLE 6 AFFIRMATIVE COVENANTS** **~~69~~77**

6.1 Conduct of Business and Maintenance of Existence and Assets. ~~69~~77
6.2 Violations ~~69~~78
6.3 Consolidated Fixed Charge Coverage Ratio ~~70~~78
6.4 Execution of Supplemental Instruments ~~70~~78
6.5 Payment of Indebtedness ~~70~~78
6.6 Standards of Financial Statements ~~70~~78
6.7 Taxes ~~70~~78
6.8 Interest Rate Protection ~~70~~78
6.9 Deposit Accounts ~~70~~78
6.10 Credit Insurance ~~71~~79
6.11 2022 Real Estate Purchase. ~~71~~79
6.12 Post-Closing Obligations. ~~71~~79
6.13 Compliance with Anti-Corruption Laws and Sanctions. 80

**ARTICLE 7 NEGATIVE COVENANTS** **~~72~~80**

7.1 Merger, Consolidation, Acquisition and Sale of Assets. ~~72~~80
7.2 Creation of Liens ~~72~~80
7.3 Guarantees ~~72~~80
7.4 Investments ~~73~~81
7.5 Loans ~~73~~81
7.6 Capital Expenditures ~~73~~81
7.7 Dividends, Distributions and Restricted Payments ~~74~~82
7.8 Indebtedness. ~~74~~82
7.9 Nature of Business ~~75~~83
7.10 Transactions with Affiliates ~~75~~83
7.11 Leases ~~75~~84
7.12 Subsidiaries; Partnerships. ~~76~~84
7.13 Fiscal Year and Accounting Changes ~~76~~84
7.14 Pledge of Credit ~~76~~84
7.15 Amendment of Charter Documents ~~76~~84
7.16 ERISA ~~76~~84
7.17 Prepayment of Indebtedness ~~76~~84
7.18 Modification of Material Business Agreements ~~76~~85
~~7.19 Anti-Terrorism Laws 77~~

**ARTICLE 8 CONDITIONS PRECEDENT** **~~77~~85**

8.1 Conditions to Initial Loans ~~77~~85
8.2 Conditions to Each Advance ~~80~~88

**ARTICLE 9 INFORMATION AS TO THE LOAN PARTIES** **~~81~~89**

9.1 Disclosure of Material Matters ~~81~~89

9.2 Schedules and Certificates ~~81~~89
9.3 Litigation ~~82~~90
9.4 Material Occurrences ~~82~~90
9.5 Annual Financial Statements ~~82~~90
9.6 Monthly Financial Statements ~~82~~90
9.7 Additional Information ~~83~~91
9.8 Projected Operating Budget, Availability Forecast ~~83~~91
9.9 Notice of Suits, Adverse Events ~~83~~91

**ARTICLE 10 EVENTS OF DEFAULT ~~84~~92**

10.1 Payment of Obligations ~~84~~92
10.2 Payment of Reductions or Mandatory Prepayments ~~84~~92
10.3 Misrepresentations ~~84~~92
10.4 Failure to Furnish Information, Schedules, Certificates ~~84~~92
10.5 Liens Against Assets ~~84~~92
10.6 Breach of Covenants ~~84~~92
10.7 Judgment ~~84~~92
10.8 Insolvency and Related Proceedings ~~85~~92
10.9 Guarantor Default ~~85~~93
10.10 Material Adverse Effect ~~85~~93
10.11 Loss of Priority Lien ~~85~~93
10.12 Breach of Material Business Agreements ~~85~~93
10.13 Cross Default; Cross Acceleration ~~85~~93
10.14 Change of Control ~~85~~93
10.15 Invalidity of Loan Documents ~~86~~93
10.16 Loss of Material Intellectual Property ~~86~~93
10.17 Destruction of Collateral ~~86~~94
10.18 Business Interruption ~~86~~94
10.19 Hedging Contracts ~~86~~94

**ARTICLE 11 AGENT'S RIGHTS AND REMEDIES AFTER DEFAULT ~~86~~94**

11.1 Rights and Remedies ~~86~~94
11.2 Agent Discretion ~~87~~95
11.3 Setoff ~~87~~95
11.4 Rights and Remedies not Exclusive ~~87~~95
11.5 Appointment of Receiver ~~87~~95
11.6 Reserved ~~88~~95
11.7 Allocation of Payments After Event of Default. ~~88~~95

**ARTICLE 12 WAIVERS AND JUDICIAL PROCEEDINGS ~~89~~97**

12.1 Waiver of Notice ~~89~~97
12.2 Delay ~~89~~97
12.3 Jury Waiver ~~89~~97

**ARTICLE 13 EFFECTIVE DATE AND TERMINATION ~~90~~98**

13.1 Term ~~90~~98
13.2 Termination ~~90~~98

**ARTICLE 14 REGARDING AGENT** ........ ~~90~~98

14.1 Appointment. ........ ~~90~~98
14.2 Nature of Duties. ........ ~~91~~99
14.3 Lack of Reliance on Agent and Resignation. ........ ~~91~~99
14.4 Certain Rights of Agent. ........ ~~92~~100
14.5 Reliance. ........ ~~92~~100
14.6 Notice of Default.. ........ ~~92~~100
14.7 Indemnification. ........ ~~93~~100
14.8 Agent in its Individual Capacity. ........ ~~93~~101
14.9 Delivery of Documents. ........ ~~93~~101
14.10 Loan Parties' Undertaking to Agent.. ........ ~~93~~101
14.11 No Reliance on Agent's Customer Identification Program. ........ ~~93~~101
14.12 Erroneous Payments. ........ ~~93~~101
14.13 Agent Professionals. ........ 103

**ARTICLE 15 MISCELLANEOUS** ........ ~~95~~103

15.1 Governing Law ........ ~~95~~103
15.2 Entire Understanding ........ ~~95~~103
15.3 Transfers and Assignments. ........ ~~98~~106
15.4 Application of Payments ........ ~~101~~109
15.5 Indemnity ........ ~~101~~109
15.6 Notice ........ ~~101~~109
15.7 Survival ........ ~~103~~111
15.8 Severability ........ ~~103~~111
15.9 Expenses ........ ~~103~~111
15.10 Important Information About Procedures Required by the USA Patriot Act ........ ~~104~~112
15.11 Injunctive Relief ........ ~~104~~112
15.12 No Liability; Consequential Damages ........ ~~104~~112
15.13 Counterparts; Electronic Signatures ........ ~~104~~112
15.14 Construction ........ ~~104~~112
15.15 Confidentiality; Sharing Information. ........ ~~105~~113
15.16 Publicity ........ ~~105~~113
15.17 Conflict Clause ........ ~~105~~113
15.18 Amendment and Restatement. ........ ~~106~~114

# LIST OF SCHEDULES AND EXHIBITS

All Schedules to the Credit and Security Agreement:


| | |
|---|---|
| Schedule 1 | Commitments of Lenders |
| Schedule 1.2(a) | Owned Real Property |
| Schedule 1.2(b) | Liens |
| Schedule 1.2(c) | Existing Letters of Credit |
| Schedule 4.3 | Deposit Accounts |
| Schedule 4.5 | Inventory Locations |
| Schedule 4.15(c) | Loan Parties' States of Organization and Chief Executive Offices |
| Schedule 4.20 | Commercial Tort Claims |
| Schedule 5.2 | Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 | Officers, Directors, Shareholders, Capitalization |
| Schedule 5.9(b) | Litigation |
| Schedule 5.10 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 5.19 | Material Business Agreements |
| Schedule 5.21 | Business and Property |
| Schedule 7.4 | Investments |
| Schedule 7.5 | Loans |
| Schedule 7.8 | Indebtedness |


All Exhibits to the Credit and Security Agreement:


Exhibit A Form of Borrowing Base Certificate
Exhibit B Form of Revolving Note
Exhibit C Form of Term Loan Note
Exhibit D Form of Compliance Certificate

# SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

This **SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Agreement"), has been executed and is dated as of March 18, 2022 by and among **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING, LLC**, a Pennsylvania limited liability company, ("Equipment Leasing"), **R&R EXPRESS HOLDCO, INC.**, a Pennsylvania corporation ("Express Holdco"), **RxG&A, LLC**, a Pennsylvania limited liability company ("RxG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), and **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", and together with Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, Express Holdco, RxG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, RFX Tampa and any other Person who may hereafter become a borrower hereunder are each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and **THE HUNTINGTON NATIONAL BANK**, as Agent, Lender and Issuer.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. All financial computations to be made under this Agreement, unless otherwise specifically provided herein, shall be made in accordance with GAAP applied on a basis consistent with the financial statements delivered to Agent on or prior to the Closing Date. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" or "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Express Holdco and its Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

1.2 **General Terms**. For purposes of this Agreement, the following terms shall have the following meanings:

"2022 Real Estate Purchase" means, that certain purchase by Express Properties of the real property located at 200 Industrial Drive, Pittsburgh, PA 15275; provided that (i) prior to completing such purchase the purchaser provides ten (10) Business Days' advance written notice to the Agent of its intent to make such purchase, (ii) the purchase price shall not exceed $2,500,000, (iii) the Loan Parties shall demonstrate proforma Undrawn Availability of the Loan Parties for the ninety (90) day period prior to such proposed purchase and immediately after giving effect to such proposed purchase is greater than the greater of (1) ten percent (10%) of the Borrowing Base or (2) $5,000,000, and (iv) no Event of Default or Default shall exist immediately prior to or after giving effect to such purchase.

"2024 Revolving Commitment Increase Agreement" means that certain Revolving Commitment Increase Agreement, dated as of June 26, 2024, by and between the Agent, the Issuer, Huntington, as the increasing lender, and the Borrowers, which increased the Revolving Commitment to $85,000,000, pursuant to and in accordance with Section 2.17 of this Agreement.

"AAGEX Entities" means, collectively, AAGEX Group, AGX Carriers, AGX Intermodal, and AGX Logistics.

"AAGEX Group" means AAGEX Freight Group, LLC, a Florida limited liability company.

"Advances" means each Revolving Loan and issuance of a Letter of Credit.

"Affiliate" means as to any Person, any other Person (excluding any Foreign Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to be "controlled by" a Person if such Person possesses, directly or indirectly, power either (i) to vote five percent (5%) or more of the securities having ordinary voting power for the election of directors of such

Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent" shall mean Huntington, in its capacity as administrative agent and collateral agent for Lenders, and their successors and assigns.

"Agent Professionals" shall mean attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Agent.

"Aggregate Commitment" means the sum of the Aggregate Revolving Commitment plus the Aggregate Term Loan Commitment plus the Aggregate Term Loan 2 Commitment.

"Aggregate Credit Exposure" shall mean, at any time, the aggregate Credit Exposure of all Lenders.

"Aggregate Revolving Commitment" shall mean, at any time, the aggregate Revolving Commitments of all Lenders. The Aggregate Revolving Commitment as of June 26, 2024 (pursuant to the 2024 Revolving Commitment Increase Agreement) is $85,000,000.

"Aggregate Revolving Exposure" shall mean, at any time, the aggregate Revolving Exposure of all Lenders.

"Aggregate Term Loan Commitment" shall mean, at any time, the aggregate Term Loan Commitments of all Lenders. The Aggregate Term Loan Commitment as of the Closing Date is $3,675,000.

"Aggregate Term Loan 2 Commitment" shall mean, at any time, the aggregate Term Loan 2 Commitments of all Lenders. The Aggregate Term Loan 2 Commitment as of the Sixth Amendment Effective Date is $972,000.

"Agreement" shall have the meaning set forth in the preamble, as the same may be amended, restated, modified, or supplemented from time to time.

"AGX Carriers" means AGX Freight Carriers, LLC, a Georgia limited liability company.

"AGX Intermodal" means AGX Freight Intermodal, LLC, a Florida limited liability company.

"AGX Logistics" means AGX Freight Logistics, LLC, Georgia limited liability company.

"Alternate Base Rate" means, for any day, a ~~fluctuating interest~~ rate per annum equal to the ~~highest~~greatest of: (a) the Prime ~~Commercial~~ Rate in effect on such day, (b) the Fed Funds Rate in effect on such day *plus* ~~0.25%, (c) Daily Simple SOFR plus 0.25~~0.50% per annum, and (~~d~~c) Daily Simple SOFR for such day (taking into account the Floor~~. Each~~ set forth in the definition of "Daily Simple SOFR") *plus* 2.00% per annum. Any change in the Alternate Base Rate ~~shall automatically and immediately change the interest rate on any Domestic Rate Loans that accrue interest with respect to the Alternate Base Rate, without notice to Borrowers, subject~~

to any maximum or minimum interest rate limitation specified by applicable law, it being agreed that (i) such rate is not necessarily the lowest rate of interest then available from Agent on fluctuating rate loans and (ii) such rate may be established by Agent by public announcement or otherwise.due to a change in the Prime Rate, the Fed Funds Rate or Daily Simple SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Fed Funds Rate or Daily Simple SOFR, respectively. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

"A.M. Transportation" means A.M. Transportation Services LLC, a Pennsylvania limited liability company.

"A.M. Transportation Acquisition" means Express Holdco's acquisition of sixty percent (60%) of the issued and outstanding voting membership interests of A.M. Transportation pursuant to the A.M. Transportation Acquisition Documents.

"A.M. Transportation Acquisition Documents" means, collectively, the (i) Asset Purchase Agreement, dated as of March 31, 2021, by and among A.M. Transportation Services, Inc., a Massachusetts corporation, A.M. Transportation, and the other parties party thereto, (ii) Operating Agreement of A.M. Transportation effective as of March 2, 2021, (iii) A.M. Transportation Subordination Agreement, (iv) A.M. Transportation Subordinated Note, and (v) all other documents and instruments delivered in connection with the A.M. Transportation Acquisition.

"A.M. Transportation Subordinated Note" means that certain Subordinated Promissory Note, effective March 31, 2021 made by A.M. Transportation in favor of A.M. Transportation Services, Inc. in the amount of $500,000 being a portion of the purchase price in connection with the A.M. Transportation Acquisition payable on terms acceptable to Agent.

"A.M. Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of March 31, 2021, among the Agent, A.M. Transportation Services, Inc., and A.M. Transportation.

"American Group" means New American Group LLC, a Pennsylvania limited liability company.

"American Group Acquisition" means Express Holdco's acquisition of sixty percent (60%) of the issued and outstanding membership interests of American Group pursuant to the American Group Acquisition Documents.

"American Group Acquisition Documents" means, collectively, the (i) Membership Interest Purchase Agreement, dated as of November 30, 2019 by and among the Seller (as defined therein) party thereto, the members of the Seller, American Group and Express Holdco, (ii) Operating Agreement of American Group, dated as of November 30, 2019, executed by American Group Seller and Express Holdco, as members,(iii) Contribution Agreement by

American Group Seller, American Group and Express Holdco, as buyer and (iv) all other documents and instruments delivered in connection with the American Group Acquisition.

"American Group Seller" shall mean American Group, LLC, an Arizona limited liability company, the parent company of American Group and seller of certain of the membership interest of American Group under the American Group Acquisition Documents, to be known as MSKD, LLC after the consummation of the American Group Acquisition.

"American Group Seller Subordinated Note" means that certain Subordinated Promissory Note made by Express Holdco in favor of American Group Seller in the amount of $2,150,000 being a portion of the purchase price in connection with the American Group Acquisition and payable on terms acceptable to Agent commencing on the first day of the month following ninety days (90) after November 30, 2019 as permitted pursuant to the American Group Seller Subordination Agreement.

"American Group Seller Subordination Agreement" means the Subordination Agreement dated as December 14, 2018 among American Group Seller, as seller, the Borrowers, and the Agent.

"Annual Dividends" means annual non-tax dividends or distributions made by any Loan Party; provided that (i) prior to making any such annual dividend or distribution the Loan Parties provide ten (10) Business Days' advance written notice to the Agent of their intent to make such proposed annual dividend or distribution; (ii) the Loan Parties shall demonstrate proforma (a) Consolidated Fixed Charge Coverage Ratio of not less than 1.25 to 1.00 after giving effect to any such proposed annual divided or distribution and (b) Undrawn Availability of the Loan Parties for the ninety (90) day period prior to any such proposed annual dividend or distribution and immediately after giving effect to any such proposed annual dividend or distribution is greater than the greater of (1) ten percent (10%) of the Borrowing Base or (2) $5,000,000; and (iii) no Event of Default or Default shall exist immediately prior to or after giving effect to each such annual dividend or distribution.

"Anti-Corruption Laws" means~~ all laws, rules, and regulations of any jurisdiction applicable to Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.~~, collectively, the United States Foreign Corrupt Practices Act of 1977 and all other similar anti-corruption legislation in other jurisdictions.

"Anti-Terrorism Laws" means those laws and sanctions relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act (Public Law 107-56), the Bank Secrecy Act (Public Law 91-508), the Trading with the Enemy Act (50 U.S.C. App. Section 1 et. seq.), the International Emergency Economic Powers Act (50 U.S.C. Section 1701 et. seq.), and the sanction regulations promulgated pursuant thereto by the Office of Foreign Assets Control, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957 (as any of the foregoing may from time to time be amended, renewed, extended or replaced).

"Applicable Base Rate Margin" means the applicable margin determined by reference to Quarterly Average Undrawn Availability set forth in the Pricing Grid table below under the

heading "Revolving Loans Applicable Base Rate Margin" or "Term Loan / Term Loan 2 Applicable Base Rate Margin", as applicable.

| **Pricing Grid** | | | | | |
|---|---|---|---|---|---|
| **Level** | **Quarterly Average Undrawn Availability** | **Revolving Loans Applicable Base Rate Margin** | **Revolving Loans Applicable SOFR Rate Margin** | **Term Loan / Term Loan 2 Applicable Base Rate Margin** | **Term Loan / Term Loan 2 Applicable SOFR Rate Margin** |
| **I** | **> $10,000,000** | **0.50%** | **2.36%** | **1.00%** | **2.86%** |
| **II** | **> $5,000,000& ≤ $10,000,000** | **0.50%** | **2.61%** | **1.00%** | **3.11%** |
| **III** | **≤ $5,000,000** | **0.50%** | **2.86%** | **1.00%** | **3.36%** |

The Applicable Base Rate Margin and Applicable SOFR Rate Margin shall initially be set at Level I and thereafter shall be determined as of the end of each fiscal quarter based on Quarterly Average Undrawn Availability as of such quarter end, commencing with the fiscal quarter ending March 31, 2022. Each change in the Applicable Base Rate Margin and Applicable SOFR Rate Margin shall be effective during the period commencing on the first day of each applicable fiscal quarter and ending on the last day of each applicable fiscal quarter.

"Applicable SOFR Rate Margin" means the applicable margin set forth in the table above under the headings "Revolving Loans Applicable SOFR Rate Margin" or "Term Loan / Term Loan 2 Applicable SOFR Rate Margin", as applicable.

"Asset Acquiring Subsidiary" means a Subsidiary formed for the purpose of acquiring the assets of another entity operating in the freight transportation and logistics business ("Business Acquisition") and (i) which Subsidiary's ownership interest which are owned by a Loan Party shall be pledged to Agent, (ii) which such Subsidiary shall grant first priority perfected Liens in its assets to the Agent, and (iii) which Subsidiary shall become a Borrower according to Section 7.12 and be subject to the requirements of Section 7.12 hereof, provided that, the joinder of such Subsidiary may not be required to be completed contemporaneously with the formation of such Subsidiary as prescribed by Section 7.12 but at a time, or within a time period, following any such Business Acquisition that the Agent may require in its sole discretion.

"Authorized Officer" means a Person's president, chief executive officer, chief financial officer or any other officer approved by Agent in its reasonable discretion.

"Banking Service" means any financial accommodation or credit extended to any Borrower or other Loan Party by any Lender or any affiliate thereof (other than pursuant to this Agreement) including: (i) commercial credit cards, stored value cards (ii) credit card processing

services, (iii) debit cards, (iv) purchase cards, (v) cash management, treasury management, administration or related services, including the automated clearing house processing of electronic fund transfers, (vi) controlled disbursement accounts or services, or (vii) return items, overdraft and interstate depository network accounts or services.

"Banking Service Agreement" means each agreement entered into from time to time by any Borrower or any other Loan Party with a Lender or any affiliate thereof in connection with the obtaining of any ~~Bank~~Banking Service.

"Bankruptcy Event" means, with respect to any Person, such Person or such Person's direct or indirect parent company becoming the subject of a bankruptcy or insolvency proceeding, or having had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark" means, initially, the Daily Simple SOFR; provided that if a Benchmark Transition Event ~~and its related Benchmark Replacement Date have~~has occurred with respect to Daily Simple SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section ~~3.9. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.~~3.10.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Agent and Borrowers giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Agent and Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or

then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

~~"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day", the definition of "U.S. Government Securities Business Day," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods and other technical, administrative or operational matters) that Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).~~

"Benchmark Replacement Date" means a date and time determined by Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c).

~~For the avoidance of doubt, if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination.~~

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, of Governors of the Federal Reserve Bank of New YorkSystem, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) is no longer, or as of a specified future date will no longer be, representative.

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.9(c)3.10 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.9(c)3.10.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefited Lender" shall have the meaning set forth in Section 2.15(d).

"Blocked Person" means any of the following: (a) a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224; (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224; (c) a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (d) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224; (e) a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or

~~other replacement official publication of such list; or (f) a Person who is affiliated or associated with a Person listed above.~~

"Border" shall have the meaning set forth in the preamble.

"Border Logistics" shall have the meaning set forth in the preamble.

"Borrower" shall have the meaning set forth in the preamble, and singularly, shall include any additional Borrower that becomes party to this Agreement as permitted by Agent in its sole and absolute discretion pursuant to a joinder or similar instrument.

"Borrower Representative" means Express Holdco.

"Borrowers" shall have the meaning set forth in the preamble, and collectively, shall include any additional Borrowers that become party to this Agreement as permitted by Agent in its sole and absolute discretion pursuant to a joinder or similar instrument.

"Borrowing Base" means, in respect of Borrowers at any time of determination, the following:

(a) up to 90% of Borrowers' Eligible Accounts, minus

(b) the aggregate sum of all Reserves then in effect. Notwithstanding anything to the contrary herein, Agent may, in its sole discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in determining the Borrowing Base.

"Borrowing Base Certificate" means a certificate duly executed by an Authorized Officer of the Borrower Representative appropriately completed and in substantially the form of Exhibit A hereto.

"Business Acquisition" shall have the meaning set forth in the definition of Asset Acquiring Subsidiary.

"Business Day" means any day other than a Saturday, a Sunday, or other day on which ~~the Agent and each Lender is~~commercial banks in New York City or Columbus, Ohio are authorized or required to be closed.

"Capital Expenditures" means with respect to any Person for any period determined in accordance with GAAP, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Collateral Account" means, with respect to Borrowers, that certain commercial deposit account maintained at Agent for the purpose of collecting Borrowers' accounts and proceeds of other Collateral, (a) the funds within which shall be the sole and exclusive property

of Agent and (b) in respect of which Agent for the benefit of Agent and Lenders shall have the irrevocable and exclusive right to withdraw funds until all of the Obligations are paid, performed, satisfied and enforced in full and the commitments of Agent, Lenders and Issuer to make any Advances hereunder have terminated.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sections 9601 et seq.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Body or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means (a) the Permitted Holder shall cease to own, free and clear of all Liens (other than to Lender), 80% of the outstanding voting equity interests of Express Holdco on a fully diluted basis; (b) Richard S. Francis shall cease to hold a management position with Express Holdco; (c) any merger or consolidation of or with any Loan Party or sale of all or substantially all of the property or assets of any Loan Party (other than the R & R Ownership Restructure); (d) in respect of any Person, the replacement of a majority of the directors or managers who constituted the board of directors or the managing body on the date hereof for any reason other than death or disability, and such replacement shall not have been approved by such board of directors or managing body as constituted on the date hereof, (e) in respect of any Person, such Person shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting equity interests of any existing or future Subsidiary, (f) with respect to AAGEX Group, (x) Mike Williams shall cease to own, free and clear of all Liens or other encumbrances, at least 40% of the outstanding voting equity interest in AAGEX Group or (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interest in AAGEX Group, (g) with respect to TLogistics, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 51% of the outstanding voting equity interest in TLogistics, (h) with respect to American Group, (x) Michael C. Schember and Daniel P. Krivickas, Jr. shall cease to own, free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in American Group and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in American Group, (i) following the Employment Issuance, with respect to Paradigm, Paradigm Management, Final Mile and Final Mile Solutions, (x) John Gallardo shall cease to own, free and clear of all Liens and encumbrances, at least 20% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 80% of the outstanding voting equity interests in Paradigm, Paradigm

Management, Final Mile and Final Mile Solution, (j) following the Employment Issuance, with respect to GT Logistics, (x) Kelly Armstrong shall cease to own, free and clear of all Liens and encumbrances, at least 10% of the outstanding voting equity interests in GT Logistics and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in GT Logistics or (k) with respect to New WLX Holdings (x) John Hein shall cease to own, free and clear of all Liens or encumbrances, at least 20% of the outstanding voting equity interests in New WLX Holdings, (y) Larry Catlett shall cease to own free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in New WLX Holdings, (z) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 70% of the outstanding voting equity interests in New WLX Holdings, (l) with respect to A.M. Transportation, (x) Mission Impossible Software, LLC shall cease to own free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in A.M. Transportation, and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in A. M. Transportation, (m) with respect to RFX, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in RFX, and (y) RFX, Inc. shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in RFX unless Express Holdco's ownership in RFX, Inc. increases by any amount no longer owned by RFX, Inc., (n) with respect to Food Express, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Food Express, (o) with respect to Pioneer, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interest in Pioneer, (y) Kimberly Welby shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in Pioneer unless Express Holdco's ownership in Pioneer increases by any amount no longer owned by Kimberly Welby, (p) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Load to Ride and One Stop, (q) RFX shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interests in RFX Tampa, and (r) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Taylor Transportation.

"Charges" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar Governmental Body, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Loan Party or any of its Affiliates.

"Charter Documents" means, as to any Person (other than a natural person), the charter, certificate or articles of incorporation or organization, by-laws, code of regulations, general or limited partnership agreement, certificate of limited partnership, certificate of formation, operating agreement, and other similar organizational or governing documents of such Person.

"CIP Regulations" shall have the meaning set forth in Section 14.11.

"Closing Date" means March 18, 2022.

"Code" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder.

"Collateral" means all real and personal property owned by any Loan Party, whether now owned or existing, or hereafter arising or acquired or received by such Loan Party, wherever located, including:

(a) all Accounts;

(b) all Inventory;

(c) all Equipment and Fixtures;

(d) all General Intangibles, Payment Intangibles and Intellectual Property;

(e) all Investment Property;

(f) all Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository;

(g) the Pledged Securities;

(h) (i) its Goods and other personal property including all merchandise returned or rejected by Account Debtors, relating to or securing any of the Accounts; (ii) its rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lien or, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to such Loan Party from any Account Debtors relating to the Accounts; (iv) other property, including warranty claims, relating to any Goods; (v) all of such Person's contract rights, rights of payment which have been earned under a contract right, Instruments (including promissory notes), Chattel Paper (including electronic chattel paper), Documents, warehouse receipts, letters of credit, and money; (vi) all Commercial Tort Claims (whether now existing or hereafter arising), including those described on Schedule 4.20 (Commercial Tort Claims) and on any supplement thereto received by Agent pursuant to Section 4.20, all Letter-of-Credit Rights (whether or not such Letter of Credit is evidenced by a writing), and all supporting obligations; (vii) if and when obtained by any Loan Party, all real and personal property of third parties in which such Person has been granted a Lien or security interest as security for the payment or enforcement of Accounts; and (viii) any other goods or personal property, if any, in which such Person may hereafter in writing grant a security interest to Agent or any Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent or any Lender and any Loan Party;

(i) each Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any

such Loan Party or in which it has an interest), computer programs, electronic media, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g) or (h) of this definition of "Collateral"; and

(j) all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h) and (i) of this definition of "Collateral" in whatever form, including: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

Notwithstanding anything to the contrary contained in clauses (a) through (j) above, the security interest created by this Agreement shall not extend to (i) Excluded Property and (ii) the certain 10% ownership interest in a HondaJet Elite HA-420 aircraft held and owned by Equipment Leasing, as evidenced by that certain HondaJet Elite HA-420 Fractional Interest Purchase Agreement executed by Equipment Leasing December 6, 2021.

"Commitment Percentage" of any Lender shall mean any such Lender's percentage of the Aggregate Commitment as set forth on the Commitment Schedule, as it may be update or adjusted pursuant to the terms of this Agreement.

"Commitment Schedule" shall mean the Commitment Schedule attached to this Agreement, as it may be amended from time to time pursuant to the terms of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et. seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a compliance certificate in the form attached as Exhibit D.

"Conforming Changes" means, with respect to either the use or administration of Daily Simple SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.8 and other technical, administrative or operational matters) that Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated), or are franchise or branch profits Taxes.

"Consents" means all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business, including any Consents required under all applicable federal, state or other applicable law.

"Consolidated EBITDA" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the sum of (a) net income (or loss) (excluding extraordinary gains), *plus* (b) to the extent deducted in determining such net income (or loss), (i) all interest expense, (ii) all charges against (or *minus* credits to) income for federal, state and local taxes, (iii) depreciation and amortization expense, and (iv) non-cash charges against (or *minus* credits to) income that are approved in writing by Agent in its sole discretion.

"Consolidated Fixed Charge Coverage Ratio" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the ratio of (a) Consolidated EBITDA, *less* the sum of Capital Expenditures (*minus* Capital Expenditures that were specifically funded by Indebtedness or a Capital Lease, other than a Revolving Loan), *less* taxes paid in cash, *less* dividends, distributions, and permitted repurchases of equity interests paid in cash *to* (b) Consolidated Fixed Charges.

"Consolidated Fixed Charges" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the difference between (a) the sum of (i) interest expense, including the interest component of any Capital Lease, *plus* (ii) scheduled principal payments on Indebtedness and Capital Leases, *less* (b) the sum of scheduled net investment in direct financing lease payments.

"Controlled Group" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Person, are treated as a single employer under Section 414 of the Code.

"Corporate Retreat Property" means the Real Property and improvements thereon located at 550 S. Barfield Drive, Marco Island, Florida.

"Corporate Retreat Property Mortgage Facility" means the mortgage facility consisting of (i) a mortgage granted by Express Properties in favor of Huntington with respect to the Corporate Retreat Property, (ii) a mortgage note made by Express Properties and payable to Huntington, (iii) a guaranty made by Richard S. Francis of the obligations owing from Express Properties to Huntington under the mortgage of the Corporate Retreat Property, in form and substance acceptable to Huntington and (iv) an interest rate swap transaction entered into by Express Properties and Huntington as of the closing of the aforementioned mortgage.

"Corporate Retreat Purchase" means the purchase by Express Properties of the Corporate Retreat Property.

"Credit Exposure" shall mean, for any Lender, at any time, the aggregate of such Lender's respective pro rata shares of the Revolving Exposure ~~and~~, the Term Loan Exposure, and the Term Loan 2 Exposure.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to the greater of (a) SOFR for the day (such day, the ~~“~~"SOFR Determination Date~~”~~") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website, and (b) the Floor. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Date, the SOFR in respect of such SOFR Determination Date has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to Daily Simple SOFR has not occurred, then the SOFR for such SOFR Determination Date will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than ~~ten~~three (~~10~~3) consecutive SOFR Rate Days. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to Borrowers.

"Default" means an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" means two percent (2%) per annum in excess of the rate of interest or fee rate or percentage applicable to any Obligation from time to time.

"Defaulting Lender" shall have the meaning set forth in Section 2.16 hereof.

"Designated Prepayment" shall have the meaning set forth in Section 2.5(c).

"Dollar" and the sign "$" means lawful money of the United States of America.

"Domestic Rate Loan" means any Loan that bears interest with reference to the Alternate Base Rate.

"Driver Solutions" means R & R Driver Solutions Inc, a Pennsylvania corporation.

"Eligible Accounts" means, those Accounts created by each Borrower in the ordinary course of its business, that arise out of its sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made by Borrowers under the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the criteria set forth below; provided, however, that such criteria may be revised from time to time by Agent in its Permitted Discretion to address the results of any Collateral monitoring or any field examination performed by Agent or any consultant from time to time. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits and

unapplied cash remitted to Borrowers. Without limiting Agent's discretion provided herein, "Eligible Accounts" shall not include any Account:

(a) which is not subject to a first priority perfected security interest in favor of Agent for the benefit of Agent and Lenders;

(b) which is subject to any Lien other than a Permitted Encumbrance that does not have priority over the Lien in favor of Agent for the benefit of Agent and Lenders;

(c) with respect to which (i) is unpaid more than ninety (90) days after the date of the original invoice therefor or more than thirty (30) days after the original due date, whichever is later or (ii) which has been written off the books of such Borrower or otherwise designated as uncollectible. Notwithstanding the foregoing, in no event shall Accounts that remain unpaid more than one hundred twenty (120) days from the date of the original invoice be deemed to be "Eligible Accounts";

(d) which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates to Borrowers are ineligible;

(e) with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true;

(f) which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payment of interest;

(g) for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrower or if such Account was invoiced more than once;

(h) with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i) which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j) which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(k) which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada (other than Quebec) or (ii) is not organized under applicable law of the U.S., any state of the U.S., Canada, or any province of Canada (other than the province of Quebec), unless, in each case, such Account is insured by credit insurance satisfactory to Agent in its Permitted Discretion;

(l) which is owed in any currency other than Dollars;

(m) which is owed by (i) any Federal, state or local government (or any department, agency, public corporation, or instrumentality thereof) unless (i) such Account is backed by a Letter of Credit acceptable to Agent which is in the possession of Agent, or (ii) with respect to the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) and any other steps necessary to perfect the Lien of Agent in such Account have been complied with to Agent's satisfaction;

(n) which is owed by any Affiliate, employee, officer, director, agent or stockholder of any Loan Party;

(o) which, for any Account Debtor, the aggregate amount of Accounts owed from such Account Debtor exceeds 20% of all Eligible Accounts, to the extent of such excess;

(p) which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor;

(q) which is subject to any counterclaim, deduction, defense, setoff or dispute (a "contra"); provided, however, that unless the Account Debtor has asserted any such contra, if the amount of the account exceeds the amount of the contra, such excess shall be considered for eligibility if such excess is not otherwise excluded by this definition of Eligible Accounts;

(r) which is evidenced by any promissory note, chattel paper, or instrument;

(s) which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Borrower to seek judicial enforcement in such jurisdiction of payment of such Account ("No Access Jurisdiction"), unless such Borrower has filed such report or is qualified to do business in such No Access Jurisdiction;

(t) with respect to which such Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in

the ordinary course of business, or any Account which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(u) which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local;

(v) which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Borrower has or has had an ownership interest in such goods, or which indicates any party other than such Borrower as payee or remittance party;

(w) which was created on cash on delivery terms;

(x) which is an Account of Equipment Leasing and/or which was derived from any leasing transaction or which would generate lease company receivables;

(y) which Agent determines may not be paid by reason of the Account Debtor's inability to pay or which Agent otherwise determines is unacceptable for any reason whatsoever.

In the event that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower Representative shall notify Agent thereof within five (5) Business Days. In determining the amount of an Eligible Account, the stated amount of an Account may, in Agent's sole discretion, be reduced by, without duplication, to the extent not reflected in such stated amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any written or oral agreement or understanding) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrower to reduce the amount of such Account.

"Eligible Assignee" shall mean any of the following Persons: (a) a Lender; (b) an Affiliate of a Lender; and (c) any other Person (other than a natural person) approved by (i) Agent, and (ii) in the case of any assignment of a commitment to make Advances hereunder, Issuer; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of such Borrower's Affiliates or Subsidiaries and; provided, further, that, notwithstanding the foregoing, a Person shall only be an "Eligible Assignee" if the assignment to or participation of such Person shall not constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code); provided, further, that, the consent of the Borrower Representative (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender, a well-capitalized bank, insurance company, or regulated financial institution; provided that the Borrower Representative shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Agent within five (5) Business Days after having received prior notice thereof.

"Employment Issuance" means, the issuance of certain ownership interests, as part of any stock incentive plan set forth in certain compensation and/or employment agreements for the high-level managers of (A) Express Holdco whereby on or about December 31, 2020, Express Holdco, on terms and conditions set forth therein, issued (1) twenty percent (20%) ownership interests to John Gallardo in each of the following entities: Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (2) ten percent (10%) ownership interests to Kelly Armstrong in GT Logistics and (B) the AAGEX Group whereby AAGEX Group will grant incentive ownership units to present and future employees which shall only vest upon satisfaction of certain conditions set forth in such compensation and/or employment agreements and shall otherwise be bound by the terms and restrictions thereof including no voting rights and otherwise in form and substance satisfactory to the Agent in its sole discretion.

"Environmental Authority" means any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(b).

"Environmental Indemnity Agreement" shall mean that certain amended and restated Environmental Indemnity Agreement dated as of the date hereof and delivered by the Loan Parties to and in favor of the Agent.

"Environmental Laws" shall have the meaning set forth in the Environmental Indemnity Agreement.

"Equipment Leasing" means R&R Equipment Leasing, LLC, a Pennsylvania limited liability company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import and the rules and regulations promulgated thereunder as from time to time in effect.

"Erroneous Payment" shall have the meaning set forth in Section 14.12.

"Event of Default" shall have the meaning set forth in Article 10.

"Excluded Property" means specific equipment, accessions and related products and proceeds that are financed as Capital Expenditures by or through a third-party, including but not limited to, Huntington Equipment Finance or other leasing and/or equipment finance departments of the Agent.

"Excluded Swap Obligations" means, with respect to any Guarantor, any Swap Obligation if, and only to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the

regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of any Lender with respect to an applicable interest in a Loan or commitment pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan or commitment or (ii) a Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to a Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.11(f) and (d) any withholding Taxes imposed pursuant to FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Letters of Credit" means the Letters of Credit listed on Schedule 1.2(c) attached hereto, in each case issued by the Agent.

"Existing Loan Documents" means that certain Amended and Restated Credit and Security Agreement, dated as of December 14, 2018 (as amended prior to the date hereof), by and among certain of the Borrowers and the Agent, together with all loan documents executed and delivered in connection therewith.

"Express" shall have the meaning set forth in the preamble.

"Express Holdco" means R&R Express Holdco, Inc., a Pennsylvania corporation.

"Express Properties" shall have the meaning set forth in the preamble.

"Facility Termination Date" means March 18, 2027.

"Fastport" means Fastport Inc., a Delaware corporation.

"Fastport Pledge Agreement" means that certain amended and restated pledge agreement entered into by the Permitted Holder in favor of the Agent whereby the Permitted Holder pledged all of the ownership interests in Fastport owned by the Permitted Holder to the Agent.

"Fastport Proceeds" means proceeds received by the Permitted Holder in cash or cash equivalent property from the sale or other disposition of all of the ownership interests in Fastport owned by the Permitted Holder.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Bodies and implementing such Sections of the Code.

"Fed Funds Rate" means, for any day, the rate per annum (rounded upwards, if necessary, to the nearest one hundredth of one percent (1/100 of 1%)) equal to the weighted average of the rates on overnightcalculated by the NYFRB based on such day's federal funds transactions with members of the Federal Reserve System on any day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, however, that: (a) if the day for which such rate is to be determined is not a Business Day, the Fed Funds Rate for such day shall be such a rate on such transactions on the immediately preceding Business Day as soby depositary institutions, as determined in such manner as shall be set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day and (b)by the NYFRB as the effective federal funds rate; provided that, if the Fed Funds Rate shallas so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Fee Letter" means that certain fee letter between Huntington and Borrowers dated as of the date hereof.

"Final Mile" shall have the meaning set forth in the preamble.

"Final Mile Solutions" shall have the meaning set forth in the preamble.

"Financials" means the annual or monthly financial statements, as applicable, of Express and its Subsidiaries delivered pursuant to Sections 9.5 and 9.6 of this Agreement.

"First Amendment Effective Date" means December 30, 2022.

"Food Express" means Refrigerated Food Express, LLC, a Pennsylvania limited liability company.

"Foreign Subsidiary" means any Subsidiary that is not organized or incorporated in the United States or any state or territory thereof.

"Floor" means a per annum rate of interest equal to 0.14%.

"Foreign Lender" means any Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles as promulgated by the United States of America Financial Accounting Standards Board and in effect from time to time.

"Government Receivables" shall have the meaning set forth in the definition of Eligible Accounts.

"Governmental Body" means ~~any nation or~~the government~~, any state or other~~ of the United States or any other nation, or of any political subdivision thereof~~ or any~~, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising ~~the~~executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to ~~a~~ government (including any supra-national bodies such as the European Union or the European Central Bank).

"GT" shall have the meaning set forth in the preamble.

"GT Logistics" shall have the meaning set forth in the preamble.

"Guarantor" means each Person that executes and delivers a Guaranty to Agent or any Lender in respect of any of the Obligations.

"Guaranty" means any obligation, contingent or otherwise of any Person guaranteeing or having the economic effect of guaranteeing any Indebtedness, liability or other obligation of any other Person (a "primary obligor") in any manner, whether directly or indirectly, and including any obligation of any surety, direct or indirect, (a) to purchase, or pay, or advance or supply funds for the purchase or payment of, such Indebtedness, liability or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, liability or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Discharge" means any release or threat of release of a reportable quantity of any Hazardous Substances.

"Hazardous Substance" means, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" means all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedging Contracts" means any foreign exchange contract, currency swap agreement, futures contract, commodities hedge agreement, interest rate protection agreement, interest rate future agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, option agreement or any other similar hedging agreement or arrangement entered into by a Person in the ordinary course of business.

"Hedging Obligations" means all liabilities of a Person under Hedging Contracts.

"Huntington" means Huntington National Bank, a national banking association, in its individual capacity, and its successors.

"Income Tax Distributions" shall have the meaning set forth in Section 7.7.

"Indebtedness" means, with respect to a Person at any date of determination, any and all indebtedness, obligations or liabilities (other than trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness), whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several, of such Person for or in respect of: (a) borrowed money, (b) amounts owing under or liabilities in respect of any note purchase or acceptance credit facility, (c) the undrawn amount in connection with letters of credit and any reimbursement obligation (contingent or otherwise) under any letter of credit, (d) Hedging Obligations, (e) any other transaction (including forward sale or purchase agreements, Capital Leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements, (f) any guaranty of Indebtedness for borrowed money, and (g) all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Intellectual Property" means all now owned or hereafter acquired right, title and interest in trade names, trademarks, trade secrets, service marks, data bases, domain names, software and software systems, including source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, patents, patent applications, patents pending, copyrights, royalties, literary rights, licenses and franchises.

"ISP" shall have the meaning set forth in Section 2.8(b).

"Issuer" shall mean, with respect to any Letter of Credit, the issuer of such Letter of Credit and shall be, with respect to any Letter of Credit hereunder, Huntington, and each of its successors and assigns (in each case, which may be replaced by Agent in its sole discretion).

"Lender" or "Lenders" mean the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder, including any transferee, successor or assign of a Lender. Unless the context otherwise requires, the term "Lender" includes Issuer.

"Lender Default" shall have the meaning set forth in Section 2.16(a).

"Letter of Credit Exposure" means, at any time, the aggregate undrawn amount of all outstanding Letters of Credit *plus* the aggregate amount of all disbursements relating to Letters of Credit that have not been reimbursed by Borrowers.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2.

"Letters of Credit" shall have the meaning set forth in Section 2.7.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any option agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Load to Ride" means Load to Ride Transportation, LLC, a Pennsylvania limited liability company.

"Loan" means each Revolving Loan ~~and~~, the Term Loan, and the Term Loan 2; and "Loans" shall collectively mean the Revolving Loans, the Term Loan, and the Term Loan 2.

"Loan Account" shall have the meaning set forth in Section 2.6.

"Loan Documents" means this Agreement, each Note and Letter of Credit, any Guaranty, Fastport Pledge Agreement, security agreement, including any copyright security agreement, patent security agreement, trademark security agreement or domain name security agreement, collateral assignment, pledge agreement, lockbox agreement, account assignment, control agreement, letter of credit application and agreement or other reimbursement agreement, Perfection Certificate, officer's certificate, Waiver, Mortgage, Banking Service Agreement, Hedging Contract, American Group Seller Subordination Agreement, RFX Subordination Agreement, LTR Subordination Agreement, Taylor Transportation Subordination Agreement, any Permitted Business Acquisition Subordination Agreement, any other subordination agreement, intercreditor agreement and any and all other agreements, instruments and documents, including powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Loan Party or Guarantor or delivered to Agent, Issuer or any Lender in connection with this Agreement.

"Loan Party" or "Loan Parties" means, singularly or collectively, as the context may require, Borrowers, any additional Borrower, the Guarantors, or any other Person who becomes a party to this Agreement pursuant to a joinder or similar agreement and their respective successors and assigns.

"Lockbox" means a post office box rented by and in the name of Borrowers as required by this Agreement and as to which only Agent has access pursuant to the requirements of this Agreement.

"LTR Acquisition" means Express Holdco's acquisition of one hundred (100%) of the issued and outstanding membership interests of Load to Ride and One Stop pursuant to the LTR Acquisition Documents.

"LTR Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, effective as of December 30, 2022, by and among Load to Ride Transportation, LLC, a Colorado limited liability company, One Stop Freightways, LLC, a Colorado limited liability company, LTR Seller, Load to Ride, One Stop, and Express Holdco (the "LTR MIPA"), (ii) the LTR Subordinated Note, (iii) the Contribution Agreements (as defined in the LTR MIPA), (iv) the Equipment Transfer Agreement (as defined in the LTR MIPA), (v) the Consulting Agreement for the LTR Seller (as described in the LTR MIPA), and (vi) all other documents and instruments delivered in connection with the LTR Acquisition.

"LTR Seller" means Marc Haney.

"LTR Subordinated Note" means that certain Subordinated Promissory Note, dated as of December 30, 2022 made by Express Holdco in favor of Load to Ride Transportation, LLC, a Colorado limited liability company in the amount of $1,725,000 being a portion of the purchase price in connection with the LTR Acquisition, bearing interest at 4% per annum, having a maturity of 36 months and otherwise payable on terms and conditions acceptable to Agent.

"LTR Subordination Agreement" means that certain Subordination Agreement, dated as of December 30, 2022, among the Agent, Load to Ride Transportation, LLC, a Colorado limited liability company, Load to Ride, One Stop and Express Holdco.

"Material Adverse Effect" means a material adverse effect on (a) the financial condition, results of operations, business or prospects of the applicable Person, (b) any Loan Party's ability to pay the Obligations in accordance with the terms thereof, (c) the value of the Collateral, Lenders' Liens on the Collateral, or the priority of any such Lien, or (d) the practical realization of the benefits of the rights and remedies under the Loan Documents by Agent and Lenders.

"Material Business Agreement" means any agreement that if terminated, rescinded or breached would have a Material Adverse Effect on any Loan Party.

"Maximum Borrowing Amount" means, at any time, in respect of Borrowers an amount equal to the lesser of (a) the Aggregate Revolving Commitment *minus* any Reserves to be taken from the top of the line and (b) the Borrowers' Borrowing Base.

"Mortgage" or "Mortgages" means each mortgage, assignment of rents, deed of trust or other agreement that conveys or evidences a Lien to Agent, for the benefit of the Agent and Lenders, on the Owned Real Property.

"Multiemployer Plan" means a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Net Cash Proceeds" means (i) proceeds received in cash or cash equivalent property from the sale (including without limitation any sale and leaseback), assignment or other disposition of any property, net of (A) the reasonable cash costs approved by Agent of sale, assignment or other disposition and (B) the amount of any Indebtedness approved by Agent secured by such property permitted by this Agreement; (ii) proceeds of insurance on account of the loss of or damage to any property of such Person, and payments of compensation for any property taken by condemnation or eminent domain; and (iii) proceeds received in cash or cash equivalents from (A) the issuance of any capital stock by such Person, or any other additions to the equity of such Person (other than retained earnings) or any contributions to such capital, or (B) issuance of any Indebtedness by such Person net of reasonable costs approved by Agent incurred in connection with such transaction.

"New WLE" means New WLE, LLC, a Pennsylvania limited liability company.

"New WLX" means New WLX, LLC, a Pennsylvania limited liability company.

"New WLX Holdings" means New WLX Holdings, LLC, a Pennsylvania limited liability company.

"New WLX Holdings Acquisition" means Express Holdco's acquisition of seventy percent (70%) of the issued and outstanding membership interests of New WLX Holdings pursuant to the New WLX Holdings Acquisition Documents.

"New WLX Holdings Acquisition Documents" means, collectively, the (i) Contribution Agreement, dated as of December 31, 2020 by and among WLX, LLC, a Missouri limited liability company, New WLX Holdings, and the other parties party thereto, (ii) Contribution Agreement, dated as of December 31, 2020 by and among WLE, LLC, a Missouri limited liability company, New WLX Holdings, and the other parties party thereto, (iii) Operating Agreement of New WLX Holdings, dated as of December 31, 2020, executed by John Hein, Larry Catlett and Express Holdco, as members, (iv) Single Member Limited Liability Company Operating Agreement of New WLX, dated as of December 31, 2020, executed by New WLX Holdings, as the sole member, (v) Single Member Limited Liability Company Operating Agreement of New WLE, dated as of December 31, 2020, executed by New WLX Holdings, as the sole member, (vi) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and John Hein, (vii) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and Larry Catlett, (viii) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and John O'Toole, and (ix) all other documents and instruments delivered in connection with the New WLX Holdings Acquisition.

"No Access Jurisdiction" shall have the meaning set forth in the definition of Eligible Accounts.

"Non-Consenting Lender" shall have the meaning set forth in Section 15.3(h) hereof.

"Non-Defaulting Lender" shall have the meaning set forth in Section 2.16.

"North Carolina Property" means the Real Property and improvements thereon located at (i) 5523 US 301 Service Rd, Hope Mills, North Carolina, and (ii) 5417 US 301 Service Rd., Hope Mills, North Carolina.

"Note" means each Revolving Note ~~and the~~, each Term Loan Note, and each Term Loan 2 Note; and "Notes" shall collectively mean all such promissory notes.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means any and all loans, advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization, receivership or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document (including any Loan Document), whether or not for the payment of money, (a) owing by the Loan Parties to Lenders, Agent or Issuer or to any other direct or indirect Subsidiary or Affiliate of Lenders, Agent or Issuer pursuant to the terms of the Agreement or the other Loan Documents, (b) owing by the Loan Parties to Agent or any direct or indirect subsidiary or affiliate of Agent arising (i) by reason of an equipment lease or guarantee, (ii) under any Banking Services Agreement, (iii) out of Agent's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, or (iv) under any other agreement between Agent and any Loan Party, or (c) constituting Hedging Obligations (other than, with respect to any Guarantor, the Excluded Hedging Obligations of such Guarantor, if any), in each case, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and any amendments, extensions, renewals or increases and all costs and expenses of Agent, Issuer or any Lender and incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses and all obligations of any Loan Party to Agent, Issuer or any Lender to perform acts or refrain from taking any action. Notwithstanding the foregoing, with respect to any Guarantor, the Obligations shall not include Excluded Swap Obligations in respect of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"One Stop" means One Stop Freightways, LLC, a Pennsylvania limited liability company.

"Original Closing Date" means the closing date of the transaction in connection with the Existing Loan Documents, which date was December 14, 2018.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Documents).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Owned Real Property" means all Real Property set forth on Schedule 1.2(a); provided, however that Owned Real Property shall exclude the Corporate Retreat Property.

"Paradigm" shall have the meaning set forth in the preamble.

"Paradigm Management" shall have the meaning set forth in the preamble.

"Payment Office" means initially The Huntington National Bank, 7 Easton Oval, Mail code: EA4W57, Columbus, Ohio 43219; and, thereafter, such other office of Agent, if any, which it may designate by notice to the Borrower Representative and Lenders.

"Perfection Certificate" means the perfection certificate and the responses thereto provided by Borrowers to Agent.

"Permitted Business Acquisition" means, any Business Acquisition made in any fiscal year to the extent that the aggregate consideration paid or to be paid by any of the Loan Parties or Asset Acquiring Subsidiaries when coupled with all other Permitted Business Acquisitions made in such fiscal year does not exceed $2,000,000; provided that, (1) the Loan Parties shall deliver to the Agent prior written notice of the intent to consummate any Permitted Business Acquisition at least ten (10) Business Days before such Permitted Business Acquisition, (2) the minimum ownership interest to be purchased by any Loan Party or Asset Acquiring Subsidiary shall be a least sixty percent (60%) of any such entity being acquired, (3) the Loan Parties shall demonstrate a Consolidated Fixed Charge Coverage Ratio of at least 1.25 to 1.00 for the immediately preceding fiscal quarter prior to such proposed Permitted Business Acquisition, and (4) the Loan Parties shall demonstrate that the average Undrawn Availability of the Loan Parties for the immediately preceding fiscal quarter prior to the proposed Permitted Business Acquisition was not less than fifteen percent (15%) of the Borrowing Base after deducting the proforma purchase price, initial costs and/or payments for any such Permitted Business Acquisition.

"Permitted Business Acquisition Indebtedness" means unsecured subordinated debt in any one fiscal year not to exceed $2,500,000 in the aggregate incurred in connection with any

Permitted Business Acquisition, which such debt shall be (i) repayable in not less than five years with interest not greater than the Prime ~~Commercial~~ Rate plus three percent (3.00%), (ii) subject to a subordination agreement in form and substance acceptable to the Agent in its sole discretion (a "Permitted Business Acquisition Subordination Agreement"), and (iii) evidenced by a subordinated promissory note with its payment terms conditioned on, among other things, a daily average Undrawn Availability of at least $2,000,000 for the sixty (60) days prior to each payment and immediately after giving effect to each such payment.

"Permitted Business Acquisition Subordination Agreement" shall have the meaning set forth in the definition of Permitted Business Acquisition Indebtedness.

"Permitted Discretion" shall mean a determination made in good faith and in the exercise (from the perspective of a secured asset-based lender) of commercially reasonable business judgment.

"Permitted Encumbrances" means (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental Charges that (i) are not delinquent or (ii) are being contested in good faith by appropriate proceedings that stay the enforcement of such Liens and with respect to which proper reserves have been taken by the Loan Parties in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of Agent for the benefit of Agent and Lenders and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of any Loan Party's business; (e) mechanics, workers, materialmen's, warehousemen's, common carriers, landlord's or other like Liens arising in the ordinary course of any Loan Party's business with respect to obligations which are not due or which are being contested in good faith by the applicable Loan Party; (f) Liens placed upon equipment and real estate assets acquired to secure a portion of the purchase price thereof including Liens for any such equipment and assets that are subject to specific equipment financing by a third party but which were initially purchased from proceeds of an Advance made hereunder, which purchase was subsequently reimbursed by the proceeds of the specific equipment financing, provided that (i) any such Lien shall not encumber any other property of the Loan Parties other than insurance and other proceeds of such equipment and real estate and (ii) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; (g) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the use of such Real Property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (h) attachment and judgment liens which do not constitute an Event of Default under Section 10.7; and (i) Liens disclosed on Schedule 1.2(b) provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien.

"Permitted Holder" means Richard S. Francis, or any trusts for the benefit of Richard S. Francis or the members of his immediate family so long as Richard S. Francis is the named trustee and remains the trustee of any such trust.

"Permitted Holder Note" means, collectively, (i) that certain Note, dated December 31, 2016 made by the Permitted Holder in favor of Express in the original principal amount of $1,011,158.00 and (ii) that certain Note, dated December 31, 2016, made by the Permitted Holder in favor of Express in the original principal amount of $770,658.00.

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or Governmental Body.

"Pioneer" means Pioneer Transfer, LLC, a Pennsylvania limited liability company.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Loan Parties or any member of the Controlled Group or any such Plan to which any Loan Party or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledged Securities" means all of the equity interest of a Subsidiary of a Loan Party owned by a Loan Party and certain equity interests of each such Subsidiary owned by a non-Loan Party as more fully set forth on Schedule 5.3, whether now owned or hereafter acquired or created, and all proceeds thereof; provided that Pledged Securities shall exclude equity interests in any foreign Subsidiary in excess of sixty-five percent (65%) of the total outstanding shares of voting capital stock or other voting equity interest of such foreign Subsidiary. (Schedule 5.3 hereto lists, as of the Closing Date and as of the effective date of any amendment to this Agreement updating the same as the Agent may permit, all of the Pledged Securities.)

"Prime ~~Commercial~~ Rate" means the rate ~~established by Agent~~of interest publicly announced from time to time ~~based on its consideration of economic, money market, business and competitive factors, and it is not necessarily Agent's most favored rate. Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby shall change automatically without notice to the Loan Parties immediately with each change in the Prime Commercial Rate. The interest rate change will not occur more often than each Business Day. If the Prime Commercial Rate becomes unavailable, Agent may designate a substitute index after notifying Borrower Representative.~~by Agent as its "prime rate", which rate may not be the lowest or most favorable rate then being charged commercial borrowers or others by Agent. Any change in the Prime Rate announced by Agent shall take effect at the opening of business on the day specified in the public announcement of such change. Notwithstanding the foregoing, if the Prime Rate shall be less than the Floor, such rate shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"PTL Seller" means Pioneer Transfer, LLC, a Delaware limited liability company.

"Quarterly Average Undrawn Availability" shall mean for any fiscal quarter of the Borrowers, an amount equal to the average daily Undrawn Availability during such fiscal quarter as determined by the Agent's loan reporting system.

"R&R Logistics" shall have the meaning set forth in the preamble.

"Real Property" means all real property, both owned and leased, of any Loan Party.

"RCRA" means the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 *et. seq.*

~~"Reference Time" with respect to any setting of the then-current Benchmark means (a) if such Benchmark is Daily Simple SOFR, then four (4) U.S. Government Securities Business Days prior to (i) if the date of such setting is a U.S. Government Securities Business Day, such date or (ii) if the date of such setting is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such date and (b) if such Benchmark is not Daily Simple SOFR, then the time determined by Agent in accordance with the applicable Benchmark Replacement Conforming Changes.~~

"Recipient" means Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document.

"Register" has the meaning specified in Section 15.3(c).

"Relevant Governmental Body" means the Federal Reserve Board or the ~~Federal Reserve Bank of New York~~NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board or the ~~Federal Reserve Bank of New York~~NYFRB, or any successor thereto.

"Required Lenders" shall mean, any of Lenders (other than Defaulting Lenders) holding at least 51% based on each Lender's Commitment Percentage, of (a) prior to the Facility Termination Date, the Aggregate Commitment, and (b) after the Facility Termination Date, the Aggregate Credit Exposure; provided that, as long as there are only two Lenders (that are not Defaulting Lenders), Required Lenders shall mean both Lenders (that are not Defaulting Lenders); provided further that, if there are greater than two Lenders (that are not Defaulting Lenders), at least two Lenders (that are not Defaulting Lenders) shall be needed to constitute Required Lenders.

"Reserves" means any and all reserves which Agent deems necessary, in its Permitted Discretion, to maintain, including, without limitation, reserves for accrued and unpaid interest and principal on the Obligations, dilution reserves, availability blockage to reserve for the payment of expenses in connection with the Collateral or any disposition thereof, reserves for any Banking Services, Letters of Credit, or Hedging Contracts, including any "mark-to-market" in connection therewith, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, price adjustments, returned inventory, slow moving inventory, market fluctuations in the value of inventory, reserves for inventory shrinkage, reserves for customs charges and shipping charges related to any inventory in transit, reserves for the creditworthiness of any Account Debtor, reserves for dilution of Accounts, reserves for Indebtedness of any Loan Party, reserves for uninsured losses of any Loan Party,

reserves for payroll, taxes, fees, assessments, and other governmental charges with respect to the Collateral or any Loan Party, and any environmental remediation costs or expenses.

"Revolving Commitment" means the commitment of each Lender to make Revolving Loans and to issue Letters of Credit, as such commitment may be reduced pursuant the terms of this Agreement.

"Revolving Exposure" shall mean, for any Lender, at any time, the aggregate of such Lender's respective outstanding principal amount of Revolving Loans and Letter of Credit Exposure at such time.

"Revolving Loan" means a loan made pursuant to Section 2.1.

"Revolving Note" or "Revolving Notes" means, singularly or collectively, as the context may require, the promissory notes referred to in Section 2.1.

"RFS Seller" means Refrigerated Food Express, Inc., an Ohio corporation.

"RFX" means RFX, LLC, a Pennsylvania limited liability company.

"RFX Acquisition" means Express Holdco's acquisition of (1) ninety percent (90%) of the issued and outstanding membership interests of RFX, (2) ninety percent (90%) of the issued and outstanding membership interests of Pioneer, and (3) one hundred (100%) of the issued and outstanding membership interests of Food Express pursuant to the RFX Acquisition Documents.

"RFX Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, dated as of January 31, 2022, by and among RFX Seller, PTL Seller, RFS Seller, the sole shareholder of RFX Seller set forth on the signature pages thereto, RFX, and Express Holdco, (ii) Bill of Sale and Assignment and Assumption Agreement, dated as of January 31, 2022, by and among RFX Seller, PTL Seller, RFS Seller, the shareholders of RFX Seller set forth on the signature pages thereto, RFX, and Express Holdco, (iii) Operating Agreement, effective as of January 31, 2022, between RFX Seller and Express Holdco, (iv) Operating Agreement, effective as of January 31, 2022, between PTL Seller and Express Holdco, (v) Single Member Limited Liability Company Operating Agreement of Food Express, effective as of January 31, 2022, adopted by RFX, as the sole member of Food Express, (vi) Contribution Agreement, dated as of January 31, 2022, between RFX Seller, RFX and Express Holdco, (vii) Contribution Agreement, dated as of January 31, 2022, between PTL Seller, Pioneer and Express Holdco, (viii) Contribution Agreement, dated as of January 31, 2022, between RFS Seller, Food Express and Express Holdco, (ix) Consulting Agreement, dated as of January 31, 2022, between RFX and Kimberly Welby, (x) Employment Agreement, dated as of January 31, 2022, between RFX and Shirley Bellavance, (xi) Employment Agreement, dated as of January 31, 2022, between RFX and Jennifer Finnemore, (xii) Executive Employment Agreement, date as of January 31, 2022, between RFX and Nate Lourie, (xiii) Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer, and (xiv) all other documents and instruments delivered in connection with the RFX Acquisition.

"RFX Seller" means RFX, Inc., a Massachusetts corporation.

"RFX Subordinated Note" means that certain Subordinated Promissory Note, dated as of January 31, 2022 made by Express Holdco in favor of RFX Seller in the amount of $1,000,000 being a portion of the purchase price in connection with the RFX Acquisition payable on terms acceptable to Agent.

"RFX Subordination Agreement" means that certain Subordination Agreement, dated as of January 31, 2022, among the Agent, RFX Seller, and Express Holdco.

"RxG&A" means RxG&A, LLC, a Pennsylvania limited liability company.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any Sanctions~~ (at the time of this Agreement, Cuba, Iran, North Korea, Crimea Region and Syria)~~.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by ~~the Office of Foreign Assets Control of the U.S. Department of the Treasury~~OFAC, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union and any member state thereof, His Majesty's Treasury or any other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country~~ or~~, (c) any Person owned ~~or controlled~~directly or indirectly by any such Person or Persons described in ~~the foregoing~~ clauses (a) ~~or~~and (b), or (d) any Person otherwise the subject or target of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government~~, ~~ (including those administered by ~~the Office of Foreign Assets Control of~~OFAC, the U.S. Department of ~~the Treasury~~State or the U.S. Department of ~~State~~Commerce), the United Nations Security Council, the European Union and any member state thereof, His Majesty's Treasury or any other relevant sanctions authority.

"Settlement Date" means one or more Business Days of each week as selected by Agent in its reasonable discretion.

"Sixth Amendment Effective Date" means July 31, 2024.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the ~~Federal Reserve Bank of New York~~NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Loan" means any Loan that bears interest based on the Daily Simple SOFR.

"Subchapter S" means subchapter S of the Code.

"Subsidiary" means a corporation or other entity of whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Swap Obligation" means, with respect to any Guarantor, any obligation of any Person to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section la(47) of the Commodity Exchange Act between any Lender and one or more Swap Counterparties.

"Taylor Transportation" means New Taylor Transportation, LLC, a Pennsylvania limited liability company.

"Taylor Transportation Acquisition" means (i) Express Holdco's acquisition of one hundred (100%) of the business assets of Taylor Transportation, Inc., a Delaware corporation, pursuant to the Taylor Transportation Acquisition Documents, which such assets are to be held by Express Holdco's newly formed subsidiary, Taylor Transportation, and (ii) Equipment Leasing's acquisition of certain rolling stock and all of the business equipment of Taylor Equipment Leasing LLC.

"Taylor Transportation Acquisition Documents" means, collectively, (i) the Asset Purchase Agreement, effective as of March 31, 2023, among Taylor Transportation, Inc. and Taylor Equipment Leasing LLC, as the seller and Express Holdco and Equipment Leasing, as the buyers, and the other parties thereto, (ii) the Taylor Transportation Subordinated Note, (iii) Bill of Sale and Assignment and Assumption ~~Agreement – Assets~~Agreement-Assets, dated as March 31, 2023 among Taylor Transportation, Inc, and Express Holdco, (iv) Bill of Sale and Assignment and Assumption Agreement – Equipment, dated as of March 31, 2023, among Taylor Equipment Leasing LLC and Equipment Leasing, (v) Assignment and Assumption of Contracts, dated as of March 31, 2023, by and among Taylor Transportation, Inc. and Express Holdco, (vi) the Taylor Transportation Contribution Agreement, and (vii) all other documents and instruments delivered in connection with the Taylor Transportation Acquisition.

"Taylor Transportation Contribution Agreement" means, that certain Contribution Agreement entered into by Express Holdco and Taylor Transportation, whereby Express Holdco will transfer the assets purchased pursuant to the Taylor Transportation Acquisition to Taylor Transportation in exchange for all of the membership interests of Taylor Transportation.

"Taylor Transportation Subordinated Note" means that certain Subordinated Promissory Note, dated as of March 31, 2023 made by Express Holdco in favor of Taylor Transportation, Inc., a Delaware corporation in the amount of $2,500,000 being a portion of the purchase price in connection with the Taylor Transportation Acquisition, bearing interest at (i) 3% per annum in

the first year and (ii) 9% annum in the second year, having a maturity of 24 months and otherwise payable on terms and conditions acceptable to Agent.

"Taylor Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of June 23, 2023, among the Agent, Taylor Transportation, Inc., a Delaware corporation and Express Holdco.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(b).

"Term Loan Commitment" means the commitment of each Lender to make its portion of the Term Loan on the Closing Date as set forth on the Commitment Schedule.

"Term Loan Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan.

"Term Loan Note" shall have the meaning set forth in Section 2.10(b)(i).

"Term Loan 2" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(c).

"Term Loan 2 Commitment" means the commitment of each Lender to make its portion of the Term Loan 2 on the Sixth Amendment Effective Date as set forth on the Commitment Schedule.

"Term Loan 2 Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan 2.

"Term Loan 2 Note" shall have the meaning set forth in Section 2.10(c)(i).

"TLogistics" means TLogistics, LLC, a Pennsylvania limited liability company.

"Toxic Substances" means any material present on the Real Property which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. Sections 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances, and includes asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Transferee" shall have the meaning set forth in Section 15.15.

"TUI Commission Rights Purchase Agreement" means that certain Commission Rights Purchase Agreement, dated as of January 1, 2023, by and between Transport Unlimited, Inc., a Pennsylvania corporation ("TUI") and Express Holdco, as buyer, whereby TUI will sell and

assign to Express Holdco the rights of TUI to the Purchased Commission Rights (as defined therein), subject to the terms and conditions set forth therein.

"UCP" shall have the meaning set forth in Section 2.8(b).

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Undrawn Availability" means, as of any date of determination, an amount equal to (a) the Maximum Borrowing Amount, *minus* (b) the sum of (i) the Aggregate Revolving Exposure, *plus* (ii) all amounts due and owing to each Borrower's trade creditors which are outstanding sixty (60) days or more beyond the due date (without duplication with respect to any such amount deducted from the Borrowing Base), *plus* (iii) fees and expenses for which each Borrower is liable but which have not been paid or charged to the Loan Account.

~~"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.~~

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest or Lien in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Pennsylvania, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Waiver" means, collectively, any landlord's waiver, warehouseman's waiver, bailee's waiver, creditor's waiver, mortgagee waiver, processor waiver, customs broker waiver, and any similar waiver, executed and delivered in connection with this Agreement, in form and substance satisfactory to Agent.

"Week" means the time period commencing on Monday and ending on Friday of each calendar week.

1.3 **Uniform Commercial Code Terms.** All terms used herein and defined in the Uniform Commercial Code as adopted in the Commonwealth of Pennsylvania from time to time

shall have the meaning given therein unless otherwise defined herein. Such terms shall include: "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Deposit Account", "Document", "Equipment", "Farm Products", "Financial Asset", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Investment Property", "Lease", "Lessor", "Letter-of-Credit Rights", "money", "Payment Intangibles", "Proceeds", "Record", "Secured Party", "Securities Account", "Security", "Security Entitlement", "Security Interest" and "Supporting Obligation". To the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the effective date of such amendment, modification or revision.

1.4 **General Matters of Construction.** For the purpose of computing periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". Unless the context otherwise expressly requires, (a) all references to laws, statutes and regulations shall include any amendments, renewals, extensions, replacements, or successor laws, statutes or regulations, (b) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, restated, supplemented or otherwise modified, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns, (d) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not any particular provision hereof, (e) any reference to payment, repayment, or prepayment shall be construed as referring to payment of immediately available funds in Dollars, (f) any reference to any Loan Document means, unless the context expressly states otherwise, such Loan Document in form and substance satisfactory to Agent, (g) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (h) the word "will" shall be construed to have the same meaning and effect as the word "shall", (i) wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa, and (j) captions used in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

1.5 **Time References.** All the references in the Loan Documents are to Columbus, Ohio time.

1.6 **Lease Accounting Changes**. If there occurs after the Original Closing Date any change in GAAP resulting from the implementation of Financial Accounting Standards Update Board Accounting Standards Topic 842 (Leases) that affects in any respect the calculation of any covenant contained in this Agreement or the definition of any term defined under GAAP used in such calculations, Agent and Borrower Representative shall negotiate in good faith to amend the provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of the parties after such change in GAAP conform as nearly as possible to their respective positions as of the Closing Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and Borrowers shall provide additional financial statements or supplements thereto, attachments to compliance certificates and/or calculations regarding financial covenants as Agent may reasonably require in order to provide the appropriate financial information required hereunder with respect to Borrowers both reflecting any applicable changes

in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP. Notwithstanding the foregoing, if Agent and Borrower Representative are unable to agree on appropriate amendments within one year after the effective date of the changes in Financial Accounting Standards Update Board Accounting Standards Topic 842 (Leases), then all covenant calculations and definitions shall thereafter be computed in accordance with GAAP as so changed.

1.7 **Rates**. Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the ~~Benchmark,~~Alternate Base Rate or Daily Simple SOFR, or any component definition thereof or rates ~~referenced~~referred to in the definition thereof or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the ~~Benchmark~~Alternate Base Rate, Daily Simple SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any ~~Benchmark Replacement~~ Conforming Changes. Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, Daily Simple SOFR or any other Benchmark or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error ~~or~~by, or any calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE 2
## ADVANCES, PAYMENTS

2.1 **Revolving Loans.** Subject to the terms and conditions set forth in this Agreement, Lenders, severally and not jointly, will make Revolving Loans to Borrowers in aggregate amounts outstanding at any time prior to the Facility Termination Date equal to such Lender's pro rata share of the Maximum Borrowing Amount *less* such Lender's Commitment Percentage of Letter of Credit Exposure. All Revolving Loans shall bear interest as a SOFR Rate Loan until Borrowers elect to convert them to Domestic Rate Loans in accordance with Section 2.2(b). Revolving Loans shall be evidenced by a Revolving Note substantially in the form attached as Exhibit B.

2.2 **Procedure for Borrowing Advances.**

(a) The Borrower Representative shall notify Agent in writing prior to 1:00 p.m. on a Business Day of Borrowers' request to incur, on such day, a Revolving Loan. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or any Lender, or with respect to any other Obligation, become due, the same shall be deemed a request for a Revolving Loan charged to the Loan Account as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or

any other agreement with Agent, Issuer or any Lender, and such request shall be irrevocable.

(b) Borrower Representative may elect to convert all of the Loans to Domestic Rate Loans (or SOFR Rate Loans if they are Domestic Rate Loans) by providing irrevocable notice to Agent. Each such notice shall be in form and substance satisfactory to Agent in its Permitted Discretion, appropriately completed and signed by an Authorized Officer of each Borrower and must be received by Agent at least one (1) Business Day prior to the effective day of such request.

2.3 **Disbursement of Loan Proceeds.** All Loans shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent and Lenders, shall be charged to the Loan Account on Agent's books. During the term of this Agreement, Borrowers may use the Revolving Loans by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Loan requested by Borrowers or deemed to have been requested by Borrowers under Section 2.2(a), with respect to requested Revolving Loans to the extent Lenders make such Revolving Loans, shall be made available to Borrowers on the day so requested by way of credit to Borrowers' operating account at Huntington, in immediately available federal funds or other immediately available funds or, with respect to Revolving Loans deemed to have been requested by Borrowers, shall be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4 **Repayment of Loans.** The Loans shall be due and payable in full on the Facility Termination Date subject to earlier prepayment as herein provided.

(a) Any Account Debtor payment with respect to Accounts which is evidenced by a check, note, draft, automated clearing house transfer, electronic transfer, or any other similar item of payment may not be immediately collectible. In calculating availability, Borrowers agree that any such item of payment will be deemed to have been received by Agent and will be provisionally credited to the Loan Account by Agent on the Business Day immediately following the day on which Agent has actual possession of such item of payment for deposit to the Cash Collateral Account. In consideration of Agent's agreement for provisional crediting of items of payment, Borrowers agree that, in calculating interest and other charges on the Obligations, all Account Debtor payments will be treated as having been credited to the Loan Account on the second Business Day immediately following the Business Day on which such payments are deemed to have been received by Agent pursuant to this paragraph.

(b) Agent shall not be required to credit the Loan Account for the amount of any item of payment or other payment which is unsatisfactory to Agent. All credits shall be provisional, subject to verification and final settlement. Agent may charge the Loan Account for the amount of any item of payment or other payment which is returned to Agent unpaid or otherwise not collected. Borrowers agree that any information and data reported to Borrowers pursuant to any service which is received prior to final posting and confirmation is subject to correction and is not to be construed as final posting

information. Agent and Lenders shall have no liability for the content of such preliminary service related information.

(c) All payments of principal, interest and other amounts payable hereunder, or under any of the other Loan Documents shall be made to Agent at the Payment Office not later than 11:00 a.m. Ohio time on the due date in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Loan Account or by making Advances as provided in Section 2.2.

(d) Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any other Loan Document, without any deduction whatsoever, including any deduction for any setoff or counterclaim.

2.5 **Mandatory Reduction or Prepayment of Loans.**

(a) If at any time the Aggregate Revolving Exposure exceeds the Maximum Borrowing Amount, then Borrowers shall immediately pay to Agent such difference, and such difference shall be immediately due and payable at the Payment Office and shall be applied to the Revolving Loan.

(b) Immediately after the receipt by any Borrower of any Net Cash Proceeds, Borrowers shall make or cause to be made a mandatory prepayment of the Loans in an amount equal to 100% of such Net Cash Proceeds.

(c) Immediately after the receipt by the Permitted Holder of any Fastport Proceeds, Borrowers shall cause the Permitted Holder to make a mandatory prepayment with respect to the aggregate outstanding amount due under the Permitted Holder Note and the Borrowers shall make or cause to be made a mandatory prepayment of the Loans in an amount not to exceed the aggregate outstanding amount due under the Permitted Holder Note.

(d) Nothing in this Section 2.5 shall be construed to constitute Agent's or any Lender's consent to any transaction not otherwise expressly permitted by Article 7. On the date any mandatory prepayment is received by Agent pursuant to clause (b) above (each such payment being a "Designated Prepayment"), such Designated Prepayment shall be allocated and applied, in the sole discretion of Agent to the repayment of any Loan. Each Designated Prepayment which is applied to ~~any~~the Term Loan or the Term Loan 2 shall be applied in inverse order of maturing installments.

2.6 **Statement of Account.** Agent shall maintain, in accordance with its customary procedures, a loan account ("Loan Account") in the name of Borrowers in which shall be recorded, among other things, the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender.

2.7 **Letters of Credit.** Subject to the terms and conditions hereof, Issuer shall (a) issue letters of credit (together with the Existing Letters of Credit, collectively, "Letters of

Credit") for the account of Borrowers; provided, however, that Issuer will not be required to issue any Letters of Credit to the extent that the stated amount of such Letters of Credit would then cause the Revolving Exposure of Borrowers to exceed the Maximum Borrowing Amount. The maximum stated amount of Letters of Credit outstanding shall not exceed $2,000,000 in the aggregate at any time. Each drawing under any Letter of Credit shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

2.8 **Issuance of Letters of Credit.**

(a) The Borrower Representative may request Issuer to issue a Letter of Credit by delivering to Issuer at the Payment Office Issuer's form of application and agreement for letter of credit, completed to the satisfaction of Issuer, and such other certificates, documents and other papers and information as Issuer may reasonably request no later than 1:00 p.m. Ohio time at least five (5) Business Days' prior to the date of such proposed issuance.

(b) Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts or other forms of written demand for payment or, acceptances of issued drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than the earlier of one (1) year from the date of issuance or five (5) Business Days prior to the Facility Termination Date. Each trade Letter of Credit shall be subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600, and any amendments or revisions thereof adhered to by Issuer (the "UCP"). Each standby Letter of Credit shall be subject to the International Standby Practices (1998), International Chamber of Commerce Publication 590 and any amendments or revisions thereof adhered to by Issuer (the "ISP") or the UCP, as determined by Issuer. Each Letter of Credit shall be governed, to the extent not inconsistent with the UCP or the ISP, as applicable, by the laws of the Commonwealth of Pennsylvania.

(c) Issuer shall have sole discretion whether to accept any draft. Without in any way limiting Issuer's sole discretion whether to accept any draft, no draft may be presented for acceptance, and Issuer will generally not accept any drafts (i) that arise out of transactions involving the sale of goods by applicable Borrower not in the ordinary course of its business, (ii) that involve a sale to an Affiliate of any Borrower, (iii) that involve any purchase for which Issuer has not received all related documents, instruments and forms requested by Issuer, or (iv) that is not eligible for discounting with Federal Reserve Banks pursuant to paragraph 7 of Section 13 of the Federal Reserve Act, as amended.

(d) Issuer shall notify Agent and Lenders of the request by Borrower Representative for a Letter of Credit hereunder within a reasonable time after receiving such request.

(e) Notwithstanding any term, provision, condition or covenant contained herein, while an Event of Default exists, Issuer shall not be required to issue, and Borrowers shall not be entitled to request the issuance of, a Letter of Credit.

(f) All Existing Letters of Credit shall be deemed to have been issued pursuant hereto and shall be subject to and governed by the terms and conditions hereof.

2.9 **Requirements For Issuance of Letters of Credit.**

(a) In connection with the issuance of any Letter of Credit, Borrowers shall indemnify, save and hold Agent, Issuer and each Lender harmless from any loss, cost, expense or liability, including payments made by Agent, Issuer and Lenders and expenses and reasonable attorneys' fees incurred by Agent, Issuer and Lenders arising out of, or in connection with, any Letter of Credit to be issued or created for any Borrower. Borrowers shall be bound by Agent's and Issuer's regulations and good faith interpretations of any Letter of Credit issued or created to the Loan Account, although this interpretation may be different from its own; and, neither Agent, nor any Lender, nor Issuer, nor any of their correspondents shall be liable for any error, negligence, or mistakes, whether of omission or commission, in following any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments or supplements thereto or in issuing or paying any Letter of Credit.

(b) Borrowers shall authorize and direct Issuer to deliver to Agent all instruments, documents, and other writings and property received by Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance therefor.

(c) In connection with all Letters of Credit issued by Issuer under this Agreement, Borrowers hereby appoint Issuer, or its designee, as their attorney, with full power and authority upon the occurrence of an Event of Default or Default, (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the U.S. Customs Department in the name of such Borrower or Issuer or Issuer's designee, and to sign and deliver to officials of such customs department powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's name or Issuer's, or in the name of Issuer's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Issuer nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

(d) Each Lender shall to the extent of the amount equal to the product of such Lender's Commitment Percentage *multiplied by* the aggregate amount of all unpaid reimbursement obligations arising from disbursements made or obligations incurred with respect to the Letters of Credit be deemed to have irrevocably purchased an undivided

participation in each such unpaid reimbursement obligation. In the event that at the time a disbursement is made the unpaid balance of Advances exceeds or would exceed, with the making of such disbursement, the Maximum Borrowing Amount, and such disbursement is not reimbursed by Borrowers within two (2) Business Days, Agent shall promptly notify each Lender and upon Agent's demand each Lender shall pay to Agent such Lender's proportionate share of such unpaid disbursement together with such Lender's proportionate share of Agent's reasonable unreimbursed costs and expenses relating to such disbursement. In the event Issuer makes a disbursement in respect of a Letter of Credit, each Lender shall pay to such Issuer, upon such Issuer's demand, such Lender's proportionate share of such disbursement together with such Lender's proportionate share of such Issuer's reasonable unreimbursed costs and expenses relating to such disbursement. Upon receipt by Agent of a repayment from any Borrower of any amount disbursed by Agent for which Agent had already been reimbursed by Lenders, Agent shall deliver to each Lender that Lender's pro rata share of such repayment. Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (ii) no Letter of Credit issued hereunder remains outstanding and uncancelled or (iii) all Persons (other than the applicable Borrower) have been fully reimbursed for all payments made under or relating to Letters of Credit.

(e) Immediately upon the request of Agent, (i) after the occurrence of a Default or an Event of Default, or (ii) any Letter of Credit remains outstanding after five (5) Business Days prior to the Facility Termination Date, in each such case, Borrowers will deposit and maintain in an account with Agent in cash, as cash collateral, in an amount equal to one hundred five percent (105%) of the amount of outstanding Letters of Credit. In each case, Borrowers hereby irrevocably authorizes Agent, in its sole discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits in such account or in an account opened by Borrowers, in any amount required to be made by Borrowers, out of the proceeds of Accounts or other Collateral, from an Advance, or out of any other funds of any Borrower coming into Agent's or any Lender's possession at any time. Any net return on such cash or investments shall be credited to such account and constitute additional cash collateral. Borrowers may not withdraw any amount credited to any such account except upon payment and performance in full of all Obligations and termination of this Agreement.

2.10 **Term ~~Loan~~Loans.**

(a) Existing Term Loan. As of the Original Closing Date, Huntington, as lender, under the Existing Loan Documents ("Existing Lender") made a term loan to the Borrowers in accordance with its term loan commitment set forth in the Existing Loan Documents (the "Existing Term Loan"). The Existing Term Loan was made in the aggregate principal amount of $4,200,000. On the Closing Date the Existing Term Loan will be repaid in full by the Borrowers with the proceeds of the Term Loan.

(b) Closing Date Term Loan.

(i) (b) Amount of the Closing Date Term Loan. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan") to Borrowers on the Closing Date, in an amount equal to such Lender's Term Loan Commitment and otherwise in accordance with Section 2.10(eb)(ii). The Term Loan shall bear interest as a SOFR Rate Loan until Borrower electsBorrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan shall be evidenced by a secured promissory note (the "Term Loan Note") substantially in the form attached as Exhibit C.

(ii) (c) Funding by Lender; Term Loan Draws. Agent andThe Lenders shall make the amount of the Term Loan available to Borrowerthe Borrowers on the Closing Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) (d) Amortization; Payments. The Term Loan shall amortize in sixty (60) equal consecutive monthly installments. Each of the first sixty (60) installments of principal shall be in an amount equal to $17,500.00 and shall be payable on the first day of each calendar month, commencing on April 1, 2022. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan, fixed monthly installments of principal shall be due in the amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

(c) Term Loan 2.

(i) Amount of the Term Loan 2. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan 2") to Borrowers on the Sixth Amendment Effective Date, in an amount equal to such Lender's Term Loan 2 Commitment and otherwise in accordance with Section 2.10(c)(ii). The Term Loan 2 shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan 2 shall be evidenced by a secured promissory note (the "Term Loan 2 Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan 2 Draws. The Lenders shall make the amount of the Term Loan 2 available to the Borrowers on the Sixth Amendment Effective Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan 2 shall amortize in two hundred and forty (240) equal consecutive monthly installments. Each of the installments of principal shall be in an amount equal to $4,050.00 and shall be

payable on the first day of each calendar month, commencing on September 1, 2024. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan 2 and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan 2 may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan 2, fixed monthly installments of principal shall be due in the amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

2.11 **Additional Payments.** Any sums reasonably expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under any Loan Document, including such Borrower's obligations under Sections 2.7, 4.2, 4.3, 4.4, 4.12, 4.13, 6.7 and 15.9 may be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

2.12 **Use of Proceeds**. Borrowers shall apply the proceeds of Advances and the other Loans (a) to repay existing Indebtedness owed to existing lenders, (b) to pay fees and expenses relating to the transaction contemplated by this Agreement, (c) for lawful corporate purposes, (d) to provide for working capital needs, (e) with respect to the Term Loan, to refinance the Existing Term Loan, (f) with respect to the Revolving Loans, to provide for all or a portion of the purchase price or consideration for any Permitted Business Acquisition, (g) with respect to the Revolving Loans, to finance the 2022 Real Estate Purchase, so long as the conditions to such purchase set forth herein have been satisfied, (h) with respect to the Revolving Loans, to provide for all or a portion of the purchase price in connection with the LTR Acquisition and the Taylor Transportation Acquisition, and (i) with respect to the Revolving Loans, to provide a portion of the purchase price in an amount not to exceed $2,000,000 in connection with the Corporate Retreat Purchase, and (j) with respect to the Term Loan 2, to provide a portion of the purchase price for the purchase of the North Carolina Property.

Borrowers will not request any Loan or Letter of Credit, and Borrowers shall not use, and shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

2.13 **Joint and Several Obligations of Loan Parties.**

(a) Each Loan Party acknowledges and agrees that Agent, Issuer and each Lender is entering into this Agreement at the request of each Loan Party and with the understanding that each Loan Party is and shall remain fully liable, jointly and severally, for payment in full of the Loans, Advances and other credit extensions under this Agreement or any Loan Document. Each Loan Party further agrees that it is receiving or

will receive a direct or indirect pecuniary benefit for any Loan, Advance and other credit extension made pursuant to this Agreement or the Loan Documents. Anything in this Agreement or any other Loan Document to the contrary notwithstanding, in no event shall the maximum liability of any Loan Party exceed the maximum amount that (after giving effect to the incurrence of the obligations hereunder and to any rights to contribution or other rights of such Loan Party from such other Loan Party) would not render the rights to payment of Agent, Issuer and Lenders hereunder void, voidable or avoidable under any applicable fraudulent transfer law or conveyance law.

(c) In the event that any obligation of any Loan Party under this Agreement or any Loan Document is deemed to be an agreement by such Loan Party to answer for the debt or default of another Loan Party or as an accommodation maker or hypothecation of property as security therefor, each Loan Party represents and warrants that (i) no representation has been made to such Loan Party as to the creditworthiness of such other Loan Party, and (ii) such Loan Party has established adequate means of obtaining from such other Loan Party on a continuing basis, financial or other information pertaining to such other Loan Party's financial condition. Each Loan Party expressly waives, except as expressly required under this Agreement, diligence, demand, presentment, protest and notice of every kind and nature whatsoever, consents to the taking by Agent of any additional security of another Loan Party for the Obligations, or the alteration or release in any manner of any security of another Loan Party now or hereafter held in connection with the Obligations, and consents that Agent, Issuer and Lenders and any other Loan Party may deal with each other in connection with such Obligations or otherwise, or alter any contracts now or hereafter existing between them, in any manner whatsoever, including without limitation the renewal, extension, acceleration or changes in time for payment of any such obligations or in the terms or conditions of any security held. Agent, Issuer and Lenders are hereby expressly given the right, at their option, to proceed in the enforcement of any of the Obligations independently of any other remedy or security they may at any time hold in connection with such obligations secured, and it shall not be necessary for Agent, Issuer or any Lender to proceed upon or against or exhaust any other security or remedy before proceeding to enforce their rights against any Loan Party.

(d) Each Loan Party further agrees that it will not enforce any right of subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid to Agent or any Lender by any other Loan Party with respect to any liability incurred by it hereunder or under any Loan Document, any payment made by it to Agent, Issuer or any Lender with respect to any of the Obligations or any collateral security therefor until such time as all Obligations are paid in full in cash. Any claim which any Loan Party may have against any other Loan Party with respect to any payments to Agent, Issuer or any Lender hereunder or under any other Loan Document are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of all Obligations and, in the event of any insolvency proceeding relating to any Loan Party, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or

distribution of any character, whether in cash, securities or other property, shall be made to any other Loan Party therefor.

2.14 **Borrower Representative.**

(a) Each Borrower hereby irrevocably constitutes and appoints the Borrower Representative and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, and in any such capacity to borrow, sign and endorse any Loan Document, and to execute and deliver all other instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, hereby authorizes Agent and each Lender to pay over or credit all loan proceeds hereunder in accordance with the request of Borrower Representative, and to take any and all appropriate actions, including without limitation the right to give or receive any notice or other document provided for under this Agreement or under any Loan Document on behalf of such Borrower, and to execute on behalf of such Borrower any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement. Any notice given to or received from the Borrower Representative on behalf of any Borrower under this Agreement shall be deemed to have been given to or received from such Borrower.

(b) Agent, Issuer and Lenders shall not incur any liability to any Borrower as a result of the handling of this credit facility as a co-borrowing facility with a Borrower Representative in the manner set forth in this Agreement. To induce Agent, Issuer and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent, Issuer and Lenders and holds Agent, Issuer and Lenders harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent, Issuer or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of any Borrower as provided herein, reliance by Agent, Issuer or any Lender on any request or instruction from Borrower Representative or any other action taken by Agent, Issuer or any Lender with respect to this Section 2.14, except for the gross negligence or willful misconduct, as determined by a final non-appealable judgment by a court of competent jurisdiction, of Agent, Issuer or any Lender.

2.15 **Manner of Borrowing and Payment; Settlement.**

(a) Each borrowing of Revolving Loans shall be advanced according to the applicable Commitment Percentages of Lenders.

(b) Each payment (including each prepayment) by Borrowers on account of the principal of and interest on the Revolving Loans, shall be applied to the Revolving Loans pro rata according to the applicable Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or

counterclaim and shall be made to Agent on behalf of Lenders to the Payment Office, in each case on or prior to 12:00 (noon) in Dollars and in immediately available funds.

(c) (i) Notwithstanding anything to the contrary contained in Sections 2.16(a) and 2.16(b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Loans shall be advanced by Agent and each payment by any Borrower on account of Revolving Loans shall be applied first to those Revolving Loans advanced by Agent. On or before 2:30 p.m. on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (x) if the aggregate amount of new Revolving Loans made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Loans during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (1) such Revolving Loans and (2) such repayments and (y) if the aggregate amount of repayments applied to outstanding Revolving Loans during such Week exceeds the aggregate amount of new Revolving Loans made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (1) such repayments and (2) such Revolving Loans.

(ii) Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date. Such certificate of Agent shall be presumed correct in the absence of manifest error.

(d) If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances or other Loans, as applicable, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances or other Loans, as applicable, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances or other Loans, as applicable, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances or other Loans, as applicable, may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment

Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowers of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Fed Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, *multiplied by* (ii) such amount, *multiplied by* (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be presumed correct, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to Revolving Loans hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.16 **Defaulting Lender.**

(a) Notwithstanding anything to the contrary contained herein, in the event any Lender (i) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance, (ii) notifies either Agent or Borrower Representative that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement), (iii) has notified any Borrower, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement, or (iv) becomes, or its parent becomes, subject to a Bankruptcy Event (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.16 while such Lender Default remains in effect.

(b) Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, such amount shall not be applied to any Advances of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Advances then outstanding.

(c) A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Loan Documents. All amendments, waivers and other modifications of this

Agreement and the Loan Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d) Other than as expressly set forth in this Section 2.16, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged. Nothing in this Section 2.16 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Loan Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

2.17 **Increase in Commitments.**

(a) (a) Borrowers Request. The Borrowers may by written notice to the Agent elect to request (x) prior to the Facility Termination Date, an increase to the existing Revolving Commitments (the "Incremental Revolving Commitment"), by an aggregate amount, after giving effect to the 2024 Revolving Commitment Increase Agreement, not in excess of $~~20,000,000~~10,000,000. The notice shall specify (i) the date (each, an "Increase Effective Date") on which the Borrowers propose that the Incremental Revolving Commitment shall be effective, which shall be a date not less than ten (10) Business Days after the date on which such notice is delivered to the Agent and (ii) the identity of each Person to whom the Borrowers propose any portion of the Incremental Revolving Commitment be allocated and the amounts of such allocations; provided, that (a) each new Lender providing all or a portion of the Incremental Revolving Commitments shall satisfy the requirements of 15.3(a) and shall be subject to the approval of the Agent (such approval not to be unreasonably withheld or delayed), (b) the consent of the Issuer shall be required for any Person providing any portion of the Incremental Revolving Commitment and (c) an existing Lender approached to provide all or a portion of the Incremental Revolving Commitment may elect or decline, in its sole discretion, to provide such Incremental Revolving Commitment.

(b) Conditions. No Incremental Revolving Commitments shall become effective as of the Increase Effective Date unless:

(i) no Event of Default or Default shall exist as of such date, and no Event of Default or Default shall occur on such date as a result of making any Advances on such date or from the application of the proceeds thereof;

(ii) the representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(iii) on a pro forma basis (assuming, in the case of Incremental Revolving Commitments, that such Incremental Revolving Commitments are fully drawn), the Borrowers shall be in compliance with the covenant set forth in Section 6.3 and each other financial covenant as of the end of the latest fiscal quarter of the Borrowers for which financial statements are available; and

(iv) the Borrowers shall deliver or cause to be delivered any officer's certificates, legal opinions or other documents reasonably requested by the Agent.

(c) Increase Joinder. The Incremental Revolving Commitments shall be effected by a joinder agreement (the "Increase Joinder") executed by the Borrowers, the Agent and each Lender making such Incremental Revolving Commitment, in form and substance reasonably satisfactory to each of them. Notwithstanding the provisions of Section 15.2, the Increase Joinder may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the ~~Administrative~~ Agent, to effect the provisions of this Section 2.17. Within a reasonable time after the effective date of any increase or joinder, the Agent shall distribute such Increase Joinder to each of the Lenders. In addition, unless otherwise specifically provided herein, all references in Loan Documents to Revolving Loans shall be deemed, unless the context otherwise requires, to include references to Revolving Loans made pursuant to Incremental Revolving Commitments made pursuant to this Agreement. This Section 2.17 shall supersede any provisions to the contrary. In connection with any Incremental Revolving Commitments pursuant to this Section 2.17, any Person becoming a Lender pursuant to an Increase Joinder shall (1) execute such additional documents and agreements as the Agent may reasonably request and (2) in the case of any new Lender that is organized under the laws of a jurisdiction outside of the United States of America, provide to the Agent, its name, address, tax identification number and/or such other information as shall be necessary for the Agent to comply with "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA Patriot Act.

(d) Adjustment of Revolving Loans. Each Lender that is acquiring an Incremental Revolving Commitment on the Increase Effective Date shall make a Revolving Loan, the proceeds of which will be used to prepay the Revolving Loans of the other ~~Revolving~~applicable Lenders immediately prior to such Increase Effective Date, so that, after giving effect thereto, the Revolving Loans outstanding are held by the Lenders pro rata based on their Revolving Commitments after giving effect to such Increase Effective Date. If there is a new Advance of Revolving Loans on such Increase Effective Date, the Lenders after giving effect to such Increase Effective Date shall make such Revolving Loans in accordance with Section 2.1.

(e) Equal and Ratable Benefit. The Loans and Revolving Commitments established pursuant to this paragraph shall constitute Loans and Revolving Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Liens created by the ~~Collateral~~Loan Documents, except that the new Loans may be subordinated in right of payment or the Liens securing the new Loans may be subordinated, in each case, to the extent set forth in the Increase Joinder. The Loan Parties shall take any actions reasonably required by the Agent to ensure and/or demonstrate that the Liens granted by the Loan Documents continue to be perfected under the Uniform Commercial ~~Cord~~Code or otherwise after giving effect to the establishment of any such new Revolving Commitments.

## ARTICLE 3
## INTEREST AND FEES

3.1 **Interest.**

(a) Interest on the Loans shall be payable in arrears on the first (1st) day of each calendar month. Interest charges shall be computed on the actual principal amount of Loans outstanding during the calendar month. If any payment to be made by Borrowers shall come due on a day other than a Business Day, the due date shall be extended to the next succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; provided, however, that if such next succeeding Business Day occurs in the following calendar month, then the due date shall be the immediately preceding Business Day.

(b) Domestic Rate Loans shall bear interest for each day at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin, and SOFR Rate Loans shall bear interest at a rate per annum equal to Daily Simple SOFR plus the Applicable SOFR Rate Margin. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

(c) Upon and after the occurrence of an Event of Default, (i) all interest accruing in respect of any Obligation shall bear interest per annum at the Default Rate, (ii) all Letter of Credit Fees shall be increased by a percentage equal to the Default Rate, and all other fees under any Loan Document shall be increased by a percentage equal to the Default Rate. All interest accrued at the Default Rate shall be due and payable on demand.

3.2 **Letter of Credit Fees.**

Borrowers shall pay (i) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit, for each day from and excluding the date of issuance of same to and including the date of expiration or termination, equal to (A) the stated amount of each outstanding Letter of Credit on

the date of its issuance or renewal, as the case may be, *multiplied by* (B) the Applicable SOFR Rate Margin, such fees to be payable monthly in arrears on the first day of each calendar month and on the Facility Termination Date, (ii) to Agent, for the benefit of Issuer, facing fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily stated amount of each outstanding Letter of Credit *multiplied by* one-quarter of one percent (0.25%) per annum, such fees to be payable monthly in arrears on the first (1st) day of each calendar month and on the Facility Termination Date and (iii) to Agent, for the benefit of Issuer, any and all fees and expenses as agreed upon by Issuer and Borrowers in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder (all of the foregoing fees, the "Letter of Credit Fees"). All such Letter of Credit Fees and other charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in Issuer's prevailing charges for that type of transaction.

3.3 **Unused Facility Fee.** From the Closing Date to the payment in full in cash of all Obligations under this Agreement, Borrowers have and shall continue to pay to Agent, for the ratable benefit of Lenders, an unused fee monthly commencing on the first (1st) day of each month thereafter. The unused fee payable to Agent shall be determined by multiplying three-eighths of one percent (0.375%) per annum times the daily unused amount of the Aggregate Revolving Commitment each day during the relevant period or portion thereof. The unused fee shall be computed in the same manner as in Section 3.6. Whenever any payment of the unused fee shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next Business Day. It is expressly understood that the unused fee herein described shall not be refundable under any circumstances.

3.4 **Reserved.**

3.5 **Reserved.**

3.6 **Computation of Interest and Fees; Restatement; Conforming Changes.**

(a) ~~.~~Interest on the unpaid principal balance of the Loans is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Any reference in this Agreement to a "per annum" rate shall be based on a year of 360 days. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the rate otherwise applicable during such extension.

(b) If, as a result of any restatement of or other adjustment to the financial statements of Borrowers or for any other reason, any Borrower or Agent reasonably determines that (i) the Consolidated Fixed Charge Coverage Ratio as calculated by Borrowers as of any applicable date was inaccurate and (ii) a proper calculation of the

Consolidated Fixed Charge Coverage Ratio would have resulted in higher pricing for such period, Borrowers shall immediately and retroactively be obligated to pay to Agent, for the ratable benefit of Lenders, promptly on demand by Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to Borrowers under any bankruptcy or insolvency law, automatically and without further action by Agent), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. This paragraph shall not limit the rights of Agent under Section 3.8 or 3.11 or under Article 10 of this Agreement. Borrowers' obligations under this paragraph shall survive the termination of the Aggregate Commitments and the repayment of all other Obligations hereunder.

(c) In connection with the use or administration of Daily Simple SOFR, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Agent will promptly notify Borrowers and Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Daily Simple SOFR.

3.7 **Maximum Charges.** In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under applicable law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under applicable law, such excess amount shall be first applied to any unpaid principal balance owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Agent and Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.8 **Increased Costs; Losses.**

~~. In the event that, (a) the introduction of any law, treaty, rule or regulation or any change therein after the Closing Date, (b) any change after the Closing Date in the interpretation or administration of any law, treaty, rule or regulation by any central bank or other Governmental Body or (c) the compliance by Agent, Issuer or any Lender with any guideline, request or directive from any central bank or other Governmental Body (whether or not having the force of Law) after the Closing Date (for purposes of this Section 3.8, the term " Agent " or "Lender" shall include Agent, any Lender and any corporation or bank controlling Agent or any Lender and the office or branch where Agent or any Lender (as so defined) makes or maintains any Loans), shall:~~

~~(a) subject Agent or any Lender to any tax of any kind whatsoever with respect to any Loan Document or change the basis of taxation of payments to Agent or any such Lender of principal, fees, interest or any other amount payable under any Loan Documents (except for changes in the rate of tax on the overall net income of Agent or any Lender by the jurisdiction in which it maintains its principal office); or~~

(a) ~~(b)~~ Increased Costs Generally. If any Change in Law shall (i) impose, modify or ~~hold~~deem applicable any reserve, special deposit, ~~assessment~~compulsory loan, insurance charge or similar requirement against assets ~~held by~~of, ~~or~~ deposits ~~in~~with or for the account of, ~~advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or~~

~~(c)~~ or credit extended or participated in by, any Lender or any Issuer, (ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto or (iii) impose on any Lender or any Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made or maintained by such Lender or any Letter of Credit or participation therein, ~~impose on Agent or any Lender any other condition with respect to any Loan Document;~~

and the result of any of the foregoing ~~is~~shall be to increase the cost to ~~Agent or any~~such Lender, such Issuer or such other Recipient of making, ~~renewing~~converting to, continuing or maintaining ~~its Advances or the other Loans hereunder by an amount that Agent or any Lender deems to be material~~any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, such Issuer or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any ~~payment~~sum received or receivable by such Lender, Issuer or other Recipient hereunder (whether of principal, interest or ~~otherwise) in respect of any of the Advances or the other Loans by an amount that Agent or any Lender deems to be material, then, in any case Borrowers shall promptly pay Agent or such Lender, upon its demand~~any other amount) then, upon request of such Lender, Issuer or other Recipient, Borrowers will pay to such Lender, Issuer or other Recipient, as the case may be, such additional amount or amounts as will compensate ~~Agent or~~ such Lender, Issuer or other Recipient, as the case may be, for such additional ~~cost or such reduction, as applicable. Agent or such Lender shall certify the amount of such additional cost or reduced amount to the Borrower Representative, and such certification shall be presumed correct absent manifest error.~~costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender or Issuer determines that any Change in Law affecting such Lender or such Issuer or any lending office of such Lender or such Lender's or Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or Issuer's capital or on the capital of such Lender's or Issuer's holding company, if any, as a consequence of this Agreement, the Aggregate Commitments of such Lender or the Loans made or maintained by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by any Issuer, to a level below that which such Lender or such Issuer or such Lender's or such Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuer's policies and the policies of such Lender's or such Issuer's holding company with respect to capital

adequacy and liquidity), then from time to time Borrowers will pay to such Lender or such Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuer or such Lender's or such Issuer's holding company for any such reduction suffered.

(c) Certificates for Reimbursement; Delay in Requests. A certificate of a Lender or an Issuer setting forth the amount or amounts necessary to compensate such Lender or its holding company as specified in Section 3.8 and delivered to Borrowers shall be conclusive absent manifest error. Borrowers shall pay such Lender or such Issuer the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof. Failure or delay on the part of a Lender or Issuer to demand compensation pursuant to this Section 3.8 shall not constitute a waiver of such Lender's or such Issuer's right to demand such compensation; provided that Borrowers shall not be required to compensate a Lender or Issuer pursuant to this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or such Issuer notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(d) Compensation for Losses. Upon demand of any Lender (with a copy to Agent) from time to time, Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of (a) any payment or prepayment of any SOFR Rate Loan on a day other than an interest payment date (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), (b) any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow any SOFR Loan on the date or in the amount notified by Borrowers, including any loss or expense arising from the liquidation or reemployment of funds or from any fees payable.

3.9 **~~Indemnity; Benchmark Replacement Setting;~~ Illegality; Inability to Determine Rates.**

~~(a) Indemnity. Borrowers shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses and expenses that Agent and any Lender may sustain or incur as a consequence of any prepayment, conversion of, or any default by Borrowers in the payment of the principal of or interest on any Loan or failure by Borrowers to complete a borrowing of, a prepayment of or conversion of or to a Loan after notice thereof has been given, including any interest payable by Agent or any Lender to lenders of funds obtained by it in order to make or maintain its Loans hereunder.~~

(a) Illegality. If any Lender determines that any law, rule or regulation has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to SOFR or Daily Simple SOFR, or to determine or charge interest rates based upon SOFR or Daily Simple SOFR, then, upon notice thereof by such

Lender to Borrowers (through Agent), the accrual of interest on the Loans based upon Daily Simple SOFR shall be suspended until each affected Lender shall notify Agent and Borrowers that the circumstances causing such suspension no longer exist, and beginning on the date of such suspension, interest shall accrue thereon at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin.

(b) Inability to Determine Rates. Subject to Section 3.10, if at any time (a) Agent determines (which determination shall be conclusive and binding absent manifest error) that Daily Simple SOFR cannot be determined pursuant to the definition thereof (including because SOFR is not available or published on a current basis) or (b) Agent is advised by the Required Lenders that Daily Simple SOFR does not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans hereunder, Agent will promptly so notify Borrowers and each Lender. In any such event (including during any Benchmark Unavailability Period), the accrual of interest hereunder based upon Daily Simple SOFR shall be suspended until Agent (with respect to clause (b), upon the instruction of the Required Lenders) revokes such notice, and beginning on the date of such suspension, interest shall accrue hereunder at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin.

3.10 ~~(b)~~ **Effect of Benchmark ~~Replacement Setting~~Transition Event.**

(a) ~~(i)~~ Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, ~~upon~~following the occurrence of a Benchmark Transition Event, ~~Agent and Borrowers may amend this Agreement to~~the Benchmark Replacement will replace ~~the~~ then-current Benchmark ~~with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective~~for all purposes hereunder and under any Loan Document at the time~~,~~ (not less than five ~~(5)~~ Business Days after Agent has provided notice thereof to each Lender~~, that is provided in the applicable amendment implementing~~) set forth in the notice of implementation of such Benchmark Replacement provided by Agent to Borrowers and the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as Agent has not received, by such time, written notice of objection to such ~~amendment~~Benchmark Replacement from Lenders comprising the Required Lenders.~~ No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.9(b) will occur prior to the applicable Benchmark Transition Start Date.~~

(b) ~~(ii)~~ Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Agent will have the right to make ~~Benchmark Replacement~~ Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such ~~Benchmark Replacement~~ Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c) ~~(iii)~~ Notices; Standards for Decisions and Determinations. Agent will promptly notify Borrowers and the Lenders of (~~A~~i) the implementation of any Benchmark

Replacement and (Bii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Agent will promptly notify Borrowers of the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.9(b)3.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.9(b)3.10.

3.11 **Taxes**Benchmark Unavailability Period. Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of Daily Simple SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, (A) Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to Domestic Rate Loans and (B) any outstanding affected Daily Simple SOFR Loans will be deemed to have been converted into Domestic Rate Loans immediately. During a Benchmark Unavailability Period, the component of Alternate Base Rate based upon the then-current Benchmark will not be used in any determination of Alternate Base Rate.

(c) Illegality. If any Lender determines that any law has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to SOFR or Daily Simple SOFR, or to determine or charge interest rates based upon SOFR or Daily Simple SOFR, then, upon notice thereof by such Lender to Borrowers (through Agent), (1) any obligation of such Lender to make or continue Daily Simple SOFR Loans or to convert Domestic Rate Loans to Daily Simple SOFR Loans shall be suspended, and (2) if such notice asserts the illegality of such Lender making or maintaining Domestic Rate Loans the interest rate on which is determined by reference to Daily Simple SOFR component of the Alternate Base Rate, the interest rate on which Domestic Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by Agent without reference to the Daily Simple SOFR component of the Alternate Base Rate, in each case until such Lender notifies Agent and Borrowers that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (A) Borrowers shall, upon demand from such Lender (with a copy to Agent), prepay or, if applicable, convert all Daily Simple SOFR Loans of such Lender to Domestic Rate Loans (the interest rate on which Domestic Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by Agent without reference to Daily Simple SOFR component of the Alternate Base Rate) on the interest payment date therefor, if such Lender may lawfully continue to maintain such Daily Simple SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Daily Simple SOFR Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Daily Simple SOFR, Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to Daily Simple SOFR component thereof until Agent is

advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Daily Simple SOFR. Upon any such prepayment or conversion, Borrowers shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required under this Agreement.

3.10 **Capital Adequacy.**

. In the event that Agent or any Lender shall have determined that (a) the introduction of any law, treaty, rule or regulation or any change therein after the Closing Date, (b) any change after the Closing Date in the interpretation or administration of any law, treaty, rule or regulation by any central bank or other Governmental Body or (c) the compliance by Agent, Issuer or any Lender with any guideline, request or directive from any central bank or other Governmental Body (whether or not having the force of Law) after the Closing Date (for purposes of this Section 3.10, the term " Agent " or any "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any such Lender and the office or branch where Agent or any such Lender (as so defined) makes or maintains any Loans), has or would have the effect of reducing the rate of return on Agent's or any such Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or any such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's or any such Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any such Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent or any such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction. In determining such amount or amounts, Agent or any such Lender may use any reasonable averaging or attribution methods. The protection of this Section 3.10 shall be available to Agent or any such Lender regardless of any possible contention of invalidity or inapplicability with respect to the applicable law, regulation or condition. A certificate of Agent or any Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to this Section 3.10 when delivered to Borrowers shall be presumed correct absent manifest error.

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law requires the deduction or withholding of any Tax from any such payment by Agent or any Loan Party, then Agent or such Loan Party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.11) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Body in accordance with applicable law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c) Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.11) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender or an Issuer (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender or an Issuer, shall be conclusive absent manifest error.

(d) Indemnification by Lenders. Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrowers have not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 15.3(c) relating to the maintenance of a Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to Lender from any other source against any amount due to Agent under this paragraph (d).

(e) Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.11, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(f) Status of Lenders. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.11, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrowers and Agent, at the time or times reasonably requested by Borrowers or Agent, such properly completed and executed documentation reasonably requested by Borrowers or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In

addition, any Lender, if reasonably requested by Borrowers or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrowers or Agent as will enable Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f) (ii)(A)(i), (ii)(B) and (ii)(D) of this Section) shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A) any Lender that is a U.S. Person shall deliver to Borrowers and Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form and substance satisfactory to Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to such Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in form and substance satisfactory to Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form and substance satisfactory to Agent on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers or Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i)

of the Code) and such additional documentation reasonably requested by Borrowers or Agent as may be necessary for Borrowers and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrowers and Agent in writing of its legal inability to do so.

(g) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.11 (including by the payment of additional amounts pursuant to this Section 3.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 3.11(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body. Notwithstanding anything to the contrary in this Section 3.11(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 3.11(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.11(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

3.12 **Survival.** All of Borrowers' obligations under Sections 3.8 through 3.11 shall survive any assignment of rights by any Lender, termination of the commitments and repayment of the Obligations.

## ARTICLE 4
## COLLATERAL; SECURITY AGREEMENT

4.1 **Security Interest in the Collateral.** To secure the prompt payment and performance of the Obligations, each Loan Party hereby grants to Agent, for the benefit of the Agent, each Lender, and the benefit of each of their respective Affiliates, a continuing security

interest in and a pledge of all of its Collateral. Each Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect such security interest and shall cause its financial statements to reflect such security interest. In addition, to secure such prompt payment and performance of the Obligations, each Loan Party shall also assign, pledge, hypothecate and grant to Agent, for the benefit of Agent and each Lender, a mortgage on its Owned Real Property, if any.

4.2 **Perfection of Security Interest.** Each Loan Party shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, without limitation, (a) immediately discharging all Liens other than Permitted Encumbrances, (b) using best efforts to obtain each Waiver as Agent may request, (c) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral (including, in the case of Collateral consisting of motor vehicles subject to certificate of title statutes, upon the request of Agent, the Agent shall have received the original title certificates that identify Agent as lienholder for such motor vehicles; provided, however that no such original title certificates shall be required to be delivered for motor vehicles owned by the Loan Parties as of the Closing Date), (d) entering into lockbox and other custodial arrangements satisfactory to Agent as and to the extent required hereunder, and (e) executing and delivering control agreements, instruments of pledge, Mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of ~~Agent 's~~Agent's security interest in Collateral under the Uniform Commercial Code or other applicable law. Each Loan Party hereby authorizes Agent to file against such Loan Party, one or more financing, continuation, or amendment statements or recording, notice, or perfection statements pursuant to the Uniform Commercial Code or such other laws, acts or codes pertaining to personal property, to perfect Liens securing Obligations arising hereunder in form and substance satisfactory to Agent. All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent immediately upon demand.

4.3 **Dominion of Funds, Lockbox, and Deposit Accounts.** (a) Borrowers shall maintain with Agent a Lockbox and any controlled deposit accounts required by Agent, including the Cash Collateral Account, each of which shall be subject to a lockbox agreement, deposit account control agreement or other Loan Document satisfactory to Agent in its sole discretion. Each Borrower shall notify each Account Debtor in writing (such notices to be in form and substance satisfactory to Agent) and otherwise use its best efforts to ensure that each Account Debtor remits all payments thereon directly to address specified in the agreement for such Lockbox, and all invoices rendered after the date hereof shall bear such address.

(b) No Borrower shall maintain or have any operating account, deposit account, investment account, securities account or similar account at any bank, depositary source, financial intermediary or other financial institution, other than the deposit accounts set forth on Schedule 4.3 hereof, or such other accounts acceptable to Agent in

its sole discretion. For the avoidance of doubt, the Brookline Money Market Account (as defined in Section 6.9) balance shall not exceed $50,000 at any time (in accordance with the terms and conditions as described in Section 6.9).

(c) All collections from Account Debtors of each Borrower sent to the Lockbox shall be deposited on a daily basis directly into the Cash Collateral Account. The Cash Collateral Account shall not be subject to any deduction, set off, banker's lien or any other right in favor of any Person other than Agent. All funds deposited into the Cash Collateral Account shall be the exclusive property of Agent and shall be subject to the sole and exclusive control of Agent and only to such signing authority designated from time to time by Agent. No Borrower shall have control over or any interest in any such funds.

(d) Any collections received by any Borrower shall be deemed held by such Borrower in trust and as fiduciary for Agent. Each Borrower agrees not to commingle any such collections with any of such Borrower's other funds or property, but rather to hold such funds separate and apart in trust and as fiduciary for Agent until deposit is made into the Cash Collateral Account or other deposit account directed by Agent. Each Borrower hereby agrees to deposit on a daily basis such directly received collections into the Cash Collateral Account.

(e) Each Loan Party shall pay to Agent on demand all usual and customary fees and reasonable expenses which Agent incurs in connection with (i) the forwarding of any proceeds of any Loan and (ii) the establishment and maintenance of any accounts as provided for in this Section 4.3. Agent may, without making demand, charge all such fees and reasonable expenses to the Loan Account as a Domestic Rate Loan type of Revolving Loan and add them to the Obligations.

4.4 **Preservation and Disposition of Collateral.** Each Loan Party will safeguard and protect all Collateral for Agent's general account and shall make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement. Following the occurrence of a Default or Event of Default, in addition to the rights and remedies set forth in Section 11.1, Agent may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including (a) the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) employing and maintaining at any of any Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) leasing warehouse facilities to which Agent may move all or part of the Collateral; and (d) using any Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral. Agent shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of any Loan Party's Real Property. Each Loan Party shall cooperate fully with all of Agent's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as Agent may direct. Agent is hereby authorized by the Loan Parties, from time to time in Agent's sole discretion, (a) after the occurrence of a Default or an Event of Default, or (b) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Revolving Loans to Borrowers which Agent, in its sole discretion,

deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (iii) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement. All of Agent's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

4.5 **Ownership of Collateral.** With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (a) each Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (b) each Loan Document or other writing executed by any Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (c) all signatures and endorsements of each Loan Party that appear on such documents and agreements shall be genuine and each Loan Party shall have full capacity to execute same; and (d) each Loan Party's Inventory shall be located as set forth on Schedule 4.5 (as such schedule may be updated from time to time and delivered to Agent) and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the ordinary course of business and with respect to Inventory in transit from one location identified on Schedule 4.5 (as such schedule may be updated from time to time) to another location identified on Schedule 4.5.

4.6 **Defense of the Interests of Agent and Lenders.** Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, the interests of Agent and Lenders in the Collateral shall continue in full force and effect. During such period no Loan Party shall, without Agent's prior written consent, pledge, sell (except Inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for sales, assignments, and transfers expressly permitted elsewhere herein, any part of the Collateral. Each Loan Party shall defend the interests of Agent and Lenders in the Collateral against any and all Persons whatsoever. At any time after an Event of Default or Default has occurred, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises such right to take possession of the Collateral, the Loan Parties shall, upon demand, assemble the Collateral in the best manner possible and make it available to Agent at a place reasonably convenient to Agent. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence of a Default or an Event of Default, each Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Loan Party's possession, they, and each of them, shall be held by such Loan Party in trust as Agent's trustee, and such Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7 **Books and Records.** Each Loan Party shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all Charges; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Accounts, advances and investments and all other proper accruals (including accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this Section 4.7 shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountants as shall then be regularly engaged by Borrowers or the other Loan Parties.

4.8 **Financial Disclosure.** Each Loan Party hereby irrevocably authorizes and directs all accountants and auditors employed by such Loan Party at any time and promptly after the request of Agent to exhibit and deliver to Agent and each Lender copies of any Loan Party's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in such accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Loan Party's financial status and business operations. Each Loan Party hereby authorizes all federal, state and municipal authorities to furnish to Agent and each Lender copies of reports or examinations relating to such Loan Party, whether made by such Loan Party or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Loan Party prior to obtaining such information or materials from such accountants or such authorities.

4.9 **Compliance with Laws.** Each Loan Party shall be in compliance with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of such Loan Party's business including, without limitation the USA PATRIOT Act and Beneficial Ownership Regulations, unless such failure would not reasonably be expected to have a Material Adverse Effect. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect. Borrowers will maintain in effect and enforce policies and procedures designed to ensure compliance by Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

4.10 **Inspection of Premises; Appraisals.** At all times as Agent deems necessary, Agent shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Loan Party's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Loan Party's business. Agent and its agents may enter upon any of each Loan Party's premises at any time during business hours and at any other reasonable time, and from time to time as Agent deems necessary or desirable, for the purpose of auditing, inspecting and appraising the Collateral and any and all records pertaining thereto and the operation of such Loan Party's business. Agent shall have the right to conduct such field examinations, inspections and appraisals at such times as Agent deems necessary, in each case, at Borrowers' expense; provided that, (a) Loan Parties shall be required to pay for no more than two (2) field exams per calendar year unless an Event of Default occurs, in which case such

limitations shall not apply and (b) unless an Event of Default exists, Agent shall schedule its audits and inspections so as to minimize interference with such Borrower's business.

4.11 **Insurance.** Each Loan Party shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At each Loan Party's own cost and expense in amounts and with carriers acceptable to Agent, each Loan Party shall (a) keep all its insurable properties and properties in which each Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Loan Party's including business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Loan Party is engaged in business; and (e) furnish Agent (i) with a status report with respect to the renewal of all such insurance no later than ten (10) days before the expiration date thereof, (ii) with evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (iii) with lender loss payable, mortgagee and additional insured endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured, lender loss payee and mortgagee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy, lender loss payable clauses and mortgagee clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. The Loan Parties shall provide copies of all such insurance policies (including the appropriate lender loss payee, mortgagee and additional insured endorsements) within ten (10) days after Agent's request. In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by Agent and the applicable Loan Party to make payment for such loss to Agent and not to such Loan Party and Agent jointly. If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage with respect to Collateral. All loss recoveries with respect to Collateral received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by Agent to applicable Borrower or any other Loan Party or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Loan Parties to Agent, on demand.

4.12 **Failure to Pay Insurance.** If any Loan Party fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Loan Party, and such premium shall be

charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

4.13 **Payment of Taxes.** Each Loan Party will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral including real and personal property taxes, assessments and Charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except those taxes, assessments or Charges to the extent that any Loan Party has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's and Lenders' security interest in or Lien on the Collateral and provided that no Lien for any such taxes has attached to any Collateral. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Loan Party and Agent, Issuer or any Lender which Agent, Issuer or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's opinion, may possibly create a valid Lien on any Collateral, Agent may without notice to the Loan Parties pay the taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds Agent, Issuer and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any Loan Party has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any payment by Agent or any Lender under this Section 4.13 shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations and, until the Loan Parties shall furnish Agent or any Lender with an indemnity therefor (or supply Agent or any such Lender with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent or such Lender may hold without interest any balance owing to any Loan Party's credit and Agent or such Lender shall retain its security interest in any and all Collateral held by Agent or such Lender.

4.14 **Payment of Leasehold Obligations.** Each Loan Party shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's reasonable request will provide evidence of having done so.

4.15 **Accounts Receivable.** Each Loan Party represents, warrants and agrees as follows:

(a) Nature of Accounts. Each Account is a bona fide and valid account representing a bona fide obligation incurred by the Account Debtor therein named, for a fixed sum as set forth in the invoice relating thereto (other than immaterial or unintentional invoice) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Loan Party, or work, labor or services fully rendered by a Loan Party as of the date each Account is created. Such Account is due and owing without

dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by the Loan Parties to Agent.

(b) Solvency of Account Debtors. Each Account Debtor as of the date each Account is created, is and will be solvent and able to pay each Account on which the Account Debtor is obligated in full when due or with respect to such Account Debtor of any Loan Party who are not solvent such Loan Party has set up on its books and in its financial records bad debt reserves adequate to cover the uncollectible portion.

(c) Locations of Loan Parties. Each Loan Party's state of organization and the address and location of its chief executive office are set forth on Schedule 4.15(c). Until written notice is given to Agent by the Borrower Representative of any other office at which any Loan Party keeps its records pertaining to Accounts, all such records shall be kept at such executive office.

(d) Notification of Assignment of Accounts. At any time following the occurrence of a Default or an Event of Default, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Accounts to any and all Account Debtors or any third party holding or otherwise concerned with any of the Collateral. Thereafter, Agent shall have the sole right to collect the Accounts, take possession of the Collateral, or both. Agent's collection expenses, including stationery and postage, telephone and telegraph, secretarial and clerical expenses, the salaries of any collection personnel used for collection, and other expenses may be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

(e) Power of Agent to Act on Loan Parties' Behalf. Agent shall have the right, at any time, to receive, endorse, assign and/or deliver in the name of Agent or any Loan Party any and all checks, drafts and other instruments for the payment of money relating to the Accounts, and each Loan Party hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Loan Party hereby appoints and constitutes Agent or Agent's designee as such Loan Party's attorney-in-fact with power at any time after providing reasonable notice to all Loan Parties (provided, however that no such notice shall be required at any time after the occurrence and during the continuance of an Event of Default or Default) (i) to endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Loan Party's name on any invoice or bill of lading relating to any of the Accounts, drafts against Account Debtors, assignments and verifications of Accounts; (iii) to send verifications of Accounts to any Account Debtor; (iv) to demand payment of the Accounts; (v) to enforce payment of the Accounts by legal proceedings or otherwise; (vi) to exercise any right and remedy of any Loan Party with respect to the collection of the Accounts and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the Accounts; (viii) to settle, adjust or compromise any legal proceedings brought to collect Accounts; (ix) to prepare, file and sign such Loan Party's name on a proof of claim in bankruptcy or similar document against any Account Debtor; (x) to prepare, file and sign such Loan Party's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Accounts; and (xi) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are

hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time following the occurrence of an Event of Default or Default, to change the address for delivery of mail addressed to any Loan Party to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Loan Party.

(f) No Liability. Neither Agent, Issuer nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts or any instrument received in payment thereof, or for any damage resulting therefrom. Agent may, without notice or consent from any Loan Party, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Accounts or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept the return of the goods represented by any of the Accounts, without notice to or consent by any Loan Party, all without discharging or in any way affecting any Loan Party's liability hereunder.

(g) Adjustments. No Loan Party will, without Agent's consent, compromise or adjust any Account (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore (i) customary in the business or industry of such Borrower, and (ii) done in the ordinary course of such Borrower's business.

4.16 **Maintenance of Equipment.** Each Loan Party shall maintain its Equipment in good operating condition and repair in substantial accordance with industry standards (reasonable wear and tear excepted) and shall make all necessary replacements of and repairs thereto so that the value and operating efficiency of such Equipment shall be maintained and preserved. No Loan Party shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.17 **Exculpation of Liability.** Nothing herein contained shall be construed to constitute Agent, Issuer or any Lender as any Loan Party's agent for any purpose whatsoever, nor shall Agent, Issuer or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Neither Agent, Issuer nor any Lender shall assume, whether by anything herein or in any assignment or otherwise, any Loan Party's obligations under any contract or agreement assigned to Agent, Issuer or Lenders, and neither Agent, Issuer nor any Lender shall be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.18 **Environmental Matters.**

(a) The Loan Parties shall ensure that the Real Property remains in compliance with all Environmental Laws, and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by applicable law or appropriate Governmental Bodies.

(b) In the event any Loan Party obtains, gives or receives notice of any Hazardous Discharge at the Real Property or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Loan Party's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Environmental Authority, then the Borrower Representative shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Loan Party is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(c) The Loan Parties shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Loan Party to dispose of Hazardous Substances and shall continue to forward copies of correspondence between any Loan Party and any Environmental Authority regarding such claims to Agent until the claim is settled. The Loan Parties shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Loan Party is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in the Real Property and the Collateral.

4.19 **Financing Statements.** Except for (a) the financing statements filed by Agent, and (b) those financing statements permitted to be filed hereunder, no financing statement or similar notice of Lien covering any of the Collateral or any proceeds thereof is on file in any public office.

4.20 **Commercial Tort Claims.**

(a) The only existing or potential Commercial Tort Claims of any Loan Party existing (regardless of whether the amount, defendant or other material facts can be determined and regardless of whether such Commercial Tort Claim has been asserted, threatened or has otherwise been made known to the obligee thereof or whether litigation has been commenced for such claims) are those listed on Schedule 4.20, as supplemented pursuant to the terms hereof, which sets forth such information separately for each Loan Party.

(b) Each Loan Party agrees that, if it shall acquire any interest in any Commercial Tort Claim (whether from another Person or because such Commercial Tort Claim shall have come into existence), (i) such Loan Party shall, immediately upon such acquisition, deliver to Agent, in each case in form and substance satisfactory to Agent, a notice of the existence and nature of such Commercial Tort Claim and deliver a supplement to Schedule 4.20 containing a specific description of such Commercial Tort Claim, certified by such Loan Party as true, correct and complete, (ii) the provision of Section 4.1 shall apply to such Commercial Tort Claim (and each Loan Party authorizes Agent to supplement such schedule with a description of such Commercial Tort Claim if such Loan Party fails to deliver the supplement described in clause (i)) and (iii) such Loan Party shall execute and deliver to Agent, in each case in form and substance satisfactory to Agent, any certificate, agreement and other document, and take all other action, deemed by Agent to be reasonably necessary or appropriate for Agent to obtain a first-priority, perfected security interest in all such Commercial Tort Claims. Any supplement to Schedule 4.20 delivered pursuant to this Section 4.20 shall become part of Schedule 4.20 for all purposes hereunder.

4.21 **Pledged Securities.**

(a) Schedule 5.3 sets forth, as of the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 5.3 or upon the occurrence of a Permitted Business Acquisition), a complete and accurate list of the ownership of the issued and outstanding equity interests of each Borrower and their respective Subsidiaries, if any. Each Loan Party represents and warrants that (i) all Pledged Securities owned by it have been duly authorized, validly issued, are fully paid and non-assessable, (ii) with respect to any certificates delivered to Agent representing any Pledged Securities, either such certificates are Securities as defined in Article 8 of the Uniform Commercial Code as a result of actions by the issuer or otherwise, or, if such certificates are not Securities as defined in Article 8 of the Uniform Commercial Code, such Loan Party has so informed Agent so that Agent may take steps to perfect its security interest therein as a General Intangible and each Loan Party covenants to not cause such certificates to become Securities as defined in Article 8 of the Uniform Commercial Code without Agent's prior written consent, (iii) with respect to any Pledged Securities not represented by certificates, such Loan Party has so informed Agent so that Agent may take steps to perfect its security interest therein as a General Intangible and each Loan Party covenants to not cause such uncertificated Pledged Securities to become represented by certificates or to become Securities as defined in Article 8 of the Uniform Commercial Code without Agent's prior written consent, and (iv) all such Pledged Securities held by a securities intermediary are covered by a control agreement among such Loan Party, the securities intermediary and Agent pursuant to which Agent has ~~Control~~"control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code).

(b) (i) None of the Pledged Securities has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) except as set forth on Schedule 5.3, there are existing no options, warrants, calls or commitments of any

character whatsoever relating to such Pledged Securities or which obligate the issuer of any Pledged Securities to issue additional equity interests, and (iii) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Body or any other Person is required for the pledge by such Loan Party of such Pledged Securities pursuant to this Agreement or for the exercise by Agent of remedies in respect of the Pledged Securities, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(c) (i) Each Borrower hereby grants a security interest in and pledges and collaterally assigns all of each Borrower's rights and title to the Pledged Securities. For the better protection of Agent and Lenders hereunder, Borrowers shall execute appropriate transfer powers with respect to the Pledged Securities represented by certificates and, concurrently therewith, deliver such the Pledged Securities and the aforesaid transfer powers with Agent promptly upon Agent's request. (ii) Each Borrower authorizes Agent, at any time after the occurrence and during the continuance of an Event of Default, to transfer the Pledged Securities into the name of Agent or Agent's nominee, but Agent shall be under no duty to do so. Notwithstanding any provision or inference herein or elsewhere to the contrary, unless and until there shall have occurred and is continuing an Event of Default (A) Agent shall have no right to vote the Pledged Securities, and (B) Borrowers shall be entitled to receive and retain (free from the lien of Agent once paid) all dividends and other distributions made with respect to the Pledged Securities prior to an Event of Default, unless the payment of such dividends or distributions caused an Event of Default (and for clarification, Borrowers may in all cases receive and retain (free from the lien of Agent once paid) dividends permitted by this Agreement made prior to an Event of Default). (iii) Agent shall at all times have the rights and remedies of a secured party under the Uniform Commercial Code and Pennsylvania law as in effect from time to time, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, the Notes or any other Loan Document, or otherwise provided in law or equity. Upon the occurrence and during the continuance of an Event of Default hereunder, Agent, in its sole discretion, may sell, assign, transfer and deliver the Pledged Securities, at any time, or from time to time. No prior notice need be given to Borrowers or to any other Person in the case of any sale of the Pledged Securities that Agent reasonably determines to be declining speedily in value or that is customarily sold in any securities exchange, over-the-counter market or other recognized market, but in any other case Agent shall give Borrower Representative no fewer than ten days prior notice of either the time and place of any public sale of the Pledged Securities or of the time after which any private sale or other intended disposition thereof is to be made. Each Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Agent may purchase the Pledged Securities, or any part thereof, free from any right of redemption, all of which rights each Borrower hereby waives and releases. After deducting all expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Agent may apply the net proceeds of each such sale to or toward the payment of the Obligations, whether or not then due, in such order and by such division as Agent in its sole discretion

may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrowers.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each Loan Party as to itself and any Subsidiary represents and warrants as follows:

5.1 **Authority.** Each Loan Party has the full power, authority and legal right to enter into this Agreement and the other Loan Documents to which it is a party and to perform all of its respective obligations hereunder and thereunder, as applicable. This Agreement and the other Loan Documents to which each Loan Party is a party constitute the legal, valid and binding obligations of such Loan Party, enforceable against it in accordance with their terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally. The execution, delivery and performance of this Agreement and of the other Loan Documents by each Loan Party has been authorized by all necessary action.

5.2 **Formation and Qualification; Subsidiaries**. Each Loan Party and Subsidiary of a Loan Party is duly incorporated or organized, as applicable, and in good standing under the laws of the jurisdictions listed on Schedule 5.2 and is qualified to do business and is in good standing in the jurisdictions listed on Schedule 5.2 (including, where applicable and as noted on such Schedule, each No Access Jurisdiction) which constitute all jurisdictions in which qualification and good standing are necessary for such Loan Party or Subsidiary to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. The only Subsidiaries of any Loan Party are listed on Schedule 5.2.

5.3 **Officers, Directors, Shareholders, Capitalization**. The names and titles of all executive officers and directors of each Loan Party as of the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to Schedule 5.3 or upon the occurrence of a Permitted Business Acquisition), are set forth on Schedule 5.3. Schedule 5.3 also sets forth for each Loan Party and Subsidiary of a Loan Party as of the Closing Date (or as of any subsequent date whereby this Agreement is amended or upon the occurrence of a Permitted Business Acquisition), the names of such Loan Party's equity holders and a description of such Person's equity interest in such Loan Party or Subsidiary (including, if applicable, a listing of the share or unit certificates and the number of shares or units of equity interests held by such Person). There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any equity interests in any Loan Party or any Subsidiary thereof, except as set forth on Schedule 5.3.

5.4 **Governmental Approvals; No Conflicts**. The transactions contemplated by this Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Body, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any law applicable to any Loan Party or any Subsidiary thereof, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary thereof or any assets of any of them, or give rise to

a right thereunder to require any payment to be made by any Loan Party or any Subsidiary thereof, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any Subsidiary thereof, except Permitted Encumbrances.

5.5 **Tax Returns**. Each Loan Party and Subsidiary thereof has filed all federal, state and local tax returns and other reports such Loan Party or Subsidiary is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable. The provision for taxes on the books of such Loan Party and Subsidiary thereof is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Loan Party has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its or any Subsidiaries books. No tax Liens have been filed and no claims are being asserted with respect to any taxes.

5.6 **Financial Statements.**

(a) The monthly projected statements of income, statements of cash flow, balance sheet and availability, for the twelve-month period ending December 31, 2022, of Express and its Subsidiaries prepared on a consolidated and consolidating basis (and copies of which were delivered to Agent), were prepared by an Authorized Officer of the Borrower Representative, are based on underlying assumptions and estimates which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

(b) The consolidated and consolidating balance sheets of Express and its Subsidiaries as of December 31, 2020, and the related statements of income, changes in stockholder's or member's equity, and changes in cash flow for the period ended on each such date, all accompanied by reports containing opinions without qualification by independent certified public accountants, copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied and present fairly in all material respects the financial condition of Express and its Subsidiaries at such date and the results of their operations for such period. Since the date of the financial statements and other reports described in the immediately preceding sentence, there has been no change in the financial condition of Express and its Subsidiaries taken as a whole as shown on the consolidated balance sheet as of such date and no change in the aggregate value of machinery, Equipment and Real Property, if any, owned by Express and Subsidiaries, except changes in the ordinary course of business, none of which individually or in the aggregate has had, or reasonably could be believed to cause in the future, a Material Adverse Effect.

5.7 **Organization Name**. No Loan Party has been known by any other name in the past five (5) years and does not sell Inventory under any other name, nor has any Loan Party been the surviving entity of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.8 **OSHA and Environmental Compliance.**

(a) Each Loan Party and Subsidiary thereof has duly complied with, and (i) its facilities, business, assets, property, and Equipment, and (ii) to its knowledge, its leaseholds are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; and, there have been no outstanding citations, notices or orders of non-compliance issued to any Loan Party or any Subsidiary thereof or relating to the business, assets, property, leaseholds or Equipment of such Person under any such laws, rules or regulations.

(b) Each Loan Party and Subsidiary thereof has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c) except as set forth in the Phase I Environmental Site Assessment Report (Phase I Report) certified and previously delivered to Agent solely in connection with the North Carolina Property, (i) There are no releases, spills, discharges, leaks, Hazardous Discharges or disposal of Hazardous Substances at, upon, under or within any Real Property; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property; (iii) to the knowledge of any Loan Party, the Real Property has never been used as a treatment, storage or disposal facility of Hazardous Waste and (iv) no Hazardous Substances are present on the Real Property.

5.9 **Solvency; No Litigation, No Violation, ERISA.**

(a) After giving effect to the transactions contemplated by this Agreement, the Loan Parties will be solvent, able to pay their debts as they mature, have capital sufficient to carry on their business and all businesses in which they are about to engage, and (i) as of the Closing Date, the fair present saleable value of their assets, calculated on a going concern basis, is in excess of the amount of their liabilities and (ii) subsequent to the Closing Date, the fair saleable value of their assets (calculated on a going concern basis) will be in excess of the amount of their liabilities.

(b) Except as disclosed in Schedule 5.9(b), no Loan Party or any Subsidiary thereof has as of the Closing Date any pending or threatened litigation, arbitration, action or proceeding seeking damages, individually or in the aggregate, in excess of $500,000. No Loan Party or any Subsidiary thereof has any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect.

(c) No Loan Party or any Subsidiary thereof is in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Loan Party or any Subsidiary thereof in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d) No Loan Party or any Subsidiary thereof is a member of any Controlled Group nor does any such Person maintain or contribute to any Plan or Multiemployer Plan.

5.10 **Patents, Trademarks, Copyrights and Licenses**. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by any Loan Party are set forth on Schedule 5.10, are valid and have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the patents, trademarks, service marks, copyrights, design rights, tradenames, assumed names, trade secrets and licenses which are necessary for the operation of its business; there is no objection to or pending challenge to the validity of any such patent, trademark, copyright, design right, tradename, trade secret or license and no Loan Party is aware of any grounds for any challenge, except as set forth in Schedule 5.10. Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design right, copyright, copyright application and copyright license owned or held by any Loan Party consists of original material or property developed by such Loan Party or was lawfully acquired by such Loan Party from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all customized software licensed by any Loan Party, such Loan Party is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement, each such source code escrow agreement being listed on Schedule 5.10.

5.11 **Licenses and Permits**. Each Loan Party and Subsidiary thereof (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state or local law or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to comply with or procure such licenses or permits would reasonably be expected to have a Material Adverse Effect.

5.12 **Default of Indebtedness**. No Loan Party or any Subsidiary thereof is in default in the payment of the principal of or interest on any Indebtedness or under any instrument or agreement under or subject to which any Indebtedness has been issued and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.13 **No Burdensome Restrictions; No Default**. No Loan Party or any Subsidiary thereof is party to any contract or agreement, the performance of which could reasonably be expected to have a Material Adverse Effect. No Loan Party or any Subsidiary thereof has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance. No Loan Party or any Subsidiary thereof is in default in the payment or performance of any of its contractual obligations and no Default has occurred.

5.14 **No Labor Disputes**. No Loan Party or any Subsidiary thereof is involved in any labor dispute and there are no strikes or walkouts or union organization of any employees of any

Loan Party or Subsidiary thereof threatened or in existence and no labor contract is scheduled to expire during the term of this Agreement.

5.15 **Margin Regulations**. No Loan Party or any Subsidiary thereof is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance or the other Loans will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16 **Investment Company Act**. No Loan Party or any Subsidiary thereof is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17 **Disclosure**. No representation or warranty made by any Loan Party in this Agreement or in any financial statement, report, certificate or any other document furnished in connection herewith contains any untrue statement of fact or omits to state any fact necessary to make the statements herein or therein not misleading. There is no fact known to any Loan Party or which reasonably should be known to such Loan Party which such Loan Party has not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement which could reasonably be expected to have a Material Adverse Effect.

5.18 **Hedging Contracts**. Except as required pursuant to Section 6.8, no Loan Party or any Subsidiary thereof is a party to, nor will it be a party to, any Hedging Contract unless such contract provides that damages upon termination following an event of default thereunder are payable on a "two-way basis" without regard to fault on the part of either party.

5.19 **Material Business Agreements**. All Material Business Agreements to which any Loan Party or any Subsidiary thereof is a party or is bound are listed on Schedule 5.19. No Loan Party or any Subsidiary thereof is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (a) any Material Business Agreement to which it is a party or (b) any agreements or instruments evidencing or governing Indebtedness.

5.20 **Application of Certain Laws and Regulations**. No Loan Party nor any Affiliate of any Loan Party is subject to any statute, rule or regulation which regulates the incurrence of any Indebtedness, including statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.21 **Business and Property of the Loan Parties**. Upon and after the Closing Date, no Loan Party proposes to engage in any business other than as set forth on Schedule 5.21 and activities necessary to conduct the foregoing. On the Closing Date, each Loan Party will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Loan Party.

5.22 **Anti-Terrorism LawsReserved**. Borrower has not and will not engage or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding any of the prohibitions set forth in any Anti-Terrorism Law.

.

5.23 **Anti-Corruption Laws and Sanctions**. Each Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by such Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and each Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of such Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in such Borrower being designated as a Sanctioned Person. None of (a) each Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of each Borrower, any agent of such Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

.

(a) None of (i) any Loan Party, any Subsidiary thereof or, any of the respective directors, officers, employees or Affiliates of any Loan Party or any Subsidiary thereof, or (ii) any agent or representative of any Loan Party or any Subsidiary thereof that will act in any capacity in connection with, or benefit from, the credit facilities provided hereunder, (A) is a Sanctioned Person or currently the subject or target of any Sanctions, (B) has its assets located in a Sanctioned Country, (C) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons or (D) has taken any action, directly or indirectly, that would result in a violation by such Persons of any Anti-Corruption Laws or has the purpose of evading or avoiding any Anti-Corruption Laws. Each of the Loan Parties and their respective Subsidiaries has implemented and maintains in effect policies and procedures designed to promote and achieve compliance by the Loan Parties and their respective Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the Anti-Corruption Laws. Each of the Loan Parties and their respective Subsidiaries, and each director, officer, employee, agent and Affiliate of the Loan Parties and their respective Subsidiaries, is in compliance with the Anti-Corruption Laws.

(b) No proceeds of any Loan have been used, directly or indirectly, by any Loan Party, any Subsidiary thereof or any of the respective directors, officers, employees, Affiliates or agents of the foregoing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, including any payments (directly or indirectly) to a

Sanctioned Person or a Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

5.24 **Beneficial Ownership Certificate**. Each Borrower represents that as of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

## ARTICLE 6
## AFFIRMATIVE COVENANTS

Each Loan Party agrees as to itself and each Subsidiary, until payment in full of the Obligations and termination of this Agreement, that it shall:

6.1 **Conduct of Business and Maintenance of Existence and Assets.**

(a) Conduct continuously and operate actively its business and the business of any Subsidiary according to good business practices;

(b) maintain all of its properties and the properties of any Subsidiary useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any Intellectual Property right or other rights;

(c) keep in full force and effect its existence and the existence of any Subsidiary and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and

(d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain all rights, licenses, leases, powers and franchises of itself or any Subsidiary under the laws of the United States or any political subdivision thereof and under any other laws having application to such Person.

6.2 **Violations**. Immediately notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Loan Party or any Subsidiary thereof or the Collateral which could reasonably be expected to have a Material Adverse Effect.

6.3 **Consolidated Fixed Charge Coverage Ratio**. Maintain a Consolidated Fixed Charge Coverage Ratio for Express Holdco and its Subsidiaries on a consolidated basis of not less than 1.10 to 1.00, which ratio shall be determined as of each fiscal quarter end for the four (4) consecutive fiscal quarters then ending on each such date.

6.4 **Execution of Supplemental Instruments**. Each Loan Party will, and will cause each Subsidiary to execute and deliver, or cause to be executed and delivered, to Agent and

Lenders such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, Mortgages, deeds of trust and other documents and such other actions), which may be required by law or which Agent or any Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created, all at the expense of the Loan Parties.

6.5 **Payment of Indebtedness**. Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its Indebtedness.

6.6 **Standards of Financial Statements**. Cause all financial statements referred to in Sections 9.5, 9.6, 9.7 and 9.8 to be complete and correct in all material respects (subject, in the case of interim financial statements, to notes and normal year-end audit adjustments) and to be prepared in reasonable detail.

6.7 **Taxes**. Pay, and cause each Subsidiary thereof to pay, when due, all (a) income taxes, assessments and other Charges. If any tax, assessment or other Charge by any Governmental Body creates a Lien on the Collateral which Agent, in the exercise of its sole judgment, determines is currently enforceable, Agent without notice to the Loan Parties may pay the taxes, assessments or other Charges. Any such payments shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent immediately upon demand.

6.8 **Interest Rate Protection**. Promptly upon Agent's request, maintain Hedging Contracts with financial institutions acceptable to Agent on such terms and under such conditions as shall be acceptable to Agent.

6.9 **Deposit Accounts**. On the Closing Date, Borrowers shall transfer all funds in any deposit accounts maintained with any other financial institution, to the extent not yet transferred and unless otherwise determined by the Agent in its sole discretion, to the Cash Collateral Account. Notwithstanding the foregoing, Borrowers shall be permitted to maintain that certain Money Market Savings Account with Brookline Bank (Account #1241008323) (the "Brookline Money Market Account"); provided that, (i) the Brookline Money Market Account balance shall not exceed $50,000 at any time, and (ii) if at any time the Brookline Money Market Account balance exceeds $50,000, Borrowers shall promptly transfer the excess funds to the Cash Collateral Account.

6.10 **Credit Insurance**. The Borrowers shall maintain credit insurance policies on no less than fifty percent (50%) of all Eligible Accounts (the insurance carrier, amount and terms of such insurance shall be reasonably acceptable to Agent and shall name Agent as beneficiary or loss payee, as applicable).

6.11 **2022 Real Estate Purchase.** Within thirty (30) days of the 2022 Real Estate Purchase (or such longer time period as agreed to by the Agent in its sole discretion), the Borrowers shall deliver or cause to be delivered to Agent, for the benefit of the Lenders (all of which shall be in a form and substance satisfactory to Agent):

(a) updated schedules to this Agreement (including, but not limited to, Schedule 1.2(a));

(b) a Mortgage (including assignment of leases and rents);

(c) appropriate updates to the Environmental Indemnity Agreement or a new environmental indemnity agreement (as required by Agent);

(d) ALTA mortgagee's title policy with endorsements as required by Agent;

(e) an appraisal (market value "as is") prepared by an appraiser acceptable to Agent;

(f) environmental reports acceptable to Agent;

(g) surveys acceptable to Agent;

(h) if any such parcel of Real Property is determined by Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to Agent; and

(i) such other information, documentation, and certifications as may be reasonably required by Agent.

6.12 **Post-Closing Obligations**. Within sixty (60) days of the Closing Date (or such longer time period as agreed to by the Agent in its sole discretion), the Borrowers shall use commercially reasonable efforts to deliver or cause to be delivered a landlord waiver in form and substance satisfactory to the Agent for certain premises located at Presidents Place - at 1250 Hancock Street, Suite 7N, Quincy, Massachusetts 02169 and leased by RFX pursuant to that lease entered into with Quincy Property Owner I, LLC, a Massachusetts limited liability company, as landlord (the "RFX Lease"). To the extent the RFX Lease is not in affect during such time, the Borrowers shall deliver a landlord waiver in form and substance satisfactory to the Agent for the then applicable lease of the applicable Borrowers.

6.13 **Compliance with Anti-Corruption Laws and Sanctions**. Conduct its businesses in compliance with all Anti-Corruption Laws and applicable Sanctions and maintain policies and procedures designed to promote and achieve compliance with all Anti-Corruption Laws and applicable Sanctions.

## ARTICLE 7
## NEGATIVE COVENANTS

No Loan Party or any Subsidiary thereof, until satisfaction in full of the Obligations and termination of this Agreement, shall:

7.1 **Merger, Consolidation, Acquisition and Sale of Assets.**

(a) Enter into any merger, division, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person except for in connection with and pursuant to the American Group Acquisition, the New WLX Holdings Acquisition, the A.M. Transportation Acquisition, the RFX Acquisition, the LTR Acquisition, the Taylor Transportation Acquisition and any Permitted Business Acquisition or permit any other Person to consolidate with or merge with it.

(b) Sell, pledge, lease, transfer or otherwise dispose of any of its properties or assets, other than (i) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete, not to exceed in the aggregate the sum of $500,000 in any consecutive twelve (12) month period, (ii) sales of inventory to Account Debtors in the ordinary course of business, (iii) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other Intellectual Property rights in the ordinary course of business, and (iv) leases (including leases to own) of tractors and trailers entered into in the ordinary course of business where the applicable Loan Party or Subsidiary is the lessor and the lessee is an owner-operator, (v) in transfer of equity in connection with the Employment Issuance, and (vi) the transfer of assets pursuant to the Taylor Transportation Contribution Agreement.

7.2 **Creation of Liens**. Create, assign, transfer or suffer to exist any Lien upon or against any of its Collateral, except Permitted Encumbrances, or enter into any agreement or undertaking restricting the right or ability of any Loan Party or Lender to sell, assign or transfer any Collateral except as are expressly provided for herein.

7.3 **Guarantees**. Become liable upon the obligations of any Person by assumption, endorsement or Guaranty thereof or otherwise (other than to Agent or Lender or any affiliate thereof) except (a) the endorsement of checks in the ordinary course of business, (b) guarantees made by a Loan Party with respect to the Obligations of another Loan Party, (c) with respect to American Group, the guaranty for payment and performance given by American Group in connection with the American Group Seller Subordinated Note, (d) with respect to RFX and Pioneer, the Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer in connection with the RFX Subordinated Note, (e) with respect to Load to Ride and One Stop, the Guarantee Joinder to Subordinated Promissory Note, dated as of December 30, 2022, executed by Load to Ride and One Stop in connection with the LTR Subordinated Note, (f) with respect to Taylor Transportation, the Guarantee Joinder to Subordinated Promissory Note, dated as of March 31, 2023, executed by Taylor Transportation in connection with the Taylor Transportation Subordinated Note, and (g) the Guaranty made by Express Holdco of the obligations owing from Express Properties to Huntington or any direct or indirect subsidiary or affiliate of Huntington under any mortgage loan provided by Huntington or any direct or indirect subsidiary or affiliate of Huntington to Express Properties in connection with the Corporate Retreat Purchase.

7.4 **Investments**. Purchase, hold, acquire or invest in the obligations or stock of, or any other interest in, or make or permit to exist any investment or any other interest in (including

any option, warrant or other right to acquire any of the foregoing) any Person, except (a) investments existing on the Closing Date and set forth on Schedule 7.4, (b) obligations issued or guaranteed by the United States of America or any agency thereof, (c) commercial paper with maturities of not more than one hundred eighty (180) days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (d) certificates of time deposit and bankers' acceptances having maturities of not more than one hundred eighty (180) days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, (e) U.S. money market funds (i) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc., or (ii) that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof, (f) investments by a Loan Party in a Loan Party, (g) investments made consisting of a Permitted Business Acquisition, or (h) investments in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional investments made in connection with the same so long as such additional investments are permitted by the Lenders in their sole discretion.

7.5 **Loans**. Make advances, loans or extensions of credit to any Person, including without limitation any holder of an equity interest in any Borrower, any Subsidiary or Affiliate, other than another Loan Party, except with respect to (a) loans existing on the Closing Date (not including the extensions of credit set forth in clause (c) below) and set forth on Schedule ~~7,5~~7.5 (including loans made prior to the Original Closing Date to the Permitted Holder), (b) the extension of commercial trade credit in connection with the sale of Inventory in the ordinary course of its business, (c) the extension of credit to agents, drivers and business affiliates that are not Affiliates of any Loan Party in the ordinary course of business and in amounts not to exceed $250,000 at any time with respect to each agent, driver or business affiliate and in an aggregate amount with respect to all such agents, drivers and business affiliates not to exceed $2,500,000 at any time, or (d) advances in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional advances made in connection with the same so long as such additional advances are permitted by the Lenders in their sole discretion.

7.6 **Capital Expenditures**. Make or incur any Capital Expenditure or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $10,000,000 in each fiscal year (other than Capital Expenditures or commitments thereof made or incurred in connection with the New WLX Holdings Acquisition, the LTR Acquisition, and the Taylor Transportation Acquisition), provided that, solely for the fiscal year ending December 31, 2023, Capital Expenditures made or incurred or commitments thereof in such fiscal year shall not be in excess of $18,750,000 (which includes Capital Expenditures made or incurred in connection with the Corporate Retreat Purchase).

7.7 **Dividends, Distributions and Restricted Payments**. Declare, pay or make any dividend on any shares of the common stock, preferred stock or other equity interest, as applicable, of any Loan Party (other than dividends or distributions payable in stock or other equity interest, as applicable, or splits or reclassifications of its stock or other equity interests), or

apply or otherwise distribute any of its funds, property or assets to the purchase, redemption or other retirement of any common or preferred stock or other equity interest, or any warrant as applicable, or of any options to purchase or acquire any such shares of common or preferred stock or other equity interest, as applicable, of any Loan Party, or pay any management, consulting or other similar fees, charges or expenses, other than, (a) with respect to any Loan Party, distributions may be made by any such Loan Party which has elected to be taxed in accordance with Subchapter S and any comparable state tax laws to its respective shareholders in an amount necessary for the payment of the federal and state income tax obligations on account of the attribution of each such Loan Party's income to such shareholders by reason of such Loan Party being a Subchapter S corporation in each case determined by reference to the shareholder who has the highest combined marginal rate for income tax purposes ("Income Tax Distributions") so long as (i) a notice of termination with regard to this Agreement shall not be outstanding, (ii) no Event of Default or Default shall exist immediately prior to or after giving effect to such dividend or distribution; (b) any Subsidiary of any Borrower may make any dividend or distribution to such Borrower, and (c) Annual Dividends. Notwithstanding the foregoing, the Loan Parties may exercise any call rights ("Call Right Exercise") included in the A.M. Transportation Acquisition Documents, the American Group Acquisition Documents, the New WLX Holdings Acquisition Documents, the RFX Acquisition Documents and any other documents entered into in connection with a Permitted Business Acquisition and pay any amounts required due to the exercise by any applicable seller of the put rights ("Put Rights Payments") included in the A.M. Transportation Acquisition Documents, the American Group Acquisition Documents, the New WLX Holdings Acquisition Documents, the RFX Acquisition Documents and any other entered into in connection with a Permitted Business Acquisition so long as (i) a notice of termination with regard to this Agreement shall not be outstanding at the time of such Call Right Exercise or such Put Right Payment, (ii) no Event of Default or Default shall exist immediately prior to or after giving effect to such Call Right Exercise or such Put Right Payment, and (iii) the Loan Parties shall demonstrate proforma (a) Consolidated Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 immediately prior to and after giving effect to any such Call Right Exercise or Put Right Payment and (b) Undrawn Availability of the Loan Parties of at least $7,500,000 immediately prior to and after giving effect to any such Call Right Exercise or Put Right Payment.

7.8 **Indebtedness.** Create, incur, assume or suffer to exist any Indebtedness except in respect of:

(a) Indebtedness existing on the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 7.8) and set forth on Schedule 7.8 (including any extensions, renewals or refinancings thereof);

(b) Indebtedness to Agent, Lender or any of their respective affiliates, regardless of whether pursuant to the Loan Documents;

(c) Indebtedness incurred for Capital Expenditures permitted under Section 7.6;

(d) Indebtedness as permitted under Section 7.3 and 7.11;

(e) Indebtedness arising from Hedging Contracts required pursuant to Section 6.8;

(f) Indebtedness arising in connection with the American Group Seller Subordinated Note which Indebtedness is subject to the American Group Seller Subordination Agreement;

(g) Indebtedness arising in connection with the A.M. Transportation Subordinated Note which Indebtedness is subject to the A.M. Transportation Subordination Agreement;

(h) Permitted Business Acquisition Indebtedness;

(i) Indebtedness arising in connection with the RFX Subordinated Note which Indebtedness is subject to the RFX Subordination Agreement;

(j) Indebtedness arising in connection with the LTR Subordinated Note which Indebtedness is subject to the LTR Subordination Agreement; and

(k) Indebtedness arising in connection with the Taylor Transportation Subordinated Note which Indebtedness is subject to the Taylor Transportation Subordination Agreement;

7.9 **Nature of Business**. Change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby, purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business for assets or property which are useful in, necessary for and are to be used in its business, as presently conducted and any business closely related thereto.

7.10 **Transactions with Affiliates**. Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise deal with, any Affiliate, except transactions in the ordinary course of business, on an arm's length basis, and on terms no less favorable than terms which would have been obtainable from a Person other than an Affiliate.

7.11 **Leases**. Enter as lessee into any lease arrangement (except lease arrangements between any of the Borrowers and Express Properties or among any of the Borrowers, as approved by the Agent) for real or personal property (other than Capital Leases permitted under Section 7.6) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $2,500,000 in any one fiscal year in the aggregate for all Loan Parties.

7.12 **Subsidiaries; Partnerships.**

(a) Form any Subsidiary (including but not limited to, an Asset Acquiring Subsidiary) or, in the case of a Business Acquisition, join a Subsidiary unless, (i) such Subsidiary expressly becomes a Borrower and becomes jointly and severally liable for the obligations of the Borrowers hereunder, under the Notes and under any other agreement among Borrowers and Agent, for the benefit of Agent and Lenders, (ii) such Borrower pledges 100% of the equity interest owned by such Borrower in such Subsidiary to

Agent, for the benefit of Agent and Lenders, (iii) Agent shall have received all documents, including organizational documents and legal opinions it may reasonably require in connection therewith all of which shall be in form and substance satisfactory to the Agent in its sole discretion, including, without limitation, all information that may be reasonably requested by Agent to comply with applicable "know your customer" requirements established by U.S. regulatory authorities (including without limitation pursuant to the Beneficial Ownership Regulation) and (iv) such Subsidiary grants first priority perfected Liens in its assets to Agent, for the benefit of Agent and Lenders; provided, however, to the extent such Subsidiary becomes a Borrower, none of such assets which become Collateral shall be included in the Borrowing Base in accordance with the terms of this Agreement until such time as Agent makes such determination in its sole discretion; or

(b) Enter into any partnership, joint venture or similar agreement.

7.13 **Fiscal Year and Accounting Changes**. Change its fiscal year from twelve consecutive calendar months ending on December 31st of each calendar year or make any material change (a) in accounting treatment and reporting practices except as required by GAAP or (b) in tax reporting treatment except as required or permitted by law.

7.14 **Pledge of Credit**. Now or hereafter pledge Agent's or any Lender's credit on any purchase or for any purpose whatsoever.

7.15 **Amendment of Charter Documents**. Amend, modify or waive any term or material provision of its Charter Documents, other than amendments and modifications to the Charter Documents in connection with the Employment Issuance that are acceptable to the Agent in its sole discretion.

7.16 **ERISA**. Become part of a Controlled Group or create, maintain or become obligated to contribute to any Plan or Multiemployer Plan.

7.17 **Prepayment of Indebtedness**. At any time, directly or indirectly, prepay any Indebtedness (other than to Agent or any Lender or any affiliate of thereof) or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Loan Party or any Subsidiary thereof.

7.18 **Modification of Material Business Agreements**. Amend, waive or otherwise modify in any material respect the terms of any Material Business Agreement or the TUI Commission Rights Purchase Agreement without the prior written consent of Agent.

~~7.19 **Anti-Terrorism Laws**. Has not and shall note, at any time, directly or indirectly, whether through itself, its Affiliates, or agents, (a) engage in any transaction with any Blocked Person, (b) engage in any transaction that violates federal or state sanctions laws, such as those issued by the Office of Foreign Asset Control, (c) engage in or conspire to engage in any transaction that evades or avoids any of the prohibitions set forth in (a) or (b), or (d) fail to provide to Agent any information requested from time to time by Agent in its sole discretion, confirming the compliance of each Loan Party and any Subsidiary thereof with this Section.~~

# ARTICLE 8
# CONDITIONS PRECEDENT

8.1 **Conditions to Initial Loans**. The agreement of Agent, Issuer and Lenders to make the initial Loans and other Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Loans and other Advances, of the following conditions precedent, unless waived by Agent:

(a) Loan Documents. Agent shall have received duly executed (i) Loan Documents and (ii) original stock certificates of each Subsidiary, if any and to the extent not previously delivered to the Agent, along with duly executed stock powers, all in form and substance satisfactory to Agent;

(b) Collateral and Security. To the extent no previously delivered, all Collateral items required to be physically delivered to Agent under the Loan Documents shall have been so delivered, accompanied by any appropriate instruments of transfer (or arrangements satisfactory to Agent for such delivery shall be in place), and all taxes, fees and other charges then due and payable in connection with the execution, delivery, recording, publishing and filing of such instruments and incurrence of the Obligations and the delivery of the Loan Documents shall have been paid in full;

(c) Lien Searches. Agent shall have received accurate and complete copies of any Lien, pending suit, title and other public record searches required by Agent;

(d) Filings, Registrations and Recordings. Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral (including the notation of liens on vehicle titles) shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and all actions necessary to perfect and protect the Liens of Agent shall have been taken;

(e) Organizational Proceedings of the Loan Parties. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Board of Directors, Managers or Members, as applicable, of each Loan Party authorizing (i) the execution, delivery and performance of this Agreement, the Notes, and any related agreements, and (ii) the granting by such Loan Party of the security interests in and Liens upon the Collateral, in each case, certified by an Authorized Officer of such Loan Party as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

(f) Incumbency Certificates of the Loan Parties. Agent shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each Loan Party, dated the Closing Date, as to the incumbency and signature of the Authorized Officers of each Loan Party executing this Agreement, any certificate

or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary;

(g) Certificates. Agent shall have received (i) a copy of the Charter Documents of each Loan Party, together with all amendments thereto, certified by the Secretary of State or other appropriate official of such entity's jurisdiction of formation, incorporation or organization, as applicable (with respect to the formation documents), and by an Authorized Officer of such Loan Party (with respect to the governance documents), or (ii) to the extent delivered to the Agent in connection with the Existing Loan Documents, certification from each such Loan Party of no changes in its Charter Documents since last delivered to the Agent.

(h) Good Standing. Agent shall have received copies of good standing certificates, or similar certifications, as applicable, for the Loan Parties dated not more than thirty (30) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such entity's jurisdiction of incorporation or organization, as applicable, and each jurisdiction where the conduct of each entity's business activities or the ownership of each such entity's properties necessitates qualification;

(i) Legal Opinion. Agent shall have received the (i) executed legal opinion of Dinsmore & Shohl, LLP, counsel to each Loan Party and (ii) any other required local counsel opinions, each in form and substance satisfactory to Agent, which shall cover such matters incident to the transactions contemplated by this Agreement, and the other Loan Documents as Agent may reasonably require and the Loan Parties hereby authorize and direct such counsel to deliver such opinions to Agent;

(j) No Litigation. (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against any Loan Party or against the officers, directors or managers of any Loan Party, (A) in connection with the Loan Documents or any of the transactions contemplated thereby and which, in the sole discretion of Agent, is deemed material or (B) which Agent determines could have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Loan Party or the conduct of its business or inconsistent with the due consummation of the transactions contemplated by the Loan Documents shall have been issued by any Governmental Body;

(k) Credit Insurance. Agent shall have reviewed all credit insurance policies, coverages and limits;

(l) Beneficial Ownership. Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by Agent;

(m) Fees. Agent shall have received all fees payable to Agent, Issuer and each Lender and reimbursement of all expenses on or prior to the Closing Date, including, without limitation, those fees set forth in the Fee Letter;

(n) Financial Statements; Projections. Agent shall have received the consolidating and consolidated monthly financial statements set forth in Section 5.6(a) and such financial statements shall not in the reasonable judgment of Agent, reflect any material adverse change in the financial condition of any Loan Party. Agent shall have received a copy of projections which shall be satisfactory in all respects to Agent;

(o) Insurance. Agent shall have received, in form and substance satisfactory to Agent, evidence that each Loan Party has the insurance required by Section 4.11, listing Agent as lender loss payee, additional insured and mortgagee, as applicable;

(p) Payment Instructions. Agent shall have received written instructions from the Borrower Representative directing the application of proceeds of the initial Loans and other Advances made pursuant to this Agreement;

(q) Reserved.

(r) Consents. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by the Loan Documents; and, such Consents and Waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(s) No Adverse Material Effect. (i) Since December 31, 2020, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent shall have been proven to be inaccurate or misleading in any material respect;

(t) Waivers. Agent shall have received Waivers satisfactory to Agent with respect to all premises leased by the Loan Parties or at which Inventory is located;

(u) Equity Interest Certificates and Transfer Powers. To the extent applicable, Borrowers shall deliver to Agent original stock certificates and membership interest certificates, as the case may be, for the Borrowers, together with corresponding transfer powers duly executed in blank, and otherwise in form and substance satisfactory to the Agent.

(v) Existing Indebtedness. Agent shall have received (i) a payoff letter, in form and substance satisfactory to Agent, pursuant to which any existing Indebtedness that is to be paid by initial Loans hereunder will be paid in full, and (ii) evidence satisfactory to Agent that all necessary termination statements, satisfaction documents and any other applicable releases in connection with any existing Indebtedness and all other Liens with respect to the Loan Parties that are not Permitted Encumbrances have been filed or arrangements satisfactory to Agent have been made for such filing;

(w) Borrowing Base; Undrawn Availability. Agent shall have received an executed Borrowing Base Certificate from the Borrower Representative demonstrating that the Borrowing Base is sufficient to support the Advances in the amount requested by the Borrower Representative on the Closing Date.

(x) Owned Real Property. With respect to each parcel of Owned Real Property, Agent shall have received:

(i) an amended and restated Mortgage (including assignment of leases and rents);

(ii) the Environmental Indemnity Agreement;

(iii) ALTA mortgagee's title policy endorsement to the existing title policy acceptable to Agent;

(iv) if any such parcel of Real Property is determined by Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to Agent; and

(v) such other information, documentation, and certifications as may be reasonably required by Agent;

(y) Other. All organizational and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to Agent and its counsel.

8.2 **Conditions to Each Advance**. The agreement of Agent, Issuer and each Lender to make any Advance requested to be made on any date (including the initial Loans and Advances), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a) Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to any Loan Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b) No Default. No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

(c) Maximum Advances. In the case of any Advances requested to be made, after giving effect thereto, the Aggregate Revolving Exposure shall not exceed the Maximum Borrowing Amount.

Each request for an Advance by the Borrower Representative hereunder shall constitute a representation and warranty by Borrowers as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

## ARTICLE 9
## INFORMATION AS TO THE LOAN PARTIES

Each Borrower shall, on behalf of itself and the other Loan Parties, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1 **Disclosure of Material Matters**. Immediately upon learning thereof, report to Agent any Default and all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including any Lien or claim asserted against the Collateral, any loss, damage or destruction of any material portion of the Collateral, and any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or material claims or material disputes asserted by any Account Debtor or other obligor.

9.2 **Schedules and Certificates**. Deliver to Agent on or before the fifteenth (15th) day of each calendar month for the prior calendar month:

(a) an accounts receivable aging (reconciled to the general ledger, the Financials and the Borrowing Base Certificate),

(b) an accounts payable schedule (reconciled to the general ledger and to the Financials), and

(c) a Borrowing Base Certificate (which shall be calculated as of the last day of the prior calendar month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement), together with supporting documentation satisfactory to Agent.

In addition, the Borrower Representative shall deliver to Agent on or before each Tuesday, or if such day is not a Business Day, the following Business Day, for the prior Week an interim Borrowing Base Certificate (which shall be calculated as of the last Business Day of the prior week and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement) reflecting all activity (sales, collections, credits, etc.) affecting the accounts of each Borrower for all Business Days of the immediately preceding Week, together with supporting documentation satisfactory to Agent. The amount derived as being excluded from Eligible Accounts used on such interim Borrowing Base Certificate shall be the amount that is calculated and updated monthly pursuant to this Section 9.2 and which is satisfactory to Agent.

In addition, the Borrower Representative will deliver to Agent at such intervals as Agent may reasonably require: (i) confirmatory assignment schedules, (ii) copies of Account Debtor's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents or

other information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Accounts by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section 9.2 are to be in form satisfactory to Agent and executed by the Borrower Representative and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and the Borrower Representative's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

9.3 **Litigation**. Immediately notify Agent in writing of any litigation, suit or administrative proceeding affecting any Loan Party or any Subsidiary thereof, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect on any such Person.

9.4 **Material Occurrences**. Immediately notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any default under any Material Business Agreement; (c) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Express Holdco and its Subsidiaries on a consolidated or consolidating basis as of the date of such statements; (d) each and every default by any Loan Party or any Subsidiary thereof which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (e) any other development in the business or affairs of any Loan Party or Subsidiary thereof which could reasonably be expected to have a Material Adverse Effect on any such Person, describing the nature thereof and the action the Loan Parties or such Subsidiary proposes to take with respect thereto.

9.5 **Annual Financial Statements**. Furnish to Agent within one hundred fifty (150) days after the end of each fiscal year (except with respect to (i) the fiscal year ending December 31, 2022, not later than May 31, 2024, and (ii) the fiscal year ending December 31, 2023, within two hundred forty (240) days after the end of such fiscal year (but not later than August 31, 2024), unless otherwise extended by the Agent in its sole discretion), audited financial statements of Express Holdco and its Subsidiaries on a consolidated basis, including statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, together with consolidating schedules, all prepared in accordance with GAAP, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent. In addition, the reports shall be accompanied by a Compliance Certificate of Borrowers signed by an Authorized Officer of the Borrower Representative, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such event, and such

Compliance Certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11.

9.6 **Monthly Financial Statements**. Furnish Agent within thirty (30) days after the end of each fiscal month, an unaudited balance sheet of Express Holdco and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Express Holdco and its Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to the business of Express Holdco and its Subsidiaries and setting forth in each case in comparative form the figures from the projected annual operating budget delivered pursuant to Section 9.8 covering the current fiscal year. Such financial statements and reports shall be accompanied by a Compliance Certificate of an Authorized Officer, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers or the applicable Loan Party with respect to such event and, such certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11, and any other certification as Agent shall reasonably request.

9.7 **Additional Information**. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the representations, warranties, terms, covenants, provisions and conditions of this Agreement, the Notes and the other Loan Documents have been complied with by Borrowers, the other Loan Parties, or any Subsidiary thereof, including, without the necessity of any request by Agent, (a) all documentation and other information that Agent requests to enable Agent and Lenders to comply with their ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, (b) copies of all environmental audits and reviews, (c) at least thirty (30) days prior thereto, notice of any Loan Party's opening of any new place of business, closing of any existing place of business or a change in its legal name, and (d) immediately upon any Loan Party's or any Subsidiary's learning thereof, notice of any material labor dispute to which any such Person may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Loan Party or a Subsidiary is a party or by which any such Person is bound.

9.8 **Projected Operating Budget, Availability Forecast**. Furnish Agent no later than December 31 of each year and for each fiscal year thereafter during the term of this Agreement, a month by month projected operating budget and cash flows of Express Holdco and its Subsidiaries on a consolidated and consolidating basis for such fiscal year (including an income statement and statement of cash flows for each calendar month, and a balance sheet and availability projection as at the end of each calendar month), such projections to be accompanied by a certificate signed by an Authorized Officer to the effect that such projections and forecasts have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such Authorized Officer has no reasonable basis to question the

reasonableness of any material assumptions on which such projections and forecasts were prepared.

9.9 **Notice of Suits, Adverse Events**. Furnish Agent with immediate notice of (a) any lapse or other termination of any Consent issued to any Loan Party, or any Subsidiary thereof by any Governmental Body or any other Person that is material to the operation of any such Person's business, (b) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; (c) copies of any periodic or special reports filed by any Loan Party or any Subsidiary thereof with any Governmental Body or Person, material in nature, or if requested by Agent, Issuer or any Lender, and (d) copies of any material notices and other communications from any Governmental Body which specifically relate to any Loan Party or Subsidiary thereof.

## ARTICLE 10
## EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1 **Payment of Obligations**. Failure by any Borrower to pay any principal or interest on any Loan, reimbursement obligation in respect of any Letter of Credit, prepayment, fee, charge, expense reimbursement or other amount or any other Obligation when due and payable, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or any other Loan Document;

10.2 **Payment of Reductions or Mandatory Prepayments**. Failure by any Borrower to timely pay any amounts due under or in connection with Section 2.5;

10.3 **Misrepresentations**. Any representation or warranty made or deemed made by any Loan Party in this Agreement, or any Loan Party or Guarantor in any other Loan Document, amendment or modification thereof or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

10.4 **Failure to Furnish Information, Schedules, Certificates**. Failure by any Loan Party to (a) furnish financial statements, financial information, schedules, reports, borrowing base certificates or other information required to be provided hereunder when due, (b) furnish any additional financial or other information requested by Agent within ten (10) days after such information is requested, or (c) permit the inspection of its books or records;

10.5 **Liens Against Assets**. Issuance of a notice of Lien, levy, assessment, injunction or attachment against (i) the Collateral or (ii) a material portion of the other property of any Loan Party or Subsidiary thereof which is not discharged or lifted within thirty (30) days;

10.6 **Breach of Covenants**. Failure or neglect of any Loan Party, Guarantor or the Permitted Holder to perform, keep or observe any term, provision, condition, covenant contained in this Agreement or any other Loan Document, or contained in any other agreement or

arrangement, now or hereafter entered into between any Loan Party, Guarantor or Permitted Holder and Agent, Issuer or any Lender;

10.7 **Judgment**. Any judgment or judgments are rendered or judgment liens filed against any Loan Party, any Subsidiary thereof or any Guarantor for an aggregate amount in excess of $100,000 which, within thirty (30) days of such rendering, or filing is not either fully and completely satisfied, stayed, discharged of record or bonded;

10.8 **Insolvency and Related Proceedings**. Any Loan Party, any Affiliate or Subsidiary thereof or any Guarantor shall (a) apply for, consent to, acquiesce in, or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (b) make a general assignment for the benefit of creditors, (c) admit in writing its inability, or be generally unable to pay its debts as they become due or cease operations of its present business, (d) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (e) be adjudicated a bankrupt or insolvent, (f) file a petition seeking to take advantage of any other law providing for the relief of debtors, (g) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (h) take any action for the purpose of effecting any of the foregoing;

10.9 **Guarantor Default**. Any Guaranty given in respect of any Obligations shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any such Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of any Guaranty to which Guarantor is a party, or any Guarantor shall deny that such Guarantor has any further liability under any Guaranty to which such Guarantor is a party, or shall give notice to such effect;

10.10 **Material Adverse Effect**. Agent, in its sole discretion, determines that a Material Adverse Effect has occurred in respect of any Loan Party or any Guarantor;

10.11 **Loss of Priority Lien**. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest;

10.12 **Breach of Material Business Agreements**. A default of the obligations of any Loan Party under any Material Business Agreement to which it is a party shall occur and not be cured within any applicable cure period if such default could reasonably be expected to have a Material Adverse Effect;

10.13 **Cross Default; Cross Acceleration**. . Any Loan Party shall (a) default in any payment of principal of or interest on any Indebtedness beyond any period of grace with respect to such payment or (b) default in the observance of any other covenant, term or condition contained in any agreement or instrument (including, but not limited to, any agreements or instruments executed in connection with Corporate Retreat Property Mortgage Facility) pursuant to which such Indebtedness is created, secured or evidenced, if the effect of such default is to permit the acceleration of any such Indebtedness (whether or not such right shall have been waived);

10.14 **Change of Control**. Any Change of Control of any Loan Party or any Guarantor shall occur;

10.15 **Invalidity of Loan Documents**. Any material provision of any Loan Document shall, for any reason, cease to be valid and binding on any Loan Party, or any Loan Party shall so claim in writing to Agent;

10.16 **Loss of Material Intellectual Property**. (a) Any Governmental Body shall (i) revoke, terminate, suspend or adversely modify any license, permit, patent, trademark or tradename of any Loan Party, or (ii) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (iii) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Loan Party's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; or (b) any agreement which is necessary or material to the operation of any Loan Party's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination;

10.17 **Destruction of Collateral**. Any portion of the Collateral shall be seized or taken by a Governmental Body, or any Loan Party or the title and rights of any Loan Party shall have become the subject matter of litigation which might, in the sole discretion of Agent, upon final determination, result in material impairment or loss of the security provided by any Loan Document; or

10.18 **Business Interruption**. The operations of any Loan Party are interrupted at any time for more than seven (7) consecutive days, which interruption would reasonably be expected to have a Material Adverse Effect.

10.19 **Hedging Contracts**. Any Borrower fails to comply with or to perform any term, obligation, covenant or condition contained in or the occurrence or existence of any event of default, termination event or other similar event under or with respect to any Hedging Contract.

## ARTICLE 11
## AGENT'S RIGHTS AND REMEDIES AFTER DEFAULT

11.1 **Rights and Remedies**. Upon the occurrence of (a) an Event of Default pursuant to Section 10.8, all Obligations shall be immediately due and payable and this Agreement and the obligation of Issuer and Lenders to make Advances and maintain Loans shall be deemed terminated; and (b) any other Event of Default and at any time thereafter (such Event of Default not having previously been cured), at the option of Agent or the Required Lenders, all Obligations shall be immediately due and payable and Issuer and Lenders shall have the right to terminate this Agreement and to terminate the obligation of Issuer and Lenders to make Advances and maintain Loans. Upon the occurrence of any Event of Default, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to

realize upon any Collateral by any available judicial procedure and/or to take, to the extent permitted by applicable law, possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of any Loan Party's premises or other premises without legal process and without incurring liability to any Loan Party therefor, and Agent may thereupon, or at any time thereafter, in its sole discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require the Loan Parties to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give the Loan Parties reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to the Loan Parties at least five (5) days prior to such sale or sales is reasonable notification. At any public sale Agent may bid for and become the purchaser, and Agent, Issuer and Lenders, or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Loan Party. In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Loan Party's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights which are used in connection with (y) Inventory for the purpose of disposing of such Inventory and (z) Equipment for the purpose of completing the manufacture of unfinished goods. The proceeds realized from the sale of any Collateral shall be applied as follows: first, to the reasonable costs, expenses and attorneys' fees and expenses incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; second, to interest due upon any of the Obligations and any fees payable under this Agreement; and, third, to the principal of the Obligations and Hedging Obligations. If any deficiency shall arise, the Loan Parties shall remain liable to Agent, Issuer and Lenders therefor.

11.2 **Agent Discretion**. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the rights of Agent, Issuer and Lenders hereunder.

11.3 **Setoff**. In addition to any other rights which Agent, Issuer and Lenders or their affiliates may have under applicable law, upon the occurrence of an Event of Default hereunder, Agent, Issuer and each Lender, including any branch, Subsidiary or Affiliate thereof, shall have a right to apply any Loan Party's property held by Agent, Issuer or such Lender, such branch, Subsidiary or Affiliate to reduce the Obligations.

11.4 **Rights and Remedies not Exclusive**. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5 **Appointment of Receiver**. Upon the occurrence of an Event of Default and at all times thereafter, Agent shall be entitled to the immediate appointment of a receiver for all or part

of the Collateral, whether such receivership is incidental to a proposed sale of the Collateral, pursuant to the Uniform Commercial Code or otherwise. Each Loan Party hereby consents to the appointment of such a receiver without bond, to the full extent permitted by applicable statute or law.

11.6 **Reserved**.

11.7 **Allocation of Payments After Event of Default.** Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of Agent in connection with enforcing the rights of Agent, Lenders and Issuer under this Agreement and the Loan Documents and to the payment of any protective advances made by Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FOURTH, to the payment of the outstanding principal amount of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FIFTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of Lenders and Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender or Issuer;

SIXTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents;

SEVENTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit) and arising under the Term Loan and the Term Loan 2;

EIGHTH, to the payment of all Obligations owing to Agent in connection with Banking Services and Hedging Contracts;

NINTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "EIGHTH" above;

TENTH, to the payment of all obligations owing to Huntington in connection with the Corporate Retreat Property Mortgage Facility; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of Lenders and Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that then outstanding Advances held by such Lender or Issuer bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FIFTH", "SIXTH", "SEVENTH", and "NINTH" above; and (c) to the extent that any amounts available for distribution pursuant to clause “SEVENTH” above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by Agent in a cash collateral account and applied (i) first, to reimburse Issuer from time to time for any drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "EIGHTH" and "NINTH" above in the manner provided in this Section 11.7. For avoidance of doubt, any amounts received and applied to the obligations of the type described in clause "TENTH" shall only be applied after all amounts are applied to the items and obligations of the types described in clauses "FIRST" through "NINTH", to the extent such amounts have not been exhausted.

## ARTICLE 12
## WAIVERS AND JUDICIAL PROCEEDINGS

12.1 **Waiver of Notice**. Each Loan Party hereby waives notice of non-payment of any of the Accounts, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2 **Delay**. No delay or omission on Agent's, Issuer's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3 **Jury Waiver**. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW

EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## ARTICLE 13
## EFFECTIVE DATE AND TERMINATION

13.1 **Term**. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party, Agent, Issuer and Lenders, shall become effective on the date hereof and shall continue in full force and effect until the Facility Termination Date, unless sooner terminated as herein provided. Without limiting Section 11.1, (a) the Aggregate Revolving Commitment shall expire on the Facility Termination Date, and (b) all unpaid Obligations shall be paid in full by Borrowers on the Facility Termination Date. Borrowers may terminate this Agreement with at least thirty (30) Business Days' prior written notice thereof to Agent, upon (a) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (b) the cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to Agent of a cash deposit as required by Section 2.9(d)), (c) the payment in full of all reimbursable expenses and other Obligations together with accrued and unpaid interest thereon, and (d) the payment in full of any amount due under Section 2.11.

13.2 **Termination**. The termination of this Agreement shall not affect any Loan Party's, Agent's, Issuer's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent, Issuer and each Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that the Loan Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Loan Party have been paid or performed in full after the termination of this Agreement or each Loan Party has furnished Agent, Issuer and Lenders with an indemnification satisfactory to Agent, Issuer and Lenders with respect thereto. Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive the termination hereof until all Obligations are paid or performed in full. Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

## ARTICLE 14
## REGARDING AGENT

14.1 **Appointment**. Each Lender and Issuer hereby designates Huntington to act as Agent for each such Lender and Issuer under this Agreement and the Loan Documents. Each Lender and Issuer hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders and Issuer. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including without limitation, collection of the Notes) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Loan Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2 **Nature of Duties**. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Loan Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (a) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct, or (b) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Loan Documents, as the case may be, or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Loan Documents or for any failure of any Loan Party to perform its obligations hereunder. Agent shall not be under any obligation to any Lender or Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Loan Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent in respect to the Advances and the Loans to the Loan Parties shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or Issuer; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

14.3 **Lack of Reliance on Agent and Resignation**. Independently and without reliance upon Agent, any other Lender or Issuer, each Lender and Issuer has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances and the Loans hereunder and the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of each Loan Party. Agent shall have no duty or responsibility,

either initially or on a continuing basis, to provide any Lender or Issuer with any credit or other information with respect thereto, whether coming into its possession before making of the Advances and the Loans or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender or Issuer for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Loan Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Loan Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

Agent may resign on thirty (30) days' written notice to each of Lenders, Issuer and Borrower Representative and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to the Loan Parties.

Any such successor of Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After Agent's resignation as Agent, the provisions of this Article 14 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

14.4 **Certain Rights of Agent**. If Agent shall request instructions from Lenders and Issuer with respect to any act or action (including failure to act) in connection with this Agreement or any Loan Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders and Issuer shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

14.5 **Reliance**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Loan Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.6 **Notice of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Loan Documents, unless Agent has received notice from a Lender, Issuer or a Loan Party referring to this Agreement or the Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders and Issuer. Agent shall take such action with respect to such Default or Event of

Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders and Issuer.

14.7 **Indemnification**. To the extent Agent is not reimbursed and indemnified by the Loan Parties, each Lender will reimburse and indemnify Agent and Issuer in proportion to its respective portion of the Advances and Loans (or, if no Advances or Loans are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent or Issuer in performing their duties hereunder, or in any way relating to or arising out of this Agreement or any Loan Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's or Issuer's gross negligence or willful misconduct.

14.8 **Agent in its Individual Capacity**. With respect to the obligation of Agent to lend under this Agreement, the Advances and Loans made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9 **Delivery of Documents**. To the extent Agent receives financial statements required under Article 9 of this Agreement, Agent will promptly furnish such documents and information to Lenders and Issuer.

14.10 **Loan Parties' Undertaking to Agent**. Without prejudice to their respective obligations to Lenders and/or Issuer under the other provisions of this Agreement, each Loan Party hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent, Lenders or Issuer or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of Lenders and Issuer or the relevant one or more of them pursuant to this Agreement.

14.11 **No Reliance on Agent's Customer Identification Program**. Each of Lenders and Issuer acknowledges and agrees that neither such Lender nor Issuer, nor any of their Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Issuer's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record keeping, (c) comparisons with

government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other laws.

14.12 **<u>Erroneous Payments</u>**.

(a) Each Lender and Issuer hereby agrees that (i) if Agent notifies such Lender or Issuer that Agent has determined in its sole discretion that any funds received by such Lender or Issuer from Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender or Issuer (whether or not known to such Lender or Issuer) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof), such Lender or Issuer shall promptly, but in no event later than one (1) Business Day thereafter, return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender or Issuer to the date such amount is repaid to Agent at the greater of the Fed Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender or Issuer shall not assert, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Erroneous Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of Agent to any Lender or Issuer under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), if any Lender or Issuer receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from Agent (or any of its Affiliates) that (x) is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates), or (z) such Lender or Issuer otherwise becomes aware was transmitted, or received, in error (in whole or in part):

(i) (A) in the case of immediately preceding clause (x) or (y), an error shall be presumed to have been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) or (B) in the case of immediately preceding clause (z), an error has been made, in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender or Issuer shall promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify Agent of its receipt of such payment, prepayment or repayment, the details

thereof (in reasonable detail) and that it is so notifying Agent pursuant to this Section 14.12(b).

(c) Each Borrower agrees, for itself and each other Loan Party, that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender or Issuer that has received such Erroneous Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights of such Lender or Issuer with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by Borrowers or any other Loan Party, except, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Agent from Borrowers or any other Loan Party for the express purpose of making such Erroneous Payment.

(d) Each party's obligations under this Section 14.2 shall survive the resignation or replacement of Agent, any transfer of rights or obligations by (or the replacement of) a Lender, the termination of the Aggregate Commitment or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

14.13 **Agent Professionals**. Agent may perform its duties through agents and employees. Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care, except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such agents, employees or Agent Professionals.

## ARTICLE 15
## MISCELLANEOUS

15.1 **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. Any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement or any related agreement may be brought in any court of competent jurisdiction in the Commonwealth of Pennsylvania, United States of America, and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to the Borrower Representative at its address set forth in Section 15.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the option of Agent, Issuer or Lenders, by service upon the Borrower Representative which each Loan Party irrevocably appoints as such Loan Party's agent for the purpose of accepting service within the Commonwealth of Pennsylvania. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent,

Issuer or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction. Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Any judicial proceeding by any Loan Party against Agent, Issuer or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of Allegheny, Commonwealth of Pennsylvania.

15.2 **Entire Understanding**.

(a) This Agreement and the other Loan Documents contain the entire understanding between each Loan Party, Agent, Issuer and Lenders and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, Agent's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of the Loan Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b) The Required Lenders, Agent with the consent in writing of the Required Lenders, and the Loan Parties may, subject to the provisions of this Section 15.2(b), from time to time enter into written supplemental agreements to this Agreement or the Loan Documents executed by the Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Issuer, Agent or the Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, the consent of Issuer must be obtained with respect to any amendment, waiver or consent with respect to Sections 2.7, 2.8 and 2.9 or any other provisions, the amendment or waivers of which would adversely affect Issuer and, provided, further, that no such supplemental agreement shall:

(i) increase the Revolving Commitment of any Lender, without the written consent of Agent and such Lender;

(ii) extend the maturity of any Note or the due date for any amount payable hereunder without the written consent of Agent and each Lender affected thereby;

(iii) decrease the rate of interest or reduce any fee payable by the Loan Parties to Lenders and/or Issuer pursuant to this Agreement without the written consent of Agent and each Lender and/or Issuer affected thereby;

(iv) alter the definition of the term Required Lenders without the consent of Agent and each Lender;

(v) alter, amend or modify this Section 15.2(b) without the consent of Agent and each Lender;

(vi) release any Collateral during any calendar year (other than in connection with dispositions of collateral permitted by this Agreement) having an aggregate value in excess of One Million Dollars ($1,000,000) without the consent of each Lender;

(vii) change the rights and duties of Agent without the consent of each Lender;

(viii) increase the advance rates in definition of Borrowing Base above the advance rates in effect on the Closing Date without the consent of each Lender;

(ix) release any Loan Party from the Obligations under this Agreement, or any Loan Document without the consent of each Lender; or

(x) alter, amend or modify Section 11.7 hereof without the consent of each Lender.

Any such supplemental agreement shall apply equally to each Lender and Issuer and shall be binding upon the Loan Parties, Lenders, Issuer, Agent and all future holders of the Obligations. In the case of any waiver, the Loan Parties, Agent, Lenders and Issuer shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, Agent may at its discretion and without the consent of Lenders, voluntarily permit the outstanding Revolving Loans and the amount of Letters of Credit outstanding at any time to exceed one hundred ten percent (110%) of the Borrowing Base for up to ninety (90) consecutive Business Days provided that such outstanding Advances do not exceed the Aggregate Revolving Commitment. For purposes of the preceding sentence, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Borrowing Base was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be "Eligible Accounts" becomes ineligible or collections of Accounts applied

to reduce outstanding Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Advances to exceed the Borrowing Base by more than ten percent (10%), Agent shall use its efforts to have the Loan Parties decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

15.3 **Transfers and Assignments.**

(a) Successors and Assigns**.** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their rights or Obligations hereunder without the prior written consent of Agent. No Lender may assign or otherwise transfer any of its rights or Obligations hereunder except: (i) to an Eligible Assignee in accordance with the provisions of Section 15.3(a), (ii) by way of participation in accordance with the provisions of Section 15.3(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 15.3(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 15.3(d) and, to the extent expressly contemplated hereby, the Affiliates of each of Agent, Lenders and the respective directors, officers, employees, agents and advisors of such Affiliates) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Transfer of Commitments. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the commitment to make Advances and Loans hereunder (which for this purpose includes Advances and Loans outstanding thereunder) or, if the applicable commitment to make Advances and Loans hereunder is not then in effect, the principal outstanding balance of the Advances and Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Advances and Loans, unless Agent otherwise consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances and

Loans or the commitment to make Advances and Loans hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Advances and Loans on a non-pro rata basis; (iii) any assignment of a commitment to make Advances and Loans hereunder must be approved by Agent unless the Person that is the proposed assignee is itself a Lender with a commitment to make Advances and Loans hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500). Subject to acceptance and recording thereof by Agent pursuant to Section 15.3(b), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 15.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 15.3(d).

(c) Maintenance of Register. Agent, acting solely for this purpose as an agent of the Loan Parties, shall maintain at its office in Columbus, Ohio, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the commitments to make Advances and Loans hereunder of, and principal amounts of the Advances and Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Loan Parties, Agent and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower Representative and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, Borrower Representative or Agent, sell participations to any Person (other than a natural person or any Loan Party or any of the Loan Party's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and/or the Advances and Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a

Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 15.2(b)(i) through 15.2(b)(ix) that affects such Participant. The Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.7, 3.8, 3.9 and 15.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 15.3(a).

A Participant shall not be entitled to receive any greater payment under Section 15.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Loan Parties' prior written consent.

(e) Pledge of Interests. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f) Notes. Each Borrower shall execute and deliver: (i) to Agent, the transferor and the transferee, any consent or release (of all or a portion of the obligations of the transferor) to be delivered in connection with each assignment or other transfer under this Section 15.3, (ii) if a Lender's entire interest in its commitments to make Advances and other Loans hereunder and all of its Advances and other Loans have been transferred to the transferee, an appropriate replacement note against return of the Notes (marked "replaced") held by the transferor and (iii) if only a portion of a Lender's interest in its commitments to make Advances and other Loans hereunder and such Advances and other Loans have been transferred, replacement notes to each of the transferor and the transferee against return of the original such Notes of the transferor (each marked "replaced") held by the transferor; provided, that, simultaneously with Borrowers' delivery of new Notes pursuant to this Section 15.3(f), the transferor Agent will deliver to Borrowers any Note being replaced in whole or in part, and each such Note delivered by the transferor Lender shall be conspicuously marked "replaced" when so delivered.

(g) Replacement of Certain Lenders. If any Lender is a Defaulting Lender hereunder, then Borrower Representative may, at its sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 15.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that: (i) Borrower Representative shall have received the prior written consent of Agent, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts). No Lender shall be required to make any such assignment

and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower Representative to require such assignment and delegation cease to apply.

(h) Replacement of Non-Consenting Lenders. If, in connection with any proposed amendment, waiver or consent hereunder pursuant to Section 15.2(b) hereof: (i) requiring the consent of all Lenders, the consent of Required Lenders is obtained but the consent of all Lenders whose consent is required is not obtained or (ii) requiring the consent of Required Lenders, the consent of Lenders holding fifty-one percent (51%) or more is obtained but the consent of Required Lenders is not obtained (any Lender withholding consent as described in clause (i) and (ii) hereof being referred to as a "Non-Consenting Lender"), then, so long as Agent is not a Non-Consenting Lender, Agent may, at the sole expense of the Loan Parties, upon notice to such Non-Consenting Lender and Borrower Representative, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 15.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).

15.4 **Application of Payments**. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations in such order as Agent determines in its sole discretion. To the extent that any Loan Party makes a payment or Agent, Issuer or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent, Issuer or Lenders.

15.5 **Indemnity**. Each Loan Party shall indemnify Agent, Issuer and each Lender and each of their officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent, Issuer or any Lender or any other such indemnified party in any litigation, proceeding or investigation with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, any Loan Document, whether or not Lender is a party thereto.

15.6 **Notice**. Any notice or request hereunder may be given to any Borrower or any Loan Party or to Agent, Issuer or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15.6. Any notice, request, demand, direction or other communication (for purposes of this Section 15.6 only, a "Notice") to be given to or made upon any party hereto

under any provision of this Agreement shall be given or made in writing (which includes by means of electronic transmission (i.e., "e-mail")). Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names in Section 15.6(d) or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15.6. Any notice provided to the Borrower Representative shall be deemed to have been given to each other Loan Party. Any Notice shall be effective:

(a) In the case of hand-delivery, when delivered;

(b) If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c) In the case of electronic transmission, when actually received;

(d) If given by any other means (including by overnight courier), when actually received, and

(e) When any Lender or Issuer gives a Notice to Borrower Representative or any Loan Party, such Lender or Issuer shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders and Issuer.

(A) If to Agent, Issuer or any Lender at:

The Huntington National Bank
200 Public Square CM64
Cleveland, Ohio 44114
Attention: ABL Account Manager
Telephone: 412-667-6525
Email: ABLOperations@huntington.com

With copies to (which shall not constitute notice):

Buchanan Ingersoll & Rooney, PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania 15219
Attention: Sean M. Girdwood
Telephone: 412-392-1635
Email: sean.girdwood@bipc.com

(B) If to Borrowers at:

R & R Express Holdco, Inc.
100 Commerce Drive
Pittsburgh, Pennsylvania 15275
Attention: Richard S. Francis, President
Telephone: 800-223-8973
Email: rich@balrrexp.com

With copies to (which shall not constitute notice):

Dinsmore & Shohl LLP
Six PPG Place, Suite 1300
Pittsburgh, Pennsylvania 15222
Attention: Jim Carlisle, Esq.
Telephone: 412-230-8984
Email: jim.carlisle@dinsmore.com

15.7 **Survival**. The obligations of the Loan Parties under Sections 2.9, 2.11, 03.7, 3.8, 3.9, 3.10, 3.11 and 15.5 shall survive termination of the Loan Documents and payment in full of the Obligations.

15.8 **Severability**. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

15.9 **Expenses**.

(a) Loan Parties shall pay all costs, expenses, including reasonable attorneys' fees (including the allocated costs of in house counsel), and disbursements incurred by Agent (i) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, (ii) in connection with any advice given to any Lender or Issuer with respect to its rights and obligations under this Agreement and all related agreements, in each case, which may be charged to the Loan Account as a Revolving Loan of a Domestic Rate Loan and added to the Obligations. Expenses being reimbursed by the Loan Parties under this Section include costs and expenses incurred in connection with: (1) appraisals and insurance reviews; (2) field examinations and the preparation of reports based on the fees charged by a third party retained by Agent or the internally allocated fees for each Person employed by Agent with respect to each field examination; (3) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of Agent; (4) taxes, fees and other charges for (A) lien and title searches and title insurance and (B) recording any Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Liens of Agent, Issuer, or any Lender; (5) sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and (6) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

(b) Loan Parties shall pay all costs, expenses, including reasonable attorneys' fees (including the allocated costs of in house counsel), and disbursements incurred by Agent, Lenders and Issuer (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, (ii) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's, Issuer's or any Lender's security interest in or Lien on any of

the Collateral, whether through judicial proceedings or otherwise, or (iii) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's, any Lender's or Issuer's transactions with any Loan Party.

(c) The out-of-pocket expenses (including attorneys' fees and expenses) of Agent and Lenders permitted by this Agreement will be for the account of Borrowers and Borrowers acknowledge that Borrower Representative will receive summary invoice(s) reflecting only the total amount due and that such summary invoice(s) may not contain any narrative description of the services provided. Furthermore, Borrowers acknowledge that delivery of summary invoice(s) shall not in any way constitute a waiver of any right or privilege of Agent or any Lender associated with such invoice(s).

15.10 **Important Information About Procedures Required by the USA Patriot Act**. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with Agent or the Lenders.

What this means: When an entity or person opens an account or establishes a relationship with Agent or the Lenders, Agent or the Lenders may ask for the name, address, date of birth, and other information that will allow Agent and the Lenders to identify the entity or person who opens an account or establishes a relationship with Agent or the Lenders. Agent or the Lenders may also ask to see identifying documents for the entity or person.

15.11 **Injunctive Relief**. Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Agent, Issuer or Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

15.12 **No Liability; Consequential Damages**. Agent's and Lenders' sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as such party deals with similar property for its own account. Neither Agent, any Lender, nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Loan Party or any other Person or to take any other action whatsoever with regard to any Collateral. The powers conferred on Agent and Lenders hereunder are solely to protect Agent's and Lenders' interest in the Collateral and shall not impose any duty upon Agent's or any Lender to exercise any such powers. Agent and Lenders shall be accountable only for amounts that Agent and Lenders actually receive as a result of the exercise of such powers, and neither Agent, each Lender nor any of Agent's or Lenders' officers, directors, employees or agents shall be responsible to any Loan Party for any act or failure to act hereunder, except for Agent's or any Lender's gross negligence or willful misconduct. Agent and Lenders, and any of their respective agents or attorneys, shall not be liable to any Loan Party for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

15.13 **Counterparts; Electronic Signatures**. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by email transmission shall be deemed to be an original signature hereto.

15.14 **Construction**. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits hereto.

15.15 **Confidentiality; Sharing Information.**

(a) Agent, Issuer and Lenders and each transferee thereof ("Transferee") shall hold all non-public information obtained by Agent or such Transferee in accordance with Agent's, and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender, and such Transferee may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel and other professional advisors, (b) to any other Lender, and such Transferee and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process.

(b) Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by Agent, Issuer, Lenders or by one or more Subsidiaries or Affiliates of Agent, Issuer or Lenders and each Loan Party hereby authorizes Agent, Issuer and Lenders to share any information delivered to Agent, Issuer or any Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of Agent, Issuer or any Lender to enter into this Agreement, to any such Subsidiary or Affiliate of Agent, Issuer or such Lender, it being understood that any such Subsidiary or Affiliate of Agent, Issuer or such Lender receiving such information shall be bound by the provisions of this Section 15.15 as if it were Agent, Issuer or a Lender, hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

15.16 **Publicity**. Each Loan Party hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among the Loan Parties and Agent, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent in its sole discretion shall deem appropriate.

15.17 **Conflict Clause**. In the event of any conflict, inconsistency or discrepancy between the provisions of this Agreement and the provisions of the Loan Documents and any other collateral agreements, the provisions giving Agent or any Lender greater rights or remedies shall govern to the maximum extent permitted by any applicable law, it being understood and agreed that the purpose of this Agreement and any Loan Documents is to add to, and not to limit, detract or derogate from, diminish or otherwise impair or reduce the rights granted to Agent and

Lenders pursuant to this Agreement or the Loan Documents. For greater certainty, where the provisions of this Agreement and the provisions of the Loan Documents deal with the same subject matter but are not identical, no conflict between the said documents shall exist or be deemed to exist unless the observance of or compliance with the provisions of one of the said documents will cause a default under or breach of the provisions of the other document or documents.

15.18 **Amendment and Restatement.**

(a) Existing Obligations. Borrowers hereby acknowledge, confirm and agree that Borrowers are indebted to Agent for outstanding loans and advances to Borrowers under the Existing Loan Documents, together with all interest accrued and accruing thereon (to the extent applicable), and all fees, costs, expenses and other charges relating thereto, all of which are unconditionally owing by Borrowers to Agent to the extent set forth in the Existing Loan Documents, without offset, defense or counterclaim of any kind, nature or description whatsoever.

(b) Acknowledgment of Security Interests.

(i) Borrowers hereby acknowledge, confirm and agree that Agent shall continue to have a security interest in and lien upon the Collateral heretofore granted to such parties pursuant to the Existing Loan Documents to secure the Obligations, as well as any Collateral granted under this Agreement or under any of the other Loan Documents or otherwise granted to or held by Agent.

(ii) The liens and security interests of Agent in the Collateral shall be deemed to be continuously granted and perfected from the earliest date of the granting and perfection of such liens and security interests to Agent whether under the Existing Loan Documents, this Agreement or any of the other Loan Documents.

(c) Existing Agreements. Borrowers hereby acknowledge, confirm and agree that, subject to this Section 15.18: (i) the Existing Loan Documents have been duly executed and delivered by Borrowers and are in full force and effect as of the date hereof; (ii) the agreements and obligations of Borrowers contained in the Existing Loan Documents constitute the legal, valid and binding obligations of Borrowers enforceable against Borrowers in accordance with their terms, except as they may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, and Borrowers do not have a valid defense to the enforcement of such obligations; and (iii) Agent is entitled to all of the rights, remedies and benefits provided for in or arising pursuant to the Existing Loan Documents.

(d) Waiver and Release of all Claims and Defenses. Each Borrower hereby represents and warrants to Agent, and agrees with Agent, that such Borrower does not have any claim or offset against, or defense or counterclaim to, any obligation or liability

under this Agreement, the Existing Loan Documents or any other Loan Document, and such Borrower hereby waives and releases Agent and all of its affiliates, officers, agents, attorneys, employees and representatives, as of the date hereof, from any and all such claims, offsets, defenses and counterclaims of which such Borrower is aware or unaware, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto.

(e) Restatement.

(i) Except as otherwise stated in Section 15.18(b) hereof and this Section 15.18(e)(i), as of the date hereof, the terms, conditions, agreements, covenants, representations and warranties set forth in the Existing Loan Documents are simultaneously amended and restated in their entirety (excluding the schedules prepared as of the Original Closing Date, which shall be superseded by the schedules delivered on and after the Closing Date), and as so amended and restated, replaced and superseded by the terms, conditions, agreements, covenants, representations and warranties set forth in this Agreement and the other Loan Documents executed or delivered on or after the date hereof, except that nothing herein or in the other Loan Documents shall impair or adversely affect the continuation of the liability of Borrowers for the Obligations heretofore incurred and the security interests, liens and other interests in the Collateral heretofore granted, pledged or assigned by Borrowers to Agent (whether directly, indirectly or otherwise).

(ii) The amendment and restatement contained herein shall not, in any manner, be construed to constitute payment of, or impair, limit, cancel or extinguish, or constitute a novation in respect of, the Obligations of Borrowers evidenced by or arising under any of the Existing Loan Documents, and the Liens and security interests of Agent securing such Obligations and other obligations and liabilities, which shall not in any manner be impaired, limited, terminated, waived or released, but shall continue in full force and effect in favor of Agent.

All loans, advances and other financial accommodations under any of the Existing Loan Documents and all other Obligations of Borrowers to Agent outstanding and unpaid as of the date hereof pursuant to the Existing Loan Documents or otherwise shall be deemed Obligations of Borrowers pursuant to the terms hereto.

[SIGNATURE PAGES AND SCHEDULES/EXHIBITS OMITTED]

# **EXHIBIT B**

Updated Schedules 1, 1.2(a), 1.2(b), 4.5, 5.2, 5.3, and 5.19 of the Credit Agreement

SCHEDULE 1

COMMITMENT SCHEDULE

| **Lender** | **Revolving Commitment** | **Term Loan Commitment** | **Term Loan 2 Commitment** | **Commitment** |
|---|---|---|---|---|
| The Huntington National Bank | $65,934,223.07 | $2,740,776.93 | $972,000.00 | $69,647,000.00 |
| S&T BANK | $19,065,776.93 | $934,223.07 | $0.00 | $20,000,000.00 |
| | | | | |
| **Total** | **$85,000,000** | **$3,675,000** | **$972,000** | **$89,647,000.00** |

**SCHEDULE 1.2(a)**

## OWNED REAL PROPERTY

100 Commerce Drive, Findlay Township, Pennsylvania owned by R&R Express Properties, LLC

1401 Iron St. in North Kansas City, MO 64116, owned by R&R Express Properties

5417 US HWY 301, Hope Mills, North Carolina owned by R&R Express Properties, LLC

5545 US HWY 301, Hope Mills, North Carolina owned by R&R Express Properties, LLC

**SCHEDULE 1.2(b)**

## LIENS

1. UCC-1 Financing Statement 2017052700008 filed May 27, 2017, with the Secretary of the Commonwealth of Pennsylvania, naming R & R Express, Inc. as debtor and IBM Credit LLC as secured party (covering all of the following equipment together with all related software, whether now owned or hereafter acquired and wherever located (all as more fully described on IBM Credit LLC Agreement(s) including specifically listed items all additions, attachments, accessories, accessions and upgrades thereto and any and all substitutions, replacements or exchanges for any such item of equipment or software and any and all proceeds of any of the foregoing, including, without limitation, payments under insurance or any indemnity or warranty relating to loss or damage to such equipment and software.)
2. Trailer Lease Agreement, dated August 1, 2022, by and between Taylor Express and Diamond Leasing and Finance, LLC
3. Lease Agreement, dated February 4, 2022, by and between Taylor Express and Fleet Equipment Leasing, LLC
4. Equipment Lease Agreement, dated October 31, 2020, by and between Taylor Express and PACCAR Financial Corp., as amended by Equipment Lease Agreement Schedule A, dated February 28, 2022
5. Security Agreement Retail Installment Contract, by and between Taylor Equipment and Peterbilt of Atlanta, LLC, dated August 31, 2022
6. Master Trailer Lease and Service Agreement, dated January 28, 2022, by and between Taylor Express and Star Leasing Company, LLC
7. Equipment Lease Agreement, dated January 18, 2022, by and between Taylor Express and XTRA Lease LLC
8. UCC-1 Financing Statement 20230515099346 filed May 15, 2023, with the Secretary of the Commonwealth of Pennsylvania, naming R & R Express, Inc. as debtor and Xerox Financial Services as secured party.
9. State Tax Lien, Lien ID 205964, against R&R Express Holdco Inc., in favor of the Commonwealth of Pennsylvania filed May 20, 2024, in the Court of Common Pleas of Allegheny County, PA (in the original stated amount of $9,990.66).
10. Lessor Lien granted pursuant to that certain Park Space Lease Agreement effective April 18, 2024, by and between Semi-Stow., a Texas limited liability company, as lessor, and Load to Ride Transportation, LLC (identified as "LTR Transport"), as lessee, for real property located at 3740 E 64th Ave., Commerce City, Colorado 80022.
11. UCC-1 Financing Statement 20240703168561 filed July 3, 2024, with the Secretary of the Commonwealth of Pennsylvania, naming R & R Express, Inc. as debtor and COMDOC as secured party.

**SCHEDULE 4.5**

## INVENTORY LOCATIONS

All inventory is located at 100 Commerce Dr., Pittsburgh, Pennsylvania; 11764 Marco Beach Dr., Suite 10, Jacksonville, Florida; 1401 Iron Street, North Kansas City, Missouri; 1250 Hancock Street, Suite 7N, Quincy, Massachusetts; 8-10 Hollis Street, Groton, Massachusetts; 18342 West Creek Dr., Tinley Park, Illinois; 100 Fleet Street, Suite 201, Pittsburgh, Pennsylvania; 16125 Business Parkway, Hagerstown, Maryland; 600 S. German Lane, Suite 106, Conway, Arkansas; 3740 E 64th Ave, Commerce City, CO 80022; 1707 N 5th St., Union City, Tennessee; 5545 US 301 Service Rd, Hope Mills, North Carolina; 5417 US 301 Service Rd., Hope Mills, North Carolina; and 390 Interlocken Crescent, Broomfield, Colorado.

**SCHEDULE 5.2**

**INCORPORATION/ORGANIZATION/
FOREIGN QUALIFICATION/SUBSIDIARIES**

| Loan Party | State of Incorporation/Organization | States Qualified to do Business In |
|---|---|---|
| R & R Express, Inc. | PA | PA, CA, IL, IN, MD, MN, WV, NJ, MI, MD, TN |
| GT Worldwide Transport, Inc. | FL | FL, IL, PA, MN, NJ, WV, TN |
| Border Connect Freight Services, Inc. | PA | PA, MN, MI |
| Paradigm Transportation, LLC | PA | PA, IL, TN |
| Final Mile Dedicated Group, LLC | PA | PA |
| R & R Express Logistics, Inc. | FL | FL, MN, NJ, WV |
| GT Worldwide Logistics, LLC | FL | FL, IL, PA, MN, NJ |
| Border Connect Logistics, Inc. | PA | PA |
| Paradigm Transportation Management Group, LLC | PA | PA |
| Final Mile Solutions Group, LLC | PA | PA |
| AAGEX Freight Group, LLC | FL | FL |
| AGX Freight Carriers, LLC | GA | GA, NJ, MN |
| AGX Freight Logistics, LLC | GA | GA, NJ, MN |
| AGX Freight Intermodal, LLC | FL | FL, NJ, MN |
| R&R Express Properties, LLC | PA | PA |
| R & R Driver Solutions Inc | PA | PA |
| New American Group LLC | PA | AZ, PA |
| R&R Express Holdco, Inc. | PA | PA, MN |
| RxG&A, LLC | PA | PA |
| R&R Equipment Leasing, LLC | PA | PA, TN |
| TLogistics, LLC | PA | PA |
| New WLX Holdings, LLC | PA | MO, PA |
| New WLX, LLC | PA | AR, KS, MO, NE, OK, PA TX, IL, TN |
| New WLE, LLC | PA | MO, PA |
| A.M. Transportation Services LLC | PA | PA, MA |
| RFX, LLC | PA | MA, TX |
| Refrigerated Food Express, LLC | PA | None. |
| Pioneer Transfer, LLC | PA | TX |
| Load to Ride Transportation, LLC | PA | IL, CO, TN |
| One Stop Freightways, LLC | PA | CO |
| RFX Tampa, LLC | FL | None. |
| New Taylor Transportation, LLC | PA | TN, NC |

**SCHEDULE 5.3**

## OFFICERS, DIRECTORS, SHAREHOLDERS, CAPITALIZATION

| Loan Party | Name of Executive Officer/ Directors | Title | Equity Holder |
|---|---|---|---|
| R & R Express, Inc. | Richard S. Francis | President and Director | 100% owned by R&R Express Holdco, Inc. |
| GT Worldwide Transport, Inc. | Richard S. Francis | President and Director | 100% owned by R&R Express Holdco, Inc. |
| Border Connect Freight Services, Inc. | Richard S. Francis | President and Director | 100% owned by R&R Express Holdco, Inc. |
| Paradigm Transportation, LLC | John F. Gallardo | CEO and President | 80% owned by R&R Express Holdco, Inc.; 20% owned by John F. Gallardo |
| | Marlori A. Histed | Secretary and Treasurer | |
| | Richard S. Francis | Manager | |
| Final Mile Dedicated Group, LLC | John F. Gallardo | CEO and President | 80% owned by R&R Express Holdco, Inc.; 20% owned by John F. Gallardo |
| | Marlori A. Histed | Secretary and Treasurer | |
| | Richard S. Francis | Manager | |
| R & R Express Logistics, Inc. | Richard S. Francis | President and Director | 100% owned by R&R Express Holdco, Inc. |
| GT Worldwide Logistics, LLC | Clint Prosperi | President | 90% owned by R&R Express Holdco, Inc.; 10% owned by Lloyd K. Armstrong |
| | Lloyd K. Armstrong | Vice President | |
| | Ray Francis | Executive Vice President | |
| | Brian Golden | Treasurer | |
| | James R. Carlisle | Secretary | |
| | Richard S. Francis | Manager | |
| Border Connect Logistics, Inc. | Richard S. Francis | President and Director | 100% owned by |

| | | | |
|---|---|---|---|
| | | | R&R Express Holdco, Inc. |
| Paradigm Transportation Management Group, LLC | John F. Gallardo | CEO and President | 80% owned by R&R Express Holdco, Inc.; 20% owned by John F. Gallardo |
| | Marlori A. Histed | Secretary and Treasurer | |
| | Richard S. Francis | Manager | |
| Final Mile Solutions Group, LLC | John F. Gallardo | CEO and President | 80% owned by R&R Express Holdco, Inc.; 20% owned by John F. Gallardo |
| | Marlori A. Histed | Secretary and Treasurer | |
| | Richard S. Francis | Manager | |
| AAGEX Freight Group, LLC | Michael P. Williams | President and Manager | 60% owned by R & R Express Holdco, Inc.; 40% owned by Michael P. Williams |
| | Richard S. Francis | Manager | |
| AGX Freight Carriers, LLC | Michael P. Williams | President | 100% owned by AAGEX Freight Group, LLC |
| AGX Freight Logistics, LLC | Michael P. Williams | President | 100% owned by AAGEX Freight Group, LLC |
| AGX Freight Intermodal, LLC | Michael P. Williams | President | 100% owned by AAGEX Freight Group, LLC |
| R&R Express Holdco, Inc. | Richard S. Francis | President and Director | 80% owned by Richard S. Francis, as Trustee of The Kathleen L. Francis Spousal Lifetime Access Trust; 20% owned by Kathleen L. Francis, as Trustee of The Richard S. Francis Spousal Lifetime Access Trust |
| RxG&A, LLC | Richard S. Francis | President | 100% owned by |

| | | | |
|---|---|---|---|
| | | | R&R Express Holdco, Inc. |
| R&R Equipment Leasing, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| Tlogistics, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| R & R Driver Solutions Inc | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| R&R Express Properties, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| New American Group LLC | Michael C. Schember | CEO and Treasurer | 60% owned by R&R Express Holdco, Inc.; 40% owned by MSDK, LLC |
| | Daniel P. Krivickas, Jr. | President and Secretary | |
| | Richard S. Francis | Manager | |
| New WLX Holdings, LLC | John Hein | President and Secretary | 70% owned by R&R Express Holdco, Inc.; 20% owned by John Hein; 10% owned by Larry Catlett |
| | Larry Catlett | Vice President, General Manager and Treasurer | |
| | Richard S. Francis | Manager | |
| New WLX, LLC | Richard S. Francis | President, Treasurer and Secretary | 100% owned by New WLX Holdings, LLC |
| New WLE, LLC | Richard S. Francis | President, Treasurer and Secretary | 100% owned by New WLX Holdings, LLC |
| A.M. Transportation Services LLC | John Krakowski | President | 100% owned by R&R Express Holdco, Inc. |
| | Richard S. Francis | Director | |
| | Brian C. Golden | Secretary, Treasurer | |

| | | | |
|---|---|---|---|
| RFX, LLC | Nathaniel Lourie | President | 90% owned by R&R Express Holdco, Inc.; 10% owned by RFX, Inc. |
| | Brian C. Golden | Secretary | |
| | Amy L. Starling | Treasurer | |
| | Richard S. Francis | Manager | |
| Refrigerated Food Express, LLC | Richard J. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| | Brian C. Golden | Secretary | |
| | Amy L. Starling | Treasurer | |
| | Richard S. Francis | Manager | |
| Pioneer Transfer, LLC | Nathaniel Lourie | President | 90% owned by R&R Express Holdco, Inc.; 10% owned by Pioneer Transfer, LLC (Delaware) |
| | Brian C. Golden | Secretary | |
| | Amy L. Starling | Treasurer | |
| | Richard S. Francis | Manager | |
| Load to Ride Transportation, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| One Stop Freightways, LLC | Richard S. Francis | President | 100% owned by R&R Express Holdco, Inc. |
| RFX Tampa, LLC | Ryan Nolan | President | 100% owned by RFX, LLC |
| New Taylor Transportation, LLC | Richard S. Francis | CEO | 100% owned by R&R Express Holdco, Inc. |

| | | | |
|---|---|---|---|
| | David Wiebusch | President | |

**SCHEDULE 5.19**

## MATERIAL BUSINESS AGREEMENTS

1. Lease by and between Quincy Property Owner I, LLC, as landlord, and RFX, Inc., as tenant, dated November 22, 2019, for real property located at 1250 Hancock Street, Quincy, Massachusetts, as assigned to RFX, LLC.

2. Membership Interest Purchase Agreement by and among RFX, Inc., a Massachusetts corporation; Refrigerated Food Express, Inc., an Ohio corporation; Pioneer Transfer, LLC, a Delaware limited liability company; RFX, LLC, a Pennsylvania limited liability company; R&R Express Holdco, Inc., a Pennsylvania corporation; and Kimberly Welby, and dated January 31, 2022.

3. Guarantee Joinder to Subordinated Note executed by RFX, LLC, a Pennsylvania limited liability company, and Pioneer Transfer, LLC, a Pennsylvania limited liability company, and dated January 31, 2022.

4. Vehicle Lease Service Agreement executed June 3, 2014, between New WLX, LLC, a Missouri limited liability company, as successor-in-interest to WLX, LLC, a Missouri limited liability company, and Penske Truck Leasing Co. L.P., a Delaware limited partnership, to lease approximately thirty (30) tractors trailers and obtain a license to use the Penske facilities located at 13690 Lakefront Drive, Earth City, Missouri for tractor trailer parking and power supply access.

5. Membership Interest Purchase Agreement by and among Load to Ride Transportation, LLC, a Colorado limited liability company; One Stop Freightways, LLC, a Colorado limited liability company; Marc Haney; Load to Ride Transportation, LLC, a Pennsylvania limited liability company; One Stop Freightways, LLC, a Pennsylvania limited liability company; and R&R Express Holdco, Inc, a Pennsylvania corporation, and dated December 29, 2022.

6. Guarantee Joinder to Subordinated Promissory Note by Load to Ride Transportation, LLC, a Pennsylvania limited liability company, and One Stop Freightways, LLC, a Pennsylvania limited liability company; in favor of Load to Ride Transportation, LLC, a Colorado limited liability company dated December 29, 2022.

7. Lease by and between Taylor 1419 N. 5th Street, TN LLC, as landlord, and New Taylor Transportation, LLC, as tenant, dated March 31, 2023, for real property located at 1707 N 5th St., Union City, TN 38261.

8. Asset Purchase Agreement by and among Taylor Transportation, Inc., a Delaware corporation; Taylor Equipment Leasing, LLC, a Delaware limited liability company, and R&R Express Holdco, Inc., a Pennsylvania corporation, R&R Equipment Leasing, LLC, a Pennsylvania limited liability company and New Taylor Transportation, LLC, a Pennsylvania limited liability company dated March 31, 2023.

9. Truckload Service Level Agreement (SLA# 186-U-TL) between New Taylor Transportation, LLC and shipper / carrier The Goodyear Tire & Rubber Company dated May 1, 2016 and amended June 22, 2021 and May 2, 2022.

10. Transportation Services Agreement between New Taylor Transportation, LLC and shipper / carrier Kohler Co. dated October 29, 2021.

11. Agreement for Motor Carriage Transportation between New Taylor Transportation, LLC and shipper / carrier Mann+Hummel Purolator Filters, LLC dated March 3, 2020.

12. Agreement between American Trucking and Transportation Insurance Company (ATTIC), a Risk Retention Group and its Class A Shareholders, including R&R Express Holdco, Inc. who acquired 2.152 shares in ATTIC from White Willow Holdings, LLC. The Agreement establishes collateral in support of Auto Liability coverage for Taylor Transportation, LLC.

13. Equipment Lease Agreement, dated October 31, 2020, by and between Taylor Transportation, Inc. and PACCAR Financial Corp., as amended by Equipment Lease Agreement Schedule A, dated February 28, 2022, and Security Agreement, dated August 31, 2022, by and between Taylor Equipment Leasing and Peterbilt of Atlanta, LLC, as assigned to PACCAR Financial Corp. by Peterbilt of Atlanta, LLC, each as assigned to New Taylor Transportation, LLC.

14. Agreement of Purchase and Sale dated September 1, 2023, by and among Taylor 1419 N. 5th Street, TN LLC, a Delaware limited liability company, Taylor 5417 S. US 301, NC LLC, a Delaware limited liability company, and Taylor 5523 S. US 301, NC LLC, as Sellers, and R&R Express Properties, LLC, a Pennsylvania limited liability company, as Purchaser, as amended by that certain First Amendment to Purchase and Sale Agreement dated January 30, 2024, as amended by that certain Second Amendment to Purchase and Sale Agreement dated May 2, 2024, as amended by that certain Third Amendment to Purchase and Sale Agreement dated June 28, 2024.

15. Park Space Lease Agreement effective April 18, 2024, by and between Semi-Stow., a Texas limited liability company, as lessor, and Load to Ride Transportation, LLC (identified as "LTR Transport"), as lessee, for real property located at 3740 E 64th Ave., Commerce City, Colorado 80022.

16. Sublease dated March 18, 2023, by and between THE VAIL CORPORATION, a Colorado corporation, as Sublandlord, and R&R EXPRESS LOGISTICS, INC., a Florida corporation, as Subtenant, for certain premises located at 390 Interlocken Crescent, Broomfield, Colorado 80021.

# EXHIBIT C

Updated Exhibits A and D of the Credit Agreement

**BORROWING BASE REPORT**

| Company: R&R EXPRESS HOLDCO, INC.<br>Commitment: 85,000,000<br>Description: ABL Managed Line of Credit | R&R A/R Aging | AAGEX A/R Aging | New American Group A/R Aging | WLX A/R Aging | RFX A/R Aging | Total A/R Aging |
|---|---|---|---|---|---|---|
| 1. Control Balance from Previous Certificate @ | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| 2. Adds: A) Invoices From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| B) Other Positive Adjustments From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| 3. Less: A) Credits issued (Date/ #) From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| B) Write-Offs From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| C) Other Negative Adjustments From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| 4. Less: A) Gross Collections From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| B) Discounts From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| C) non AR Cash Collections From: | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| 5. Control Balance This Certificate @ | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| | | | | | | |
| **6. Less: Ineligibles @** | | | | | | |
| A) Past Due (90 Days from invoice date/60 Days past due) / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| B) Credits over 90 days added back / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| C) Cross Age (50%) / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| D) Intercompany / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| E) Contras / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| F) Foreign / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| G) Denied Access States / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| H) Non-Trade/COD / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| I) Unapplied Cash - GL account #211001 / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| J) Government / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| K) Concentration / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| L) Other / | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| 7. Total Ineligible | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| 8. Eligible Collateral | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| 9. Approved Advance Rate | **90.0%** | **90.0%** | **90.0%** | **90.0%** | **90.0%** | **90.0%** |
| 10. Net Collateral Value (line 8 X line 9) | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| | | | | | | **Availability Calculation** |
| 11. Total Collateral Value (Line 10 A/R) | | | | | | **$0.00** |
| 12. Overadvance | | | | | | **$0.00** |
| 13. Total Collateral AR + Overadvance | | | | | | **$0.00** |
| 12. Maximum Credit Line | | | | | | **$85,000,000.00** |
| 13. Lesser of Line 11 (collateral limit) or Line 12 (credit limit) | | | | | | **$0.00** |
| 14. Less: Letter of Credit or Other Reserves - Fuel Tax Reserves | | | | | | **$0.00** |
| 15. Net Availability | | | | | | **$0.00** |
| 16. Loans Outstanding | | | | | | |
| a) Balance from previous Borrowing Base | | | | | | **$0.00** |
| b) Advances | | | | | | **$0.00** |
| c) Cash Receipts | | | | | | **$0.00** |
| d) Ending Loan Balance | | | | | | **0.00** |
| 17. Ending Availability (line 15 minus line 16d) | | | | | | **$0.00** |

*This Borrowing Base Report is delivered to the Agent pursuant to a certain Second Amended and Restated Credit and Security Agreement, together with all the amendments thereto (the "Agreement") between the undersigned, the other Borrowers, the Lenders, and the Agent. All capitalized terms not defined in this Report shall have the same meanings in the Agreement. The undersigned certifies the following: (1) each of the accounts referenced on line 8 above is an Eligible Account; (2) all of the inventory referenced above is Eligible Inventory; (3) any other collateral against which an advance has been requested hereunder is eligible collateral under the terms of the Agreement; (4) the above calculations are true and accurate in all respects; (5) each of the warranties contained in the Agreement are true and correct, except to the extent that the same relate to an earlier date; and (6) no Event of Default or Pending Default exists.*

**Company: R&R Express Holdco, Inc.**

Date: ____________________

Authorized Signer: ____________________

Authorized Signature:

# EXHIBIT D--FORM OF COMPLIANCE CERTIFICATE

To: The Huntington National Bank

This Compliance Certificate is furnished pursuant to that certain Second Amended and Restated Credit and Security Agreement dated as of March 18, 2022 (as amended, restated, modified, or supplemented from time to time, the "Agreement") among R&R Express Holdco, Inc., a Pennsylvania corporation ("Borrower Representative"), the other Borrowers and Loan Parties defined in the Agreement, the Lenders party thereto from time to time, and The Huntington National Bank, as Agent, Issuer and a Lender. Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1. I am the duly elected _______________ of Borrower Representative;[1]

2. I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Express Holdco and its Subsidiaries during the accounting period covered by the attached financial statements dated ______________. The accompanying financial statements present fairly in all material respects the financial condition and results of operations of Express Holdco and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied; provided that if such financial statements are furnished to Agent pursuant to Section 9.6 of the Agreement (Monthly Financial Statements), they shall be subject to (i) normal year-end audit adjustments that individually and in the aggregate are not material to the business of Express Holdco and its Subsidiaries and the absence of footnotes, and (ii) the absence of footnotes;

3. The examinations described in paragraph 2 did not disclose, except as set forth below, and I have no knowledge of (i) the existence of any condition or event which constitutes a Default or Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate or (ii) any change in GAAP or in the application thereof that has occurred since the date of the reviewed financial statements referred to in Section 9.5 of the Agreement;

4. I hereby certify that no Loan Party has changed (i) its name without having given Agent the notice required by Section 9.7 of the Agreement, (ii) its chief executive office, (iii) principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization;

5. Schedule I attached hereto sets forth financial data and computations evidencing Borrowers' compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct;

[1] Compliance Certificate to be completed by an Authorized Officer of the Borrower Representative.

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the (i) nature of the condition or event, the period during which it has existed and the action which Borrowers have taken, is taking, or proposes to take with respect to each such condition or event or (i) the change in GAAP or the application thereof and the effect of such change on the attached financial statements:

______________________________________________________________________________

______________________________________________________________________________

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this ____ day of __________, ______.

**R&R EXPRESS HOLDCO, INC.**

By:____________________________________

Name:__________________________________

Title:__________________________________

SCHEDULE I

Compliance as of [_______ __, ____] ("Compliance Date") with

Provisions of 6.3, 7.5, 7.6 and 7.11 of the Agreement

**Section 6.3:** Each Loan Party agrees as to itself and each Subsidiary, until payment in full of the Obligations and termination of this Agreement, that it shall: maintain a Consolidated Fixed Charge Coverage Ratio for Express Holdco and its Subsidiaries on a consolidated basis of not less than 1.10 to 1.00 as of each fiscal quarter end for the four (4) consecutive fiscal quarters ended on ________________, 20____

The Loan Parties' and their Subsidiaries' Fixed Charge Coverage Ratio for the period ended ________________, 20____ is _____ to 1.00. **(Borrowers to attach detailed calculation to this Schedule I).**

***Section 6.3:*** (In compliance / Not in Compliance / Not Applicable): **______________.**

**Section 7.5:** Make advances, loans or extensions of credit to any Person, including without limitation any holder of an equity interest in any Borrower, any Subsidiary or Affiliate, other than another Loan Party, except with respect to (a) loans existing on the Closing Date (not including the extensions of credit set forth in clause (c) below) and set forth on Schedule 7.5 (including loans made prior to the Original Closing Date to the Permitted Holder), (b) the extension of commercial trade credit in connection with the sale of Inventory in the ordinary course of its business, (c) the extension of credit to agents, drivers and business affiliates that are not Affiliates of any Loan Party in the ordinary course of business and in amounts not to exceed $250,000 at any time with respect to each agent, driver or business affiliate and in an aggregate amount with respect to all such agents, drivers and business affiliates not to exceed $2,500,000 at any time, or (d) advances in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional advances made in connection with the same so long as such additional advances are permitted by the Lenders in their sole discretion.

The aggregate outstanding principal balance of the loans made to the Permitted Holder equal $___________ as of the Compliance Date.

The balance (individual and aggregate) as of the Compliance Date of all extensions of credit to agents, drivers and business Affiliates that are not Affiliates of any Loan Party is as set forth on the attached spreadsheet.

**Section 7.6:** Make or incur any Capital Expenditure or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $10,000,000 in each fiscal year (other than Capital Expenditures or commitments thereof made or incurred in connection with the New WLX Holdings Acquisition, the LTR Acquisition, and the Taylor Transportation Acquisition); provided that, solely for the fiscal year ending December 31, 2023, Capital Expenditures made or incurred or commitments thereof in such fiscal year shall not be in excess of $18,750,000 (which includes Capital Expenditures made or incurred in connection with the Corporate Retreat Purchase).

The Loan Parties and their Subsidiaries incurred Capital Expenditures in the current fiscal year totaling ($______________).

***Section 7.6:*** (In compliance / Not in Compliance or Not Applicable): ______________.

**Section 7.11:** No Loan Party or any Subsidiary thereof until satisfaction in full of the Obligations and the termination of this Agreement, shall: enter as lessee into any lease arrangement (except lease arrangements between any of the Borrowers and Express Properties or among any of the Borrowers, as approved by the Agent) for real or personal property (other than Capital Leases permitted under Section 7.6) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $2,500,000 in any one fiscal year in the aggregate for all Loan Parties.

The Loan Parties and their Subsidiaries' aggregate annual rental payments for all leased property totals ($______________).

***Section 7.11:*** (In compliance / Not in Compliance or Not Applicable): ______________.

Miscellaneous:

**Surety Bonds:** The (i) aggregate amount of surety bonds issued where any Borrower is the principal with respect to such surety bonds is $______________ as of the Compliance Date, (ii) a schedule detailing the issued surety bonds are attached hereto to this Compliance Certificate, which shall be updated from time to time and delivered to Agent.

[Final compliance spreadsheet (including spreadsheet showing balances of extensions of credit pursuant to Section 7.5(c))
to be provided by Agent]

*Execution Version*

# SEVENTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS SEVENTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of August 30, 2024 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers have requested that the Lenders (i) make a new Term Loan to the Borrowers on the Effective Date to fund the purchase of certain new Owned Real Property located in Tennessee, and (ii) make certain other amendments and grant certain other accommodations all as hereinafter provided, on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. **Recitals**. The foregoing recitals are hereby incorporated by this reference.

2. **Amendments**.

(a) On the Effective Date, the Credit Agreement, is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text or double-underlined text) as set forth in a conformed copy of the Credit Agreement attached as Exhibit A hereto (the credit agreement attached hereto as Exhibit A being referred to herein as the "Composite Credit Agreement").

(b) Each of Schedule 1 [Commitments of Lenders], Schedule 1.2(a) [Owned Real Property], and Schedule 5.10 [Patents, Trademarks, Copyrights and Licenses] of the Credit Agreement are hereby amended and restated in their entirety in the forms attached hereto as Exhibit B, respectively.

(c) With the exception of the above noted schedules and exhibits, no other schedules or exhibits to the Credit Agreement are being amended or modified in connection with this Amendment.

3. **Release; No Discharge**. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

4. **Conditions to Effectiveness**. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment.

(b) Execution and Delivery of the Note. The Borrowers shall have executed and delivered to the Agent a new Term Loan 3 Note (as defined in the Composite Credit Agreement), and a corresponding Disclosure for Confession of Judgment.

(c) Secretary's Certificates. The Agent shall have received a certificate dated as of the Effective Date and signed by the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each of the Loan Parties, in form and substance satisfactory to the Agent, certifying as appropriate as to: (i) all action taken by each Loan Party in connection with this Amendment and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated hereunder and under the Credit Agreement; (ii) the names of the Authorized Officers authorized to sign the Loan Documents and their true signatures; and (iii) copies of its Charter Documents as in effect on the date hereof certified by the appropriate state official where such documents are filed in a state office together with (and subject to Section 6(a) below) certificates from the appropriate state officials as to the continued existence and good standing of each Loan Party in each state where organized or qualified to do business (or to the extent previously delivered to the Agent, certification from each such Loan Party of no changes to its Charter Documents since last delivered to the Agent.

(d) Officer's Certificate. A certificate of each of the Borrowers signed by an Authorized Officer, dated as of the Effective Date, in form and substance satisfactory to the Agent, stating that: (i) each Borrower has complied with all duties and obligations required to date to be carried out and performed by it pursuant to the terms of the Credit Agreement or any other Loan Document, (ii) no Default or Event of Default has occurred and is continuing, or would result from the Loans to be made on the date hereof or from the application of the proceeds therefrom, (iii) all representations and warranties contained in the Credit Agreement, as supplemented by the revised schedules hereto, or any other Loan Document are true and correct as of the date hereof, and (iv) each Borrower is in compliance with all agreements and conditions under the Credit Agreement and the Loan Documents.

(e) Opinion. The Borrowers shall deliver a written opinion of counsel (including local counsel if necessary) for the Loan Parties, dated as of the Effective Date in form and substance satisfactory to the Agent and its counsel.

(f) Acknowledgment of Security Interest in Trademarks. The Borrowers shall have executed and delivered to the Agent a new Acknowledgment of Security Interest in Trademarks in connection with the updated Schedule 5.10 attached hereto.

(g) KYC/AML/Beneficial Ownership. The Agent shall have received all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by the Agent.

(h) Real Estate Documents and Diligence. With respect to each new parcel of Owned Real Property, the Agent shall have received:

(i) a fully executed and notarized Mortgage;

(ii) a fully executed Environmental Indemnity Agreement;

(iii) ALTA mortgagee's title policy with endorsements as required by the Agent;

(iv) an appraisal (market value "as is") prepared by an appraiser acceptable to the Agent;

(v) environmental reports and/or other environmental diligence acceptable to the Agent;

(vi) surveys and zoning letters acceptable to the Agent, to the extent required by the Agent in its discretion; and

(vii) if any such parcel of Owned Real Property is determined by the Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to the Agent.

(i) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(j) Payment of Fees and Expenses. The Borrowers shall reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

(k) Miscellaneous. The Loan Parties shall have provided such other documents, agreements, instruments, deliverables and items deemed reasonably necessary by the Agent and shall have satisfied such other conditions as set forth in the closing agenda provided to the Loan Parties in connection with this Amendment.

5. **Representations and Warranties**. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

6. **Post-Closing Obligations**.

(a) The original due dates for the delivery of the post-closing obligations set forth in (i) Section 6(a) of the Sixth Amendment to Second Amended and Restated Credit and Security Agreement, dated as of July 31, 2024 (the "Sixth Amendment"), is hereby extended by the Lenders to the date that is sixty (60) days after the Effective Date (or such later date as may be consented to by the Agent in its sole discretion), and (ii) Section 6(b) and 6(d) of the Sixth Amendment, are hereby extended by the Lenders to the date that is fifteen (15) days after the Effective Date (or such later date as may be consented to by the Agent in its sole discretion).

(b) By September 30, 2024, the Borrowers shall have sold the Owned Real Property located at 1401 Iron St. in North Kansas City, MO 64116 (owned by Express Properties) and all proceeds thereto shall be subject to the terms and conditions of the Credit Agreement (the "Missouri Property Sale"); provided that, if the Missouri Property Sale does not occur by September 30, 2024, the Borrowers shall deliver, no later than by November 29, 2024 (or such later date as may be consented to by the Agent in its sole discretion), in form and substance satisfactory to the Agent (i) a fully executed and notarized Mortgage, (ii) a fully executed Environmental Indemnity Agreement, (iii) ALTA mortgagee's title policy with endorsements as required by the Agent, (iv) an appraisal, (v) environmental reports and/or other environmental diligence acceptable to the Agent, and (vi) such other information, documentation, and certifications as may be reasonably required by the Agent.

7. **Miscellaneous**.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby. Each Loan Party hereby further confirms its guarantees, pledges and grants of security interests, as applicable, under each of the Loan Documents to which it is party. Each Loan Party reconfirms the prior grant of the security interest in and first priority, perfected lien in favor of the Agent for its benefit and the ratable benefit of each Lender, upon and to, all of its right, title and interest in and to the Collateral, whether now owned or hereafter acquired, created or arising and wherever located.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) Further Assurances. The Borrowers agree to execute such other documents, instruments and agreements and take such further actions reasonably requested by the Agent to effectuate the provisions of this Amendment.

(f) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

*[Signature Page Follows]*

**[SIGNATURE PAGE – SEVENTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC, AGX FREIGHT LOGISTICS, LLC, AGX FREIGHT INTERMODAL, LLC, RFX TAMPA, LLC, NEW TAYLOR TRANSPORTATION, LLC, A.M. TRANSPORTATION SERVICES LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By: Richard S. Francis (SEAL)
Name: Richard S. Francis
Title: Manager

**[SIGNATURE PAGE – SEVENTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, ~~a Lender~~ and Issuer

By: [signature]
Name: Nelson Rauscher
Title: Vice President

**[SIGNATURE PAGE – SEVENTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: [signature]
Name: Richard Ford
Title: Business Credit Portfolio Manager

# **EXHIBIT A**

Composite Credit Agreement

*Exhibit A – ~~Sixth~~Seventh Amendment to Second A&R Credit and Security Agreement*

*First Amendment dated December 30, 2022*
*Incorporating Second Amendment dated February 7, 2023*
*Third Amendment and Joinder dated June 21, 2023*
*Fourth Amendment dated September 1, 2023*
*Fifth Amendment dated May 28, 2024*
*Revolving Credit Increase Agreement dated June 26, 2024*
*Sixth Amendment dated July 31, 2024*
*Seventh Amendment dated August 30, 2024*

**SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT**
**among**

**THE HUNTINGTON NATIONAL BANK**
**(as Administrative Agent, a Lender and issuer of Letters of Credit)**

**THE LENDERS PARTY HERETO**

**and**

**R&R EXPRESS HOLDCO, INC,**
**R & R EXPRESS, INC.,**
**GT WORLDWIDE TRANSPORT, INC.,**
**BORDER CONNECT FREIGHT SERVICES, INC.,**
**PARADIGM TRANSPORTATION, LLC,**
**FINAL MILE DEDICATED GROUP, LLC,**
**R & R EXPRESS LOGISTICS, INC.,**
**GT WORLDWIDE LOGISTICS, LLC,**
**BORDER CONNECT LOGISTICS, INC.,**
**PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC,**
**FINAL MILE SOLUTIONS GROUP, LLC,**
**AAGEX FREIGHT GROUP, LLC,**
**AGX FREIGHT CARRIERS, LLC,**
**AGX FREIGHT LOGISTICS, LLC,**
**AGX FREIGHT INTERMODAL, LLC,**
**R&R EXPRESS PROPERTIES, LLC,**
**R&R EQUIPMENT LEASING, LLC**
**RXG&A, LLC,**
**TLOGISTICS, LLC,**
**R & R DRIVER SOLUTIONS INC,**
**NEW AMERICAN GROUP LLC,**
**NEW WLX HOLDINGS, LLC,**
**NEW WLX, LLC,**
**NEW WLE, LLC,**
**A.M. TRANSPORTATION SERVICES LLC,**
**RFX, LLC,**

**REFRIGERATED FOOD EXPRESS, LLC,**
**PIONEER TRANSFER, LLC**
**LOAD TO RIDE TRANSPORTATION, LLC,**
**ONE STOP FREIGHTWAYS, LLC,**
**RFX TAMPA, LLC, and**
**NEW TAYLOR TRANSPORTATION, LLC**

**as Borrowers**

**March 18, 2022**

# TABLE OF CONTENTS


Page

**ARTICLE 1 DEFINITIONS** .......... **2**

1.1 Accounting Terms .......... 2
1.2 General Terms .......... 2
1.3 Uniform Commercial Code Terms .......... 36
1.4 General Matters of Construction .......... 36
1.5 Time References .......... 37
1.6 Lease Accounting Changes. .......... 37
1.7 Rates. .......... 37

**ARTICLE 2 ADVANCES, PAYMENTS** .......... **38**

2.1 Revolving Loans .......... 38
2.2 Procedure for Borrowing Advances. .......... 38
2.3 Disbursement of Loan Proceeds .......... 38
2.4 Repayment of Loans .......... ~~38~~39
2.5 Mandatory Reduction or Prepayment of Loans. .......... ~~39~~40
2.6 Statement of Account .......... 40
2.7 Letters of Credit .......... 40
2.8 Issuance of Letters of Credit. .......... 40
2.9 Requirements For Issuance of Letters of Credit. .......... 41
2.10 Term Loans. .......... 43
2.11 Additional Payments .......... ~~44~~45
2.12 Use of Proceeds .......... ~~44~~45
2.13 Joint and Several Obligations of Loan Parties .......... ~~45~~46
2.14 Borrower Representative. .......... ~~46~~47
2.15 Manner of Borrowing and Payment; Settlement. .......... ~~47~~48
2.16 Defaulting Lender. .......... ~~48~~49
2.17 Increase in Commitments. .......... ~~49~~50

**ARTICLE 3 INTEREST AND FEES** .......... **~~51~~52**

3.1 Interest. .......... ~~51~~52
3.2 Letter of Credit Fees. .......... ~~52~~53
3.3 Unused Facility Fee .......... ~~52~~53
3.4 Reserved. .......... ~~52~~53
3.5 Reserved .......... ~~52~~53
3.6 Computation of Interest and Fees; Restatement; Conforming Changes .......... ~~52~~54
3.7 Maximum Charges .......... ~~53~~54
3.8 Increased Costs; Losses .......... ~~53~~55
3.9 Illegality; Inability to Determine Rates. .......... ~~55~~56
3.10 Effect of Benchmark Transition Event. .......... ~~55~~57
3.11 Taxes .......... ~~56~~57
3.12 Survival.. .......... ~~60~~62

**ARTICLE 4 COLLATERAL; SECURITY AGREEMENT** .......... **~~60~~62**

4.1 Security Interest in the Collateral ~~60~~62
4.2 Perfection of Security Interest ~~61~~62
4.3 Dominion of Funds, Lockbox, and Deposit Accounts ~~61~~62
4.4 Preservation and Disposition of Collateral ~~62~~63
4.5 Ownership of Collateral ~~63~~64
4.6 Defense of the Interests of Agent and Lenders ~~63~~64
4.7 Books and Records ~~64~~65
4.8 Financial Disclosure ~~64~~65
4.9 Compliance with Laws ~~64~~65
4.10 Inspection of Premises; Appraisals ~~64~~66
4.11 Insurance ~~65~~66
4.12 Failure to Pay Insurance ~~66~~67
4.13 Payment of Taxes ~~66~~67
4.14 Payment of Leasehold Obligations ~~66~~67
4.15 Accounts Receivable ~~66~~68
4.16 Maintenance of Equipment ~~68~~69
4.17 Exculpation of Liability ~~68~~69
4.18 Environmental Matters. ~~68~~70
4.19 Financing Statements ~~69~~70
4.20 Commercial Tort Claims. ~~69~~70
4.21 Pledged Securities. ~~70~~71

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES** **~~71~~73**

5.1 Authority ~~71~~73
5.2 Formation and Qualification; Subsidiaries ~~72~~73
5.3 Officers, Directors, Shareholders, Capitalization ~~72~~73
5.4 Governmental Approvals; No Conflicts ~~72~~73
5.5 Tax Returns ~~72~~74
5.6 Financial Statements. ~~73~~74
5.7 Organization Name ~~73~~74
5.8 OSHA and Environmental Compliance. ~~73~~75
5.9 Solvency; No Litigation, No Violation, ERISA. ~~74~~75
5.10 Patents, Trademarks, Copyrights and Licenses ~~74~~76
5.11 Licenses and Permits ~~75~~76
5.12 Default of Indebtedness ~~75~~76
5.13 No Burdensome Restrictions; No Default ~~75~~76
5.14 No Labor Disputes ~~75~~77
5.15 Margin Regulations ~~75~~77
5.16 Investment Company Act ~~76~~77
5.17 Disclosure ~~76~~77
5.18 Hedging Contracts ~~76~~77
5.19 Material Business Agreements ~~76~~77
5.20 Application of Certain Laws and Regulations ~~76~~77
5.21 Business and Property of the Loan Parties ~~76~~77
5.22 Reserved ~~76~~78
5.23 Anti-Corruption Laws and Sanctions ~~76~~78

5.24 Beneficial Ownership Certificate. ~~77~~78

**ARTICLE 6 AFFIRMATIVE COVENANTS** **~~77~~78**

6.1 Conduct of Business and Maintenance of Existence and Assets. ~~77~~78
6.2 Violations ~~78~~79
6.3 Consolidated Fixed Charge Coverage Ratio ~~78~~79
6.4 Execution of Supplemental Instruments ~~78~~79
6.5 Payment of Indebtedness ~~78~~79
6.6 Standards of Financial Statements ~~78~~79
6.7 Taxes ~~78~~79
6.8 Interest Rate Protection ~~78~~80
6.9 Deposit Accounts ~~78~~80
6.10 Credit Insurance ~~79~~80
6.11 2022 Real Estate Purchase. ~~79~~80
6.12 Post-Closing Obligations. ~~79~~81
6.13 Compliance with Anti-Corruption Laws and Sanctions. ~~80~~81

**ARTICLE 7 NEGATIVE COVENANTS** **~~80~~81**

7.1 Merger, Consolidation, Acquisition and Sale of Assets. ~~80~~81
7.2 Creation of Liens ~~80~~82
7.3 Guarantees ~~80~~82
7.4 Investments ~~81~~82
7.5 Loans ~~81~~83
7.6 Capital Expenditures ~~81~~83
7.7 Dividends, Distributions and Restricted Payments ~~82~~83
7.8 Indebtedness. ~~82~~84
7.9 Nature of Business ~~83~~85
7.10 Transactions with Affiliates ~~83~~85
7.11 Leases ~~84~~85
7.12 Subsidiaries; Partnerships. ~~84~~85
7.13 Fiscal Year and Accounting Changes ~~84~~85
7.14 Pledge of Credit ~~84~~86
7.15 Amendment of Charter Documents ~~84~~86
7.16 ERISA ~~84~~86
7.17 Prepayment of Indebtedness ~~84~~86
7.18 Modification of Material Business Agreements ~~85~~86

**ARTICLE 8 CONDITIONS PRECEDENT** **~~85~~86**

8.1 Conditions to Initial Loans ~~85~~86
8.2 Conditions to Each Advance ~~88~~89

**ARTICLE 9 INFORMATION AS TO THE LOAN PARTIES** **~~89~~90**

9.1 Disclosure of Material Matters ~~89~~90
9.2 Schedules and Certificates ~~89~~90
9.3 Litigation ~~90~~91
9.4 Material Occurrences ~~90~~91
9.5 Annual Financial Statements ~~90~~91

9.6 Monthly Financial Statements ~~90~~92
9.7 Additional Information ~~91~~92
9.8 Projected Operating Budget, Availability Forecast ~~91~~92
9.9 Notice of Suits, Adverse Events ~~91~~93

**ARTICLE 10 EVENTS OF DEFAULT ~~92~~93**

10.1 Payment of Obligations ~~92~~93
10.2 Payment of Reductions or Mandatory Prepayments ~~92~~93
10.3 Misrepresentations ~~92~~93
10.4 Failure to Furnish Information, Schedules, Certificates ~~92~~93
10.5 Liens Against Assets ~~92~~93
10.6 Breach of Covenants ~~92~~94
10.7 Judgment ~~92~~94
10.8 Insolvency and Related Proceedings ~~92~~94
10.9 Guarantor Default ~~93~~94
10.10 Material Adverse Effect ~~93~~94
10.11 Loss of Priority Lien ~~93~~94
10.12 Breach of Material Business Agreements ~~93~~94
10.13 Cross Default; Cross Acceleration ~~93~~94
10.14 Change of Control ~~93~~95
10.15 Invalidity of Loan Documents ~~93~~95
10.16 Loss of Material Intellectual Property ~~93~~95
10.17 Destruction of Collateral ~~94~~95
10.18 Business Interruption ~~94~~95
10.19 Hedging Contracts ~~94~~95

**ARTICLE 11 AGENT'S RIGHTS AND REMEDIES AFTER DEFAULT ~~94~~95**

11.1 Rights and Remedies ~~94~~95
11.2 Agent Discretion ~~95~~96
11.3 Setoff ~~95~~96
11.4 Rights and Remedies not Exclusive ~~95~~96
11.5 Appointment of Receiver ~~95~~97
11.6 Reserved ~~95~~97
11.7 Allocation of Payments After Event of Default. ~~95~~97

**ARTICLE 12 WAIVERS AND JUDICIAL PROCEEDINGS ~~97~~98**

12.1 Waiver of Notice ~~97~~98
12.2 Delay ~~97~~98
12.3 Jury Waiver ~~97~~98

**ARTICLE 13 EFFECTIVE DATE AND TERMINATION ~~98~~99**

13.1 Term ~~98~~99
13.2 Termination ~~98~~99

**ARTICLE 14 REGARDING AGENT ~~98~~100**

14.1 Appointment. ~~98~~100
14.2 Nature of Duties. ~~99~~100

14.3 Lack of Reliance on Agent and Resignation. ~~99~~100
14.4 Certain Rights of Agent. ~~100~~101
14.5 Reliance. ~~100~~101
14.6 Notice of Default. ~~100~~101
14.7 Indemnification. ~~100~~102
14.8 Agent in its Individual Capacity. ~~101~~102
14.9 Delivery of Documents. ~~101~~102
14.10 Loan Parties' Undertaking to Agent. ~~101~~102
14.11 No Reliance on Agent's Customer Identification Program. ~~101~~102
14.12 Erroneous Payments. ~~101~~103
14.13 Agent Professionals. ~~103~~104

**ARTICLE 15 MISCELLANEOUS** **~~103~~104**

15.1 Governing Law ~~103~~104
15.2 Entire Understanding ~~103~~105
15.3 Transfers and Assignments. ~~106~~107
15.4 Application of Payments ~~109~~110
15.5 Indemnity ~~109~~110
15.6 Notice ~~109~~111
15.7 Survival ~~111~~112
15.8 Severability ~~111~~112
15.9 Expenses ~~111~~112
15.10 Important Information About Procedures Required by the USA Patriot Act ~~112~~113
15.11 Injunctive Relief ~~112~~113
15.12 No Liability; Consequential Damages ~~112~~113
15.13 Counterparts; Electronic Signatures ~~112~~114
15.14 Construction ~~112~~114
15.15 Confidentiality; Sharing Information. ~~113~~114
15.16 Publicity ~~113~~114
15.17 Conflict Clause ~~113~~115
15.18 Amendment and Restatement. ~~114~~115

# **LIST OF SCHEDULES AND EXHIBITS**

All Schedules to the Credit and Security Agreement:


| | |
|---|---|
| Schedule 1 | Commitments of Lenders |
| Schedule 1.2(a) | Owned Real Property |
| Schedule 1.2(b) | Liens |
| Schedule 1.2(c) | Existing Letters of Credit |
| Schedule 4.3 | Deposit Accounts |
| Schedule 4.5 | Inventory Locations |
| Schedule 4.15(c) | Loan Parties' States of Organization and Chief Executive Offices |
| Schedule 4.20 | Commercial Tort Claims |
| Schedule 5.2 | Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 | Officers, Directors, Shareholders, Capitalization |
| Schedule 5.9(b) | Litigation |
| Schedule 5.10 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 5.19 | Material Business Agreements |
| Schedule 5.21 | Business and Property |
| Schedule 7.4 | Investments |
| Schedule 7.5 | Loans |
| Schedule 7.8 | Indebtedness |


All Exhibits to the Credit and Security Agreement:


| | |
|---|---|
| Exhibit A | Form of Borrowing Base Certificate |
| Exhibit B | Form of Revolving Note |
| Exhibit C | Form of Term Loan Note |
| Exhibit D | Form of Compliance Certificate |

# SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

This **SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Agreement"), has been executed and is dated as of March 18, 2022 by and among **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING, LLC**, a Pennsylvania limited liability company, ("Equipment Leasing"), **R&R EXPRESS HOLDCO, INC.**, a Pennsylvania corporation ("Express Holdco"), **RxG&A, LLC**, a Pennsylvania limited liability company ("RxG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), and **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", and together with Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, Express Holdco, RxG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, RFX Tampa and any other Person who may hereafter become a borrower hereunder are each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and **THE HUNTINGTON NATIONAL BANK**, as Agent, Lender and Issuer.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. All financial computations to be made under this Agreement, unless otherwise specifically provided herein, shall be made in accordance with GAAP applied on a basis consistent with the financial statements delivered to Agent on or prior to the Closing Date. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" or "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Express Holdco and its Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

1.2 **General Terms**. For purposes of this Agreement, the following terms shall have the following meanings:

"2022 Real Estate Purchase" means, that certain purchase by Express Properties of the real property located at 200 Industrial Drive, Pittsburgh, PA 15275; provided that (i) prior to completing such purchase the purchaser provides ten (10) Business Days' advance written notice to the Agent of its intent to make such purchase, (ii) the purchase price shall not exceed $2,500,000, (iii) the Loan Parties shall demonstrate proforma Undrawn Availability of the Loan Parties for the ninety (90) day period prior to such proposed purchase and immediately after giving effect to such proposed purchase is greater than the greater of (1) ten percent (10%) of the Borrowing Base or (2) $5,000,000, and (iv) no Event of Default or Default shall exist immediately prior to or after giving effect to such purchase.

"2024 Revolving Commitment Increase Agreement" means that certain Revolving Commitment Increase Agreement, dated as of June 26, 2024, by and between the Agent, the Issuer, Huntington, as the increasing lender, and the Borrowers, which increased the Revolving Commitment to $85,000,000, pursuant to and in accordance with Section 2.17 of this Agreement.

"AAGEX Entities" means, collectively, AAGEX Group, AGX Carriers, AGX Intermodal, and AGX Logistics.

"AAGEX Group" means AAGEX Freight Group, LLC, a Florida limited liability company.

"Advances" means each Revolving Loan and issuance of a Letter of Credit.

"Affiliate" means as to any Person, any other Person (excluding any Foreign Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to be "controlled by" a Person if such Person possesses, directly or indirectly, power either (i) to vote five percent (5%) or more of the securities having ordinary voting power for the election of directors of such

Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent" shall mean Huntington, in its capacity as administrative agent and collateral agent for Lenders, and their successors and assigns.

"Agent Professionals" shall mean attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Agent.

"Aggregate Commitment" means the sum of the Aggregate Revolving Commitment plus the Aggregate Term Loan Commitment plus the Aggregate Term Loan 2 Commitment plus the Aggregate Term Loan 3 Commitment.

"Aggregate Credit Exposure" shall mean, at any time, the aggregate Credit Exposure of all Lenders.

"Aggregate Revolving Commitment" shall mean, at any time, the aggregate Revolving Commitments of all Lenders. The Aggregate Revolving Commitment as of June 26, 2024 (pursuant to the 2024 Revolving Commitment Increase Agreement) is $85,000,000.

"Aggregate Revolving Exposure" shall mean, at any time, the aggregate Revolving Exposure of all Lenders.

"Aggregate Term Loan Commitment" shall mean, at any time, the aggregate Term Loan Commitments of all Lenders. The Aggregate Term Loan Commitment as of the Closing Date is $3,675,000.

"Aggregate Term Loan 2 Commitment" shall mean, at any time, the aggregate Term Loan 2 Commitments of all Lenders. The Aggregate Term Loan 2 Commitment as of the Sixth Amendment Effective Date is $972,000.

"Aggregate Term Loan 3 Commitment" shall mean, at any time, the aggregate Term Loan 3 Commitments of all Lenders. The Aggregate Term Loan 3 Commitment as of the Seventh Amendment Effective Date is $520,000.00.

"Agreement" shall have the meaning set forth in the preamble, as the same may be amended, restated, modified, or supplemented from time to time.

"AGX Carriers" means AGX Freight Carriers, LLC, a Georgia limited liability company.

"AGX Intermodal" means AGX Freight Intermodal, LLC, a Florida limited liability company.

"AGX Logistics" means AGX Freight Logistics, LLC, Georgia limited liability company.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of: (a) the Prime Rate in effect on such day, (b) the Fed Funds Rate in effect on such day *plus* 0.50%

per annum, and (c) Daily Simple SOFR for such day (taking into account the Floor set forth in the definition of "Daily Simple SOFR") *plus* 2.00% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Fed Funds Rate or Daily Simple SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Fed Funds Rate or Daily Simple SOFR, respectively. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

"A.M. Transportation" means A.M. Transportation Services LLC, a Pennsylvania limited liability company.

"A.M. Transportation Acquisition" means Express Holdco's acquisition of sixty percent (60%) of the issued and outstanding voting membership interests of A.M. Transportation pursuant to the A.M. Transportation Acquisition Documents.

"A.M. Transportation Acquisition Documents" means, collectively, the (i) Asset Purchase Agreement, dated as of March 31, 2021, by and among A.M. Transportation Services, Inc., a Massachusetts corporation, A.M. Transportation, and the other parties party thereto, (ii) Operating Agreement of A.M. Transportation effective as of March 2, 2021, (iii) A.M. Transportation Subordination Agreement, (iv) A.M. Transportation Subordinated Note, and (v) all other documents and instruments delivered in connection with the A.M. Transportation Acquisition.

"A.M. Transportation Subordinated Note" means that certain Subordinated Promissory Note, effective March 31, 2021 made by A.M. Transportation in favor of A.M. Transportation Services, Inc. in the amount of $500,000 being a portion of the purchase price in connection with the A.M. Transportation Acquisition payable on terms acceptable to Agent.

"A.M. Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of March 31, 2021, among the Agent, A.M. Transportation Services, Inc., and A.M. Transportation.

"American Group" means New American Group LLC, a Pennsylvania limited liability company.

"American Group Acquisition" means Express Holdco's acquisition of sixty percent (60%) of the issued and outstanding membership interests of American Group pursuant to the American Group Acquisition Documents.

"American Group Acquisition Documents" means, collectively, the (i) Membership Interest Purchase Agreement, dated as of November 30, 2019 by and among the Seller (as defined therein) party thereto, the members of the Seller, American Group and Express Holdco, (ii) Operating Agreement of American Group, dated as of November 30, 2019, executed by American Group Seller and Express Holdco, as members,(iii) Contribution Agreement by American Group Seller, American Group and Express Holdco, as buyer and (iv) all other documents and instruments delivered in connection with the American Group Acquisition.

"American Group Seller" shall mean American Group, LLC, an Arizona limited liability company, the parent company of American Group and seller of certain of the membership interest of American Group under the American Group Acquisition Documents, to be known as MSKD, LLC after the consummation of the American Group Acquisition.

"American Group Seller Subordinated Note" means that certain Subordinated Promissory Note made by Express Holdco in favor of American Group Seller in the amount of $2,150,000 being a portion of the purchase price in connection with the American Group Acquisition and payable on terms acceptable to Agent commencing on the first day of the month following ninety days (90) after November 30, 2019 as permitted pursuant to the American Group Seller Subordination Agreement.

"American Group Seller Subordination Agreement" means the Subordination Agreement dated as December 14, 2018 among American Group Seller, as seller, the Borrowers, and the Agent.

"Annual Dividends" means annual non-tax dividends or distributions made by any Loan Party; provided that (i) prior to making any such annual dividend or distribution the Loan Parties provide ten (10) Business Days' advance written notice to the Agent of their intent to make such proposed annual dividend or distribution; (ii) the Loan Parties shall demonstrate proforma (a) Consolidated Fixed Charge Coverage Ratio of not less than 1.25 to 1.00 after giving effect to any such proposed annual divided or distribution and (b) Undrawn Availability of the Loan Parties for the ninety (90) day period prior to any such proposed annual dividend or distribution and immediately after giving effect to any such proposed annual dividend or distribution is greater than the greater of (1) ten percent (10%) of the Borrowing Base or (2) $5,000,000; and (iii) no Event of Default or Default shall exist immediately prior to or after giving effect to each such annual dividend or distribution.

"Anti-Corruption Laws" means, collectively, the United States Foreign Corrupt Practices Act of 1977 and all other similar anti-corruption legislation in other jurisdictions.

"Anti-Terrorism Laws" means those laws and sanctions relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act (Public Law 107-56), the Bank Secrecy Act (Public Law 91-508), the Trading with the Enemy Act (50 U.S.C. App. Section 1 et. seq.), the International Emergency Economic Powers Act (50 U.S.C. Section 1701 et. seq.), and the sanction regulations promulgated pursuant thereto by the Office of Foreign Assets Control, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957 (as any of the foregoing may from time to time be amended, renewed, extended or replaced).

"Applicable Base Rate Margin" means the applicable margin determined by reference to Quarterly Average Undrawn Availability set forth in the Pricing Grid table below under the heading "Revolving Loans Applicable Base Rate Margin" or "Term Loan / Term Loan 2 / Term Loan 3 Applicable Base Rate Margin", as applicable.

| **Pricing Grid** | | | | | |
|---|---|---|---|---|---|
| **Level** | | **Revolving** | **Revolving** | **Term Loan / Term** | **Term Loan / Term** |

| | **Quarterly Average Undrawn Availability** | **Loans Applicable Base Rate Margin** | **Loans Applicable SOFR Rate Margin** | **Loan 2 / Term Loan 3 Applicable Base Rate Margin** | **Loan 2 / Term Loan 3 Applicable SOFR Rate Margin** |
|---|---|---|---|---|---|
| **I** | **> $10,000,000** | **0.50%** | **2.36%** | **1.00%** | **2.86%** |
| **II** | **> $5,000,000& ≤ $10,000,000** | **0.50%** | **2.61%** | **1.00%** | **3.11%** |
| **III** | **≤ $5,000,000** | **0.50%** | **2.86%** | **1.00%** | **3.36%** |

The Applicable Base Rate Margin and Applicable SOFR Rate Margin shall initially be set at Level I and thereafter shall be determined as of the end of each fiscal quarter based on Quarterly Average Undrawn Availability as of such quarter end, commencing with the fiscal quarter ending March 31, 2022. Each change in the Applicable Base Rate Margin and Applicable SOFR Rate Margin shall be effective during the period commencing on the first day of each applicable fiscal quarter and ending on the last day of each applicable fiscal quarter.

"Applicable SOFR Rate Margin" means the applicable margin set forth in the table above under the headings "Revolving Loans Applicable SOFR Rate Margin" or "Term Loan / Term Loan 2 / Term Loan 3 Applicable SOFR Rate Margin", as applicable.

"Asset Acquiring Subsidiary" means a Subsidiary formed for the purpose of acquiring the assets of another entity operating in the freight transportation and logistics business ("Business Acquisition") and (i) which Subsidiary's ownership interest which are owned by a Loan Party shall be pledged to Agent, (ii) which such Subsidiary shall grant first priority perfected Liens in its assets to the Agent, and (iii) which Subsidiary shall become a Borrower according to Section 7.12 and be subject to the requirements of Section 7.12 hereof, provided that, the joinder of such Subsidiary may not be required to be completed contemporaneously with the formation of such Subsidiary as prescribed by Section 7.12 but at a time, or within a time period, following any such Business Acquisition that the Agent may require in its sole discretion.

"Authorized Officer" means a Person's president, chief executive officer, chief financial officer or any other officer approved by Agent in its reasonable discretion.

"Banking Service" means any financial accommodation or credit extended to any Borrower or other Loan Party by any Lender or any affiliate thereof (other than pursuant to this Agreement) including: (i) commercial credit cards, stored value cards (ii) credit card processing services, (iii) debit cards, (iv) purchase cards, (v) cash management, treasury management, administration or related services, including the automated clearing house processing of electronic fund transfers, (vi) controlled disbursement accounts or services, or (vii) return items, overdraft and interstate depository network accounts or services.

"Banking Service Agreement" means each agreement entered into from time to time by any Borrower or any other Loan Party with a Lender or any affiliate thereof in connection with the obtaining of any Banking Service.

"Bankruptcy Event" means, with respect to any Person, such Person or such Person's direct or indirect parent company becoming the subject of a bankruptcy or insolvency proceeding, or having had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark" means, initially, the Daily Simple SOFR; provided that if a Benchmark Transition Event has occurred with respect to Daily Simple SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.10.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Agent and Borrowers giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Agent and Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means a date and time determined by Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) is no longer, or as of a specified future date will no longer be, representative.

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.10 and (b) ending at the time that a Benchmark

Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.10.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefited Lender" shall have the meaning set forth in Section 2.15(d).

"Border" shall have the meaning set forth in the preamble.

"Border Logistics" shall have the meaning set forth in the preamble.

"Borrower" shall have the meaning set forth in the preamble, and singularly, shall include any additional Borrower that becomes party to this Agreement as permitted by Agent in its sole and absolute discretion pursuant to a joinder or similar instrument.

"Borrower Representative" means Express Holdco.

"Borrowers" shall have the meaning set forth in the preamble, and collectively, shall include any additional Borrowers that become party to this Agreement as permitted by Agent in its sole and absolute discretion pursuant to a joinder or similar instrument.

"Borrowing Base" means, in respect of Borrowers at any time of determination, the following:

(a) up to 90% of Borrowers' Eligible Accounts, minus

(b) the aggregate sum of all Reserves then in effect. Notwithstanding anything to the contrary herein, Agent may, in its sole discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in determining the Borrowing Base.

"Borrowing Base Certificate" means a certificate duly executed by an Authorized Officer of the Borrower Representative appropriately completed and in substantially the form of Exhibit A hereto.

"Business Acquisition" shall have the meaning set forth in the definition of Asset Acquiring Subsidiary.

"Business Day" means any day other than a Saturday, a Sunday, or other day on which commercial banks in New York City or Columbus, Ohio are authorized or required to be closed.

"Capital Expenditures" means with respect to any Person for any period determined in accordance with GAAP, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Collateral Account" means, with respect to Borrowers, that certain commercial deposit account maintained at Agent for the purpose of collecting Borrowers' accounts and proceeds of other Collateral, (a) the funds within which shall be the sole and exclusive property of Agent and (b) in respect of which Agent for the benefit of Agent and Lenders shall have the irrevocable and exclusive right to withdraw funds until all of the Obligations are paid, performed, satisfied and enforced in full and the commitments of Agent, Lenders and Issuer to make any Advances hereunder have terminated.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sections 9601 et seq.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Body or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means (a) the Permitted Holder shall cease to own, free and clear of all Liens (other than to Lender), 80% of the outstanding voting equity interests of Express Holdco on a fully diluted basis; (b) Richard S. Francis shall cease to hold a management position with Express Holdco; (c) any merger or consolidation of or with any Loan Party or sale of all or substantially all of the property or assets of any Loan Party (other than the R & R Ownership Restructure); (d) in respect of any Person, the replacement of a majority of the directors or managers who constituted the board of directors or the managing body on the date hereof for any reason other than death or disability, and such replacement shall not have been approved by such board of directors or managing body as constituted on the date hereof, (e) in respect of any Person, such Person shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting equity interests of any existing or future Subsidiary, (f) with respect to AAGEX Group, (x) Mike Williams shall cease to own, free and clear of all Liens or other encumbrances, at least 40% of the outstanding voting equity interest in AAGEX Group or (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interest in AAGEX Group, (g) with respect to TLogistics, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 51% of the outstanding voting equity interest in TLogistics, (h) with respect to American Group, (x) Michael C. Schember and Daniel P. Krivickas, Jr. shall cease to own, free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in American Group and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60%

of the outstanding voting equity interests in American Group, (i) following the Employment Issuance, with respect to Paradigm, Paradigm Management, Final Mile and Final Mile Solutions, (x) John Gallardo shall cease to own, free and clear of all Liens and encumbrances, at least 20% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 80% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solution, (j) following the Employment Issuance, with respect to GT Logistics, (x) Kelly Armstrong shall cease to own, free and clear of all Liens and encumbrances, at least 10% of the outstanding voting equity interests in GT Logistics and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in GT Logistics or (k) with respect to New WLX Holdings (x) John Hein shall cease to own, free and clear of all Liens or encumbrances, at least 20% of the outstanding voting equity interests in New WLX Holdings, (y) Larry Catlett shall cease to own free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in New WLX Holdings, (z) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 70% of the outstanding voting equity interests in New WLX Holdings, (l) with respect to A.M. Transportation, (x) Mission Impossible Software, LLC shall cease to own free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in A.M. Transportation, and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in A. M. Transportation, (m) with respect to RFX, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in RFX, and (y) RFX, Inc. shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in RFX unless Express Holdco's ownership in RFX, Inc. increases by any amount no longer owned by RFX, Inc., (n) with respect to Food Express, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Food Express, (o) with respect to Pioneer, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interest in Pioneer, (y) Kimberly Welby shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in Pioneer unless Express Holdco's ownership in Pioneer increases by any amount no longer owned by Kimberly Welby, (p) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Load to Ride and One Stop, (q) RFX shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interests in RFX Tampa, and (r) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Taylor Transportation.

"Charges" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar Governmental Body, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Loan Party or any of its Affiliates.

"Charter Documents" means, as to any Person (other than a natural person), the charter, certificate or articles of incorporation or organization, by-laws, code of regulations, general or limited partnership agreement, certificate of limited partnership, certificate of formation, operating agreement, and other similar organizational or governing documents of such Person.

"CIP Regulations" shall have the meaning set forth in Section 14.11.

"Closing Date" means March 18, 2022.

"Code" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder.

"Collateral" means all real and personal property owned by any Loan Party, whether now owned or existing, or hereafter arising or acquired or received by such Loan Party, wherever located, including:

(a) all Accounts;

(b) all Inventory;

(c) all Equipment and Fixtures;

(d) all General Intangibles, Payment Intangibles and Intellectual Property;

(e) all Investment Property;

(f) all Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository;

(g) the Pledged Securities;

(h) (i) its Goods and other personal property including all merchandise returned or rejected by Account Debtors, relating to or securing any of the Accounts; (ii) its rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lien or, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to such Loan Party from any Account Debtors relating to the Accounts; (iv) other property, including warranty claims, relating to any Goods; (v) all of such Person's contract rights, rights of payment which have been earned under a contract right, Instruments (including promissory notes), Chattel Paper (including electronic chattel paper), Documents, warehouse receipts, letters of credit, and money; (vi) all Commercial Tort Claims (whether now existing or hereafter arising), including those described on Schedule 4.20 (Commercial Tort Claims) and on any supplement thereto received by Agent pursuant to Section 4.20, all Letter-of-Credit Rights (whether or not such Letter of Credit is evidenced by a writing), and all supporting obligations; (vii) if and when obtained by any Loan Party, all real and personal property of third parties in which such Person has been granted a Lien or security interest as security for the payment or enforcement of Accounts; and (viii) any other goods or personal property, if any, in which such Person may hereafter in writing grant a security interest to Agent or

any Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent or any Lender and any Loan Party;

(i) each Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any such Loan Party or in which it has an interest), computer programs, electronic media, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g) or (h) of this definition of "Collateral"; and

(j) all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h) and (i) of this definition of "Collateral" in whatever form, including: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

Notwithstanding anything to the contrary contained in clauses (a) through (j) above, the security interest created by this Agreement shall not extend to (i) Excluded Property and (ii) the certain 10% ownership interest in a HondaJet Elite HA-420 aircraft held and owned by Equipment Leasing, as evidenced by that certain HondaJet Elite HA-420 Fractional Interest Purchase Agreement executed by Equipment Leasing December 6, 2021.

"Commitment Percentage" of any Lender shall mean any such Lender's percentage of the Aggregate Commitment as set forth on the Commitment Schedule, as it may be update or adjusted pursuant to the terms of this Agreement.

"Commitment Schedule" shall mean the Commitment Schedule attached to this Agreement, as it may be amended from time to time pursuant to the terms of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et. seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a compliance certificate in the form attached as Exhibit D.

"Conforming Changes" means, with respect to either the use or administration of Daily Simple SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.8 and other technical, administrative or operational matters) that Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of

any such rate exists, in such other manner of administration as Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated), or are franchise or branch profits Taxes.

"Consents" means all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business, including any Consents required under all applicable federal, state or other applicable law.

"Consolidated EBITDA" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the sum of (a) net income (or loss) (excluding extraordinary gains), *plus* (b) to the extent deducted in determining such net income (or loss), (i) all interest expense, (ii) all charges against (or *minus* credits to) income for federal, state and local taxes, (iii) depreciation and amortization expense, and (iv) non-cash charges against (or *minus* credits to) income that are approved in writing by Agent in its sole discretion.

"Consolidated Fixed Charge Coverage Ratio" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the ratio of (a) Consolidated EBITDA, *less* the sum of Capital Expenditures (*minus* Capital Expenditures that were specifically funded by Indebtedness or a Capital Lease, other than a Revolving Loan), *less* taxes paid in cash, *less* dividends, distributions, and permitted repurchases of equity interests paid in cash *to* (b) Consolidated Fixed Charges.

"Consolidated Fixed Charges" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the difference between (a) the sum of (i) interest expense, including the interest component of any Capital Lease, *plus* (ii) scheduled principal payments on Indebtedness and Capital Leases, *less* (b) the sum of scheduled net investment in direct financing lease payments.

"Controlled Group" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Person, are treated as a single employer under Section 414 of the Code.

"Corporate Retreat Property" means the Real Property and improvements thereon located at 550 S. Barfield Drive, Marco Island, Florida.

"Corporate Retreat Property Mortgage Facility" means the mortgage facility consisting of (i) a mortgage granted by Express Properties in favor of Huntington with respect to the Corporate Retreat Property, (ii) a mortgage note made by Express Properties and payable to Huntington, (iii) a guaranty made by Richard S. Francis of the obligations owing from Express Properties to Huntington under the mortgage of the Corporate Retreat Property, in form and substance acceptable to Huntington and (iv) an interest rate swap transaction entered into by Express Properties and Huntington as of the closing of the aforementioned mortgage.

"Corporate Retreat Purchase" means the purchase by Express Properties of the Corporate Retreat Property.

"Credit Exposure" shall mean, for any Lender, at any time, the aggregate of such Lender's respective pro rata shares of the Revolving Exposure, the Term Loan Exposure, ~~and~~ the Term Loan 2 Exposure, and the Term Loan 3 Exposure.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to the greater of (a) SOFR for the day (such day, the "SOFR Determination Date") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website, and (b) the Floor. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Date, the SOFR in respect of such SOFR Determination Date has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to Daily Simple SOFR has not occurred, then the SOFR for such SOFR Determination Date will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to Borrowers.

"Default" means an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" means two percent (2%) per annum in excess of the rate of interest or fee rate or percentage applicable to any Obligation from time to time.

"Defaulting Lender" shall have the meaning set forth in Section 2.16 hereof.

"Designated Prepayment" shall have the meaning set forth in Section 2.5(c).

"Dollar" and the sign "$" means lawful money of the United States of America.

"Domestic Rate Loan" means any Loan that bears interest with reference to the Alternate Base Rate.

"Driver Solutions" means R & R Driver Solutions Inc, a Pennsylvania corporation.

"Eligible Accounts" means, those Accounts created by each Borrower in the ordinary course of its business, that arise out of its sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made by Borrowers under the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the criteria set forth below; provided, however, that such criteria may be revised from time to

time by Agent in its Permitted Discretion to address the results of any Collateral monitoring or any field examination performed by Agent or any consultant from time to time. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits and unapplied cash remitted to Borrowers. Without limiting Agent's discretion provided herein, "Eligible Accounts" shall not include any Account:

(a) which is not subject to a first priority perfected security interest in favor of Agent for the benefit of Agent and Lenders;

(b) which is subject to any Lien other than a Permitted Encumbrance that does not have priority over the Lien in favor of Agent for the benefit of Agent and Lenders;

(c) with respect to which (i) is unpaid more than ninety (90) days after the date of the original invoice therefor or more than thirty (30) days after the original due date, whichever is later or (ii) which has been written off the books of such Borrower or otherwise designated as uncollectible. Notwithstanding the foregoing, in no event shall Accounts that remain unpaid more than one hundred twenty (120) days from the date of the original invoice be deemed to be "Eligible Accounts";

(d) which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates to Borrowers are ineligible;

(e) with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true;

(f) which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payment of interest;

(g) for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrower or if such Account was invoiced more than once;

(h) with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i) which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay

its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j) which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(k) which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada (other than Quebec) or (ii) is not organized under applicable law of the U.S., any state of the U.S., Canada, or any province of Canada (other than the province of Quebec), unless, in each case, such Account is insured by credit insurance satisfactory to Agent in its Permitted Discretion;

(l) which is owed in any currency other than Dollars;

(m) which is owed by (i) any Federal, state or local government (or any department, agency, public corporation, or instrumentality thereof) unless (i) such Account is backed by a Letter of Credit acceptable to Agent which is in the possession of Agent, or (ii) with respect to the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) and any other steps necessary to perfect the Lien of Agent in such Account have been complied with to Agent's satisfaction;

(n) which is owed by any Affiliate, employee, officer, director, agent or stockholder of any Loan Party;

(o) which, for any Account Debtor, the aggregate amount of Accounts owed from such Account Debtor exceeds 20% of all Eligible Accounts, to the extent of such excess;

(p) which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor;

(q) which is subject to any counterclaim, deduction, defense, setoff or dispute (a "contra"); provided, however, that unless the Account Debtor has asserted any such contra, if the amount of the account exceeds the amount of the contra, such excess shall be considered for eligibility if such excess is not otherwise excluded by this definition of Eligible Accounts;

(r) which is evidenced by any promissory note, chattel paper, or instrument;

(s) which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Borrower to seek judicial enforcement in such jurisdiction of payment of

such Account ("No Access Jurisdiction"), unless such Borrower has filed such report or is qualified to do business in such No Access Jurisdiction;

(t) with respect to which such Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(u) which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local;

(v) which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Borrower has or has had an ownership interest in such goods, or which indicates any party other than such Borrower as payee or remittance party;

(w) which was created on cash on delivery terms;

(x) which is an Account of Equipment Leasing and/or which was derived from any leasing transaction or which would generate lease company receivables;

(y) which Agent determines may not be paid by reason of the Account Debtor's inability to pay or which Agent otherwise determines is unacceptable for any reason whatsoever.

In the event that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower Representative shall notify Agent thereof within five (5) Business Days. In determining the amount of an Eligible Account, the stated amount of an Account may, in Agent's sole discretion, be reduced by, without duplication, to the extent not reflected in such stated amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any written or oral agreement or understanding) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrower to reduce the amount of such Account.

"Eligible Assignee" shall mean any of the following Persons: (a) a Lender; (b) an Affiliate of a Lender; and (c) any other Person (other than a natural person) approved by (i) Agent, and (ii) in the case of any assignment of a commitment to make Advances hereunder, Issuer; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of such Borrower's Affiliates or Subsidiaries and; provided, further, that, notwithstanding the foregoing, a Person shall only be an "Eligible Assignee" if the assignment to or participation of such Person shall not constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code); provided, further, that, the consent of the Borrower Representative (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender, a well-capitalized

bank, insurance company, or regulated financial institution; provided that the Borrower Representative shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Agent within five (5) Business Days after having received prior notice thereof.

"Employment Issuance" means, the issuance of certain ownership interests, as part of any stock incentive plan set forth in certain compensation and/or employment agreements for the high-level managers of (A) Express Holdco whereby on or about December 31, 2020, Express Holdco, on terms and conditions set forth therein, issued (1) twenty percent (20%) ownership interests to John Gallardo in each of the following entities: Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (2) ten percent (10%) ownership interests to Kelly Armstrong in GT Logistics and (B) the AAGEX Group whereby AAGEX Group will grant incentive ownership units to present and future employees which shall only vest upon satisfaction of certain conditions set forth in such compensation and/or employment agreements and shall otherwise be bound by the terms and restrictions thereof including no voting rights and otherwise in form and substance satisfactory to the Agent in its sole discretion.

"Environmental Authority" means any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(b).

"Environmental Indemnity Agreement" shall mean that certain amended and restated Environmental Indemnity Agreement dated as of the date hereof and delivered by the Loan Parties to and in favor of the Agent.

"Environmental Laws" shall have the meaning set forth in the Environmental Indemnity Agreement.

"Equipment Leasing" means R&R Equipment Leasing, LLC, a Pennsylvania limited liability company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import and the rules and regulations promulgated thereunder as from time to time in effect.

"Erroneous Payment" shall have the meaning set forth in Section 14.12.

"Event of Default" shall have the meaning set forth in Article 10.

"Excluded Property" means specific equipment, accessions and related products and proceeds that are financed as Capital Expenditures by or through a third-party, including but not limited to, Huntington Equipment Finance or other leasing and/or equipment finance departments of the Agent.

"Excluded Swap Obligations" means, with respect to any Guarantor, any Swap Obligation if, and only to the extent that, all or a portion of the Guaranty of such Guarantor of, or

the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of any Lender with respect to an applicable interest in a Loan or commitment pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan or commitment or (ii) a Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to a Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.11(f) and (d) any withholding Taxes imposed pursuant to FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Letters of Credit" means the Letters of Credit listed on Schedule 1.2(c) attached hereto, in each case issued by the Agent.

"Existing Loan Documents" means that certain Amended and Restated Credit and Security Agreement, dated as of December 14, 2018 (as amended prior to the date hereof), by and among certain of the Borrowers and the Agent, together with all loan documents executed and delivered in connection therewith.

"Express" shall have the meaning set forth in the preamble.

"Express Holdco" means R&R Express Holdco, Inc., a Pennsylvania corporation.

"Express Properties" shall have the meaning set forth in the preamble.

"Facility Termination Date" means March 18, 2027.

"Fastport" means Fastport Inc., a Delaware corporation.

"Fastport Pledge Agreement" means that certain amended and restated pledge agreement entered into by the Permitted Holder in favor of the Agent whereby the Permitted Holder pledged all of the ownership interests in Fastport owned by the Permitted Holder to the Agent.

"Fastport Proceeds" means proceeds received by the Permitted Holder in cash or cash equivalent property from the sale or other disposition of all of the ownership interests in Fastport owned by the Permitted Holder.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Bodies and implementing such Sections of the Code.

"Fed Funds Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that, if the Fed Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Fee Letter" means that certain fee letter between Huntington and Borrowers dated as of the date hereof.

"Final Mile" shall have the meaning set forth in the preamble.

"Final Mile Solutions" shall have the meaning set forth in the preamble.

"Financials" means the annual or monthly financial statements, as applicable, of Express and its Subsidiaries delivered pursuant to Sections 9.5 and 9.6 of this Agreement.

"First Amendment Effective Date" means December 30, 2022.

"Food Express" means Refrigerated Food Express, LLC, a Pennsylvania limited liability company.

"Foreign Subsidiary" means any Subsidiary that is not organized or incorporated in the United States or any state or territory thereof.

"Floor" means a per annum rate of interest equal to 0.14%.

"Foreign Lender" means any Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles as promulgated by the United States of America Financial Accounting Standards Board and in effect from time to time.

"Government Receivables" shall have the meaning set forth in the definition of Eligible Accounts.

"Governmental Body" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"GT" shall have the meaning set forth in the preamble.

"GT Logistics" shall have the meaning set forth in the preamble.

"Guarantor" means each Person that executes and delivers a Guaranty to Agent or any Lender in respect of any of the Obligations.

"Guaranty" means any obligation, contingent or otherwise of any Person guaranteeing or having the economic effect of guaranteeing any Indebtedness, liability or other obligation of any other Person (a "primary obligor") in any manner, whether directly or indirectly, and including any obligation of any surety, direct or indirect, (a) to purchase, or pay, or advance or supply funds for the purchase or payment of, such Indebtedness, liability or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, liability or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Discharge" means any release or threat of release of a reportable quantity of any Hazardous Substances.

"Hazardous Substance" means, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" means all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedging Contracts" means any foreign exchange contract, currency swap agreement, futures contract, commodities hedge agreement, interest rate protection agreement, interest rate future agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar

agreement, option agreement or any other similar hedging agreement or arrangement entered into by a Person in the ordinary course of business.

"Hedging Obligations" means all liabilities of a Person under Hedging Contracts.

"Huntington" means Huntington National Bank, a national banking association, in its individual capacity, and its successors.

"Income Tax Distributions" shall have the meaning set forth in Section 7.7.

"Indebtedness" means, with respect to a Person at any date of determination, any and all indebtedness, obligations or liabilities (other than trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness), whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several, of such Person for or in respect of: (a) borrowed money, (b) amounts owing under or liabilities in respect of any note purchase or acceptance credit facility, (c) the undrawn amount in connection with letters of credit and any reimbursement obligation (contingent or otherwise) under any letter of credit, (d) Hedging Obligations, (e) any other transaction (including forward sale or purchase agreements, Capital Leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements, (f) any guaranty of Indebtedness for borrowed money, and (g) all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Intellectual Property" means all now owned or hereafter acquired right, title and interest in trade names, trademarks, trade secrets, service marks, data bases, domain names, software and software systems, including source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, patents, patent applications, patents pending, copyrights, royalties, literary rights, licenses and franchises.

"ISP" shall have the meaning set forth in Section 2.8(b).

"Issuer" shall mean, with respect to any Letter of Credit, the issuer of such Letter of Credit and shall be, with respect to any Letter of Credit hereunder, Huntington, and each of its successors and assigns (in each case, which may be replaced by Agent in its sole discretion).

"Lender" or "Lenders" mean the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder, including any transferee, successor or assign of a Lender. Unless the context otherwise requires, the term "Lender" includes Issuer.

"Lender Default" shall have the meaning set forth in Section 2.16(a).

"Letter of Credit Exposure" means, at any time, the aggregate undrawn amount of all outstanding Letters of Credit *plus* the aggregate amount of all disbursements relating to Letters of Credit that have not been reimbursed by Borrowers.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2.

"Letters of Credit" shall have the meaning set forth in Section 2.7.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any option agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Load to Ride" means Load to Ride Transportation, LLC, a Pennsylvania limited liability company.

"Loan" means each Revolving Loan, the Term Loan, ~~and~~ the Term Loan 2, and the Term Loan 3; and "Loans" shall collectively mean the Revolving Loans, the Term Loan, ~~and~~ the Term Loan 2, and the Term Loan 3.

"Loan Account" shall have the meaning set forth in Section 2.6.

"Loan Documents" means this Agreement, each Note and Letter of Credit, any Guaranty, Fastport Pledge Agreement, security agreement, including any copyright security agreement, patent security agreement, trademark security agreement or domain name security agreement, collateral assignment, pledge agreement, lockbox agreement, account assignment, control agreement, letter of credit application and agreement or other reimbursement agreement, Perfection Certificate, officer's certificate, Waiver, Mortgage, Banking Service Agreement, Hedging Contract, American Group Seller Subordination Agreement, RFX Subordination Agreement, LTR Subordination Agreement, Taylor Transportation Subordination Agreement, any Permitted Business Acquisition Subordination Agreement, any other subordination agreement, intercreditor agreement and any and all other agreements, instruments and documents, including powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Loan Party or Guarantor or delivered to Agent, Issuer or any Lender in connection with this Agreement.

"Loan Party" or "Loan Parties" means, singularly or collectively, as the context may require, Borrowers, any additional Borrower, the Guarantors, or any other Person who becomes a party to this Agreement pursuant to a joinder or similar agreement and their respective successors and assigns.

"Lockbox" means a post office box rented by and in the name of Borrowers as required by this Agreement and as to which only Agent has access pursuant to the requirements of this Agreement.

"LTR Acquisition" means Express Holdco's acquisition of one hundred (100%) of the issued and outstanding membership interests of Load to Ride and One Stop pursuant to the LTR Acquisition Documents.

"LTR Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, effective as of December 30, 2022, by and among Load to Ride Transportation, LLC, a Colorado limited liability company, One Stop Freightways, LLC, a Colorado limited liability company, LTR Seller, Load to Ride, One Stop, and Express Holdco (the "LTR MIPA"), (ii) the LTR Subordinated Note, (iii) the Contribution Agreements (as defined in the LTR MIPA), (iv) the Equipment Transfer Agreement (as defined in the LTR MIPA), (v) the Consulting Agreement for the LTR Seller (as described in the LTR MIPA), and (vi) all other documents and instruments delivered in connection with the LTR Acquisition.

"LTR Seller" means Marc Haney.

"LTR Subordinated Note" means that certain Subordinated Promissory Note, dated as of December 30, 2022 made by Express Holdco in favor of Load to Ride Transportation, LLC, a Colorado limited liability company in the amount of $1,725,000 being a portion of the purchase price in connection with the LTR Acquisition, bearing interest at 4% per annum, having a maturity of 36 months and otherwise payable on terms and conditions acceptable to Agent.

"LTR Subordination Agreement" means that certain Subordination Agreement, dated as of December 30, 2022, among the Agent, Load to Ride Transportation, LLC, a Colorado limited liability company, Load to Ride, One Stop and Express Holdco.

"Material Adverse Effect" means a material adverse effect on (a) the financial condition, results of operations, business or prospects of the applicable Person, (b) any Loan Party's ability to pay the Obligations in accordance with the terms thereof, (c) the value of the Collateral, Lenders' Liens on the Collateral, or the priority of any such Lien, or (d) the practical realization of the benefits of the rights and remedies under the Loan Documents by Agent and Lenders.

"Material Business Agreement" means any agreement that if terminated, rescinded or breached would have a Material Adverse Effect on any Loan Party.

"Maximum Borrowing Amount" means, at any time, in respect of Borrowers an amount equal to the lesser of (a) the Aggregate Revolving Commitment *minus* any Reserves to be taken from the top of the line and (b) the Borrowers' Borrowing Base.

"Mortgage" or "Mortgages" means each mortgage, assignment of rents, deed of trust or other agreement that conveys or evidences a Lien to Agent, for the benefit of the Agent and Lenders, on the Owned Real Property.

"Multiemployer Plan" means a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Net Cash Proceeds" means (i) proceeds received in cash or cash equivalent property from the sale (including without limitation any sale and leaseback), assignment or other disposition of any property, net of (A) the reasonable cash costs approved by Agent of sale,

assignment or other disposition and (B) the amount of any Indebtedness approved by Agent secured by such property permitted by this Agreement; (ii) proceeds of insurance on account of the loss of or damage to any property of such Person, and payments of compensation for any property taken by condemnation or eminent domain; and (iii) proceeds received in cash or cash equivalents from (A) the issuance of any capital stock by such Person, or any other additions to the equity of such Person (other than retained earnings) or any contributions to such capital, or (B) issuance of any Indebtedness by such Person net of reasonable costs approved by Agent incurred in connection with such transaction.

"New WLE" means New WLE, LLC, a Pennsylvania limited liability company.

"New WLX" means New WLX, LLC, a Pennsylvania limited liability company.

"New WLX Holdings" means New WLX Holdings, LLC, a Pennsylvania limited liability company.

"New WLX Holdings Acquisition" means Express Holdco's acquisition of seventy percent (70%) of the issued and outstanding membership interests of New WLX Holdings pursuant to the New WLX Holdings Acquisition Documents.

"New WLX Holdings Acquisition Documents" means, collectively, the (i) Contribution Agreement, dated as of December 31, 2020 by and among WLX, LLC, a Missouri limited liability company, New WLX Holdings, and the other parties party thereto, (ii) Contribution Agreement, dated as of December 31, 2020 by and among WLE, LLC, a Missouri limited liability company, New WLX Holdings, and the other parties party thereto, (iii) Operating Agreement of New WLX Holdings, dated as of December 31, 2020, executed by John Hein, Larry Catlett and Express Holdco, as members, (iv) Single Member Limited Liability Company Operating Agreement of New WLX, dated as of December 31, 2020, executed by New WLX Holdings, as the sole member, (v) Single Member Limited Liability Company Operating Agreement of New WLE, dated as of December 31, 2020, executed by New WLX Holdings, as the sole member, (vi) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and John Hein, (vii) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and Larry Catlett, (viii) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and John O'Toole, and (ix) all other documents and instruments delivered in connection with the New WLX Holdings Acquisition.

"No Access Jurisdiction" shall have the meaning set forth in the definition of Eligible Accounts.

"Non-Consenting Lender" shall have the meaning set forth in Section 15.3(h) hereof.

"Non-Defaulting Lender" shall have the meaning set forth in Section 2.16.

"North Carolina Property" means the Real Property and improvements thereon located at (i) 5523 US 301 Service Rd, Hope Mills, North Carolina, and (ii) 5417 US 301 Service Rd., Hope Mills, North Carolina.

"Note" means each Revolving Note, each Term Loan Note, ~~and~~ each Term Loan 2 Note, and each Term Loan 3 Note; and "Notes" shall collectively mean all such promissory notes.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means any and all loans, advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization, receivership or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document (including any Loan Document), whether or not for the payment of money, (a) owing by the Loan Parties to Lenders, Agent or Issuer or to any other direct or indirect Subsidiary or Affiliate of Lenders, Agent or Issuer pursuant to the terms of the Agreement or the other Loan Documents, (b) owing by the Loan Parties to Agent or any direct or indirect subsidiary or affiliate of Agent arising (i) by reason of an equipment lease or guarantee, (ii) under any Banking Services Agreement, (iii) out of Agent's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, or (iv) under any other agreement between Agent and any Loan Party, or (c) constituting Hedging Obligations (other than, with respect to any Guarantor, the Excluded Hedging Obligations of such Guarantor, if any), in each case, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and any amendments, extensions, renewals or increases and all costs and expenses of Agent, Issuer or any Lender and incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses and all obligations of any Loan Party to Agent, Issuer or any Lender to perform acts or refrain from taking any action. Notwithstanding the foregoing, with respect to any Guarantor, the Obligations shall not include Excluded Swap Obligations in respect of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"One Stop" means One Stop Freightways, LLC, a Pennsylvania limited liability company.

"Original Closing Date" means the closing date of the transaction in connection with the Existing Loan Documents, which date was December 14, 2018.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered,

become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Documents).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Owned Real Property" means all Real Property set forth on Schedule 1.2(a); provided, however that Owned Real Property shall exclude the Corporate Retreat Property.

"Paradigm" shall have the meaning set forth in the preamble.

"Paradigm Management" shall have the meaning set forth in the preamble.

"Payment Office" means initially The Huntington National Bank, 7 Easton Oval, Mail code: EA4W57, Columbus, Ohio 43219; and, thereafter, such other office of Agent, if any, which it may designate by notice to the Borrower Representative and Lenders.

"Perfection Certificate" means the perfection certificate and the responses thereto provided by Borrowers to Agent.

"Permitted Business Acquisition" means, any Business Acquisition made in any fiscal year to the extent that the aggregate consideration paid or to be paid by any of the Loan Parties or Asset Acquiring Subsidiaries when coupled with all other Permitted Business Acquisitions made in such fiscal year does not exceed $2,000,000; provided that, (1) the Loan Parties shall deliver to the Agent prior written notice of the intent to consummate any Permitted Business Acquisition at least ten (10) Business Days before such Permitted Business Acquisition, (2) the minimum ownership interest to be purchased by any Loan Party or Asset Acquiring Subsidiary shall be a least sixty percent (60%) of any such entity being acquired, (3) the Loan Parties shall demonstrate a Consolidated Fixed Charge Coverage Ratio of at least 1.25 to 1.00 for the immediately preceding fiscal quarter prior to such proposed Permitted Business Acquisition, and (4) the Loan Parties shall demonstrate that the average Undrawn Availability of the Loan Parties for the immediately preceding fiscal quarter prior to the proposed Permitted Business Acquisition was not less than fifteen percent (15%) of the Borrowing Base after deducting the proforma purchase price, initial costs and/or payments for any such Permitted Business Acquisition.

"Permitted Business Acquisition Indebtedness" means unsecured subordinated debt in any one fiscal year not to exceed $2,500,000 in the aggregate incurred in connection with any Permitted Business Acquisition, which such debt shall be (i) repayable in not less than five years with interest not greater than the Prime Rate plus three percent (3.00%), (ii) subject to a subordination agreement in form and substance acceptable to the Agent in its sole discretion (a "Permitted Business Acquisition Subordination Agreement"), and (iii) evidenced by a subordinated promissory note with its payment terms conditioned on, among other things, a daily

average Undrawn Availability of at least $2,000,000 for the sixty (60) days prior to each payment and immediately after giving effect to each such payment.

"Permitted Business Acquisition Subordination Agreement" shall have the meaning set forth in the definition of Permitted Business Acquisition Indebtedness.

"Permitted Discretion" shall mean a determination made in good faith and in the exercise (from the perspective of a secured asset-based lender) of commercially reasonable business judgment.

"Permitted Encumbrances" means (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental Charges that (i) are not delinquent or (ii) are being contested in good faith by appropriate proceedings that stay the enforcement of such Liens and with respect to which proper reserves have been taken by the Loan Parties in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of Agent for the benefit of Agent and Lenders and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of any Loan Party's business; (e) mechanics, workers, materialmen's, warehousemen's, common carriers, landlord's or other like Liens arising in the ordinary course of any Loan Party's business with respect to obligations which are not due or which are being contested in good faith by the applicable Loan Party; (f) Liens placed upon equipment and real estate assets acquired to secure a portion of the purchase price thereof including Liens for any such equipment and assets that are subject to specific equipment financing by a third party but which were initially purchased from proceeds of an Advance made hereunder, which purchase was subsequently reimbursed by the proceeds of the specific equipment financing, provided that (i) any such Lien shall not encumber any other property of the Loan Parties other than insurance and other proceeds of such equipment and real estate and (ii) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; (g) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the use of such Real Property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (h) attachment and judgment liens which do not constitute an Event of Default under Section 10.7; and (i) Liens disclosed on Schedule 1.2(b) provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien.

"Permitted Holder" means Richard S. Francis, or any trusts for the benefit of Richard S. Francis or the members of his immediate family so long as Richard S. Francis is the named trustee and remains the trustee of any such trust.

"Permitted Holder Note" means, collectively, (i) that certain Note, dated December 31, 2016 made by the Permitted Holder in favor of Express in the original principal amount of

$1,011,158.00 and (ii) that certain Note, dated December 31, 2016, made by the Permitted Holder in favor of Express in the original principal amount of $770,658.00.

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or Governmental Body.

"Pioneer" means Pioneer Transfer, LLC, a Pennsylvania limited liability company.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Loan Parties or any member of the Controlled Group or any such Plan to which any Loan Party or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledged Securities" means all of the equity interest of a Subsidiary of a Loan Party owned by a Loan Party and certain equity interests of each such Subsidiary owned by a non-Loan Party as more fully set forth on Schedule 5.3, whether now owned or hereafter acquired or created, and all proceeds thereof; provided that Pledged Securities shall exclude equity interests in any foreign Subsidiary in excess of sixty-five percent (65%) of the total outstanding shares of voting capital stock or other voting equity interest of such foreign Subsidiary. (Schedule 5.3 hereto lists, as of the Closing Date and as of the effective date of any amendment to this Agreement updating the same as the Agent may permit, all of the Pledged Securities.)

"Prime Rate" means the rate of interest publicly announced from time to time by Agent as its "prime rate", which rate may not be the lowest or most favorable rate then being charged commercial borrowers or others by Agent. Any change in the Prime Rate announced by Agent shall take effect at the opening of business on the day specified in the public announcement of such change. Notwithstanding the foregoing, if the Prime Rate shall be less than the Floor, such rate shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"PTL Seller" means Pioneer Transfer, LLC, a Delaware limited liability company.

"Quarterly Average Undrawn Availability" shall mean for any fiscal quarter of the Borrowers, an amount equal to the average daily Undrawn Availability during such fiscal quarter as determined by the Agent's loan reporting system.

"R&R Logistics" shall have the meaning set forth in the preamble.

"Real Property" means all real property, both owned and leased, of any Loan Party.

"RCRA" means the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 *et. seq.*

"Recipient" means Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document.

"Register" has the meaning specified in Section 15.3(c).

"Relevant Governmental Body" means the Federal Reserve Board or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board or the NYFRB, or any successor thereto.

"Required Lenders" shall mean, any of Lenders (other than Defaulting Lenders) holding at least 51% based on each Lender's Commitment Percentage, of (a) prior to the Facility Termination Date, the Aggregate Commitment, and (b) after the Facility Termination Date, the Aggregate Credit Exposure; provided that, as long as there are only two Lenders (that are not Defaulting Lenders), Required Lenders shall mean both Lenders (that are not Defaulting Lenders); provided further that, if there are greater than two Lenders (that are not Defaulting Lenders), at least two Lenders (that are not Defaulting Lenders) shall be needed to constitute Required Lenders.

"Reserves" means any and all reserves which Agent deems necessary, in its Permitted Discretion, to maintain, including, without limitation, reserves for accrued and unpaid interest and principal on the Obligations, dilution reserves, availability blockage to reserve for the payment of expenses in connection with the Collateral or any disposition thereof, reserves for any Banking Services, Letters of Credit, or Hedging Contracts, including any "mark-to-market" in connection therewith, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, price adjustments, returned inventory, slow moving inventory, market fluctuations in the value of inventory, reserves for inventory shrinkage, reserves for customs charges and shipping charges related to any inventory in transit, reserves for the creditworthiness of any Account Debtor, reserves for dilution of Accounts, reserves for Indebtedness of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for payroll, taxes, fees, assessments, and other governmental charges with respect to the Collateral or any Loan Party, and any environmental remediation costs or expenses.

"Revolving Commitment" means the commitment of each Lender to make Revolving Loans and to issue Letters of Credit, as such commitment may be reduced pursuant the terms of this Agreement.

"Revolving Exposure" shall mean, for any Lender, at any time, the aggregate of such Lender's respective outstanding principal amount of Revolving Loans and Letter of Credit Exposure at such time.

"Revolving Loan" means a loan made pursuant to Section 2.1.

"Revolving Note" or "Revolving Notes" means, singularly or collectively, as the context may require, the promissory notes referred to in Section 2.1.

"RFS Seller" means Refrigerated Food Express, Inc., an Ohio corporation.

"RFX" means RFX, LLC, a Pennsylvania limited liability company.

"RFX Acquisition" means Express Holdco's acquisition of (1) ninety percent (90%) of the issued and outstanding membership interests of RFX, (2) ninety percent (90%) of the issued

and outstanding membership interests of Pioneer, and (3) one hundred (100%) of the issued and outstanding membership interests of Food Express pursuant to the RFX Acquisition Documents.

"RFX Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, dated as of January 31, 2022, by and among RFX Seller, PTL Seller, RFS Seller, the sole shareholder of RFX Seller set forth on the signature pages thereto, RFX, and Express Holdco, (ii) Bill of Sale and Assignment and Assumption Agreement, dated as of January 31, 2022, by and among RFX Seller, PTL Seller, RFS Seller, the shareholders of RFX Seller set forth on the signature pages thereto, RFX, and Express Holdco, (iii) Operating Agreement, effective as of January 31, 2022, between RFX Seller and Express Holdco, (iv) Operating Agreement, effective as of January 31, 2022, between PTL Seller and Express Holdco, (v) Single Member Limited Liability Company Operating Agreement of Food Express, effective as of January 31, 2022, adopted by RFX, as the sole member of Food Express, (vi) Contribution Agreement, dated as of January 31, 2022, between RFX Seller, RFX and Express Holdco, (vii) Contribution Agreement, dated as of January 31, 2022, between PTL Seller, Pioneer and Express Holdco, (viii) Contribution Agreement, dated as of January 31, 2022, between RFS Seller, Food Express and Express Holdco, (ix) Consulting Agreement, dated as of January 31, 2022, between RFX and Kimberly Welby, (x) Employment Agreement, dated as of January 31, 2022, between RFX and Shirley Bellavance, (xi) Employment Agreement, dated as of January 31, 2022, between RFX and Jennifer Finnemore, (xii) Executive Employment Agreement, date as of January 31, 2022, between RFX and Nate Lourie, (xiii) Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer, and (xiv) all other documents and instruments delivered in connection with the RFX Acquisition.

"RFX Seller" means RFX, Inc., a Massachusetts corporation.

"RFX Subordinated Note" means that certain Subordinated Promissory Note, dated as of January 31, 2022 made by Express Holdco in favor of RFX Seller in the amount of $1,000,000 being a portion of the purchase price in connection with the RFX Acquisition payable on terms acceptable to Agent.

"RFX Subordination Agreement" means that certain Subordination Agreement, dated as of January 31, 2022, among the Agent, RFX Seller, and Express Holdco.

"RxG&A" means RxG&A, LLC, a Pennsylvania limited liability company.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union and any member state thereof, His Majesty's Treasury or any other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned directly or indirectly by any such Person or Persons described in clauses (a) and (b), or (d) any Person otherwise the subject or target of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC, the U.S. Department of State or the U.S. Department of Commerce), the United Nations Security Council, the European Union and any member state thereof, His Majesty's Treasury or any other relevant sanctions authority.

"Settlement Date" means one or more Business Days of each week as selected by Agent in its reasonable discretion.

"Seventh Amendment Effective Date" means August 30, 2024.

"Sixth Amendment Effective Date" means July 31, 2024.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Loan" means any Loan that bears interest based on the Daily Simple SOFR.

"Subchapter S" means subchapter S of the Code.

"Subsidiary" means a corporation or other entity of whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Swap Obligation" means, with respect to any Guarantor, any obligation of any Person to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section la(47) of the Commodity Exchange Act between any Lender and one or more Swap Counterparties.

"Taylor Transportation" means New Taylor Transportation, LLC, a Pennsylvania limited liability company.

"Taylor Transportation Acquisition" means (i) Express Holdco's acquisition of one hundred (100%) of the business assets of Taylor Transportation, Inc., a Delaware corporation,

pursuant to the Taylor Transportation Acquisition Documents, which such assets are to be held by Express Holdco's newly formed subsidiary, Taylor Transportation, and (ii) Equipment Leasing's acquisition of certain rolling stock and all of the business equipment of Taylor Equipment Leasing LLC.

"Taylor Transportation Acquisition Documents" means, collectively, (i) the Asset Purchase Agreement, effective as of March 31, 2023, among Taylor Transportation, Inc. and Taylor Equipment Leasing LLC, as the seller and Express Holdco and Equipment Leasing, as the buyers, and the other parties thereto, (ii) the Taylor Transportation Subordinated Note, (iii) Bill of Sale and Assignment and Assumption Agreement-Assets, dated as March 31, 2023 among Taylor Transportation, Inc, and Express Holdco, (iv) Bill of Sale and Assignment and Assumption Agreement – Equipment, dated as of March 31, 2023, among Taylor Equipment Leasing LLC and Equipment Leasing, (v) Assignment and Assumption of Contracts, dated as of March 31, 2023, by and among Taylor Transportation, Inc. and Express Holdco, (vi) the Taylor Transportation Contribution Agreement, and (vii) all other documents and instruments delivered in connection with the Taylor Transportation Acquisition.

"Taylor Transportation Contribution Agreement" means, that certain Contribution Agreement entered into by Express Holdco and Taylor Transportation, whereby Express Holdco will transfer the assets purchased pursuant to the Taylor Transportation Acquisition to Taylor Transportation in exchange for all of the membership interests of Taylor Transportation.

"Taylor Transportation Subordinated Note" means that certain Subordinated Promissory Note, dated as of March 31, 2023 made by Express Holdco in favor of Taylor Transportation, Inc., a Delaware corporation in the amount of $2,500,000 being a portion of the purchase price in connection with the Taylor Transportation Acquisition, bearing interest at (i) 3% per annum in the first year and (ii) 9% annum in the second year, having a maturity of 24 months and otherwise payable on terms and conditions acceptable to Agent.

"Taylor Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of June 23, 2023, among the Agent, Taylor Transportation, Inc., a Delaware corporation and Express Holdco.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"Tennessee Property" means the Real Property and improvements thereon located at 1419 North 5th Street, Union City, Obion County, Tennessee.

"Term Loan" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(b).

"Term Loan Commitment" means the commitment of each Lender to make its portion of the Term Loan on the Closing Date as set forth on the Commitment Schedule.

"Term Loan Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan.

"Term Loan Note" shall have the meaning set forth in Section 2.10(b)(i).

"Term Loan 2" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(c).

"Term Loan 2 Commitment" means the commitment of each Lender to make its portion of the Term Loan 2 on the Sixth Amendment Effective Date as set forth on the Commitment Schedule.

"Term Loan 2 Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan 2.

"Term Loan 2 Note" shall have the meaning set forth in Section 2.10(c)(i).

"Term Loan 3" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(d).

"Term Loan 3 Commitment" means the commitment of each Lender to make its portion of the Term Loan 3 on the Seventh Amendment Effective Date as set forth on the Commitment Schedule.

"Term Loan 3 Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan 3.

"Term Loan 3 Note" shall have the meaning set forth in Section 2.10(d)(i).

"TLogistics" means TLogistics, LLC, a Pennsylvania limited liability company.

"Toxic Substances" means any material present on the Real Property which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. Sections 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances, and includes asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Transferee" shall have the meaning set forth in Section 15.15.

"TUI Commission Rights Purchase Agreement" means that certain Commission Rights Purchase Agreement, dated as of January 1, 2023, by and between Transport Unlimited, Inc., a Pennsylvania corporation ("TUI") and Express Holdco, as buyer, whereby TUI will sell and assign to Express Holdco the rights of TUI to the Purchased Commission Rights (as defined therein), subject to the terms and conditions set forth therein.

"UCP" shall have the meaning set forth in Section 2.8(b).

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Undrawn Availability" means, as of any date of determination, an amount equal to (a) the Maximum Borrowing Amount, *minus* (b) the sum of (i) the Aggregate Revolving Exposure, *plus* (ii) all amounts due and owing to each Borrower's trade creditors which are outstanding sixty (60) days or more beyond the due date (without duplication with respect to any such amount deducted from the Borrowing Base), *plus* (iii) fees and expenses for which each Borrower is liable but which have not been paid or charged to the Loan Account.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest or Lien in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Pennsylvania, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Waiver" means, collectively, any landlord's waiver, warehouseman's waiver, bailee's waiver, creditor's waiver, mortgagee waiver, processor waiver, customs broker waiver, and any similar waiver, executed and delivered in connection with this Agreement, in form and substance satisfactory to Agent.

"Week" means the time period commencing on Monday and ending on Friday of each calendar week.

1.3 **Uniform Commercial Code Terms.** All terms used herein and defined in the Uniform Commercial Code as adopted in the Commonwealth of Pennsylvania from time to time shall have the meaning given therein unless otherwise defined herein. Such terms shall include: "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Deposit Account", "Document", "Equipment", "Farm Products", "Financial Asset", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Investment Property", "Lease", "Lessor", "Letter-of-Credit Rights", "money", "Payment Intangibles", "Proceeds", "Record", "Secured Party", "Securities Account", "Security", "Security Entitlement", "Security Interest" and "Supporting Obligation". To the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the

Uniform Commercial Code, such expanded definition will apply automatically as of the effective date of such amendment, modification or revision.

1.4 **General Matters of Construction.** For the purpose of computing periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". Unless the context otherwise expressly requires, (a) all references to laws, statutes and regulations shall include any amendments, renewals, extensions, replacements, or successor laws, statutes or regulations, (b) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, restated, supplemented or otherwise modified, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns, (d) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not any particular provision hereof, (e) any reference to payment, repayment, or prepayment shall be construed as referring to payment of immediately available funds in Dollars, (f) any reference to any Loan Document means, unless the context expressly states otherwise, such Loan Document in form and substance satisfactory to Agent, (g) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (h) the word "will" shall be construed to have the same meaning and effect as the word "shall", (i) wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa, and (j) captions used in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

1.5 **Time References.** All the references in the Loan Documents are to Columbus, Ohio time.

1.6 **Lease Accounting Changes**. If there occurs after the Original Closing Date any change in GAAP resulting from the implementation of Financial Accounting Standards Update Board Accounting Standards Topic 842 (Leases) that affects in any respect the calculation of any covenant contained in this Agreement or the definition of any term defined under GAAP used in such calculations, Agent and Borrower Representative shall negotiate in good faith to amend the provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of the parties after such change in GAAP conform as nearly as possible to their respective positions as of the Closing Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and Borrowers shall provide additional financial statements or supplements thereto, attachments to compliance certificates and/or calculations regarding financial covenants as Agent may reasonably require in order to provide the appropriate financial information required hereunder with respect to Borrowers both reflecting any applicable changes in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP. Notwithstanding the foregoing, if Agent and Borrower Representative are unable to agree on appropriate amendments within one year after the effective date of the changes in Financial Accounting Standards Update Board Accounting Standards Topic 842 (Leases), then all covenant calculations and definitions shall thereafter be computed in accordance with GAAP as so changed.

1.7 **Rates**. Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Alternate Base Rate or Daily Simple SOFR, or any component definition thereof or rates referred to in the definition thereof or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate, Daily Simple SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, Daily Simple SOFR or any other Benchmark or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error by, or any calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE 2
## ADVANCES, PAYMENTS

2.1 **Revolving Loans.** Subject to the terms and conditions set forth in this Agreement, Lenders, severally and not jointly, will make Revolving Loans to Borrowers in aggregate amounts outstanding at any time prior to the Facility Termination Date equal to such Lender's pro rata share of the Maximum Borrowing Amount *less* such Lender's Commitment Percentage of Letter of Credit Exposure. All Revolving Loans shall bear interest as a SOFR Rate Loan until Borrowers elect to convert them to Domestic Rate Loans in accordance with Section 2.2(b). Revolving Loans shall be evidenced by a Revolving Note substantially in the form attached as Exhibit B.

2.2 **Procedure for Borrowing Advances.**

(a) The Borrower Representative shall notify Agent in writing prior to 1:00 p.m. on a Business Day of Borrowers' request to incur, on such day, a Revolving Loan. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or any Lender, or with respect to any other Obligation, become due, the same shall be deemed a request for a Revolving Loan charged to the Loan Account as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent, Issuer or any Lender, and such request shall be irrevocable.

(b) Borrower Representative may elect to convert all of the Loans to Domestic Rate Loans (or SOFR Rate Loans if they are Domestic Rate Loans) by providing irrevocable notice to Agent. Each such notice shall be in form and substance satisfactory to Agent in its Permitted Discretion, appropriately completed and signed by an

Authorized Officer of each Borrower and must be received by Agent at least one (1) Business Day prior to the effective day of such request.

2.3 **Disbursement of Loan Proceeds.** All Loans shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent and Lenders, shall be charged to the Loan Account on Agent's books. During the term of this Agreement, Borrowers may use the Revolving Loans by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Loan requested by Borrowers or deemed to have been requested by Borrowers under Section 2.2(a), with respect to requested Revolving Loans to the extent Lenders make such Revolving Loans, shall be made available to Borrowers on the day so requested by way of credit to Borrowers' operating account at Huntington, in immediately available federal funds or other immediately available funds or, with respect to Revolving Loans deemed to have been requested by Borrowers, shall be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4 **Repayment of Loans.** The Loans shall be due and payable in full on the Facility Termination Date subject to earlier prepayment as herein provided.

(a) Any Account Debtor payment with respect to Accounts which is evidenced by a check, note, draft, automated clearing house transfer, electronic transfer, or any other similar item of payment may not be immediately collectible. In calculating availability, Borrowers agree that any such item of payment will be deemed to have been received by Agent and will be provisionally credited to the Loan Account by Agent on the Business Day immediately following the day on which Agent has actual possession of such item of payment for deposit to the Cash Collateral Account. In consideration of Agent's agreement for provisional crediting of items of payment, Borrowers agree that, in calculating interest and other charges on the Obligations, all Account Debtor payments will be treated as having been credited to the Loan Account on the second Business Day immediately following the Business Day on which such payments are deemed to have been received by Agent pursuant to this paragraph.

(b) Agent shall not be required to credit the Loan Account for the amount of any item of payment or other payment which is unsatisfactory to Agent. All credits shall be provisional, subject to verification and final settlement. Agent may charge the Loan Account for the amount of any item of payment or other payment which is returned to Agent unpaid or otherwise not collected. Borrowers agree that any information and data reported to Borrowers pursuant to any service which is received prior to final posting and confirmation is subject to correction and is not to be construed as final posting information. Agent and Lenders shall have no liability for the content of such preliminary service related information.

(c) All payments of principal, interest and other amounts payable hereunder, or under any of the other Loan Documents shall be made to Agent at the Payment Office not later than 11:00 a.m. Ohio time on the due date in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall

have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Loan Account or by making Advances as provided in Section 2.2.

(d) Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any other Loan Document, without any deduction whatsoever, including any deduction for any setoff or counterclaim.

2.5 **Mandatory Reduction or Prepayment of Loans.**

(a) If at any time the Aggregate Revolving Exposure exceeds the Maximum Borrowing Amount, then Borrowers shall immediately pay to Agent such difference, and such difference shall be immediately due and payable at the Payment Office and shall be applied to the Revolving Loan.

(b) Immediately after the receipt by any Borrower of any Net Cash Proceeds, Borrowers shall make or cause to be made a mandatory prepayment of the Loans in an amount equal to 100% of such Net Cash Proceeds.

(c) Immediately after the receipt by the Permitted Holder of any Fastport Proceeds, Borrowers shall cause the Permitted Holder to make a mandatory prepayment with respect to the aggregate outstanding amount due under the Permitted Holder Note and the Borrowers shall make or cause to be made a mandatory prepayment of the Loans in an amount not to exceed the aggregate outstanding amount due under the Permitted Holder Note.

(d) Nothing in this Section 2.5 shall be construed to constitute Agent's or any Lender's consent to any transaction not otherwise expressly permitted by Article 7. On the date any mandatory prepayment is received by Agent pursuant to clause (b) above (each such payment being a "Designated Prepayment"), such Designated Prepayment shall be allocated and applied, in the sole discretion of Agent to the repayment of any Loan. Each Designated Prepayment which is applied to the Term Loan ~~or~~, the Term Loan 2 or the Term Loan 3 shall be applied in inverse order of maturing installments.

2.6 **Statement of Account.** Agent shall maintain, in accordance with its customary procedures, a loan account ("Loan Account") in the name of Borrowers in which shall be recorded, among other things, the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender.

2.7 **Letters of Credit.** Subject to the terms and conditions hereof, Issuer shall (a) issue letters of credit (together with the Existing Letters of Credit, collectively, "Letters of Credit") for the account of Borrowers; provided, however, that Issuer will not be required to issue any Letters of Credit to the extent that the stated amount of such Letters of Credit would then cause the Revolving Exposure of Borrowers to exceed the Maximum Borrowing Amount. The maximum stated amount of Letters of Credit outstanding shall not exceed $2,000,000 in the aggregate at any time. Each drawing under any Letter of Credit shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

2.8 **Issuance of Letters of Credit.**

(a) The Borrower Representative may request Issuer to issue a Letter of Credit by delivering to Issuer at the Payment Office Issuer's form of application and agreement for letter of credit, completed to the satisfaction of Issuer, and such other certificates, documents and other papers and information as Issuer may reasonably request no later than 1:00 p.m. Ohio time at least five (5) Business Days' prior to the date of such proposed issuance.

(b) Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts or other forms of written demand for payment or, acceptances of issued drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than the earlier of one (1) year from the date of issuance or five (5) Business Days prior to the Facility Termination Date. Each trade Letter of Credit shall be subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600, and any amendments or revisions thereof adhered to by Issuer (the "UCP"). Each standby Letter of Credit shall be subject to the International Standby Practices (1998), International Chamber of Commerce Publication 590 and any amendments or revisions thereof adhered to by Issuer (the "ISP") or the UCP, as determined by Issuer. Each Letter of Credit shall be governed, to the extent not inconsistent with the UCP or the ISP, as applicable, by the laws of the Commonwealth of Pennsylvania.

(c) Issuer shall have sole discretion whether to accept any draft. Without in any way limiting Issuer's sole discretion whether to accept any draft, no draft may be presented for acceptance, and Issuer will generally not accept any drafts (i) that arise out of transactions involving the sale of goods by applicable Borrower not in the ordinary course of its business, (ii) that involve a sale to an Affiliate of any Borrower, (iii) that involve any purchase for which Issuer has not received all related documents, instruments and forms requested by Issuer, or (iv) that is not eligible for discounting with Federal Reserve Banks pursuant to paragraph 7 of Section 13 of the Federal Reserve Act, as amended.

(d) Issuer shall notify Agent and Lenders of the request by Borrower Representative for a Letter of Credit hereunder within a reasonable time after receiving such request.

(e) Notwithstanding any term, provision, condition or covenant contained herein, while an Event of Default exists, Issuer shall not be required to issue, and Borrowers shall not be entitled to request the issuance of, a Letter of Credit.

(f) All Existing Letters of Credit shall be deemed to have been issued pursuant hereto and shall be subject to and governed by the terms and conditions hereof.

2.9 **Requirements For Issuance of Letters of Credit.**

(a) In connection with the issuance of any Letter of Credit, Borrowers shall indemnify, save and hold Agent, Issuer and each Lender harmless from any loss, cost, expense or liability, including payments made by Agent, Issuer and Lenders and expenses and reasonable attorneys' fees incurred by Agent, Issuer and Lenders arising out of, or in connection with, any Letter of Credit to be issued or created for any Borrower. Borrowers shall be bound by Agent's and Issuer's regulations and good faith interpretations of any Letter of Credit issued or created to the Loan Account, although this interpretation may be different from its own; and, neither Agent, nor any Lender, nor Issuer, nor any of their correspondents shall be liable for any error, negligence, or mistakes, whether of omission or commission, in following any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments or supplements thereto or in issuing or paying any Letter of Credit.

(b) Borrowers shall authorize and direct Issuer to deliver to Agent all instruments, documents, and other writings and property received by Issuer pursuant to the Letter of Credit and to accept and rely upon Agent’s instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance therefor.

(c) In connection with all Letters of Credit issued by Issuer under this Agreement, Borrowers hereby appoint Issuer, or its designee, as their attorney, with full power and authority upon the occurrence of an Event of Default or Default, (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the U.S. Customs Department in the name of such Borrower or Issuer or Issuer's designee, and to sign and deliver to officials of such customs department powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's name or Issuer's, or in the name of Issuer's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Issuer nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

(d) Each Lender shall to the extent of the amount equal to the product of such Lender’s Commitment Percentage *multiplied by* the aggregate amount of all unpaid reimbursement obligations arising from disbursements made or obligations incurred with respect to the Letters of Credit be deemed to have irrevocably purchased an undivided participation in each such unpaid reimbursement obligation. In the event that at the time a disbursement is made the unpaid balance of Advances exceeds or would exceed, with the making of such disbursement, the Maximum Borrowing Amount, and such disbursement is not reimbursed by Borrowers within two (2) Business Days, Agent shall promptly notify each Lender and upon Agent’s demand each Lender shall pay to Agent such Lender’s proportionate share of such unpaid disbursement together with such Lender’s proportionate share of Agent’s reasonable unreimbursed costs and expenses

relating to such disbursement. In the event Issuer makes a disbursement in respect of a Letter of Credit, each Lender shall pay to such Issuer, upon such Issuer's demand, such Lender's proportionate share of such disbursement together with such Lender's proportionate share of such Issuer's reasonable unreimbursed costs and expenses relating to such disbursement. Upon receipt by Agent of a repayment from any Borrower of any amount disbursed by Agent for which Agent had already been reimbursed by Lenders, Agent shall deliver to each Lender that Lender's pro rata share of such repayment. Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (ii) no Letter of Credit issued hereunder remains outstanding and uncancelled or (iii) all Persons (other than the applicable Borrower) have been fully reimbursed for all payments made under or relating to Letters of Credit.

(e) Immediately upon the request of Agent, (i) after the occurrence of a Default or an Event of Default, or (ii) any Letter of Credit remains outstanding after five (5) Business Days prior to the Facility Termination Date, in each such case, Borrowers will deposit and maintain in an account with Agent in cash, as cash collateral, in an amount equal to one hundred five percent (105%) of the amount of outstanding Letters of Credit. In each case, Borrowers hereby irrevocably authorizes Agent, in its sole discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits in such account or in an account opened by Borrowers, in any amount required to be made by Borrowers, out of the proceeds of Accounts or other Collateral, from an Advance, or out of any other funds of any Borrower coming into Agent's or any Lender's possession at any time. Any net return on such cash or investments shall be credited to such account and constitute additional cash collateral. Borrowers may not withdraw any amount credited to any such account except upon payment and performance in full of all Obligations and termination of this Agreement.

2.10 **Term Loans.**

(a) Existing Term Loan. As of the Original Closing Date, Huntington, as lender, under the Existing Loan Documents ("Existing Lender") made a term loan to the Borrowers in accordance with its term loan commitment set forth in the Existing Loan Documents (the "Existing Term Loan"). The Existing Term Loan was made in the aggregate principal amount of $4,200,000. On the Closing Date the Existing Term Loan will be repaid in full by the Borrowers with the proceeds of the Term Loan.

(b) Closing Date Term Loan.

(i) Amount of the Closing Date Term Loan. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan") to Borrowers on the Closing Date, in an amount equal to such Lender's Term Loan Commitment and otherwise in accordance with Section 2.10(b)(ii). The Term Loan shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan shall be evidenced

by a secured promissory note (the "Term Loan Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan Draws. The Lenders shall make the amount of the Term Loan available to the Borrowers on the Closing Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan shall amortize in sixty (60) equal consecutive monthly installments. Each of the first sixty (60) installments of principal shall be in an amount equal to $17,500.00 and shall be payable on the first day of each calendar month, commencing on April 1, 2022. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan, fixed monthly installments of principal shall be due in the amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

(c) Term Loan 2.

(i) Amount of the Term Loan 2. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan 2") to Borrowers on the Sixth Amendment Effective Date, in an amount equal to such Lender's Term Loan 2 Commitment and otherwise in accordance with Section 2.10(c)(ii). The Term Loan 2 shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan 2 shall be evidenced by a secured promissory note (the "Term Loan 2 Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan 2 Draws. The Lenders shall make the amount of the Term Loan 2 available to the Borrowers on the Sixth Amendment Effective Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan 2 shall amortize in two hundred and forty (240) equal consecutive monthly installments. Each of the installments of principal shall be in an amount equal to $4,050.00 and shall be payable on the first day of each calendar month, commencing on September 1, 2024. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan 2 and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan 2 may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan 2, fixed monthly installments of principal shall be due in the

amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

(d) Term Loan 3.

(i) Amount of the Term Loan 3. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan 3") to Borrowers on the Seventh Amendment Effective Date, in an amount equal to such Lender's Term Loan 3 Commitment and otherwise in accordance with Section 2.10(d)(ii). The Term Loan 3 shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan 3 shall be evidenced by a secured promissory note (the "Term Loan 3 Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan 3 Draws. The Lenders shall make the amount of the Term Loan 3 available to the Borrowers on the Seventh Amendment Effective Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan 3 shall amortize in two hundred and forty (240) equal consecutive monthly installments. Each of the installments of principal shall be in an amount equal to $2,166.67 and shall be payable on the first day of each calendar month, commencing on October 1, 2024. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan 3 and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan 3 may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan 3, fixed monthly installments of principal shall be due in the amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

2.11 **Additional Payments.** Any sums reasonably expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under any Loan Document, including such Borrower's obligations under Sections 2.7, 4.2, 4.3, 4.4, 4.12, 4.13, 6.7 and 15.9 may be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

2.12 **Use of Proceeds**. Borrowers shall apply the proceeds of Advances and the other Loans (a) to repay existing Indebtedness owed to existing lenders, (b) to pay fees and expenses relating to the transaction contemplated by this Agreement, (c) for lawful corporate purposes, (d) to provide for working capital needs, (e) with respect to the Term Loan, to refinance the Existing Term Loan, (f) with respect to the Revolving Loans, to provide for all or a portion of the purchase price or consideration for any Permitted Business Acquisition, (g) with respect to the Revolving

Loans, to finance the 2022 Real Estate Purchase, so long as the conditions to such purchase set forth herein have been satisfied, (h) with respect to the Revolving Loans, to provide for all or a portion of the purchase price in connection with the LTR Acquisition and the Taylor Transportation Acquisition, (i) with respect to the Revolving Loans, to provide a portion of the purchase price in an amount not to exceed $2,000,000 in connection with the Corporate Retreat Purchase, and (j) with respect to the Term Loan 2, to provide a portion of the purchase price for the purchase of the North Carolina Property, and (k) with respect to the Term Loan 3, to provide a portion of the purchase price for the purchase of the Tennessee Property.

Borrowers will not request any Loan or Letter of Credit, and Borrowers shall not use, and shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

2.13 **Joint and Several Obligations of Loan Parties.**

(a) Each Loan Party acknowledges and agrees that Agent, Issuer and each Lender is entering into this Agreement at the request of each Loan Party and with the understanding that each Loan Party is and shall remain fully liable, jointly and severally, for payment in full of the Loans, Advances and other credit extensions under this Agreement or any Loan Document. Each Loan Party further agrees that it is receiving or will receive a direct or indirect pecuniary benefit for any Loan, Advance and other credit extension made pursuant to this Agreement or the Loan Documents. Anything in this Agreement or any other Loan Document to the contrary notwithstanding, in no event shall the maximum liability of any Loan Party exceed the maximum amount that (after giving effect to the incurrence of the obligations hereunder and to any rights to contribution or other rights of such Loan Party from such other Loan Party) would not render the rights to payment of Agent, Issuer and Lenders hereunder void, voidable or avoidable under any applicable fraudulent transfer law or conveyance law.

(c) In the event that any obligation of any Loan Party under this Agreement or any Loan Document is deemed to be an agreement by such Loan Party to answer for the debt or default of another Loan Party or as an accommodation maker or hypothecation of property as security therefor, each Loan Party represents and warrants that (i) no representation has been made to such Loan Party as to the creditworthiness of such other Loan Party, and (ii) such Loan Party has established adequate means of obtaining from such other Loan Party on a continuing basis, financial or other information pertaining to such other Loan Party's financial condition. Each Loan Party expressly waives, except as expressly required under this Agreement, diligence, demand, presentment, protest and notice of every kind and nature whatsoever, consents to the taking by Agent of any additional security of another Loan Party for the Obligations, or the alteration or release in any manner of any security of another Loan Party now or hereafter held in connection with the Obligations, and consents that Agent, Issuer and Lenders and any other Loan

Party may deal with each other in connection with such Obligations or otherwise, or alter any contracts now or hereafter existing between them, in any manner whatsoever, including without limitation the renewal, extension, acceleration or changes in time for payment of any such obligations or in the terms or conditions of any security held. Agent, Issuer and Lenders are hereby expressly given the right, at their option, to proceed in the enforcement of any of the Obligations independently of any other remedy or security they may at any time hold in connection with such obligations secured, and it shall not be necessary for Agent, Issuer or any Lender to proceed upon or against or exhaust any other security or remedy before proceeding to enforce their rights against any Loan Party.

(d) Each Loan Party further agrees that it will not enforce any right of subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid to Agent or any Lender by any other Loan Party with respect to any liability incurred by it hereunder or under any Loan Document, any payment made by it to Agent, Issuer or any Lender with respect to any of the Obligations or any collateral security therefor until such time as all Obligations are paid in full in cash. Any claim which any Loan Party may have against any other Loan Party with respect to any payments to Agent, Issuer or any Lender hereunder or under any other Loan Document are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of all Obligations and, in the event of any insolvency proceeding relating to any Loan Party, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Loan Party therefor.

2.14 **Borrower Representative.**

(a) Each Borrower hereby irrevocably constitutes and appoints the Borrower Representative and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, and in any such capacity to borrow, sign and endorse any Loan Document, and to execute and deliver all other instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, hereby authorizes Agent and each Lender to pay over or credit all loan proceeds hereunder in accordance with the request of Borrower Representative, and to take any and all appropriate actions, including without limitation the right to give or receive any notice or other document provided for under this Agreement or under any Loan Document on behalf of such Borrower, and to execute on behalf of such Borrower any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement. Any notice given to or received from the Borrower Representative on behalf of any Borrower under this Agreement shall be deemed to have been given to or received from such Borrower.

(b) Agent, Issuer and Lenders shall not incur any liability to any Borrower as a result of the handling of this credit facility as a co-borrowing facility with a Borrower

Representative in the manner set forth in this Agreement. To induce Agent, Issuer and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent, Issuer and Lenders and holds Agent, Issuer and Lenders harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent, Issuer or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of any Borrower as provided herein, reliance by Agent, Issuer or any Lender on any request or instruction from Borrower Representative or any other action taken by Agent, Issuer or any Lender with respect to this Section 2.14, except for the gross negligence or willful misconduct, as determined by a final non-appealable judgment by a court of competent jurisdiction, of Agent, Issuer or any Lender.

2.15 **Manner of Borrowing and Payment; Settlement.**

(a) Each borrowing of Revolving Loans shall be advanced according to the applicable Commitment Percentages of Lenders.

(b) Each payment (including each prepayment) by Borrowers on account of the principal of and interest on the Revolving Loans, shall be applied to the Revolving Loans pro rata according to the applicable Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of Lenders to the Payment Office, in each case on or prior to 12:00 (noon) in Dollars and in immediately available funds.

(c) (i) Notwithstanding anything to the contrary contained in Sections 2.16(a) and 2.16(b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Loans shall be advanced by Agent and each payment by any Borrower on account of Revolving Loans shall be applied first to those Revolving Loans advanced by Agent. On or before 2:30 p.m. on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (x) if the aggregate amount of new Revolving Loans made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Loans during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (1) such Revolving Loans and (2) such repayments and (y) if the aggregate amount of repayments applied to outstanding Revolving Loans during such Week exceeds the aggregate amount of new Revolving Loans made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (1) such repayments and (2) such Revolving Loans.

(ii) Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date. Such certificate of Agent shall be presumed correct in the absence of manifest error.

(d) If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances or other Loans, as applicable, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances or other Loans, as applicable, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances or other Loans, as applicable, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances or other Loans, as applicable, may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowers of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Fed Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, *multiplied by* (ii) such amount, *multiplied by* (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be presumed correct, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to Revolving Loans hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.16 **Defaulting Lender.**

(a) Notwithstanding anything to the contrary contained herein, in the event any Lender (i) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance, (ii) notifies either Agent or Borrower Representative that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement), (iii) has notified any Borrower, or

has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement, or (iv) becomes, or its parent becomes, subject to a Bankruptcy Event (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.16 while such Lender Default remains in effect.

(b) Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, such amount shall not be applied to any Advances of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Advances then outstanding.

(c) A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Loan Documents. All amendments, waivers and other modifications of this Agreement and the Loan Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d) Other than as expressly set forth in this Section 2.16, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged. Nothing in this Section 2.16 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Loan Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

2.17 **Increase in Commitments.**

(a) (a) Borrowers Request. The Borrowers may by written notice to the Agent elect to request (x) prior to the Facility Termination Date, an increase to the existing Revolving Commitments (the "Incremental Revolving Commitment"), by an aggregate amount, after giving effect to the 2024 Revolving Commitment Increase Agreement, not in excess of $10,000,000. The notice shall specify (i) the date (each, an "Increase Effective Date") on which the Borrowers propose that the Incremental

Revolving Commitment shall be effective, which shall be a date not less than ten (10) Business Days after the date on which such notice is delivered to the Agent and (ii) the identity of each Person to whom the Borrowers propose any portion of the Incremental Revolving Commitment be allocated and the amounts of such allocations; provided, that (a) each new Lender providing all or a portion of the Incremental Revolving Commitments shall satisfy the requirements of 15.3(a) and shall be subject to the approval of the Agent (such approval not to be unreasonably withheld or delayed), (b) the consent of the Issuer shall be required for any Person providing any portion of the Incremental Revolving Commitment and (c) an existing Lender approached to provide all or a portion of the Incremental Revolving Commitment may elect or decline, in its sole discretion, to provide such Incremental Revolving Commitment.

(b) Conditions. No Incremental Revolving Commitments shall become effective as of the Increase Effective Date unless:

(i) no Event of Default or Default shall exist as of such date, and no Event of Default or Default shall occur on such date as a result of making any Advances on such date or from the application of the proceeds thereof;

(ii) the representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(iii) on a pro forma basis (assuming, in the case of Incremental Revolving Commitments, that such Incremental Revolving Commitments are fully drawn), the Borrowers shall be in compliance with the covenant set forth in Section 6.3 and each other financial covenant as of the end of the latest fiscal quarter of the Borrowers for which financial statements are available; and

(iv) the Borrowers shall deliver or cause to be delivered any officer's certificates, legal opinions or other documents reasonably requested by the Agent.

(c) Increase Joinder. The Incremental Revolving Commitments shall be effected by a joinder agreement (the "Increase Joinder") executed by the Borrowers, the Agent and each Lender making such Incremental Revolving Commitment, in form and substance reasonably satisfactory to each of them. Notwithstanding the provisions of Section 15.2, the Increase Joinder may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent, to effect the provisions of this Section 2.17. Within a reasonable time after the effective date of any increase or joinder, the Agent shall distribute such Increase Joinder to each of the Lenders. In addition, unless otherwise specifically provided herein, all references in Loan Documents to Revolving Loans shall be deemed, unless the context otherwise requires, to include references to Revolving Loans made pursuant to Incremental Revolving Commitments made pursuant

to this Agreement. This Section 2.17 shall supersede any provisions to the contrary. In connection with any Incremental Revolving Commitments pursuant to this Section 2.17, any Person becoming a Lender pursuant to an Increase Joinder shall (1) execute such additional documents and agreements as the Agent may reasonably request and (2) in the case of any new Lender that is organized under the laws of a jurisdiction outside of the United States of America, provide to the Agent, its name, address, tax identification number and/or such other information as shall be necessary for the Agent to comply with "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA Patriot Act.

(d) Adjustment of Revolving Loans. Each Lender that is acquiring an Incremental Revolving Commitment on the Increase Effective Date shall make a Revolving Loan, the proceeds of which will be used to prepay the Revolving Loans of the other applicable Lenders immediately prior to such Increase Effective Date, so that, after giving effect thereto, the Revolving Loans outstanding are held by the Lenders pro rata based on their Revolving Commitments after giving effect to such Increase Effective Date. If there is a new Advance of Revolving Loans on such Increase Effective Date, the Lenders after giving effect to such Increase Effective Date shall make such Revolving Loans in accordance with Section 2.1.

(e) Equal and Ratable Benefit. The Loans and Revolving Commitments established pursuant to this paragraph shall constitute Loans and Revolving Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Liens created by the Loan Documents, except that the new Loans may be subordinated in right of payment or the Liens securing the new Loans may be subordinated, in each case, to the extent set forth in the Increase Joinder. The Loan Parties shall take any actions reasonably required by the Agent to ensure and/or demonstrate that the Liens granted by the Loan Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Revolving Commitments.

## ARTICLE 3
## INTEREST AND FEES

### 3.1 **Interest.**

(a) Interest on the Loans shall be payable in arrears on the first (1st) day of each calendar month. Interest charges shall be computed on the actual principal amount of Loans outstanding during the calendar month. If any payment to be made by Borrowers shall come due on a day other than a Business Day, the due date shall be extended to the next succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; provided, however, that if such next succeeding Business Day occurs in the following calendar month, then the due date shall be the immediately preceding Business Day.

(b) Domestic Rate Loans shall bear interest for each day at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin, and SOFR Rate Loans shall bear interest at a rate per annum equal to Daily Simple SOFR plus the Applicable SOFR Rate Margin. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

(c) Upon and after the occurrence of an Event of Default, (i) all interest accruing in respect of any Obligation shall bear interest per annum at the Default Rate, (ii) all Letter of Credit Fees shall be increased by a percentage equal to the Default Rate, and all other fees under any Loan Document shall be increased by a percentage equal to the Default Rate. All interest accrued at the Default Rate shall be due and payable on demand.

3.2 **Letter of Credit Fees.**

Borrowers shall pay (i) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit, for each day from and excluding the date of issuance of same to and including the date of expiration or termination, equal to (A) the stated amount of each outstanding Letter of Credit on the date of its issuance or renewal, as the case may be, *multiplied by* (B) the Applicable SOFR Rate Margin, such fees to be payable monthly in arrears on the first day of each calendar month and on the Facility Termination Date, (ii) to Agent, for the benefit of Issuer, facing fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily stated amount of each outstanding Letter of Credit *multiplied by* one-quarter of one percent (0.25%) per annum, such fees to be payable monthly in arrears on the first (1st) day of each calendar month and on the Facility Termination Date and (iii) to Agent, for the benefit of Issuer, any and all fees and expenses as agreed upon by Issuer and Borrowers in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder (all of the foregoing fees, the "Letter of Credit Fees"). All such Letter of Credit Fees and other charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in Issuer's prevailing charges for that type of transaction.

3.3 **Unused Facility Fee.** From the Closing Date to the payment in full in cash of all Obligations under this Agreement, Borrowers have and shall continue to pay to Agent, for the ratable benefit of Lenders, an unused fee monthly commencing on the first (1st) day of each month thereafter. The unused fee payable to Agent shall be determined by multiplying three-eighths of one percent (0.375%) per annum times the daily unused amount of the Aggregate Revolving Commitment each day during the relevant period or portion thereof. The unused fee shall be computed in the same manner as in Section 3.6. Whenever any payment of the unused fee shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the

next Business Day. It is expressly understood that the unused fee herein described shall not be refundable under any circumstances.

3.4 **Reserved.**

3.5 **Reserved**.

3.6 **Computation of Interest and Fees; Restatement; Conforming Changes**.

(a) Interest on the unpaid principal balance of the Loans is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Any reference in this Agreement to a "per annum" rate shall be based on a year of 360 days. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the rate otherwise applicable during such extension.

(b) If, as a result of any restatement of or other adjustment to the financial statements of Borrowers or for any other reason, any Borrower or Agent reasonably determines that (i) the Consolidated Fixed Charge Coverage Ratio as calculated by Borrowers as of any applicable date was inaccurate and (ii) a proper calculation of the Consolidated Fixed Charge Coverage Ratio would have resulted in higher pricing for such period, Borrowers shall immediately and retroactively be obligated to pay to Agent, for the ratable benefit of Lenders, promptly on demand by Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to Borrowers under any bankruptcy or insolvency law, automatically and without further action by Agent), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. This paragraph shall not limit the rights of Agent under Section 3.8 or 3.11 or under Article 10 of this Agreement. Borrowers' obligations under this paragraph shall survive the termination of the Aggregate Commitments and the repayment of all other Obligations hereunder.

(c) In connection with the use or administration of Daily Simple SOFR, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Agent will promptly notify Borrowers and Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Daily Simple SOFR.

3.7 **Maximum Charges.** In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under applicable law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under applicable law, such excess amount shall be first applied to any unpaid principal balance

owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Agent and Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.8 **Increased Costs; Losses.**

(a) Increased Costs Generally. If any Change in Law shall (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any Issuer, (ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto or (iii) impose on any Lender or any Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made or maintained by such Lender or any Letter of Credit or participation therein, and the result of any of the foregoing shall be to increase the cost to such Lender, such Issuer or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, such Issuer or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, Issuer or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Issuer or other Recipient, Borrowers will pay to such Lender, Issuer or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, Issuer or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender or Issuer determines that any Change in Law affecting such Lender or such Issuer or any lending office of such Lender or such Lender's or Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or Issuer's capital or on the capital of such Lender's or Issuer's holding company, if any, as a consequence of this Agreement, the Aggregate Commitments of such Lender or the Loans made or maintained by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by any Issuer, to a level below that which such Lender or such Issuer or such Lender's or such Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuer's policies and the policies of such Lender's or such Issuer's holding company with respect to capital adequacy and liquidity), then from time to time Borrowers will pay to such Lender or such Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuer or such Lender's or such Issuer's holding company for any such reduction suffered.

(c) Certificates for Reimbursement; Delay in Requests. A certificate of a Lender or an Issuer setting forth the amount or amounts necessary to compensate such Lender or its holding company as specified in Section 3.8 and delivered to Borrowers

shall be conclusive absent manifest error. Borrowers shall pay such Lender or such Issuer the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof. Failure or delay on the part of a Lender or Issuer to demand compensation pursuant to this Section 3.8 shall not constitute a waiver of such Lender's or such Issuer's right to demand such compensation; provided that Borrowers shall not be required to compensate a Lender or Issuer pursuant to this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or such Issuer notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(d) Compensation for Losses. Upon demand of any Lender (with a copy to Agent) from time to time, Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of (a) any payment or prepayment of any SOFR Rate Loan on a day other than an interest payment date (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), (b) any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow any SOFR Loan on the date or in the amount notified by Borrowers, including any loss or expense arising from the liquidation or reemployment of funds or from any fees payable.

3.9 **Illegality; Inability to Determine Rates.**

(a) Illegality. If any Lender determines that any law, rule or regulation has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to SOFR or Daily Simple SOFR, or to determine or charge interest rates based upon SOFR or Daily Simple SOFR, then, upon notice thereof by such Lender to Borrowers (through Agent), the accrual of interest on the Loans based upon Daily Simple SOFR shall be suspended until each affected Lender shall notify Agent and Borrowers that the circumstances causing such suspension no longer exist, and beginning on the date of such suspension, interest shall accrue thereon at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin.

(b) Inability to Determine Rates. Subject to Section 3.10, if at any time (a) Agent determines (which determination shall be conclusive and binding absent manifest error) that Daily Simple SOFR cannot be determined pursuant to the definition thereof (including because SOFR is not available or published on a current basis) or (b) Agent is advised by the Required Lenders that Daily Simple SOFR does not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans hereunder, Agent will promptly so notify Borrowers and each Lender. In any such event (including during any Benchmark Unavailability Period), the accrual of interest hereunder based upon Daily Simple SOFR shall be suspended until Agent (with respect to clause (b), upon the instruction of the Required Lenders) revokes such notice, and beginning on the date of

such suspension, interest shall accrue hereunder at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin.

3.10 **Effect of Benchmark Transition Event.**

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, following the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace then-current Benchmark for all purposes hereunder and under any Loan Document at the time (not less than five Business Days after Agent has provided notice thereof to each Lender) set forth in the notice of implementation of such Benchmark Replacement provided by Agent to Borrowers and the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b) Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c) Notices; Standards for Decisions and Determinations. Agent will promptly notify Borrowers and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Agent will promptly notify Borrowers of the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.10.

3.11 **Taxes.**

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law requires the deduction or withholding of any Tax from any such payment by Agent or any Loan Party, then Agent or such Loan Party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so

that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.11) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Body in accordance with applicable law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c) Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.11) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender or an Issuer (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender or an Issuer, shall be conclusive absent manifest error.

(d) Indemnification by Lenders. Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrowers have not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 15.3(c) relating to the maintenance of a Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to Lender from any other source against any amount due to Agent under this paragraph (d).

(e) Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.11, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(f) Status of Lenders. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.11, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such

Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrowers and Agent, at the time or times reasonably requested by Borrowers or Agent, such properly completed and executed documentation reasonably requested by Borrowers or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrowers or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrowers or Agent as will enable Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f) (ii)(A)(i), (ii)(B) and (ii)(D) of this Section) shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A) any Lender that is a U.S. Person shall deliver to Borrowers and Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS

Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form and substance satisfactory to Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to such Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in form and substance satisfactory to Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form and substance satisfactory to Agent on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers or Agent

to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or Agent as may be necessary for Borrowers and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrowers and Agent in writing of its legal inability to do so.

(g) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.11 (including by the payment of additional amounts pursuant to this Section 3.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 3.11(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body. Notwithstanding anything to the contrary in this Section 3.11(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 3.11(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.11(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other

information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

3.12 **Survival.** All of Borrowers' obligations under Sections 3.8 through 3.11 shall survive any assignment of rights by any Lender, termination of the commitments and repayment of the Obligations.

## ARTICLE 4
## COLLATERAL; SECURITY AGREEMENT

4.1 **Security Interest in the Collateral.** To secure the prompt payment and performance of the Obligations, each Loan Party hereby grants to Agent, for the benefit of the Agent, each Lender, and the benefit of each of their respective Affiliates, a continuing security interest in and a pledge of all of its Collateral. Each Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect such security interest and shall cause its financial statements to reflect such security interest. In addition, to secure such prompt payment and performance of the Obligations, each Loan Party shall also assign, pledge, hypothecate and grant to Agent, for the benefit of Agent and each Lender, a mortgage on its Owned Real Property, if any.

4.2 **Perfection of Security Interest.** Each Loan Party shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, without limitation, (a) immediately discharging all Liens other than Permitted Encumbrances, (b) using best efforts to obtain each Waiver as Agent may request, (c) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral (including, in the case of Collateral consisting of motor vehicles subject to certificate of title statutes, upon the request of Agent, the Agent shall have received the original title certificates that identify Agent as lienholder for such motor vehicles; provided, however that no such original title certificates shall be required to be delivered for motor vehicles owned by the Loan Parties as of the Closing Date), (d) entering into lockbox and other custodial arrangements satisfactory to Agent as and to the extent required hereunder, and (e) executing and delivering control agreements, instruments of pledge, Mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest in Collateral under the Uniform Commercial Code or other applicable law. Each Loan Party hereby authorizes Agent to file against such Loan Party, one or more financing, continuation, or amendment statements or recording, notice, or perfection statements pursuant to the Uniform Commercial Code or such other laws, acts or codes pertaining to personal property, to perfect Liens securing Obligations arising hereunder in form and substance satisfactory to Agent. All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent immediately upon demand.

4.3 **<u>Dominion of Funds, Lockbox, and Deposit Accounts</u>.** (a) Borrowers shall maintain with Agent a Lockbox and any controlled deposit accounts required by Agent, including the Cash Collateral Account, each of which shall be subject to a lockbox agreement, deposit account control agreement or other Loan Document satisfactory to Agent in its sole discretion. Each Borrower shall notify each Account Debtor in writing (such notices to be in form and substance satisfactory to Agent) and otherwise use its best efforts to ensure that each Account Debtor remits all payments thereon directly to address specified in the agreement for such Lockbox, and all invoices rendered after the date hereof shall bear such address.

(b) No Borrower shall maintain or have any operating account, deposit account, investment account, securities account or similar account at any bank, depositary source, financial intermediary or other financial institution, other than the deposit accounts set forth on <u>Schedule 4.3</u> hereof, or such other accounts acceptable to Agent in its sole discretion. For the avoidance of doubt, the Brookline Money Market Account (as defined in Section 6.9) balance shall not exceed $50,000 at any time (in accordance with the terms and conditions as described in Section 6.9).

(c) All collections from Account Debtors of each Borrower sent to the Lockbox shall be deposited on a daily basis directly into the Cash Collateral Account. The Cash Collateral Account shall not be subject to any deduction, set off, banker's lien or any other right in favor of any Person other than Agent. All funds deposited into the Cash Collateral Account shall be the exclusive property of Agent and shall be subject to the sole and exclusive control of Agent and only to such signing authority designated from time to time by Agent. No Borrower shall have control over or any interest in any such funds.

(d) Any collections received by any Borrower shall be deemed held by such Borrower in trust and as fiduciary for Agent. Each Borrower agrees not to commingle any such collections with any of such Borrower's other funds or property, but rather to hold such funds separate and apart in trust and as fiduciary for Agent until deposit is made into the Cash Collateral Account or other deposit account directed by Agent. Each Borrower hereby agrees to deposit on a daily basis such directly received collections into the Cash Collateral Account.

(e) Each Loan Party shall pay to Agent on demand all usual and customary fees and reasonable expenses which Agent incurs in connection with (i) the forwarding of any proceeds of any Loan and (ii) the establishment and maintenance of any accounts as provided for in this Section 4.3. Agent may, without making demand, charge all such fees and reasonable expenses to the Loan Account as a Domestic Rate Loan type of Revolving Loan and add them to the Obligations.

4.4 **<u>Preservation and Disposition of Collateral</u>.** Each Loan Party will safeguard and protect all Collateral for Agent's general account and shall make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement. Following the occurrence of a Default or Event of Default, in addition to the rights and remedies set forth in Section 11.1, Agent may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including (a) the hiring of such security

guards or the placing of other security protection measures as Agent may deem appropriate; (b) employing and maintaining at any of any Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) leasing warehouse facilities to which Agent may move all or part of the Collateral; and (d) using any Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral. Agent shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of any Loan Party's Real Property. Each Loan Party shall cooperate fully with all of Agent's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as Agent may direct. Agent is hereby authorized by the Loan Parties, from time to time in Agent's sole discretion, (a) after the occurrence of a Default or an Event of Default, or (b) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Revolving Loans to Borrowers which Agent, in its sole discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (iii) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement. All of Agent's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

4.5 **Ownership of Collateral.** With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (a) each Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (b) each Loan Document or other writing executed by any Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (c) all signatures and endorsements of each Loan Party that appear on such documents and agreements shall be genuine and each Loan Party shall have full capacity to execute same; and (d) each Loan Party's Inventory shall be located as set forth on Schedule 4.5 (as such schedule may be updated from time to time and delivered to Agent) and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the ordinary course of business and with respect to Inventory in transit from one location identified on Schedule 4.5 (as such schedule may be updated from time to time) to another location identified on Schedule 4.5.

4.6 **Defense of the Interests of Agent and Lenders.** Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, the interests of Agent and Lenders in the Collateral shall continue in full force and effect. During such period no Loan Party shall, without Agent's prior written consent, pledge, sell (except Inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for sales, assignments, and transfers expressly permitted elsewhere herein, any part of the Collateral. Each Loan Party shall defend the interests of Agent and Lenders in the Collateral against any and all Persons whatsoever. At any time after an Event of Default or Default has occurred, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and

advertising materials. If Agent exercises such right to take possession of the Collateral, the Loan Parties shall, upon demand, assemble the Collateral in the best manner possible and make it available to Agent at a place reasonably convenient to Agent. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence of a Default or an Event of Default, each Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Loan Party's possession, they, and each of them, shall be held by such Loan Party in trust as Agent's trustee, and such Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7 **Books and Records.** Each Loan Party shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all Charges; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Accounts, advances and investments and all other proper accruals (including accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this Section 4.7 shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountants as shall then be regularly engaged by Borrowers or the other Loan Parties.

4.8 **Financial Disclosure.** Each Loan Party hereby irrevocably authorizes and directs all accountants and auditors employed by such Loan Party at any time and promptly after the request of Agent to exhibit and deliver to Agent and each Lender copies of any Loan Party's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in such accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Loan Party's financial status and business operations. Each Loan Party hereby authorizes all federal, state and municipal authorities to furnish to Agent and each Lender copies of reports or examinations relating to such Loan Party, whether made by such Loan Party or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Loan Party prior to obtaining such information or materials from such accountants or such authorities.

4.9 **Compliance with Laws.** Each Loan Party shall be in compliance with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of such Loan Party's business including, without limitation the USA PATRIOT Act and Beneficial Ownership Regulations, unless such failure would not reasonably be expected to have a Material Adverse Effect. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect. Borrowers will maintain in effect and enforce policies and procedures designed to ensure compliance by Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

4.10 **Inspection of Premises; Appraisals.** At all times as Agent deems necessary, Agent shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Loan Party's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Loan Party's business. Agent and its agents may enter upon any of each Loan Party's premises at any time during business hours and at any other reasonable time, and from time to time as Agent deems necessary or desirable, for the purpose of auditing, inspecting and appraising the Collateral and any and all records pertaining thereto and the operation of such Loan Party's business. Agent shall have the right to conduct such field examinations, inspections and appraisals at such times as Agent deems necessary, in each case, at Borrowers' expense; provided that, (a) Loan Parties shall be required to pay for no more than two (2) field exams per calendar year unless an Event of Default occurs, in which case such limitations shall not apply and (b) unless an Event of Default exists, Agent shall schedule its audits and inspections so as to minimize interference with such Borrower's business.

4.11 **Insurance.** Each Loan Party shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At each Loan Party's own cost and expense in amounts and with carriers acceptable to Agent, each Loan Party shall (a) keep all its insurable properties and properties in which each Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Loan Party's including business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Loan Party is engaged in business; and (e) furnish Agent (i) with a status report with respect to the renewal of all such insurance no later than ten (10) days before the expiration date thereof, (ii) with evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (iii) with lender loss payable, mortgagee and additional insured endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured, lender loss payee and mortgagee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy, lender loss payable clauses and mortgagee clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. The Loan Parties shall provide copies of all such insurance policies (including the appropriate lender loss payee, mortgagee and additional insured endorsements) within ten (10) days after Agent's request. In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by Agent and the applicable Loan Party to make payment for such loss to Agent and not to such Loan Party and Agent jointly. If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name thereon and do such other things as Agent

may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage with respect to Collateral. All loss recoveries with respect to Collateral received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by Agent to applicable Borrower or any other Loan Party or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Loan Parties to Agent, on demand.

4.12 **Failure to Pay Insurance.** If any Loan Party fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Loan Party, and such premium shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

4.13 **Payment of Taxes.** Each Loan Party will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral including real and personal property taxes, assessments and Charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except those taxes, assessments or Charges to the extent that any Loan Party has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's and Lenders' security interest in or Lien on the Collateral and provided that no Lien for any such taxes has attached to any Collateral. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Loan Party and Agent, Issuer or any Lender which Agent, Issuer or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's opinion, may possibly create a valid Lien on any Collateral, Agent may without notice to the Loan Parties pay the taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds Agent, Issuer and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any Loan Party has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any payment by Agent or any Lender under this Section 4.13 shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations and, until the Loan Parties shall furnish Agent or any Lender with an indemnity therefor (or supply Agent or any such Lender with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent or such Lender may hold without interest any balance owing to any Loan Party's credit and Agent or such Lender shall retain its security interest in any and all Collateral held by Agent or such Lender.

4.14 **Payment of Leasehold Obligations.** Each Loan Party shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's reasonable request will provide evidence of having done so.

4.15 **Accounts Receivable.** Each Loan Party represents, warrants and agrees as follows:

(a) Nature of Accounts. Each Account is a bona fide and valid account representing a bona fide obligation incurred by the Account Debtor therein named, for a fixed sum as set forth in the invoice relating thereto (other than immaterial or unintentional invoice) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Loan Party, or work, labor or services fully rendered by a Loan Party as of the date each Account is created. Such Account is due and owing without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by the Loan Parties to Agent.

(b) Solvency of Account Debtors. Each Account Debtor as of the date each Account is created, is and will be solvent and able to pay each Account on which the Account Debtor is obligated in full when due or with respect to such Account Debtor of any Loan Party who are not solvent such Loan Party has set up on its books and in its financial records bad debt reserves adequate to cover the uncollectible portion.

(c) Locations of Loan Parties. Each Loan Party's state of organization and the address and location of its chief executive office are set forth on Schedule 4.15(c). Until written notice is given to Agent by the Borrower Representative of any other office at which any Loan Party keeps its records pertaining to Accounts, all such records shall be kept at such executive office.

(d) Notification of Assignment of Accounts. At any time following the occurrence of a Default or an Event of Default, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Accounts to any and all Account Debtors or any third party holding or otherwise concerned with any of the Collateral. Thereafter, Agent shall have the sole right to collect the Accounts, take possession of the Collateral, or both. Agent's collection expenses, including stationery and postage, telephone and telegraph, secretarial and clerical expenses, the salaries of any collection personnel used for collection, and other expenses may be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

(e) Power of Agent to Act on Loan Parties' Behalf. Agent shall have the right, at any time, to receive, endorse, assign and/or deliver in the name of Agent or any Loan Party any and all checks, drafts and other instruments for the payment of money relating to the Accounts, and each Loan Party hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Loan Party hereby appoints and constitutes Agent or Agent's designee as such Loan Party's attorney-in-fact with power at any time after providing reasonable notice to all Loan Parties (provided, however that no such notice shall be required at any time after the occurrence and during the continuance of an Event of Default or Default) (i) to endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Loan Party's name on any invoice or bill of lading relating to any of the Accounts, drafts against Account Debtors, assignments and verifications of Accounts; (iii) to send verifications of Accounts to any Account Debtor; (iv) to demand payment of

the Accounts; (v) to enforce payment of the Accounts by legal proceedings or otherwise; (vi) to exercise any right and remedy of any Loan Party with respect to the collection of the Accounts and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the Accounts; (viii) to settle, adjust or compromise any legal proceedings brought to collect Accounts; (ix) to prepare, file and sign such Loan Party's name on a proof of claim in bankruptcy or similar document against any Account Debtor; (x) to prepare, file and sign such Loan Party's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Accounts; and (xi) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time following the occurrence of an Event of Default or Default, to change the address for delivery of mail addressed to any Loan Party to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Loan Party.

(f) No Liability. Neither Agent, Issuer nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts or any instrument received in payment thereof, or for any damage resulting therefrom. Agent may, without notice or consent from any Loan Party, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Accounts or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept the return of the goods represented by any of the Accounts, without notice to or consent by any Loan Party, all without discharging or in any way affecting any Loan Party's liability hereunder.

(g) Adjustments. No Loan Party will, without Agent's consent, compromise or adjust any Account (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore (i) customary in the business or industry of such Borrower, and (ii) done in the ordinary course of such Borrower's business.

4.16 **Maintenance of Equipment.** Each Loan Party shall maintain its Equipment in good operating condition and repair in substantial accordance with industry standards (reasonable wear and tear excepted) and shall make all necessary replacements of and repairs thereto so that the value and operating efficiency of such Equipment shall be maintained and preserved. No Loan Party shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.17 **Exculpation of Liability.** Nothing herein contained shall be construed to constitute Agent, Issuer or any Lender as any Loan Party's agent for any purpose whatsoever, nor shall Agent, Issuer or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless

of the cause thereof. Neither Agent, Issuer nor any Lender shall assume, whether by anything herein or in any assignment or otherwise, any Loan Party's obligations under any contract or agreement assigned to Agent, Issuer or Lenders, and neither Agent, Issuer nor any Lender shall be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.18 **Environmental Matters.**

(a) The Loan Parties shall ensure that the Real Property remains in compliance with all Environmental Laws, and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by applicable law or appropriate Governmental Bodies.

(b) In the event any Loan Party obtains, gives or receives notice of any Hazardous Discharge at the Real Property or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Loan Party's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Environmental Authority, then the Borrower Representative shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Loan Party is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(c) The Loan Parties shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Loan Party to dispose of Hazardous Substances and shall continue to forward copies of correspondence between any Loan Party and any Environmental Authority regarding such claims to Agent until the claim is settled. The Loan Parties shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Loan Party is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in the Real Property and the Collateral.

4.19 **Financing Statements.** Except for (a) the financing statements filed by Agent, and (b) those financing statements permitted to be filed hereunder, no financing statement or similar notice of Lien covering any of the Collateral or any proceeds thereof is on file in any public office.

4.20 **Commercial Tort Claims.**

(a) The only existing or potential Commercial Tort Claims of any Loan Party existing (regardless of whether the amount, defendant or other material facts can be

determined and regardless of whether such Commercial Tort Claim has been asserted, threatened or has otherwise been made known to the obligee thereof or whether litigation has been commenced for such claims) are those listed on Schedule 4.20, as supplemented pursuant to the terms hereof, which sets forth such information separately for each Loan Party.

(b) Each Loan Party agrees that, if it shall acquire any interest in any Commercial Tort Claim (whether from another Person or because such Commercial Tort Claim shall have come into existence), (i) such Loan Party shall, immediately upon such acquisition, deliver to Agent, in each case in form and substance satisfactory to Agent, a notice of the existence and nature of such Commercial Tort Claim and deliver a supplement to Schedule 4.20 containing a specific description of such Commercial Tort Claim, certified by such Loan Party as true, correct and complete, (ii) the provision of Section 4.1 shall apply to such Commercial Tort Claim (and each Loan Party authorizes Agent to supplement such schedule with a description of such Commercial Tort Claim if such Loan Party fails to deliver the supplement described in clause (i)) and (iii) such Loan Party shall execute and deliver to Agent, in each case in form and substance satisfactory to Agent, any certificate, agreement and other document, and take all other action, deemed by Agent to be reasonably necessary or appropriate for Agent to obtain a first-priority, perfected security interest in all such Commercial Tort Claims. Any supplement to Schedule 4.20 delivered pursuant to this Section 4.20 shall become part of Schedule 4.20 for all purposes hereunder.

4.21 **Pledged Securities.**

(a) Schedule 5.3 sets forth, as of the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 5.3 or upon the occurrence of a Permitted Business Acquisition), a complete and accurate list of the ownership of the issued and outstanding equity interests of each Borrower and their respective Subsidiaries, if any. Each Loan Party represents and warrants that (i) all Pledged Securities owned by it have been duly authorized, validly issued, are fully paid and non-assessable, (ii) with respect to any certificates delivered to Agent representing any Pledged Securities, either such certificates are Securities as defined in Article 8 of the Uniform Commercial Code as a result of actions by the issuer or otherwise, or, if such certificates are not Securities as defined in Article 8 of the Uniform Commercial Code, such Loan Party has so informed Agent so that Agent may take steps to perfect its security interest therein as a General Intangible and each Loan Party covenants to not cause such certificates to become Securities as defined in Article 8 of the Uniform Commercial Code without Agent's prior written consent, (iii) with respect to any Pledged Securities not represented by certificates, such Loan Party has so informed Agent so that Agent may take steps to perfect its security interest therein as a General Intangible and each Loan Party covenants to not cause such uncertificated Pledged Securities to become represented by certificates or to become Securities as defined in Article 8 of the Uniform Commercial Code without Agent's prior written consent, and (iv) all such Pledged Securities held by a securities intermediary are covered by a control agreement among such Loan Party, the securities intermediary and Agent pursuant to

which Agent has "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code).

(b) (i) None of the Pledged Securities has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) except as set forth on Schedule 5.3, there are existing no options, warrants, calls or commitments of any character whatsoever relating to such Pledged Securities or which obligate the issuer of any Pledged Securities to issue additional equity interests, and (iii) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Body or any other Person is required for the pledge by such Loan Party of such Pledged Securities pursuant to this Agreement or for the exercise by Agent of remedies in respect of the Pledged Securities, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(c) (i) Each Borrower hereby grants a security interest in and pledges and collaterally assigns all of each Borrower's rights and title to the Pledged Securities. For the better protection of Agent and Lenders hereunder, Borrowers shall execute appropriate transfer powers with respect to the Pledged Securities represented by certificates and, concurrently therewith, deliver such the Pledged Securities and the aforesaid transfer powers with Agent promptly upon Agent's request. (ii) Each Borrower authorizes Agent, at any time after the occurrence and during the continuance of an Event of Default, to transfer the Pledged Securities into the name of Agent or Agent's nominee, but Agent shall be under no duty to do so. Notwithstanding any provision or inference herein or elsewhere to the contrary, unless and until there shall have occurred and is continuing an Event of Default (A) Agent shall have no right to vote the Pledged Securities, and (B) Borrowers shall be entitled to receive and retain (free from the lien of Agent once paid) all dividends and other distributions made with respect to the Pledged Securities prior to an Event of Default, unless the payment of such dividends or distributions caused an Event of Default (and for clarification, Borrowers may in all cases receive and retain (free from the lien of Agent once paid) dividends permitted by this Agreement made prior to an Event of Default). (iii) Agent shall at all times have the rights and remedies of a secured party under the Uniform Commercial Code and Pennsylvania law as in effect from time to time, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, the Notes or any other Loan Document, or otherwise provided in law or equity. Upon the occurrence and during the continuance of an Event of Default hereunder, Agent, in its sole discretion, may sell, assign, transfer and deliver the Pledged Securities, at any time, or from time to time. No prior notice need be given to Borrowers or to any other Person in the case of any sale of the Pledged Securities that Agent reasonably determines to be declining speedily in value or that is customarily sold in any securities exchange, over-the-counter market or other recognized market, but in any other case Agent shall give Borrower Representative no fewer than ten days prior notice of either the time and place of any public sale of the Pledged Securities or of the time after which any private sale or other intended disposition thereof is to be made. Each Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Agent may purchase the

Pledged Securities, or any part thereof, free from any right of redemption, all of which rights each Borrower hereby waives and releases. After deducting all expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Agent may apply the net proceeds of each such sale to or toward the payment of the Obligations, whether or not then due, in such order and by such division as Agent in its sole discretion may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrowers.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each Loan Party as to itself and any Subsidiary represents and warrants as follows:

5.1 **Authority.** Each Loan Party has the full power, authority and legal right to enter into this Agreement and the other Loan Documents to which it is a party and to perform all of its respective obligations hereunder and thereunder, as applicable. This Agreement and the other Loan Documents to which each Loan Party is a party constitute the legal, valid and binding obligations of such Loan Party, enforceable against it in accordance with their terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally. The execution, delivery and performance of this Agreement and of the other Loan Documents by each Loan Party has been authorized by all necessary action.

5.2 **Formation and Qualification; Subsidiaries**. Each Loan Party and Subsidiary of a Loan Party is duly incorporated or organized, as applicable, and in good standing under the laws of the jurisdictions listed on Schedule 5.2 and is qualified to do business and is in good standing in the jurisdictions listed on Schedule 5.2 (including, where applicable and as noted on such Schedule, each No Access Jurisdiction) which constitute all jurisdictions in which qualification and good standing are necessary for such Loan Party or Subsidiary to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. The only Subsidiaries of any Loan Party are listed on Schedule 5.2.

5.3 **Officers, Directors, Shareholders, Capitalization**. The names and titles of all executive officers and directors of each Loan Party as of the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to Schedule 5.3 or upon the occurrence of a Permitted Business Acquisition), are set forth on Schedule 5.3. Schedule 5.3 also sets forth for each Loan Party and Subsidiary of a Loan Party as of the Closing Date (or as of any subsequent date whereby this Agreement is amended or upon the occurrence of a Permitted Business Acquisition), the names of such Loan Party's equity holders and a description of such Person's equity interest in such Loan Party or Subsidiary (including, if applicable, a listing of the share or unit certificates and the number of shares or units of equity interests held by such Person). There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any equity interests in any Loan Party or any Subsidiary thereof, except as set forth on Schedule 5.3.

5.4 **Governmental Approvals; No Conflicts**. The transactions contemplated by this Agreement (a) do not require any consent or approval of, registration or filing with, or any other

action by, any Governmental Body, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any law applicable to any Loan Party or any Subsidiary thereof, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary thereof or any assets of any of them, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary thereof, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any Subsidiary thereof, except Permitted Encumbrances.

5.5 **Tax Returns**. Each Loan Party and Subsidiary thereof has filed all federal, state and local tax returns and other reports such Loan Party or Subsidiary is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable. The provision for taxes on the books of such Loan Party and Subsidiary thereof is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Loan Party has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its or any Subsidiaries books. No tax Liens have been filed and no claims are being asserted with respect to any taxes.

5.6 **Financial Statements.**

(a) The monthly projected statements of income, statements of cash flow, balance sheet and availability, for the twelve-month period ending December 31, 2022, of Express and its Subsidiaries prepared on a consolidated and consolidating basis (and copies of which were delivered to Agent), were prepared by an Authorized Officer of the Borrower Representative, are based on underlying assumptions and estimates which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

(b) The consolidated and consolidating balance sheets of Express and its Subsidiaries as of December 31, 2020, and the related statements of income, changes in stockholder's or member's equity, and changes in cash flow for the period ended on each such date, all accompanied by reports containing opinions without qualification by independent certified public accountants, copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied and present fairly in all material respects the financial condition of Express and its Subsidiaries at such date and the results of their operations for such period. Since the date of the financial statements and other reports described in the immediately preceding sentence, there has been no change in the financial condition of Express and its Subsidiaries taken as a whole as shown on the consolidated balance sheet as of such date and no change in the aggregate value of machinery, Equipment and Real Property, if any, owned by Express and Subsidiaries, except changes in the ordinary course of business, none of which individually or in the aggregate has had, or reasonably could be believed to cause in the future, a Material Adverse Effect.

5.7 **Organization Name**. No Loan Party has been known by any other name in the past five (5) years and does not sell Inventory under any other name, nor has any Loan Party been

the surviving entity of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.8 **OSHA and Environmental Compliance.**

(a) Each Loan Party and Subsidiary thereof has duly complied with, and (i) its facilities, business, assets, property, and Equipment, and (ii) to its knowledge, its leaseholds are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; and, there have been no outstanding citations, notices or orders of non-compliance issued to any Loan Party or any Subsidiary thereof or relating to the business, assets, property, leaseholds or Equipment of such Person under any such laws, rules or regulations.

(b) Each Loan Party and Subsidiary thereof has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c) except as set forth in each of the Phase I Environmental Site Assessment Report (Phase I Report) certified and previously delivered to Agent solely in connection with the North Carolina Property and Tennessee Property and the Phase II Environmental Site Assessment Report (Phase II Report) certified and previously delivered to Agent solely in connection with the Tennessee Property, (i) There are no releases, spills, discharges, leaks, Hazardous Discharges or disposal of Hazardous Substances at, upon, under or within any Real Property; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property; (iii) to the knowledge of any Loan Party, the Real Property has never been used as a treatment, storage or disposal facility of Hazardous Waste and (iv) no Hazardous Substances are present on the Real Property.

5.9 **Solvency; No Litigation, No Violation, ERISA.**

(a) After giving effect to the transactions contemplated by this Agreement, the Loan Parties will be solvent, able to pay their debts as they mature, have capital sufficient to carry on their business and all businesses in which they are about to engage, and (i) as of the Closing Date, the fair present saleable value of their assets, calculated on a going concern basis, is in excess of the amount of their liabilities and (ii) subsequent to the Closing Date, the fair saleable value of their assets (calculated on a going concern basis) will be in excess of the amount of their liabilities.

(b) Except as disclosed in Schedule 5.9(b), no Loan Party or any Subsidiary thereof has as of the Closing Date any pending or threatened litigation, arbitration, action or proceeding seeking damages, individually or in the aggregate, in excess of $500,000. No Loan Party or any Subsidiary thereof has any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect.

(c) No Loan Party or any Subsidiary thereof is in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Loan Party or any Subsidiary thereof in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d) No Loan Party or any Subsidiary thereof is a member of any Controlled Group nor does any such Person maintain or contribute to any Plan or Multiemployer Plan.

5.10 **Patents, Trademarks, Copyrights and Licenses**. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by any Loan Party are set forth on Schedule 5.10, are valid and have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the patents, trademarks, service marks, copyrights, design rights, tradenames, assumed names, trade secrets and licenses which are necessary for the operation of its business; there is no objection to or pending challenge to the validity of any such patent, trademark, copyright, design right, tradename, trade secret or license and no Loan Party is aware of any grounds for any challenge, except as set forth in Schedule 5.10. Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design right, copyright, copyright application and copyright license owned or held by any Loan Party consists of original material or property developed by such Loan Party or was lawfully acquired by such Loan Party from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all customized software licensed by any Loan Party, such Loan Party is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement, each such source code escrow agreement being listed on Schedule 5.10.

5.11 **Licenses and Permits**. Each Loan Party and Subsidiary thereof (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state or local law or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to comply with or procure such licenses or permits would reasonably be expected to have a Material Adverse Effect.

5.12 **Default of Indebtedness**. No Loan Party or any Subsidiary thereof is in default in the payment of the principal of or interest on any Indebtedness or under any instrument or agreement under or subject to which any Indebtedness has been issued and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.13 **No Burdensome Restrictions; No Default**. No Loan Party or any Subsidiary thereof is party to any contract or agreement, the performance of which could reasonably be expected to have a Material Adverse Effect. No Loan Party or any Subsidiary thereof has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not

a Permitted Encumbrance. No Loan Party or any Subsidiary thereof is in default in the payment or performance of any of its contractual obligations and no Default has occurred.

5.14 **No Labor Disputes**. No Loan Party or any Subsidiary thereof is involved in any labor dispute and there are no strikes or walkouts or union organization of any employees of any Loan Party or Subsidiary thereof threatened or in existence and no labor contract is scheduled to expire during the term of this Agreement.

5.15 **Margin Regulations**. No Loan Party or any Subsidiary thereof is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance or the other Loans will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16 **Investment Company Act**. No Loan Party or any Subsidiary thereof is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17 **Disclosure**. No representation or warranty made by any Loan Party in this Agreement or in any financial statement, report, certificate or any other document furnished in connection herewith contains any untrue statement of fact or omits to state any fact necessary to make the statements herein or therein not misleading. There is no fact known to any Loan Party or which reasonably should be known to such Loan Party which such Loan Party has not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement which could reasonably be expected to have a Material Adverse Effect.

5.18 **Hedging Contracts**. Except as required pursuant to Section 6.8, no Loan Party or any Subsidiary thereof is a party to, nor will it be a party to, any Hedging Contract unless such contract provides that damages upon termination following an event of default thereunder are payable on a "two-way basis" without regard to fault on the part of either party.

5.19 **Material Business Agreements**. All Material Business Agreements to which any Loan Party or any Subsidiary thereof is a party or is bound are listed on Schedule 5.19. No Loan Party or any Subsidiary thereof is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (a) any Material Business Agreement to which it is a party or (b) any agreements or instruments evidencing or governing Indebtedness.

5.20 **Application of Certain Laws and Regulations**. No Loan Party nor any Affiliate of any Loan Party is subject to any statute, rule or regulation which regulates the incurrence of any Indebtedness, including statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.21 **Business and Property of the Loan Parties**. Upon and after the Closing Date, no Loan Party proposes to engage in any business other than as set forth on Schedule 5.21 and activities necessary to conduct the foregoing. On the Closing Date, each Loan Party will own all

the property and possess all of the rights and Consents necessary for the conduct of the business of such Loan Party.

5.22 **Reserved**.

5.23 **Anti-Corruption Laws and Sanctions**.

(a) None of (i) any Loan Party, any Subsidiary thereof or, any of the respective directors, officers, employees or Affiliates of any Loan Party or any Subsidiary thereof, or (ii) any agent or representative of any Loan Party or any Subsidiary thereof that will act in any capacity in connection with, or benefit from, the credit facilities provided hereunder, (A) is a Sanctioned Person or currently the subject or target of any Sanctions, (B) has its assets located in a Sanctioned Country, (C) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons or (D) has taken any action, directly or indirectly, that would result in a violation by such Persons of any Anti-Corruption Laws or has the purpose of evading or avoiding any Anti-Corruption Laws. Each of the Loan Parties and their respective Subsidiaries has implemented and maintains in effect policies and procedures designed to promote and achieve compliance by the Loan Parties and their respective Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the Anti-Corruption Laws. Each of the Loan Parties and their respective Subsidiaries, and each director, officer, employee, agent and Affiliate of the Loan Parties and their respective Subsidiaries, is in compliance with the Anti-Corruption Laws.

(b) No proceeds of any Loan have been used, directly or indirectly, by any Loan Party, any Subsidiary thereof or any of the respective directors, officers, employees, Affiliates or agents of the foregoing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, including any payments (directly or indirectly) to a Sanctioned Person or a Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

5.24 **Beneficial Ownership Certificate**. Each Borrower represents that as of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

## ARTICLE 6
## AFFIRMATIVE COVENANTS

Each Loan Party agrees as to itself and each Subsidiary, until payment in full of the Obligations and termination of this Agreement, that it shall:

6.1 **Conduct of Business and Maintenance of Existence and Assets.**

(a) Conduct continuously and operate actively its business and the business of any Subsidiary according to good business practices;

(b) maintain all of its properties and the properties of any Subsidiary useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any Intellectual Property right or other rights;

(c) keep in full force and effect its existence and the existence of any Subsidiary and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and

(d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain all rights, licenses, leases, powers and franchises of itself or any Subsidiary under the laws of the United States or any political subdivision thereof and under any other laws having application to such Person.

6.2 **Violations**. Immediately notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Loan Party or any Subsidiary thereof or the Collateral which could reasonably be expected to have a Material Adverse Effect.

6.3 **Consolidated Fixed Charge Coverage Ratio**. Maintain a Consolidated Fixed Charge Coverage Ratio for Express Holdco and its Subsidiaries on a consolidated basis of not less than 1.10 to 1.00, which ratio shall be determined as of each fiscal quarter end for the four (4) consecutive fiscal quarters then ending on each such date.

6.4 **Execution of Supplemental Instruments**. Each Loan Party will, and will cause each Subsidiary to execute and deliver, or cause to be executed and delivered, to Agent and Lenders such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, Mortgages, deeds of trust and other documents and such other actions), which may be required by law or which Agent or any Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created, all at the expense of the Loan Parties.

6.5 **Payment of Indebtedness**. Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its Indebtedness.

6.6 **Standards of Financial Statements**. Cause all financial statements referred to in Sections 9.5, 9.6, 9.7 and 9.8 to be complete and correct in all material respects (subject, in the

case of interim financial statements, to notes and normal year-end audit adjustments) and to be prepared in reasonable detail.

6.7 **Taxes**. Pay, and cause each Subsidiary thereof to pay, when due, all (a) income taxes, assessments and other Charges. If any tax, assessment or other Charge by any Governmental Body creates a Lien on the Collateral which Agent, in the exercise of its sole judgment, determines is currently enforceable, Agent without notice to the Loan Parties may pay the taxes, assessments or other Charges. Any such payments shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent immediately upon demand.

6.8 **Interest Rate Protection**. Promptly upon Agent's request, maintain Hedging Contracts with financial institutions acceptable to Agent on such terms and under such conditions as shall be acceptable to Agent.

6.9 **Deposit Accounts**. On the Closing Date, Borrowers shall transfer all funds in any deposit accounts maintained with any other financial institution, to the extent not yet transferred and unless otherwise determined by the Agent in its sole discretion, to the Cash Collateral Account. Notwithstanding the foregoing, Borrowers shall be permitted to maintain that certain Money Market Savings Account with Brookline Bank (Account #1241008323) (the "Brookline Money Market Account"); provided that, (i) the Brookline Money Market Account balance shall not exceed $50,000 at any time, and (ii) if at any time the Brookline Money Market Account balance exceeds $50,000, Borrowers shall promptly transfer the excess funds to the Cash Collateral Account.

6.10 **Credit Insurance**. The Borrowers shall maintain credit insurance policies on no less than fifty percent (50%) of all Eligible Accounts (the insurance carrier, amount and terms of such insurance shall be reasonably acceptable to Agent and shall name Agent as beneficiary or loss payee, as applicable).

6.11 **2022 Real Estate Purchase.** Within thirty (30) days of the 2022 Real Estate Purchase (or such longer time period as agreed to by the Agent in its sole discretion), the Borrowers shall deliver or cause to be delivered to Agent, for the benefit of the Lenders (all of which shall be in a form and substance satisfactory to Agent):

(a) updated schedules to this Agreement (including, but not limited to, Schedule 1.2(a));

(b) a Mortgage (including assignment of leases and rents);

(c) appropriate updates to the Environmental Indemnity Agreement or a new environmental indemnity agreement (as required by Agent);

(d) ALTA mortgagee's title policy with endorsements as required by Agent;

(e) an appraisal (market value "as is") prepared by an appraiser acceptable to Agent;

(f) environmental reports acceptable to Agent;

(g) surveys acceptable to Agent;

(h) if any such parcel of Real Property is determined by Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to Agent; and

(i) such other information, documentation, and certifications as may be reasonably required by Agent.

6.12 **Post-Closing Obligations**. Within sixty (60) days of the Closing Date (or such longer time period as agreed to by the Agent in its sole discretion), the Borrowers shall use commercially reasonable efforts to deliver or cause to be delivered a landlord waiver in form and substance satisfactory to the Agent for certain premises located at Presidents Place - at 1250 Hancock Street, Suite 7N, Quincy, Massachusetts 02169 and leased by RFX pursuant to that lease entered into with Quincy Property Owner I, LLC, a Massachusetts limited liability company, as landlord (the "RFX Lease"). To the extent the RFX Lease is not in affect during such time, the Borrowers shall deliver a landlord waiver in form and substance satisfactory to the Agent for the then applicable lease of the applicable Borrowers.

6.13 **Compliance with Anti-Corruption Laws and Sanctions**. Conduct its businesses in compliance with all Anti-Corruption Laws and applicable Sanctions and maintain policies and procedures designed to promote and achieve compliance with all Anti-Corruption Laws and applicable Sanctions.

## ARTICLE 7
## NEGATIVE COVENANTS

No Loan Party or any Subsidiary thereof, until satisfaction in full of the Obligations and termination of this Agreement, shall:

7.1 **Merger, Consolidation, Acquisition and Sale of Assets.**

(a) Enter into any merger, division, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person except for in connection with and pursuant to the American Group Acquisition, the New WLX Holdings Acquisition, the A.M. Transportation Acquisition, the RFX Acquisition, the LTR Acquisition, the Taylor Transportation Acquisition and any Permitted Business Acquisition or permit any other Person to consolidate with or merge with it.

(b) Sell, pledge, lease, transfer or otherwise dispose of any of its properties or assets, other than (i) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete, not to exceed in the aggregate the sum of $500,000 in any consecutive twelve (12) month period, (ii) sales of inventory to Account Debtors in the ordinary course of business, (iii) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other Intellectual Property rights in the ordinary course of

business, and (iv) leases (including leases to own) of tractors and trailers entered into in the ordinary course of business where the applicable Loan Party or Subsidiary is the lessor and the lessee is an owner-operator, (v) in transfer of equity in connection with the Employment Issuance, and (vi) the transfer of assets pursuant to the Taylor Transportation Contribution Agreement.

7.2 **Creation of Liens**. Create, assign, transfer or suffer to exist any Lien upon or against any of its Collateral, except Permitted Encumbrances, or enter into any agreement or undertaking restricting the right or ability of any Loan Party or Lender to sell, assign or transfer any Collateral except as are expressly provided for herein.

7.3 **Guarantees**. Become liable upon the obligations of any Person by assumption, endorsement or Guaranty thereof or otherwise (other than to Agent or Lender or any affiliate thereof) except (a) the endorsement of checks in the ordinary course of business, (b) guarantees made by a Loan Party with respect to the Obligations of another Loan Party, (c) with respect to American Group, the guaranty for payment and performance given by American Group in connection with the American Group Seller Subordinated Note, (d) with respect to RFX and Pioneer, the Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer in connection with the RFX Subordinated Note, (e) with respect to Load to Ride and One Stop, the Guarantee Joinder to Subordinated Promissory Note, dated as of December 30, 2022, executed by Load to Ride and One Stop in connection with the LTR Subordinated Note, (f) with respect to Taylor Transportation, the Guarantee Joinder to Subordinated Promissory Note, dated as of March 31, 2023, executed by Taylor Transportation in connection with the Taylor Transportation Subordinated Note, and (g) the Guaranty made by Express Holdco of the obligations owing from Express Properties to Huntington or any direct or indirect subsidiary or affiliate of Huntington under any mortgage loan provided by Huntington or any direct or indirect subsidiary or affiliate of Huntington to Express Properties in connection with the Corporate Retreat Purchase.

7.4 **Investments**. Purchase, hold, acquire or invest in the obligations or stock of, or any other interest in, or make or permit to exist any investment or any other interest in (including any option, warrant or other right to acquire any of the foregoing) any Person, except (a) investments existing on the Closing Date and set forth on Schedule 7.4, (b) obligations issued or guaranteed by the United States of America or any agency thereof, (c) commercial paper with maturities of not more than one hundred eighty (180) days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (d) certificates of time deposit and bankers' acceptances having maturities of not more than one hundred eighty (180) days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, (e) U.S. money market funds (i) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc., or (ii) that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof, (f) investments by a Loan Party in a Loan Party, (g) investments made consisting of a Permitted Business Acquisition, or (h) investments in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission

Rights Purchase Agreement, including any additional investments made in connection with the same so long as such additional investments are permitted by the Lenders in their sole discretion.

7.5 **Loans**. Make advances, loans or extensions of credit to any Person, including without limitation any holder of an equity interest in any Borrower, any Subsidiary or Affiliate, other than another Loan Party, except with respect to (a) loans existing on the Closing Date (not including the extensions of credit set forth in clause (c) below) and set forth on Schedule 7.5 (including loans made prior to the Original Closing Date to the Permitted Holder), (b) the extension of commercial trade credit in connection with the sale of Inventory in the ordinary course of its business, (c) the extension of credit to agents, drivers and business affiliates that are not Affiliates of any Loan Party in the ordinary course of business and in amounts not to exceed $250,000 at any time with respect to each agent, driver or business affiliate and in an aggregate amount with respect to all such agents, drivers and business affiliates not to exceed $2,500,000 at any time, or (d) advances in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional advances made in connection with the same so long as such additional advances are permitted by the Lenders in their sole discretion.

7.6 **Capital Expenditures**. Make or incur any Capital Expenditure or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $10,000,000 in each fiscal year (other than Capital Expenditures or commitments thereof made or incurred in connection with the New WLX Holdings Acquisition, the LTR Acquisition, and the Taylor Transportation Acquisition), provided that, solely for the fiscal year ending December 31, 2023, Capital Expenditures made or incurred or commitments thereof in such fiscal year shall not be in excess of $18,750,000 (which includes Capital Expenditures made or incurred in connection with the Corporate Retreat Purchase).

7.7 **Dividends, Distributions and Restricted Payments**. Declare, pay or make any dividend on any shares of the common stock, preferred stock or other equity interest, as applicable, of any Loan Party (other than dividends or distributions payable in stock or other equity interest, as applicable, or splits or reclassifications of its stock or other equity interests), or apply or otherwise distribute any of its funds, property or assets to the purchase, redemption or other retirement of any common or preferred stock or other equity interest, or any warrant as applicable, or of any options to purchase or acquire any such shares of common or preferred stock or other equity interest, as applicable, of any Loan Party, or pay any management, consulting or other similar fees, charges or expenses, other than, (a) with respect to any Loan Party, distributions may be made by any such Loan Party which has elected to be taxed in accordance with Subchapter S and any comparable state tax laws to its respective shareholders in an amount necessary for the payment of the federal and state income tax obligations on account of the attribution of each such Loan Party's income to such shareholders by reason of such Loan Party being a Subchapter S corporation in each case determined by reference to the shareholder who has the highest combined marginal rate for income tax purposes ("Income Tax Distributions") so long as (i) a notice of termination with regard to this Agreement shall not be outstanding, (ii) no Event of Default or Default shall exist immediately prior to or after giving effect to such dividend or distribution; (b) any Subsidiary of any Borrower may make any dividend or distribution to such Borrower, and (c) Annual Dividends. Notwithstanding the foregoing, the Loan Parties may

exercise any call rights ("Call Right Exercise") included in the A.M. Transportation Acquisition Documents, the American Group Acquisition Documents, the New WLX Holdings Acquisition Documents, the RFX Acquisition Documents and any other documents entered into in connection with a Permitted Business Acquisition and pay any amounts required due to the exercise by any applicable seller of the put rights ("Put Rights Payments") included in the A.M. Transportation Acquisition Documents, the American Group Acquisition Documents, the New WLX Holdings Acquisition Documents, the RFX Acquisition Documents and any other entered into in connection with a Permitted Business Acquisition so long as (i) a notice of termination with regard to this Agreement shall not be outstanding at the time of such Call Right Exercise or such Put Right Payment, (ii) no Event of Default or Default shall exist immediately prior to or after giving effect to such Call Right Exercise or such Put Right Payment, and (iii) the Loan Parties shall demonstrate proforma (a) Consolidated Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 immediately prior to and after giving effect to any such Call Right Exercise or Put Right Payment and (b) Undrawn Availability of the Loan Parties of at least $7,500,000 immediately prior to and after giving effect to any such Call Right Exercise or Put Right Payment.

7.8 **Indebtedness.** Create, incur, assume or suffer to exist any Indebtedness except in respect of:

(a) Indebtedness existing on the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 7.8) and set forth on Schedule 7.8 (including any extensions, renewals or refinancings thereof);

(b) Indebtedness to Agent, Lender or any of their respective affiliates, regardless of whether pursuant to the Loan Documents;

(c) Indebtedness incurred for Capital Expenditures permitted under Section 7.6;

(d) Indebtedness as permitted under Section 7.3 and 7.11;

(e) Indebtedness arising from Hedging Contracts required pursuant to Section 6.8;

(f) Indebtedness arising in connection with the American Group Seller Subordinated Note which Indebtedness is subject to the American Group Seller Subordination Agreement;

(g) Indebtedness arising in connection with the A.M. Transportation Subordinated Note which Indebtedness is subject to the A.M. Transportation Subordination Agreement;

(h) Permitted Business Acquisition Indebtedness;

(i) Indebtedness arising in connection with the RFX Subordinated Note which Indebtedness is subject to the RFX Subordination Agreement;

(j) Indebtedness arising in connection with the LTR Subordinated Note which Indebtedness is subject to the LTR Subordination Agreement; and

(k) Indebtedness arising in connection with the Taylor Transportation Subordinated Note which Indebtedness is subject to the Taylor Transportation Subordination Agreement;

7.9 **Nature of Business**. Change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby, purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business for assets or property which are useful in, necessary for and are to be used in its business, as presently conducted and any business closely related thereto.

7.10 **Transactions with Affiliates**. Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise deal with, any Affiliate, except transactions in the ordinary course of business, on an arm's length basis, and on terms no less favorable than terms which would have been obtainable from a Person other than an Affiliate.

7.11 **Leases**. Enter as lessee into any lease arrangement (except lease arrangements between any of the Borrowers and Express Properties or among any of the Borrowers, as approved by the Agent) for real or personal property (other than Capital Leases permitted under Section 7.6) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $2,500,000 in any one fiscal year in the aggregate for all Loan Parties.

7.12 **Subsidiaries; Partnerships.**

(a) Form any Subsidiary (including but not limited to, an Asset Acquiring Subsidiary) or, in the case of a Business Acquisition, join a Subsidiary unless, (i) such Subsidiary expressly becomes a Borrower and becomes jointly and severally liable for the obligations of the Borrowers hereunder, under the Notes and under any other agreement among Borrowers and Agent, for the benefit of Agent and Lenders, (ii) such Borrower pledges 100% of the equity interest owned by such Borrower in such Subsidiary to Agent, for the benefit of Agent and Lenders, (iii) Agent shall have received all documents, including organizational documents and legal opinions it may reasonably require in connection therewith all of which shall be in form and substance satisfactory to the Agent in its sole discretion, including, without limitation, all information that may be reasonably requested by Agent to comply with applicable "know your customer" requirements established by U.S. regulatory authorities (including without limitation pursuant to the Beneficial Ownership Regulation) and (iv) such Subsidiary grants first priority perfected Liens in its assets to Agent, for the benefit of Agent and Lenders; provided, however, to the extent such Subsidiary becomes a Borrower, none of such assets which become Collateral shall be included in the Borrowing Base in accordance with the terms of this Agreement until such time as Agent makes such determination in its sole discretion; or

(b) Enter into any partnership, joint venture or similar agreement.

7.13 **<u>Fiscal Year and Accounting Changes</u>**. Change its fiscal year from twelve consecutive calendar months ending on December 31st of each calendar year or make any material change (a) in accounting treatment and reporting practices except as required by GAAP or (b) in tax reporting treatment except as required or permitted by law.

7.14 **<u>Pledge of Credit</u>**. Now or hereafter pledge Agent's or any Lender's credit on any purchase or for any purpose whatsoever.

7.15 **<u>Amendment of Charter Documents</u>**. Amend, modify or waive any term or material provision of its Charter Documents, other than amendments and modifications to the Charter Documents in connection with the Employment Issuance that are acceptable to the Agent in its sole discretion.

7.16 **<u>ERISA</u>**. Become part of a Controlled Group or create, maintain or become obligated to contribute to any Plan or Multiemployer Plan.

7.17 **<u>Prepayment of Indebtedness</u>**. At any time, directly or indirectly, prepay any Indebtedness (other than to Agent or any Lender or any affiliate of thereof) or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Loan Party or any Subsidiary thereof.

7.18 **<u>Modification of Material Business Agreements</u>**. Amend, waive or otherwise modify in any material respect the terms of any Material Business Agreement or the TUI Commission Rights Purchase Agreement without the prior written consent of Agent.

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1 **<u>Conditions to Initial Loans</u>**. The agreement of Agent, Issuer and Lenders to make the initial Loans and other Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Loans and other Advances, of the following conditions precedent, unless waived by Agent:

(a) <u>Loan Documents</u>. Agent shall have received duly executed (i) Loan Documents and (ii) original stock certificates of each Subsidiary, if any and to the extent not previously delivered to the Agent, along with duly executed stock powers, all in form and substance satisfactory to Agent;

(b) <u>Collateral and Security</u>. To the extent no previously delivered, all Collateral items required to be physically delivered to Agent under the Loan Documents shall have been so delivered, accompanied by any appropriate instruments of transfer (or arrangements satisfactory to Agent for such delivery shall be in place), and all taxes, fees and other charges then due and payable in connection with the execution, delivery, recording, publishing and filing of such instruments and incurrence of the Obligations and the delivery of the Loan Documents shall have been paid in full;

(c) <u>Lien Searches</u>. Agent shall have received accurate and complete copies of any Lien, pending suit, title and other public record searches required by Agent;

(d) Filings, Registrations and Recordings. Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral (including the notation of liens on vehicle titles) shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and all actions necessary to perfect and protect the Liens of Agent shall have been taken;

(e) Organizational Proceedings of the Loan Parties. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Board of Directors, Managers or Members, as applicable, of each Loan Party authorizing (i) the execution, delivery and performance of this Agreement, the Notes, and any related agreements, and (ii) the granting by such Loan Party of the security interests in and Liens upon the Collateral, in each case, certified by an Authorized Officer of such Loan Party as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

(f) Incumbency Certificates of the Loan Parties. Agent shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each Loan Party, dated the Closing Date, as to the incumbency and signature of the Authorized Officers of each Loan Party executing this Agreement, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary;

(g) Certificates. Agent shall have received (i) a copy of the Charter Documents of each Loan Party, together with all amendments thereto, certified by the Secretary of State or other appropriate official of such entity's jurisdiction of formation, incorporation or organization, as applicable (with respect to the formation documents), and by an Authorized Officer of such Loan Party (with respect to the governance documents), or (ii) to the extent delivered to the Agent in connection with the Existing Loan Documents, certification from each such Loan Party of no changes in its Charter Documents since last delivered to the Agent.

(h) Good Standing. Agent shall have received copies of good standing certificates, or similar certifications, as applicable, for the Loan Parties dated not more than thirty (30) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such entity's jurisdiction of incorporation or organization, as applicable, and each jurisdiction where the conduct of each entity's business activities or the ownership of each such entity's properties necessitates qualification;

(i) Legal Opinion. Agent shall have received the (i) executed legal opinion of Dinsmore & Shohl, LLP, counsel to each Loan Party and (ii) any other required local counsel opinions, each in form and substance satisfactory to Agent, which shall cover such matters incident to the transactions contemplated by this Agreement, and the other

Loan Documents as Agent may reasonably require and the Loan Parties hereby authorize and direct such counsel to deliver such opinions to Agent;

(j) No Litigation. (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against any Loan Party or against the officers, directors or managers of any Loan Party, (A) in connection with the Loan Documents or any of the transactions contemplated thereby and which, in the sole discretion of Agent, is deemed material or (B) which Agent determines could have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Loan Party or the conduct of its business or inconsistent with the due consummation of the transactions contemplated by the Loan Documents shall have been issued by any Governmental Body;

(k) Credit Insurance. Agent shall have reviewed all credit insurance policies, coverages and limits;

(l) Beneficial Ownership. Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by Agent;

(m) Fees. Agent shall have received all fees payable to Agent, Issuer and each Lender and reimbursement of all expenses on or prior to the Closing Date, including, without limitation, those fees set forth in the Fee Letter;

(n) Financial Statements; Projections. Agent shall have received the consolidating and consolidated monthly financial statements set forth in Section 5.6(a) and such financial statements shall not in the reasonable judgment of Agent, reflect any material adverse change in the financial condition of any Loan Party. Agent shall have received a copy of projections which shall be satisfactory in all respects to Agent;

(o) Insurance. Agent shall have received, in form and substance satisfactory to Agent, evidence that each Loan Party has the insurance required by Section 4.11, listing Agent as lender loss payee, additional insured and mortgagee, as applicable;

(p) Payment Instructions. Agent shall have received written instructions from the Borrower Representative directing the application of proceeds of the initial Loans and other Advances made pursuant to this Agreement;

(q) Reserved.

(r) Consents. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by the Loan Documents; and, such Consents and Waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(s) No Adverse Material Effect. (i) Since December 31, 2020, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent shall have been proven to be inaccurate or misleading in any material respect;

(t) Waivers. Agent shall have received Waivers satisfactory to Agent with respect to all premises leased by the Loan Parties or at which Inventory is located;

(u) Equity Interest Certificates and Transfer Powers. To the extent applicable, Borrowers shall deliver to Agent original stock certificates and membership interest certificates, as the case may be, for the Borrowers, together with corresponding transfer powers duly executed in blank, and otherwise in form and substance satisfactory to the Agent.

(v) Existing Indebtedness. Agent shall have received (i) a payoff letter, in form and substance satisfactory to Agent, pursuant to which any existing Indebtedness that is to be paid by initial Loans hereunder will be paid in full, and (ii) evidence satisfactory to Agent that all necessary termination statements, satisfaction documents and any other applicable releases in connection with any existing Indebtedness and all other Liens with respect to the Loan Parties that are not Permitted Encumbrances have been filed or arrangements satisfactory to Agent have been made for such filing;

(w) Borrowing Base; Undrawn Availability. Agent shall have received an executed Borrowing Base Certificate from the Borrower Representative demonstrating that the Borrowing Base is sufficient to support the Advances in the amount requested by the Borrower Representative on the Closing Date.

(x) Owned Real Property. With respect to each parcel of Owned Real Property, Agent shall have received:

(i) an amended and restated Mortgage (including assignment of leases and rents);

(ii) the Environmental Indemnity Agreement;

(iii) ALTA mortgagee's title policy endorsement to the existing title policy acceptable to Agent;

(iv) if any such parcel of Real Property is determined by Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to Agent; and

(v) such other information, documentation, and certifications as may be reasonably required by Agent;

(y) Other. All organizational and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to Agent and its counsel.

8.2 **Conditions to Each Advance**. The agreement of Agent, Issuer and each Lender to make any Advance requested to be made on any date (including the initial Loans and Advances), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a) Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to any Loan Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b) No Default. No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

(c) Maximum Advances. In the case of any Advances requested to be made, after giving effect thereto, the Aggregate Revolving Exposure shall not exceed the Maximum Borrowing Amount.

Each request for an Advance by the Borrower Representative hereunder shall constitute a representation and warranty by Borrowers as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

## ARTICLE 9
## INFORMATION AS TO THE LOAN PARTIES

Each Borrower shall, on behalf of itself and the other Loan Parties, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1 **Disclosure of Material Matters**. Immediately upon learning thereof, report to Agent any Default and all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including any Lien or claim asserted against the Collateral, any loss, damage or destruction of any material portion of the Collateral, and any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or material claims or material disputes asserted by any Account Debtor or other obligor.

9.2 **Schedules and Certificates**. Deliver to Agent on or before the fifteenth (15th) day of each calendar month for the prior calendar month:

(a) an accounts receivable aging (reconciled to the general ledger, the Financials and the Borrowing Base Certificate),

(b) an accounts payable schedule (reconciled to the general ledger and to the Financials), and

(c) a Borrowing Base Certificate (which shall be calculated as of the last day of the prior calendar month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement), together with supporting documentation satisfactory to Agent.

In addition, the Borrower Representative shall deliver to Agent on or before each Tuesday, or if such day is not a Business Day, the following Business Day, for the prior Week an interim Borrowing Base Certificate (which shall be calculated as of the last Business Day of the prior week and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement) reflecting all activity (sales, collections, credits, etc.) affecting the accounts of each Borrower for all Business Days of the immediately preceding Week, together with supporting documentation satisfactory to Agent. The amount derived as being excluded from Eligible Accounts used on such interim Borrowing Base Certificate shall be the amount that is calculated and updated monthly pursuant to this Section 9.2 and which is satisfactory to Agent.

In addition, the Borrower Representative will deliver to Agent at such intervals as Agent may reasonably require: (i) confirmatory assignment schedules, (ii) copies of Account Debtor's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents or other information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Accounts by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section 9.2 are to be in form satisfactory to Agent and executed by the Borrower Representative and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and the Borrower Representative's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

9.3 **Litigation**. Immediately notify Agent in writing of any litigation, suit or administrative proceeding affecting any Loan Party or any Subsidiary thereof, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect on any such Person.

9.4 **Material Occurrences**. Immediately notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any default under any Material Business Agreement; (c) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Express Holdco and its Subsidiaries on a consolidated or consolidating basis as of the date of such statements; (d) each and every default by any Loan Party or any Subsidiary thereof which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (e) any other development in the business or affairs of any Loan Party or Subsidiary thereof which could reasonably be expected to have a Material Adverse Effect on any

such Person, describing the nature thereof and the action the Loan Parties or such Subsidiary proposes to take with respect thereto.

9.5 **Annual Financial Statements**. Furnish to Agent within one hundred fifty (150) days after the end of each fiscal year (except with respect to (i) the fiscal year ending December 31, 2022, not later than May 31, 2024, and (ii) the fiscal year ending December 31, 2023, within two hundred forty (240) days after the end of such fiscal year (but not later than August 31, 2024), unless otherwise extended by the Agent in its sole discretion), audited financial statements of Express Holdco and its Subsidiaries on a consolidated basis, including statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, together with consolidating schedules, all prepared in accordance with GAAP, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent. In addition, the reports shall be accompanied by a Compliance Certificate of Borrowers signed by an Authorized Officer of the Borrower Representative, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such event, and such Compliance Certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11.

9.6 **Monthly Financial Statements**. Furnish Agent within thirty (30) days after the end of each fiscal month, an unaudited balance sheet of Express Holdco and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Express Holdco and its Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to the business of Express Holdco and its Subsidiaries and setting forth in each case in comparative form the figures from the projected annual operating budget delivered pursuant to Section 9.8 covering the current fiscal year. Such financial statements and reports shall be accompanied by a Compliance Certificate of an Authorized Officer, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers or the applicable Loan Party with respect to such event and, such certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11, and any other certification as Agent shall reasonably request.

9.7 **Additional Information**. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the representations, warranties, terms, covenants, provisions and conditions of this Agreement, the Notes and the other Loan Documents have been complied with by Borrowers, the other Loan Parties, or any Subsidiary thereof, including, without the necessity of any request by Agent, (a) all documentation and other information that Agent requests to enable Agent and Lenders to comply

with their ongoing obligations under applicable “know your customer” and anti-money-laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, (b) copies of all environmental audits and reviews, (c) at least thirty (30) days prior thereto, notice of any Loan Party's opening of any new place of business, closing of any existing place of business or a change in its legal name, and (d) immediately upon any Loan Party's or any Subsidiary's learning thereof, notice of any material labor dispute to which any such Person may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Loan Party or a Subsidiary is a party or by which any such Person is bound.

9.8 **Projected Operating Budget, Availability Forecast**. Furnish Agent no later than December 31 of each year and for each fiscal year thereafter during the term of this Agreement, a month by month projected operating budget and cash flows of Express Holdco and its Subsidiaries on a consolidated and consolidating basis for such fiscal year (including an income statement and statement of cash flows for each calendar month, and a balance sheet and availability projection as at the end of each calendar month), such projections to be accompanied by a certificate signed by an Authorized Officer to the effect that such projections and forecasts have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such Authorized Officer has no reasonable basis to question the reasonableness of any material assumptions on which such projections and forecasts were prepared.

9.9 **Notice of Suits, Adverse Events**. Furnish Agent with immediate notice of (a) any lapse or other termination of any Consent issued to any Loan Party, or any Subsidiary thereof by any Governmental Body or any other Person that is material to the operation of any such Person's business, (b) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; (c) copies of any periodic or special reports filed by any Loan Party or any Subsidiary thereof with any Governmental Body or Person, material in nature, or if requested by Agent, Issuer or any Lender, and (d) copies of any material notices and other communications from any Governmental Body which specifically relate to any Loan Party or Subsidiary thereof.

## ARTICLE 10
## EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1 **Payment of Obligations**. Failure by any Borrower to pay any principal or interest on any Loan, reimbursement obligation in respect of any Letter of Credit, prepayment, fee, charge, expense reimbursement or other amount or any other Obligation when due and payable, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or any other Loan Document;

10.2 **Payment of Reductions or Mandatory Prepayments**. Failure by any Borrower to timely pay any amounts due under or in connection with Section 2.5;

10.3 **Misrepresentations**. Any representation or warranty made or deemed made by any Loan Party in this Agreement, or any Loan Party or Guarantor in any other Loan Document, amendment or modification thereof or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

10.4 **Failure to Furnish Information, Schedules, Certificates**. Failure by any Loan Party to (a) furnish financial statements, financial information, schedules, reports, borrowing base certificates or other information required to be provided hereunder when due, (b) furnish any additional financial or other information requested by Agent within ten (10) days after such information is requested, or (c) permit the inspection of its books or records;

10.5 **Liens Against Assets**. Issuance of a notice of Lien, levy, assessment, injunction or attachment against (i) the Collateral or (ii) a material portion of the other property of any Loan Party or Subsidiary thereof which is not discharged or lifted within thirty (30) days;

10.6 **Breach of Covenants**. Failure or neglect of any Loan Party, Guarantor or the Permitted Holder to perform, keep or observe any term, provision, condition, covenant contained in this Agreement or any other Loan Document, or contained in any other agreement or arrangement, now or hereafter entered into between any Loan Party, Guarantor or Permitted Holder and Agent, Issuer or any Lender;

10.7 **Judgment**. Any judgment or judgments are rendered or judgment liens filed against any Loan Party, any Subsidiary thereof or any Guarantor for an aggregate amount in excess of $100,000 which, within thirty (30) days of such rendering, or filing is not either fully and completely satisfied, stayed, discharged of record or bonded;

10.8 **Insolvency and Related Proceedings**. Any Loan Party, any Affiliate or Subsidiary thereof or any Guarantor shall (a) apply for, consent to, acquiesce in, or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (b) make a general assignment for the benefit of creditors, (c) admit in writing its inability, or be generally unable to pay its debts as they become due or cease operations of its present business, (d) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (e) be adjudicated a bankrupt or insolvent, (f) file a petition seeking to take advantage of any other law providing for the relief of debtors, (g) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (h) take any action for the purpose of effecting any of the foregoing;

10.9 **Guarantor Default**. Any Guaranty given in respect of any Obligations shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any such Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of any Guaranty to which Guarantor is a party, or any Guarantor shall deny that such Guarantor has any further liability under any Guaranty to which such Guarantor is a party, or shall give notice to such effect;

10.10 **Material Adverse Effect**. Agent, in its sole discretion, determines that a Material Adverse Effect has occurred in respect of any Loan Party or any Guarantor;

10.11 **Loss of Priority Lien**. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest;

10.12 **Breach of Material Business Agreements**. A default of the obligations of any Loan Party under any Material Business Agreement to which it is a party shall occur and not be cured within any applicable cure period if such default could reasonably be expected to have a Material Adverse Effect;

10.13 **Cross Default; Cross Acceleration**. . Any Loan Party shall (a) default in any payment of principal of or interest on any Indebtedness beyond any period of grace with respect to such payment or (b) default in the observance of any other covenant, term or condition contained in any agreement or instrument (including, but not limited to, any agreements or instruments executed in connection with Corporate Retreat Property Mortgage Facility) pursuant to which such Indebtedness is created, secured or evidenced, if the effect of such default is to permit the acceleration of any such Indebtedness (whether or not such right shall have been waived);

10.14 **Change of Control**. Any Change of Control of any Loan Party or any Guarantor shall occur;

10.15 **Invalidity of Loan Documents**. Any material provision of any Loan Document shall, for any reason, cease to be valid and binding on any Loan Party, or any Loan Party shall so claim in writing to Agent;

10.16 **Loss of Material Intellectual Property**. (a) Any Governmental Body shall (i) revoke, terminate, suspend or adversely modify any license, permit, patent, trademark or tradename of any Loan Party, or (ii) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (iii) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Loan Party's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; or (b) any agreement which is necessary or material to the operation of any Loan Party's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination;

10.17 **Destruction of Collateral**. Any portion of the Collateral shall be seized or taken by a Governmental Body, or any Loan Party or the title and rights of any Loan Party shall have become the subject matter of litigation which might, in the sole discretion of Agent, upon final determination, result in material impairment or loss of the security provided by any Loan Document; or

10.18 **Business Interruption**. The operations of any Loan Party are interrupted at any time for more than seven (7) consecutive days, which interruption would reasonably be expected to have a Material Adverse Effect.

10.19 **Hedging Contracts**. Any Borrower fails to comply with or to perform any term, obligation, covenant or condition contained in or the occurrence or existence of any event of default, termination event or other similar event under or with respect to any Hedging Contract.

## ARTICLE 11
## AGENT'S RIGHTS AND REMEDIES AFTER DEFAULT

11.1 **Rights and Remedies**. Upon the occurrence of (a) an Event of Default pursuant to Section 10.8, all Obligations shall be immediately due and payable and this Agreement and the obligation of Issuer and Lenders to make Advances and maintain Loans shall be deemed terminated; and (b) any other Event of Default and at any time thereafter (such Event of Default not having previously been cured), at the option of Agent or the Required Lenders, all Obligations shall be immediately due and payable and Issuer and Lenders shall have the right to terminate this Agreement and to terminate the obligation of Issuer and Lenders to make Advances and maintain Loans. Upon the occurrence of any Event of Default, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take, to the extent permitted by applicable law, possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of any Loan Party's premises or other premises without legal process and without incurring liability to any Loan Party therefor, and Agent may thereupon, or at any time thereafter, in its sole discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require the Loan Parties to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give the Loan Parties reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to the Loan Parties at least five (5) days prior to such sale or sales is reasonable notification. At any public sale Agent may bid for and become the purchaser, and Agent, Issuer and Lenders, or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Loan Party. In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Loan Party's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights which are used in connection with (y) Inventory for the purpose of disposing of such Inventory and (z) Equipment for the purpose of completing the manufacture of unfinished goods. The proceeds realized from the sale of any Collateral shall be applied as follows: first, to the reasonable costs, expenses and attorneys' fees and expenses incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; second, to interest due upon any of the Obligations and any fees payable under this Agreement;

and, third, to the principal of the Obligations and Hedging Obligations. If any deficiency shall arise, the Loan Parties shall remain liable to Agent, Issuer and Lenders therefor.

11.2 **Agent Discretion**. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the rights of Agent, Issuer and Lenders hereunder.

11.3 **Setoff**. In addition to any other rights which Agent, Issuer and Lenders or their affiliates may have under applicable law, upon the occurrence of an Event of Default hereunder, Agent, Issuer and each Lender, including any branch, Subsidiary or Affiliate thereof, shall have a right to apply any Loan Party's property held by Agent, Issuer or such Lender, such branch, Subsidiary or Affiliate to reduce the Obligations.

11.4 **Rights and Remedies not Exclusive**. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5 **Appointment of Receiver**. Upon the occurrence of an Event of Default and at all times thereafter, Agent shall be entitled to the immediate appointment of a receiver for all or part of the Collateral, whether such receivership is incidental to a proposed sale of the Collateral, pursuant to the Uniform Commercial Code or otherwise. Each Loan Party hereby consents to the appointment of such a receiver without bond, to the full extent permitted by applicable statute or law.

11.6 **Reserved**.

11.7 **Allocation of Payments After Event of Default.** Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of Agent in connection with enforcing the rights of Agent, Lenders and Issuer under this Agreement and the Loan Documents and to the payment of any protective advances made by Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FOURTH, to the payment of the outstanding principal amount of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FIFTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of Lenders and Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender or Issuer;

SIXTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents;

SEVENTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit) and arising under the Term Loan ~~and~~, the Term Loan 2, and the Term Loan 3;

EIGHTH, to the payment of all Obligations owing to Agent in connection with Banking Services and Hedging Contracts;

NINTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "EIGHTH" above;

TENTH, to the payment of all obligations owing to Huntington in connection with the Corporate Retreat Property Mortgage Facility; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of Lenders and Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that then outstanding Advances held by such Lender or Issuer bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FIFTH", "SIXTH", "SEVENTH", and "NINTH" above; and (c) to the extent that any amounts available for distribution pursuant to clause "SEVENTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by Agent in a cash collateral account and applied (i) first, to reimburse Issuer from time to time for any drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "EIGHTH" and "NINTH" above in the manner provided in this Section 11.7. For avoidance of doubt, any amounts received and applied to the obligations of the type described in clause "TENTH" shall only be applied after all amounts are applied to the items and obligations of the types described in clauses "FIRST" through "NINTH", to the extent such amounts have not been exhausted.

## ARTICLE 12
## WAIVERS AND JUDICIAL PROCEEDINGS

12.1 **Waiver of Notice**. Each Loan Party hereby waives notice of non-payment of any of the Accounts, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2 **Delay**. No delay or omission on Agent's, Issuer's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3 **Jury Waiver**. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## ARTICLE 13
## EFFECTIVE DATE AND TERMINATION

13.1 **Term**. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party, Agent, Issuer and Lenders, shall become effective on the date hereof and shall continue in full force and effect until the Facility Termination Date, unless sooner terminated as herein provided. Without limiting Section 11.1, (a) the Aggregate Revolving Commitment shall expire on the Facility Termination Date, and (b) all unpaid Obligations shall be paid in full by Borrowers on the Facility Termination Date. Borrowers may terminate this Agreement with at least thirty (30) Business Days' prior written notice thereof to Agent, upon (a) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (b) the cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to Agent of a cash deposit as required by Section 2.9(d)), (c) the payment in full of all reimbursable expenses

and other Obligations together with accrued and unpaid interest thereon, and (d) the payment in full of any amount due under Section 2.11.

13.2 **Termination**. The termination of this Agreement shall not affect any Loan Party's, Agent's, Issuer's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent, Issuer and each Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that the Loan Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Loan Party have been paid or performed in full after the termination of this Agreement or each Loan Party has furnished Agent, Issuer and Lenders with an indemnification satisfactory to Agent, Issuer and Lenders with respect thereto. Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive the termination hereof until all Obligations are paid or performed in full. Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

## ARTICLE 14
## REGARDING AGENT

14.1 **Appointment**. Each Lender and Issuer hereby designates Huntington to act as Agent for each such Lender and Issuer under this Agreement and the Loan Documents. Each Lender and Issuer hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders and Issuer. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including without limitation, collection of the Notes) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Loan Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2 **Nature of Duties**. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Loan Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (a) liable for any action taken or omitted by them

as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct, or (b) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Loan Documents, as the case may be, or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Loan Documents or for any failure of any Loan Party to perform its obligations hereunder. Agent shall not be under any obligation to any Lender or Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Loan Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent in respect to the Advances and the Loans to the Loan Parties shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or Issuer; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

14.3 **Lack of Reliance on Agent and Resignation**. Independently and without reliance upon Agent, any other Lender or Issuer, each Lender and Issuer has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances and the Loans hereunder and the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of each Loan Party. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender or Issuer with any credit or other information with respect thereto, whether coming into its possession before making of the Advances and the Loans or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender or Issuer for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Loan Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Loan Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

Agent may resign on thirty (30) days' written notice to each of Lenders, Issuer and Borrower Representative and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to the Loan Parties.

Any such successor of Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After Agent's resignation as Agent, the provisions of this Article 14 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

14.4 **Certain Rights of Agent**. If Agent shall request instructions from Lenders and Issuer with respect to any act or action (including failure to act) in connection with this Agreement or any Loan Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders and Issuer shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

14.5 **Reliance**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Loan Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.6 **Notice of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Loan Documents, unless Agent has received notice from a Lender, Issuer or a Loan Party referring to this Agreement or the Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders and Issuer. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders and Issuer.

14.7 **Indemnification**. To the extent Agent is not reimbursed and indemnified by the Loan Parties, each Lender will reimburse and indemnify Agent and Issuer in proportion to its respective portion of the Advances and Loans (or, if no Advances or Loans are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent or Issuer in performing their duties hereunder, or in any way relating to or arising out of this Agreement or any Loan Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's or Issuer's gross negligence or willful misconduct.

14.8 **Agent in its Individual Capacity**. With respect to the obligation of Agent to lend under this Agreement, the Advances and Loans made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees

and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9 **Delivery of Documents**. To the extent Agent receives financial statements required under Article 9 of this Agreement, Agent will promptly furnish such documents and information to Lenders and Issuer.

14.10 **Loan Parties' Undertaking to Agent**. Without prejudice to their respective obligations to Lenders and/or Issuer under the other provisions of this Agreement, each Loan Party hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent, Lenders or Issuer or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of Lenders and Issuer or the relevant one or more of them pursuant to this Agreement.

14.11 **No Reliance on Agent's Customer Identification Program**. Each of Lenders and Issuer acknowledges and agrees that neither such Lender nor Issuer, nor any of their Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Issuer's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record keeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other laws.

14.12 **Erroneous Payments**.

(a) Each Lender and Issuer hereby agrees that (i) if Agent notifies such Lender or Issuer that Agent has determined in its sole discretion that any funds received by such Lender or Issuer from Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender or Issuer (whether or not known to such Lender or Issuer) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender or Issuer shall promptly, but in no event later than one (1) Business Day thereafter, return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender or Issuer to the date such amount is repaid to Agent at the greater of the Fed Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender or Issuer shall not assert, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Erroneous Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of Agent to any Lender or Issuer under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), if any Lender or Issuer receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from Agent (or any of its Affiliates) that (x) is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates), or (z) such Lender or Issuer otherwise becomes aware was transmitted, or received, in error (in whole or in part):

(i) (A) in the case of immediately preceding clause (x) or (y), an error shall be presumed to have been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) or (B) in the case of immediately preceding clause (z), an error has been made, in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender or Issuer shall promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying Agent pursuant to this Section 14.12(b).

(c) Each Borrower agrees, for itself and each other Loan Party, that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender or

Issuer that has received such Erroneous Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights of such Lender or Issuer with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by Borrowers or any other Loan Party, except, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Agent from Borrowers or any other Loan Party for the express purpose of making such Erroneous Payment.

(d) Each party's obligations under this Section 14.2 shall survive the resignation or replacement of Agent, any transfer of rights or obligations by (or the replacement of) a Lender, the termination of the Aggregate Commitment or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

14.13 **Agent Professionals**. Agent may perform its duties through agents and employees. Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care, except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such agents, employees or Agent Professionals.

## ARTICLE 15
## MISCELLANEOUS

15.1 **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. Any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement or any related agreement may be brought in any court of competent jurisdiction in the Commonwealth of Pennsylvania, United States of America, and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to the Borrower Representative at its address set forth in Section 15.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the option of Agent, Issuer or Lenders, by service upon the Borrower Representative which each Loan Party irrevocably appoints as such Loan Party's agent for the purpose of accepting service within the Commonwealth of Pennsylvania. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent, Issuer or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction. Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Any judicial proceeding by any Loan Party against Agent, Issuer or any Lender involving, directly or indirectly, any matter or claim in any way arising out

of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of Allegheny, Commonwealth of Pennsylvania.

15.2 **Entire Understanding**.

(a) This Agreement and the other Loan Documents contain the entire understanding between each Loan Party, Agent, Issuer and Lenders and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, Agent's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of the Loan Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b) The Required Lenders, Agent with the consent in writing of the Required Lenders, and the Loan Parties may, subject to the provisions of this Section 15.2(b), from time to time enter into written supplemental agreements to this Agreement or the Loan Documents executed by the Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Issuer, Agent or the Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, the consent of Issuer must be obtained with respect to any amendment, waiver or consent with respect to Sections 2.7, 2.8 and 2.9 or any other provisions, the amendment or waivers of which would adversely affect Issuer and, provided, further, that no such supplemental agreement shall:

(i) increase the Revolving Commitment of any Lender, without the written consent of Agent and such Lender;

(ii) extend the maturity of any Note or the due date for any amount payable hereunder without the written consent of Agent and each Lender affected thereby;

(iii) decrease the rate of interest or reduce any fee payable by the Loan Parties to Lenders and/or Issuer pursuant to this Agreement without the written consent of Agent and each Lender and/or Issuer affected thereby;

(iv) alter the definition of the term Required Lenders without the consent of Agent and each Lender;

(v) alter, amend or modify this Section 15.2(b) without the consent of Agent and each Lender;

(vi) release any Collateral during any calendar year (other than in connection with dispositions of collateral permitted by this Agreement) having an aggregate value in excess of One Million Dollars ($1,000,000) without the consent of each Lender;

(vii) change the rights and duties of Agent without the consent of each Lender;

(viii) increase the advance rates in definition of Borrowing Base above the advance rates in effect on the Closing Date without the consent of each Lender;

(ix) release any Loan Party from the Obligations under this Agreement, or any Loan Document without the consent of each Lender; or

(x) alter, amend or modify Section 11.7 hereof without the consent of each Lender.

Any such supplemental agreement shall apply equally to each Lender and Issuer and shall be binding upon the Loan Parties, Lenders, Issuer, Agent and all future holders of the Obligations. In the case of any waiver, the Loan Parties, Agent, Lenders and Issuer shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, Agent may at its discretion and without the consent of Lenders, voluntarily permit the outstanding Revolving Loans and the amount of Letters of Credit outstanding at any time to exceed one hundred ten percent (110%) of the Borrowing Base for up to ninety (90) consecutive Business Days provided that such outstanding Advances do not exceed the Aggregate Revolving Commitment. For purposes of the preceding sentence, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Borrowing Base was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be "Eligible Accounts" becomes ineligible or collections of Accounts applied to reduce outstanding Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Advances to exceed the Borrowing Base by more than ten percent (10%), Agent shall use its efforts to have the Loan Parties decrease such excess in as expeditious a

manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

15.3 **Transfers and Assignments.**

(a) Successors and Assigns**.** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their rights or Obligations hereunder without the prior written consent of Agent. No Lender may assign or otherwise transfer any of its rights or Obligations hereunder except: (i) to an Eligible Assignee in accordance with the provisions of Section 15.3(a), (ii) by way of participation in accordance with the provisions of Section 15.3(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 15.3(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 15.3(d) and, to the extent expressly contemplated hereby, the Affiliates of each of Agent, Lenders and the respective directors, officers, employees, agents and advisors of such Affiliates) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Transfer of Commitments. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the commitment to make Advances and Loans hereunder (which for this purpose includes Advances and Loans outstanding thereunder) or, if the applicable commitment to make Advances and Loans hereunder is not then in effect, the principal outstanding balance of the Advances and Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Advances and Loans, unless Agent otherwise consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances and Loans or the commitment to make Advances and Loans hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Advances and Loans on a non-pro rata basis; (iii) any assignment of a commitment to make Advances and Loans hereunder must be approved by Agent unless the Person that is the proposed assignee is itself a Lender with a commitment to make

Advances and Loans hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500). Subject to acceptance and recording thereof by Agent pursuant to Section 15.3(b), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 15.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 15.3(d).

(c) Maintenance of Register. Agent, acting solely for this purpose as an agent of the Loan Parties, shall maintain at its office in Columbus, Ohio, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the commitments to make Advances and Loans hereunder of, and principal amounts of the Advances and Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Loan Parties, Agent and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower Representative and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, Borrower Representative or Agent, sell participations to any Person (other than a natural person or any Loan Party or any of the Loan Party's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and/or the Advances and Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 15.2(b)(i) through 15.2(b)(ix)

that affects such Participant. The Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.7, 3.8, 3.9 and 15.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 15.3(a).

A Participant shall not be entitled to receive any greater payment under Section 15.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Loan Parties' prior written consent.

(e) Pledge of Interests. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f) Notes. Each Borrower shall execute and deliver: (i) to Agent, the transferor and the transferee, any consent or release (of all or a portion of the obligations of the transferor) to be delivered in connection with each assignment or other transfer under this Section 15.3, (ii) if a Lender's entire interest in its commitments to make Advances and other Loans hereunder and all of its Advances and other Loans have been transferred to the transferee, an appropriate replacement note against return of the Notes (marked "replaced") held by the transferor and (iii) if only a portion of a Lender's interest in its commitments to make Advances and other Loans hereunder and such Advances and other Loans have been transferred, replacement notes to each of the transferor and the transferee against return of the original such Notes of the transferor (each marked "replaced") held by the transferor; provided, that, simultaneously with Borrowers' delivery of new Notes pursuant to this Section 15.3(f), the transferor Agent will deliver to Borrowers any Note being replaced in whole or in part, and each such Note delivered by the transferor Lender shall be conspicuously marked "replaced" when so delivered.

(g) Replacement of Certain Lenders. If any Lender is a Defaulting Lender hereunder, then Borrower Representative may, at its sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 15.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that: (i) Borrower Representative shall have received the prior written consent of Agent, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts). No Lender shall be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower Representative to require such assignment and delegation cease to apply.

(h) Replacement of Non-Consenting Lenders. If, in connection with any proposed amendment, waiver or consent hereunder pursuant to Section 15.2(b) hereof: (i) requiring the consent of all Lenders, the consent of Required Lenders is obtained but the consent of all Lenders whose consent is required is not obtained or (ii) requiring the consent of Required Lenders, the consent of Lenders holding fifty-one percent (51%) or more is obtained but the consent of Required Lenders is not obtained (any Lender withholding consent as described in clause (i) and (ii) hereof being referred to as a "Non-Consenting Lender"), then, so long as Agent is not a Non-Consenting Lender, Agent may, at the sole expense of the Loan Parties, upon notice to such Non-Consenting Lender and Borrower Representative, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 15.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).

15.4 **Application of Payments**. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations in such order as Agent determines in its sole discretion. To the extent that any Loan Party makes a payment or Agent, Issuer or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent, Issuer or Lenders.

15.5 **Indemnity**. Each Loan Party shall indemnify Agent, Issuer and each Lender and each of their officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent, Issuer or any Lender or any other such indemnified party in any litigation, proceeding or investigation with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, any Loan Document, whether or not Lender is a party thereto.

15.6 **Notice**. Any notice or request hereunder may be given to any Borrower or any Loan Party or to Agent, Issuer or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15.6. Any notice, request, demand, direction or other communication (for purposes of this Section 15.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made in writing (which includes by means of electronic transmission (i.e., "e-mail")). Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names in Section 15.6(d) or in accordance with any subsequent unrevoked Notice from any such party that

is given in accordance with this Section 15.6. Any notice provided to the Borrower Representative shall be deemed to have been given to each other Loan Party. Any Notice shall be effective:

(a) In the case of hand-delivery, when delivered;

(b) If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c) In the case of electronic transmission, when actually received;

(d) If given by any other means (including by overnight courier), when actually received, and

(e) When any Lender or Issuer gives a Notice to Borrower Representative or any Loan Party, such Lender or Issuer shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders and Issuer.

(A) If to Agent, Issuer or any Lender at:

The Huntington National Bank
200 Public Square CM64
Cleveland, Ohio 44114
Attention: ABL Account Manager
Telephone: 412-667-6525
Email: ABLOperations@huntington.com

With copies to (which shall not constitute notice):

Buchanan Ingersoll & Rooney, PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania 15219
Attention: Sean M. Girdwood
Telephone: 412-392-1635
Email: sean.girdwood@bipc.com

(B) If to Borrowers at: R & R Express Holdco, Inc.
100 Commerce Drive
Pittsburgh, Pennsylvania 15275
Attention: Richard S. Francis, President
Telephone: 800-223-8973
Email: rich@balrrexp.com

With copies to (which shall not constitute notice):

Dinsmore & Shohl LLP
Six PPG Place, Suite 1300

Pittsburgh, Pennsylvania 15222
Attention: Jim Carlisle, Esq.
Telephone: 412-230-8984
Email: jim.carlisle@dinsmore.com

15.7 **Survival**. The obligations of the Loan Parties under Sections 2.9, 2.11, 3.7, 3.8, 3.9, 3.10, 3.11 and 15.5 shall survive termination of the Loan Documents and payment in full of the Obligations.

15.8 **Severability**. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

15.9 **Expenses**.

(a) Loan Parties shall pay all costs, expenses, including reasonable attorneys' fees (including the allocated costs of in house counsel), and disbursements incurred by Agent (i) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, (ii) in connection with any advice given to any Lender or Issuer with respect to its rights and obligations under this Agreement and all related agreements, in each case, which may be charged to the Loan Account as a Revolving Loan of a Domestic Rate Loan and added to the Obligations. Expenses being reimbursed by the Loan Parties under this Section include costs and expenses incurred in connection with: (1) appraisals and insurance reviews; (2) field examinations and the preparation of reports based on the fees charged by a third party retained by Agent or the internally allocated fees for each Person employed by Agent with respect to each field examination; (3) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of Agent; (4) taxes, fees and other charges for (A) lien and title searches and title insurance and (B) recording any Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Liens of Agent, Issuer, or any Lender; (5) sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and (6) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

(b) Loan Parties shall pay all costs, expenses, including reasonable attorneys' fees (including the allocated costs of in house counsel), and disbursements incurred by Agent, Lenders and Issuer (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, (ii) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's, Issuer's or any Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iii) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's, any Lender's or Issuer's transactions with any Loan Party.

(c) The out-of-pocket expenses (including attorneys' fees and expenses) of Agent and Lenders permitted by this Agreement will be for the account of Borrowers and Borrowers acknowledge that Borrower Representative will receive summary invoice(s) reflecting only the total amount due and that such summary invoice(s) may not contain any narrative description of the services provided. Furthermore, Borrowers acknowledge that delivery of summary invoice(s) shall not in any way constitute a waiver of any right or privilege of Agent or any Lender associated with such invoice(s).

15.10 **Important Information About Procedures Required by the USA Patriot Act**. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with Agent or the Lenders.

What this means: When an entity or person opens an account or establishes a relationship with Agent or the Lenders, Agent or the Lenders may ask for the name, address, date of birth, and other information that will allow Agent and the Lenders to identify the entity or person who opens an account or establishes a relationship with Agent or the Lenders. Agent or the Lenders may also ask to see identifying documents for the entity or person.

15.11 **Injunctive Relief**. Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Agent, Issuer or Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

15.12 **No Liability; Consequential Damages**. Agent's and Lenders' sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as such party deals with similar property for its own account. Neither Agent, any Lender, nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Loan Party or any other Person or to take any other action whatsoever with regard to any Collateral. The powers conferred on Agent and Lenders hereunder are solely to protect Agent's and Lenders' interest in the Collateral and shall not impose any duty upon Agent's or any Lender to exercise any such powers. Agent and Lenders shall be accountable only for amounts that Agent and Lenders actually receive as a result of the exercise of such powers, and neither Agent, each Lender nor any of Agent's or Lenders' officers, directors, employees or agents shall be responsible to any Loan Party for any act or failure to act hereunder, except for Agent's or any Lender's gross negligence or willful misconduct. Agent and Lenders, and any of their respective agents or attorneys, shall not be liable to any Loan Party for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

15.13 **Counterparts; Electronic Signatures**. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same

agreement. Any signature delivered by a party by email transmission shall be deemed to be an original signature hereto.

15.14 **Construction**. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits hereto.

15.15 **Confidentiality; Sharing Information.**

(a) Agent, Issuer and Lenders and each transferee thereof ("Transferee") shall hold all non-public information obtained by Agent or such Transferee in accordance with Agent's, and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender, and such Transferee may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel and other professional advisors, (b) to any other Lender, and such Transferee and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process.

(b) Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by Agent, Issuer, Lenders or by one or more Subsidiaries or Affiliates of Agent, Issuer or Lenders and each Loan Party hereby authorizes Agent, Issuer and Lenders to share any information delivered to Agent, Issuer or any Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of Agent, Issuer or any Lender to enter into this Agreement, to any such Subsidiary or Affiliate of Agent, Issuer or such Lender, it being understood that any such Subsidiary or Affiliate of Agent, Issuer or such Lender receiving such information shall be bound by the provisions of this Section 15.15 as if it were Agent, Issuer or a Lender, hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

15.16 **Publicity**. Each Loan Party hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among the Loan Parties and Agent, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent in its sole discretion shall deem appropriate.

15.17 **Conflict Clause**. In the event of any conflict, inconsistency or discrepancy between the provisions of this Agreement and the provisions of the Loan Documents and any other collateral agreements, the provisions giving Agent or any Lender greater rights or remedies shall govern to the maximum extent permitted by any applicable law, it being understood and agreed that the purpose of this Agreement and any Loan Documents is to add to, and not to limit, detract or derogate from, diminish or otherwise impair or reduce the rights granted to Agent and Lenders pursuant to this Agreement or the Loan Documents. For greater certainty, where the provisions of this Agreement and the provisions of the Loan Documents deal with the same subject matter but are not identical, no conflict between the said documents shall exist or be

deemed to exist unless the observance of or compliance with the provisions of one of the said documents will cause a default under or breach of the provisions of the other document or documents.

15.18 **Amendment and Restatement.**

(a) Existing Obligations. Borrowers hereby acknowledge, confirm and agree that Borrowers are indebted to Agent for outstanding loans and advances to Borrowers under the Existing Loan Documents, together with all interest accrued and accruing thereon (to the extent applicable), and all fees, costs, expenses and other charges relating thereto, all of which are unconditionally owing by Borrowers to Agent to the extent set forth in the Existing Loan Documents, without offset, defense or counterclaim of any kind, nature or description whatsoever.

(b) Acknowledgment of Security Interests.

(i) Borrowers hereby acknowledge, confirm and agree that Agent shall continue to have a security interest in and lien upon the Collateral heretofore granted to such parties pursuant to the Existing Loan Documents to secure the Obligations, as well as any Collateral granted under this Agreement or under any of the other Loan Documents or otherwise granted to or held by Agent.

(ii) The liens and security interests of Agent in the Collateral shall be deemed to be continuously granted and perfected from the earliest date of the granting and perfection of such liens and security interests to Agent whether under the Existing Loan Documents, this Agreement or any of the other Loan Documents.

(c) Existing Agreements. Borrowers hereby acknowledge, confirm and agree that, subject to this Section 15.18: (i) the Existing Loan Documents have been duly executed and delivered by Borrowers and are in full force and effect as of the date hereof; (ii) the agreements and obligations of Borrowers contained in the Existing Loan Documents constitute the legal, valid and binding obligations of Borrowers enforceable against Borrowers in accordance with their terms, except as they may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, and Borrowers do not have a valid defense to the enforcement of such obligations; and (iii) Agent is entitled to all of the rights, remedies and benefits provided for in or arising pursuant to the Existing Loan Documents.

(d) Waiver and Release of all Claims and Defenses. Each Borrower hereby represents and warrants to Agent, and agrees with Agent, that such Borrower does not have any claim or offset against, or defense or counterclaim to, any obligation or liability under this Agreement, the Existing Loan Documents or any other Loan Document, and such Borrower hereby waives and releases Agent and all of its affiliates, officers, agents, attorneys, employees and representatives, as of the date hereof, from any and all such

claims, offsets, defenses and counterclaims of which such Borrower is aware or unaware, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto.

(e) Restatement.

(i) Except as otherwise stated in Section 15.18(b) hereof and this Section 15.18(e)(i), as of the date hereof, the terms, conditions, agreements, covenants, representations and warranties set forth in the Existing Loan Documents are simultaneously amended and restated in their entirety (excluding the schedules prepared as of the Original Closing Date, which shall be superseded by the schedules delivered on and after the Closing Date), and as so amended and restated, replaced and superseded by the terms, conditions, agreements, covenants, representations and warranties set forth in this Agreement and the other Loan Documents executed or delivered on or after the date hereof, except that nothing herein or in the other Loan Documents shall impair or adversely affect the continuation of the liability of Borrowers for the Obligations heretofore incurred and the security interests, liens and other interests in the Collateral heretofore granted, pledged or assigned by Borrowers to Agent (whether directly, indirectly or otherwise).

(ii) The amendment and restatement contained herein shall not, in any manner, be construed to constitute payment of, or impair, limit, cancel or extinguish, or constitute a novation in respect of, the Obligations of Borrowers evidenced by or arising under any of the Existing Loan Documents, and the Liens and security interests of Agent securing such Obligations and other obligations and liabilities, which shall not in any manner be impaired, limited, terminated, waived or released, but shall continue in full force and effect in favor of Agent.

All loans, advances and other financial accommodations under any of the Existing Loan Documents and all other Obligations of Borrowers to Agent outstanding and unpaid as of the date hereof pursuant to the Existing Loan Documents or otherwise shall be deemed Obligations of Borrowers pursuant to the terms hereto.

[SIGNATURE PAGES AND SCHEDULES/EXHIBITS OMITTED]

**EXHIBIT B**

Updated Schedules 1, 1.2(a), and 5.10 of the Credit Agreement

SCHEDULE 1

COMMITMENT SCHEDULE

| Lender | Revolving Commitment | Term Loan Commitment | Term Loan 2 Commitment | Term Loan 3 Commitment | Commitment |
|---|---|---|---|---|---|
| The Huntington National Bank | $65,934,223.07 | $2,740,776.93 | $972,000.00 | $520,000 | $70,167,000.00 |
| S&T BANK | $19,065,776.93 | $934,223.07 | $0.00 | $0.00 | $20,000,000.00 |
| | | | | | |
| **Total** | **$85,000,000** | **$3,675,000** | **$972,000** | **$520,000** | **$90,167,000.00** |

**SCHEDULE 1.2(a)**

## OWNED REAL PROPERTY

100 Commerce Drive, Findlay Township, Pennsylvania owned by R&R Express Properties, LLC

1401 Iron St. in North Kansas City, MO 64116, owned by R&R Express Properties

5417 US HWY 301, Hope Mills, North Carolina owned by R&R Express Properties, LLC

5545 US HWY 301, Hope Mills, North Carolina owned by R&R Express Properties, LLC

1419 N 5th St., Union City, Tennessee owned by R&R Express Properties, LLC

**SCHEDULE 5.10**

**PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES**

| Company or Subsidiary that is the Owner of the IP | Type of IP | Description of IP | Serial Number | Filing Date | Registration Number | Jurisdiction in which IP is Registered |
|---|---|---|---|---|---|---|
| RFX, LLC | Trademark | RFX | 76550935 | September 22, 2003 | 2881235 | USA |
| RFX, LLC | Trademark | WHAT WE DO MATTERS | 88443856 | May 23, 2019 | 5914911 | USA |
| RFX, LLC | Trademark | RFX & Design | 88419142 | May 7, 2019 | 5914349 | USA |
| RFX, LLC | Trademark | RFX & Design | 76627278 | January 7, 2005 | 3034052 | USA |
| Pioneer Transfer LLC | Trademark | PIONEER TRANSFER | 90062111 | July 20, 2020 | 6338649 | USA |
| Border Connect Logistics, Inc. dba R&R Global | Trademark | FR8TMS | 98066239 | June 30, 2023 | | USA |
| R&R Express, Inc. dba R&R Family of Companies | Trademark | R&R FAMILY OF COMPANIES | 98602170 | June 14, 2024 | | USA |
| Border Connect Logistics, | Trademark | FR8TMS | 98066237 | June 30, 2023 | 7478745 | USA |

| | | | | | | |
|---|---|---|---|---|---|---|
| Inc. dba R&R Global | | | | | | |
| Border Connect Logistics, Inc. dba R&R Global | Trademark | FR8TMS | 2290747 | November 2, 2023 | | Canada |
| Border Connect Logistics, Inc. dba R&R Global | Trademark | FR8TMS | 2290755 | November 2, 2023 | | Canada |
| Border Connect Logistics, Inc. dba R&R Global | Trademark | FR8TMS | 2726438 | November 3, 2023 | M3048099 | Mexico |
| Border Connect Logistics, Inc. dba R&R Global | Trademark | FR8TMS | 2726437 | November 3, 2023 | M308095 | Mexico |

# EIGHTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS EIGHTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of November 27, 2024 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers have requested that the Lenders (i) make a new Term Loan to the Borrowers on the Effective, and (ii) make certain other amendments and grant certain other accommodations all as hereinafter provided, on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. **Recitals**. The foregoing recitals are hereby incorporated by this reference.

2. **Amendments**.

(a) On the Effective Date, the Credit Agreement, is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text or double-underlined text) as set forth in a conformed copy of the Credit Agreement attached as Exhibit A hereto (the credit agreement attached hereto as Exhibit A being referred to herein as the "Composite Credit Agreement").

(b) Each of Schedule 1 and Schedule 1.2(c) of the Credit Agreement is hereby amended and restated in its entirety in the form attached hereto as Exhibit B.

(c) The Credit Agreement hereby amended to add the form of Term Loan 4 Note attached hereto as Exhibit C as a new Exhibit E to the Credit Agreement.

(d) With the exception of the above noted schedules and exhibits, no other schedules or exhibits to the Credit Agreement are being amended or modified in connection with this Amendment.

3. **Release; No Discharge**. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

4. **Conditions to Effectiveness**. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment.

(b) Execution and Delivery of the Notes. The Borrowers shall have executed and delivered to the Lenders new Term Loan 4 Notes (as defined in the Composite Credit Agreement), and a corresponding Disclosure for Confession of Judgment.

(c) Secretary's Certificates. The Agent shall have received a certificate dated as of the Effective Date and signed by the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each of the Loan Parties, in form and substance satisfactory to the Agent, certifying as appropriate as to: (i) all action taken by each Loan Party in connection with this Amendment and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated hereunder and under the Credit Agreement; (ii) the names of the Authorized Officers authorized to sign the Loan Documents and their true signatures; and (iii) copies of its Charter Documents as in effect on the date hereof certified by the appropriate state official where such documents are filed in a state office together with (and subject to Section 6(a) below) certificates from the appropriate state officials as to the continued existence and good standing of each Loan Party in each state where organized or qualified to do business (or to the extent previously delivered to the Agent, certification from each such Loan Party of no changes to its Charter Documents since last delivered to the Agent.

(d) Officer's Certificate. A certificate of each of the Borrowers signed by an Authorized Officer, dated as of the Effective Date, in form and substance satisfactory to the Agent, stating that: (i) each Borrower has complied with all duties and obligations required to date to be carried out and performed by it pursuant to the terms of the Credit Agreement or any other Loan Document, (ii) no Default or Event of Default has occurred and is continuing, or would result from the Loans to be made on the date hereof or from the application of the proceeds therefrom, (iii) all representations and warranties contained in the Credit Agreement, as supplemented by the revised schedules hereto, or any other Loan Document are true and correct as of the date hereof, and (iv) each Borrower is in compliance with all agreements and conditions under the Credit Agreement and the Loan Documents.

(e) Opinion. The Borrowers shall deliver a written opinion of counsel (including local counsel if necessary) for the Loan Parties, dated as of the Effective Date in form and substance satisfactory to the Agent and its counsel.

(f) Unbilled Accounts Report. The Agent shall have received a report of Eligible Unbilled Accounts in form and substance satisfactory to the Agent in its Permitted Discretion.

(g) KYC/AML/Beneficial Ownership. The Agent shall have received all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by the Agent.

(h) Flood Diligence. The Agent shall have received (i) satisfactory flood due diligence for any Owned Real Property subject to a mortgage, and (ii) if any such parcel is determined by the Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to the Agent.

(i) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(j) Payment of Fees and Expenses. The Borrowers shall (i) pay to Agent an upfront fee in the amount of $10,000 for the Lenders holding the Term Loan 4 Commitments, and (ii) reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

(k) Financial Information. The Agent shall have received (i) interim financial statements together with a Compliance Certificate and supporting covenant calculations for the period ended September 30, 2024, (ii) monthly financial statement projections for the fiscal quarters ending December 31, 2024 and March 31, 2025, including without limitation income statements, balance sheets, statements of cash flows and projected Borrowing Base availability and Consolidated Fixed Charge Coverage Ratio calculations, and (iii) personal financial statements for Richard S. Francis, all in form and substance satisfactory to the Agent.

(l) Miscellaneous. The Loan Parties shall have provided such other documents, agreements, instruments, deliverables and items deemed reasonably necessary by the Agent and shall have satisfied such other conditions as set forth in the closing agenda provided to the Loan Parties in connection with this Amendment.

5. **Representations and Warranties**. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

6. Post-Closing Obligations.

(a) Within thirty (30) days of the Effective Date (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall deliver (i) accurate and complete copies of any Lien, pending suit, title and other public record searches for each Borrower required by Agent, (ii) an updated comprehensive list of all rolling stock of the Borrowers, and (iii) updated evidence that each Loan Party has the insurance required by Section 4.11 of the Credit Agreement, listing Agent as lender loss payee, additional insured and mortgagee, as applicable, in each case in form and substance satisfactory to the Agent.

(b) Within ten (10) days of the Effective Date (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall (i) with the assistance of Compass Advisors, prepare and deliver to Agent for the September and October reporting periods (x) month-end reconciliations of the Borrowers' accounts receivable balance in accordance with Agent's internal reporting system, and (y) month-end accounts receivable agings of the Borrowers, and (ii) deliver to Agent an executed engagement letter or such other evidence satisfactory to Agent that Borrowers have engaged an investment bank to raise sufficient capital to allow the Borrowers to repay the Term Loan 4 on or prior to the Term Loan 4 Maturity Date, in each case in form and substance satisfactory to the Agent.

7. **Miscellaneous**.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby. Each Loan Party hereby further confirms its guarantees, pledges and grants of security interests, as applicable, under each of the Loan Documents to which it is party. Each Loan Party reconfirms the prior grant of the security interest in and first priority, perfected lien in favor of the Agent for its benefit and the ratable benefit of each Lender, upon and to, all of its right, title and interest in and to the Collateral, whether now owned or hereafter acquired, created or arising and wherever located.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) Further Assurances. The Borrowers agree to execute such other documents, instruments and agreements and take such further actions reasonably requested by the Agent to effectuate the provisions of this Amendment.

(f) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

*[Signature Page Follows]*

**[SIGNATURE PAGE – EIGHTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC**

By: Richard S Francis (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC, AGX FREIGHT LOGISTICS, LLC, AGX FREIGHT INTERMODAL, LLC, RFX TAMPA, LLC, NEW TAYLOR TRANSPORTATION, LLC, A.M. TRANSPORTATION SERVICES LLC**

By: Richard S Francis (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By: Richard S Francis (SEAL)
Name: Richard S. Francis
Title: Manager

**[SIGNATURE PAGE – EIGHTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By: [signature]
Name: Nelson Rauscher
Title: Vice President

**[SIGNATURE PAGE – EIGHTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: ______________________________
Name: Eric Huff
Title: Senior Vice President

**EXHIBIT A**

Composite Credit Agreement

See attached.

***<u>Exhibit A – Eighth Amendment to Second A&R Credit and Security Agreement</u>***

***First Amendment dated December 30, 2022***
***Incorporating Second Amendment dated February 7, 2023***
***Third Amendment and Joinder dated June 21, 2023***
***Fourth Amendment dated September 1, 2023***
***Fifth Amendment dated May 28, 2024***
***Revolving Credit Increase Agreement dated June 26, 2024***
***Sixth Amendment dated July 31, 2024***
***Seventh Amendment dated August 30, 2024***
***Eighth Amendment dated November 27, 2024***

**SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT**
**among**

**THE HUNTINGTON NATIONAL BANK**
**(as Administrative Agent, a Lender and issuer of Letters of Credit)**

**THE LENDERS PARTY HERETO**

**and**

**R&R EXPRESS HOLDCO, INC,**
**R & R EXPRESS, INC.,**
**GT WORLDWIDE TRANSPORT, INC.,**
**BORDER CONNECT FREIGHT SERVICES, INC.,**
**PARADIGM TRANSPORTATION, LLC,**
**FINAL MILE DEDICATED GROUP, LLC,**
**R & R EXPRESS LOGISTICS, INC.,**
**GT WORLDWIDE LOGISTICS, LLC,**
**BORDER CONNECT LOGISTICS, INC.,**
**PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC,**
**FINAL MILE SOLUTIONS GROUP, LLC,**
**AAGEX FREIGHT GROUP, LLC,**
**AGX FREIGHT CARRIERS, LLC,**
**AGX FREIGHT LOGISTICS, LLC,**
**AGX FREIGHT INTERMODAL, LLC,**
**R&R EXPRESS PROPERTIES, LLC,**
**R&R EQUIPMENT LEASING, LLC**
**RXG&A, LLC,**
**TLOGISTICS, LLC,**
**R & R DRIVER SOLUTIONS INC,**
**NEW AMERICAN GROUP LLC,**
**NEW WLX HOLDINGS, LLC,**
**NEW WLX, LLC,**
**NEW WLE, LLC,**
**A.M. TRANSPORTATION SERVICES LLC,**

**RFX, LLC,**
**REFRIGERATED FOOD EXPRESS, LLC,**
**PIONEER TRANSFER, LLC**
**LOAD TO RIDE TRANSPORTATION, LLC,**
**ONE STOP FREIGHTWAYS, LLC,**
**RFX TAMPA, LLC, and**
**NEW TAYLOR TRANSPORTATION, LLC**

**as Borrowers**

**March 18, 2022**

# TABLE OF CONTENTS

Page

**ARTICLE 1 DEFINITIONS .......... 2**

1.1 Accounting Terms .......... 2
1.2 General Terms .......... 2
1.3 Uniform Commercial Code Terms .......... 37
1.4 General Matters of Construction .......... 37
1.5 Time References .......... 37
1.6 Lease Accounting Changes. .......... 37
1.7 Rates. .......... 38

**ARTICLE 2 ADVANCES, PAYMENTS .......... 38**

2.1 Revolving Loans .......... 38
2.2 Procedure for Borrowing Advances. .......... 39
2.3 Disbursement of Loan Proceeds .......... 39
2.4 Repayment of Loans .......... 39
2.5 Mandatory Reduction or Prepayment of Loans. .......... 40
2.6 Statement of Account .......... 41
2.7 Letters of Credit .......... 41
2.8 Issuance of Letters of Credit. .......... 41
2.9 Requirements For Issuance of Letters of Credit. .......... 42
2.10 Term Loans .......... 44
2.11 Additional Payments .......... 46
2.12 Use of Proceeds .......... 46
2.13 Joint and Several Obligations of Loan Parties .......... 47
2.14 Borrower Representative. .......... 48
2.15 Manner of Borrowing and Payment; Settlement. .......... 49
2.16 Defaulting Lender .......... 50
2.17 Increase in Commitments. .......... 51

**ARTICLE 3 INTEREST AND FEES .......... 53**

3.1 Interest. .......... 53
3.2 Letter of Credit Fees. .......... 54
3.3 Unused Facility Fee .......... 54
3.4 Reserved. .......... 55
3.5 Reserved .......... 55
3.6 Computation of Interest and Fees; Restatement; Conforming Changes .......... 55
3.7 Maximum Charges .......... 55
3.8 Increased Costs; Losses .......... 56
3.9 Illegality; Inability to Determine Rates. .......... 57
3.10 Effect of Benchmark Transition Event. .......... 58
3.11 Taxes .......... 58
3.12 Survival.. .......... 63

**ARTICLE 4 COLLATERAL; SECURITY AGREEMENT .......... 63**

4.1 Security Interest in the Collateral ........ 63
4.2 Perfection of Security Interest ........ 63
4.3 Dominion of Funds, Lockbox, and Deposit Accounts ........ 63
4.4 Preservation and Disposition of Collateral ........ 64
4.5 Ownership of Collateral ........ 65
4.6 Defense of the Interests of Agent and Lenders ........ 65
4.7 Books and Records ........ 66
4.8 Financial Disclosure ........ 66
4.9 Compliance with Laws ........ 66
4.10 Inspection of Premises; Appraisals ........ 67
4.11 Insurance ........ 67
4.12 Failure to Pay Insurance ........ 68
4.13 Payment of Taxes ........ 68
4.14 Payment of Leasehold Obligations ........ 68
4.15 Accounts Receivable ........ 69
4.16 Maintenance of Equipment ........ 70
4.17 Exculpation of Liability ........ 70
4.18 Environmental Matters. ........ 71
4.19 Financing Statements ........ 71
4.20 Commercial Tort Claims. ........ 71
4.21 Pledged Securities. ........ 72

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES ........ 74**

5.1 Authority ........ 74
5.2 Formation and Qualification; Subsidiaries ........ 74
5.3 Officers, Directors, Shareholders, Capitalization ........ 74
5.4 Governmental Approvals; No Conflicts ........ 74
5.5 Tax Returns ........ 75
5.6 Financial Statements ........ 75
5.7 Organization Name ........ 75
5.8 OSHA and Environmental Compliance. ........ 76
5.9 Solvency; No Litigation, No Violation, ERISA. ........ 76
5.10 Patents, Trademarks, Copyrights and Licenses ........ 77
5.11 Licenses and Permits ........ 77
5.12 Default of Indebtedness ........ 77
5.13 No Burdensome Restrictions; No Default ........ 77
5.14 No Labor Disputes ........ 78
5.15 Margin Regulations ........ 78
5.16 Investment Company Act ........ 78
5.17 Disclosure ........ 78
5.18 Hedging Contracts ........ 78
5.19 Material Business Agreements ........ 78
5.20 Application of Certain Laws and Regulations ........ 78
5.21 Business and Property of the Loan Parties ........ 78
5.22 Reserved ........ 79
5.23 Anti-Corruption Laws and Sanctions ........ 79
5.24 Beneficial Ownership Certificate. ........ 79

**ARTICLE 6 AFFIRMATIVE COVENANTS ........ 79**

6.1 Conduct of Business and Maintenance of Existence and Assets. ........ 79
6.2 Violations ........ 80
6.3 Consolidated Fixed Charge Coverage Ratio ........ 80
6.4 Execution of Supplemental Instruments ........ 80
6.5 Payment of Indebtedness ........ 80
6.6 Standards of Financial Statements ........ 80
6.7 Taxes ........ 80
6.8 Interest Rate Protection ........ 81
6.9 Deposit Accounts ........ 81
6.10 Credit Insurance ........ 81
6.11 2022 Real Estate Purchase. ........ 81
6.12 Post-Closing Obligations. ........ 82
6.13 Compliance with Anti-Corruption Laws and Sanctions ........ 82

**ARTICLE 7 NEGATIVE COVENANTS ........ 82**

7.1 Merger, Consolidation, Acquisition and Sale of Assets ........ 82
7.2 Creation of Liens ........ 83
7.3 Guarantees ........ 83
7.4 Investments ........ 83
7.5 Loans ........ 84
7.6 Capital Expenditures ........ 84
7.7 Dividends, Distributions and Restricted Payments ........ 84
7.8 Indebtedness. ........ 85
7.9 Nature of Business ........ 86
7.10 Transactions with Affiliates ........ 86
7.11 Leases ........ 86
7.12 Subsidiaries; Partnerships ........ 86
7.13 Fiscal Year and Accounting Changes ........ 87
7.14 Pledge of Credit ........ 87
7.15 Amendment of Charter Documents ........ 87
7.16 ERISA ........ 87
7.17 Prepayment of Indebtedness ........ 87
7.18 Modification of Material Business Agreements ........ 87

**ARTICLE 8 CONDITIONS PRECEDENT ........ 87**

8.1 Conditions to Initial Loans ........ 87
8.2 Conditions to Each Advance ........ 90

**ARTICLE 9 INFORMATION AS TO THE LOAN PARTIES ........ 91**

9.1 Disclosure of Material Matters ........ 91
9.2 Schedules and Certificates ........ 91
9.3 Litigation ........ 92
9.4 Material Occurrences ........ 92
9.5 Annual Financial Statements ........ 92
9.6 Monthly Financial Statements ........ 93
9.7 Additional Information ........ 93

9.8 Projected Operating Budget, Availability Forecast ..... 94
9.9 Notice of Suits, Adverse Events ..... 94

**ARTICLE 10 EVENTS OF DEFAULT ..... 94**

10.1 Payment of Obligations ..... 94
10.2 Payment of Reductions or Mandatory Prepayments ..... 94
10.3 Misrepresentations ..... 94
10.4 Failure to Furnish Information, Schedules, Certificates ..... 95
10.5 Liens Against Assets ..... 95
10.6 Breach of Covenants ..... 95
10.7 Judgment ..... 95
10.8 Insolvency and Related Proceedings ..... 95
10.9 Guarantor Default ..... 95
10.10 Material Adverse Effect ..... 95
10.11 Loss of Priority Lien ..... 95
10.12 Breach of Material Business Agreements ..... 96
10.13 Cross Default; Cross Acceleration ..... 96
10.14 Change of Control ..... 96
10.15 Invalidity of Loan Documents ..... 96
10.16 Loss of Material Intellectual Property ..... 96
10.17 Destruction of Collateral ..... 96
10.18 Business Interruption ..... 96
10.19 Hedging Contracts ..... 96

**ARTICLE 11 AGENT'S RIGHTS AND REMEDIES AFTER DEFAULT ..... 97**

11.1 Rights and Remedies ..... 97
11.2 Agent Discretion ..... 97
11.3 Setoff ..... 98
11.4 Rights and Remedies not Exclusive ..... 98
11.5 Appointment of Receiver ..... 98
11.6 Reserved ..... 98
11.7 Allocation of Payments After Event of Default. ..... 98

**ARTICLE 12 WAIVERS AND JUDICIAL PROCEEDINGS ..... 99**

12.1 Waiver of Notice ..... 99
12.2 Delay ..... 99
12.3 Jury Waiver ..... 100

**ARTICLE 13 EFFECTIVE DATE AND TERMINATION ..... 100**

13.1 Term ..... 100
13.2 Termination ..... 100

**ARTICLE 14 REGARDING AGENT ..... 101**

14.1 Appointment. ..... 101
14.2 Nature of Duties. ..... 101
14.3 Lack of Reliance on Agent and Resignation. ..... 102
14.4 Certain Rights of Agent. ..... 102

14.5 Reliance. 102
14.6 Notice of Default. 103
14.7 Indemnification.. 103
14.8 Agent in its Individual Capacity. 103
14.9 Delivery of Documents. 103
14.10 Loan Parties' Undertaking to Agent. 103
14.11 No Reliance on Agent's Customer Identification Program. 104
14.12 Erroneous Payments. 104
14.13 Agent Professionals. 105

**ARTICLE 15 MISCELLANEOUS 105**

15.1 Governing Law 105
15.2 Entire Understanding 106
15.3 Transfers and Assignments. 108
15.4 Application of Payments 111
15.5 Indemnity 111
15.6 Notice 112
15.7 Survival 113
15.8 Severability 113
15.9 Expenses 113
15.10 Important Information About Procedures Required by the USA Patriot Act 114
15.11 Injunctive Relief 114
15.12 No Liability; Consequential Damages 114
15.13 Counterparts; Electronic Signatures 115
15.14 Construction 115
15.15 Confidentiality; Sharing Information. 115
15.16 Publicity 116
15.17 Conflict Clause 116
15.18 Amendment and Restatement. 116

# LIST OF SCHEDULES AND EXHIBITS

All Schedules to the Credit and Security Agreement:


| | |
|---|---|
| Schedule 1 | Commitments of Lenders |
| Schedule 1.2(a) | Owned Real Property |
| Schedule 1.2(b) | Liens |
| Schedule 1.2(c) | Existing Letters of Credit |
| Schedule 4.3 | Deposit Accounts |
| Schedule 4.5 | Inventory Locations |
| Schedule 4.15(c) | Loan Parties' States of Organization and Chief Executive Offices |
| Schedule 4.20 | Commercial Tort Claims |
| Schedule 5.2 | Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 | Officers, Directors, Shareholders, Capitalization |
| Schedule 5.9(b) | Litigation |
| Schedule 5.10 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 5.19 | Material Business Agreements |
| Schedule 5.21 | Business and Property |
| Schedule 7.4 | Investments |
| Schedule 7.5 | Loans |
| Schedule 7.8 | Indebtedness |


All Exhibits to the Credit and Security Agreement:


Exhibit A Form of Borrowing Base Certificate
Exhibit B Form of Revolving Note
Exhibit C Form of Term Loan Note
Exhibit D Form of Compliance Certificate
Exhibit E Form of Term Loan 4 Note

# SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

This **SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Agreement"), has been executed and is dated as of March 18, 2022 by and among **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING, LLC**, a Pennsylvania limited liability company, ("Equipment Leasing"), **R&R EXPRESS HOLDCO, INC.**, a Pennsylvania corporation ("Express Holdco"), **RxG&A, LLC**, a Pennsylvania limited liability company ("RxG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), and **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", and together with Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, Express Holdco, RxG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, RFX Tampa and any other Person who may hereafter become a borrower hereunder are each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and **THE HUNTINGTON NATIONAL BANK**, as Agent, Lender and Issuer.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. All financial computations to be made under this Agreement, unless otherwise specifically provided herein, shall be made in accordance with GAAP applied on a basis consistent with the financial statements delivered to Agent on or prior to the Closing Date. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" or "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Express Holdco and its Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

1.2 **General Terms**. For purposes of this Agreement, the following terms shall have the following meanings:

"2022 Real Estate Purchase" means, that certain purchase by Express Properties of the real property located at 200 Industrial Drive, Pittsburgh, PA 15275; provided that (i) prior to completing such purchase the purchaser provides ten (10) Business Days' advance written notice to the Agent of its intent to make such purchase, (ii) the purchase price shall not exceed $2,500,000, (iii) the Loan Parties shall demonstrate proforma Undrawn Availability of the Loan Parties for the ninety (90) day period prior to such proposed purchase and immediately after giving effect to such proposed purchase is greater than the greater of (1) ten percent (10%) of the Borrowing Base or (2) $5,000,000, and (iv) no Event of Default or Default shall exist immediately prior to or after giving effect to such purchase.

"2024 Revolving Commitment Increase Agreement" means that certain Revolving Commitment Increase Agreement, dated as of June 26, 2024, by and between the Agent, the Issuer, Huntington, as the increasing lender, and the Borrowers, which increased the Revolving Commitment to $85,000,000, pursuant to and in accordance with Section 2.17 of this Agreement.

"AAGEX Entities" means, collectively, AAGEX Group, AGX Carriers, AGX Intermodal, and AGX Logistics.

"AAGEX Group" means AAGEX Freight Group, LLC, a Florida limited liability company.

"Advances" means each Revolving Loan and issuance of a Letter of Credit.

"Affiliate" means as to any Person, any other Person (excluding any Foreign Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to be "controlled by" a Person if such Person possesses, directly or indirectly, power either (i) to vote five percent (5%) or more of the securities having ordinary voting power for the election of directors of such

Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent" shall mean Huntington, in its capacity as administrative agent and collateral agent for Lenders, and their successors and assigns.

"Agent Professionals" shall mean attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Agent.

"Aggregate Commitment" means the sum of the Aggregate Revolving Commitment plus the Aggregate Term Loan Commitment plus the Aggregate Term Loan 2 Commitment plus the Aggregate Term Loan 3 Commitment plus the Aggregate Term Loan 4 Commitment.

"Aggregate Credit Exposure" shall mean, at any time, the aggregate Credit Exposure of all Lenders.

"Aggregate Revolving Commitment" shall mean, at any time, the aggregate Revolving Commitments of all Lenders. The Aggregate Revolving Commitment as of June 26, 2024 (pursuant to the 2024 Revolving Commitment Increase Agreement) is $85,000,000.

"Aggregate Revolving Exposure" shall mean, at any time, the aggregate Revolving Exposure of all Lenders.

"Aggregate Term Loan Commitment" shall mean, at any time, the aggregate Term Loan Commitments of all Lenders. The Aggregate Term Loan Commitment as of the Closing Date is $3,675,000.

"Aggregate Term Loan 2 Commitment" shall mean, at any time, the aggregate Term Loan 2 Commitments of all Lenders. The Aggregate Term Loan 2 Commitment as of the Sixth Amendment Effective Date is $972,000.

"Aggregate Term Loan 3 Commitment" shall mean, at any time, the aggregate Term Loan 3 Commitments of all Lenders. The Aggregate Term Loan 3 Commitment as of the Seventh Amendment Effective Date is $520,000.00.

"Aggregate Term Loan 4 Commitment" shall mean, at any time, the aggregate Term Loan 4 Commitments of all Lenders. The Aggregate Term Loan 4 Commitment as of the Eighth Amendment Effective Date is $5,000,000.00.

"Agreement" shall have the meaning set forth in the preamble, as the same may be amended, restated, modified, or supplemented from time to time.

"AGX Carriers" means AGX Freight Carriers, LLC, a Georgia limited liability company.

"AGX Intermodal" means AGX Freight Intermodal, LLC, a Florida limited liability company.

"AGX Logistics" means AGX Freight Logistics, LLC, Georgia limited liability company.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of: (a) the Prime Rate in effect on such day, (b) the Fed Funds Rate in effect on such day *plus* 0.50% per annum, and (c) Daily Simple SOFR for such day (taking into account the Floor set forth in the definition of "Daily Simple SOFR") *plus* 2.00% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Fed Funds Rate or Daily Simple SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Fed Funds Rate or Daily Simple SOFR, respectively. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

"A.M. Transportation" means A.M. Transportation Services LLC, a Pennsylvania limited liability company.

"A.M. Transportation Acquisition" means Express Holdco's acquisition of sixty percent (60%) of the issued and outstanding voting membership interests of A.M. Transportation pursuant to the A.M. Transportation Acquisition Documents.

"A.M. Transportation Acquisition Documents" means, collectively, the (i) Asset Purchase Agreement, dated as of March 31, 2021, by and among A.M. Transportation Services, Inc., a Massachusetts corporation, A.M. Transportation, and the other parties party thereto, (ii) Operating Agreement of A.M. Transportation effective as of March 2, 2021, (iii) A.M. Transportation Subordination Agreement, (iv) A.M. Transportation Subordinated Note, and (v) all other documents and instruments delivered in connection with the A.M. Transportation Acquisition.

"A.M. Transportation Subordinated Note" means that certain Subordinated Promissory Note, effective March 31, 2021 made by A.M. Transportation in favor of A.M. Transportation Services, Inc. in the amount of $500,000 being a portion of the purchase price in connection with the A.M. Transportation Acquisition payable on terms acceptable to Agent.

"A.M. Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of March 31, 2021, among the Agent, A.M. Transportation Services, Inc., and A.M. Transportation.

"American Group" means New American Group LLC, a Pennsylvania limited liability company.

"American Group Acquisition" means Express Holdco's acquisition of sixty percent (60%) of the issued and outstanding membership interests of American Group pursuant to the American Group Acquisition Documents.

"American Group Acquisition Documents" means, collectively, the (i) Membership Interest Purchase Agreement, dated as of November 30, 2019 by and among the Seller (as defined therein) party thereto, the members of the Seller, American Group and Express Holdco, (ii) Operating Agreement of American Group, dated as of November 30, 2019, executed by

American Group Seller and Express Holdco, as members,(iii) Contribution Agreement by American Group Seller, American Group and Express Holdco, as buyer and (iv) all other documents and instruments delivered in connection with the American Group Acquisition.

"American Group Seller" shall mean American Group, LLC, an Arizona limited liability company, the parent company of American Group and seller of certain of the membership interest of American Group under the American Group Acquisition Documents, to be known as MSKD, LLC after the consummation of the American Group Acquisition.

"American Group Seller Subordinated Note" means that certain Subordinated Promissory Note made by Express Holdco in favor of American Group Seller in the amount of $2,150,000 being a portion of the purchase price in connection with the American Group Acquisition and payable on terms acceptable to Agent commencing on the first day of the month following ninety days (90) after November 30, 2019 as permitted pursuant to the American Group Seller Subordination Agreement.

"American Group Seller Subordination Agreement" means the Subordination Agreement dated as December 14, 2018 among American Group Seller, as seller, the Borrowers, and the Agent.

"Annual Dividends" means annual non-tax dividends or distributions made by any Loan Party; provided that (i) prior to making any such annual dividend or distribution the Loan Parties provide ten (10) Business Days' advance written notice to the Agent of their intent to make such proposed annual dividend or distribution; (ii) the Loan Parties shall demonstrate proforma (a) Consolidated Fixed Charge Coverage Ratio of not less than 1.25 to 1.00 after giving effect to any such proposed annual divided or distribution and (b) Undrawn Availability of the Loan Parties for the ninety (90) day period prior to any such proposed annual dividend or distribution and immediately after giving effect to any such proposed annual dividend or distribution is greater than the greater of (1) ten percent (10%) of the Borrowing Base or (2) $5,000,000; and (iii) no Event of Default or Default shall exist immediately prior to or after giving effect to each such annual dividend or distribution.

"Anti-Corruption Laws" means, collectively, the United States Foreign Corrupt Practices Act of 1977 and all other similar anti-corruption legislation in other jurisdictions.

"Anti-Terrorism Laws" means those laws and sanctions relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act (Public Law 107-56), the Bank Secrecy Act (Public Law 91-508), the Trading with the Enemy Act (50 U.S.C. App. Section 1 et. seq.), the International Emergency Economic Powers Act (50 U.S.C. Section 1701 et. seq.), and the sanction regulations promulgated pursuant thereto by the Office of Foreign Assets Control, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957 (as any of the foregoing may from time to time be amended, renewed, extended or replaced).

"Applicable Base Rate Margin" means (i) with respect to the Term Loan 4, three and one-half percent (3.5%), and (ii) with respect to all other Loans, the applicable margin determined by reference to Quarterly Average Undrawn Availability set forth in the Pricing Grid table below

under the heading "Revolving Loans Applicable Base Rate Margin" or "Term Loan / Term Loan 2 / Term Loan 3 Applicable Base Rate Margin", as applicable.

| **Pricing Grid** | | | | | |
|---|---|---|---|---|---|
| **Level** | **Quarterly Average Undrawn Availability** | **Revolving Loans Applicable Base Rate Margin** | **Revolving Loans Applicable SOFR Rate Margin** | **Term Loan / Term Loan 2 / Term Loan 3 Applicable Base Rate Margin** | **Term Loan / Term Loan 2 / Term Loan 3 Applicable SOFR Rate Margin** |
| **I** | **> $10,000,000** | **0.50%** | **2.36%** | **1.00%** | **2.86%** |
| **II** | **> $5,000,000& ≤ $10,000,000** | **0.50%** | **2.61%** | **1.00%** | **3.11%** |
| **III** | **≤ $5,000,000** | **0.50%** | **2.86%** | **1.00%** | **3.36%** |

The Applicable Base Rate Margin and Applicable SOFR Rate Margin shall initially be set at Level I and thereafter shall be determined as of the end of each fiscal quarter based on Quarterly Average Undrawn Availability as of such quarter end, commencing with the fiscal quarter ending March 31, 2022. Each change in the Applicable Base Rate Margin and Applicable SOFR Rate Margin shall be effective during the period commencing on the first day of each applicable fiscal quarter and ending on the last day of each applicable fiscal quarter.

"Applicable SOFR Rate Margin" means (i) with respect to the Term Loan 4, five percent (5.0%), (ii) with respect to all other Loans, the applicable margin set forth in the table above under the headings "Revolving Loans Applicable SOFR Rate Margin" or "Term Loan / Term Loan 2 / Term Loan 3 Applicable SOFR Rate Margin", as applicable.

"Asset Acquiring Subsidiary" means a Subsidiary formed for the purpose of acquiring the assets of another entity operating in the freight transportation and logistics business ("Business Acquisition") and (i) which Subsidiary's ownership interest which are owned by a Loan Party shall be pledged to Agent, (ii) which such Subsidiary shall grant first priority perfected Liens in its assets to the Agent, and (iii) which Subsidiary shall become a Borrower according to Section 7.12 and be subject to the requirements of Section 7.12 hereof, provided that, the joinder of such Subsidiary may not be required to be completed contemporaneously with the formation of such Subsidiary as prescribed by Section 7.12 but at a time, or within a time period, following any such Business Acquisition that the Agent may require in its sole discretion.

"Authorized Officer" means a Person's president, chief executive officer, chief financial officer or any other officer approved by Agent in its reasonable discretion.

"Banking Service" means any financial accommodation or credit extended to any Borrower or other Loan Party by any Lender or any affiliate thereof (other than pursuant to this Agreement) including: (i) commercial credit cards, stored value cards (ii) credit card processing services, (iii) debit cards, (iv) purchase cards, (v) cash management, treasury management, administration or related services, including the automated clearing house processing of

electronic fund transfers, (vi) controlled disbursement accounts or services, or (vii) return items, overdraft and interstate depository network accounts or services.

"Banking Service Agreement" means each agreement entered into from time to time by any Borrower or any other Loan Party with a Lender or any affiliate thereof in connection with the obtaining of any Banking Service.

"Bankruptcy Event" means, with respect to any Person, such Person or such Person's direct or indirect parent company becoming the subject of a bankruptcy or insolvency proceeding, or having had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark" means, initially, the Daily Simple SOFR; provided that if a Benchmark Transition Event has occurred with respect to Daily Simple SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.10.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Agent and Borrowers giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Agent and Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means a date and time determined by Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) is no longer, or as of a specified future date will no longer be, representative.

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.10 and (b) ending at the time that a Benchmark

Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.10.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefited Lender" shall have the meaning set forth in Section 2.15(d).

"Border" shall have the meaning set forth in the preamble.

"Border Logistics" shall have the meaning set forth in the preamble.

"Borrower" shall have the meaning set forth in the preamble, and singularly, shall include any additional Borrower that becomes party to this Agreement as permitted by Agent in its sole and absolute discretion pursuant to a joinder or similar instrument.

"Borrower Representative" means Express Holdco.

"Borrowers" shall have the meaning set forth in the preamble, and collectively, shall include any additional Borrowers that become party to this Agreement as permitted by Agent in its sole and absolute discretion pursuant to a joinder or similar instrument.

"Borrowing Base" means, in respect of Borrowers at any time of determination, the following:

(a) up to 90% of Borrowers' Eligible Accounts, minus

(b) the aggregate sum of all Reserves then in effect. Notwithstanding anything to the contrary herein, Agent may, in its sole discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in determining the Borrowing Base.

"Borrowing Base Certificate" means a certificate duly executed by an Authorized Officer of the Borrower Representative appropriately completed and in substantially the form of Exhibit A hereto.

"Business Acquisition" shall have the meaning set forth in the definition of Asset Acquiring Subsidiary.

"Business Day" means any day other than a Saturday, a Sunday, or other day on which commercial banks in New York City or Columbus, Ohio are authorized or required to be closed.

"Capital Expenditures" means with respect to any Person for any period determined in accordance with GAAP, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Collateral Account" means, with respect to Borrowers, that certain commercial deposit account maintained at Agent for the purpose of collecting Borrowers' accounts and proceeds of other Collateral, (a) the funds within which shall be the sole and exclusive property of Agent and (b) in respect of which Agent for the benefit of Agent and Lenders shall have the irrevocable and exclusive right to withdraw funds until all of the Obligations are paid, performed, satisfied and enforced in full and the commitments of Agent, Lenders and Issuer to make any Advances hereunder have terminated.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sections 9601 et seq.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Body or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means (a) the Permitted Holder shall cease to own, free and clear of all Liens (other than to Lender), 80% of the outstanding voting equity interests of Express Holdco on a fully diluted basis; (b) Richard S. Francis shall cease to hold a management position with Express Holdco; (c) any merger or consolidation of or with any Loan Party or sale of all or substantially all of the property or assets of any Loan Party (other than the R & R Ownership Restructure); (d) in respect of any Person, the replacement of a majority of the directors or managers who constituted the board of directors or the managing body on the date hereof for any reason other than death or disability, and such replacement shall not have been approved by such board of directors or managing body as constituted on the date hereof, (e) in respect of any Person, such Person shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting equity interests of any existing or future Subsidiary, (f) with respect to AAGEX Group, (x) Mike Williams shall cease to own, free and clear of all Liens or other encumbrances, at least 40% of the outstanding voting equity interest in AAGEX Group or (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interest in AAGEX Group, (g) with respect to TLogistics, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 51% of the outstanding voting equity interest in TLogistics, (h) with respect to American Group, (x) Michael C. Schember and Daniel P. Krivickas, Jr. shall cease to own, free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in American Group and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60%

of the outstanding voting equity interests in American Group, (i) following the Employment Issuance, with respect to Paradigm, Paradigm Management, Final Mile and Final Mile Solutions, (x) John Gallardo shall cease to own, free and clear of all Liens and encumbrances, at least 20% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 80% of the outstanding voting equity interests in Paradigm, Paradigm Management, Final Mile and Final Mile Solution, (j) following the Employment Issuance, with respect to GT Logistics, (x) Kelly Armstrong shall cease to own, free and clear of all Liens and encumbrances, at least 10% of the outstanding voting equity interests in GT Logistics and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in GT Logistics or (k) with respect to New WLX Holdings (x) John Hein shall cease to own, free and clear of all Liens or encumbrances, at least 20% of the outstanding voting equity interests in New WLX Holdings, (y) Larry Catlett shall cease to own free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in New WLX Holdings, (z) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 70% of the outstanding voting equity interests in New WLX Holdings, (l) with respect to A.M. Transportation, (x) Mission Impossible Software, LLC shall cease to own free and clear of all Liens or encumbrances, at least 40% of the outstanding voting equity interests in A.M. Transportation, and (y) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 60% of the outstanding voting equity interests in A. M. Transportation, (m) with respect to RFX, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interests in RFX, and (y) RFX, Inc. shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in RFX unless Express Holdco's ownership in RFX, Inc. increases by any amount no longer owned by RFX, Inc., (n) with respect to Food Express, Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Food Express, (o) with respect to Pioneer, (x) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 90% of the outstanding voting equity interest in Pioneer, (y) Kimberly Welby shall cease to own, free and clear of all Liens or encumbrances, at least 10% of the outstanding voting equity interests in Pioneer unless Express Holdco's ownership in Pioneer increases by any amount no longer owned by Kimberly Welby, (p) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Load to Ride and One Stop, (q) RFX shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interests in RFX Tampa, and (r) Express Holdco shall cease to own, free and clear of all Liens or encumbrances, at least 100% of the outstanding voting equity interest in Taylor Transportation.

"Charges" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar Governmental Body, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Loan Party or any of its Affiliates.

"Charter Documents" means, as to any Person (other than a natural person), the charter, certificate or articles of incorporation or organization, by-laws, code of regulations, general or limited partnership agreement, certificate of limited partnership, certificate of formation, operating agreement, and other similar organizational or governing documents of such Person.

"CIP Regulations" shall have the meaning set forth in Section 14.11.

"Closing Date" means March 18, 2022.

"Code" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder.

"Collateral" means all real and personal property owned by any Loan Party, whether now owned or existing, or hereafter arising or acquired or received by such Loan Party, wherever located, including:

(a) all Accounts;

(b) all Inventory;

(c) all Equipment and Fixtures;

(d) all General Intangibles, Payment Intangibles and Intellectual Property;

(e) all Investment Property;

(f) all Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository;

(g) the Pledged Securities;

(h) (i) its Goods and other personal property including all merchandise returned or rejected by Account Debtors, relating to or securing any of the Accounts; (ii) its rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lien or, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to such Loan Party from any Account Debtors relating to the Accounts; (iv) other property, including warranty claims, relating to any Goods; (v) all of such Person's contract rights, rights of payment which have been earned under a contract right, Instruments (including promissory notes), Chattel Paper (including electronic chattel paper), Documents, warehouse receipts, letters of credit, and money; (vi) all Commercial Tort Claims (whether now existing or hereafter arising), including those described on Schedule 4.20 (Commercial Tort Claims) and on any supplement thereto received by Agent pursuant to Section 4.20, all Letter-of-Credit Rights (whether or not such Letter of Credit is evidenced by a writing), and all supporting obligations; (vii) if and when obtained by any Loan Party, all real and personal property of third parties in which such Person has been granted a Lien or security interest as security for the payment or enforcement of Accounts; and (viii) any other goods or personal property, if any, in which such Person may hereafter in writing grant a security interest to Agent or

any Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent or any Lender and any Loan Party;

(i) each Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any such Loan Party or in which it has an interest), computer programs, electronic media, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g) or (h) of this definition of "Collateral"; and

(j) all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h) and (i) of this definition of "Collateral" in whatever form, including: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

Notwithstanding anything to the contrary contained in clauses (a) through (j) above, the security interest created by this Agreement shall not extend to (i) Excluded Property and (ii) the certain 10% ownership interest in a HondaJet Elite HA-420 aircraft held and owned by Equipment Leasing, as evidenced by that certain HondaJet Elite HA-420 Fractional Interest Purchase Agreement executed by Equipment Leasing December 6, 2021.

"Commitment Percentage" of any Lender shall mean any such Lender's percentage of the Aggregate Commitment as set forth on the Commitment Schedule, as it may be update or adjusted pursuant to the terms of this Agreement.

"Commitment Schedule" shall mean the Commitment Schedule attached to this Agreement, as it may be amended from time to time pursuant to the terms of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et. seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a compliance certificate in the form attached as Exhibit D.

"Conforming Changes" means, with respect to either the use or administration of Daily Simple SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.8 and other technical, administrative or operational matters) that Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of

any such rate exists, in such other manner of administration as Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated), or are franchise or branch profits Taxes.

"Consents" means all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business, including any Consents required under all applicable federal, state or other applicable law.

"Consolidated EBITDA" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the sum of (a) net income (or loss) (excluding extraordinary gains), *plus* (b) to the extent deducted in determining such net income (or loss), (i) all interest expense, (ii) all charges against (or *minus* credits to) income for federal, state and local taxes, (iii) depreciation and amortization expense, and (iv) non-cash charges against (or *minus* credits to) income that are approved in writing by Agent in its sole discretion.

"Consolidated Fixed Charge Coverage Ratio" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the ratio of (a) Consolidated EBITDA, *less* the sum of Capital Expenditures (*minus* Capital Expenditures that were specifically funded by Indebtedness or a Capital Lease, other than a Revolving Loan), *less* taxes paid in cash, *less* dividends, distributions, and permitted repurchases of equity interests paid in cash *to* (b) Consolidated Fixed Charges.

"Consolidated Fixed Charges" means, in respect of Express Holdco and its Subsidiaries on a consolidated basis for any fiscal period determined in accordance with GAAP, the difference between (a) the sum of (i) interest expense, including the interest component of any Capital Lease, *plus* (ii) scheduled principal payments on Indebtedness and Capital Leases, *less* (b) the sum of scheduled net investment in direct financing lease payments.

"Controlled Group" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Person, are treated as a single employer under Section 414 of the Code.

"Corporate Retreat Property" means the Real Property and improvements thereon located at 550 S. Barfield Drive, Marco Island, Florida.

"Corporate Retreat Property Mortgage Facility" means the mortgage facility consisting of (i) a mortgage granted by Express Properties in favor of Huntington with respect to the Corporate Retreat Property, (ii) a mortgage note made by Express Properties and payable to Huntington, (iii) a guaranty made by Richard S. Francis of the obligations owing from Express Properties to Huntington under the mortgage of the Corporate Retreat Property, in form and substance acceptable to Huntington and (iv) an interest rate swap transaction entered into by Express Properties and Huntington as of the closing of the aforementioned mortgage.

"Corporate Retreat Purchase" means the purchase by Express Properties of the Corporate Retreat Property.

"Credit Exposure" shall mean, for any Lender, at any time, the aggregate of such Lender's respective pro rata shares of the Revolving Exposure, the Term Loan Exposure, the Term Loan 2 Exposure, the Term Loan 3 Exposure, and the Term Loan 4 Exposure.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to the greater of (a) SOFR for the day (such day, the "SOFR Determination Date") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website, and (b) the Floor. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Date, the SOFR in respect of such SOFR Determination Date has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to Daily Simple SOFR has not occurred, then the SOFR for such SOFR Determination Date will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to Borrowers.

"Default" means an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" means two percent (2%) per annum in excess of the rate of interest or fee rate or percentage applicable to any Obligation from time to time.

"Defaulting Lender" shall have the meaning set forth in Section 2.16 hereof.

"Designated Prepayment" shall have the meaning set forth in Section 2.5(c).

"Dollar" and the sign "$" means lawful money of the United States of America.

"Domestic Rate Loan" means any Loan that bears interest with reference to the Alternate Base Rate.

"Driver Solutions" means R & R Driver Solutions Inc, a Pennsylvania corporation.

"Eighth Amendment Effective Date" means November 27, 2024.

"Eligible Accounts" means, those Accounts created by each Borrower in the ordinary course of its business, that arise out of its sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made by Borrowers

under the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the criteria set forth below; provided, however, that such criteria may be revised from time to time by Agent in its Permitted Discretion to address the results of any Collateral monitoring or any field examination performed by Agent or any consultant from time to time. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits and unapplied cash remitted to Borrowers. Without limiting Agent's discretion provided herein, "Eligible Accounts" shall not include any Account:

(a) which is not subject to a first priority perfected security interest in favor of Agent for the benefit of Agent and Lenders;

(b) which is subject to any Lien other than a Permitted Encumbrance that does not have priority over the Lien in favor of Agent for the benefit of Agent and Lenders;

(c) with respect to which (i) is unpaid more than ninety (90) days after the date of the original invoice therefor or more than thirty (30) days after the original due date, whichever is later or (ii) which has been written off the books of such Borrower or otherwise designated as uncollectible. Notwithstanding the foregoing, in no event shall Accounts that remain unpaid more than one hundred twenty (120) days from the date of the original invoice be deemed to be "Eligible Accounts";

(d) which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates to Borrowers are ineligible;

(e) with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true;

(f) which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payment of interest;

(g) for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrower or if such Account was invoiced more than once;

(h) with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i) which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal

bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j) which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(k) which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada (other than Quebec) or (ii) is not organized under applicable law of the U.S., any state of the U.S., Canada, or any province of Canada (other than the province of Quebec), unless, in each case, such Account is insured by credit insurance satisfactory to Agent in its Permitted Discretion;

(l) which is owed in any currency other than Dollars;

(m) which is owed by (i) any Federal, state or local government (or any department, agency, public corporation, or instrumentality thereof) unless (i) such Account is backed by a Letter of Credit acceptable to Agent which is in the possession of Agent, or (ii) with respect to the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) and any other steps necessary to perfect the Lien of Agent in such Account have been complied with to Agent's satisfaction;

(n) which is owed by any Affiliate, employee, officer, director, agent or stockholder of any Loan Party;

(o) which, for any Account Debtor, the aggregate amount of Accounts owed from such Account Debtor exceeds 20% of all Eligible Accounts, to the extent of such excess;

(p) which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor;

(q) which is subject to any counterclaim, deduction, defense, setoff or dispute (a "contra"); provided, however, that unless the Account Debtor has asserted any such contra, if the amount of the account exceeds the amount of the contra, such excess shall be considered for eligibility if such excess is not otherwise excluded by this definition of Eligible Accounts;

(r) which is evidenced by any promissory note, chattel paper, or instrument;

(s) which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Borrower to seek judicial enforcement in such jurisdiction of payment of

such Account ("No Access Jurisdiction"), unless such Borrower has filed such report or is qualified to do business in such No Access Jurisdiction;

(t) with respect to which such Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(u) which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local;

(v) which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Borrower has or has had an ownership interest in such goods, or which indicates any party other than such Borrower as payee or remittance party;

(w) which was created on cash on delivery terms;

(x) which is an Account of Equipment Leasing and/or which was derived from any leasing transaction or which would generate lease company receivables;

(y) which Agent determines may not be paid by reason of the Account Debtor's inability to pay or which Agent otherwise determines is unacceptable for any reason whatsoever.

In the event that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower Representative shall notify Agent thereof within five (5) Business Days. In determining the amount of an Eligible Account, the stated amount of an Account may, in Agent's sole discretion, be reduced by, without duplication, to the extent not reflected in such stated amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any written or oral agreement or understanding) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrower to reduce the amount of such Account.

"Eligible Assignee" shall mean any of the following Persons: (a) a Lender; (b) an Affiliate of a Lender; and (c) any other Person (other than a natural person) approved by (i) Agent, and (ii) in the case of any assignment of a commitment to make Advances hereunder, Issuer; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of such Borrower's Affiliates or Subsidiaries and; provided, further, that, notwithstanding the foregoing, a Person shall only be an "Eligible Assignee" if the assignment to or participation of such Person shall not constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code); provided, further, that, the consent of the Borrower Representative (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender, a well-capitalized

bank, insurance company, or regulated financial institution; provided that the Borrower Representative shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Agent within five (5) Business Days after having received prior notice thereof.

"Eligible Unbilled Accounts" means, without duplication Accounts that meet the requirements of Eligible Accounts, except for clause (f)(ii) of such defonition, in each case as determined by Agent in its Permitted Discretion.

"Employment Issuance" means, the issuance of certain ownership interests, as part of any stock incentive plan set forth in certain compensation and/or employment agreements for the high-level managers of (A) Express Holdco whereby on or about December 31, 2020, Express Holdco, on terms and conditions set forth therein, issued (1) twenty percent (20%) ownership interests to John Gallardo in each of the following entities: Paradigm, Paradigm Management, Final Mile and Final Mile Solutions and (2) ten percent (10%) ownership interests to Kelly Armstrong in GT Logistics and (B) the AAGEX Group whereby AAGEX Group will grant incentive ownership units to present and future employees which shall only vest upon satisfaction of certain conditions set forth in such compensation and/or employment agreements and shall otherwise be bound by the terms and restrictions thereof including no voting rights and otherwise in form and substance satisfactory to the Agent in its sole discretion.

"Environmental Authority" means any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(b).

"Environmental Indemnity Agreement" shall mean that certain amended and restated Environmental Indemnity Agreement dated as of the date hereof and delivered by the Loan Parties to and in favor of the Agent.

"Environmental Laws" shall have the meaning set forth in the Environmental Indemnity Agreement.

"Equipment Leasing" means R&R Equipment Leasing, LLC, a Pennsylvania limited liability company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import and the rules and regulations promulgated thereunder as from time to time in effect.

"Erroneous Payment" shall have the meaning set forth in Section 14.12.

"Event of Default" shall have the meaning set forth in Article 10.

"Excluded Property" means specific equipment, accessions and related products and proceeds that are financed as Capital Expenditures by or through a third-party, including but not

limited to, Huntington Equipment Finance or other leasing and/or equipment finance departments of the Agent.

"Excluded Swap Obligations" means, with respect to any Guarantor, any Swap Obligation if, and only to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or its lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of any Lender with respect to an applicable interest in a Loan or commitment pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan or commitment or (ii) a Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to a Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.11(f) and (d) any withholding Taxes imposed pursuant to FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Letters of Credit" means the Letters of Credit listed on Schedule 1.2(c) attached hereto, in each case issued by the Agent.

"Existing Loan Documents" means that certain Amended and Restated Credit and Security Agreement, dated as of December 14, 2018 (as amended prior to the date hereof), by and among certain of the Borrowers and the Agent, together with all loan documents executed and delivered in connection therewith.

"Express" shall have the meaning set forth in the preamble.

"Express Holdco" means R&R Express Holdco, Inc., a Pennsylvania corporation.

"Express Properties" shall have the meaning set forth in the preamble.

"Facility Termination Date" means March 18, 2027.

"Fastport" means Fastport Inc., a Delaware corporation.

"Fastport Pledge Agreement" means that certain amended and restated pledge agreement entered into by the Permitted Holder in favor of the Agent whereby the Permitted Holder pledged all of the ownership interests in Fastport owned by the Permitted Holder to the Agent.

"Fastport Proceeds" means proceeds received by the Permitted Holder in cash or cash equivalent property from the sale or other disposition of all of the ownership interests in Fastport owned by the Permitted Holder.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Bodies and implementing such Sections of the Code.

"Fed Funds Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that, if the Fed Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Fee Letter" means that certain fee letter between Huntington and Borrowers dated as of the date hereof.

"Final Mile" shall have the meaning set forth in the preamble.

"Final Mile Solutions" shall have the meaning set forth in the preamble.

"Financials" means the annual or monthly financial statements, as applicable, of Express and its Subsidiaries delivered pursuant to Sections 9.5 and 9.6 of this Agreement.

"First Amendment Effective Date" means December 30, 2022.

"Food Express" means Refrigerated Food Express, LLC, a Pennsylvania limited liability company.

"Foreign Subsidiary" means any Subsidiary that is not organized or incorporated in the United States or any state or territory thereof.

"Floor" means a per annum rate of interest equal to 0.14%.

"Foreign Lender" means any Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles as promulgated by the United States of America Financial Accounting Standards Board and in effect from time to time.

"Government Receivables" shall have the meaning set forth in the definition of Eligible Accounts.

"Governmental Body" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"GT" shall have the meaning set forth in the preamble.

"GT Logistics" shall have the meaning set forth in the preamble.

"Guarantor" means each Person that executes and delivers a Guaranty to Agent or any Lender in respect of any of the Obligations.

"Guaranty" means any obligation, contingent or otherwise of any Person guaranteeing or having the economic effect of guaranteeing any Indebtedness, liability or other obligation of any other Person (a "primary obligor") in any manner, whether directly or indirectly, and including any obligation of any surety, direct or indirect, (a) to purchase, or pay, or advance or supply funds for the purchase or payment of, such Indebtedness, liability or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, liability or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Discharge" means any release or threat of release of a reportable quantity of any Hazardous Substances.

"Hazardous Substance" means, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" means all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedging Contracts" means any foreign exchange contract, currency swap agreement, futures contract, commodities hedge agreement, interest rate protection agreement, interest rate future agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, option agreement or any other similar hedging agreement or arrangement entered into by a Person in the ordinary course of business.

"Hedging Obligations" means all liabilities of a Person under Hedging Contracts.

"Huntington" means Huntington National Bank, a national banking association, in its individual capacity, and its successors.

"Income Tax Distributions" shall have the meaning set forth in Section 7.7.

"Indebtedness" means, with respect to a Person at any date of determination, any and all indebtedness, obligations or liabilities (other than trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness), whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several, of such Person for or in respect of: (a) borrowed money, (b) amounts owing under or liabilities in respect of any note purchase or acceptance credit facility, (c) the undrawn amount in connection with letters of credit and any reimbursement obligation (contingent or otherwise) under any letter of credit, (d) Hedging Obligations, (e) any other transaction (including forward sale or purchase agreements, Capital Leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements, (f) any guaranty of Indebtedness for borrowed money, and (g) all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Intellectual Property" means all now owned or hereafter acquired right, title and interest in trade names, trademarks, trade secrets, service marks, data bases, domain names, software and software systems, including source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, patents, patent applications, patents pending, copyrights, royalties, literary rights, licenses and franchises.

"ISP" shall have the meaning set forth in Section 2.8(b).

"Issuer" shall mean, with respect to any Letter of Credit, the issuer of such Letter of Credit and shall be, with respect to any Letter of Credit hereunder, Huntington, and each of its successors and assigns (in each case, which may be replaced by Agent in its sole discretion).

"Lender" or "Lenders" mean the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder, including any transferee, successor or assign of a Lender. Unless the context otherwise requires, the term "Lender" includes Issuer.

"Lender Default" shall have the meaning set forth in Section 2.16(a).

"Letter of Credit Exposure" means, at any time, the aggregate undrawn amount of all outstanding Letters of Credit *plus* the aggregate amount of all disbursements relating to Letters of Credit that have not been reimbursed by Borrowers.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2.

"Letters of Credit" shall have the meaning set forth in Section 2.7.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any option agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Load to Ride" means Load to Ride Transportation, LLC, a Pennsylvania limited liability company.

"Loan" means each Revolving Loan, the Term Loan, the Term Loan 2, and the Term Loan 3; and "Loans" shall collectively mean the Revolving Loans, the Term Loan, the Term Loan 2, the Term Loan 3, and the Term Loan 4.

"Loan Account" shall have the meaning set forth in Section 2.6.

"Loan Documents" means this Agreement, each Note and Letter of Credit, any Guaranty, Fastport Pledge Agreement, security agreement, including any copyright security agreement, patent security agreement, trademark security agreement or domain name security agreement, collateral assignment, pledge agreement, lockbox agreement, account assignment, control agreement, letter of credit application and agreement or other reimbursement agreement, Perfection Certificate, officer's certificate, Waiver, Mortgage, Banking Service Agreement, Hedging Contract, American Group Seller Subordination Agreement, RFX Subordination Agreement, LTR Subordination Agreement, Taylor Transportation Subordination Agreement, any Permitted Business Acquisition Subordination Agreement, any other subordination agreement, intercreditor agreement and any and all other agreements, instruments and documents, including powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Loan Party or Guarantor or delivered to Agent, Issuer or any Lender in connection with this Agreement.

"Loan Party" or "Loan Parties" means, singularly or collectively, as the context may require, Borrowers, any additional Borrower, the Guarantors, or any other Person who becomes a party to this Agreement pursuant to a joinder or similar agreement and their respective successors and assigns.

"Lockbox" means a post office box rented by and in the name of Borrowers as required by this Agreement and as to which only Agent has access pursuant to the requirements of this Agreement.

"LTR Acquisition" means Express Holdco's acquisition of one hundred (100%) of the issued and outstanding membership interests of Load to Ride and One Stop pursuant to the LTR Acquisition Documents.

"LTR Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, effective as of December 30, 2022, by and among Load to Ride Transportation, LLC, a Colorado limited liability company, One Stop Freightways, LLC, a Colorado limited liability company, LTR Seller, Load to Ride, One Stop, and Express Holdco (the "LTR MIPA"), (ii) the LTR Subordinated Note, (iii) the Contribution Agreements (as defined in the LTR MIPA), (iv) the Equipment Transfer Agreement (as defined in the LTR MIPA), (v) the Consulting Agreement for the LTR Seller (as described in the LTR MIPA), and (vi) all other documents and instruments delivered in connection with the LTR Acquisition.

"LTR Seller" means Marc Haney.

"LTR Subordinated Note" means that certain Subordinated Promissory Note, dated as of December 30, 2022 made by Express Holdco in favor of Load to Ride Transportation, LLC, a Colorado limited liability company in the amount of $1,725,000 being a portion of the purchase price in connection with the LTR Acquisition, bearing interest at 4% per annum, having a maturity of 36 months and otherwise payable on terms and conditions acceptable to Agent.

"LTR Subordination Agreement" means that certain Subordination Agreement, dated as of December 30, 2022, among the Agent, Load to Ride Transportation, LLC, a Colorado limited liability company, Load to Ride, One Stop and Express Holdco.

"Material Adverse Effect" means a material adverse effect on (a) the financial condition, results of operations, business or prospects of the applicable Person, (b) any Loan Party's ability to pay the Obligations in accordance with the terms thereof, (c) the value of the Collateral, Lenders' Liens on the Collateral, or the priority of any such Lien, or (d) the practical realization of the benefits of the rights and remedies under the Loan Documents by Agent and Lenders.

"Material Business Agreement" means any agreement that if terminated, rescinded or breached would have a Material Adverse Effect on any Loan Party.

"Maximum Borrowing Amount" means, at any time, in respect of Borrowers an amount equal to the lesser of (a) the Aggregate Revolving Commitment *minus* any Reserves to be taken from the top of the line and (b) the Borrowers' Borrowing Base.

"Mortgage" or "Mortgages" means each mortgage, assignment of rents, deed of trust or other agreement that conveys or evidences a Lien to Agent, for the benefit of the Agent and Lenders, on the Owned Real Property.

"Multiemployer Plan" means a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Net Cash Proceeds" means (i) proceeds received in cash or cash equivalent property from the sale (including without limitation any sale and leaseback), assignment or other disposition of any property, net of (A) the reasonable cash costs approved by Agent of sale, assignment or other disposition and (B) the amount of any Indebtedness approved by Agent secured by such property permitted by this Agreement; (ii) proceeds of insurance on account of the loss of or damage to any property of such Person, and payments of compensation for any property taken by condemnation or eminent domain; and (iii) proceeds received in cash or cash equivalents from (A) the issuance of any capital stock by such Person, or any other additions to the equity of such Person (other than retained earnings) or any contributions to such capital, or (B) issuance of any Indebtedness by such Person net of reasonable costs approved by Agent incurred in connection with such transaction.

"New WLE" means New WLE, LLC, a Pennsylvania limited liability company.

"New WLX" means New WLX, LLC, a Pennsylvania limited liability company.

"New WLX Holdings" means New WLX Holdings, LLC, a Pennsylvania limited liability company.

"New WLX Holdings Acquisition" means Express Holdco's acquisition of seventy percent (70%) of the issued and outstanding membership interests of New WLX Holdings pursuant to the New WLX Holdings Acquisition Documents.

"New WLX Holdings Acquisition Documents" means, collectively, the (i) Contribution Agreement, dated as of December 31, 2020 by and among WLX, LLC, a Missouri limited liability company, New WLX Holdings, and the other parties party thereto, (ii) Contribution Agreement, dated as of December 31, 2020 by and among WLE, LLC, a Missouri limited liability company, New WLX Holdings, and the other parties party thereto, (iii) Operating Agreement of New WLX Holdings, dated as of December 31, 2020, executed by John Hein, Larry Catlett and Express Holdco, as members, (iv) Single Member Limited Liability Company Operating Agreement of New WLX, dated as of December 31, 2020, executed by New WLX Holdings, as the sole member, (v) Single Member Limited Liability Company Operating Agreement of New WLE, dated as of December 31, 2020, executed by New WLX Holdings, as the sole member, (vi) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and John Hein, (vii) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and Larry Catlett, (viii) Employment Agreement, dated as of December 31, 2020 by and between New WLX Holdings and John O'Toole, and (ix) all other documents and instruments delivered in connection with the New WLX Holdings Acquisition.

"No Access Jurisdiction" shall have the meaning set forth in the definition of Eligible Accounts.

"Non-Consenting Lender" shall have the meaning set forth in Section 15.3(h) hereof.

"Non-Defaulting Lender" shall have the meaning set forth in Section 2.16.

"North Carolina Property" means the Real Property and improvements thereon located at (i) 5523 US 301 Service Rd, Hope Mills, North Carolina, and (ii) 5417 US 301 Service Rd., Hope Mills, North Carolina.

"Note" means each Revolving Note, each Term Loan Note, each Term Loan 2 Note, each Term Loan 3 Note, and each Term Loan 4 Note; and "Notes" shall collectively mean all such promissory notes.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means any and all loans, advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization, receivership or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document (including any Loan Document), whether or not for the payment of money, (a) owing by the Loan Parties to Lenders, Agent or Issuer or to any other direct or indirect Subsidiary or Affiliate of Lenders, Agent or Issuer pursuant to the terms of the Agreement or the other Loan Documents, (b) owing by the Loan Parties to Agent or any direct or indirect subsidiary or affiliate of Agent arising (i) by reason of an equipment lease or guarantee, (ii) under any Banking Services Agreement, (iii) out of Agent's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, or (iv) under any other agreement between Agent and any Loan Party, or (c) constituting Hedging Obligations (other than, with respect to any Guarantor, the Excluded Hedging Obligations of such Guarantor, if any), in each case, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and any amendments, extensions, renewals or increases and all costs and expenses of Agent, Issuer or any Lender and incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses and all obligations of any Loan Party to Agent, Issuer or any Lender to perform acts or refrain from taking any action. Notwithstanding the foregoing, with respect to any Guarantor, the Obligations shall not include Excluded Swap Obligations in respect of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"One Stop" means One Stop Freightways, LLC, a Pennsylvania limited liability company.

"Original Closing Date" means the closing date of the transaction in connection with the Existing Loan Documents, which date was December 14, 2018.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Documents).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Owned Real Property" means all Real Property set forth on Schedule 1.2(a); provided, however that Owned Real Property shall exclude the Corporate Retreat Property.

"Paradigm" shall have the meaning set forth in the preamble.

"Paradigm Management" shall have the meaning set forth in the preamble.

"Payment Office" means initially The Huntington National Bank, 7 Easton Oval, Mail code: EA4W57, Columbus, Ohio 43219; and, thereafter, such other office of Agent, if any, which it may designate by notice to the Borrower Representative and Lenders.

"Perfection Certificate" means the perfection certificate and the responses thereto provided by Borrowers to Agent.

"Permitted Business Acquisition" means, any Business Acquisition made in any fiscal year to the extent that the aggregate consideration paid or to be paid by any of the Loan Parties or Asset Acquiring Subsidiaries when coupled with all other Permitted Business Acquisitions made in such fiscal year does not exceed $2,000,000; provided that, (1) the Loan Parties shall deliver to the Agent prior written notice of the intent to consummate any Permitted Business Acquisition at least ten (10) Business Days before such Permitted Business Acquisition, (2) the minimum ownership interest to be purchased by any Loan Party or Asset Acquiring Subsidiary shall be a least sixty percent (60%) of any such entity being acquired, (3) the Loan Parties shall demonstrate a Consolidated Fixed Charge Coverage Ratio of at least 1.25 to 1.00 for the immediately preceding fiscal quarter prior to such proposed Permitted Business Acquisition, and (4) the Loan Parties shall demonstrate that the average Undrawn Availability of the Loan Parties for the immediately preceding fiscal quarter prior to the proposed Permitted Business Acquisition was not less than fifteen percent (15%) of the Borrowing Base after deducting the proforma purchase price, initial costs and/or payments for any such Permitted Business Acquisition.

"Permitted Business Acquisition Indebtedness" means unsecured subordinated debt in any one fiscal year not to exceed $2,500,000 in the aggregate incurred in connection with any

Permitted Business Acquisition, which such debt shall be (i) repayable in not less than five years with interest not greater than the Prime Rate plus three percent (3.00%), (ii) subject to a subordination agreement in form and substance acceptable to the Agent in its sole discretion (a "Permitted Business Acquisition Subordination Agreement"), and (iii) evidenced by a subordinated promissory note with its payment terms conditioned on, among other things, a daily average Undrawn Availability of at least $2,000,000 for the sixty (60) days prior to each payment and immediately after giving effect to each such payment.

"Permitted Business Acquisition Subordination Agreement" shall have the meaning set forth in the definition of Permitted Business Acquisition Indebtedness.

"Permitted Discretion" shall mean a determination made in good faith and in the exercise (from the perspective of a secured asset-based lender) of commercially reasonable business judgment.

"Permitted Encumbrances" means (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental Charges that (i) are not delinquent or (ii) are being contested in good faith by appropriate proceedings that stay the enforcement of such Liens and with respect to which proper reserves have been taken by the Loan Parties in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of Agent for the benefit of Agent and Lenders and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of any Loan Party's business; (e) mechanics, workers, materialmen's, warehousemen's, common carriers, landlord's or other like Liens arising in the ordinary course of any Loan Party's business with respect to obligations which are not due or which are being contested in good faith by the applicable Loan Party; (f) Liens placed upon equipment and real estate assets acquired to secure a portion of the purchase price thereof including Liens for any such equipment and assets that are subject to specific equipment financing by a third party but which were initially purchased from proceeds of an Advance made hereunder, which purchase was subsequently reimbursed by the proceeds of the specific equipment financing, provided that (i) any such Lien shall not encumber any other property of the Loan Parties other than insurance and other proceeds of such equipment and real estate and (ii) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; (g) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the use of such Real Property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (h) attachment and judgment liens which do not constitute an Event of Default under Section 10.7; and (i) Liens disclosed on Schedule 1.2(b) provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien.

"Permitted Holder" means Richard S. Francis, or any trusts for the benefit of Richard S. Francis or the members of his immediate family so long as Richard S. Francis is the named trustee and remains the trustee of any such trust.

"Permitted Holder Note" means, collectively, (i) that certain Note, dated December 31, 2016 made by the Permitted Holder in favor of Express in the original principal amount of $1,011,158.00 and (ii) that certain Note, dated December 31, 2016, made by the Permitted Holder in favor of Express in the original principal amount of $770,658.00.

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or Governmental Body.

"Pioneer" means Pioneer Transfer, LLC, a Pennsylvania limited liability company.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Loan Parties or any member of the Controlled Group or any such Plan to which any Loan Party or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledged Securities" means all of the equity interest of a Subsidiary of a Loan Party owned by a Loan Party and certain equity interests of each such Subsidiary owned by a non-Loan Party as more fully set forth on Schedule 5.3, whether now owned or hereafter acquired or created, and all proceeds thereof; provided that Pledged Securities shall exclude equity interests in any foreign Subsidiary in excess of sixty-five percent (65%) of the total outstanding shares of voting capital stock or other voting equity interest of such foreign Subsidiary. (Schedule 5.3 hereto lists, as of the Closing Date and as of the effective date of any amendment to this Agreement updating the same as the Agent may permit, all of the Pledged Securities.)

"Prime Rate" means the rate of interest publicly announced from time to time by Agent as its "prime rate", which rate may not be the lowest or most favorable rate then being charged commercial borrowers or others by Agent. Any change in the Prime Rate announced by Agent shall take effect at the opening of business on the day specified in the public announcement of such change. Notwithstanding the foregoing, if the Prime Rate shall be less than the Floor, such rate shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"PTL Seller" means Pioneer Transfer, LLC, a Delaware limited liability company.

"Quarterly Average Undrawn Availability" shall mean for any fiscal quarter of the Borrowers, an amount equal to the average daily Undrawn Availability during such fiscal quarter as determined by the Agent's loan reporting system.

"R&R Logistics" shall have the meaning set forth in the preamble.

"Real Property" means all real property, both owned and leased, of any Loan Party.

"RCRA" means the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 *et. seq.*

"Recipient" means Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document.

"Register" has the meaning specified in Section 15.3(c).

"Relevant Governmental Body" means the Federal Reserve Board or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board or the NYFRB, or any successor thereto.

"Required Lenders" shall mean, any of Lenders (other than Defaulting Lenders) holding at least 51% based on each Lender's Commitment Percentage, of (a) prior to the Facility Termination Date, the Aggregate Commitment, and (b) after the Facility Termination Date, the Aggregate Credit Exposure; provided that, as long as there are only two Lenders (that are not Defaulting Lenders), Required Lenders shall mean both Lenders (that are not Defaulting Lenders); provided further that, if there are greater than two Lenders (that are not Defaulting Lenders), at least two Lenders (that are not Defaulting Lenders) shall be needed to constitute Required Lenders.

"Reserves" means any and all reserves which Agent deems necessary, in its Permitted Discretion, to maintain, including, without limitation, reserves for accrued and unpaid interest and principal on the Obligations, dilution reserves, availability blockage to reserve for the payment of expenses in connection with the Collateral or any disposition thereof, reserves for any Banking Services, Letters of Credit, or Hedging Contracts, including any "mark-to-market" in connection therewith, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, price adjustments, returned inventory, slow moving inventory, market fluctuations in the value of inventory, reserves for inventory shrinkage, reserves for customs charges and shipping charges related to any inventory in transit, reserves for the creditworthiness of any Account Debtor, reserves for dilution of Accounts, reserves for Indebtedness of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for payroll, taxes, fees, assessments, and other governmental charges with respect to the Collateral or any Loan Party, and any environmental remediation costs or expenses.

"Revolving Commitment" means the commitment of each Lender to make Revolving Loans and to issue Letters of Credit, as such commitment may be reduced pursuant the terms of this Agreement.

"Revolving Exposure" shall mean, for any Lender, at any time, the aggregate of such Lender's respective outstanding principal amount of Revolving Loans and Letter of Credit Exposure at such time.

"Revolving Loan" means a loan made pursuant to Section 2.1.

"Revolving Note" or "Revolving Notes" means, singularly or collectively, as the context may require, the promissory notes referred to in Section 2.1.

"RFS Seller" means Refrigerated Food Express, Inc., an Ohio corporation.

"RFX" means RFX, LLC, a Pennsylvania limited liability company.

"RFX Acquisition" means Express Holdco's acquisition of (1) ninety percent (90%) of the issued and outstanding membership interests of RFX, (2) ninety percent (90%) of the issued and outstanding membership interests of Pioneer, and (3) one hundred (100%) of the issued and outstanding membership interests of Food Express pursuant to the RFX Acquisition Documents.

"RFX Acquisition Documents" means, collectively, (i) Membership Interest Purchase Agreement, dated as of January 31, 2022, by and among RFX Seller, PTL Seller, RFS Seller, the sole shareholder of RFX Seller set forth on the signature pages thereto, RFX, and Express Holdco, (ii) Bill of Sale and Assignment and Assumption Agreement, dated as of January 31, 2022, by and among RFX Seller, PTL Seller, RFS Seller, the shareholders of RFX Seller set forth on the signature pages thereto, RFX, and Express Holdco, (iii) Operating Agreement, effective as of January 31, 2022, between RFX Seller and Express Holdco, (iv) Operating Agreement, effective as of January 31, 2022, between PTL Seller and Express Holdco, (v) Single Member Limited Liability Company Operating Agreement of Food Express, effective as of January 31, 2022, adopted by RFX, as the sole member of Food Express, (vi) Contribution Agreement, dated as of January 31, 2022, between RFX Seller, RFX and Express Holdco, (vii) Contribution Agreement, dated as of January 31, 2022, between PTL Seller, Pioneer and Express Holdco, (viii) Contribution Agreement, dated as of January 31, 2022, between RFS Seller, Food Express and Express Holdco, (ix) Consulting Agreement, dated as of January 31, 2022, between RFX and Kimberly Welby, (x) Employment Agreement, dated as of January 31, 2022, between RFX and Shirley Bellavance, (xi) Employment Agreement, dated as of January 31, 2022, between RFX and Jennifer Finnemore, (xii) Executive Employment Agreement, date as of January 31, 2022, between RFX and Nate Lourie, (xiii) Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer, and (xiv) all other documents and instruments delivered in connection with the RFX Acquisition.

"RFX Seller" means RFX, Inc., a Massachusetts corporation.

"RFX Subordinated Note" means that certain Subordinated Promissory Note, dated as of January 31, 2022 made by Express Holdco in favor of RFX Seller in the amount of $1,000,000 being a portion of the purchase price in connection with the RFX Acquisition payable on terms acceptable to Agent.

"RFX Subordination Agreement" means that certain Subordination Agreement, dated as of January 31, 2022, among the Agent, RFX Seller, and Express Holdco.

"RxG&A" means RxG&A, LLC, a Pennsylvania limited liability company.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union and any

member state thereof, His Majesty's Treasury or any other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned directly or indirectly by any such Person or Persons described in clauses (a) and (b), or (d) any Person otherwise the subject or target of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC, the U.S. Department of State or the U.S. Department of Commerce), the United Nations Security Council, the European Union and any member state thereof, His Majesty's Treasury or any other relevant sanctions authority.

"Settlement Date" means one or more Business Days of each week as selected by Agent in its reasonable discretion.

"Seventh Amendment Effective Date" means August 30, 2024.

"Sixth Amendment Effective Date" means July 31, 2024.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Loan" means any Loan that bears interest based on the Daily Simple SOFR.

"Subchapter S" means subchapter S of the Code.

"Subsidiary" means a corporation or other entity of whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Swap Obligation" means, with respect to any Guarantor, any obligation of any Person to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section la(47) of the Commodity Exchange Act between any Lender and one or more Swap Counterparties.

"Taylor Transportation" means New Taylor Transportation, LLC, a Pennsylvania limited liability company.

"Taylor Transportation Acquisition" means (i) Express Holdco's acquisition of one hundred (100%) of the business assets of Taylor Transportation, Inc., a Delaware corporation, pursuant to the Taylor Transportation Acquisition Documents, which such assets are to be held by Express Holdco's newly formed subsidiary, Taylor Transportation, and (ii) Equipment Leasing's acquisition of certain rolling stock and all of the business equipment of Taylor Equipment Leasing LLC.

"Taylor Transportation Acquisition Documents" means, collectively, (i) the Asset Purchase Agreement, effective as of March 31, 2023, among Taylor Transportation, Inc. and Taylor Equipment Leasing LLC, as the seller and Express Holdco and Equipment Leasing, as the buyers, and the other parties thereto, (ii) the Taylor Transportation Subordinated Note, (iii) Bill of Sale and Assignment and Assumption Agreement-Assets, dated as March 31, 2023 among Taylor Transportation, Inc, and Express Holdco, (iv) Bill of Sale and Assignment and Assumption Agreement – Equipment, dated as of March 31, 2023, among Taylor Equipment Leasing LLC and Equipment Leasing, (v) Assignment and Assumption of Contracts, dated as of March 31, 2023, by and among Taylor Transportation, Inc. and Express Holdco, (vi) the Taylor Transportation Contribution Agreement, and (vii) all other documents and instruments delivered in connection with the Taylor Transportation Acquisition.

"Taylor Transportation Contribution Agreement" means, that certain Contribution Agreement entered into by Express Holdco and Taylor Transportation, whereby Express Holdco will transfer the assets purchased pursuant to the Taylor Transportation Acquisition to Taylor Transportation in exchange for all of the membership interests of Taylor Transportation.

"Taylor Transportation Subordinated Note" means that certain Subordinated Promissory Note, dated as of March 31, 2023 made by Express Holdco in favor of Taylor Transportation, Inc., a Delaware corporation in the amount of $2,500,000 being a portion of the purchase price in connection with the Taylor Transportation Acquisition, bearing interest at (i) 3% per annum in the first year and (ii) 9% annum in the second year, having a maturity of 24 months and otherwise payable on terms and conditions acceptable to Agent.

"Taylor Transportation Subordination Agreement" means that certain Subordination Agreement, dated as of June 23, 2023, among the Agent, Taylor Transportation, Inc., a Delaware corporation and Express Holdco.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"Tennessee Property" means the Real Property and improvements thereon located at 1419 North 5th Street, Union City, Obion County, Tennessee.

"Term Loan" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(b).

"Term Loan Commitment" means the commitment of each Lender to make its portion of the Term Loan on the Closing Date as set forth on the Commitment Schedule.

"Term Loan Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan.

"Term Loan Note" shall have the meaning set forth in Section 2.10(b)(i).

"Term Loan 2" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(c).

"Term Loan 2 Commitment" means the commitment of each Lender to make its portion of the Term Loan 2 on the Sixth Amendment Effective Date as set forth on the Commitment Schedule.

"Term Loan 2 Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan 2.

"Term Loan 2 Note" shall have the meaning set forth in Section 2.10(c)(i).

"Term Loan 3" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(d).

"Term Loan 3 Commitment" means the commitment of each Lender to make its portion of the Term Loan 3 on the Seventh Amendment Effective Date as set forth on the Commitment Schedule.

"Term Loan 3 Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan 3.

"Term Loan 3 Note" shall have the meaning set forth in Section 2.10(d)(i).

"Term Loan 4" means the term loan extended by Lenders to Borrowers pursuant to Section 2.10(e).

"Term Loan 4 Commitment" means the commitment of each Lender to make its portion of the Term Loan 4 on the Eighth Amendment Effective Date as set forth on the Commitment Schedule.

"Term Loan 4 Exposure" shall mean, at any time, the outstanding principal amount of the Term Loan 4.

"Term Loan 4 Note" shall have the meaning set forth in Section 2.10(e)(i).

"Term Loan 4 Maturity Date" shall have mean March 26, 2025.

"TLogistics" means TLogistics, LLC, a Pennsylvania limited liability company.

"Toxic Substances" means any material present on the Real Property which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. Sections 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances, and includes asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Transferee" shall have the meaning set forth in Section 15.15.

"TUI Commission Rights Purchase Agreement" means that certain Commission Rights Purchase Agreement, dated as of January 1, 2023, by and between Transport Unlimited, Inc., a Pennsylvania corporation ("TUI") and Express Holdco, as buyer, whereby TUI will sell and assign to Express Holdco the rights of TUI to the Purchased Commission Rights (as defined therein), subject to the terms and conditions set forth therein.

"UCP" shall have the meaning set forth in Section 2.8(b).

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Undrawn Availability" means, as of any date of determination, an amount equal to (a) the Maximum Borrowing Amount, *minus* (b) the sum of (i) the Aggregate Revolving Exposure, *plus* (ii) all amounts due and owing to each Borrower's trade creditors which are outstanding sixty (60) days or more beyond the due date (without duplication with respect to any such amount deducted from the Borrowing Base), *plus* (iii) fees and expenses for which each Borrower is liable but which have not been paid or charged to the Loan Account.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest or Lien in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Pennsylvania, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Waiver" means, collectively, any landlord's waiver, warehouseman's waiver, bailee's waiver, creditor's waiver, mortgagee waiver, processor waiver, customs broker waiver, and any

similar waiver, executed and delivered in connection with this Agreement, in form and substance satisfactory to Agent.

"Week" means the time period commencing on Monday and ending on Friday of each calendar week.

1.3 **Uniform Commercial Code Terms.** All terms used herein and defined in the Uniform Commercial Code as adopted in the Commonwealth of Pennsylvania from time to time shall have the meaning given therein unless otherwise defined herein. Such terms shall include: "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Deposit Account", "Document", "Equipment", "Farm Products", "Financial Asset", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Investment Property", "Lease", "Lessor", "Letter-of-Credit Rights", "money", "Payment Intangibles", "Proceeds", "Record", "Secured Party", "Securities Account", "Security", "Security Entitlement", "Security Interest" and "Supporting Obligation". To the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the effective date of such amendment, modification or revision.

1.4 **General Matters of Construction.** For the purpose of computing periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". Unless the context otherwise expressly requires, (a) all references to laws, statutes and regulations shall include any amendments, renewals, extensions, replacements, or successor laws, statutes or regulations, (b) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, restated, supplemented or otherwise modified, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns, (d) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not any particular provision hereof, (e) any reference to payment, repayment, or prepayment shall be construed as referring to payment of immediately available funds in Dollars, (f) any reference to any Loan Document means, unless the context expressly states otherwise, such Loan Document in form and substance satisfactory to Agent, (g) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (h) the word "will" shall be construed to have the same meaning and effect as the word "shall", (i) wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa, and (j) captions used in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

1.5 **Time References.** All the references in the Loan Documents are to Columbus, Ohio time.

1.6 **Lease Accounting Changes**. If there occurs after the Original Closing Date any change in GAAP resulting from the implementation of Financial Accounting Standards Update Board Accounting Standards Topic 842 (Leases) that affects in any respect the calculation of any covenant contained in this Agreement or the definition of any term defined under GAAP used in such calculations, Agent and Borrower Representative shall negotiate in good faith to amend the

provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of the parties after such change in GAAP conform as nearly as possible to their respective positions as of the Closing Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and Borrowers shall provide additional financial statements or supplements thereto, attachments to compliance certificates and/or calculations regarding financial covenants as Agent may reasonably require in order to provide the appropriate financial information required hereunder with respect to Borrowers both reflecting any applicable changes in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP. Notwithstanding the foregoing, if Agent and Borrower Representative are unable to agree on appropriate amendments within one year after the effective date of the changes in Financial Accounting Standards Update Board Accounting Standards Topic 842 (Leases), then all covenant calculations and definitions shall thereafter be computed in accordance with GAAP as so changed.

1.7 **Rates**. Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Alternate Base Rate or Daily Simple SOFR, or any component definition thereof or rates referred to in the definition thereof or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate, Daily Simple SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, Daily Simple SOFR or any other Benchmark or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error by, or any calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE 2
## ADVANCES, PAYMENTS

2.1 **Revolving Loans.** Subject to the terms and conditions set forth in this Agreement, Lenders, severally and not jointly, will make Revolving Loans to Borrowers in aggregate amounts outstanding at any time prior to the Facility Termination Date equal to such Lender's pro rata share of the Maximum Borrowing Amount *less* such Lender's Commitment Percentage of Letter of Credit Exposure. All Revolving Loans shall bear interest as a SOFR Rate Loan until Borrowers elect to convert them to Domestic Rate Loans in accordance with Section 2.2(b). Revolving Loans shall be evidenced by a Revolving Note substantially in the form attached as Exhibit B.

2.2 **Procedure for Borrowing Advances.**

(a) The Borrower Representative shall notify Agent in writing prior to 1:00 p.m. on a Business Day of Borrowers' request to incur, on such day, a Revolving Loan. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or any Lender, or with respect to any other Obligation, become due, the same shall be deemed a request for a Revolving Loan charged to the Loan Account as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent, Issuer or any Lender, and such request shall be irrevocable.

(b) Borrower Representative may elect to convert all of the Loans to Domestic Rate Loans (or SOFR Rate Loans if they are Domestic Rate Loans) by providing irrevocable notice to Agent. Each such notice shall be in form and substance satisfactory to Agent in its Permitted Discretion, appropriately completed and signed by an Authorized Officer of each Borrower and must be received by Agent at least one (1) Business Day prior to the effective day of such request.

2.3 **Disbursement of Loan Proceeds.** All Loans shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent and Lenders, shall be charged to the Loan Account on Agent's books. During the term of this Agreement, Borrowers may use the Revolving Loans by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Loan requested by Borrowers or deemed to have been requested by Borrowers under Section 2.2(a), with respect to requested Revolving Loans to the extent Lenders make such Revolving Loans, shall be made available to Borrowers on the day so requested by way of credit to Borrowers' operating account at Huntington, in immediately available federal funds or other immediately available funds or, with respect to Revolving Loans deemed to have been requested by Borrowers, shall be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4 **Repayment of Loans.** The Loans shall be due and payable in full on (i) the Facility Termination Date with respect to each Loan other than the Term Loan 4, and (ii) the Term Loan 4 Maturity Date with respect to the Term Loan 4, subject in each case to earlier prepayment as herein provided.

(a) Any Account Debtor payment with respect to Accounts which is evidenced by a check, note, draft, automated clearing house transfer, electronic transfer, or any other similar item of payment may not be immediately collectible. In calculating availability, Borrowers agree that any such item of payment will be deemed to have been received by Agent and will be provisionally credited to the Loan Account by Agent on the Business Day immediately following the day on which Agent has actual possession of such item of payment for deposit to the Cash Collateral Account. In consideration of Agent's agreement for provisional crediting of items of payment, Borrowers agree that, in calculating interest and other charges on the Obligations, all Account Debtor payments will be treated as having been credited to the Loan Account on the second Business Day

immediately following the Business Day on which such payments are deemed to have been received by Agent pursuant to this paragraph.

(b) Agent shall not be required to credit the Loan Account for the amount of any item of payment or other payment which is unsatisfactory to Agent. All credits shall be provisional, subject to verification and final settlement. Agent may charge the Loan Account for the amount of any item of payment or other payment which is returned to Agent unpaid or otherwise not collected. Borrowers agree that any information and data reported to Borrowers pursuant to any service which is received prior to final posting and confirmation is subject to correction and is not to be construed as final posting information. Agent and Lenders shall have no liability for the content of such preliminary service related information.

(c) All payments of principal, interest and other amounts payable hereunder, or under any of the other Loan Documents shall be made to Agent at the Payment Office not later than 11:00 a.m. Ohio time on the due date in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Loan Account or by making Advances as provided in Section 2.2.

(d) Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any other Loan Document, without any deduction whatsoever, including any deduction for any setoff or counterclaim.

2.5 **Mandatory Reduction or Prepayment of Loans.**

(a) If at any time the Aggregate Revolving Exposure exceeds the Maximum Borrowing Amount, then Borrowers shall immediately pay to Agent such difference, and such difference shall be immediately due and payable at the Payment Office and shall be applied to the Revolving Loan.

(b) Immediately after the receipt by any Borrower of any Net Cash Proceeds, Borrowers shall make or cause to be made a mandatory prepayment of the Loans in an amount equal to 100% of such Net Cash Proceeds.

(c) Immediately after the receipt by the Permitted Holder of any Fastport Proceeds, Borrowers shall cause the Permitted Holder to make a mandatory prepayment with respect to the aggregate outstanding amount due under the Permitted Holder Note and the Borrowers shall make or cause to be made a mandatory prepayment of the Loans in an amount not to exceed the aggregate outstanding amount due under the Permitted Holder Note.

(d) Nothing in this Section 2.5 shall be construed to constitute Agent's or any Lender's consent to any transaction not otherwise expressly permitted by Article 7. On the date any mandatory prepayment is received by Agent pursuant to clause (b) above (each such payment being a "Designated Prepayment"), such Designated Prepayment shall be allocated and applied, in the sole discretion of Agent to the repayment of any

Loan. Each Designated Prepayment which is applied to the Term Loan, the Term Loan 2 or the Term Loan 3 shall be applied in inverse order of maturing installments.

2.6 **Statement of Account.** Agent shall maintain, in accordance with its customary procedures, a loan account ("Loan Account") in the name of Borrowers in which shall be recorded, among other things, the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender.

2.7 **Letters of Credit.** Subject to the terms and conditions hereof, Issuer shall (a) issue letters of credit (together with the Existing Letters of Credit, collectively, "Letters of Credit") for the account of Borrowers; provided, however, that Issuer will not be required to issue any Letters of Credit to the extent that the stated amount of such Letters of Credit would then cause the Revolving Exposure of Borrowers to exceed the Maximum Borrowing Amount. The maximum stated amount of Letters of Credit outstanding shall not exceed $2,000,000 in the aggregate at any time. Each drawing under any Letter of Credit shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

2.8 **Issuance of Letters of Credit.**

(a) The Borrower Representative may request Issuer to issue a Letter of Credit by delivering to Issuer at the Payment Office Issuer's form of application and agreement for letter of credit, completed to the satisfaction of Issuer, and such other certificates, documents and other papers and information as Issuer may reasonably request no later than 1:00 p.m. Ohio time at least five (5) Business Days' prior to the date of such proposed issuance.

(b) Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts or other forms of written demand for payment or, acceptances of issued drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than the earlier of one (1) year from the date of issuance or five (5) Business Days prior to the Facility Termination Date. Each trade Letter of Credit shall be subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600, and any amendments or revisions thereof adhered to by Issuer (the "UCP"). Each standby Letter of Credit shall be subject to the International Standby Practices (1998), International Chamber of Commerce Publication 590 and any amendments or revisions thereof adhered to by Issuer (the "ISP") or the UCP, as determined by Issuer. Each Letter of Credit shall be governed, to the extent not inconsistent with the UCP or the ISP, as applicable, by the laws of the Commonwealth of Pennsylvania.

(c) Issuer shall have sole discretion whether to accept any draft. Without in any way limiting Issuer's sole discretion whether to accept any draft, no draft may be presented for acceptance, and Issuer will generally not accept any drafts (i) that arise out of transactions involving the sale of goods by applicable Borrower not in the ordinary course of its business, (ii) that involve a sale to an Affiliate of any Borrower, (iii) that

involve any purchase for which Issuer has not received all related documents, instruments and forms requested by Issuer, or (iv) that is not eligible for discounting with Federal Reserve Banks pursuant to paragraph 7 of Section 13 of the Federal Reserve Act, as amended.

(d) Issuer shall notify Agent and Lenders of the request by Borrower Representative for a Letter of Credit hereunder within a reasonable time after receiving such request.

(e) Notwithstanding any term, provision, condition or covenant contained herein, while an Event of Default exists, Issuer shall not be required to issue, and Borrowers shall not be entitled to request the issuance of, a Letter of Credit.

(f) All Existing Letters of Credit shall be deemed to have been issued pursuant hereto and shall be subject to and governed by the terms and conditions hereof.

2.9 **Requirements For Issuance of Letters of Credit.**

(a) In connection with the issuance of any Letter of Credit, Borrowers shall indemnify, save and hold Agent, Issuer and each Lender harmless from any loss, cost, expense or liability, including payments made by Agent, Issuer and Lenders and expenses and reasonable attorneys' fees incurred by Agent, Issuer and Lenders arising out of, or in connection with, any Letter of Credit to be issued or created for any Borrower. Borrowers shall be bound by Agent's and Issuer's regulations and good faith interpretations of any Letter of Credit issued or created to the Loan Account, although this interpretation may be different from its own; and, neither Agent, nor any Lender, nor Issuer, nor any of their correspondents shall be liable for any error, negligence, or mistakes, whether of omission or commission, in following any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments or supplements thereto or in issuing or paying any Letter of Credit.

(b) Borrowers shall authorize and direct Issuer to deliver to Agent all instruments, documents, and other writings and property received by Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance therefor.

(c) In connection with all Letters of Credit issued by Issuer under this Agreement, Borrowers hereby appoint Issuer, or its designee, as their attorney, with full power and authority upon the occurrence of an Event of Default or Default, (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the U.S. Customs Department in the name of such Borrower or Issuer or Issuer's designee, and to sign and deliver to officials of such customs department powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's name or Issuer's, or in the name of Issuer's designee, any order, sale or transaction, obtain the necessary documents in connection

therewith, and collect the proceeds thereof. Neither Issuer nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

(d) Each Lender shall to the extent of the amount equal to the product of such Lender's Commitment Percentage *multiplied by* the aggregate amount of all unpaid reimbursement obligations arising from disbursements made or obligations incurred with respect to the Letters of Credit be deemed to have irrevocably purchased an undivided participation in each such unpaid reimbursement obligation. In the event that at the time a disbursement is made the unpaid balance of Advances exceeds or would exceed, with the making of such disbursement, the Maximum Borrowing Amount, and such disbursement is not reimbursed by Borrowers within two (2) Business Days, Agent shall promptly notify each Lender and upon Agent's demand each Lender shall pay to Agent such Lender's proportionate share of such unpaid disbursement together with such Lender's proportionate share of Agent's reasonable unreimbursed costs and expenses relating to such disbursement. In the event Issuer makes a disbursement in respect of a Letter of Credit, each Lender shall pay to such Issuer, upon such Issuer's demand, such Lender's proportionate share of such disbursement together with such Lender's proportionate share of such Issuer's reasonable unreimbursed costs and expenses relating to such disbursement. Upon receipt by Agent of a repayment from any Borrower of any amount disbursed by Agent for which Agent had already been reimbursed by Lenders, Agent shall deliver to each Lender that Lender's pro rata share of such repayment. Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (ii) no Letter of Credit issued hereunder remains outstanding and uncancelled or (iii) all Persons (other than the applicable Borrower) have been fully reimbursed for all payments made under or relating to Letters of Credit.

(e) Immediately upon the request of Agent, (i) after the occurrence of a Default or an Event of Default, or (ii) any Letter of Credit remains outstanding after five (5) Business Days prior to the Facility Termination Date, in each such case, Borrowers will deposit and maintain in an account with Agent in cash, as cash collateral, in an amount equal to one hundred five percent (105%) of the amount of outstanding Letters of Credit. In each case, Borrowers hereby irrevocably authorizes Agent, in its sole discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits in such account or in an account opened by Borrowers, in any amount required to be made by Borrowers, out of the proceeds of Accounts or other Collateral, from an Advance, or out of any other funds of any Borrower coming into Agent's or any Lender's possession at any time. Any net return on such cash or investments shall be credited to such account and constitute additional cash collateral. Borrowers may not withdraw any amount credited to any such account except upon payment and performance in full of all Obligations and termination of this Agreement.

2.10 **Term Loans.**

(a) Existing Term Loan. As of the Original Closing Date, Huntington, as lender, under the Existing Loan Documents ("Existing Lender") made a term loan to the Borrowers in accordance with its term loan commitment set forth in the Existing Loan Documents (the "Existing Term Loan"). The Existing Term Loan was made in the aggregate principal amount of $4,200,000. On the Closing Date the Existing Term Loan will be repaid in full by the Borrowers with the proceeds of the Term Loan.

(b) Closing Date Term Loan.

(i) Amount of the Closing Date Term Loan. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan") to Borrowers on the Closing Date, in an amount equal to such Lender's Term Loan Commitment and otherwise in accordance with Section 2.10(b)(ii). The Term Loan shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan shall be evidenced by a secured promissory note (the "Term Loan Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan Draws. The Lenders shall make the amount of the Term Loan available to the Borrowers on the Closing Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan shall amortize in sixty (60) equal consecutive monthly installments. Each of the first sixty (60) installments of principal shall be in an amount equal to $17,500.00 and shall be payable on the first day of each calendar month, commencing on April 1, 2022. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan, fixed monthly installments of principal shall be due in the amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

(c) Term Loan 2.

(i) Amount of the Term Loan 2. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan 2") to Borrowers on the Sixth Amendment Effective Date, in an amount equal to such Lender's Term Loan 2 Commitment and otherwise in accordance with Section 2.10(c)(ii). The Term Loan 2 shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan 2

shall be evidenced by a secured promissory note (the "Term Loan 2 Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan 2 Draws. The Lenders shall make the amount of the Term Loan 2 available to the Borrowers on the Sixth Amendment Effective Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan 2 shall amortize in two hundred and forty (240) equal consecutive monthly installments. Each of the installments of principal shall be in an amount equal to $4,050.00 and shall be payable on the first day of each calendar month, commencing on September 1, 2024. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan 2 and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan 2 may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan 2, fixed monthly installments of principal shall be due in the amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

(d) Term Loan 3.

(i) Amount of the Term Loan 3. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan 3") to Borrowers on the Seventh Amendment Effective Date, in an amount equal to such Lender's Term Loan 3 Commitment and otherwise in accordance with Section 2.10(d)(ii). The Term Loan 3 shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan 3 shall be evidenced by a secured promissory note (the "Term Loan 3 Note") substantially in the form attached as Exhibit C.

(ii) Funding by Lender; Term Loan 3 Draws. The Lenders shall make the amount of the Term Loan 3 available to the Borrowers on the Seventh Amendment Effective Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Amortization; Payments. The Term Loan 3 shall amortize in two hundred and forty (240) equal consecutive monthly installments. Each of the installments of principal shall be in an amount equal to $2,166.67 and shall be payable on the first day of each calendar month, commencing on October 1, 2024. The final payment shall be in the amount equal to the remaining principal balance of the Term Loan 3 and shall be payable on the Facility Termination Date. Payments or prepayments of the Term Loan 3 may not be reborrowed. If a Hedging Contract is entered into by the Borrowers and the Agent with respect to the Term Loan 3, fixed monthly installments of principal shall be due in the

amounts listed on a schedule provided to the Borrowers by the Agent. Accrued interest shall be payable on the same dates as installments of principal. If not sooner paid, the outstanding principal balance and all accrued unpaid interest and other charges thereunder shall be on the Facility Termination Date.

(e) Term Loan 4.

(i) Amount of the Term Loan 4. Each Lender agrees to, severally and not jointly, make a term loan (the "Term Loan 4") to Borrowers on the Eighth Amendment Effective Date, in an amount equal to such Lender's Term Loan 4 Commitment and otherwise in accordance with Section 2.10(e)(ii). The Term Loan 4 shall bear interest as a SOFR Rate Loan until Borrowers elect to convert it to a Domestic Rate Loan in accordance with Section 2.2(b). The Term Loan 4 shall be evidenced by a secured promissory note (the "Term Loan 4 Note") substantially in the form attached as Exhibit E.

(ii) Funding by Lender; Term Loan 4 Draws. The Lenders shall make the amount of the Term Loan 4 available to the Borrowers on the Eighth Amendment Effective Date by transferring immediately available funds to the Loan Account or as Borrowers shall otherwise instruct in writing.

(iii) Payments. The outstanding principal balance of the Term Loan 4 shall be payable on the Term Loan 4 Maturity Date. Payments or prepayments of the Term Loan 4 may not be reborrowed. Accrued interest shall be payable on the first day of each month. If not sooner paid, all accrued unpaid interest and other charges related to the Term Loan 4 shall be repaid in full on the Term Loan 4 Maturity Date.

(iv) Mandatory Repayment. Borrowers shall immediately pay down the outstanding principal balance of the Term Loan 4 to an amount equal 50% of Eligible Unbilled Accounts if at any time the outstanding principal balance of the Term Loan 4 exceeds 50% of Eligible Unbilled Accounts.

2.11 **Additional Payments.** Any sums reasonably expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under any Loan Document, including such Borrower's obligations under Sections 2.7, 4.2, 4.3, 4.4, 4.12, 4.13, 6.7 and 15.9 may be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

2.12 **Use of Proceeds**. Borrowers shall apply the proceeds of Advances and the other Loans (a) to repay existing Indebtedness owed to existing lenders, (b) to pay fees and expenses relating to the transaction contemplated by this Agreement, (c) for lawful corporate purposes, (d) to provide for working capital needs, (e) with respect to the Term Loan, to refinance the Existing Term Loan, (f) with respect to the Revolving Loans, to provide for all or a portion of the purchase price or consideration for any Permitted Business Acquisition, (g) with respect to the Revolving Loans, to finance the 2022 Real Estate Purchase, so long as the conditions to such purchase set forth herein have been satisfied, (h) with respect to the Revolving Loans, to provide

for all or a portion of the purchase price in connection with the LTR Acquisition and the Taylor Transportation Acquisition, (i) with respect to the Revolving Loans, to provide a portion of the purchase price in an amount not to exceed $2,000,000 in connection with the Corporate Retreat Purchase, (j) with respect to the Term Loan 2, to provide a portion of the purchase price for the purchase of the North Carolina Property, (k) with respect to the Term Loan 3, to provide a portion of the purchase price for the purchase of the Tennessee Property, and (l) with respect to the Term Loan 4, to provide for short-term working capital needs.

Borrowers will not request any Loan or Letter of Credit, and Borrowers shall not use, and shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

2.13 **Joint and Several Obligations of Loan Parties.**

(a) Each Loan Party acknowledges and agrees that Agent, Issuer and each Lender is entering into this Agreement at the request of each Loan Party and with the understanding that each Loan Party is and shall remain fully liable, jointly and severally, for payment in full of the Loans, Advances and other credit extensions under this Agreement or any Loan Document. Each Loan Party further agrees that it is receiving or will receive a direct or indirect pecuniary benefit for any Loan, Advance and other credit extension made pursuant to this Agreement or the Loan Documents. Anything in this Agreement or any other Loan Document to the contrary notwithstanding, in no event shall the maximum liability of any Loan Party exceed the maximum amount that (after giving effect to the incurrence of the obligations hereunder and to any rights to contribution or other rights of such Loan Party from such other Loan Party) would not render the rights to payment of Agent, Issuer and Lenders hereunder void, voidable or avoidable under any applicable fraudulent transfer law or conveyance law.

(c) In the event that any obligation of any Loan Party under this Agreement or any Loan Document is deemed to be an agreement by such Loan Party to answer for the debt or default of another Loan Party or as an accommodation maker or hypothecation of property as security therefor, each Loan Party represents and warrants that (i) no representation has been made to such Loan Party as to the creditworthiness of such other Loan Party, and (ii) such Loan Party has established adequate means of obtaining from such other Loan Party on a continuing basis, financial or other information pertaining to such other Loan Party's financial condition. Each Loan Party expressly waives, except as expressly required under this Agreement, diligence, demand, presentment, protest and notice of every kind and nature whatsoever, consents to the taking by Agent of any additional security of another Loan Party for the Obligations, or the alteration or release in any manner of any security of another Loan Party now or hereafter held in connection with the Obligations, and consents that Agent, Issuer and Lenders and any other Loan Party may deal with each other in connection with such Obligations or otherwise, or alter

any contracts now or hereafter existing between them, in any manner whatsoever, including without limitation the renewal, extension, acceleration or changes in time for payment of any such obligations or in the terms or conditions of any security held. Agent, Issuer and Lenders are hereby expressly given the right, at their option, to proceed in the enforcement of any of the Obligations independently of any other remedy or security they may at any time hold in connection with such obligations secured, and it shall not be necessary for Agent, Issuer or any Lender to proceed upon or against or exhaust any other security or remedy before proceeding to enforce their rights against any Loan Party.

(d) Each Loan Party further agrees that it will not enforce any right of subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid to Agent or any Lender by any other Loan Party with respect to any liability incurred by it hereunder or under any Loan Document, any payment made by it to Agent, Issuer or any Lender with respect to any of the Obligations or any collateral security therefor until such time as all Obligations are paid in full in cash. Any claim which any Loan Party may have against any other Loan Party with respect to any payments to Agent, Issuer or any Lender hereunder or under any other Loan Document are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of all Obligations and, in the event of any insolvency proceeding relating to any Loan Party, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Loan Party therefor.

2.14 **Borrower Representative.**

(a) Each Borrower hereby irrevocably constitutes and appoints the Borrower Representative and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, and in any such capacity to borrow, sign and endorse any Loan Document, and to execute and deliver all other instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, hereby authorizes Agent and each Lender to pay over or credit all loan proceeds hereunder in accordance with the request of Borrower Representative, and to take any and all appropriate actions, including without limitation the right to give or receive any notice or other document provided for under this Agreement or under any Loan Document on behalf of such Borrower, and to execute on behalf of such Borrower any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement. Any notice given to or received from the Borrower Representative on behalf of any Borrower under this Agreement shall be deemed to have been given to or received from such Borrower.

(b) Agent, Issuer and Lenders shall not incur any liability to any Borrower as a result of the handling of this credit facility as a co-borrowing facility with a Borrower Representative in the manner set forth in this Agreement. To induce Agent, Issuer and

Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent, Issuer and Lenders and holds Agent, Issuer and Lenders harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent, Issuer or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of any Borrower as provided herein, reliance by Agent, Issuer or any Lender on any request or instruction from Borrower Representative or any other action taken by Agent, Issuer or any Lender with respect to this Section 2.14, except for the gross negligence or willful misconduct, as determined by a final non-appealable judgment by a court of competent jurisdiction, of Agent, Issuer or any Lender.

2.15 **<u>Manner of Borrowing and Payment; Settlement.</u>**

(a) Each borrowing of Revolving Loans shall be advanced according to the applicable Commitment Percentages of Lenders.

(b) Each payment (including each prepayment) by Borrowers on account of the principal of and interest on the Revolving Loans, shall be applied to the Revolving Loans pro rata according to the applicable Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of Lenders to the Payment Office, in each case on or prior to 12:00 (noon) in Dollars and in immediately available funds.

(c) (i) Notwithstanding anything to the contrary contained in Sections 2.16(a) and 2.16(b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Loans shall be advanced by Agent and each payment by any Borrower on account of Revolving Loans shall be applied first to those Revolving Loans advanced by Agent. On or before 2:30 p.m. on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (x) if the aggregate amount of new Revolving Loans made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Loans during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (1) such Revolving Loans and (2) such repayments and (y) if the aggregate amount of repayments applied to outstanding Revolving Loans during such Week exceeds the aggregate amount of new Revolving Loans made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (1) such repayments and (2) such Revolving Loans.

(ii) Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date. Such certificate of Agent shall be presumed correct in the absence of manifest error.

(d) If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances or other Loans, as applicable, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances or other Loans, as applicable, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances or other Loans, as applicable, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances or other Loans, as applicable, may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowers of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Fed Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, *multiplied by* (ii) such amount, *multiplied by* (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be presumed correct, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to Revolving Loans hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.16 **Defaulting Lender.**

(a) Notwithstanding anything to the contrary contained herein, in the event any Lender (i) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance, (ii) notifies either Agent or Borrower Representative that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement), (iii) has notified any Borrower, or

has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement, or (iv) becomes, or its parent becomes, subject to a Bankruptcy Event (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.16 while such Lender Default remains in effect.

(b) Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, such amount shall not be applied to any Advances of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Advances then outstanding.

(c) A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Loan Documents. All amendments, waivers and other modifications of this Agreement and the Loan Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d) Other than as expressly set forth in this Section 2.16, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged. Nothing in this Section 2.16 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Loan Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

2.17 **Increase in Commitments.**

(a) (a) Borrowers Request. The Borrowers may by written notice to the Agent elect to request (x) prior to the Facility Termination Date, an increase to the existing Revolving Commitments (the "Incremental Revolving Commitment"), by an aggregate amount, after giving effect to the 2024 Revolving Commitment Increase Agreement, not in excess of $10,000,000. The notice shall specify (i) the date (each, an "Increase Effective Date") on which the Borrowers propose that the Incremental

Revolving Commitment shall be effective, which shall be a date not less than ten (10) Business Days after the date on which such notice is delivered to the Agent and (ii) the identity of each Person to whom the Borrowers propose any portion of the Incremental Revolving Commitment be allocated and the amounts of such allocations; provided, that (a) each new Lender providing all or a portion of the Incremental Revolving Commitments shall satisfy the requirements of 15.3(a) and shall be subject to the approval of the Agent (such approval not to be unreasonably withheld or delayed), (b) the consent of the Issuer shall be required for any Person providing any portion of the Incremental Revolving Commitment and (c) an existing Lender approached to provide all or a portion of the Incremental Revolving Commitment may elect or decline, in its sole discretion, to provide such Incremental Revolving Commitment.

(b) Conditions. No Incremental Revolving Commitments shall become effective as of the Increase Effective Date unless:

(i) no Event of Default or Default shall exist as of such date, and no Event of Default or Default shall occur on such date as a result of making any Advances on such date or from the application of the proceeds thereof;

(ii) the representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(iii) on a pro forma basis (assuming, in the case of Incremental Revolving Commitments, that such Incremental Revolving Commitments are fully drawn), the Borrowers shall be in compliance with the covenant set forth in Section 6.3 and each other financial covenant as of the end of the latest fiscal quarter of the Borrowers for which financial statements are available; and

(iv) the Borrowers shall deliver or cause to be delivered any officer's certificates, legal opinions or other documents reasonably requested by the Agent.

(c) Increase Joinder. The Incremental Revolving Commitments shall be effected by a joinder agreement (the "Increase Joinder") executed by the Borrowers, the Agent and each Lender making such Incremental Revolving Commitment, in form and substance reasonably satisfactory to each of them. Notwithstanding the provisions of Section 15.2, the Increase Joinder may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent, to effect the provisions of this Section 2.17. Within a reasonable time after the effective date of any increase or joinder, the Agent shall distribute such Increase Joinder to each of the Lenders. In addition, unless otherwise specifically provided herein, all references in Loan Documents to Revolving Loans shall be deemed, unless the context otherwise requires, to include references to Revolving Loans made pursuant to Incremental Revolving Commitments made pursuant

to this Agreement. This Section 2.17 shall supersede any provisions to the contrary. In connection with any Incremental Revolving Commitments pursuant to this Section 2.17, any Person becoming a Lender pursuant to an Increase Joinder shall (1) execute such additional documents and agreements as the Agent may reasonably request and (2) in the case of any new Lender that is organized under the laws of a jurisdiction outside of the United States of America, provide to the Agent, its name, address, tax identification number and/or such other information as shall be necessary for the Agent to comply with "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA Patriot Act.

(d) Adjustment of Revolving Loans. Each Lender that is acquiring an Incremental Revolving Commitment on the Increase Effective Date shall make a Revolving Loan, the proceeds of which will be used to prepay the Revolving Loans of the other applicable Lenders immediately prior to such Increase Effective Date, so that, after giving effect thereto, the Revolving Loans outstanding are held by the Lenders pro rata based on their Revolving Commitments after giving effect to such Increase Effective Date. If there is a new Advance of Revolving Loans on such Increase Effective Date, the Lenders after giving effect to such Increase Effective Date shall make such Revolving Loans in accordance with Section 2.1.

(e) Equal and Ratable Benefit. The Loans and Revolving Commitments established pursuant to this paragraph shall constitute Loans and Revolving Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Liens created by the Loan Documents, except that the new Loans may be subordinated in right of payment or the Liens securing the new Loans may be subordinated, in each case, to the extent set forth in the Increase Joinder. The Loan Parties shall take any actions reasonably required by the Agent to ensure and/or demonstrate that the Liens granted by the Loan Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Revolving Commitments.

## ARTICLE 3
## INTEREST AND FEES

### 3.1 Interest.

(a) Interest on the Loans shall be payable in arrears on the first (1st) day of each calendar month. Interest charges shall be computed on the actual principal amount of Loans outstanding during the calendar month. If any payment to be made by Borrowers shall come due on a day other than a Business Day, the due date shall be extended to the next succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; provided, however, that if such next succeeding Business Day occurs in the following calendar month, then the due date shall be the immediately preceding Business Day.

(b) Domestic Rate Loans shall bear interest for each day at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin, and SOFR Rate Loans shall bear interest at a rate per annum equal to Daily Simple SOFR plus the Applicable SOFR Rate Margin. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the interest rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.

(c) Upon and after the occurrence of an Event of Default, (i) all interest accruing in respect of any Obligation shall bear interest per annum at the Default Rate, (ii) all Letter of Credit Fees shall be increased by a percentage equal to the Default Rate, and all other fees under any Loan Document shall be increased by a percentage equal to the Default Rate. All interest accrued at the Default Rate shall be due and payable on demand.

3.2 **Letter of Credit Fees.**

Borrowers shall pay (i) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit, for each day from and excluding the date of issuance of same to and including the date of expiration or termination, equal to (A) the stated amount of each outstanding Letter of Credit on the date of its issuance or renewal, as the case may be, *multiplied by* (B) the Applicable SOFR Rate Margin, such fees to be payable monthly in arrears on the first day of each calendar month and on the Facility Termination Date, (ii) to Agent, for the benefit of Issuer, facing fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily stated amount of each outstanding Letter of Credit *multiplied by* one-quarter of one percent (0.25%) per annum, such fees to be payable monthly in arrears on the first (1st) day of each calendar month and on the Facility Termination Date and (iii) to Agent, for the benefit of Issuer, any and all fees and expenses as agreed upon by Issuer and Borrowers in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder (all of the foregoing fees, the "Letter of Credit Fees"). All such Letter of Credit Fees and other charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in Issuer's prevailing charges for that type of transaction.

3.3 **Unused Facility Fee.** From the Closing Date to the payment in full in cash of all Obligations under this Agreement, Borrowers have and shall continue to pay to Agent, for the ratable benefit of Lenders, an unused fee monthly commencing on the first (1st) day of each month thereafter. The unused fee payable to Agent shall be determined by multiplying three-eighths of one percent (0.375%) per annum times the daily unused amount of the Aggregate Revolving Commitment each day during the relevant period or portion thereof. The unused fee shall be computed in the same manner as in Section 3.6. Whenever any payment of the unused fee shall be due on a day which is not a Business Day, the date for payment thereof shall be

extended to the next Business Day. It is expressly understood that the unused fee herein described shall not be refundable under any circumstances.

3.4 **Reserved.**

3.5 **Reserved.**

3.6 **Computation of Interest and Fees; Restatement; Conforming Changes**.

(a) Interest on the unpaid principal balance of the Loans is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Any reference in this Agreement to a "per annum" rate shall be based on a year of 360 days. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the rate otherwise applicable during such extension.

(b) If, as a result of any restatement of or other adjustment to the financial statements of Borrowers or for any other reason, any Borrower or Agent reasonably determines that (i) the Consolidated Fixed Charge Coverage Ratio as calculated by Borrowers as of any applicable date was inaccurate and (ii) a proper calculation of the Consolidated Fixed Charge Coverage Ratio would have resulted in higher pricing for such period, Borrowers shall immediately and retroactively be obligated to pay to Agent, for the ratable benefit of Lenders, promptly on demand by Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to Borrowers under any bankruptcy or insolvency law, automatically and without further action by Agent), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. This paragraph shall not limit the rights of Agent under Section 3.8 or 3.11 or under Article 10 of this Agreement. Borrowers' obligations under this paragraph shall survive the termination of the Aggregate Commitments and the repayment of all other Obligations hereunder.

(c) In connection with the use or administration of Daily Simple SOFR, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Agent will promptly notify Borrowers and Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Daily Simple SOFR.

3.7 **Maximum Charges.** In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under applicable law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under applicable law, such excess amount shall be first applied to any unpaid principal balance

owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Agent and Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.8 **Increased Costs; Losses.**

(a) Increased Costs Generally. If any Change in Law shall (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any Issuer, (ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto or (iii) impose on any Lender or any Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made or maintained by such Lender or any Letter of Credit or participation therein, and the result of any of the foregoing shall be to increase the cost to such Lender, such Issuer or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, such Issuer or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, Issuer or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Issuer or other Recipient, Borrowers will pay to such Lender, Issuer or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, Issuer or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender or Issuer determines that any Change in Law affecting such Lender or such Issuer or any lending office of such Lender or such Lender's or Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or Issuer's capital or on the capital of such Lender's or Issuer's holding company, if any, as a consequence of this Agreement, the Aggregate Commitments of such Lender or the Loans made or maintained by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by any Issuer, to a level below that which such Lender or such Issuer or such Lender's or such Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuer's policies and the policies of such Lender's or such Issuer's holding company with respect to capital adequacy and liquidity), then from time to time Borrowers will pay to such Lender or such Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuer or such Lender's or such Issuer's holding company for any such reduction suffered.

(c) Certificates for Reimbursement; Delay in Requests. A certificate of a Lender or an Issuer setting forth the amount or amounts necessary to compensate such

Lender or its holding company as specified in Section 3.8 and delivered to Borrowers shall be conclusive absent manifest error. Borrowers shall pay such Lender or such Issuer the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof. Failure or delay on the part of a Lender or Issuer to demand compensation pursuant to this Section 3.8 shall not constitute a waiver of such Lender's or such Issuer's right to demand such compensation; provided that Borrowers shall not be required to compensate a Lender or Issuer pursuant to this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or such Issuer notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(d) Compensation for Losses. Upon demand of any Lender (with a copy to Agent) from time to time, Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of (a) any payment or prepayment of any SOFR Rate Loan on a day other than an interest payment date (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), (b) any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow any SOFR Loan on the date or in the amount notified by Borrowers, including any loss or expense arising from the liquidation or reemployment of funds or from any fees payable.

3.9 **Illegality; Inability to Determine Rates.**

(a) Illegality. If any Lender determines that any law, rule or regulation has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to SOFR or Daily Simple SOFR, or to determine or charge interest rates based upon SOFR or Daily Simple SOFR, then, upon notice thereof by such Lender to Borrowers (through Agent), the accrual of interest on the Loans based upon Daily Simple SOFR shall be suspended until each affected Lender shall notify Agent and Borrowers that the circumstances causing such suspension no longer exist, and beginning on the date of such suspension, interest shall accrue thereon at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin.

(b) Inability to Determine Rates. Subject to Section 3.10, if at any time (a) Agent determines (which determination shall be conclusive and binding absent manifest error) that Daily Simple SOFR cannot be determined pursuant to the definition thereof (including because SOFR is not available or published on a current basis) or (b) Agent is advised by the Required Lenders that Daily Simple SOFR does not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans hereunder, Agent will promptly so notify Borrowers and each Lender. In any such event (including during any Benchmark Unavailability Period), the accrual of interest hereunder based upon Daily Simple SOFR shall be suspended until Agent (with respect to clause (b), upon the instruction of the Required Lenders) revokes such notice, and beginning on the date of

such suspension, interest shall accrue hereunder at a rate per annum equal to the Alternate Base Rate plus the Applicable Base Rate Margin.

3.10 **Effect of Benchmark Transition Event.**

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, following the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace then-current Benchmark for all purposes hereunder and under any Loan Document at the time (not less than five Business Days after Agent has provided notice thereof to each Lender) set forth in the notice of implementation of such Benchmark Replacement provided by Agent to Borrowers and the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b) Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c) Notices; Standards for Decisions and Determinations. Agent will promptly notify Borrowers and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Agent will promptly notify Borrowers of the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.10.

3.11 **Taxes.**

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law requires the deduction or withholding of any Tax from any such payment by Agent or any Loan Party, then Agent or such Loan Party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so

that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.11) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Body in accordance with applicable law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c) Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.11) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender or an Issuer (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender or an Issuer, shall be conclusive absent manifest error.

(d) Indemnification by Lenders. Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrowers have not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 15.3(c) relating to the maintenance of a Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to Lender from any other source against any amount due to Agent under this paragraph (d).

(e) Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.11, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(f) Status of Lenders. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.11, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such

Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrowers and Agent, at the time or times reasonably requested by Borrowers or Agent, such properly completed and executed documentation reasonably requested by Borrowers or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrowers or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrowers or Agent as will enable Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f) (ii)(A)(i), (ii)(B) and (ii)(D) of this Section) shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A) any Lender that is a U.S. Person shall deliver to Borrowers and Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS

Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form and substance satisfactory to Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to such Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in form and substance satisfactory to Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form and substance satisfactory to Agent on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowers or Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers or Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or Agent as may be necessary for Borrowers and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrowers and Agent in writing of its legal inability to do so.

(g) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.11 (including by the payment of additional amounts pursuant to this Section 3.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 3.11(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body. Notwithstanding anything to the contrary in this Section 3.11(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 3.11(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.11(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

3.12 **Survival.** All of Borrowers' obligations under Sections 3.8 through 3.11 shall survive any assignment of rights by any Lender, termination of the commitments and repayment of the Obligations.

## ARTICLE 4
## COLLATERAL; SECURITY AGREEMENT

4.1 **Security Interest in the Collateral.** To secure the prompt payment and performance of the Obligations, each Loan Party hereby grants to Agent, for the benefit of the Agent, each Lender, and the benefit of each of their respective Affiliates, a continuing security interest in and a pledge of all of its Collateral. Each Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect such security interest and shall cause its financial statements to reflect such security interest. In addition, to secure such prompt payment and performance of the Obligations, each Loan Party shall also assign, pledge, hypothecate and grant to Agent, for the benefit of Agent and each Lender, a mortgage on its Owned Real Property, if any.

4.2 **Perfection of Security Interest.** Each Loan Party shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, without limitation, (a) immediately discharging all Liens other than Permitted Encumbrances, (b) using best efforts to obtain each Waiver as Agent may request, (c) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral (including, in the case of Collateral consisting of motor vehicles subject to certificate of title statutes, upon the request of Agent, the Agent shall have received the original title certificates that identify Agent as lienholder for such motor vehicles; provided, however that no such original title certificates shall be required to be delivered for motor vehicles owned by the Loan Parties as of the Closing Date), (d) entering into lockbox and other custodial arrangements satisfactory to Agent as and to the extent required hereunder, and (e) executing and delivering control agreements, instruments of pledge, Mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest in Collateral under the Uniform Commercial Code or other applicable law. Each Loan Party hereby authorizes Agent to file against such Loan Party, one or more financing, continuation, or amendment statements or recording, notice, or perfection statements pursuant to the Uniform Commercial Code or such other laws, acts or codes pertaining to personal property, to perfect Liens securing Obligations arising hereunder in form and substance satisfactory to Agent. All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent immediately upon demand.

4.3 **Dominion of Funds, Lockbox, and Deposit Accounts.** (a) Borrowers shall maintain with Agent a Lockbox and any controlled deposit accounts required by Agent, including the Cash Collateral Account, each of which shall be subject to a lockbox agreement,

deposit account control agreement or other Loan Document satisfactory to Agent in its sole discretion. Each Borrower shall notify each Account Debtor in writing (such notices to be in form and substance satisfactory to Agent) and otherwise use its best efforts to ensure that each Account Debtor remits all payments thereon directly to address specified in the agreement for such Lockbox, and all invoices rendered after the date hereof shall bear such address.

(b) No Borrower shall maintain or have any operating account, deposit account, investment account, securities account or similar account at any bank, depositary source, financial intermediary or other financial institution, other than the deposit accounts set forth on Schedule 4.3 hereof, or such other accounts acceptable to Agent in its sole discretion. For the avoidance of doubt, the Brookline Money Market Account (as defined in Section 6.9) balance shall not exceed $50,000 at any time (in accordance with the terms and conditions as described in Section 6.9).

(c) All collections from Account Debtors of each Borrower sent to the Lockbox shall be deposited on a daily basis directly into the Cash Collateral Account. The Cash Collateral Account shall not be subject to any deduction, set off, banker's lien or any other right in favor of any Person other than Agent. All funds deposited into the Cash Collateral Account shall be the exclusive property of Agent and shall be subject to the sole and exclusive control of Agent and only to such signing authority designated from time to time by Agent. No Borrower shall have control over or any interest in any such funds.

(d) Any collections received by any Borrower shall be deemed held by such Borrower in trust and as fiduciary for Agent. Each Borrower agrees not to commingle any such collections with any of such Borrower's other funds or property, but rather to hold such funds separate and apart in trust and as fiduciary for Agent until deposit is made into the Cash Collateral Account or other deposit account directed by Agent. Each Borrower hereby agrees to deposit on a daily basis such directly received collections into the Cash Collateral Account.

(e) Each Loan Party shall pay to Agent on demand all usual and customary fees and reasonable expenses which Agent incurs in connection with (i) the forwarding of any proceeds of any Loan and (ii) the establishment and maintenance of any accounts as provided for in this Section 4.3. Agent may, without making demand, charge all such fees and reasonable expenses to the Loan Account as a Domestic Rate Loan type of Revolving Loan and add them to the Obligations.

4.4 **Preservation and Disposition of Collateral.** Each Loan Party will safeguard and protect all Collateral for Agent's general account and shall make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement. Following the occurrence of a Default or Event of Default, in addition to the rights and remedies set forth in Section 11.1, Agent may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including (a) the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) employing and maintaining at any of any Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) leasing

warehouse facilities to which Agent may move all or part of the Collateral; and (d) using any Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral. Agent shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of any Loan Party's Real Property. Each Loan Party shall cooperate fully with all of Agent's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as Agent may direct. Agent is hereby authorized by the Loan Parties, from time to time in Agent's sole discretion, (a) after the occurrence of a Default or an Event of Default, or (b) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Revolving Loans to Borrowers which Agent, in its sole discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (iii) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement. All of Agent's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

4.5 **Ownership of Collateral.** With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (a) each Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (b) each Loan Document or other writing executed by any Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (c) all signatures and endorsements of each Loan Party that appear on such documents and agreements shall be genuine and each Loan Party shall have full capacity to execute same; and (d) each Loan Party's Inventory shall be located as set forth on Schedule 4.5 (as such schedule may be updated from time to time and delivered to Agent) and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the ordinary course of business and with respect to Inventory in transit from one location identified on Schedule 4.5 (as such schedule may be updated from time to time) to another location identified on Schedule 4.5.

4.6 **Defense of the Interests of Agent and Lenders.** Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, the interests of Agent and Lenders in the Collateral shall continue in full force and effect. During such period no Loan Party shall, without Agent's prior written consent, pledge, sell (except Inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for sales, assignments, and transfers expressly permitted elsewhere herein, any part of the Collateral. Each Loan Party shall defend the interests of Agent and Lenders in the Collateral against any and all Persons whatsoever. At any time after an Event of Default or Default has occurred, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises such right to take possession of the Collateral, the Loan Parties shall, upon demand, assemble the Collateral in the best manner possible and make it

available to Agent at a place reasonably convenient to Agent. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence of a Default or an Event of Default, each Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Loan Party's possession, they, and each of them, shall be held by such Loan Party in trust as Agent's trustee, and such Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7 **Books and Records.** Each Loan Party shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all Charges; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Accounts, advances and investments and all other proper accruals (including accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this Section 4.7 shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountants as shall then be regularly engaged by Borrowers or the other Loan Parties.

4.8 **Financial Disclosure.** Each Loan Party hereby irrevocably authorizes and directs all accountants and auditors employed by such Loan Party at any time and promptly after the request of Agent to exhibit and deliver to Agent and each Lender copies of any Loan Party's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in such accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Loan Party's financial status and business operations. Each Loan Party hereby authorizes all federal, state and municipal authorities to furnish to Agent and each Lender copies of reports or examinations relating to such Loan Party, whether made by such Loan Party or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Loan Party prior to obtaining such information or materials from such accountants or such authorities.

4.9 **Compliance with Laws.** Each Loan Party shall be in compliance with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of such Loan Party's business including, without limitation the USA PATRIOT Act and Beneficial Ownership Regulations, unless such failure would not reasonably be expected to have a Material Adverse Effect. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect. Borrowers will maintain in effect and enforce policies and procedures designed to ensure compliance by Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

4.10 **Inspection of Premises; Appraisals.** At all times as Agent deems necessary, Agent shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Loan Party's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Loan Party's business. Agent and its agents may enter upon any of each Loan Party's premises at any time during business hours and at any other reasonable time, and from time to time as Agent deems necessary or desirable, for the purpose of auditing, inspecting and appraising the Collateral and any and all records pertaining thereto and the operation of such Loan Party's business. Agent shall have the right to conduct such field examinations, inspections and appraisals at such times as Agent deems necessary, in each case, at Borrowers' expense; provided that, (a) Loan Parties shall be required to pay for no more than two (2) field exams per calendar year unless an Event of Default occurs, in which case such limitations shall not apply and (b) unless an Event of Default exists, Agent shall schedule its audits and inspections so as to minimize interference with such Borrower's business.

4.11 **Insurance.** Each Loan Party shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At each Loan Party's own cost and expense in amounts and with carriers acceptable to Agent, each Loan Party shall (a) keep all its insurable properties and properties in which each Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Loan Party's including business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Loan Party is engaged in business; and (e) furnish Agent (i) with a status report with respect to the renewal of all such insurance no later than ten (10) days before the expiration date thereof, (ii) with evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (iii) with lender loss payable, mortgagee and additional insured endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured, lender loss payee and mortgagee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy, lender loss payable clauses and mortgagee clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. The Loan Parties shall provide copies of all such insurance policies (including the appropriate lender loss payee, mortgagee and additional insured endorsements) within ten (10) days after Agent's request. In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by Agent and the applicable Loan Party to make payment for such loss to Agent and not to such Loan Party and Agent jointly. If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name

thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage with respect to Collateral. All loss recoveries with respect to Collateral received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by Agent to applicable Borrower or any other Loan Party or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Loan Parties to Agent, on demand.

4.12 **Failure to Pay Insurance.** If any Loan Party fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Loan Party, and such premium shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

4.13 **Payment of Taxes.** Each Loan Party will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral including real and personal property taxes, assessments and Charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except those taxes, assessments or Charges to the extent that any Loan Party has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's and Lenders' security interest in or Lien on the Collateral and provided that no Lien for any such taxes has attached to any Collateral. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Loan Party and Agent, Issuer or any Lender which Agent, Issuer or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's opinion, may possibly create a valid Lien on any Collateral, Agent may without notice to the Loan Parties pay the taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds Agent, Issuer and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any Loan Party has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any payment by Agent or any Lender under this Section 4.13 shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations and, until the Loan Parties shall furnish Agent or any Lender with an indemnity therefor (or supply Agent or any such Lender with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent or such Lender may hold without interest any balance owing to any Loan Party's credit and Agent or such Lender shall retain its security interest in any and all Collateral held by Agent or such Lender.

4.14 **Payment of Leasehold Obligations.** Each Loan Party shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's reasonable request will provide evidence of having done so.

4.15 **Accounts Receivable.** Each Loan Party represents, warrants and agrees as follows:

(a) Nature of Accounts. Each Account is a bona fide and valid account representing a bona fide obligation incurred by the Account Debtor therein named, for a fixed sum as set forth in the invoice relating thereto (other than immaterial or unintentional invoice) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Loan Party, or work, labor or services fully rendered by a Loan Party as of the date each Account is created. Such Account is due and owing without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by the Loan Parties to Agent.

(b) Solvency of Account Debtors. Each Account Debtor as of the date each Account is created, is and will be solvent and able to pay each Account on which the Account Debtor is obligated in full when due or with respect to such Account Debtor of any Loan Party who are not solvent such Loan Party has set up on its books and in its financial records bad debt reserves adequate to cover the uncollectible portion.

(c) Locations of Loan Parties. Each Loan Party's state of organization and the address and location of its chief executive office are set forth on Schedule 4.15(c). Until written notice is given to Agent by the Borrower Representative of any other office at which any Loan Party keeps its records pertaining to Accounts, all such records shall be kept at such executive office.

(d) Notification of Assignment of Accounts. At any time following the occurrence of a Default or an Event of Default, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Accounts to any and all Account Debtors or any third party holding or otherwise concerned with any of the Collateral. Thereafter, Agent shall have the sole right to collect the Accounts, take possession of the Collateral, or both. Agent's collection expenses, including stationery and postage, telephone and telegraph, secretarial and clerical expenses, the salaries of any collection personnel used for collection, and other expenses may be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations.

(e) Power of Agent to Act on Loan Parties' Behalf. Agent shall have the right, at any time, to receive, endorse, assign and/or deliver in the name of Agent or any Loan Party any and all checks, drafts and other instruments for the payment of money relating to the Accounts, and each Loan Party hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Loan Party hereby appoints and constitutes Agent or Agent's designee as such Loan Party's attorney-in-fact with power at any time after providing reasonable notice to all Loan Parties (provided, however that no such notice shall be required at any time after the occurrence and during the continuance of an Event of Default or Default) (i) to endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Loan Party's name on any invoice or bill of lading relating to any of the Accounts, drafts against Account Debtors, assignments and verifications of Accounts; (iii) to send verifications of Accounts to any Account Debtor; (iv) to demand payment of the Accounts; (v) to enforce payment of the Accounts by legal proceedings or otherwise; (vi) to exercise any right and remedy of any Loan Party with respect to the

collection of the Accounts and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the Accounts; (viii) to settle, adjust or compromise any legal proceedings brought to collect Accounts; (ix) to prepare, file and sign such Loan Party's name on a proof of claim in bankruptcy or similar document against any Account Debtor; (x) to prepare, file and sign such Loan Party's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Accounts; and (xi) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time following the occurrence of an Event of Default or Default, to change the address for delivery of mail addressed to any Loan Party to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Loan Party.

(f) No Liability. Neither Agent, Issuer nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts or any instrument received in payment thereof, or for any damage resulting therefrom. Agent may, without notice or consent from any Loan Party, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Accounts or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept the return of the goods represented by any of the Accounts, without notice to or consent by any Loan Party, all without discharging or in any way affecting any Loan Party's liability hereunder.

(g) Adjustments. No Loan Party will, without Agent's consent, compromise or adjust any Account (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore (i) customary in the business or industry of such Borrower, and (ii) done in the ordinary course of such Borrower's business.

4.16 **Maintenance of Equipment.** Each Loan Party shall maintain its Equipment in good operating condition and repair in substantial accordance with industry standards (reasonable wear and tear excepted) and shall make all necessary replacements of and repairs thereto so that the value and operating efficiency of such Equipment shall be maintained and preserved. No Loan Party shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.17 **Exculpation of Liability.** Nothing herein contained shall be construed to constitute Agent, Issuer or any Lender as any Loan Party's agent for any purpose whatsoever, nor shall Agent, Issuer or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Neither Agent, Issuer nor any Lender shall assume, whether by anything herein or in any assignment or otherwise, any Loan Party's obligations under any contract or agreement assigned to Agent, Issuer or Lenders, and neither Agent, Issuer nor any Lender shall

be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.18 **Environmental Matters.**

(a) The Loan Parties shall ensure that the Real Property remains in compliance with all Environmental Laws, and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by applicable law or appropriate Governmental Bodies.

(b) In the event any Loan Party obtains, gives or receives notice of any Hazardous Discharge at the Real Property or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Loan Party's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Environmental Authority, then the Borrower Representative shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Loan Party is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(c) The Loan Parties shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Loan Party to dispose of Hazardous Substances and shall continue to forward copies of correspondence between any Loan Party and any Environmental Authority regarding such claims to Agent until the claim is settled. The Loan Parties shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Loan Party is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in the Real Property and the Collateral.

4.19 **Financing Statements.** Except for (a) the financing statements filed by Agent, and (b) those financing statements permitted to be filed hereunder, no financing statement or similar notice of Lien covering any of the Collateral or any proceeds thereof is on file in any public office.

4.20 **Commercial Tort Claims.**

(a) The only existing or potential Commercial Tort Claims of any Loan Party existing (regardless of whether the amount, defendant or other material facts can be determined and regardless of whether such Commercial Tort Claim has been asserted, threatened or has otherwise been made known to the obligee thereof or whether litigation has been commenced for such claims) are those listed on Schedule 4.20, as supplemented

pursuant to the terms hereof, which sets forth such information separately for each Loan Party.

(b) Each Loan Party agrees that, if it shall acquire any interest in any Commercial Tort Claim (whether from another Person or because such Commercial Tort Claim shall have come into existence), (i) such Loan Party shall, immediately upon such acquisition, deliver to Agent, in each case in form and substance satisfactory to Agent, a notice of the existence and nature of such Commercial Tort Claim and deliver a supplement to Schedule 4.20 containing a specific description of such Commercial Tort Claim, certified by such Loan Party as true, correct and complete, (ii) the provision of Section 4.1 shall apply to such Commercial Tort Claim (and each Loan Party authorizes Agent to supplement such schedule with a description of such Commercial Tort Claim if such Loan Party fails to deliver the supplement described in clause (i)) and (iii) such Loan Party shall execute and deliver to Agent, in each case in form and substance satisfactory to Agent, any certificate, agreement and other document, and take all other action, deemed by Agent to be reasonably necessary or appropriate for Agent to obtain a first-priority, perfected security interest in all such Commercial Tort Claims. Any supplement to Schedule 4.20 delivered pursuant to this Section 4.20 shall become part of Schedule 4.20 for all purposes hereunder.

4.21 **Pledged Securities.**

(a) Schedule 5.3 sets forth, as of the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 5.3 or upon the occurrence of a Permitted Business Acquisition), a complete and accurate list of the ownership of the issued and outstanding equity interests of each Borrower and their respective Subsidiaries, if any. Each Loan Party represents and warrants that (i) all Pledged Securities owned by it have been duly authorized, validly issued, are fully paid and non-assessable, (ii) with respect to any certificates delivered to Agent representing any Pledged Securities, either such certificates are Securities as defined in Article 8 of the Uniform Commercial Code as a result of actions by the issuer or otherwise, or, if such certificates are not Securities as defined in Article 8 of the Uniform Commercial Code, such Loan Party has so informed Agent so that Agent may take steps to perfect its security interest therein as a General Intangible and each Loan Party covenants to not cause such certificates to become Securities as defined in Article 8 of the Uniform Commercial Code without Agent's prior written consent, (iii) with respect to any Pledged Securities not represented by certificates, such Loan Party has so informed Agent so that Agent may take steps to perfect its security interest therein as a General Intangible and each Loan Party covenants to not cause such uncertificated Pledged Securities to become represented by certificates or to become Securities as defined in Article 8 of the Uniform Commercial Code without Agent's prior written consent, and (iv) all such Pledged Securities held by a securities intermediary are covered by a control agreement among such Loan Party, the securities intermediary and Agent pursuant to which Agent has "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code).

(b) (i) None of the Pledged Securities has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) except as set forth on Schedule 5.3, there are existing no options, warrants, calls or commitments of any character whatsoever relating to such Pledged Securities or which obligate the issuer of any Pledged Securities to issue additional equity interests, and (iii) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Body or any other Person is required for the pledge by such Loan Party of such Pledged Securities pursuant to this Agreement or for the exercise by Agent of remedies in respect of the Pledged Securities, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(c) (i) Each Borrower hereby grants a security interest in and pledges and collaterally assigns all of each Borrower's rights and title to the Pledged Securities. For the better protection of Agent and Lenders hereunder, Borrowers shall execute appropriate transfer powers with respect to the Pledged Securities represented by certificates and, concurrently therewith, deliver such the Pledged Securities and the aforesaid transfer powers with Agent promptly upon Agent's request. (ii) Each Borrower authorizes Agent, at any time after the occurrence and during the continuance of an Event of Default, to transfer the Pledged Securities into the name of Agent or Agent's nominee, but Agent shall be under no duty to do so. Notwithstanding any provision or inference herein or elsewhere to the contrary, unless and until there shall have occurred and is continuing an Event of Default (A) Agent shall have no right to vote the Pledged Securities, and (B) Borrowers shall be entitled to receive and retain (free from the lien of Agent once paid) all dividends and other distributions made with respect to the Pledged Securities prior to an Event of Default, unless the payment of such dividends or distributions caused an Event of Default (and for clarification, Borrowers may in all cases receive and retain (free from the lien of Agent once paid) dividends permitted by this Agreement made prior to an Event of Default). (iii) Agent shall at all times have the rights and remedies of a secured party under the Uniform Commercial Code and Pennsylvania law as in effect from time to time, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, the Notes or any other Loan Document, or otherwise provided in law or equity. Upon the occurrence and during the continuance of an Event of Default hereunder, Agent, in its sole discretion, may sell, assign, transfer and deliver the Pledged Securities, at any time, or from time to time. No prior notice need be given to Borrowers or to any other Person in the case of any sale of the Pledged Securities that Agent reasonably determines to be declining speedily in value or that is customarily sold in any securities exchange, over-the-counter market or other recognized market, but in any other case Agent shall give Borrower Representative no fewer than ten days prior notice of either the time and place of any public sale of the Pledged Securities or of the time after which any private sale or other intended disposition thereof is to be made. Each Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Agent may purchase the Pledged Securities, or any part thereof, free from any right of redemption, all of which rights each Borrower hereby waives and releases. After deducting all expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Agent

may apply the net proceeds of each such sale to or toward the payment of the Obligations, whether or not then due, in such order and by such division as Agent in its sole discretion may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrowers.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each Loan Party as to itself and any Subsidiary represents and warrants as follows:

5.1 **Authority.** Each Loan Party has the full power, authority and legal right to enter into this Agreement and the other Loan Documents to which it is a party and to perform all of its respective obligations hereunder and thereunder, as applicable. This Agreement and the other Loan Documents to which each Loan Party is a party constitute the legal, valid and binding obligations of such Loan Party, enforceable against it in accordance with their terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally. The execution, delivery and performance of this Agreement and of the other Loan Documents by each Loan Party has been authorized by all necessary action.

5.2 **Formation and Qualification; Subsidiaries**. Each Loan Party and Subsidiary of a Loan Party is duly incorporated or organized, as applicable, and in good standing under the laws of the jurisdictions listed on Schedule 5.2 and is qualified to do business and is in good standing in the jurisdictions listed on Schedule 5.2 (including, where applicable and as noted on such Schedule, each No Access Jurisdiction) which constitute all jurisdictions in which qualification and good standing are necessary for such Loan Party or Subsidiary to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. The only Subsidiaries of any Loan Party are listed on Schedule 5.2.

5.3 **Officers, Directors, Shareholders, Capitalization**. The names and titles of all executive officers and directors of each Loan Party as of the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to Schedule 5.3 or upon the occurrence of a Permitted Business Acquisition), are set forth on Schedule 5.3. Schedule 5.3 also sets forth for each Loan Party and Subsidiary of a Loan Party as of the Closing Date (or as of any subsequent date whereby this Agreement is amended or upon the occurrence of a Permitted Business Acquisition), the names of such Loan Party's equity holders and a description of such Person's equity interest in such Loan Party or Subsidiary (including, if applicable, a listing of the share or unit certificates and the number of shares or units of equity interests held by such Person). There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any equity interests in any Loan Party or any Subsidiary thereof, except as set forth on Schedule 5.3.

5.4 **Governmental Approvals; No Conflicts**. The transactions contemplated by this Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Body, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan

Documents, (b) will not violate any law applicable to any Loan Party or any Subsidiary thereof, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary thereof or any assets of any of them, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary thereof, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any Subsidiary thereof, except Permitted Encumbrances.

5.5 **Tax Returns**. Each Loan Party and Subsidiary thereof has filed all federal, state and local tax returns and other reports such Loan Party or Subsidiary is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable. The provision for taxes on the books of such Loan Party and Subsidiary thereof is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Loan Party has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its or any Subsidiaries books. No tax Liens have been filed and no claims are being asserted with respect to any taxes.

5.6 **Financial Statements.**

(a) The monthly projected statements of income, statements of cash flow, balance sheet and availability, for the twelve-month period ending December 31, 2022, of Express and its Subsidiaries prepared on a consolidated and consolidating basis (and copies of which were delivered to Agent), were prepared by an Authorized Officer of the Borrower Representative, are based on underlying assumptions and estimates which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

(b) The consolidated and consolidating balance sheets of Express and its Subsidiaries as of December 31, 2020, and the related statements of income, changes in stockholder's or member's equity, and changes in cash flow for the period ended on each such date, all accompanied by reports containing opinions without qualification by independent certified public accountants, copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied and present fairly in all material respects the financial condition of Express and its Subsidiaries at such date and the results of their operations for such period. Since the date of the financial statements and other reports described in the immediately preceding sentence, there has been no change in the financial condition of Express and its Subsidiaries taken as a whole as shown on the consolidated balance sheet as of such date and no change in the aggregate value of machinery, Equipment and Real Property, if any, owned by Express and Subsidiaries, except changes in the ordinary course of business, none of which individually or in the aggregate has had, or reasonably could be believed to cause in the future, a Material Adverse Effect.

5.7 **Organization Name**. No Loan Party has been known by any other name in the past five (5) years and does not sell Inventory under any other name, nor has any Loan Party been the surviving entity of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.8 **OSHA and Environmental Compliance.**

(a) Each Loan Party and Subsidiary thereof has duly complied with, and (i) its facilities, business, assets, property, and Equipment, and (ii) to its knowledge, its leaseholds are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; and, there have been no outstanding citations, notices or orders of non-compliance issued to any Loan Party or any Subsidiary thereof or relating to the business, assets, property, leaseholds or Equipment of such Person under any such laws, rules or regulations.

(b) Each Loan Party and Subsidiary thereof has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c) except as set forth in each of the Phase I Environmental Site Assessment Report (Phase I Report) certified and previously delivered to Agent solely in connection with the North Carolina Property and Tennessee Property and the Phase II Environmental Site Assessment Report (Phase II Report) certified and previously delivered to Agent solely in connection with the Tennessee Property, (i) There are no releases, spills, discharges, leaks, Hazardous Discharges or disposal of Hazardous Substances at, upon, under or within any Real Property; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property; (iii) to the knowledge of any Loan Party, the Real Property has never been used as a treatment, storage or disposal facility of Hazardous Waste and (iv) no Hazardous Substances are present on the Real Property.

5.9 **Solvency; No Litigation, No Violation, ERISA.**

(a) After giving effect to the transactions contemplated by this Agreement, the Loan Parties will be solvent, able to pay their debts as they mature, have capital sufficient to carry on their business and all businesses in which they are about to engage, and (i) as of the Closing Date, the fair present saleable value of their assets, calculated on a going concern basis, is in excess of the amount of their liabilities and (ii) subsequent to the Closing Date, the fair saleable value of their assets (calculated on a going concern basis) will be in excess of the amount of their liabilities.

(b) Except as disclosed in Schedule 5.9(b), no Loan Party or any Subsidiary thereof has as of the Closing Date any pending or threatened litigation, arbitration, action or proceeding seeking damages, individually or in the aggregate, in excess of $500,000. No Loan Party or any Subsidiary thereof has any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect.

(c) No Loan Party or any Subsidiary thereof is in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to

have a Material Adverse Effect, nor is any Loan Party or any Subsidiary thereof in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d) No Loan Party or any Subsidiary thereof is a member of any Controlled Group nor does any such Person maintain or contribute to any Plan or Multiemployer Plan.

5.10 **Patents, Trademarks, Copyrights and Licenses**. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by any Loan Party are set forth on Schedule 5.10, are valid and have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the patents, trademarks, service marks, copyrights, design rights, tradenames, assumed names, trade secrets and licenses which are necessary for the operation of its business; there is no objection to or pending challenge to the validity of any such patent, trademark, copyright, design right, tradename, trade secret or license and no Loan Party is aware of any grounds for any challenge, except as set forth in Schedule 5.10. Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design right, copyright, copyright application and copyright license owned or held by any Loan Party consists of original material or property developed by such Loan Party or was lawfully acquired by such Loan Party from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all customized software licensed by any Loan Party, such Loan Party is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement, each such source code escrow agreement being listed on Schedule 5.10.

5.11 **Licenses and Permits**. Each Loan Party and Subsidiary thereof (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state or local law or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to comply with or procure such licenses or permits would reasonably be expected to have a Material Adverse Effect.

5.12 **Default of Indebtedness**. No Loan Party or any Subsidiary thereof is in default in the payment of the principal of or interest on any Indebtedness or under any instrument or agreement under or subject to which any Indebtedness has been issued and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.13 **No Burdensome Restrictions; No Default**. No Loan Party or any Subsidiary thereof is party to any contract or agreement, the performance of which could reasonably be expected to have a Material Adverse Effect. No Loan Party or any Subsidiary thereof has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is

not a Permitted Encumbrance. No Loan Party or any Subsidiary thereof is in default in the payment or performance of any of its contractual obligations and no Default has occurred.

5.14 **No Labor Disputes**. No Loan Party or any Subsidiary thereof is involved in any labor dispute and there are no strikes or walkouts or union organization of any employees of any Loan Party or Subsidiary thereof threatened or in existence and no labor contract is scheduled to expire during the term of this Agreement.

5.15 **Margin Regulations**. No Loan Party or any Subsidiary thereof is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance or the other Loans will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16 **Investment Company Act**. No Loan Party or any Subsidiary thereof is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17 **Disclosure**. No representation or warranty made by any Loan Party in this Agreement or in any financial statement, report, certificate or any other document furnished in connection herewith contains any untrue statement of fact or omits to state any fact necessary to make the statements herein or therein not misleading. There is no fact known to any Loan Party or which reasonably should be known to such Loan Party which such Loan Party has not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement which could reasonably be expected to have a Material Adverse Effect.

5.18 **Hedging Contracts**. Except as required pursuant to Section 6.8, no Loan Party or any Subsidiary thereof is a party to, nor will it be a party to, any Hedging Contract unless such contract provides that damages upon termination following an event of default thereunder are payable on a "two-way basis" without regard to fault on the part of either party.

5.19 **Material Business Agreements**. All Material Business Agreements to which any Loan Party or any Subsidiary thereof is a party or is bound are listed on Schedule 5.19. No Loan Party or any Subsidiary thereof is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (a) any Material Business Agreement to which it is a party or (b) any agreements or instruments evidencing or governing Indebtedness.

5.20 **Application of Certain Laws and Regulations**. No Loan Party nor any Affiliate of any Loan Party is subject to any statute, rule or regulation which regulates the incurrence of any Indebtedness, including statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.21 **Business and Property of the Loan Parties**. Upon and after the Closing Date, no Loan Party proposes to engage in any business other than as set forth on Schedule 5.21 and activities necessary to conduct the foregoing. On the Closing Date, each Loan Party will own all

the property and possess all of the rights and Consents necessary for the conduct of the business of such Loan Party.

5.22 **Reserved**.

5.23 **Anti-Corruption Laws and Sanctions**.

(a) None of (i) any Loan Party, any Subsidiary thereof or, any of the respective directors, officers, employees or Affiliates of any Loan Party or any Subsidiary thereof, or (ii) any agent or representative of any Loan Party or any Subsidiary thereof that will act in any capacity in connection with, or benefit from, the credit facilities provided hereunder, (A) is a Sanctioned Person or currently the subject or target of any Sanctions, (B) has its assets located in a Sanctioned Country, (C) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons or (D) has taken any action, directly or indirectly, that would result in a violation by such Persons of any Anti-Corruption Laws or has the purpose of evading or avoiding any Anti-Corruption Laws. Each of the Loan Parties and their respective Subsidiaries has implemented and maintains in effect policies and procedures designed to promote and achieve compliance by the Loan Parties and their respective Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the Anti-Corruption Laws. Each of the Loan Parties and their respective Subsidiaries, and each director, officer, employee, agent and Affiliate of the Loan Parties and their respective Subsidiaries, is in compliance with the Anti-Corruption Laws.

(b) No proceeds of any Loan have been used, directly or indirectly, by any Loan Party, any Subsidiary thereof or any of the respective directors, officers, employees, Affiliates or agents of the foregoing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, including any payments (directly or indirectly) to a Sanctioned Person or a Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

5.24 **Beneficial Ownership Certificate**. Each Borrower represents that as of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

## ARTICLE 6
## AFFIRMATIVE COVENANTS

Each Loan Party agrees as to itself and each Subsidiary, until payment in full of the Obligations and termination of this Agreement, that it shall:

6.1 **Conduct of Business and Maintenance of Existence and Assets.**

(a) Conduct continuously and operate actively its business and the business of any Subsidiary according to good business practices;

(b) maintain all of its properties and the properties of any Subsidiary useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any Intellectual Property right or other rights;

(c) keep in full force and effect its existence and the existence of any Subsidiary and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and

(d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain all rights, licenses, leases, powers and franchises of itself or any Subsidiary under the laws of the United States or any political subdivision thereof and under any other laws having application to such Person.

6.2 **Violations**. Immediately notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Loan Party or any Subsidiary thereof or the Collateral which could reasonably be expected to have a Material Adverse Effect.

6.3 **Consolidated Fixed Charge Coverage Ratio**. Maintain a Consolidated Fixed Charge Coverage Ratio for Express Holdco and its Subsidiaries on a consolidated basis of not less than 1.10 to 1.00, which ratio shall be determined as of each fiscal quarter end for the four (4) consecutive fiscal quarters then ending on each such date.

6.4 **Execution of Supplemental Instruments**. Each Loan Party will, and will cause each Subsidiary to execute and deliver, or cause to be executed and delivered, to Agent and Lenders such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, Mortgages, deeds of trust and other documents and such other actions), which may be required by law or which Agent or any Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created, all at the expense of the Loan Parties.

6.5 **Payment of Indebtedness**. Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its Indebtedness.

6.6 **Standards of Financial Statements**. Cause all financial statements referred to in Sections 9.5, 9.6, 9.7 and 9.8 to be complete and correct in all material respects (subject, in the case of interim financial statements, to notes and normal year-end audit adjustments) and to be prepared in reasonable detail.

6.7 **Taxes**. Pay, and cause each Subsidiary thereof to pay, when due, all (a) income taxes, assessments and other Charges. If any tax, assessment or other Charge by any

Governmental Body creates a Lien on the Collateral which Agent, in the exercise of its sole judgment, determines is currently enforceable, Agent without notice to the Loan Parties may pay the taxes, assessments or other Charges. Any such payments shall be charged to the Loan Account as a Domestic Rate Loan type of Revolving Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent immediately upon demand.

6.8 **Interest Rate Protection**. Promptly upon Agent's request, maintain Hedging Contracts with financial institutions acceptable to Agent on such terms and under such conditions as shall be acceptable to Agent.

6.9 **Deposit Accounts**. On the Closing Date, Borrowers shall transfer all funds in any deposit accounts maintained with any other financial institution, to the extent not yet transferred and unless otherwise determined by the Agent in its sole discretion, to the Cash Collateral Account. Notwithstanding the foregoing, Borrowers shall be permitted to maintain that certain Money Market Savings Account with Brookline Bank (Account #1241008323) (the "Brookline Money Market Account"); provided that, (i) the Brookline Money Market Account balance shall not exceed $50,000 at any time, and (ii) if at any time the Brookline Money Market Account balance exceeds $50,000, Borrowers shall promptly transfer the excess funds to the Cash Collateral Account.

6.10 **Credit Insurance**. The Borrowers shall maintain credit insurance policies on no less than fifty percent (50%) of all Eligible Accounts (the insurance carrier, amount and terms of such insurance shall be reasonably acceptable to Agent and shall name Agent as beneficiary or loss payee, as applicable).

6.11 **2022 Real Estate Purchase.** Within thirty (30) days of the 2022 Real Estate Purchase (or such longer time period as agreed to by the Agent in its sole discretion), the Borrowers shall deliver or cause to be delivered to Agent, for the benefit of the Lenders (all of which shall be in a form and substance satisfactory to Agent):

(a) updated schedules to this Agreement (including, but not limited to, Schedule 1.2(a));

(b) a Mortgage (including assignment of leases and rents);

(c) appropriate updates to the Environmental Indemnity Agreement or a new environmental indemnity agreement (as required by Agent);

(d) ALTA mortgagee's title policy with endorsements as required by Agent;

(e) an appraisal (market value "as is") prepared by an appraiser acceptable to Agent;

(f) environmental reports acceptable to Agent;

(g) surveys acceptable to Agent;

(h) if any such parcel of Real Property is determined by Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to Agent; and

(i) such other information, documentation, and certifications as may be reasonably required by Agent.

6.12 **Post-Closing Obligations**. Within sixty (60) days of the Closing Date (or such longer time period as agreed to by the Agent in its sole discretion), the Borrowers shall use commercially reasonable efforts to deliver or cause to be delivered a landlord waiver in form and substance satisfactory to the Agent for certain premises located at Presidents Place - at 1250 Hancock Street, Suite 7N, Quincy, Massachusetts 02169 and leased by RFX pursuant to that lease entered into with Quincy Property Owner I, LLC, a Massachusetts limited liability company, as landlord (the "RFX Lease"). To the extent the RFX Lease is not in affect during such time, the Borrowers shall deliver a landlord waiver in form and substance satisfactory to the Agent for the then applicable lease of the applicable Borrowers.

6.13 **Compliance with Anti-Corruption Laws and Sanctions**. Conduct its businesses in compliance with all Anti-Corruption Laws and applicable Sanctions and maintain policies and procedures designed to promote and achieve compliance with all Anti-Corruption Laws and applicable Sanctions.

## ARTICLE 7
## NEGATIVE COVENANTS

No Loan Party or any Subsidiary thereof, until satisfaction in full of the Obligations and termination of this Agreement, shall:

7.1 **Merger, Consolidation, Acquisition and Sale of Assets.**

(a) Enter into any merger, division, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person except for in connection with and pursuant to the American Group Acquisition, the New WLX Holdings Acquisition, the A.M. Transportation Acquisition, the RFX Acquisition, the LTR Acquisition, the Taylor Transportation Acquisition and any Permitted Business Acquisition or permit any other Person to consolidate with or merge with it.

(b) Sell, pledge, lease, transfer or otherwise dispose of any of its properties or assets, other than (i) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete, not to exceed in the aggregate the sum of $500,000 in any consecutive twelve (12) month period, (ii) sales of inventory to Account Debtors in the ordinary course of business, (iii) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other Intellectual Property rights in the ordinary course of business, and (iv) leases (including leases to own) of tractors and trailers entered into in the ordinary course of business where the applicable Loan Party or Subsidiary is the lessor and the lessee is an owner-operator, (v) in transfer of equity in connection with the

Employment Issuance, and (vi) the transfer of assets pursuant to the Taylor Transportation Contribution Agreement.

7.2 **Creation of Liens**. Create, assign, transfer or suffer to exist any Lien upon or against any of its Collateral, except Permitted Encumbrances, or enter into any agreement or undertaking restricting the right or ability of any Loan Party or Lender to sell, assign or transfer any Collateral except as are expressly provided for herein.

7.3 **Guarantees**. Become liable upon the obligations of any Person by assumption, endorsement or Guaranty thereof or otherwise (other than to Agent or Lender or any affiliate thereof) except (a) the endorsement of checks in the ordinary course of business, (b) guarantees made by a Loan Party with respect to the Obligations of another Loan Party, (c) with respect to American Group, the guaranty for payment and performance given by American Group in connection with the American Group Seller Subordinated Note, (d) with respect to RFX and Pioneer, the Guarantee Joinder to Subordinated Promissory Note, dated as of January 31, 2022, executed by RFX and Pioneer in connection with the RFX Subordinated Note, (e) with respect to Load to Ride and One Stop, the Guarantee Joinder to Subordinated Promissory Note, dated as of December 30, 2022, executed by Load to Ride and One Stop in connection with the LTR Subordinated Note, (f) with respect to Taylor Transportation, the Guarantee Joinder to Subordinated Promissory Note, dated as of March 31, 2023, executed by Taylor Transportation in connection with the Taylor Transportation Subordinated Note, and (g) the Guaranty made by Express Holdco of the obligations owing from Express Properties to Huntington or any direct or indirect subsidiary or affiliate of Huntington under any mortgage loan provided by Huntington or any direct or indirect subsidiary or affiliate of Huntington to Express Properties in connection with the Corporate Retreat Purchase.

7.4 **Investments**. Purchase, hold, acquire or invest in the obligations or stock of, or any other interest in, or make or permit to exist any investment or any other interest in (including any option, warrant or other right to acquire any of the foregoing) any Person, except (a) investments existing on the Closing Date and set forth on Schedule 7.4, (b) obligations issued or guaranteed by the United States of America or any agency thereof, (c) commercial paper with maturities of not more than one hundred eighty (180) days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (d) certificates of time deposit and bankers' acceptances having maturities of not more than one hundred eighty (180) days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, (e) U.S. money market funds (i) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc., or (ii) that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof, (f) investments by a Loan Party in a Loan Party, (g) investments made consisting of a Permitted Business Acquisition, or (h) investments in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional investments made in connection with the same so long as such additional investments are permitted by the Lenders in their sole discretion.

7.5 **Loans**. Make advances, loans or extensions of credit to any Person, including without limitation any holder of an equity interest in any Borrower, any Subsidiary or Affiliate, other than another Loan Party, except with respect to (a) loans existing on the Closing Date (not including the extensions of credit set forth in clause (c) below) and set forth on Schedule 7.5 (including loans made prior to the Original Closing Date to the Permitted Holder), (b) the extension of commercial trade credit in connection with the sale of Inventory in the ordinary course of its business, (c) the extension of credit to agents, drivers and business affiliates that are not Affiliates of any Loan Party in the ordinary course of business and in amounts not to exceed $250,000 at any time with respect to each agent, driver or business affiliate and in an aggregate amount with respect to all such agents, drivers and business affiliates not to exceed $2,500,000 at any time, or (d) advances in an amount not to exceed $3,150,000 made in connection with and in accordance with the terms and conditions of the TUI Commission Rights Purchase Agreement, including any additional advances made in connection with the same so long as such additional advances are permitted by the Lenders in their sole discretion.

7.6 **Capital Expenditures**. Make or incur any Capital Expenditure or commitments for Capital Expenditures (including Capital Leases) in an aggregate amount for Express Holdco and its Subsidiaries on a consolidated basis in excess of $10,000,000 in each fiscal year (other than Capital Expenditures or commitments thereof made or incurred in connection with the New WLX Holdings Acquisition, the LTR Acquisition, and the Taylor Transportation Acquisition), provided that, solely for the fiscal year ending December 31, 2023, Capital Expenditures made or incurred or commitments thereof in such fiscal year shall not be in excess of $18,750,000 (which includes Capital Expenditures made or incurred in connection with the Corporate Retreat Purchase).

7.7 **Dividends, Distributions and Restricted Payments**. Declare, pay or make any dividend on any shares of the common stock, preferred stock or other equity interest, as applicable, of any Loan Party (other than dividends or distributions payable in stock or other equity interest, as applicable, or splits or reclassifications of its stock or other equity interests), or apply or otherwise distribute any of its funds, property or assets to the purchase, redemption or other retirement of any common or preferred stock or other equity interest, or any warrant as applicable, or of any options to purchase or acquire any such shares of common or preferred stock or other equity interest, as applicable, of any Loan Party, or pay any management, consulting or other similar fees, charges or expenses, other than, (a) with respect to any Loan Party, distributions may be made by any such Loan Party which has elected to be taxed in accordance with Subchapter S and any comparable state tax laws to its respective shareholders in an amount necessary for the payment of the federal and state income tax obligations on account of the attribution of each such Loan Party's income to such shareholders by reason of such Loan Party being a Subchapter S corporation in each case determined by reference to the shareholder who has the highest combined marginal rate for income tax purposes ("Income Tax Distributions") so long as (i) a notice of termination with regard to this Agreement shall not be outstanding, (ii) no Event of Default or Default shall exist immediately prior to or after giving effect to such dividend or distribution; (b) any Subsidiary of any Borrower may make any dividend or distribution to such Borrower, and (c) Annual Dividends. Notwithstanding the foregoing, the Loan Parties may exercise any call rights ("Call Right Exercise") included in the A.M. Transportation Acquisition Documents, the American Group Acquisition Documents, the New WLX Holdings Acquisition Documents, the RFX Acquisition Documents and any other

documents entered into in connection with a Permitted Business Acquisition and pay any amounts required due to the exercise by any applicable seller of the put rights ("Put Rights Payments") included in the A.M. Transportation Acquisition Documents, the American Group Acquisition Documents, the New WLX Holdings Acquisition Documents, the RFX Acquisition Documents and any other entered into in connection with a Permitted Business Acquisition so long as (i) a notice of termination with regard to this Agreement shall not be outstanding at the time of such Call Right Exercise or such Put Right Payment, (ii) no Event of Default or Default shall exist immediately prior to or after giving effect to such Call Right Exercise or such Put Right Payment, and (iii) the Loan Parties shall demonstrate proforma (a) Consolidated Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 immediately prior to and after giving effect to any such Call Right Exercise or Put Right Payment and (b) Undrawn Availability of the Loan Parties of at least (x) $12,500,000 for the period from the Eighth Amendment Effective Date until all Obligations under the Term Loan 4 are repaid in full, and (ii) $7,500,000 at all other times, in each case immediately prior to and after giving effect to any such Call Right Exercise or Put Right Payment.

7.8 **Indebtedness.** Create, incur, assume or suffer to exist any Indebtedness except in respect of:

(a) Indebtedness existing on the Closing Date (or as of any subsequent date whereby this Agreement is amended and the Agent permits an update to such Schedule 7.8) and set forth on Schedule 7.8 (including any extensions, renewals or refinancings thereof);

(b) Indebtedness to Agent, Lender or any of their respective affiliates, regardless of whether pursuant to the Loan Documents;

(c) Indebtedness incurred for Capital Expenditures permitted under Section 7.6;

(d) Indebtedness as permitted under Section 7.3 and 7.11;

(e) Indebtedness arising from Hedging Contracts required pursuant to Section 6.8;

(f) Indebtedness arising in connection with the American Group Seller Subordinated Note which Indebtedness is subject to the American Group Seller Subordination Agreement;

(g) Indebtedness arising in connection with the A.M. Transportation Subordinated Note which Indebtedness is subject to the A.M. Transportation Subordination Agreement;

(h) Permitted Business Acquisition Indebtedness;

(i) Indebtedness arising in connection with the RFX Subordinated Note which Indebtedness is subject to the RFX Subordination Agreement;

(j) Indebtedness arising in connection with the LTR Subordinated Note which Indebtedness is subject to the LTR Subordination Agreement; and

(k) Indebtedness arising in connection with the Taylor Transportation Subordinated Note which Indebtedness is subject to the Taylor Transportation Subordination Agreement;

7.9 **Nature of Business**. Change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby, purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business for assets or property which are useful in, necessary for and are to be used in its business, as presently conducted and any business closely related thereto.

7.10 **Transactions with Affiliates**. Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise deal with, any Affiliate, except transactions in the ordinary course of business, on an arm's length basis, and on terms no less favorable than terms which would have been obtainable from a Person other than an Affiliate.

7.11 **Leases**. Enter as lessee into any lease arrangement (except lease arrangements between any of the Borrowers and Express Properties or among any of the Borrowers, as approved by the Agent) for real or personal property (other than Capital Leases permitted under Section 7.6) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $2,500,000 in any one fiscal year in the aggregate for all Loan Parties.

7.12 **Subsidiaries; Partnerships.**

(a) Form any Subsidiary (including but not limited to, an Asset Acquiring Subsidiary) or, in the case of a Business Acquisition, join a Subsidiary unless, (i) such Subsidiary expressly becomes a Borrower and becomes jointly and severally liable for the obligations of the Borrowers hereunder, under the Notes and under any other agreement among Borrowers and Agent, for the benefit of Agent and Lenders, (ii) such Borrower pledges 100% of the equity interest owned by such Borrower in such Subsidiary to Agent, for the benefit of Agent and Lenders, (iii) Agent shall have received all documents, including organizational documents and legal opinions it may reasonably require in connection therewith all of which shall be in form and substance satisfactory to the Agent in its sole discretion, including, without limitation, all information that may be reasonably requested by Agent to comply with applicable "know your customer" requirements established by U.S. regulatory authorities (including without limitation pursuant to the Beneficial Ownership Regulation) and (iv) such Subsidiary grants first priority perfected Liens in its assets to Agent, for the benefit of Agent and Lenders; provided, however, to the extent such Subsidiary becomes a Borrower, none of such assets which become Collateral shall be included in the Borrowing Base in accordance with the terms of this Agreement until such time as Agent makes such determination in its sole discretion; or

(b) Enter into any partnership, joint venture or similar agreement.

7.13 **Fiscal Year and Accounting Changes**. Change its fiscal year from twelve consecutive calendar months ending on December 31st of each calendar year or make any material change (a) in accounting treatment and reporting practices except as required by GAAP or (b) in tax reporting treatment except as required or permitted by law.

7.14 **Pledge of Credit**. Now or hereafter pledge Agent's or any Lender's credit on any purchase or for any purpose whatsoever.

7.15 **Amendment of Charter Documents**. Amend, modify or waive any term or material provision of its Charter Documents, other than amendments and modifications to the Charter Documents in connection with the Employment Issuance that are acceptable to the Agent in its sole discretion.

7.16 **ERISA**. Become part of a Controlled Group or create, maintain or become obligated to contribute to any Plan or Multiemployer Plan.

7.17 **Prepayment of Indebtedness**. At any time, directly or indirectly, prepay any Indebtedness (other than to Agent or any Lender or any affiliate of thereof) or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Loan Party or any Subsidiary thereof.

7.18 **Modification of Material Business Agreements**. Amend, waive or otherwise modify in any material respect the terms of any Material Business Agreement or the TUI Commission Rights Purchase Agreement without the prior written consent of Agent.

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1 **Conditions to Initial Loans**. The agreement of Agent, Issuer and Lenders to make the initial Loans and other Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Loans and other Advances, of the following conditions precedent, unless waived by Agent:

(a) Loan Documents. Agent shall have received duly executed (i) Loan Documents and (ii) original stock certificates of each Subsidiary, if any and to the extent not previously delivered to the Agent, along with duly executed stock powers, all in form and substance satisfactory to Agent;

(b) Collateral and Security. To the extent no previously delivered, all Collateral items required to be physically delivered to Agent under the Loan Documents shall have been so delivered, accompanied by any appropriate instruments of transfer (or arrangements satisfactory to Agent for such delivery shall be in place), and all taxes, fees and other charges then due and payable in connection with the execution, delivery, recording, publishing and filing of such instruments and incurrence of the Obligations and the delivery of the Loan Documents shall have been paid in full;

(c) Lien Searches. Agent shall have received accurate and complete copies of any Lien, pending suit, title and other public record searches required by Agent;

(d) Filings, Registrations and Recordings. Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral (including the notation of liens on vehicle titles) shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and all actions necessary to perfect and protect the Liens of Agent shall have been taken;

(e) Organizational Proceedings of the Loan Parties. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Board of Directors, Managers or Members, as applicable, of each Loan Party authorizing (i) the execution, delivery and performance of this Agreement, the Notes, and any related agreements, and (ii) the granting by such Loan Party of the security interests in and Liens upon the Collateral, in each case, certified by an Authorized Officer of such Loan Party as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

(f) Incumbency Certificates of the Loan Parties. Agent shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each Loan Party, dated the Closing Date, as to the incumbency and signature of the Authorized Officers of each Loan Party executing this Agreement, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary;

(g) Certificates. Agent shall have received (i) a copy of the Charter Documents of each Loan Party, together with all amendments thereto, certified by the Secretary of State or other appropriate official of such entity's jurisdiction of formation, incorporation or organization, as applicable (with respect to the formation documents), and by an Authorized Officer of such Loan Party (with respect to the governance documents), or (ii) to the extent delivered to the Agent in connection with the Existing Loan Documents, certification from each such Loan Party of no changes in its Charter Documents since last delivered to the Agent.

(h) Good Standing. Agent shall have received copies of good standing certificates, or similar certifications, as applicable, for the Loan Parties dated not more than thirty (30) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such entity's jurisdiction of incorporation or organization, as applicable, and each jurisdiction where the conduct of each entity's business activities or the ownership of each such entity's properties necessitates qualification;

(i) Legal Opinion. Agent shall have received the (i) executed legal opinion of Dinsmore & Shohl, LLP, counsel to each Loan Party and (ii) any other required local counsel opinions, each in form and substance satisfactory to Agent, which shall cover such matters incident to the transactions contemplated by this Agreement, and the other Loan Documents as Agent may reasonably require and the Loan Parties hereby authorize and direct such counsel to deliver such opinions to Agent;

(j) No Litigation. (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against any Loan Party or against the officers, directors or managers of any Loan Party, (A) in connection with the Loan Documents or any of the transactions contemplated thereby and which, in the sole discretion of Agent, is deemed material or (B) which Agent determines could have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Loan Party or the conduct of its business or inconsistent with the due consummation of the transactions contemplated by the Loan Documents shall have been issued by any Governmental Body;

(k) Credit Insurance. Agent shall have reviewed all credit insurance policies, coverages and limits;

(l) Beneficial Ownership. Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information in respect of Borrowers and their Affiliates required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, that has been reasonably requested by Agent;

(m) Fees. Agent shall have received all fees payable to Agent, Issuer and each Lender and reimbursement of all expenses on or prior to the Closing Date, including, without limitation, those fees set forth in the Fee Letter;

(n) Financial Statements; Projections. Agent shall have received the consolidating and consolidated monthly financial statements set forth in Section 5.6(a) and such financial statements shall not in the reasonable judgment of Agent, reflect any material adverse change in the financial condition of any Loan Party. Agent shall have received a copy of projections which shall be satisfactory in all respects to Agent;

(o) Insurance. Agent shall have received, in form and substance satisfactory to Agent, evidence that each Loan Party has the insurance required by Section 4.11, listing Agent as lender loss payee, additional insured and mortgagee, as applicable;

(p) Payment Instructions. Agent shall have received written instructions from the Borrower Representative directing the application of proceeds of the initial Loans and other Advances made pursuant to this Agreement;

(q) Reserved.

(r) Consents. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by the Loan Documents; and, such Consents and Waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(s) No Adverse Material Effect. (i) Since December 31, 2020, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent shall have been proven to be inaccurate or misleading in any material respect;

(t) Waivers. Agent shall have received Waivers satisfactory to Agent with respect to all premises leased by the Loan Parties or at which Inventory is located;

(u) Equity Interest Certificates and Transfer Powers. To the extent applicable, Borrowers shall deliver to Agent original stock certificates and membership interest certificates, as the case may be, for the Borrowers, together with corresponding transfer powers duly executed in blank, and otherwise in form and substance satisfactory to the Agent.

(v) Existing Indebtedness. Agent shall have received (i) a payoff letter, in form and substance satisfactory to Agent, pursuant to which any existing Indebtedness that is to be paid by initial Loans hereunder will be paid in full, and (ii) evidence satisfactory to Agent that all necessary termination statements, satisfaction documents and any other applicable releases in connection with any existing Indebtedness and all other Liens with respect to the Loan Parties that are not Permitted Encumbrances have been filed or arrangements satisfactory to Agent have been made for such filing;

(w) Borrowing Base; Undrawn Availability. Agent shall have received an executed Borrowing Base Certificate from the Borrower Representative demonstrating that the Borrowing Base is sufficient to support the Advances in the amount requested by the Borrower Representative on the Closing Date.

(x) Owned Real Property. With respect to each parcel of Owned Real Property, Agent shall have received:

(i) an amended and restated Mortgage (including assignment of leases and rents);

(ii) the Environmental Indemnity Agreement;

(iii) ALTA mortgagee's title policy endorsement to the existing title policy acceptable to Agent;

(iv) if any such parcel of Real Property is determined by Agent to be in a flood zone, a flood notification form signed by Borrowers and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to Agent; and

(v) such other information, documentation, and certifications as may be reasonably required by Agent;

(y) Other. All organizational and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to Agent and its counsel.

8.2 **Conditions to Each Advance**. The agreement of Agent, Issuer and each Lender to make any Advance requested to be made on any date (including the initial Loans and Advances), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a) Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to any Loan Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b) No Default. No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

(c) Maximum Advances. In the case of any Advances requested to be made, after giving effect thereto, the Aggregate Revolving Exposure shall not exceed the Maximum Borrowing Amount.

Each request for an Advance by the Borrower Representative hereunder shall constitute a representation and warranty by Borrowers as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

## ARTICLE 9
## INFORMATION AS TO THE LOAN PARTIES

Each Borrower shall, on behalf of itself and the other Loan Parties, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1 **Disclosure of Material Matters**. Immediately upon learning thereof, report to Agent any Default and all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including any Lien or claim asserted against the Collateral, any loss, damage or destruction of any material portion of the Collateral, and any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or material claims or material disputes asserted by any Account Debtor or other obligor.

9.2 **Schedules and Certificates**. Deliver to Agent on or before the fifteenth (15th) day of each calendar month for the prior calendar month:

(a) an accounts receivable aging (reconciled to the general ledger, the Financials and the Borrowing Base Certificate),

(b) an accounts payable schedule (reconciled to the general ledger and to the Financials), and

(c) a Borrowing Base Certificate (which shall be calculated as of the last day of the prior calendar month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement), together with supporting documentation satisfactory to Agent.

In addition, the Borrower Representative shall deliver to Agent on or before each Tuesday, or if such day is not a Business Day, the following Business Day, for the prior Week

(x) a report of Eligible Unbilled Accounts in form and substance satisfactory to Agent in its Permitted Discretion, and (y) an interim Borrowing Base Certificate (which shall be calculated as of the last Business Day of the prior week and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement) reflecting all activity (sales, collections, credits, etc.) affecting the accounts of each Borrower for all Business Days of the immediately preceding Week, together with supporting documentation satisfactory to Agent. The amount derived as being excluded from Eligible Accounts used on such interim Borrowing Base Certificate shall be the amount that is calculated and updated monthly pursuant to this Section 9.2 and which is satisfactory to Agent.

In addition, the Borrower Representative will deliver to Agent at such intervals as Agent may reasonably require: (i) confirmatory assignment schedules, (ii) copies of Account Debtor's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents or other information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Accounts by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section 9.2 are to be in form satisfactory to Agent and executed by the Borrower Representative and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and the Borrower Representative's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

9.3 **Litigation**. Immediately notify Agent in writing of any litigation, suit or administrative proceeding affecting any Loan Party or any Subsidiary thereof, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect on any such Person.

9.4 **Material Occurrences**. Immediately notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any default under any Material Business Agreement; (c) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Express Holdco and its Subsidiaries on a consolidated or consolidating basis as of the date of such statements; (d) each and every default by any Loan Party or any Subsidiary thereof which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (e) any other development in the business or affairs of any Loan Party or Subsidiary thereof which could reasonably be expected to have a Material Adverse Effect on any such Person, describing the nature thereof and the action the Loan Parties or such Subsidiary proposes to take with respect thereto.

9.5 **Annual Financial Statements**. Furnish to Agent within one hundred fifty (150) days after the end of each fiscal year (except with respect to (i) the fiscal year ending December 31, 2022, not later than May 31, 2024, and (ii) the fiscal year ending December 31, 2023, within two hundred forty (240) days after the end of such fiscal year (but not later than August 31, 2024), unless otherwise extended by the Agent in its sole discretion), audited financial

statements of Express Holdco and its Subsidiaries on a consolidated basis, including statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, together with consolidating schedules, all prepared in accordance with GAAP, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent. In addition, the reports shall be accompanied by a Compliance Certificate of Borrowers signed by an Authorized Officer of the Borrower Representative, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such event, and such Compliance Certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11.

9.6 **Monthly Financial Statements**. Furnish Agent within thirty (30) days after the end of each fiscal month, an unaudited balance sheet of Express Holdco and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Express Holdco and its Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to the business of Express Holdco and its Subsidiaries and setting forth in each case in comparative form the figures from the projected annual operating budget delivered pursuant to Section 9.8 covering the current fiscal year. Such financial statements and reports shall be accompanied by a Compliance Certificate of an Authorized Officer, which shall state, among other items, that, based on an examination sufficient to permit such Authorized Officer to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers or the applicable Loan Party with respect to such event and, such certificate shall have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Sections 6.3, 7.6 and 7.11, and any other certification as Agent shall reasonably request.

9.7 **Additional Information**. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the representations, warranties, terms, covenants, provisions and conditions of this Agreement, the Notes and the other Loan Documents have been complied with by Borrowers, the other Loan Parties, or any Subsidiary thereof, including, without the necessity of any request by Agent, (a) all documentation and other information that Agent requests to enable Agent and Lenders to comply with their ongoing obligations under applicable “know your customer” and anti-money-laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulations, (b) copies of all environmental audits and reviews, (c) at least thirty (30) days prior thereto, notice of any Loan Party's opening of any new place of business, closing of any existing place of business or a change in its legal name, and (d) immediately upon any Loan Party's or any Subsidiary's learning thereof, notice of any material labor dispute to which any such Person may become a party, any strikes or walkouts relating to any of its plants or other facilities, and

the expiration of any labor contract to which any Loan Party or a Subsidiary is a party or by which any such Person is bound.

9.8 **Projected Operating Budget, Availability Forecast**. Furnish Agent no later than December 31 of each year and for each fiscal year thereafter during the term of this Agreement, a month by month projected operating budget and cash flows of Express Holdco and its Subsidiaries on a consolidated and consolidating basis for such fiscal year (including an income statement and statement of cash flows for each calendar month, and a balance sheet and availability projection as at the end of each calendar month), such projections to be accompanied by a certificate signed by an Authorized Officer to the effect that such projections and forecasts have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such Authorized Officer has no reasonable basis to question the reasonableness of any material assumptions on which such projections and forecasts were prepared.

9.9 **Notice of Suits, Adverse Events**. Furnish Agent with immediate notice of (a) any lapse or other termination of any Consent issued to any Loan Party, or any Subsidiary thereof by any Governmental Body or any other Person that is material to the operation of any such Person's business, (b) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; (c) copies of any periodic or special reports filed by any Loan Party or any Subsidiary thereof with any Governmental Body or Person, material in nature, or if requested by Agent, Issuer or any Lender, and (d) copies of any material notices and other communications from any Governmental Body which specifically relate to any Loan Party or Subsidiary thereof.

## ARTICLE 10
## EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1 **Payment of Obligations**. Failure by any Borrower to pay any principal or interest on any Loan, reimbursement obligation in respect of any Letter of Credit, prepayment, fee, charge, expense reimbursement or other amount or any other Obligation when due and payable, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or any other Loan Document;

10.2 **Payment of Reductions or Mandatory Prepayments**. Failure by any Borrower to timely pay any amounts due under or in connection with Section 2.5;

10.3 **Misrepresentations**. Any representation or warranty made or deemed made by any Loan Party in this Agreement, or any Loan Party or Guarantor in any other Loan Document, amendment or modification thereof or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

10.4 **Failure to Furnish Information, Schedules, Certificates**. Failure by any Loan Party to (a) furnish financial statements, financial information, schedules, reports, borrowing base certificates or other information required to be provided hereunder when due, (b) furnish any additional financial or other information requested by Agent within ten (10) days after such information is requested, or (c) permit the inspection of its books or records;

10.5 **Liens Against Assets**. Issuance of a notice of Lien, levy, assessment, injunction or attachment against (i) the Collateral or (ii) a material portion of the other property of any Loan Party or Subsidiary thereof which is not discharged or lifted within thirty (30) days;

10.6 **Breach of Covenants**. Failure or neglect of any Loan Party, Guarantor or the Permitted Holder to perform, keep or observe any term, provision, condition, covenant contained in this Agreement or any other Loan Document, or contained in any other agreement or arrangement, now or hereafter entered into between any Loan Party, Guarantor or Permitted Holder and Agent, Issuer or any Lender;

10.7 **Judgment**. Any judgment or judgments are rendered or judgment liens filed against any Loan Party, any Subsidiary thereof or any Guarantor for an aggregate amount in excess of $100,000 which, within thirty (30) days of such rendering, or filing is not either fully and completely satisfied, stayed, discharged of record or bonded;

10.8 **Insolvency and Related Proceedings**. Any Loan Party, any Affiliate or Subsidiary thereof or any Guarantor shall (a) apply for, consent to, acquiesce in, or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (b) make a general assignment for the benefit of creditors, (c) admit in writing its inability, or be generally unable to pay its debts as they become due or cease operations of its present business, (d) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (e) be adjudicated a bankrupt or insolvent, (f) file a petition seeking to take advantage of any other law providing for the relief of debtors, (g) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (h) take any action for the purpose of effecting any of the foregoing;

10.9 **Guarantor Default**. Any Guaranty given in respect of any Obligations shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any such Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of any Guaranty to which Guarantor is a party, or any Guarantor shall deny that such Guarantor has any further liability under any Guaranty to which such Guarantor is a party, or shall give notice to such effect;

10.10 **Material Adverse Effect**. Agent, in its sole discretion, determines that a Material Adverse Effect has occurred in respect of any Loan Party or any Guarantor;

10.11 **Loss of Priority Lien**. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest;

10.12 **Breach of Material Business Agreements**. A default of the obligations of any Loan Party under any Material Business Agreement to which it is a party shall occur and not be cured within any applicable cure period if such default could reasonably be expected to have a Material Adverse Effect;

10.13 **Cross Default; Cross Acceleration**. . Any Loan Party shall (a) default in any payment of principal of or interest on any Indebtedness beyond any period of grace with respect to such payment or (b) default in the observance of any other covenant, term or condition contained in any agreement or instrument (including, but not limited to, any agreements or instruments executed in connection with Corporate Retreat Property Mortgage Facility) pursuant to which such Indebtedness is created, secured or evidenced, if the effect of such default is to permit the acceleration of any such Indebtedness (whether or not such right shall have been waived);

10.14 **Change of Control**. Any Change of Control of any Loan Party or any Guarantor shall occur;

10.15 **Invalidity of Loan Documents**. Any material provision of any Loan Document shall, for any reason, cease to be valid and binding on any Loan Party, or any Loan Party shall so claim in writing to Agent;

10.16 **Loss of Material Intellectual Property**. (a) Any Governmental Body shall (i) revoke, terminate, suspend or adversely modify any license, permit, patent, trademark or tradename of any Loan Party, or (ii) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (iii) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Loan Party's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; or (b) any agreement which is necessary or material to the operation of any Loan Party's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination;

10.17 **Destruction of Collateral**. Any portion of the Collateral shall be seized or taken by a Governmental Body, or any Loan Party or the title and rights of any Loan Party shall have become the subject matter of litigation which might, in the sole discretion of Agent, upon final determination, result in material impairment or loss of the security provided by any Loan Document; or

10.18 **Business Interruption**. The operations of any Loan Party are interrupted at any time for more than seven (7) consecutive days, which interruption would reasonably be expected to have a Material Adverse Effect.

10.19 **Hedging Contracts**. Any Borrower fails to comply with or to perform any term, obligation, covenant or condition contained in or the occurrence or existence of any event of default, termination event or other similar event under or with respect to any Hedging Contract.

# ARTICLE 11
# AGENT'S RIGHTS AND REMEDIES AFTER DEFAULT

11.1 **Rights and Remedies**. Upon the occurrence of (a) an Event of Default pursuant to Section 10.8, all Obligations shall be immediately due and payable and this Agreement and the obligation of Issuer and Lenders to make Advances and maintain Loans shall be deemed terminated; and (b) any other Event of Default and at any time thereafter (such Event of Default not having previously been cured), at the option of Agent or the Required Lenders, all Obligations shall be immediately due and payable and Issuer and Lenders shall have the right to terminate this Agreement and to terminate the obligation of Issuer and Lenders to make Advances and maintain Loans. Upon the occurrence of any Event of Default, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take, to the extent permitted by applicable law, possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of any Loan Party's premises or other premises without legal process and without incurring liability to any Loan Party therefor, and Agent may thereupon, or at any time thereafter, in its sole discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require the Loan Parties to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give the Loan Parties reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to the Loan Parties at least five (5) days prior to such sale or sales is reasonable notification. At any public sale Agent may bid for and become the purchaser, and Agent, Issuer and Lenders, or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Loan Party. In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Loan Party's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights which are used in connection with (y) Inventory for the purpose of disposing of such Inventory and (z) Equipment for the purpose of completing the manufacture of unfinished goods. The proceeds realized from the sale of any Collateral shall be applied as follows: first, to the reasonable costs, expenses and attorneys' fees and expenses incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; second, to interest due upon any of the Obligations and any fees payable under this Agreement; and, third, to the principal of the Obligations and Hedging Obligations. If any deficiency shall arise, the Loan Parties shall remain liable to Agent, Issuer and Lenders therefor.

11.2 **Agent Discretion**. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the rights of Agent, Issuer and Lenders hereunder.

11.3 **Setoff**. In addition to any other rights which Agent, Issuer and Lenders or their affiliates may have under applicable law, upon the occurrence of an Event of Default hereunder, Agent, Issuer and each Lender, including any branch, Subsidiary or Affiliate thereof, shall have a right to apply any Loan Party's property held by Agent, Issuer or such Lender, such branch, Subsidiary or Affiliate to reduce the Obligations.

11.4 **Rights and Remedies not Exclusive**. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5 **Appointment of Receiver**. Upon the occurrence of an Event of Default and at all times thereafter, Agent shall be entitled to the immediate appointment of a receiver for all or part of the Collateral, whether such receivership is incidental to a proposed sale of the Collateral, pursuant to the Uniform Commercial Code or otherwise. Each Loan Party hereby consents to the appointment of such a receiver without bond, to the full extent permitted by applicable statute or law.

11.6 **Reserved**.

11.7 **Allocation of Payments After Event of Default.** Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of Agent in connection with enforcing the rights of Agent, Lenders and Issuer under this Agreement and the Loan Documents and to the payment of any protective advances made by Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FOURTH, to the payment of the outstanding principal amount of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 15.2(b);

FIFTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of Lenders and Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender or Issuer;

SIXTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents;

SEVENTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit) and arising under the Term Loan, the Term Loan 2, the Term Loan 3, and the Term Loan 4;

EIGHTH, to the payment of all Obligations owing to Agent in connection with Banking Services and Hedging Contracts;

NINTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "EIGHTH" above;

TENTH, to the payment of all obligations owing to Huntington in connection with the Corporate Retreat Property Mortgage Facility; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of Lenders and Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that then outstanding Advances held by such Lender or Issuer bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FIFTH", "SIXTH", "SEVENTH", and "NINTH" above; and (c) to the extent that any amounts available for distribution pursuant to clause "SEVENTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by Agent in a cash collateral account and applied (i) first, to reimburse Issuer from time to time for any drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "EIGHTH" and "NINTH" above in the manner provided in this Section 11.7. For avoidance of doubt, any amounts received and applied to the obligations of the type described in clause "TENTH" shall only be applied after all amounts are applied to the items and obligations of the types described in clauses "FIRST" through "NINTH", to the extent such amounts have not been exhausted.

## ARTICLE 12
## WAIVERS AND JUDICIAL PROCEEDINGS

12.1 **Waiver of Notice**. Each Loan Party hereby waives notice of non-payment of any of the Accounts, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2 **Delay**. No delay or omission on Agent's, Issuer's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3 **Jury Waiver**. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## ARTICLE 13
## EFFECTIVE DATE AND TERMINATION

13.1 **Term**. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party, Agent, Issuer and Lenders, shall become effective on the date hereof and shall continue in full force and effect until the Facility Termination Date, unless sooner terminated as herein provided. Without limiting Section 11.1, (a) the Aggregate Revolving Commitment shall expire on the Facility Termination Date, and (b) all unpaid Obligations shall be paid in full by Borrowers on the Facility Termination Date. Borrowers may terminate this Agreement with at least thirty (30) Business Days' prior written notice thereof to Agent, upon (a) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (b) the cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to Agent of a cash deposit as required by Section 2.9(d)), (c) the payment in full of all reimbursable expenses and other Obligations together with accrued and unpaid interest thereon, and (d) the payment in full of any amount due under Section 2.11.

13.2 **Termination**. The termination of this Agreement shall not affect any Loan Party's, Agent's, Issuer's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent, Issuer and each Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that the Loan Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Loan Party have been paid or performed in full after the termination of this Agreement or each Loan Party has furnished Agent, Issuer and Lenders with an indemnification satisfactory to Agent, Issuer and Lenders with respect thereto. Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code to

demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive the termination hereof until all Obligations are paid or performed in full. Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

## ARTICLE 14
## REGARDING AGENT

14.1 **Appointment**. Each Lender and Issuer hereby designates Huntington to act as Agent for each such Lender and Issuer under this Agreement and the Loan Documents. Each Lender and Issuer hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders and Issuer. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including without limitation, collection of the Notes) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Loan Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2 **Nature of Duties**. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Loan Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (a) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct, or (b) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Loan Documents, as the case may be, or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Loan Documents or for any failure of any Loan Party to perform its obligations hereunder. Agent shall not be under any obligation to any Lender or Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Loan Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent in respect to the Advances and the Loans to the Loan Parties shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or Issuer; and nothing in this Agreement, expressed or

implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

14.3 **Lack of Reliance on Agent and Resignation**. Independently and without reliance upon Agent, any other Lender or Issuer, each Lender and Issuer has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances and the Loans hereunder and the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of each Loan Party. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender or Issuer with any credit or other information with respect thereto, whether coming into its possession before making of the Advances and the Loans or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender or Issuer for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Loan Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Loan Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

Agent may resign on thirty (30) days' written notice to each of Lenders, Issuer and Borrower Representative and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to the Loan Parties.

Any such successor of Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After Agent's resignation as Agent, the provisions of this Article 14 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

14.4 **Certain Rights of Agent**. If Agent shall request instructions from Lenders and Issuer with respect to any act or action (including failure to act) in connection with this Agreement or any Loan Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders and Issuer shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

14.5 **Reliance**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Loan Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact

and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.6 **Notice of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Loan Documents, unless Agent has received notice from a Lender, Issuer or a Loan Party referring to this Agreement or the Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders and Issuer. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders and Issuer.

14.7 **Indemnification**. To the extent Agent is not reimbursed and indemnified by the Loan Parties, each Lender will reimburse and indemnify Agent and Issuer in proportion to its respective portion of the Advances and Loans (or, if no Advances or Loans are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent or Issuer in performing their duties hereunder, or in any way relating to or arising out of this Agreement or any Loan Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's or Issuer's gross negligence or willful misconduct.

14.8 **Agent in its Individual Capacity**. With respect to the obligation of Agent to lend under this Agreement, the Advances and Loans made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9 **Delivery of Documents**. To the extent Agent receives financial statements required under Article 9 of this Agreement, Agent will promptly furnish such documents and information to Lenders and Issuer.

14.10 **Loan Parties' Undertaking to Agent**. Without prejudice to their respective obligations to Lenders and/or Issuer under the other provisions of this Agreement, each Loan Party hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent, Lenders or Issuer or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of Lenders and Issuer or the relevant one or more of them pursuant to this Agreement.

14.11 **No Reliance on Agent's Customer Identification Program**. Each of Lenders and Issuer acknowledges and agrees that neither such Lender nor Issuer, nor any of their Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Issuer's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record keeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other laws.

14.12 **Erroneous Payments**.

(a) Each Lender and Issuer hereby agrees that (i) if Agent notifies such Lender or Issuer that Agent has determined in its sole discretion that any funds received by such Lender or Issuer from Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender or Issuer (whether or not known to such Lender or Issuer) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender or Issuer shall promptly, but in no event later than one (1) Business Day thereafter, return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender or Issuer to the date such amount is repaid to Agent at the greater of the Fed Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender or Issuer shall not assert, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Erroneous Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of Agent to any Lender or Issuer under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), if any Lender or Issuer receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from Agent (or any of its Affiliates) that (x) is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates), or (z) such Lender or Issuer otherwise becomes aware was transmitted, or received, in error (in whole or in part):

(i) (A) in the case of immediately preceding clause (x) or (y), an error shall be presumed to have been made (and that it is deemed to have

knowledge of such error at the time of receipt of such Erroneous Payment) or (B) in the case of immediately preceding clause (z), an error has been made, in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender or Issuer shall promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying Agent pursuant to this Section 14.12(b).

(c) Each Borrower agrees, for itself and each other Loan Party, that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender or Issuer that has received such Erroneous Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights of such Lender or Issuer with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by Borrowers or any other Loan Party, except, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Agent from Borrowers or any other Loan Party for the express purpose of making such Erroneous Payment.

(d) Each party's obligations under this Section 14.2 shall survive the resignation or replacement of Agent, any transfer of rights or obligations by (or the replacement of) a Lender, the termination of the Aggregate Commitment or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

14.13 **Agent Professionals**. Agent may perform its duties through agents and employees. Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care, except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such agents, employees or Agent Professionals.

## ARTICLE 15
## MISCELLANEOUS

15.1 **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. Any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement or any related agreement may be brought in any court of competent jurisdiction in the Commonwealth of Pennsylvania, United States of America, and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this

Agreement. Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to the Borrower Representative at its address set forth in Section 15.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the option of Agent, Issuer or Lenders, by service upon the Borrower Representative which each Loan Party irrevocably appoints as such Loan Party's agent for the purpose of accepting service within the Commonwealth of Pennsylvania. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent, Issuer or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction. Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Any judicial proceeding by any Loan Party against Agent, Issuer or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of Allegheny, Commonwealth of Pennsylvania.

15.2 **Entire Understanding**.

(a) This Agreement and the other Loan Documents contain the entire understanding between each Loan Party, Agent, Issuer and Lenders and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, Agent's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of the Loan Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b) The Required Lenders, Agent with the consent in writing of the Required Lenders, and the Loan Parties may, subject to the provisions of this Section 15.2(b), from time to time enter into written supplemental agreements to this Agreement or the Loan Documents executed by the Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Issuer, Agent or the Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, the consent of Issuer must be obtained with respect to any amendment, waiver or consent with respect to Sections 2.7, 2.8 and 2.9 or any other provisions, the amendment or waivers of which would adversely affect Issuer and, provided, further, that no such supplemental agreement shall:

(i) increase the Revolving Commitment of any Lender, without the written consent of Agent and such Lender;

(ii) extend the maturity of any Note or the due date for any amount payable hereunder without the written consent of Agent and each Lender affected thereby;

(iii) decrease the rate of interest or reduce any fee payable by the Loan Parties to Lenders and/or Issuer pursuant to this Agreement without the written consent of Agent and each Lender and/or Issuer affected thereby;

(iv) alter the definition of the term Required Lenders without the consent of Agent and each Lender;

(v) alter, amend or modify this Section 15.2(b) without the consent of Agent and each Lender;

(vi) release any Collateral during any calendar year (other than in connection with dispositions of collateral permitted by this Agreement) having an aggregate value in excess of One Million Dollars ($1,000,000) without the consent of each Lender;

(vii) change the rights and duties of Agent without the consent of each Lender;

(viii) increase the advance rates in definition of Borrowing Base above the advance rates in effect on the Closing Date without the consent of each Lender;

(ix) release any Loan Party from the Obligations under this Agreement, or any Loan Document without the consent of each Lender; or

(x) alter, amend or modify Section 11.7 hereof without the consent of each Lender.

Any such supplemental agreement shall apply equally to each Lender and Issuer and shall be binding upon the Loan Parties, Lenders, Issuer, Agent and all future holders of the Obligations. In the case of any waiver, the Loan Parties, Agent, Lenders and Issuer shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, Agent may at its discretion and without the consent of Lenders, voluntarily permit the outstanding Revolving Loans and the

amount of Letters of Credit outstanding at any time to exceed one hundred ten percent (110%) of the Borrowing Base for up to ninety (90) consecutive Business Days provided that such outstanding Advances do not exceed the Aggregate Revolving Commitment. For purposes of the preceding sentence, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Borrowing Base was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be "Eligible Accounts" becomes ineligible or collections of Accounts applied to reduce outstanding Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Advances to exceed the Borrowing Base by more than ten percent (10%), Agent shall use its efforts to have the Loan Parties decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

15.3 **Transfers and Assignments.**

(a) Successors and Assigns**.** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their rights or Obligations hereunder without the prior written consent of Agent. No Lender may assign or otherwise transfer any of its rights or Obligations hereunder except: (i) to an Eligible Assignee in accordance with the provisions of Section 15.3(a), (ii) by way of participation in accordance with the provisions of Section 15.3(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 15.3(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 15.3(d) and, to the extent expressly contemplated hereby, the Affiliates of each of Agent, Lenders and the respective directors, officers, employees, agents and advisors of such Affiliates) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Transfer of Commitments. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances and Loans hereunder and the Advances and Loans at the time owing to such Lender or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the commitment to make Advances and Loans hereunder (which for this purpose includes Advances and Loans outstanding

thereunder) or, if the applicable commitment to make Advances and Loans hereunder is not then in effect, the principal outstanding balance of the Advances and Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Advances and Loans, unless Agent otherwise consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances and Loans or the commitment to make Advances and Loans hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Advances and Loans on a non-pro rata basis; (iii) any assignment of a commitment to make Advances and Loans hereunder must be approved by Agent unless the Person that is the proposed assignee is itself a Lender with a commitment to make Advances and Loans hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500). Subject to acceptance and recording thereof by Agent pursuant to Section 15.3(b), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 15.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 15.3(d).

(c) Maintenance of Register. Agent, acting solely for this purpose as an agent of the Loan Parties, shall maintain at its office in Columbus, Ohio, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the commitments to make Advances and Loans hereunder of, and principal amounts of the Advances and Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Loan Parties, Agent and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower Representative and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, Borrower Representative or Agent, sell participations to any Person (other than a natural person or any Loan Party or any of the Loan Party's Affiliates or Subsidiaries)

(each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment to make Advances and Loans hereunder and/or the Advances and Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 15.2(b)(i) through 15.2(b)(ix) that affects such Participant. The Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.7, 3.8, 3.9 and 15.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 15.3(a).

A Participant shall not be entitled to receive any greater payment under Section 15.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Loan Parties' prior written consent.

(e) Pledge of Interests. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f) Notes. Each Borrower shall execute and deliver: (i) to Agent, the transferor and the transferee, any consent or release (of all or a portion of the obligations of the transferor) to be delivered in connection with each assignment or other transfer under this Section 15.3, (ii) if a Lender's entire interest in its commitments to make Advances and other Loans hereunder and all of its Advances and other Loans have been transferred to the transferee, an appropriate replacement note against return of the Notes (marked "replaced") held by the transferor and (iii) if only a portion of a Lender's interest in its commitments to make Advances and other Loans hereunder and such Advances and other Loans have been transferred, replacement notes to each of the transferor and the transferee against return of the original such Notes of the transferor (each marked "replaced") held by the transferor; provided, that, simultaneously with Borrowers' delivery of new Notes pursuant to this Section 15.3(f), the transferor Agent will deliver to Borrowers any Note being replaced in whole or in part, and each such Note delivered by the transferor Lender shall be conspicuously marked "replaced" when so delivered.

(g) Replacement of Certain Lenders. If any Lender is a Defaulting Lender hereunder, then Borrower Representative may, at its sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate, without recourse

(in accordance with the restrictions contained in Section 15.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that: (i) Borrower Representative shall have received the prior written consent of Agent, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts). No Lender shall be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower Representative to require such assignment and delegation cease to apply.

(h) Replacement of Non-Consenting Lenders. If, in connection with any proposed amendment, waiver or consent hereunder pursuant to Section 15.2(b) hereof: (i) requiring the consent of all Lenders, the consent of Required Lenders is obtained but the consent of all Lenders whose consent is required is not obtained or (ii) requiring the consent of Required Lenders, the consent of Lenders holding fifty-one percent (51%) or more is obtained but the consent of Required Lenders is not obtained (any Lender withholding consent as described in clause (i) and (ii) hereof being referred to as a "Non-Consenting Lender"), then, so long as Agent is not a Non-Consenting Lender, Agent may, at the sole expense of the Loan Parties, upon notice to such Non-Consenting Lender and Borrower Representative, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 15.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).

15.4 **Application of Payments**. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations in such order as Agent determines in its sole discretion. To the extent that any Loan Party makes a payment or Agent, Issuer or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent, Issuer or Lenders.

15.5 **Indemnity**. Each Loan Party shall indemnify Agent, Issuer and each Lender and each of their officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent, Issuer or any

Lender or any other such indemnified party in any litigation, proceeding or investigation with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, any Loan Document, whether or not Lender is a party thereto.

15.6 **Notice**. Any notice or request hereunder may be given to any Borrower or any Loan Party or to Agent, Issuer or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15.6. Any notice, request, demand, direction or other communication (for purposes of this Section 15.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made in writing (which includes by means of electronic transmission (i.e., "e-mail")). Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names in Section 15.6(d) or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15.6. Any notice provided to the Borrower Representative shall be deemed to have been given to each other Loan Party. Any Notice shall be effective:

(a) In the case of hand-delivery, when delivered;

(b) If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c) In the case of electronic transmission, when actually received;

(d) If given by any other means (including by overnight courier), when actually received, and

(e) When any Lender or Issuer gives a Notice to Borrower Representative or any Loan Party, such Lender or Issuer shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders and Issuer.

(A) If to Agent, Issuer or any Lender at:

The Huntington National Bank
200 Public Square CM64
Cleveland, Ohio 44114
Attention: ABL Account Manager
Telephone: 412-667-6525
Email: ABLOperations@huntington.com

With copies to (which shall not constitute notice):

Buchanan Ingersoll & Rooney, PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania 15219
Attention: Sean M. Girdwood

Telephone: 412-392-1635
Email: sean.girdwood@bipc.com

(B) If to Borrowers at: R & R Express Holdco, Inc.
100 Commerce Drive
Pittsburgh, Pennsylvania 15275
Attention: Richard S. Francis, President
Telephone: 800-223-8973
Email: rich@balrrexp.com

With copies to (which shall not constitute notice):

Dinsmore & Shohl LLP
Six PPG Place, Suite 1300
Pittsburgh, Pennsylvania 15222
Attention: Jim Carlisle, Esq.
Telephone: 412-230-8984
Email: jim.carlisle@dinsmore.com

15.7 **Survival**. The obligations of the Loan Parties under Sections 2.9, 2.11, 3.7, 3.8, 3.9, 3.10, 3.11 and 15.5 shall survive termination of the Loan Documents and payment in full of the Obligations.

15.8 **Severability**. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

15.9 **Expenses**.

(a) Loan Parties shall pay all costs, expenses, including reasonable attorneys' fees (including the allocated costs of in house counsel), and disbursements incurred by Agent (i) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, (ii) in connection with any advice given to any Lender or Issuer with respect to its rights and obligations under this Agreement and all related agreements, in each case, which may be charged to the Loan Account as a Revolving Loan of a Domestic Rate Loan and added to the Obligations. Expenses being reimbursed by the Loan Parties under this Section include costs and expenses incurred in connection with: (1) appraisals and insurance reviews; (2) field examinations and the preparation of reports based on the fees charged by a third party retained by Agent or the internally allocated fees for each Person employed by Agent with respect to each field examination; (3) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of Agent; (4) taxes, fees and other charges for (A) lien and title searches and title insurance and (B) recording any Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Liens of Agent, Issuer, or any Lender; (5) sums paid or incurred

to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and (6) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

(b) Loan Parties shall pay all costs, expenses, including reasonable attorneys' fees (including the allocated costs of in house counsel), and disbursements incurred by Agent, Lenders and Issuer (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, (ii) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's, Issuer's or any Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iii) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's, any Lender's or Issuer's transactions with any Loan Party.

(c) The out-of-pocket expenses (including attorneys' fees and expenses) of Agent and Lenders permitted by this Agreement will be for the account of Borrowers and Borrowers acknowledge that Borrower Representative will receive summary invoice(s) reflecting only the total amount due and that such summary invoice(s) may not contain any narrative description of the services provided. Furthermore, Borrowers acknowledge that delivery of summary invoice(s) shall not in any way constitute a waiver of any right or privilege of Agent or any Lender associated with such invoice(s).

15.10 **Important Information About Procedures Required by the USA Patriot Act**. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with Agent or the Lenders.

What this means: When an entity or person opens an account or establishes a relationship with Agent or the Lenders, Agent or the Lenders may ask for the name, address, date of birth, and other information that will allow Agent and the Lenders to identify the entity or person who opens an account or establishes a relationship with Agent or the Lenders. Agent or the Lenders may also ask to see identifying documents for the entity or person.

15.11 **Injunctive Relief**. Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Agent, Issuer or Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

15.12 **No Liability; Consequential Damages**. Agent's and Lenders' sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as such party deals with similar property for its own account. Neither Agent, any Lender, nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Loan Party or any other Person or to take any other action whatsoever with regard to any Collateral. The powers conferred on Agent and Lenders hereunder are solely to

protect Agent's and Lenders' interest in the Collateral and shall not impose any duty upon Agent's or any Lender to exercise any such powers. Agent and Lenders shall be accountable only for amounts that Agent and Lenders actually receive as a result of the exercise of such powers, and neither Agent, each Lender nor any of Agent's or Lenders' officers, directors, employees or agents shall be responsible to any Loan Party for any act or failure to act hereunder, except for Agent's or any Lender's gross negligence or willful misconduct. Agent and Lenders, and any of their respective agents or attorneys, shall not be liable to any Loan Party for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

15.13 **Counterparts; Electronic Signatures**. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by email transmission shall be deemed to be an original signature hereto.

15.14 **Construction**. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits hereto.

15.15 **Confidentiality; Sharing Information.**

(a) Agent, Issuer and Lenders and each transferee thereof ("Transferee") shall hold all non-public information obtained by Agent or such Transferee in accordance with Agent's, and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender, and such Transferee may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel and other professional advisors, (b) to any other Lender, and such Transferee and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process.

(b) Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by Agent, Issuer, Lenders or by one or more Subsidiaries or Affiliates of Agent, Issuer or Lenders and each Loan Party hereby authorizes Agent, Issuer and Lenders to share any information delivered to Agent, Issuer or any Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of Agent, Issuer or any Lender to enter into this Agreement, to any such Subsidiary or Affiliate of Agent, Issuer or such Lender, it being understood that any such Subsidiary or Affiliate of Agent, Issuer or such Lender receiving such information shall be bound by the provisions of this Section 15.15 as if it were Agent, Issuer or a Lender, hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

15.16 **Publicity**. Each Loan Party hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among the Loan Parties and Agent, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent in its sole discretion shall deem appropriate.

15.17 **Conflict Clause**. In the event of any conflict, inconsistency or discrepancy between the provisions of this Agreement and the provisions of the Loan Documents and any other collateral agreements, the provisions giving Agent or any Lender greater rights or remedies shall govern to the maximum extent permitted by any applicable law, it being understood and agreed that the purpose of this Agreement and any Loan Documents is to add to, and not to limit, detract or derogate from, diminish or otherwise impair or reduce the rights granted to Agent and Lenders pursuant to this Agreement or the Loan Documents. For greater certainty, where the provisions of this Agreement and the provisions of the Loan Documents deal with the same subject matter but are not identical, no conflict between the said documents shall exist or be deemed to exist unless the observance of or compliance with the provisions of one of the said documents will cause a default under or breach of the provisions of the other document or documents.

15.18 **Amendment and Restatement.**

(a) Existing Obligations. Borrowers hereby acknowledge, confirm and agree that Borrowers are indebted to Agent for outstanding loans and advances to Borrowers under the Existing Loan Documents, together with all interest accrued and accruing thereon (to the extent applicable), and all fees, costs, expenses and other charges relating thereto, all of which are unconditionally owing by Borrowers to Agent to the extent set forth in the Existing Loan Documents, without offset, defense or counterclaim of any kind, nature or description whatsoever.

(b) Acknowledgment of Security Interests.

(i) Borrowers hereby acknowledge, confirm and agree that Agent shall continue to have a security interest in and lien upon the Collateral heretofore granted to such parties pursuant to the Existing Loan Documents to secure the Obligations, as well as any Collateral granted under this Agreement or under any of the other Loan Documents or otherwise granted to or held by Agent.

(ii) The liens and security interests of Agent in the Collateral shall be deemed to be continuously granted and perfected from the earliest date of the granting and perfection of such liens and security interests to Agent whether under the Existing Loan Documents, this Agreement or any of the other Loan Documents.

(c) Existing Agreements. Borrowers hereby acknowledge, confirm and agree that, subject to this Section 15.18: (i) the Existing Loan Documents have been duly executed and delivered by Borrowers and are in full force and effect as of the date hereof; (ii) the agreements and obligations of Borrowers contained in the Existing Loan

Documents constitute the legal, valid and binding obligations of Borrowers enforceable against Borrowers in accordance with their terms, except as they may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, and Borrowers do not have a valid defense to the enforcement of such obligations; and (iii) Agent is entitled to all of the rights, remedies and benefits provided for in or arising pursuant to the Existing Loan Documents.

(d) Waiver and Release of all Claims and Defenses. Each Borrower hereby represents and warrants to Agent, and agrees with Agent, that such Borrower does not have any claim or offset against, or defense or counterclaim to, any obligation or liability under this Agreement, the Existing Loan Documents or any other Loan Document, and such Borrower hereby waives and releases Agent and all of its affiliates, officers, agents, attorneys, employees and representatives, as of the date hereof, from any and all such claims, offsets, defenses and counterclaims of which such Borrower is aware or unaware, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto.

(e) Restatement.

(i) Except as otherwise stated in Section 15.18(b) hereof and this Section 15.18(e)(i), as of the date hereof, the terms, conditions, agreements, covenants, representations and warranties set forth in the Existing Loan Documents are simultaneously amended and restated in their entirety (excluding the schedules prepared as of the Original Closing Date, which shall be superseded by the schedules delivered on and after the Closing Date), and as so amended and restated, replaced and superseded by the terms, conditions, agreements, covenants, representations and warranties set forth in this Agreement and the other Loan Documents executed or delivered on or after the date hereof, except that nothing herein or in the other Loan Documents shall impair or adversely affect the continuation of the liability of Borrowers for the Obligations heretofore incurred and the security interests, liens and other interests in the Collateral heretofore granted, pledged or assigned by Borrowers to Agent (whether directly, indirectly or otherwise).

(ii) The amendment and restatement contained herein shall not, in any manner, be construed to constitute payment of, or impair, limit, cancel or extinguish, or constitute a novation in respect of, the Obligations of Borrowers evidenced by or arising under any of the Existing Loan Documents, and the Liens and security interests of Agent securing such Obligations and other obligations and liabilities, which shall not in any manner be impaired, limited,

terminated, waived or released, but shall continue in full force and effect in favor of Agent.

All loans, advances and other financial accommodations under any of the Existing Loan Documents and all other Obligations of Borrowers to Agent outstanding and unpaid as of the date hereof pursuant to the Existing Loan Documents or otherwise shall be deemed Obligations of Borrowers pursuant to the terms hereto.

[SIGNATURE PAGES AND SCHEDULES/EXHIBITS OMITTED]

**EXHIBIT B**

Updated Schedules to Credit Agreement

See attached.

SCHEDULE 1

COMMITMENT SCHEDULE

| **Lender** | **Revolving Commitment** | **Term Loan Commitment** | **Term Loan 2 Commitment** | **Term Loan 3 Commitment** | **Term Loan 4 Commitment** | **Commitment** |
|---|---|---|---|---|---|---|
| The Huntington National Bank | $65,934,223.07 | $2,740,776.93 | $972,000.00 | $520,000 | $5,000,000 | $**75,167,000.00** |
| S&T Bank | $19,065,776.93 | $934,223.07 | $0.00 | $0.00 | $0.00 | $**20,000,000.00** |
| | | | | | | |
| **Total** | **$85,000,000** | **$3,675,000** | **$972,000** | **$520,000** | **$5,000,000** | **$95,167,000.00** |

**SCHEDULE 1.2(c)**

**EXISTING LETTERS OF CREDIT**

| **Company or Subsidiary** | **Name and address of payor or secured Party** | **Amount owed** | **Maturity Date** | **Security Interest (if any)** |
|---|---|---|---|---|
| RFX, LLC | Quincy Property Owner I, LLC<br>c / o: Related Beal | $28,568 | 6/30/2032 | Office Lease |
| New WLX, LLC | Sentry Select Insurance Company<br>1800 North Point Dr, Stevens Point, WI | $139,662 | 10/29/2025 | Insurance Contract |
| New WLX, LLC | Penske Truck Leasing Co., L.P.<br>2675 Morgantown Rd, Reading, PA | $155,000 | 1/31/2025 | Equipment Lease |
| AGX Freight Carriers, LLC | Strategic Insurance Underwriters<br>5391 Lakewood Ranch Blvd N Suite 203<br>Sarasota, Florida 34240 | $153,917 | 7/31/2025 | Insurance Contract |
| R&R Express, Inc. | Osbidian Insurance Holdings, Inc.<br>1330 Ave of the Americas, New York, NY, 10019 | $1,090,000 | 6/30/2025 | Insurance Contract |

**EXHIBIT C**

Form of Term Loan 4 Note

See attached.

**EXHIBIT E**

**FORM OF**
**TERM LOAN 4 NOTE**

$5,000,000.00 November 27, 2024

**R & R EXPRESS, INC.**, a Pennsylvania corporation, **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation, **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation, **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company, **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company, **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation, **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company, **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation, **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company, **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company, **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company, **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company, **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company, **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company, **R&R EXPRESS PROPERTIES, LLC**, a Pennsylvania limited liability company, **R&R EQUIPMENT LEASING, LLC**, a Pennsylvania limited liability company, **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation, **RXG&A, LLC**, a Pennsylvania limited liability company, **TLOGISTICS, LLC**, a Pennsylvania limited liability company, **R & R DRIVER SOLUTIONS INC**, a Pennsylvania corporation, **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company, **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company, **NEW WLX, LLC**, a Pennsylvania limited liability company, **NEW WLE, LLC**, a Pennsylvania limited liability company, **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company, **RFX, LLC**, a Pennsylvania limited liability company, **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company, **PIONEER TRANSFER**, **LLC**, a Pennsylvania limited liability company, **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company, **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company, **RFX TAMPA, LLC**, a Florida limited liability company, and **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company (each a "Borrower" and collectively, the "Borrowers"), jointly and severally promise to pay to the order of **THE HUNTINGTON NATIONAL BANK**, a national banking association (the "Lender"), at the Payment Office (as defined in the Credit Agreement, as hereinafter defined), the aggregate unpaid principal amount of the Term Loan 4 made by the Lender to the Borrowers, which shall be the amount stated above, in immediately available funds, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Credit Agreement. The Borrowers shall pay the principal of and accrued and unpaid interest on the Term Loan 4 in full on the Term Loan 4 Maturity Date and shall make such mandatory repayments as are required to be made under the terms of the Credit Agreement.

The Lender shall, and is hereby authorized to, record in accordance with its usual practice, the date and amount of the Term Loan 4 and the date and amount of each principal payment hereunder.

This Term Loan 4 Note (this "Note") is issued pursuant to, and is entitled to the benefits of, the Second Amended and Restated Credit and Security Agreement dated as of March 18, 2022, as amended by that certain First Amendment, Waiver and Joinder to Second Amended and Restated Credit and Security Agreement dated as of December 30, 2022, as amended by that certain Second Amendment to Second Amended and Restated Credit and Security Agreement dated as of February 7, 2023, as amended by that certain Third Amendment and Joinder to Second Amended and Restated Credit and Security

Agreement dated as of June 21, 2023, as amended by that certain Fourth Amendment to Second Amended and Restated Credit and Security Agreement dated as of September 1, 2023, as amended by that certain Waiver and Fifth Amendment to Second Amended and Restated Credit and Security Agreement dated as of May 28, 2024, as amended by that certain Sixth Amendment to Second Amended and Restated Credit and Security Agreement dated as of July 31, 2024, as amended by that certain Seventh Amendment to Second Amended and Restated Credit and Security Agreement dated as of August 30, 2024, and as amended by that certain Eighth Amendment to Second Amended and Restated Credit and Security Agreement dated as of the date hereof (as it may be amended, restated, supplemented or modified and in effect from time to time, is herein called the "Credit Agreement"), among the Borrowers, the Lenders from time to time party thereto, and THE HUNTINGTON NATIONAL BANK, a national banking association, as Agent, Issuer and a Lender, to which Credit Agreement reference is hereby made for a statement of the terms and conditions governing this Note, including the terms and conditions under which this Note may be prepaid or its maturity date accelerated. This Note is secured pursuant to the Loan Documents, as more specifically described in the Credit Agreement and reference is made thereto for a statement of the terms and provisions thereof. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Credit Agreement.

Except as expressly provided in the Credit Agreement, the Borrowers expressly waive presentment, demand, protest and notice of any kind.

**EACH BORROWER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, ANY ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD, FOLLOWING THE OCCURRENCE OF AN EVENT OF DEFAULT, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST EACH BORROWER FOR SUCH SUMS AS ARE DUE AND/OR MAY BECOME DUE UNDER THIS NOTE, WITH OR WITHOUT DECLARATION, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION AND WITH AN AMOUNT EQUAL TO TEN PERCENT (10%) OF THE AMOUNT OF SUCH JUDGMENT, BUT NOT LESS THAN TEN THOUSAND DOLLARS ($10,000.00), ADDED FOR ATTORNEYS' COLLECTION FEES. TO THE EXTENT PERMITTED BY LAW, EACH BORROWER RELEASES ALL ERRORS IN SUCH PROCEEDINGS. IF A COPY OF THIS NOTE, VERIFIED BY AFFIDAVIT BY OR ON BEHALF OF THE HOLDER OF THIS NOTE SHALL HAVE BEEN FILED IN SUCH ACTION, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL NOTE AS A WARRANT OF ATTORNEY. THE AUTHORITY AND POWER TO APPEAR FOR AND CONFESS JUDGMENT AGAINST EACH BORROWER SHALL NOT BE EXHAUSTED BY THE INITIAL EXERCISE THEREOF AND MAY BE EXERCISED AS OFTEN AS THE HOLDER SHALL FIND IT NECESSARY AND DESIRABLE AND THIS NOTE SHALL BE A SUFFICIENT WARRANT THEREFOR. THE HOLDER HEREOF MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR THE SAME AMOUNT. IN THE EVENT ANY JUDGMENT CONFESSED AGAINST EACH BORROWER HEREUNDER IS STRICKEN OR OPENED UPON APPLICATION BY OR ON EACH BORROWER'S BEHALF FOR ANY REASON, THE HOLDER IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST EACH BORROWER FOR ANY PART OR ALL OF THE AMOUNTS OWING HEREUNDER, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS.**

**WITH RESPECT TO THE ATTORNEY'S COLLECTION FEES PROVIDED FOR IN THE FOREGOING WARRANT OF ATTORNEY, EACH BORROWER WILL NOT BE HELD RESPONSIBLE FOR LEGAL FEES, COSTS OR EXPENSES IN CONNECTION WITH ANY**

**EVENT OF DEFAULT UNDER THE CREDIT AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS AND ANY COLLECTION PROCEEDINGS RELATED THERETO, IN EXCESS OF THOSE ACTUALLY INCURRED. ANY ASSESSMENT IN EXCESS THEREOF SET FORTH IN THE FOREGOING WARRANT OF ATTORNEY WILL BE HELD AS ADDITIONAL COLLATERAL FOR THE OBLIGATIONS, LEGAL FEES, COSTS AND EXPENSES AND UPON PAYMENT OF SUCH OBLIGATIONS, LEGAL FEES, COSTS AND EXPENSES IN FULL, THE LENDER WILL CAUSE THE JUDGMENT SO CONFESSED TO BE SATISFIED, AND, TO THE EXTENT HELD BY THE LENDER, REMIT TO EACH BORROWER ANY SUCH EXCESS. IF SUCH ASSESSMENT IS LESS THAN THE LEGAL FEES, COSTS AND EXPENSES ACTUALLY INCURRED, THE LENDER SHALL NOT BE DEEMED TO HAVE WAIVED ANY RIGHT TO SEEK TO REASSESS OR OTHERWISE INITIATE ACTION FOR PAYMENT OF ADDITIONAL LEGAL FEES, COSTS AND EXPENSES.**

*[Signature Pages to Follow]*

**[SIGNATURE PAGE 1 OF 2 TO TERM LOAN 4 NOTE]**

**IN WITNESS WHEREOF**, each Borrower, intending to be legally bound, has caused this Note to be executed and delivered as of the date first set forth above in Pittsburgh, Pennsylvania as a document under seal.

**WARNING -- BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON ITS PART TO COMPLY WITH THE CREDIT AGREEMENT, OR ANY OTHER CAUSE.**

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC**

By:__________________________________(SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC, AGX FREIGHT LOGISTICS, LLC, AGX FREIGHT INTERMODAL, LLC, RFX TAMPA, LLC, NEW TAYLOR TRANSPORTATION, LLC, A.M. TRANSPORTATION SERVICES LLC**

By: __________________________________(SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**[SIGNATURE PAGE 2 OF 2 TO TERM LOAN 4 NOTE]**

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By:__________________________________(SEAL)
Name: Richard S. Francis
Title: Manager

Buchanan Draft 3/25/25

# NINTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS NINTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), dated as of March ___, 2025 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as the same has been and may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers have requested that the Lenders (i) extend the Term Loan 4 Maturity Date, and (ii) make certain other amendments and grant certain other accommodations all as hereinafter provided, on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. **Recitals**. The foregoing recitals are hereby incorporated by this reference.

2. **Amendment to Section 1.2 of the Credit Agreement.** The definition of "Term Loan 4 Maturity Date" in Section 1.2 of the Credit Agreement is hereby amended and restated in its entirety as follows:

"Term Loan 4 Maturity Date" means May 12, 2025.

3. **Release; No Discharge**. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

4. **Conditions to Effectiveness**. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment.

(b) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(c) Payment of Fees and Expenses. The Borrowers shall (i) pay to Agent an extension fee in the amount of $15,000, and (ii) reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

(d) Miscellaneous. The Loan Parties shall have provided such other documents, agreements, instruments, deliverables and items deemed reasonably necessary by the Agent and shall have satisfied such other conditions as set forth in the closing agenda provided to the Loan Parties in connection with this Amendment.

5. **Representations and Warranties**. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

6. **Post-Closing Obligation**. Within forty-five (45) days of the Effective Date, but in any event not later than May 12, 2025 (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall have filed and provided Agent evidence of filing of an assignment and all supporting documentation required pursuant to the procedures set forth under the Assignment of Claims Act (and any other documentation as may reasonably be required by the Agent) to effect the assignment of claims under that certain contract by RFX and the United States Postal Service, dated on or about October 22, 2021.

7. **Miscellaneous**.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby. Each Loan Party hereby further confirms its guarantees, pledges and grants of security interests, as applicable, under each of the Loan Documents to which it is party. Each Loan Party reconfirms the prior grant of the security interest in and first priority, perfected lien in favor of the Agent for its benefit and the ratable benefit of each Lender, upon

and to, all of its right, title and interest in and to the Collateral, whether now owned or hereafter acquired, created or arising and wherever located.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) Further Assurances. The Borrowers agree to execute such other documents, instruments and agreements and take such further actions reasonably requested by the Agent to effectuate the provisions of this Amendment.

(f) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

*[Signature Page Follows]*

**[SIGNATURE PAGE – NINTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC**

By:____________________________ (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC, AGX FREIGHT LOGISTICS, LLC, AGX FREIGHT INTERMODAL, LLC, RFX TAMPA, LLC, NEW TAYLOR TRANSPORTATION, LLC, A.M. TRANSPORTATION SERVICES LLC**

By: ____________________________ (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By:____________________________ (SEAL)
Name: Richard S. Francis
Title: Manager

**[SIGNATURE PAGE – NINTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By:______________________________________
Name:____________________________________
Title:_____________________________________

**[SIGNATURE PAGE – NINTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By:____________________________________
Name:__________________________________
Title:___________________________________

*Execution Version*

# TENTH AMENDMENT AND WAIVER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

**THIS TENTH AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Amendment"), effective as of May 12, 2025 ("Effective Date") is made by and among **R&R EXPRESS HOLDCO, INC**, a Pennsylvania corporation ("Holdco"), **R & R EXPRESS, INC.**, a Pennsylvania corporation ("Express"), **GT WORLDWIDE TRANSPORT, INC.**, a Florida corporation ("GT"), **BORDER CONNECT FREIGHT SERVICES, INC.**, a Pennsylvania corporation ("Border"), **PARADIGM TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Paradigm"), **FINAL MILE DEDICATED GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile"), **R & R EXPRESS LOGISTICS, INC.**, a Florida corporation ("R&R Logistics"), **GT WORLDWIDE LOGISTICS, LLC**, a Florida limited liability company ("GT Logistics"), **BORDER CONNECT LOGISTICS, INC.**, a Pennsylvania corporation ("Border Logistics"), **PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC**, a Pennsylvania limited liability company ("Paradigm Management"), **FINAL MILE SOLUTIONS GROUP, LLC**, a Pennsylvania limited liability company ("Final Mile Solutions"), **AAGEX FREIGHT GROUP, LLC**, a Florida limited liability company ("AAGEX Group"), **AGX FREIGHT CARRIERS, LLC**, a Georgia limited liability company ("AGX Carriers"), **AGX FREIGHT LOGISTICS, LLC**, a Georgia limited liability company ("AGX Logistics"), **AGX FREIGHT INTERMODAL, LLC**, a Florida limited liability company ("AGX Intermodal"), **R&R EXPRESS PROPERTIES, LLC,** a Pennsylvania limited liability company ("Express Properties"), **R&R EQUIPMENT LEASING**, **LLC**, a Pennsylvania limited liability company ("Equipment Leasing"), **RXG&A**, **LLC**, a Pennsylvania limited liability company ("RXG&A"), **TLOGISTICS, LLC**, a Pennsylvania limited liability company ("TLogistics"), **R & R DRIVER SOLUTIONS INC.**, a Pennsylvania corporation ("Driver Solutions"), **NEW AMERICAN GROUP LLC**, a Pennsylvania limited liability company ("American Group"), **NEW WLX HOLDINGS, LLC**, a Pennsylvania limited liability company ("New WLX Holdings"), **NEW WLX, LLC**, a Pennsylvania limited liability company ("New WLX"), **NEW WLE, LLC**, a Pennsylvania limited liability company ("New WLE"), **A.M. TRANSPORTATION SERVICES LLC**, a Pennsylvania limited liability company ("A.M. Transportation"), **RFX, LLC**, a Pennsylvania limited liability company ("RFX"), **REFRIGERATED FOOD EXPRESS, LLC**, a Pennsylvania limited liability company ("Food Express"), **PIONEER TRANSFER, LLC**, a Pennsylvania limited liability company ("Pioneer"), **LOAD TO RIDE TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Load to Ride"), **ONE STOP FREIGHTWAYS, LLC**, a Pennsylvania limited liability company ("One Stop"), **RFX TAMPA, LLC**, a Florida limited liability company ("RFX Tampa"), **NEW TAYLOR TRANSPORTATION, LLC**, a Pennsylvania limited liability company ("Taylor Transportation", together with Holdco, Express, GT, Border, Paradigm, Final Mile, R&R Logistics, GT Logistics, Border Logistics, Paradigm Management, Final Mile Solutions, AAGEX Group, AGX Carriers, AGX Logistics, AGX Intermodal, Express Properties, Equipment Leasing, RXG&A, TLogistics, Driver Solutions, American Group, New WLX Holdings, New WLX, New WLE, A.M. Transportation, RFX, Food Express, Pioneer, Load to Ride, One Stop, and RFX Tampa, each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto (together with their respective successors and assigns, the "Lenders"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association (in its individual capacity "Huntington"), as administrative agent for the Lenders (the "Agent").

WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Agent are parties to that certain Second Amended and Restated Credit and Security Agreement, dated as of March 18, 2022 (as amended through that certain Ninth Amendment to Second Amended and Restated Credit Agreement dated as March 26, 2025 ("Ninth

Amendment"), as the same may hereafter be amended, modified, restated or supplemented from time to time, the "Credit Agreement");

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement;

WHEREAS, the Borrowers have informed the Agent that Express intends to enter into a transaction to sell certain of its real property (particularly located at 1707 North 5th Street, Union City, Tennessee 38261) ("Express Property Sale") pursuant to a letter of intent dated April 14, 2025, entered into by Express and Volume Transportation Inc.;

WHEREAS, Section 7.1 (b) of the Credit Agreement prohibits any Borrower from selling or disposing of any of its properties or assets (subject to certain exceptions stated therein which are not applicable to the Express Property Sale) without the consent of the Required Lenders;

WHEREAS, Borrowers failed to comply with the post-closing covenant set forth in Ninth Amendment requiring the Borrowers to deliver to Agent evidence that Borrowers filed an assignment (with all supporting documentation) as required by and pursuant to the Assignment of Claims Act to effect the assignment of claims under that certain contract by RFX and the United States Postal Service (dated on or about October 22, 2021), and non-compliance with the same constitutes an Event of Default under Section 10.6 of the Credit Agreement ("Existing Default");

WHEREAS, the Borrowers have requested that the Required Lenders (i) waive the Existing Default, (ii) consent to the Express Property Sale, (iii) extend the Term Loan 4 Maturity Date, and (iv) make certain other amendments and grant certain other accommodations all as hereinafter provided, on the terms and conditions as set forth herein, and the Lenders are willing to accommodate the request of the Borrowers, subject to and on the terms and conditions set forth herein;

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

1. **Recitals**. The foregoing recitals are hereby incorporated by this reference.

2. **Waiver**. The Required Lenders hereby waive the Existing Default. The foregoing waiver is limited to the Existing Default only and does not relate to any other Events of Default or other violations existing under the Credit Agreement or indicate an agreement on the part of the Required Lenders to grant any such waivers in the future.

3. **Consent**. The Required Lenders hereby consent to the Express Property Sale. Such consent is conditioned upon Express's compliance with Section 2.5(b) of the Credit Agreement upon the consummation of the Express Property Sale which requires the immediate mandatory prepayment of the Loans with 100% of the Net Cash Proceeds received from any sale or disposition of assets. The foregoing constitutes an accommodation to the Borrowers and the consent contained herein shall be limited to the specific consent made herein, and the foregoing consent does not constitute a course of dealing on the part of the Lenders or represent any agreement on the part of the Lenders to agree to any further consents, other than as specifically set forth herein.

4. **Amendment to Section 1.2 of the Credit Agreement.** The definition of "Term Loan 4 Maturity Date" in Section 1.2 of the Credit Agreement is hereby amended and restated in its entirety as follows:

"Term Loan 4 Maturity Date" means June 30, 2025.

5. **Sale of Certain Assets**.

(a)(i) By June 15, 2025, the Borrowers shall provide to the Agent an executed purchase agreement for the proposed sale of New American Group LLC or, alternatively, (ii) by June 30, 2025, the Borrowers shall provide to the Agent documentation evidencing a firm commitment to a capital raising event that will result in a net capital raise of at least $10,000,000 for the Borrowers.

(b)(i) By June 15, 2025, the Borrowers shall provide to the Agent a letter of intent for the sale of the controlling shares of Holdco ("Company Sale") for an amount that will result in the full repayment of the Term Loan 4, or (ii) the Borrowers shall develop and provide to the Agent a confidential informational memorandum (CIM) that will be utilized to more broadly market the sale of Holdco; *provided however*, that, if the Borrowers elect not to pursue the Company Sale, the Borrowers shall deliver an executed term sheet with terms agreed to by the Borrowers and the Agent (and satisfactory to the Agent in its sole discretion) with terms and conditions providing for the development of sufficient capital for the Borrowers to fully eliminate the Term Loan 4 and overadvance on the Eligible Unbilled Accounts and to provide sufficient liquidity (as determined by the Agent in its sole discretion) to support the Borrowers' operations.

6. **Assignment of Claims; Quarterly Updates**. (1) Within thirty (30) days of the Effective Date, but in any event not later than June 12, 2025 (or such later date as may be consented to by the Agent in its sole discretion) the Borrowers shall provide to the Agent an assignment of claims and any requisite supporting documentation *executed in blank* for the assignment of the account receivables under that certain contract by RFX and the United States Postal Service, dated on or about October 22, 2021 to be held by the Agent and (2) Borrowers shall provide quarterly (or upon the reasonable request of the Agent) updates to the Agent regarding the government contracting officer contact information including the department, division and address where notice of the assignment to effect an assignment of claims pursuant to the Assignment of Claims Act of 1940 would need to filed by the Agent upon an Event of Default.

7. **Release; No Discharge**. The Borrowers and their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, jointly and severally, release and forever discharge Agent, each Lender, and their respective subsidiaries, affiliates, officers, directors, employees, agents, attorneys, predecessors, successors and assigns, both present and former (collectively the "Lender Affiliates") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against Agent, Lender or the Lender Affiliates which the Borrowers or any of their respective parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, personal representatives, successors and assigns, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, whether presently existing, suspected, known, unknown, contemplated or anticipated from the beginning of time to the date of this Amendment.

8. **Conditions to Effectiveness**. The amendments set forth herein shall become effective upon the date that each of the following conditions has been satisfied to the satisfaction of the Agent:

(a) Execution and Delivery of Amendment. The Borrowers and the Lenders shall have executed and delivered to the Agent this Amendment.

(b) Legal Details. All legal details and proceedings in connection with the transactions contemplated by this Amendment shall be in form and substance satisfactory to the Agent and counsel for the Agent, and the Agent shall have received all such other counterpart originals or certified or other copies of such documents and proceedings in connection with such transactions, in form and substance satisfactory to the Agent and its counsel, as the Agent or its counsel may reasonably request.

(c) Payment of Fees and Expenses. The Borrowers shall (i) pay to Agent an extension fee in the amount of $30,000, and (ii) reimburse Agent for all costs and expenses, including reasonable legal fees and expenses of attorneys incurred in connection with this Amendment.

(d) Miscellaneous. The Loan Parties shall have provided such other documents, agreements, instruments, deliverables and items deemed reasonably necessary by the Agent and shall have satisfied such other conditions as set forth in the closing agenda provided to the Loan Parties in connection with this Amendment.

9. **Representations and Warranties**. By its execution and delivery of this Amendment to the Agent, each of the Borrowers represents and warrants to the Agent and the Lenders as follows:

(a) As of the date hereof: (i) the execution, delivery and performance of this Amendment and any and all other documents executed and/or delivered in connection herewith have been authorized by all requisite company action on the part of the Borrowers and will not violate any Borrower's organizational documents; (ii) the representations and warranties of Borrowers contained in the Credit Agreement and the other Loan Documents are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of such date (except representations and warranties which relate solely to an earlier date or time, which representations and warranties shall be true and correct on and as of the specific dates or times referred to therein); (iii) the Borrowers have performed and complied with all covenants and conditions of the Credit Agreement and the other Loan Documents, and except for the Existing Default, no Event of Default or Default under the Credit Agreement has occurred and is continuing or exists; and (iv) the Credit Agreement and all other Loan Documents are and remain legal, valid, binding and enforceable obligations in accordance with the terms thereof.

(b) No Consents. To the extent any consent, approval, order or authorization or registration, declaration or filing with any official body or other Person is required in connection with the valid execution and delivery of this Amendment or the carrying out or performance of any of the transactions required or contemplated by this Amendment, all such consents, approvals, orders or authorizations shall have been obtained or all such registrations, declarations or filings shall have been accomplished prior to the consummation of this Amendment.

(c) No Conflict. The execution of this Amendment shall not contravene any law applicable to Borrowers, the Agent or the Lenders. No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or, to any Borrower's knowledge, proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Amendment or the consummation of the transactions contemplated hereby, which in the Agent's or any Lender's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Amendment, or any of the other Loan Documents.

(d) Material Adverse Effect. After giving effect to this Amendment, no Material Adverse Effect shall have occurred with respect to the Borrowers or any of the other Loan Parties since the Closing Date of the Credit Agreement.

10. **Miscellaneous**.

(a) Full Force and Effect. All provisions of the Credit Agreement remain in full force and effect on and after the date hereof, except as expressly amended hereby. The parties do not amend any provisions of the Credit Agreement except as expressly amended hereby. Each Loan Party hereby further confirms its guarantees, pledges and grants of security interests, as applicable, under each of the Loan

Documents to which it is party. Each Loan Party reconfirms the prior grant of the security interest in and first priority, perfected lien in favor of the Agent for its benefit and the ratable benefit of each Lender, upon and to, all of its right, title and interest in and to the Collateral, whether now owned or hereafter acquired, created or arising and wherever located.

(b) Counterparts. This Amendment may be signed in counterparts (by facsimile transmission or otherwise) but all of which together shall constitute one and the same instrument.

(c) Incorporation into Credit Agreement. This Amendment shall be incorporated into the Credit Agreement by this reference. All provisions, including all representations and warranties, set forth herein shall be a part of the Credit Agreement as if originally contained therein.

(d) Governing Law. This Amendment shall be deemed to be a contract under the laws of the Commonwealth of Pennsylvania and for all purposes shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

(e) Further Assurances. The Borrowers agree to execute such other documents, instruments and agreements and take such further actions reasonably requested by the Agent to effectuate the provisions of this Amendment.

(f) No Novation. Except as amended hereby, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. The Borrowers, the Agent and the Lenders acknowledge and agree that this Amendment is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Credit Agreement or the other Loan Documents.

**[SIGNATURE PAGE – TENTH AMENDMENT AND WAIVER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, intending to be legally bound hereunder, have executed this Amendment as of the day and year first above written, as a document under seal.

**BORROWERS:**

**R & R EXPRESS, INC., GT WORLDWIDE TRANSPORT, INC., BORDER CONNECT FREIGHT SERVICES, INC., R & R EXPRESS LOGISTICS, INC., BORDER CONNECT LOGISTICS, INC., GT WORLDWIDE LOGISTICS, LLC, R&R EXPRESS PROPERTIES, LLC, R&R EQUIPMENT LEASING, LLC, R&R EXPRESS HOLDCO, INC, RXG&A, LLC, TLOGISTICS, LLC, R & R DRIVER SOLUTIONS INC, NEW WLX, LLC, NEW WLE, LLC, LOAD TO RIDE TRANSPORTATION, LLC, ONE STOP FREIGHTWAYS, LLC**

By:____________________________ (SEAL)
Name: Richard S. Francis
Title: President

**AGX FREIGHT CARRIERS, LLC, AGX FREIGHT LOGISTICS, LLC, AGX FREIGHT INTERMODAL, LLC, RFX TAMPA, LLC, NEW TAYLOR TRANSPORTATION, LLC, A.M. TRANSPORTATION SERVICES LLC**

By:____________________________ (SEAL)
Name: Richard S. Francis
Title: Authorized Signer

**PARADIGM TRANSPORTATION, LLC, FINAL MILE DEDICATED GROUP, LLC, PARADIGM TRANSPORTATION MANAGEMENT GROUP, LLC, FINAL MILE SOLUTIONS GROUP, LLC, NEW AMERICAN GROUP LLC, NEW WLX HOLDINGS, LLC, AAGEX FREIGHT GROUP, LLC, RFX, LLC, REFRIGERATED FOOD EXPRESS, LLC, PIONEER TRANSFER, LLC**

By:____________________________ (SEAL)
Name: Richard S. Francis
Title: Manager

**[SIGNATURE PAGE – TENTH AMENDMENT AND WAIVER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**THE HUNTINGTON NATIONAL BANK**, a national banking association, as Agent, a Lender and Issuer

By: ______________________

Name: Nelson Rauscher

Title: Vice President

**[SIGNATURE PAGE – TENTH AMENDMENT AND WAIVER TO SECOND AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

**S&T BANK**, as a Lender

By: [signature]
Name: Richard Ford
Title: VP Portfolio Manager