Filing # 245817848 E-Filed 04/13/2026 11:07:03 AM

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT**
**IN AND FOR COLLIER COUNTY, FLORIDA**

THE HUNTINGTON NATIONAL BANK, as lender,
and THE HUNTINGTON NATIONAL BANK,
as Administrative Agent and Collateral Agent,

Plaintiffs,

v. Case No.: 11-2026-CA-000170-00001-01

R&R EXPRESS PROPERTIES, LLC,
RICHARD S. FRANCIS, KATHLEEN
L. FRANCIS, and CENTENNIAL BANK,

Defendants.
_______________________________________________/

**NOTICE OF FILING HEARING TRANSCRIPT**

Plaintiffs, THE HUNTINGTON NATIONAL BANK, as Lender and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent, by and through their undersigned counsel, hereby file the attached hearing transcript from the March 31, 2026 hearing on Plaintiffs' Motion To Permit Recording of Lis Pendens.

Respectfully submitted,

/s/ John D. Emmanuel
John D. Emmanuel
Florida Bar No: 0475572
john.emmanuel@bipc.com
Alexandra M. Dragovich, Esq.
Florida Bar No. 1025374
alexandra.dragovich@bipc.com
BUCHANAN INGERSOLL & ROONEY PC
401 East Jackson Street, Suite 2400
Tampa, FL 33602

Tel. No. 813 222 8180/Fax No: 813 222 8189
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 13, 2026, pursuant to Florida Rules of Judicial Administration, Rule 2.516, I electronically filed the foregoing with the Clerk of Court by using the Florida Court E-Portal Filing System, which will send a notice of electronic filing to all counsel of record.

/s/ John D. Emmanuel______________
John D. Emmanuel
FBN: 475572

# In the Matter Of:

Huntington National Bank vs R&R Express

11-2026-CA-000170-00001-01

## HEARING

*March 31, 2026*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA

THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent,

Plaintiffs,

vs.

CASE NO. 11-2026-CA-000170-00001-01

R&R EXPRESS PROPERTIES, LLC, RICHARD S. FRANCIS, KATHLEEN L. FRANCIS, and CENTENNIAL BANK,

Defendants.

HEARING

BEFORE THE

HONORABLE PAMELA BARGER

Tuesday, March 31, 2026

1:30 P.M.

Hillary Koby

Digital Reporter

Commission No. HH 343877

APPEARANCES OF COUNSEL

On behalf of Plaintiffs, The Huntington National Bank, as lender, and the Huntington National Bank, as Administrative Agent and Collateral Agent:

RICHARD SALAZAR, ESQ.
ALEXANDRA DRAGOVICH, ESQ.
BUCHANAN INGERSOLL & ROONEY
401 E. Jackson Street
Suite 2400
Tampa, Florida 33602
813-228-7411
richard.salazar@bipc.com
alexandra.dragovich@bipc.com
APPEARED IN PERSON

On behalf of Defendant, Centennial Bank:

JOHN A. ANTHONY, ESQ.
ANTHONY & PARTNERS
100 S. Ashley Drive
Suite 1600
Tampa, Florida 33602
813-273-5616
janthony@anthonyandpartners.com
APPEARED IN PERSON

On behalf of Defendants, Richard S. Francis, Kathleen L. Francis:

REBECCA A. RODRIGUEZ, ESQ.
NELSON MULLINS
100 Southeast 3rd Avenue
Suite 2700
Fort Lauderdale, Florida 33394
954-745-5264
rebecca.rodriguez@nelsonmullins.com
APPEARED IN PERSON

Also Present:

Matt Beatty, Huntington Representative

EXAMINATION INDEX


| EXAMINATION | PAGE |
|---|---|
| Direct Examination by Mr. Salazar | 20 |
| Cross-Examination by Ms. Rodriguez | 45 |


EXHIBIT INDEX


| PLAINTIFF | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Second Restated Credit Agreement | 24 |
| Exhibits 2,3 | Mortgage Agreement, Mortgage Note | 30 |
| Exhibit 4 | Appraisal 2024 | 33 |
| Exhibit 5 | Special Warranty Deed | 41 |
| Exhibit 6 | Default Letter 1-5-2026 | 44 |

| DEFENDANT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibits 6,7 | Huntington Payoff Documents | 56 |

PROCEEDINGS

THE BAILIFF: All rise, please. Collier County Court is now in session. Magistrate Pamela Barger presiding.

THE COURT: You may be seated.

All right. I have Huntington National Bank versus R&R Express Properties, 26CA170. If I can have your appearances for the record, please.

MR. SALAZAR: Your Honor, Richard Salazar on behalf of the Huntington plaintiffs. To my left is my law partner, Alexandra Dragovich, and also with us today is (audio interruption) representatives, Matt Beatty.

THE COURT: All right.

MR. ANTHONY: Good afternoon, Your Honor. John Anthony on behalf of Centennial Bank, which was a defendant and remains a cross-plaintiff with respect to one remaining count of its cross-claim against Mr. and Mrs. Francis.

THE COURT: Okay.

MS. RODRIGUEZ: Good afternoon, Your Honor. Rebecca Rodriguez from Nelson Mullins for defendants, Kathleen and Richard Francis.

THE COURT: And your last name was Rodriguez?

MS. RODRIGUEZ: Rodriguez with a Z, yes, Your

Honor.

THE COURT: All right. Mr. Salazar, this is your motion to permit a lis pendens?

MR. SALAZAR: Yes, Your Honor. And -- and preliminary, I wanted to ask how you wish to proceed, whether you want openings or -- or we have one witness to testify. We could go straight to testimony and leave argument for after. However, Your Honor wants to proceed, we'll proceed.

THE COURT: I have read the file, so I don't know that I need an opening, but if you want to make one, I'll let you make one.

MR. SALAZAR: I -- I can be very brief.

THE COURT: Okay. That's fine.

Oh, Madam Court Reporter, can I get your name?

THE REPORTER: Hillary Koby, Esquire Solutions.

THE COURT: Thank you.

THE REPORTER: Thank you.

MR. SALAZAR: Your Honor, the -- the -- as we see it, the facts in this case are not overly complex. The plaintiffs have a series of lender-borrower relationships with what I will refer to generically as the R&R Express entities. It's -- it's a group of companies that are in the logistics business. And

collectively, when you refer just to R&R Express, it refers to a number of entities that are identified in the -- in the -- what will be Exhibit 1, the mortgage and security agreement.

You'll see that it lists -- lists a number of entities. The main relationship, the relationship that has the highest dollar value, is the revolving line of credit that the lender, both Huntington Bank and another participating lender, agreed to lend, or agreed to make available to these group of companies, the R&R Express companies generally.

Okay. Now, in this particular matter involving the lis pendens, and frankly, the underlying claim truly involves one affiliate, and that company is named R&R Express Properties, LLC. That -- that company is not in the logistics business. That company is basically a holding company for a couple of pieces of property.

In the -- in the case -- in the piece of property that we're fighting over today, Huntington Bank lent -- issued and lent a mortgage -- issued a mortgage to R&R Express Properties, LLC, in roughly -- in the -- in the amount of $6 million, secured by a residential property on Marco Island.

Now, why -- why we are here today is because

the R&R Express companies generally are in economic trouble. They have sought to obtain additional financing that Huntington Bank has not been willing to provide, and Huntington Bank -- Huntington Bank has actually suggested that the companies be liquidated.

So -- and so what has happened now, though, is in late 2025, R&R Express Properties took this -- took this Marco Island property, which it had purchased for roughly 8,750,000 and had -- and had initially a $6 million mortgage on. They transferred the property to the Francises.

And in the case -- and in the Francises -- particularly Richard Francis, is sort of the -- the ultimate owner behind most of these -- behind most of these companies. He's either the sole owner ultimately, or perhaps he's the majority owner with a couple of -- of minor owners mixed in.

But what's happened was on the December 29 of the -- of 2025, a special warranty deed was executed transferring the property, the -- the Marco Island property, from Huntington Bank to the Francises. Now, there's a couple of problems with this transfer.

First and foremost, there was a provision in the main security mortgage -- excuse me, in the main credit security agreement that governs the relationship

that says you can't transfer -- no co- borrower, no one can transfer property, can transfer assets away. And R&R Express Properties, LLC, is one of the specific parties to that agreement.

So by conducting that transfer, they engaged in a violation of the -- of the credit security agreement. And then the bigger problem is the transfer was done for virtually no consideration other than the assumption, the net assumption by the Francises of the outstanding mortgage. In other words, when R&R Express transferred this property to the Francises, they didn't get anything for it except -- except, you know, the Francises then tried to refinance the mortgage.

And the problem with that is the property, depending upon which analysis you look at -- it was worth -- it was -- the purchase price was about 8,750,000 when R&R Express Properties purchased it. We have an appraisal that appraised it as high as $10.4 million.

Even the Francises' effort to refinance the mortgage, those documents reflect that their appraisal appraised the property at roughly $8,950,000. But when you look at the special warranty deed and it says the consideration paid, it says ten bucks. So the net effect of -- of this transfer is that the equity that

was in this property, because the mortgage amount at the time of the transfer was in the neighborhood of $5.3 million, what -- what the net effect of what happened was is R&R Express Properties transferred the equity in the property to -- to insiders for zero value.

Huntington Bank has brought claims against -- or has named R&R Express and has named the Francises for violation of the Florida Uniform Fraudulent Transfers Act. Frankly, you know, we submit that this transaction squarely fits into both -- both prongs of that Act, that it was -- that this transfer was made with an actual intent to defraud creditors, or at a minimum, it was made at a time in which that -- made -- the transfer was made with no equivalent -- but with no reasonable equivalent value, and was made while the company was insolvent.

Mr. Beatty will be able to testify here today about the financial troubles that the R&R Express companies as a whole are having, and that how -- and why the recommendation has been from Huntington Bank that they should basically wind down.

But again, this transfer was made, a transfer that R&R Express Properties did not notify Huntington of before they did it. And that's -- and the reason

for that, candidly, is because they knew they were going to be in violation of the security agreement.

MS. RODRIGUEZ: Objection.

MR. SALAZAR: The I'll -- I'll rephrase.

The fact is that transaction was made. Huntington was never informed. Huntington had contractual rights to object to that transfer or at least to put conditions on that transfer. And again, given the fact that the transfer was made with -- for no value, no extra value other than the amount of the mortgage, the net effect of the transfer was to take away from -- from R&R Express value of anywhere from $3 to 5 million.

And that is -- and that is value that unsecured creditors could ultimately use to, you know, satisfy some of the outstanding debts that R&R Express has and will continue to have.

In terms of -- in terms of applying for the lis pendens, Your Honor, you know, I've read the case law. Our standard is not necessarily that we have to prove our case outright, but that we have to prove there's enough of a dispute here that the -- the filing of a lis pendens, the granting of leave to file a list pendens is warranted.

Frankly, Your Honor, I think that the verified

complaint alone establishes sufficient basis for the lis pendens. We're willing to, you know, obviously, introduce any other evidence that -- that's here today. I note that the -- all the lis pendens all the lis pendens is designed to do is to put third parties on notice.

To the extent that there's now an attempt by the Francises to further transfer this property and to try and transfer it to a purchaser, you know, in good faith for value, that there's a notification on record that this -- that the ownership of this property is being contested and that the lis pendens should remain until the -- the dispute is either resolved or -- or decided by the Court.

There's nothing about a lis pendens that will keep the Francises from continuing to use and enjoy the property, which I believe the records will show that they're trying to -- they're using it as -- as homestead property. And again, nothing about a lis pendens prevents that. But for to preserve the ability of the Court, ultimately to grant relief in the form of voiding the transfer, the plaintiffs respectfully press that the best use of this Court's discretion is to -- is to use the lis pendens to grant us leave to file the lis pendens.

Thank you, Your Honor.

THE COURT: All right. Thank you.

Ms. Rodriguez, do you have any opening?

MS. RODRIGUEZ: Good afternoon, Your Honor.

I agree with some of what Mr. Salazar said. There are multiple entities who do business with Huntington in various capacities, and there are relationships there. This case, it may not be complex, but it's a bit odd. The evidence will show that R&R Express Properties, LLC, owned real estate in Marco Island, Florida, and that Huntington Bank had a secured first position mortgage lien on that property for $6 million. That's not in dispute.

The doc stance disclosed and paid to the Florida Department of Revenue on that document was for 6 million -- a $6 million obligation. The intangible taxes disclosed on those documents and paid to the Florida Department of Revenue was for a $6 million obligation. There's no dispute about their first mortgage lien position on that property. There are restructuring efforts going on in the various companies. That is also true. We don't dispute that.

Again, my clients are the Francises individually, the homeowners. As part of aggressive liquidation efforts, sometimes things get sold. And

the Francises, evidence will show they went to Centennial Bank to take out their -- a loan in their own name, to purchase this asset out of the company to raise capital for R&R Express.

They went to Centennial Bank. Centennial Bank funded the loan. The closing agent, Ron Webster, which is a law firm locally here who handled the closing, relied upon two payoff codes generated by Huntington for this property. One was on December 18th. The other was on January 5th, 2026, to include additional per diem and interest that had accrued because of that holiday gap.

The evidence will show that Ron Webster's law office, serving as closing agent, wired that money to Huntington Bank. Huntington Bank took issue with the wire. The evidence will show they did not return it to the closing agent.

They filed suit a few days later that same month on January 23rd alleging an attempted fraudulent transfer on the property. Those are the claims at issue in this case, two UFTA claims for the Marco Island property.

Oddly, they do not return them -- Huntington does not return $5.3 million to the transfer, the closing agent, so the closing agent could interplead

the funds with the Court.

MR. SALAZAR: Yeah.

MS. RODRIGUEZ: Huntington does not interplead the funds with the Court. Huntington, while this suit is pending, forwards my client's purchase money mortgage funds to a third-party creditor who has since released their lien.

And it's put my clients in a very awkward position. And then brazenly, we're here now because Huntington is claiming that this was a fraudulent transfer that wasn't for value or consideration. They forwarded my client's mortgage funds to a third party. The horse had left the barn. We don't think there's any legal remedy to make that bank now interpleaded back. And they're claiming fraudulent transfer despite providing two payoff quotes on what it would take to release their mortgage.

So, now we're here on two claims for UFTA. And I -- you know, this hearing might be easier than some, Your Honor, because we use a lot of the same cases in our respective briefing on lis pendens issues. And there seems to be a concession from Counsel that this isn't actually about the $6 million mortgage lien, because if it was, they would have that -- as -- as a matter of right under 4823, you can just lis pendens a

property if you're seeking mortgage foreclosure, which isn't what they're seeking here.

So, since it's not based on a duly recorded instrument, they're requesting leave of court to attach a lis pendens to the property. So, they have an additional tie to the property in excess of the recorded first position $6 million mortgage, which again, is not released of record because they rejected the payoff funds in either late January or early February.

So, the standard -- we agree on the standard. The standard, then, since there isn't a duly recorded instrument at issue here, is, is there a fair nexus between what the claims are and the property? And as part of that analysis, Plaintiff's own cases say that, yes, the Court does have to review what the claims are and yes, not pre-try the entire case, but if -- you do have to look at the merits somewhat today.

And this is from the Chiusolo versus Kennedy case, the Supreme Court case, 1993. We both cited to it in our respective briefing. The proponent of the lis pendens bears the burden of showing that the claim affects the real property in question and that there is a substantial likelihood of success on the merits. So, it's a little bit more than just reviewing if the claim

alleges the property.

There is a threshold success on the merits review that has to take place before Your Honor can determine whether affixing the lis pendens is proper. Defendants take the position that it would not be. The world is already on notice that Huntington Bank has a $6 million lien -- first position lien interest in this property. So, the suggestion that it could be sold without them being paid, especially with the facts we have here, is not convincing.

To the extent Your Honor may ultimately disagree with Defendants, the case law that both sides have cited to make it very clear that the second step after the fair nexus analysis, if Plaintiff survives that threshold analysis, is what bond is appropriate. What this relief would do is tie up my client's homestead property for the foreseeable future while this case gets litigated.

And as Counsel said, and as we raised in our motion to dismiss, which isn't going to be heard today, but we might get into it a little bit because we have to discuss the merits of the case for purposes of the fair nexus prong of the analysis, UFTA bars relief if there's a lien interest in the property. And there's no dispute here that mortgage -- their mortgage lien is

a first position lien interest in the property. So as we raise -- raised in our motion to dismiss, they can't get UFTA relief.

Now, could they cure that by amending to seek some other kind of relief? Like -- like Counsel said, there are different relationships here and different transactions. Perhaps, but we're not there yet. We're here on the complaint they've currently pleaded. And what they pleaded for is two -- two counts of UFTA relief, which the case law is very clear, you cannot get if there is a lien position on the property, which this property has. So, they are protected.

The relief they're seeking in their current -- the current iteration of their complaint, we believe will be dismissed, possibly relief to amend. But what this really is in -- in Defendant's view, as laid out in our briefing, is an attempt at an impermissible prejudgment writ of attachment. They're secured up to $6 million on this property.

What -- the relief they are seeking from this Court is for -- because of these other relationships with companies that are not pleaded into this case, are not before, Your Honor, Your Honor does not currently have jurisdiction over any of the parties that they're talking about except for R&R Express, the seller, that

because of these other relationships and interwoven debts with Huntington, they should be allowed to lis pendens to the property.

It would be tantamount to an injunction as to my clients, and it would be tantamount to an impermissible pre-judgment rid of attachment, and that is our view.

Thank you, Your Honor.

THE COURT: All right. Thank you.

Anything from you, Mr. Anthony?

MR. ANTHONY: No, Your Honor. We -- we were shocked when we were sued. We thought we were making a standard loan on a very nice house from our mortgage department. When we read the newspaper and saw how horrible we were, we tried to figure out what was going on. We demanded the funds, and we received the funds. We applied them as a credit on the debt of the Francises.

There's still some money left over. We dropped all of our counts against Huntington in our cross-claim. We dropped all but one of our cross-claim counts -- counter-claims against Huntington, our cross-claim counts, we dropped all but one of them, a breach of contract claim against the Francises because they still owe some of the money. It didn't -- it

didn't end up quite getting us even.

So we're -- we're still on board, hoping to get even with respect to the balance of our debt. We're not, like, a third-party that's -- third party, to me, connotes somebody who's driving by the courthouse, not joined as a defendant in a fraud case because they made a loan to the Francises. So, we're a party. And -- but we released our lien because we have other collateral within the bank that has been frozen to secure the residual balance.

And so we -- short of it is, we don't have a dog in this particular hunt, even though we have not managed to get ourselves completely out of the case.

THE COURT: Understood.

All right. Mr. Salazar?

MR. SALAZAR: Your Honor, we have one witness, a Mr. Matt Beatty.

THE COURT: Okay. You can come to the witness stand.

THE BAILIFF: Step on the stand. Raise your right hand to be sworn.

MATTHEW BEATTY,

having been first duly sworn, testified as follows:

THE REPORTER: Thank you.

THE BAILIFF: Proceed on the stand.

DIRECT EXAMINATION

BY MR. SALAZAR:

Q. Mr. Beatty, could you please state your full name?

A. Sure. Matthew Beatty.

Q. Who are you employed by?

A. Huntington National Bank.

Q. What do you do for Huntington National Bank?

A. I'm a special assets officer.

Q. What does a special assets officer for Huntington Bank do?

A. We handle distressed commercial loans, meaning loans that are higher risk of default, maybe are out of business or, you know, basically at risk of not getting the balance paid in full.

Q. How many years of experience do you have as a special assets officer?

A. 15.

Q. Okay. Are you familiar with a group of companies called R&R Express?

A. Yes, I am.

Q. What type of -- well, does Huntington Bank have any sort of business relationship with the R&R Express Company Group, I'll call it?

A. Yes. We have a fairly extensive relationship

with them. We have term debts, revolving lines of credit, and specifically a -- a mortgage loan to R&R Express properties.

Q. Now -- and how are you aware of this relationship?

A. I manage the relationship.

Q. How long have you managed the relationship?

A. Four months.

Q. And -- and just for edification, what is -- what's a revolving line of credit?

A. A revolving credit -- and most people would be familiar with, like, a home equity line of credit. So similar to that. It's -- you know, a loan, you get about -- you'll have a limit, say $50 million, and you'll have to draw up until that much and pay and borrow against that.

Q. What other type of loans does Huntington Bank maintain with the R&R Express companies, generally?

A. There's a term loan, there's some equipment loans, and then there's a mortgage loan to the Marco Island property.

Q. What is -- what is a term loan?

A. It is a loan with a specific balance. Say you purchase a piece of equipment or a piece of property, and you make monthly payments on a regular basis until

the balance is paid for.
Q. And -- and then -- and then what was the last loan that you referred to?
A. The Marco Island loan? The mortgage to Marco Island or --
Q. What --
A. -- the equipment loans?
Q. Yeah. I just want to make sure what that refers to.
A. Which ones? The equipment loans or the Marco Island?
Q. The Marco Island one.
A. The loan that was secured by the property here in Florida, mortgaged on --
Q. Is Huntington the sole lender in connection with these relationships with the R&R Express companies?
A. No. There's another participant, S&T Bank.
Q. And which of the loans that you have referenced does S&T Bank also participate in?
A. The revolving loan and the term loan to that is secured by the corporate headquarters in Pittsburgh.
Q. Did Huntington Bank enter into a specific agreement with R&R Express governing the revolving line of credit?

A. Yes. There is a credit and security agreement that -- that governs that.

MR. SALAZAR: May I approach, Your Honor?

THE COURT: You may.

(Sotto voce discussion between Court and Counsel.)

BY MR. SALAZAR:

Q. Mr. Beatty, I've handed you what has been marked as Plaintiff's Exhibit 1. It's in the binder. I wanted to see if you can open that and tell me if you can identify the document.

A. Yes. This is the second amended restated credit security agreement.

Q. And -- and could you tell me what the purpose of that agreement is?

A. This essentially governs the entire lending relationship. It defines the terms and everything and, you know, covenant structure and things of that nature.

MR. SALAZAR: Your Honor, I actually have a courtesy copy for you if you'd like it, but I'll understand if you don't want it.

THE WITNESS: It's a heck of a paperweight.

THE COURT: It -- it is. You can pass it to the bailiff. I don't know if I need it, but we'll see.

BY MR. SALAZAR:

Q. Mr. Beatty, could you turn to the first page

of the document that's been marked as Plaintiff's Exhibit 1?

MR. SALAZAR: Well, actually, let me back up. I move Plaintiff's Exhibit 1 into evidence.

Is there any objection?

MS. RODRIGUEZ: No objection.

THE COURT: It will be admitted.

(Plaintiff's Exhibit 1 was marked for identification.)

BY MR. SALAZAR:

Q. Mr. Beatty, could you turn to the first page of -- of the document?

A. Sure.

Q. And -- and read the title of it to make sure we're all on the same page.

A. Sure. It's says, "Second amended and restated credit and security agreement among Huntington National Bank and," -- do you want me list all these lenders -- I mean, all these entities? I think --

Q. Not -- not necessarily. I just want to make sure we're on the same page.

A. Oh, okay. Sure. Sure.

Q. Now, the -- the attachments, the -- the ten tabs to the attachment, what do those represent?

A. Each varying sections of the -- of the

agreement. And these -- actually, let me take a look here.

So these are the amendments, First amendment, second amendment. So there was various amendments done over the years to this to -- this document.

Q. Okay. Now, is -- is R&R Express Properties, LLC, identified as a party to this agreement?

A. Yes. R&R Express Properties is listed as a co-borrower on this, as a borrower.

Q. Okay. Can you just describe generally where it's listed on Page 1?

A. Sure. It's about halfway down, just below AGX Freight and Modal, LLC.

Q. Now, can you turn to -- to Section 7.1 of this agreement? It is -- I'll get a page number for you in a minute. Page 68.

A. Okay.

Q. Do you see the part that reads, "Merger, consolidation, acquisition, and sale of assets?"

A. I do.

Q. All right. Looking at 7.1B, can you read that in conjunction with the -- with the prefatory paragraph that starts "the covenant"?

A. Sure. "No one party or subsidiary thereof, until satisfaction in full of the obligations and

termination of this agreement shall sell, pledge, lease, transfer, or otherwise dispose of any of its properties or assets other than the sales or dispositions of equipment that is substantially worn, damaged, or obsolete, not to exceed in the aggregate sum of $500,000 in any consecutive 12-month period.

"Sales of inventory to account debtors in the ordinary course of business, the licensing on a non-exclusive basis of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, and leases, including leases to own tractors and trailers entered into in the ordinary course of business or applicable -- applicable loan party or subsidiary is the lesser and the lessee as an owner/operator, and in the transfer of equity in connection with the employment issuance."

Q. Now, is -- is that a standard provision in a credit security agreement?

A. Yes, it is pretty standard.

Q. And -- and why do -- do you why -- when I say "standard," standard for Huntington?

A. I think standing in the -- standard in the banking industry in general.

Q. Do you know why that is?

A. Yes. To prevent a company from selling assets

that are pledged -- or selling assets in general, I should say. I would correct myself, selling assets in general without permission of the -- of the lender.

Q. What is R&R Express Properties; to your knowledge?

A. A real estate holding company for the for the R&R Express relationship.

Q. Do you know what assets R&R Express Properties holds?

A. Up until December, they held the Marco Island property, and currently, the other asset they hold is the -- the real estate the corporate headquarters real estate located in Pittsburgh.

Q. Do you know what type of property the Marco Island Property is?

A. I -- sure. It's a residential waterfront property.

Q. Do you know who owns R&R Express Properties, LLC?

A. Ultimately, it's Richard Francis.

Q. Is that -- is Richard Francis the ultimate owner of all of the other R&R Express companies?

A. Most of them. There's -- there's an entity or two that has the minority ownership, but it's generally Richard Francis for the most part.

Q. Okay. As we sit here today, what monies does R&R Express Properties owe Huntington Bank?

A. On the revolving line of credit, it owes $12.2 million. For the Marco Island property, it owes 5.3. For the real estate secured by the Pittsburgh property, it is 2.9 million, and there are $2.3 million in equipment loans.

Q. We talked a little bit about -- about the Marco Island property. We've used the term -- or at least I think we used the term "Marco Island mortgage loan."

Can you describe for me what that loan is?

A. What the loan is? Sure. It's -- well, I'll -- so -- so what it is, essentially, is just a -- a term, same idea that -- we lent them $6 million to purchase the property and repay it through monthly payments. Now, that property specifically was fully -- originally fully funded by the line of credit. The full -- the full $8.75 million purchase price was fully funded by the revolving line of credit with the intention that mortgage would be put in place in the future.

But S&T decided they wanted -- did not want to participate in that particular loan, and Huntington agreed to provide the $6 million mortgage. So once

that mortgage was granted, that $6 million was then in turn, repaid the line of credit.

MR. SALAZAR: May I approach, Your Honor?

THE COURT: You may.

(Sotto voce discussion between Counsel.)

BY MR. SALAZAR:

Q. Mr. Beatty, I'm handing you what has been marked as Plaintiff's Exhibit 2 and Plaintiff's Exhibit 3.

A. Yes.

Q. I'm asking you to review those documents and let me know when you finish.

A. Sure. Okay.

Q. Do you recognize what has been marked as Plaintiff's Exhibit 2?

A. Yes, I do.

Q. Please -- please state for the Court what that document is.

A. It's the mortgage security agreement, assignment of leases and rents fixture filing.

Q. And who are the parties to that agreement?

A. R&R Express Property and Huntington National Bank.

Q. And then -- and then please identify what Exhibit 3 is.

A. There's the mortgage note.

Q. And who are the parties to that note?

A. Also R&R -- R&R Express Properties and the Huntington National Bank.

MR. SALAZAR: Okay. Move to admit Plaintiffs two and three into evidence, Your Honor.

MS. RODRIGUEZ: No objection, Judge.

THE COURT: They'll be admitted.

(Plaintiffs Exhibits 2 and 3 were marked for identification.)

THE COURT: Do you have a copy for the Court?

MR. SALAZAR: I do.

THE COURT: I don't think that's it.

MR. SALAZAR: You're right. That's not it.

THE COURT: No.

MR. SALAZAR: This one is 3. This is not it.

THE COURT: No. If you want to wait until you're done with the witness and then give me his copy, that's fine.

MR. SALAZAR: Okay. I do -- I do have a copy of what's Exhibit 3, the mortgage note.

THE COURT: Okay.

MR. SALAZAR: Hand it to the bailiff, or --

THE COURT: Yeah.

BY MR. SALAZAR:

Q. Why was the mortgage loan on the Marco Island property only made by Huntington as opposed to Huntington in conjunction with any other lenders?

A. S&T Bank did not -- or wasn't interested in participating in that particular loan, and Huntington agreed to it because the value of the collateral exceeded the loan balance, and it was viewed that there was excess equity that could be tapped by Armor Express Property's creditors if necessary. And with the -- and the -- both -- that their inability to transfer the property as defined in the loan agreements made us feel comfortable to the external loan.

Q. As of -- well, let me put it this way. How much -- by 2025, how much equity did Huntington Bank maintain that was in the Marco Island property?

MS. RODRIGUEZ: Objection, Your Honor.

THE COURT: What's your objection?

MS. RODRIGUEZ: That he would be testifying to facts not in evidence. There's no valuation -- there's no expert valuation before this court.

MR. SALAZAR: I'm about to -- I'm about to --

THE COURT: Okay.

MR. SALAZAR: -- ask him about it --

THE COURT: Okay. Sustained.

MR. SALAZAR: -- during the break.

THE COURT: Overruled.

MR. SALAZAR: I'll -- well, I'll attempt to go with this.

THE COURT: Sorry.

BY MR. SALAZAR:

Q. At any time, did Huntington Bank ever have the Marco Island property appraised?

A. Yes. In December of 2024, we had an appraisal done.

Q. Now, why did you have -- why did Huntington Bank have an appraisal done?

A. It's just -- in ordinary course of business. We typically get valuations on a collateral from time to time just to understand valuation.

MR. SALAZAR: May I approach, Your Honor?

THE COURT: You may.

BY MR. SALAZAR:

Q. Mr. Beatty, I have handed you what has been marked as Plaintiff's Exhibit 4, and I ask you to identify that document.

A. Oh, yeah, sure. This is the appraisal. I just referenced. It was -- it was done in December of 2024.

Q. And just to be clear, what is it that this is an appraisal of?

A. The -- the property that's shared by the Marco Island at 550 South Barfield Drive.

Q. And -- and at the time of this appraisal, what was the balance of the mortgage -- roughly, what was the balance of the mortgage on the -- on the Huntington -- on the property held by Huntington Bank?

A. At the time of the appraisal, it was probably about $5.7 million.

MR. SALAZAR: Your Honor, move Plaintiff's Exhibit 4 into evidence.

THE COURT: Any objection?

THE WITNESS: No objection, Your Honor.

THE COURT: That will be admitted.

(Plaintiff's Exhibit 4 was marked for identification.)

BY MR. SALAZAR:

Q. Now, Mr. Beatty, what was the appraisal -- what was the amount at which the Marco Island property was appraised at in Plaintiff's Exhibit 4?

A. $10.4 million.

Q. And just so we're clear, what date was that -- what -- what date was associated with that appraisal?

A. December 12th, 2024.

Q. I'm sorry. I'd hate to repeat the question was -- but I can't remember what the answer was. I

forgot to write it down.
What was the -- what was the balance of the mortgage at the time of this appraisal was --
A. It was approximately 5.7 million.
Q. Can you describe for me, generally, the business of the R&R Express entities?
A. In general terms, they're a logistics company.
Q. And just -- just so we -- we're -- all agree what logistics -- what -- what do you mean by?
A. Sure. I mean, it's mostly associated with the trucking industry. They -- they manage the process of moving truck loads of whatever the product may be from the shipper to the ultimate customers.
Q. Okay. But what was happening to R&R -- R&R's financial performance in late 2025?
A. In late 2025, they entered into what we call the liquidity crunch, which is a shortfall of cash flow. They didn't have enough cash coming through the business to support their day-to-day operations.
Q. Did R&R Express ever propose with Huntington Bank how to deal with this cash flow problem?
A. Yes. They actually consulted a -- what we call a chief -- well not -- what we call what is called a chief restructuring officer. So they engaged a chief restructuring officer, I think, around mid-November,

and they actually developed a plan.

And what their proposal was to us in early December was for the bank group to provide them upwards of $25 million in additional borrowings to get them through to March of this year with the hopes that they'd be able to turn things around and maybe sell some assets. But ultimately, the plan didn't have any specifics on how to re-pay our debt, get us back on a path to normal operations.

Q. So I take it that -- did -- did Huntington agree with the workout plan?

A. No, he did not. No.

Q. What --what is the current status of the R&R Express companies today; to your knowledge?

A. They are all in liquidation at this -- at this juncture.

Q. In December of 2025, what was the level of communications between Huntington Bank and -- let me put it -- and -- and say in December 2025, what was the frequency of communications between Huntington Bank and representatives of R&R Express companies regarding their financial situation?

A. It was almost near daily basis. Now, a lot of the conversations were held between counsel, but they were talking on a daily basis. The CRO was holding at

minimum, a weekly call with all parties involved, and IT was having fairly consistent conversations with the CRO as well as a -- in a one-off.

Q. During -- during these communications, are you aware of any instance in which R&R Express Properties indicated that it was going to transfer the Marco Island property?

A. No. No. It was never made, no.

Q. Did R&R Express Properties transfer the Marco Island property?

A. Yes, they did.

Q. Can you describe the circumstances of how Huntington learned of the transfer of the Marco Island property?

A. Yes. So on the morning of January 5th, a payoff was sent to Richard Francis. And later that afternoon, we received a full payoff. We received a payoff wired to us. I received notification of it. It caught me by surprise because I wasn't expecting a payoff to be coming in because nothing had ever been disclosed to us up until that point.

So when that occurred, I informed our counsel of what had transpired, and they -- they began looking into it and then determined that Mr. Francis had transferred the deed on December 29th into his name

individually. And his wife too, I should add.

Q. Now, when you received a payoff request, which -- which -- well, let's -- let's understand.

What do you mean by a payoff request?

A. In this particular instance, Mr. Francis called the customer service department to get the payoff quote, which is a bit outside of the norm in a -- with a relationship of this size, typically, that -- that request would be either come directly to me or given the fact that our respective counsels were in daily communications, it usually should have been vetted through counsel and made its way down to me. So at -- at no time was that -- did that occur at all. It seemed like he was trying to circumvent our typical processes.

MS. RODRIGUEZ: Objection, Your Honor.

MR. SALAZAR: Fair.

THE COURT: Sustained.

MR. SALAZAR: Is -- is that the entire -- is the entire answer objected to, or just --

MS. RODRIGUEZ: The last part or just the last part.

MR. SALAZAR: Okay.

BY MR. SALAZAR:

Q. When -- when you -- when you learned of the

payoff request, did you assume that the property that the Marco Island property had been transferred by R&R Express?

A. No. I would have no reason to expect it to be transferred because it was expressly prohibited in the loan documents.

Q. Can you identify generally, the circumstance? Well -- let me put it like this: Do you assume that when you receive a payoff request that because the -- the mortgage is about to be paid off?

A. No. No, not at all. I mean, there are instances where payoff requests are made -- it is strictly for informational purposes only. Typically, if a payoff is coming -- if a payoff is actually forthcoming, I usually know about it. It's not a surprise, and it's typically not made the same day as a request.

Q. Now, in relation to the payoff -- let me rephrase.

Upon -- upon providing R&R Express with the amount of the payoff for the mortgage, how quickly did -- did Huntington receive the -- the request the funds to satisfy that request?

A. It was the same day. I mean, we received a request approximately 9:00 in the morning, and I think

I received notification, say, 3:00 in the afternoon, 3:30 in that -- the same afternoon, on January 5th.

Q. Did you consider that quick payment to be unusual?

A. Yes. It -- it did seem to be a very unusual.

Q. Do you recall who the payoff -- do you -- do you recall who the transmission of the payoff request came from?

A. Who -- who submitted the actual payoff?

Q. Yeah.

A. Ronald Webster did.

Q. Now, did you know the name Ronald Webster before that time?

A. No, I was --

Q. Was Mr. Webster one of the attorneys that R&R Express properties that had been communicating on behalf of R&R Express properties to Huntington during this time?

A. No, he was not.

Q. But there were other attorneys on behalf of R&R Express that had been communicating with Huntington, correct?

A. Yes, that's correct.

Q. How did Huntington find out about the transfer of the property -- of the Marco Island property?

A. Sure. As as I stated earlier, after we received the payoff, we had our -- our counsel look into what happened, and they discovered a special warranty deed had been recorded on or around December 29th, 2025.

Q. Now, after -- after discovering this transfer, what steps did Huntington take to -- to assert his rights?

A. I believe our counsel put everybody on notice about -- about that. They -- I think they sent some letters to -- to Ron Webster, and I guess they also reached out to Centennial Bank, ultimately through our attorneys to discuss the transfer and -- and convey that we thought it was a fraudulent transfer.

MR. SALAZAR: May I approach, Your Honor?

THE COURT: You may.

BY MR. SALAZAR:

Q. Mr. Beatty, can you review what has been marked as Plaintiff's Exhibit 5 and tell me if you recognize it?

A. Yes. It's a special warranty deed from R&R Express properties transferring the Marco Island property to Richard and Kathleen Francises' names individual -- individually.

Q. Now, can you read the small print on top that

looks like it was a stamp some -- sort of file stamp?

A. The instrument number at the top, is that what you're referring to?

Q. Yes.

A. Sure. Instrument 676834646540, Page 1336. Recorded 12-29-25 at 3:44 p.m.

Do you need the rest of it, the clerk and all that?

Q. No. What I'm going to -- what I'm going to -- do you see the part where it says, "doc?" D-O-C.

A. Yeah.

Q. Can you read the monetary amount that's next to it?

A. That's $0.70? Or is it -- I don't know, it looks like it says, Doc, $0.70 recorded in 1850 and whatever C-O-N-S, $10. Consideration, $10.

MR. SALAZAR: Your Honor, move to admit Plaintiff's Exhibit 5.

MS. RODRIGUEZ: No objection.

THE COURT: Okay. That'll be admitted.

(Plaintiff's Exhibit 5 was marked for identification.)

MR. SALAZAR: And I have a courtesy copy.

THE COURT: Okay. Officer, can you get the coursed copy for me? Thank you.

THE BAILIFF: You're welcome.

BY MR. SALAZAR:

Q. Now, did R&R Express Properties, LLC, ask permission to transfer the Marco Island property to the Francises individually?

A. No, no, they did not.

Q. Had they requested, would Huntington have consented to the transfer?

A. No.

Q. In your view, is R&R Express Properties, LLC insolvent?

A. Yes, it is insolvent.

Q. Why -- why do you -- what's your basis for that?

A. At this particular time, the debts outstanding to R&R Express properties exceed $20 million, and -- which includes -- because they were a co- borrower on the revolver, including the Marco Island property and the -- the term loan here with the property in Pittsburgh.

And the only asset that it truly owns now is the property in Pittsburgh, which we estimate to be valued at about $3.5 million. So the debts far out -- far out exceed the assets.

Q. Did the transfer of the Marco Island property

done without Huntington consent harm Huntington?
A. Yes. Because Huntington as a creditors would -- would have been entitled to any excess equity in the property on Marco Island.
Q. At any time, has R&R Express Properties indicated it's willing to rescind the transfer?
A. No.
Q. Do you know if there was a financial institution involved in the payment transmitted to Huntington Bank for the mortgage payoff?
A. Yes, it was Centennial Bank.
Q. Ultimately, what happened to the funds that came from Centennial Bank to pay off that mortgage?
A. We held them for a period of time and ultimately transferred them back to Centennial Bank.
MR. SALAZAR: Can I have a moment, Your Honor? I'm almost done.
THE COURT: No problem.
(Sotto voce discussion between Counsel.)
MR. SALAZAR: May -- may I approach, Your Honor?
THE COURT: You may.
BY MR. SALAZAR:
Q. Mr. Beatty, I'm handing you what has been marked, I believe, as Plaintiff's Exhibit 6.

Can you identify that document for me?

A. Sure. It's a -- a notice of default that was sent to R&R Express Hold Company on January 5th, 2026.

Q. Okay. Why was that letter sent?

A. So we had agreed that the company would need to deliver the restructuring plan that was acceptable to the agent lenders for payment -- repayment for the obligations by December 19th -- 19 -- 2025. And we did not determine that that plan they had submitted was -- was acceptable.

Q. Now, prior to the sending of this letter, had there been communications with R&R Express about the concept of them being -- being held in default?

A. Yes. They -- they were very aware of this requirement and they -- they had agreed to it.

MR. SALAZAR: Your Honor, moved to admit Plaintiff's Exhibit 6.

THE COURT: Any objection?

That will be admitted.

(Plaintiff's Exhibit 6 has been marked for identification.)

MR. SALAZAR: Oh, I think that's it.

Your Honor, I tendered the witness for cross.

THE COURT: Okay. Ms. Rodriguez?

MS. RODRIGUEZ: Thank you, Your Honor.

Quick housekeeping question. I did stay within the scope of direct, but I think Mr. Beatty traveled here, so if it's acceptable to you, Mr. Salazar, I'll go through all of my questions for Mr. Beatty and go outside of direct, or I can let you finish and recall him in my defense.

It's your -- it's your call. Just let me know.

MR. SALAZAR: I wasn't planning on making an objection beyond the scope of direct, Your Honor.

MS. RODRIGUEZ: Okay.

THE COURT: Okay.

MS. RODRIGUEZ: Okay. Then with -- then, Your Honor, my next question is: With respect to questions that may go outside the scope of direct, permission to treat the witness as hostile?

THE COURT: You may.

MS. RODRIGUEZ: Thank you.

CROSS-EXAMINATION

BY MS. RODRIGUEZ:

Q. Mr. Beatty, good afternoon. Earlier, you testified that your title is special asset manager at Huntington Bank, correct?

A. Yes.

Q. And you said you've been doing that type of

work for 15 years?
A. Yes, correct.
Q. Has -- has that -- all 15 years been at Huntington, or have you worked for other financial institutions?
A. Other financial institutions. I --
Q. Such as?
A. PNC Bank.
Q. Okay. Any others?
A. I worked at Citizens Bank, but I wasn't in -- in this type of position at Citizens Bank.
Q. What was your position at Citizens Bank?
A. I was an underwriter, new money underwriter.
Q. Okay. So when -- those 15 years encompass all of that banking career?
A. No. The 15 -- I excluded the Citizens -- I excluded my time at Citizens, when I'm referring to time and workout -- so the time and workout was 15 years between PNC and Huntington Bank.
Q. Okay. And how long have you been employed by Huntington Bank?
A. Eight years.
Q. Okay. Have you held any other job titles there besides special asset manager?
A. No. I've only worked in our special assets

group the entire time.
     Q.  Okay.  So you've been in that position for a while for -- Huntington?
     A.  Yes.
     Q.  And do you mind giving us just a brief background on your education, particularly with respect to finance?
     A.  Yeah, sure.  My -- my degree is in management, actually.  So I have a Bachelor of Science in management.
     Q.  Okay.  Any graduate degrees?
     A.  No.
     Q.  Okay.  Have you ever been a licensed CPA?
     A.  No.
     Q.  Have you ever been a licensed attorney?
     A.  No.
     Q.  Have you ever been a licensed real estate appraiser?
     A.  No.
     Q.  In your capacity as special asset manager for Huntington Bank, do you receive ongoing training for that position?
     A.  As far as --
     Q.  Do you receive training on any company policies or procedures in the course of that work?

A. Oh, yes. Yes. I mean, we do online trainings on a consistent basis, yes.
Q. What -- what does consistent mean to you? Monthly, annually?
A. Monthly -- monthly. I mean, it varies from quarter to quarter. So -- I mean, probably, yes, I'd say monthly.
Q. And is that training internal?
Sorry, I cut you off. Were you doing?
A. No, go ahead, ma'am.
Q. Okay. Is that training conducted internally, or does Huntington utilize a vendor to train your position?
A. Internally.
Q. Internally. Okay. Do you recall the last time you had training for your position, the most recent?
A. I don't want to say.
Q. Okay. In part of your role as special asset manager for Huntington Bank, you testified earlier to dealing with loan workouts and loans that have issues?
A. Correct. Yes.
Q. Okay. Do you ever deal with loan payoffs in those scenarios in your role as special asset manager for Huntington Bank?

A. Yes.

Q. How routinely would you say?

A. How -- several times a year, I'd say.

Q. Okay. And in your training -- where is Huntington located?

A. Our corporate headquarters is located in Columbus, Ohio.

Q. Is that where you report? Is that what -- the office you work out of?

A. I work out of Pittsburgh, Pennsylvania.

Q. Okay. In your training that you received internally as special asset manager, do you receive any training on Florida law and payoffs?

A. No.

Q. Okay. Did you verify the complaints in this case?

A. Yes.

Q. What did you review to confirm the accuracy of the allegations in the complaint in this case?

A. What did I review? Financial statements. I'm trying to think what else was in there -- was in the complaint. Financial statements, primarily.

Q. What else?

A. I mean, I can't recall, but also something I referred to whenever I -- when I would verify the

complaint.

Q. Okay. Earlier, you were testifying about that big binder there, Plaintiff's Exhibit 1, which is an agreement with ten amendments.

Did you review those documents in preparing to verify the complaint for Huntington Bank in this case?

A. Yeah. I guess I should have. I never said before, but yes, I mean, I -- I have reviewed all the loan documents. I did that prior too. So I -- so I do that upon -- once the loan ownership is transferred to me, I review the loan documents at that point in time and become familiar with it.

So I had already reviewed them prior to the complaint was familiar.

Q. Okay. Do you know why the complaint excluded the ten amendments to that agreement, which are Tabs 1 through 10?

A. Why they were excluded? I thought it was -- we were just basing off the primary the -- the main parent security agreement. Maybe the other ten was -- it's not much.

Q. Okay. In your review of the loan documents and preparing to verify Huntington Bank's complaint in this case, did you see that the Marco Islands property is excluded as real property in the subsequent

amendments to that agreement?

A. Yes. I was aware it said it was excluded as -- as collateral, correct.

Q. Okay. So is it your testimony that excluding the ten amendments to the governing loan document at issue in this case to your verified complaint was inadvertence and a mistake?

A. I mean, maybe it could have been considered an oversight, but I don't think it was intentional.

Q. Okay. Do you know that you signed the verified complaint under penalty of perjury?

MR. SALAZAR: (No verbal response.)

BY MS. RODRIGUEZ:

Q. Well it sounds like my questions asked to Mr. Salazar first.

Earlier, you testified that the bankruptcy agent -- I -- I wrote it down because you -- you said, and then you corrected yourself, "Full payoff for the mortgage."

Do you remember the day that wire came in?

A. Yeah. January 5th, 2026.

Q. Do you remember what time of day you found out that that wire came in?

A. It was around 3:00, 3:30.

Q. Okay. And what did you do when you found out

that wire came in?
A. Advised Counsel.
Q. Okay. Did you talk to anyone else in Huntington about that besides Counsel?
A. My leadership.
Q. Which -- who was that?
A. John Brian.
Q. Anyone else?
A. He was my team leader.
Q. Okay.
A. I believe I would -- I would have just told him.
Q. Did you say Brian or Brown?
A. John Brian.
Q. Brian. Okay. And is he head of workouts for Huntington?
A. He's my team leader.
Q. And what's your team called?
A. My team called?
Q. Well, you said you -- he's your team leader. Do you have a department name or a team name?
A. It's just our financial recovery unit. I mean, have --
Q. Financial recovery.
Okay. Earlier, you testified that Huntington

sent the $5.2 million back, if that's the word you used, "back" to Centennial.

A. Uh-huh.

Q. But isn't it true that Huntington received the payoff funds from a closing agent and not Centennial?

A. Yes, that's correct.

Q. So earlier when you testified that transferring this property is prohibited in the loan documents, that's what you said. "Transferring the property is prohibited in the loan documents."

Are you -- does -- do the addendums to this agreement, the subsequent amendments to this agreement, weigh into that testimony?

A. No.

Q. I'm asking because your verified the complaint excluded them, so I'm just trying to be consistent here. Did you keep that in mind when you gave that testimony earlier?

A. I know, because to my knowledge, it wouldn't have been changed in those subsequent documents.

Q. Okay. And you testified that the current balance of the mortgage loan is $5.3 million approximately, correct?

A. Yes.

Q. Are you taking into account the money

Huntington forwarded to another creditor when you come up with that number?

A. No.

Q. Okay. Isn't it true that if Huntington would have applied that money when it received it, the mortgage loan balance would actually be zero?

A. Yes.

Q. In the -- I think you said eight years you've been with Huntington, correct? And in the same role?

A. (No verbal response.)

Q. Is it unusual for Huntington to forward millions of dollars from a company in workout to a different bank without approval of the customer?

A. Yes. But I'd say the circumstances surrounding this all around are unusual.

Q. Is it Huntington's policy and procedure that if there's a questionable wire, it should be returned to the transferor?

A. I'm not sure specifically what the policy is surrounding that, so I can't speak to it.

Q. Who made the decision to send that money to a third party and not return it or inter-plead it with the court?

A. I believe our respective counsels made that decision.

Q. It wasn't your decision?
A. No.
Q. So on January 5th -- I believe this is in evidence. Yes. This is -- I'm going to be referring to Plaintiff's Exhibit 6.
On January 5th, Huntington generated this letter declaring R&R Express in default. Interestingly, the same day, $5.2 million was wired to pay off the mortgage.
Was that letter generated before or after Huntington found out this the funds were wired to the bank?
A. To be honest, I'm not sure.
Q. Well, you signed it. Would do you recall what time of day you signed it?
A. No, I -- I don't know.
Q. Is it possible that that letter was generated after Huntington received the funds and realized that the Francises had purchased the property from R&R and R&R was trying to pay down its debt with the bank?
A. Sure. It could be possible.
Q. Okay. But you're not sure what occurred first?
A. I -- no, I -- I do not recall.
Q. Okay.

MS. RODRIGUEZ: Okay. Just a moment, Your Honor.

May I approach, Your Honor?

THE COURT: You may.

MS. RODRIGUEZ: Counsel has already been handed copies. We've stipulated to the admissibility of my intended exhibits, Your Honor. They all aren't questions for him, but they're pre-marked.

THE COURT: Okay.

MS. RODRIGUEZ: If I may approach or maybe give them to you.

THE COURT: That's fine.

MS. RODRIGUEZ: Okay.

THE COURT: Yes, please. Thank you.

MS. RODRIGUEZ: Here, this for you.

(Sotto voce discussion between Counsel.)

BY MS. RODRIGUEZ:

Q. Mr. Beatty, I just handed the judge my entire packet. Most of it does not relate to you. So my questions for you are limited to those two documents there that are Huntington payoff documents.

They are Plaintiff -- sorry, Defendant's 6 and 7.

(Defendant's Exhibits 6 and 7 were marked for identification.)

BY MS. RODRIGUEZ:
Q. Were you aware that Huntington generated a payoff for this mortgage loan in December of 2025?
A. I was not aware.
Q. Do you know who Nelson -- it would be -- do you know how to pronounce --
A. Nelson Roscher [phonetic], yes.
Q. Nelson Roscher is?
A. Yes.
Q. Who is he?
A. He was a loan officer assigned to this relationship prior to me.
Q. Right. Because earlier you testified you've only been assigned to this particular relationship for four months, right?
A. Yes.
Q. So Mr. Roscher was the -- was he also a special asset manager?
A. No, he was not. He was the relationship manager who assisting with asset-based lending.
Q. Okay. So when you took over this relationship, were you aware that Mr. Roscher had issued in December a payoff quote to R&R Express for this -- for five point -- was it $5.2 million and change?

A. No, I was not.

Q. Okay. And then with respect to Defendant's Exhibit 7, this -- the subsequent Huntington payoff quote for this mortgage that was issued January 5th -- did you generate that document?

A. I did not.

Q. Do you know who did?

A. Someone in our payoff department, customer service for payoff department. I guess, would be the simplest way to explain that.

Q. Okay. Is there a name on the top right of that document?

A. Yes, it's me.

Q. That's you. So it's your testimony that you didn't generate that payoff?

A. No, I did not. This just identifies the officer assigned to the loan at that particular time.

Q. Okay. So that's the designation at the top, and that's why the other says Mr. Roscher?

A. Correct.

Q. So it's possible that the payoff quote that was generated in December wasn't generated by Mr. Roscher but someone else on the team?

A. Yes.

Q. Okay. I know you said you -- you were

assigned to this relationship about four months ago.
Do you remember the date or at least, like, early month or late month?
A. It was late November is when it was assigned to me, very late November, say -- say somewhere around Thanksgiving.
Q. Okay. And you testified earlier that you were having, I think, weekly meetings with the CRO about this relationship? Is that what you. --
A. Yes. Yes. They -- they initiated a group call with everybody -- all parties involved, all the attorneys for both sides, all the banks, and -- and them as well.
Q. And just so we're on the same page, CRO is industry lingo for --
A. Chief restructuring officer.
Q. Okay. So you've been assigned to this relationship since November of 2025. You're having weekly meetings with the CRO about this relationship, and a payoff is generated in December and you don't know about it. That's your testimony?
A. Correct.
Q. And then another payoff is generated in January for the mortgage loan, and you don't know about it?

A. The January one?
Q. Yes.
A. No. I didn't know about that one.
Q. Okay. Tell me about that.
A. The -- the payoff -- what was sent out? I mean, what's the best way to say this? I mean, I was aware of the payoff, it was sent out. It was -- it was routed through me first. I wanted to know if there was any fees or anything that needed to be added onto this or any outstanding -- you know, other fees or expenses owed. And then the letter was then submitted --- or I'm sorry, forwarded to your client.
Q. Okay. So before it's transmitted to the customer, you did review it and approve it for accuracy?
A. Yes. The amounts that were on there, yes, I approved it being accurate, yes.
Q. Okay. And then later that day, that you said in the afternoon, you learned that Huntington had received a wire for an amount, you know, close to that pay amount, you know, over $5 million?
A. Yes, we received it. I mean, they're -- they're allowed to pay the loan off if they choose.
Q. I agree. Earlier, you testified that the companies are insolvent?

A. Yes.

Q. Are any of them in bankruptcy?

A. No.

Q. As the special asset manager assigned to these relationships, are they still paying on their loans?

A. No. Well, let me -- let me rephrase that. I mean, there -- there are still accounts receivable being collected. That's paying on the principal balance. But as far as the loan payments, they are not being made.

Q. Okay. And when you say "loan payments," are you referring to this mortgage that they tried to pay off in -- in -- on January 5th?

A. That's one of them, correct.

Q. What about what -- what are the other ones?

A. The term loan that's secured by the real estate in Pittsburgh, and then they have various equipment loans secured by trucks and trailers, and then the revolving line of credit.

Q. All right. Is Huntington still receiving payments from R&R?

A. No.

Q. Any of the R&R -- when I -- sorry, when I say "R&R," I mean any of them.

A. No. Other -- I mean, we're receiving zero

payments other than the accounts receivable that are being collected, or paying down the principal balance of the revolver -- revolving line of credit. Beyond that, no loan payments are being made on any of the obligations.

Q. So their incoming accounts receivable of the business, which is still functioning, is -- is going straight to Huntington to pay down the debt?

A. Well, the business is no longer functioning. It is simply collecting the accounts receivable to repay the balance on the revolving --

Q. Right. No, I understand that -- I understand that they're not actively engaging in trade, but the company is still owed money and they are collecting on those -- on those accounts receivable, correct?

A. Yeah, a very small amount at this point. It's basically a trickle. There's -- most -- most of their largest customers have ceased payments.

Q. With respect to Plaintiff's Exhibit -- Exhibits 2 and 3, the note in the mortgage for the Marco property, the top of each of those pages on -- on Plaintiff's Exhibits 2 and 3, discloses an obligation amount at recordation.

Do you see that amount there?

A. Yes.

Q. What obligation amount was disclosed to the clerk when it was recorded with the clerk?

A. $6 million.

Q. Okay. And documents, stance, and intangible taxes, those payments are memorialized on those documents as well.

To your knowledge, since you were assigned to this relationship, has Huntington ever supplemented its tax payments to the Florida Department of Revenue to claim a larger lien interest on this particular property than what they initially paid on $6 million obligation?

A. No.

Q. Earlier, you testified that the plan was to, "sell some assets," and then you went on to say, "liquidation."

When a company is aggressively liquidating, based on your years of experience in banking and special asset management, do they sometimes sell things at a discount?

A. Yes.

MS. RODRIGUEZ: Let me just check -- no further questions. Thank you.

THE COURT: All right. Mr Salazar, re-direct/cross?

MR. SALAZAR: I have nothing further, Your Honor --

THE COURT: Okay.

MR. SALAZAR: -- for this witness.

THE COURT: All right. Mr. Beatty, you can step down.

THE WITNESS: Should I just leave this here?

THE COURT: Yeah. The attorney -- the attorneys will come get their --

THE WITNESS: Come grab these? Okay.

THE COURT: -- papers. All right. Mr. Salazar?

MR. SALAZAR: No. Your Honor, I have no further witnesses.

THE COURT: Are you planning to call witnesses, Ms. Rodriguez?

MS. RODRIGUEZ: No, Your Honor. Counsel stipulated the admissibility of my exhibits, so -- and I just crossed his witness --

THE COURT: Okay.

MS. RODRIGUEZ: -- so I'm -- I'm done. Thank you.

THE COURT: All right. Let's take a short restroom break and then we can come back and finish up.

All right. We'll take about five to ten

minutes. Thank you.

THE BAILIFF: All right. All rise, please. We'll be in recess for a few.

(A recess was taken.)

THE BAILIFF: All rise, please. Court is back in session.

THE COURT: You can be seated.

All right. Are we proceeding to argument?

MR. SALAZAR: Yes, Your Honor.

THE COURT: All right. Go ahead, Mr. Salazar.

PLAINTIFF'S CLOSING ARGUMENT

MR. SALAZAR: Sure. Your Honor, I'll say I'll be brief, but those are kind of last -- last -- famous last words for -- for any sort of attorney.

Your Honor, based upon the evidence, both in the verified complaint and the testimony in the documents that have been submitted into evidence here today, there -- there are a couple of things that are just -- just ringing out. And -- and the biggest -- the biggest -- the biggest piece of evidence, the biggest question here is how -- why a property, a piece of property that has been appraised as high in value as $10.4 million was transferred from R&R Express Properties, LLC, for the net amount of roughly 5.3 million, which was the amount of the mortgage.

That's over $5 million in equity, and there has been no evidence in the record, no explanation how that was in exchange for reasonably equivalent value. The -- the closest that counsel for the Francises come up with is that, well, okay, sometimes in liquidations, properties are sold at a discount.

But -- but let's -- let's be clear about the setting here, Your Honor. This was not a case where an unbiased third party with no relationship to anyone here came in and bought the property at a discount. This was the Francises, including Richard Francis, who is the majority or sole owner of all of these entities, saying, hey, I'll buy the property from my company, only assume the mortgage, and -- okay, so the property was worth an extra 5 million? Well, I just got a good deal.

So there's no -- there's no as insiders, they have no ability to claim that they're somehow good faith purchasers for value. They knew what they were doing. They know that the companies, the R&R Express companies, are in trouble. They know that the money that those companies will be able to raise is not going to -- is -- is going to be far lower than the liabilities they owe to Huntington Bank.

But what Huntington Bank and other creditors

can do is say, look, you know, there are other assets of this company that we can use to satisfy the outstanding obligations. That -- that Marco -- Marco Island property was one of them. It had $5 million -- over $5 million in equity based upon the evidence in the record.

What -- what has happened here is the Francises have basically taken $5 million of equity, which was an asset of R&R properties, R&R Express Properties, LLC, and -- by simply saying, okay, we'll -- we'll -- they treat it like a refinance of a mortgage. But the problem here is not the mortgage. The problem is the transfer of the property away from R&R Express Properties, LLC, to the Francises, who are hatband -- and wife, basically taking that property away from the -- and taking it away and insulating it from the ability of creditors to use that property to satisfy their obligations.

Again, no evidence -- I did -- I did not hear a thing about why a 5.3 million loan assumption as being the sole consideration was reasonable for a property worth 10.4 million. I -- I think that's a deal any of us would take.

Opposing counsel also referred -- started referring to, well, you know, Huntington hasn't paid

the tax on whether they have a lien on this property. Huntington does not have a lien on the property. That -- that's clear. And -- and we also don't dispute that the property does not fall within the definition of collateral in connection with the Plaintiff's Exhibit 1. That -- that is not in dispute either.

And opposing counsel started talking about that, but that's not the issue. The issue is that the security agreement also prohibited the transfer of assets, not collateral, assets, except for those assets that were specifically identified in Section 7.1B of Plaintiff's Exhibit 1. The Marco Island property does not fall into any of those categories.

Therefore, the R&R Express had a contractual -- R&R Express Properties, who was a party to Plaintiff's Exhibit 1, had a contractual obligation not to sell that property and not to pledge that property. And that's exactly what's happened. I think it's undisputed that's what's happened here. The -- the way it's been characterized here is, yes, the Francises bought the property from the company, and they took basically a $10.4 million asset and only paid 5 million for it.

Now, that already falls into the -- the category under the Florida Uniform Transfers Act under

Subpart B, that talks about a transfer for -- of less than reasonably equivalent value while the creditor -- while the debtor is insolvent or -- or otherwise unable to pay its debts.

We've got the evidence in the record, and it's uncontested that the R&R Express properties overall, are not in a position to pay their debts as they come due, that there's not cash coming in, there's not cash from operations, that they are basically not operating at all. That the only thing they're trying to collect are some outstanding receivables, and those receivables are not going to satisfy the outstanding obligations to Huntington and -- and to the other lender.

Now, there's also been a contention, -- and this is -- in all candor, this is raised in their motion to dismiss, that somehow -- that our claim, for violation of the Florida Uniform Fraudulent Transfers Act, fails because the Marco Island property does not constitute an asset. And the -- the basis of that argument is that an asset -- that -- that something -- that an asset that is -- that a piece of property or whatever it is that is -- that is covered by an equitable lien is therefore outside of the definition of an asset and not subject to the Florida Uniform Fraudulent Transfers Act.

And there's a rationale for that. The rationale says that, you know what, if the property was subject to -- to a lien, unsecured creditors aren't getting defrauded because they couldn't get to the property anyway. But the words that are getting left out when it comes to that argument are three words, "to the extent" of the lien.

And what that means, Your Honor, is, is that a piece of property that is fully obligated by lien cannot be subject to a fraudulent transfer claim. But a property that is only partially covered, that the value of it is only partially covered by an equitable lien, that property can be subject to the Florida Uniform Fraudulent Transfers Act and we have the case law. We have one case out of the -- I believe it's a bankruptcy court in Fort Myers.

And we also have a second DCA case. And the interesting thing about the second DCA case, the second DCA case makes a finding that the particular asset in question was exempt from the operation of the Uniform Fraudulent Transfers Act.

But if you look at the decision, they make an analysis of what the lien amount is and what the property is worth. And in that case, they say because the lien amount is actually greater than the value of

the property, then it falls outside of the definition of asset and can be subject to a uniform fraudulent transfer.

We have completely the opposite case here. In fact, the -- the mortgage value is roughly half of -- of the value of the property itself. There's plenty of equity, and therefore, yes, the Marco Island property can constitute -- can constitute -- can be subject to the Uniform Fraudulent Transfers Act as -- as an asset.

And finally, Your Honor, one other point, again, not looking to re-hash everything because I think between the complaint, between what we put out here, is -- is the concept of the mortgage payoff. The one thing Huntington Bank -- and I think -- I think the opposing counsel -- I think we all agree on is that there was nothing in the agreement, nothing in the security agreement that -- that prohibited R&R Express Properties, LLC, from paying off its own mortgage.

We -- we agree with all of that. I think -- I think what's happening here is -- is Defendants are trying to make the argument that somehow because we responded to a payoff request and gave the number, that somehow there's some sort of implied consent that we -- we approved this transfer, but nothing could be further from the truth.

First, Mr. Beatty testified pretty -- pretty soundedly that, hey, look, we get payoff requests all the time. They don't necessarily lead to a transaction, but we do provide the information. Secondly, it's not the payoff of the mortgage that's the problem, primarily, it's the transfer. They had -- the defendants, R&R Express, which is the defendant in this case, had an obligation -- R&R Express Holdings, excuse me, R&R Express Properties, had an obligation not to transfer the property, and that's exactly what happened.

If R&R Express Properties found the money to pay off the mortgage, I -- I'm sure that Huntington Bank would have been fine. But even if that had happened, there was still a contractual bond on transferring the property, and for this precise reason, because if what the defendants have done is -- is not a fraudulent transfer, well, then we know what's going to happen next with R&R Express. One other assets, they'll try and transfer them for -- for -- especially to an insider for less than fair value, and the net effect of that is unsecured creditors get hurt.

Now, Huntington Bank is a secured creditor with respect to the mortgage. But Huntington Bank is also an unsecured creditor to the extent that the

obligations that are owed to the -- the amounts owed to Huntington Bank and to the other lenders, you know, do not get paid and they're not covered by the collateral. They still have an unsecured claim, and unsecured creditors have a right to bring claims under the Uniform Fraud Transfers Act.

They have a right to sit there and say, hey, look, we know this company is going downhill financially, but no, we have a right to object for you to just transfer your assets out and make our claims worthless by not having anything to satisfy them.

I only ask that -- that in theory, I'd be asked -- for a few minutes to rebuttal to the extent that I feel the need to respond to anything to Ms. Rodriguez's closing.

THE COURT: All right. Thank you.

Ms. Rodriguez?

DEFENDANT'S CLOSING ARGUMENT

MS. RODRIGUEZ: A quick point about the timeline here, Your Honor. The original -- with respect to Plaintiff's Exhibit 1, the original iteration of that agreement pre-dates R&R Express purchasing the property. So, there are subsequent amendments to that agreement that contemplate and identify R&R Express property -- the -- the Marco

Island property, excuse m -- and made clear that it is excluded from the definition of real estate in that governing agreement.

The reason the original agreement doesn't speak to that is because the parties did not have a time machine. R&R expressed known the Marco Island property when the original agreement was entered into. They did, however, contemplate how the parties were going to treat the Marco Island property in the ten subsequent amendments to that agreement, which all exclude this particular property from the definition of real estate for that loan agreement.

And it makes sense. There was a separate mortgage agreement that was recorded, executed separately, In Huntington system, it's able to be pulled up and generate its own payoff number separate from the other debt. Huntington paid, and disclosed to the Florida Department of Revenue that that obligation was $6 million.

And the statute says -- this is Florida Statute 20108, "The mortgage, trustee, or other instrument shall not be enforceable in any court of this state as to such advance unless and until the tax due thereon, upon each advance that have been made thereunder has been paid."

You see that -- that statute come up a lot, Your Honor, in loan modification cases, where the original loan amount that was recorded and the obligation that was disclosed to the Florida Department of Revenue is taxed at a certain amount, and then later, the loan is amended for a new unpaid principal balance, and that delta difference, they didn't pay the taxes on it.

The statute is very clear that that difference requires taxation by the Florida Department of Revenue, or the -- or the Courts are not permitted to enforce the difference. And, you know, this Florida Supreme Court, Hill v. Davis, makes clear the Court is not supposed to blue pen plain language legislation. That's not the judiciary's role.

With respect to the argument that there's not a lien, a mortgage is a lien in Florida. A mortgage is a lien in Florida, and -- and there's -- the evidence before the Court makes clear that Huntington, as we sit here today, has the world on notice by virtue of their recorded mortgage lien, that they have a lien against this property for up to $6 million.

And the argument is that this was an assumption. This wasn't an assumption. An assumption would have required Huntington, on Huntington paper, to

work with the Francises and -- and allow -- and fund the Francises' purchasing this out. What this was -- was the Francis went to a different lender, a different bank, and took out personal debt to buy this asset from the company. So, with respect to it being framed as an assumption, it wasn't an assumption. It was a new debt with an entirely different lender that before this transaction, was not involved. So, it's -- it's a new loan.

Just to circle back to what the standard is here today, Your Honor, you know, that based on the briefing, I think the parties are in agreement that the test here is, is there a fair nexus to what's being pled. And part of that contemplates, is there a substantial likelihood of success on the merits. For the reasons I laid out when we started, there's not.

Maybe that can be cured by amendment. I don't know, but we're not there yet. And it would -- our position is it would be appropriate to either deny or at least defer until the motion to dismiss could be heard, if nothing else, in the interest of judicial economy. If their motion is granted today, and we argue the motion to dismiss in a month, and we -- and it's granted, we're back here on a motion to dissolve the lis pendens. And that doesn't make any sense for

anybody.

Huntington's own testimony is that the -- R&R Express had the right to pay off their mortgage loan, but their conduct suggests that they didn't. And Huntington's own testimony was if the payment was applied, the loan amount would be zero. They don't dispute that they didn't inter-plead it with the court, despite the fact that this case was already pending. They don't dispute that they did not return it to the closing agent who wired it to them. They don't dispute that they sent it to a third-party creditor.

Ultimately, Your Honor, it is Defendant's position that what this really is -- is tantamount to an impermissible injunction and a pre-judgment writ of attachment. The testimony is that the accounts receivable for the R&R companies are paying down the debt. The testimony before this Court is that Huntington is not aware of any bankruptcy filings, and as an officer of the Court, I -- I'm not aware of any either.

This -- the word "insolvent" is being bandied about. That's a financial conclusion. And I -- there's nothing in the record to support that characterization of the R&R companies. Restructured -- restructuring, yes. Liquidating, yes. Insolvent? No.

There's no record of it. There's no audits, there's no CPA reports to that effect.

And the timing of Huntington declaring the R&R companies in default, conveniently, the day they received the $5 million -- why, but they refused to apply, is -- is something Defendants think the Court should weigh in determining whether the lis pendens should be posted.

On one side, they are saying Huntington -- Huntington is saying that R&R did not make efforts to pay them down. And on the other, they admit this loan could have been zeroed out for not an insignificant sum, for over $5 million, and Huntington unilaterally decided what to do with the money and elected not to apply it.

So, in sum, Your Honor, under the fair nexus test, we do not think they've met their burden. The burden sits with the movement that is seeking the imposition of a lis pendens. But to the extent Your Honor may disagree with our position based on the evidence heard here today, our alternative position would be, and cases cited by both sides support this, that a lis pendens against a property of this value should be subject to the posting of a bond.

Huntington's own exhibit says this property is

worth at least $10.4 million as of December 2024. So, based on their own valuation that they admitted into evidence today, our position would be, to the extent Your Honor grants the relief -- which we don't think you should, but if you did -- that the posting of a bond for $10.4 million would be an appropriate condition precedent to allowing them to lis pendens my client's homestead. Thank you.

THE COURT: All right. Thank you.

Any rebuttal?

MR. SALAZAR: Yes, Your Honor.

MR. SALAZAR: First, on the bond. The concept of 10.4 -- did -- opposing counsel is correct in that the lis pendens can be conditioned upon a bond, but the bond is supposed to reflect actual damages that the improper lis pendens could put on the owner of the property. And 10.4 million would not be a measure of damages.

The only way 10.4 million would be a proper bond is if you could sit there and say, oh, the property is worth 10.4 million today, and then by the time that the lis pendens is dissolved, the property is worth zero. This is a residential property of Marco Island. Candidly, I -- I think that is highly unlikely.

Candidly, also, the property may even be worth more by the time that this resolution -- by the time this dispute resolves. So I think any bond should be relatively small and -- because I think there's a very good chance -- first, I think the list pendens would be appropriate in the circumstances, and second, I think the chance of any significant damages is minor.

A couple of things I just wanted to respond to. Just so that we're clear, Huntington Bank does have a mortgage on the property, but Huntington Bank and the other lenders also sit as unsecured creditors, and part of the assets that they can ultimately use to satisfy their debts are other assets of R&R Express, which should be -- and that's what we're fighting about in this lawsuit -- should be this property that was transferred.

What keeps getting ignored is -- is that, well, they did they -- they borrowed money to get the mortgage. Again, but we know what we know what the difference in the amounts are, but the transfer was barred. It doesn't matter what the definition -- whether the definition in the agreement excluded it from considering it as owned real property because Section 7.1, the prohibition is, sell, pledge, lease, transfer, or otherwise dispose of any of its

properties, small P, not a defined term, or assets other than -- and then the exceptions are listed.

There -- there's no -- there's no evidence here that R&R Express Properties did anything other than not only violate the main credit security agreement, but the transfer was made to a couple of insiders for less than equivalent value. And there's been no explanation on why the purchase of -- why the -- the concept of the Francises obtaining this property for -- for its -- for nothing more than, you know, taking out a new mortgage to replace the old mortgage, that somehow that that was reasonable under the circumstances and not designed to limit creditors of R&R Express from having their debt satisfied.

Another point that -- that opposing counsel raised is, Defendants seemed caught up on -- on Huntington Bank when they received the mortgage funds, and after they investigated that they didn't return the -- the mortgage funds, they did not return the payment to the closing agent. Well, she keeps referring to a third party. Well, the third party is Centennial Bank. They're a party to this case.

It was Centennial Bank's money that was sent to us. Centennial Bank was -- was -- with the party sitting there saying, we financed this. We didn't

know -- but you know what, maybe we didn't know everything that was going on here. They're still in this case, and that's who we transmitted the money back to. Candidly, I'm not sure what the point of was putting it in the registry of the court when, basically, Centennial Bank received their funds back, and as the documents that opposing counsel admitted today, Centennial Bank released their mortgage.

So -- so, you know, the concept of -- of not liking the procedure, and -- and frankly, that has nothing to do with whether it's appropriate to allow us to file this lis pendens in this case, but -- but just so you know that that's who the third party is, and they're not exactly a third party. They are -- they are in this case.

And just so you know, our position is plain and simple. The -- the lis pendens does not act as a lien. It does not keep-- it does not put any restriction on the Francises, while this case is going on, from using and enjoying the property as their homestead. We -- we cannot foreclose on a lis pendens. We have a lien with respect to the mortgage, but the imposition of a lis pendens is not the same thing as a lien. It does not give the ability of -- of a creditor to take property. But what it does do, it -- it

keeps -- it keeps it keeps the ability of the Court, if it ultimately finds that this transfer was a violation of the Florida Uniform Fraudulent Transfers Act, it keeps it -- gives this -- it empowers this Court to say, I'm going to void that transaction.

Whereas, if there is no lis pendens, there are at least ways the Francises could further transfer this property, and -- and even a declaration that the -- that the transfer from R&R Express properties to the Francises was fraudulent and should be voided, that -- that, you know, that will be moot at that point because the Francises, in theory, can find ways to transfer this property in a way that are -- in a way that Huntington Bank and the other lenders will no longer be able to -- to attack.

That's all I have, Your Honor.

THE COURT: All right. All right. I'm going to reserve ruling on the motion. I need to take a look at the documents you submitted as well as the case law in light of your arguments. So I'm going to ask each of you to prepare a recommended order with the ruling you think I should make, which supports your positions.

And I have templates on my JAX instructions page that you can utilize, as well as an e-mail address from my office on the JAX instructions page. I'll give

you about two weeks to submit those if that's sufficient time.

MR. SALAZAR: Yes, Your Honor.

THE COURT: All right. And then just e-mail them to my office. I'll review everything and then edit whichever one I agree with. The exception period will be preserved since you don't know what my ruling will be.

All right. Anything further?

MR. SALAZAR: Your Honor, from the plaintiff's standpoint, I think we had some case law to submit to the Court.

Do we have clean copies?

MS. RODRIGUEZ: They have highlights, but they're clean.

MR. SALAZAR: Are -- are all of them -- all of them are the same highlighted?

MS. RODRIGUEZ: Yes.

MR. SALAZAR: Well, as long as you highlighted it.

MS. RODRIGUEZ: I don't object to you submitting them at your proposed lawyer if -- if you haven't submitted them.

MR. SALAZAR: If -- if Your Honor prefers -- whatever Your Honor prefers.

THE COURT: That's fine. You can -- you can e-mail them.

MR. SALAZAR: Okay. Great. Thank you.

THE COURT: Uh-huh. And then, Mr. Salazar, I -- for the evidence clerk, I was missing a few exhibits. I need 2, 4, and 6. There are some up here.

MR. SALAZAR: Okay.

THE COURT: These are yours, if you want to collect them.

MS. RODRIGUEZ: The mortgage, the security agreement, 4 is the appraisal, and 6 was the default notice.

I have a copy of your 2 if you want it, but I wrote the number 2 on it.

THE COURT: It should be up there.

MS. RODRIGUEZ: Okay.

MR. SALAZAR: I do have 4 and 6 here, Your Honor, but these -- these are the --

MS. RODRIGUEZ: Those were extras. I gave the Judge one full set of mine.

THE COURT: Yeah. I have -- I have all in yours.

MS. RODRIGUEZ: Yeah. That was an extra for the witness.

MR. SALAZAR: Okay. I have 4 and 6.

THE COURT: Okay.

MR. SALAZAR: I can --

THE COURT: You can hand them to me. It doesn't matter.

MR. SALAZAR: Here you go, Your Honor.

THE COURT: Thank you.

MR. SALAZAR: Number 2.

THE COURT: Thank you.

MR. SALAZAR: Thank you.

THE COURT: All right. All right. Thank you, everyone. Court will be adjourned.

MS. RODRIGUEZ: Thank you.

MR. SALAZAR: Thank you, Your Honor.

(Thereupon, the proceedings were adjourned at 3:28 p.m.)

CERTIFICATE OF DIGITAL REPORTER

I, Hillary Koby, CER, a Digital Reporter and Notary public within the State of Florida, do hereby certify that on Tuesday, March 31, 2026, before the Honorable Pamela Barger, in the District Court of Collier County, State of Florida, I digitally reported the proceedings had and the evidence given, together with the objections of counsel and the rulings of the Court thereto, and that said testimony was accurately captured with annotations by me during the proceeding, taken at said time and place.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 3rd day of April, 2026.

Hillary Koby
Notary Commission Florida/HH 343877
Commission Expires: December 21, 2026

CERTIFICATE OF TRANSCRIPTIONIST

I, Jesse Patrick, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 3rd day of April, 2026.

JESSE PATRICK

Jesse Patrick

**$**

**$0.70** 41:14,15
**$10** 41:16
**$10.4** 8:18 33:20 65:23 68:22 79:1,6
**$12.2** 28:3
**$2.3** 28:6
**$20** 42:16
**$25** 35:4
**$3** 10:12
**$3.5** 42:23
**$5** 60:21 66:1 67:4,5,8 78:5,13
**$5.2** 53:1 55:8 57:24
**$5.3** 9:3 13:24 53:22
**$5.7** 33:8
**$50** 21:14
**$500,000** 26:6
**$6** 6:23 7:9 12:12,16, 18 14:23 15:7 16:7 17:19 28:15,25 29:1 63:3,11 74:19 75:22
**$8,950,000** 8:22
**$8.75** 28:19

**-**

**--what** 35:13

**1**

**1** 6:3 23:8 24:2,4,8 25:11 50:3,16 68:6,12, 16 73:21
**10** 50:17
**10.4** 67:22 79:13,17, 19,21
**12-29-25** 41:6
**12-month** 26:6
**12th** 33:23
**1336** 41:5
**15** 20:18 46:1,3, 14,16,18
**1850** 41:15
**18th** 13:9
**19** 44:8
**1993** 15:20
**19th** 44:8

**2**

**2** 29:8,15 30:9 62:20,22 85:6,13, 14 86:7
**2.9** 28:6
**20108** 74:21
**2024** 32:8,23 33:23 79:1
**2025** 7:7,19 31:14 34:15,16 35:17,19 40:5 44:8 57:3 59:18
**2026** 13:10 44:3 51:21
**23rd** 13:19
**26CA170** 4:7
**29** 7:18
**29th** 36:25 40:5

**3**

**3** 29:9,25 30:9,16, 21 62:20, 22
**3:00** 39:1 51:24
**3:30** 39:2 51:24
**3:44** 41:6

**4**

**4** 32:19 33:10,14, 19 85:6, 11,17,25
**4823** 14:25

**5**

**5** 10:13 40:19 41:18,21 66:15 68:23
**5.3** 28:4 65:24 67:20
**5.7** 34:4
**550** 33:2
**5th** 13:10 36:15 39:2 44:3 51:21 55:3,6 58:4 61:13

**6**

**6** 12:16 43:25 44:17,20 55:5 56:22,24 85:6,11, 17,25
**676834646540** 41:5
**68** 25:16

**7**

**7**
56:23,24
58:3

**7.1**
25:14
80:24

**7.1B**
25:21
68:11

**8**

**8,750,000**
7:9 8:17

**9**

**9:00**
38:25

**A**

**ability**
11:20
66:18
67:17
82:24
83:1

**acceptable**
44:6,10
45:3

**account**
26:7
53:25

**accounts**
61:7
62:1,6,
10,15
77:15

**accrued**
13:11

**accuracy**
49:18
60:15

**accurate**
60:17

**acquisition**
25:19

**act**
9:10,12
68:25
69:18,25
70:14,21
71:9 73:6
82:17
83:3

**actively**
62:13

**actual**
9:13 39:9
79:15

**add**
37:1

**added**
60:9

**addendums**
53:11

**additional**
7:2 13:10
15:6 35:4

**address**
83:24

**adjourned**
86:11

**admissibility**
56:6
64:18

**admit**
30:5
41:17
44:16
78:11

**admitted**
24:7 30:8
33:13
41:20
44:19
79:2 82:7

**advance**
74:23,24

**Advised**
52:2

**affects**
15:23

**affiliate**
6:14

**affixing**
16:4

**afternoon**
4:15,21
12:4
36:17
39:1,2
45:21
60:19

**agent**
13:6,14,
17,25
44:7
51:17
53:5
77:10
81:20

**aggregate**
26:5

**aggressive**
12:24

**aggressively**
63:17

**agree**
12:5
15:11
34:8
35:11
60:24
71:15,19
84:6

**agreed**
6:9 28:25
31:6
44:5,15

**agreement**
6:4 7:25
8:4,7
10:2
22:24
23:1,12,
14 24:17
25:1,7,15
26:1,18
29:19,21
50:4,16,
20 51:1
53:12
68:9
71:16,17
73:22,24
74:3,4,7,
10,12,14
76:12
80:22
81:6
85:11

**agreements**
31:11

**AGX**
25:12

**ahead**
48:10
65:10

**Alexandra**
4:11

**allegations**
49:19

**alleges**
16:1

**alleging**
13:19

**allowed**
18:2
60:23

**allowing**
79:7

**alternative**
78:21

**amend**
17:15

**amended**
23:11
24:16
75:6

**amending**
17:4

**amendment**
25:3,4
76:17

**amendments**
25:3,4
50:4,16
51:1,5
53:12
73:24
74:10

**amount**
6:23 9:1
10:10
33:18
38:21
41:12
60:20,21
62:16,23,
24 63:1
65:24,25
70:23,25

75:3,5
77:6

**amounts**
60:16
73:1
80:20

**analysis**
8:15
15:15
16:14,15,
23 70:23

**annually**
48:4

**Anthony**
4:15,16
18:10,11

**appearances**
4:8

**applicable**
26:13

**applied**
18:17
54:5 77:6

**apply**
78:6,15

**applying**
10:18

**appraisal**
8:18,21
32:8,11,
21,25
33:3,7,
17,22
34:3
85:11

**appraised**
8:18,22
32:7
33:19
65:22

**appraiser**
47:18

**approach**
23:3 29:3
32:15
40:15
43:20
56:3,10

**approval**
54:13

**approve**
60:14

**approved**
60:17
71:24

**approximately**
34:4
38:25
53:23

**argue**
76:23

**argument**
5:8 65:8,
11 69:20
70:6
71:21
73:18
75:16,23

**arguments**
83:20

**Armor**
31:8

**assert**
40:7

**asset**
13:3
27:11
42:21
45:22
46:24
47:20
48:19,24
49:12
57:18
61:4
63:19
67:9
68:22
69:19,20,
21,24
70:19
71:2,9
76:4

**asset-based**
57:20

**assets**
8:2 20:9,
10,17
25:19
26:3,25
27:1,2,8
35:7
42:24
46:25
63:15
67:1
68:10
72:19
73:10
80:12,13
81:1

**assigned**
57:11,14
58:17
59:1,4,17
61:4 63:7

**assignment**
29:20

**assisting**
57:20

**assume**
38:1,8
66:14

**assumption**
8:9 67:20
75:24
76:6

**attach**
15:4

**attachment**
17:18
18:6
24:24
77:15

**attachments**
24:23

**attack**
83:15

**attempt**
11:7
17:17
32:2

**attempted**
13:19

**attorney**
47:15
64:8
65:14

**attorneys**
39:15,20
40:13
59:12
64:9

**audio**
4:12

**audits**
78:1

**aware**
21:4 36:5
44:14
51:2
57:2,4,22
60:7
77:18,19

**awkward**
14:8

**B**

**Bachelor**
47:9

**back**
14:15
24:3 35:8
43:15
53:1,2
64:24
65:5
76:10,24
82:3,6

**background**
47:6

**bailiff**
4:2
19:20,25
23:23
30:23
42:1
65:2,5

**balance**
19:3,10
20:15
21:23
22:1 31:7
33:4,5
34:2
53:22
54:6 61:9
62:2,11
75:7

**bandied**
77:21

**bank**
4:6,16
6:8,21
7:3,4,21
9:7,21
12:11
13:2,5,15
14:14

16:6 19:9 20:7,8, 11,22 21:17 22:18,20, 23 24:18 28:2 29:23 30:4 31:4,14 32:6,11 33:6 34:21 35:3,18, 20 40:12 43:10,11, 13,15 45:23 46:8,10, 11,12,19, 21 47:21 48:20,25 50:6 54:13 55:12,20 66:24,25 71:14 72:14,23, 24 73:2 76:4 80:9,10 81:17,22, 24 82:6,8 83:14

**Bank's**
50:23 81:23

**banking**
26:23 46:15 63:18

**bankruptcy**
51:16 61:2 70:16

77:18

**banks**
59:12

**Barfield**
33:2

**Barger**
4:4

**barn**
14:13

**barred**
80:21

**bars**
16:23

**based**
15:3 63:18 65:15 67:5 76:11 78:20 79:2

**basically**
6:17 9:22 20:14 62:17 67:8,15 68:22 69:9 82:6

**basing**
50:19

**basis**
11:1 21:25 26:9 35:23,25 42:13 48:2 69:19

**bears**
15:22

**Beatty**
4:13 9:18 19:17,22 20:3,5 23:7,25 24:11 29:7 32:18 33:17 40:18 43:24 45:2,5,21 56:18 64:5 72:1

**began**
36:23

**behalf**
4:10,16 39:17,20

**big**
50:3

**bigger**
8:7

**biggest**
65:19,20, 21

**binder**
23:8 50:3

**bit**
12:9 15:25 16:21 28:8 37:7

**blue**
75:14

**board**
19:2

**bond**
16:15 72:15 78:24 79:6,12, 14,15,20

80:3

**borrow**
21:16

**borrowed**
80:18

**borrower**
8:1 25:9 42:17

**borrowings**
35:4

**bought**
66:10 68:21

**brazenly**
14:9

**breach**
18:24

**break**
31:25 64:24

**Brian**
52:7,13, 14,15

**briefing**
14:21 15:21 17:17 76:12

**bring**
73:5

**brought**
9:7

**Brown**
52:13

**bucks**
8:24

**burden**
15:22 78:17,18

**business**
5:25 6:16 12:6 20:14,23 26:8,11, 13 32:12 34:6,19 62:7,9

**buy**
66:13 76:4

**C**

**C-O-N-S**
41:16

**call**
20:24 34:16,23 36:1 45:7 59:11 64:15

**called**
20:20 34:23 37:6 52:18,19

**candidly**
10:1 79:24 80:1 82:4

**candor**
69:15

**capacities**
12:7

**capacity**
47:20

**capital**
13:4

**career**
46:15

**case**
5:21 6:19 7:12 10:19,21 12:8 13:21 15:17,20 16:12,18, 22 17:10, 22 19:6, 13 49:16, 19 50:6, 24 51:6 66:8 70:14,15, 17,18,19, 24 71:4 72:8 77:8 81:22 82:3,12, 15,19 83:19 84:11

**cases**
14:21 15:15 75:2 78:22

**cash**
34:17,18, 21 69:8

**categories**
68:13

**category**
68:25

**caught**
36:19 81:16

**ceased**
62:18

**Centennial**
4:16 13:2,5 40:12 43:11,13, 15 53:2,5 81:22,23, 24 82:6,8

**chance**
80:5,7

**change**
57:25

**changed**
53:20

**characterization**
77:24

**characterized**
68:20

**check**
63:22

**chief**
34:23,24 59:16

**Chiusolo**
15:19

**choose**
60:23

**circle**
76:10

**circumstance**
38:7

**circumstances**
36:12 54:14 80:6 81:13

**circumvent**
37:14

**cited**
15:20 16:13 78:22

**Citizens**
46:10,11, 12,16,17

**claim**
6:14 15:22,25 18:24 63:10 66:18 69:16 70:10 73:4

**claiming**
14:10,15

**claims**
9:7 13:20,21 14:18 15:14,16 73:5,10

**clean**
84:13,15

**clear**
16:13 17:10 32:24 33:21 66:7 68:3 74:1 75:9,13, 19 80:9

**clerk**
41:7 63:2 85:5

**client**
60:12

**client's**
14:5,12 16:16 79:8

**clients**
12:23 14:8 18:5

**close**
60:20

**closest**
66:4

**closing**
13:6,7, 14,17,25 53:5 65:11 73:15,18 77:10 81:20

**co-**
8:1 42:17

**co-borrower**
25:9

**codes**
13:8

**collateral**
19:9 31:6 32:13 51:3 68:5,10 73:3

**collect**
69:10 85:9

**collected**
61:8 62:2

**collecting**
62:10,14

**collectively**
6:1

**Collier**
4:2

**Columbus**
49:7

**comfortable**
31:12

**commercial**
20:12

**communicating**
39:16,21

**communications**
35:18,20 36:4 37:11 44:12

**companies**
5:25 6:10,11 7:1,5,15 9:20 12:22 17:22 20:20 21:18 22:17 27:22 35:14,21 60:25 66:20,21, 22 77:16, 24 78:4

**company**
6:14,16, 17 9:17 13:3 20:24 26:25 27:6 34:7 44:3,5 47:24 54:12 62:14 63:17 66:13 67:2 68:21

73:8 76:5

**complaint**
11:1
17:8,14
49:19,22
50:1,6,
14,15,23
51:6,11
53:15
65:16
71:12

**complaints**
49:15

**completely**
19:13
71:4

**complex**
5:21 12:8

**concept**
44:13
71:13
79:12
81:9 82:9

**concession**
14:22

**conclusion**
77:22

**condition**
79:7

**conditioned**
79:14

**conditions**
10:8

**conduct**
77:4

**conducted**
48:11

**conducting**
8:5

**confirm**
49:18

**conjunction**
25:22
31:3

**connection**
22:15
26:16
68:5

**connotes**
19:5

**consecutive**
26:6

**consent**
43:1
71:23

**consented**
42:8

**consideration**
8:8,24
14:11
41:16
67:21

**considered**
51:8

**consistent**
36:2
48:2,3
53:16

**consolidation**
25:19

**constitute**
69:19
71:8

**consulted**
34:22

**contemplate**
73:24
74:8

**contemplates**
76:14

**contention**
69:14

**contested**
11:12

**continue**
10:17

**continuing**
11:16

**contract**
18:24

**contractual**
10:7
68:15,16
72:15

**conveniently**
78:4

**conversations**
35:24
36:2

**convey**
40:13

**convincing**
16:10

**copies**
56:6
84:13

**copy**
23:19
30:11,18,
20 41:23,
25 85:13

**copyrights**
26:9

**corporate**
22:22
27:12
49:6

**correct**
27:2
39:22,23
45:23
46:2
48:22
51:3
53:6,23
54:9
58:20
59:22
61:14
62:15
79:13

**corrected**
51:18

**counsel**
14:22
16:19
17:5 23:5
29:5
35:24
36:22
37:12
40:2,9
43:19
52:2,4
56:5,16
64:17
66:4
67:24
68:7
71:15
79:13
81:15
82:7

**counsels**
37:10
54:24

**count**
4:18

**counter-claims**
18:22

**counts**
17:9
18:20,22,
23

**County**
4:3

**couple**
6:17
7:17,22
65:18
80:8 81:6

**coursed**
41:25

**court**
4:3,5,14,
20,24
5:2,10,
14,15,18
11:14,21
12:2
14:1,4
15:4,16,
20 17:21
18:9
19:14,18
23:4,5,22
24:7
29:4,17
30:8,11,
13,15,17,
22,24
31:17,20,
22,24
32:1,4,16
33:11,13
37:18
40:16
41:20,24
43:18,22
44:18,24
45:12,17

54:23 56:4,9, 12,14 63:24 64:3,5,8, 11,15,20, 23 65:5, 7,10 70:16 73:16 74:22 75:13,19 77:7,17, 19 78:6 79:9 82:5 83:1,4,17 84:4,12 85:1,4,8, 15,21 86:1,3,6, 8,10,11

**Court's**
11:23

**courtesy**
23:19 41:23

**courthouse**
19:6

**Courts**
75:11

**covenant**
23:17 25:23

**covered**
69:22 70:11,12 73:3

**CPA**
47:13 78:2

**credit**
6:8 7:25 8:6 18:17 21:2,10, 11,12 22:25 23:1,12 24:17 26:18 28:3,18, 20 29:2 61:19 62:3 81:5

**creditor**
14:6 54:1 69:2 72:23,25 77:11 82:24

**creditors**
9:13 10:15 31:9 43:2 66:25 67:17 70:3 72:22 73:5 80:11 81:13

**CRO**
35:25 36:3 59:8,14, 19

**cross**
44:23

**cross-claim**
4:18 18:21,23

**CROSS-EXAMINATION**
45:19

**cross-plaintiff**
4:17

**crossed**
64:19

**crunch**
34:17

**cure**
17:4

**cured**
76:17

**current**
17:13,14 35:13 53:21

**customer**
37:6 54:13 58:8 60:14

**customers**
34:13 62:18

**cut**
48:9

**D**

**D-O-C**
41:10

**daily**
35:23,25 37:11

**damaged**
26:5

**damages**
79:15,18 80:7

**date**
33:21,22 59:2

**Davis**
75:13

**day**
38:16,24 51:20,22 55:8,15 60:18 78:4

**day-to-day**
34:19

**days**
13:18

**DCA**
70:17,18, 19

**deal**
34:21 48:23 66:16 67:23

**dealing**
48:21

**debt**
18:17 19:3 35:8 55:20 62:8 74:17 76:4,6 77:17 81:14

**debtor**
69:3

**debtors**
26:7

**debts**
10:16 18:2 21:1 42:15,23 69:4,7 80:13

**December**
7:18 13:9 27:10 32:8,22 33:23 35:3,17, 19 36:25 40:4 44:8 57:3,23 58:22 59:20 79:1

**decided**
11:14 28:23 78:14

**decision**
54:21,25 55:1 70:22

**declaration**
83:8

**declaring**
55:7 78:3

**deed**
7:19 8:23 36:25 40:4,21

**default**
20:13 44:2,13 55:7 78:4 85:11

**defendant**
4:17 19:6 72:7

**defendant's**
17:16 56:22,24 58:2 73:18 77:12

**defendants**
4:22 16:5,12 71:20

72:7,17
78:6
81:16

**defense**
45:6

**defer**
76:20

**defined**
31:11
81:1

**defines**
23:16

**definition**
68:4
69:23
71:1
74:2,11
80:21,22

**defraud**
9:13

**defrauded**
70:4

**degree**
47:8

**degrees**
47:11

**deliver**
44:6

**delta**
75:7

**demanded**
18:16

**deny**
76:19

**department**
12:15,18
18:14
37:6
52:21
58:8,9

63:9
74:18
75:4,10

**depending**
8:15

**describe**
25:10
28:12
34:5
36:12

**designation**
58:18

**designed**
11:5
81:13

**determine**
16:4 44:9

**determined**
36:24

**determining**
78:7

**developed**
35:1

**diem**
13:11

**difference**
75:7,9,12
80:20

**direct**
20:1
45:2,5,
10,15

**directly**
37:9

**disagree**
16:12
78:20

**disclosed**
12:14,17
36:21

63:1
74:17
75:4

**discloses**
62:22

**discount**
63:20
66:6,10

**discovered**
40:3

**discovering**
40:6

**discretion**
11:23

**discuss**
16:22
40:13

**discussion**
23:5 29:5
43:19
56:16

**dismiss**
16:20
17:2
69:16
76:20,23

**dismissed**
17:15

**dispose**
26:2
80:25

**disposition
s**
26:4

**dispute**
10:22
11:13
12:13,19,
22 16:25
68:3,6
77:7,9,10

80:3

**dissolve**
76:24

**dissolved**
79:22

**distressed**
20:12

**doc**
12:14
41:10,15

**document**
12:15
23:10
24:1,12
25:5
29:18
32:20
44:1 51:5
58:5,12

**documents**
8:21
12:17
29:11
38:6
50:5,9,
11,22
53:9,10,
20 56:20,
21 63:4,6
65:17
82:7
83:19

**dog**
19:12

**dollar**
6:7

**dollars**
54:12

**downhill**
73:8

**Dragovich**
4:11

**draw**
21:15

**Drive**
33:2

**driving**
19:5

**dropped**
18:20,21,
23

**due**
69:8
74:24

**duly**
15:3,12
19:23

**E**

**e-mail**
83:24
84:4 85:2

**earlier**
40:1
45:21
48:20
50:2
51:16
52:25
53:7,18
57:13
59:7
60:24
63:14

**early**
15:9 35:2
59:3

**easier**
14:19

**economic**
7:1

**economy**

76:22
**edification** 21:9
**edit** 84:6
**education** 47:6
**effect** 8:25 9:3 10:11 72:22 78:2
**effort** 8:20
**efforts** 12:21,25 78:10
**elected** 78:14
**employed** 20:6 46:20
**employment** 26:16
**empowers** 83:4
**encompass** 46:14
**end** 19:1
**enforce** 75:11
**enforceable** 74:22
**engaged** 8:5 34:24
**engaging** 62:13
**enjoy** 11:16
**enjoying** 82:20
**enter** 22:23
**entered** 26:12 34:16 74:7
**entire** 15:17 23:15 37:19,20 47:1 56:18
**entities** 5:24 6:2, 6 12:6 24:19 34:6 66:12
**entitled** 43:3
**entity** 27:23
**equipment** 21:19,24 22:7,10 26:4 28:7 61:18
**equitable** 69:23 70:12
**equity** 8:25 9:5 21:12 26:15 31:8,14 43:3 66:1 67:5,8 71:7
**equivalent** 9:15,16 66:3 69:2 81:7
**Esquire** 5:16
**essentially** 23:15 28:14
**establishes** 11:1
**estate** 12:10 27:6,12, 13 28:5 47:17 61:17 74:2,12
**estimate** 42:22
**evidence** 11:3 12:9 13:1,13, 16 24:4 30:6 31:19 33:10 55:4 65:15,17, 20 66:2 67:5,19 69:5 75:18 78:21 79:3 81:3 85:5
**EXAMINATION** 20:1
**exceed** 26:5 42:16,24
**exceeded** 31:7
**exception** 84:6
**exceptions** 81:2
**excess** 15:6 31:8 43:3
**exchange** 66:3
**exclude** 74:11
**excluded** 46:16,17 50:15,18, 25 51:2 53:16 74:2 80:22
**excluding** 51:4
**excuse** 7:24 72:9 74:1
**executed** 7:19 74:14
**exempt** 70:20
**exhibit** 6:3 23:8 24:2,4,8 29:8,15, 25 30:21 32:19 33:10,14, 19 40:19 41:18,21 43:25 44:17,20 50:3 55:5 58:3 62:19 68:6,12, 16 73:21 78:25
**exhibits** 30:9 56:7,24 62:20,22 64:18 85:6
**expect** 38:4
**expecting** 36:19
**expenses** 60:10
**experience** 20:16 63:18
**expert** 31:20
**explain** 58:10
**explanation** 66:2 81:8
**Express** 4:7 5:24 6:1,11, 15,22 7:1,7 8:3,10,17 9:4,8,19, 24 10:12, 16 12:10 13:4 17:25 20:20,24 21:3,18 22:16,24 25:6,8 27:4,7,8, 18,22 28:2 29:22

30:3 31:8 34:6,20 35:14,21 36:5,9 38:3,20 39:16,17, 21 40:22 42:3,10, 16 43:5 44:3,12 55:7 57:23 65:23 66:20 67:9,14 68:14,15 69:6 71:17 72:7,8,9, 12,19 73:22,25 77:3 80:13 81:4,14 83:9

**expressed** 74:6

**expressly** 38:5

**extensive** 20:25

**extent** 11:7 16:11 70:7 72:25 73:13 78:19 79:3

**external** 31:12

**extra** 10:10 66:15 85:23

**extras** 85:19

**F**

**fact** 10:5,9 37:10 71:5 77:8

**facts** 5:21 16:9 31:19

**fails** 69:18

**fair** 15:13 16:14,23 37:17 72:21 76:13 78:16

**fairly** 20:25 36:2

**faith** 11:10 66:19

**fall** 68:4,13

**falls** 68:24 71:1

**familiar** 20:19 21:12 50:12,14

**famous** 65:13

**February** 15:10

**feel** 31:11 73:14

**fees** 60:9,10

**fighting** 6:20 80:14

**figure** 18:15

**file** 5:10 10:23 11:24 41:1 82:12

**filed** 13:18

**filing** 10:22 29:20

**filings** 77:18

**finally** 71:10

**finance** 47:7

**financed** 81:25

**financial** 9:19 34:15 35:22 43:8 46:4,6 49:20,22 52:22,24 77:22

**financially** 73:9

**financing** 7:3

**find** 39:24 83:12

**finding** 70:19

**finds** 83:2

**fine** 5:14 30:19 56:12 72:14 85:1

**finish** 29:12 45:6 64:24

**firm** 13:7

**fits** 9:11

**fixture** 29:20

**Florida** 9:9 12:11,15, 18 22:14 49:13 63:9 68:25 69:17,24 70:13 74:18,20 75:4,10, 12,17,18 83:3

**flow** 34:18,21

**foreclose** 82:21

**foreclosure** 15:1

**foremost** 7:23

**foreseeable** 16:17

**forgot** 34:1

**form** 11:21

**Fort** 70:16

**forthcoming** 38:15

**forward** 54:11

**forwarded** 14:12 54:1 60:12

**forwards** 14:5

**found** 51:22,25 55:11 72:12

**framed** 76:5

**Francis** 4:19,23 7:13 27:20,21, 25 36:16, 24 37:5 66:11 76:3

**Francises** 7:11,12, 21 8:9, 11,13 9:8 11:8,16

12:23 13:1 18:18,24 19:7 42:5 55:19 66:4,11 67:8,14 68:21 76:1 81:9 82:19 83:7,10, 12

**Francises'** 8:20 40:23 76:2

**frankly** 6:13 9:10 10:25 82:10

**fraud** 19:6 73:6

**fraudulent** 9:9 13:19 14:10,15 40:14 69:17,25 70:10,14, 21 71:2,9 72:18 83:3,10

**Freight** 25:13

**frequency** 35:20

**frozen** 19:9

**full** 20:3,15 25:25 28:19 36:17 51:18 85:20

**fully** 28:17,18, 19 70:9

**functioning** 62:7,9

**fund** 76:1

**funded** 13:6 28:18,20

**funds** 14:1,4,6, 12 15:9 18:16 38:23 43:12 53:5 55:11,18 81:17,19 82:6

**future** 16:17 28:22

**G**

**gap** 13:12

**gave** 53:17 71:22 85:19

**general** 26:23 27:1,3 34:7

**generally** 6:11 7:1 21:18 25:10 27:24 34:5 38:7

**generate** 58:5,15 74:16

**generated** 13:8 55:6,10, 17 57:2 58:22 59:20,23

**generically** 5:23

**give** 30:18 56:11 82:24 83:25

**giving** 47:5

**good** 4:15,21 11:9 12:4 45:21 66:15,18 80:5

**governing** 22:24 51:5 74:3

**governs** 7:25 23:2,15

**grab** 64:10

**graduate** 47:11

**grant** 11:21,24

**granted** 29:1 76:22,24

**granting** 10:23

**grants** 79:4

**Great** 85:3

**greater** 70:25

**group** 5:24 6:10 20:19,24 35:3 47:1 59:10

**guess** 40:11 50:7 58:9

**H**

**half** 71:5

**halfway** 25:12

**hand** 19:21 30:23 86:3

**handed** 23:7 32:18 56:6,18

**handing** 29:7 43:24

**handle** 20:12

**handled** 13:7

**happen** 72:19

**happened** 7:6,18 9:4 40:3 43:12 67:7 68:18,19 72:11,15

**happening** 34:14 71:20

**harm** 43:1

**hatband** 67:15

**hate** 33:24

**head** 52:15

**headquarters** 22:22 27:12 49:6

**hear** 67:19

**heard** 16:20 76:21 78:21

**hearing** 14:19

**heck** 23:21

**held** 27:10 33:6 35:24 43:14 44:13 46:23

**hey** 66:13

72:2 73:7

**high**
8:18
65:22

**higher**
20:13

**highest**
6:7

**highlighted**
84:17,19

**highlights**
84:14

**highly**
79:24

**Hill**
75:13

**Hillary**
5:16

**hold**
27:11
44:3

**holding**
6:17 27:6
35:25

**Holdings**
72:8

**holds**
27:9

**holiday**
13:12

**home**
21:12

**homeowners**
12:24

**homestead**
11:19
16:17
79:8
82:21

**honest**
55:13

**Honor**
4:9,15,21
5:1,4,8,
20 10:19,
25 12:1,4
14:20
16:3,11
17:23
18:8,11
19:16
23:3,18
29:3 30:6
31:16
32:15
33:9,12
37:16
40:15
41:17
43:16,21
44:16,23,
25 45:10,
14 56:2,
3,7 64:2,
13,17
65:9,12,
15 66:8
70:8
71:10
73:20
75:2
76:11
77:12
78:16,20
79:4,11
83:16
84:3,10,
24,25
85:18
86:5,13

**hopes**
35:5

**hoping**
19:2

**horrible**
18:15

**horse**
14:13

**hostile**
45:16

**house**
18:13

**housekeeping**
45:1

**hunt**
19:12

**Huntington**
4:6,10
6:8,20
7:3,4,21
9:7,21,24
10:6
12:7,11
13:8,15,
23 14:3,
4,10 16:6
18:2,20,
22 20:7,
8,11,22
21:17
22:15,23
24:17
26:21
28:2,24
29:22
30:4
31:2,3,5,
14 32:6,
10 33:6
34:20
35:10,18,
20 36:13
38:22
39:17,22,
24 40:7
42:7
43:1,2,10
45:23
46:4,19,
21 47:3,
21 48:12,
20,25
49:5
50:6,23
52:4,16,
25 53:4
54:1,4,9,
11 55:6,
11,18
56:21
57:2 58:3
60:19
61:20
62:8 63:8
66:24,25
67:25
68:2
69:13
71:14
72:13,23,
24 73:2
74:15,17
75:19,25
77:18
78:3,9,
10,13
80:9,10
81:17
83:14

**Huntington's**
54:16
77:2,5
78:25

**hurt**
72:22

**I**

**idea**
28:15

**identification**
24:9
30:10
33:15
41:22
44:21
56:25

**identified**
6:2 25:7
68:11

**identifies**
58:16

**identify**
23:10
29:24
32:20
38:7 44:1
73:25

**impermissible**
17:17
18:6
77:14

**implied**
71:23

**imposition**
78:19
82:23

**improper**
79:16

**inability**
31:10

**inadvertence**
51:7

**include**
13:10

**includes**
42:17

**including**

26:11 42:18 66:11

**incoming** 62:6

**individual** 40:24

**individually** 12:24 37:1 40:24 42:5

**industry** 26:23 34:11 59:15

**information** 72:4

**informational** 38:13

**informed** 10:6 36:22

**initially** 7:9 63:11

**initiated** 59:10

**injunction** 18:4 77:14

**insider** 72:21

**insiders** 9:5 66:17 81:7

**insignificant** 78:12

**insolvent** 9:17 42:11,12 60:25 69:3 77:21,25

**instance** 36:5 37:5

**instances** 38:12

**institution** 43:9

**institutions** 46:5,6

**instructions** 83:23,25

**instrument** 15:4,13 41:2,5 74:22

**insulating** 67:16

**intangible** 12:16 63:4

**intellectual** 26:10

**intended** 56:7

**intent** 9:13

**intention** 28:21

**intentional** 51:9

**inter-plead** 54:22

77:7

**interest** 13:11 16:7,24 17:1 63:10 76:21

**interested** 31:4

**interesting** 70:18

**Interestingly** 55:8

**internal** 48:8

**internally** 48:11,14, 15 49:12

**interplead** 13:25 14:3

**interpleaded** 14:14

**interruption** 4:12

**interwoven** 18:1

**introduce** 11:3

**inventory** 26:7

**investigated** 81:18

**involved** 36:1 43:9 59:11

76:8

**involves** 6:14

**involving** 6:13

**Island** 6:24 7:8, 20 12:11 13:22 21:21 22:4,5, 11,12 27:10,15 28:4,9,10 31:1,15 32:7 33:2,18 36:7,10, 13 38:2 39:25 40:22 42:4,18, 25 43:4 67:4 68:12 69:18 71:7 74:1,6,9 79:24

**Islands** 50:24

**issuance** 26:16

**issue** 13:15,21 15:13 51:6 68:8

**issued** 6:21 57:23 58:4

**issues** 14:21

48:21

**iteration** 17:14 73:22

**J**

**January** 13:10,19 15:9 36:15 39:2 44:3 51:21 55:3,6 58:4 59:24 60:1 61:13

**JAX** 83:23,25

**job** 46:23

**John** 4:16 52:7,14

**joined** 19:6

**judge** 30:7 56:18 85:20

**judicial** 76:21

**judiciary's** 75:15

**juncture** 35:16

**jurisdiction** 17:24

**K**

**Kathleen**
4:23
40:23

**keep--**
82:18

**Kennedy**
15:19

**kind**
17:5
65:13

**knew**
10:1
66:19

**knowledge**
27:5
35:14
53:19
63:7

**Koby**
5:16

**L**

**laid**
17:16
76:16

**language**
75:14

**larger**
63:10

**largest**
62:18

**late**
7:7 15:9
34:15,16
59:3,4,5

**law**
4:11
10:20
13:7,13
16:12
17:10
49:13
70:15
83:19
84:11

**lawsuit**
80:15

**lawyer**
84:22

**lead**
72:3

**leader**
52:9,17,
20

**leadership**
52:5

**learned**
36:13
37:25
60:19

**lease**
26:2
80:24

**leases**
26:11
29:20

**leave**
5:8 10:23
11:24
15:4 64:7

**left**
4:10
14:13
18:19
70:5

**legal**
14:14

**legislation**
75:14

**lend**
6:9

**lender**
6:8,9
22:15
27:3
69:13
76:3,7

**lender-borrower**
5:22

**lenders**
24:18
31:3 44:7
73:2
80:11
83:14

**lending**
23:15
57:20

**lent**
6:21
28:15

**lessee**
26:14

**lesser**
26:14

**letter**
44:4,11
55:7,10,
17 60:11

**letters**
40:11

**level**
35:17

**liabilities**
66:24

**licensed**
47:13,15,
17

**licensing**
26:8

**lien**
12:12,20
14:7,23
16:7,24,
25 17:1,
11 19:8
63:10
68:1,2
69:23
70:3,7,9,
13,23,25
75:17,18,
21 82:18,
22,24

**light**
83:20

**likelihood**
15:24
76:15

**liking**
82:10

**limit**
21:14
81:13

**limited**
56:20

**lines**
21:1

**lingo**
59:15

**liquidated**
7:5

**liquidating**
63:17
77:25

**liquidation**
12:25
35:15
63:16

**liquidations**
66:5

**liquidity**
34:17

**lis**
5:3 6:13
10:19,23
11:2,4,
12,15,19,
24,25
14:21,25
15:5,22
16:4 18:2
76:25
78:7,19,
23 79:7,
14,16,22
82:12,17,
21,23
83:6

**list**
10:23
24:18
80:5

**listed**
25:8,11
81:2

**lists**
6:5

**litigated**
16:18

**LLC**
6:15,22
8:3 12:10
25:7,13
27:19
42:3,10
65:24
67:10,14
71:18

**loads**
34:12

**loan**
13:2,6
18:13
19:7
21:2,13,
19,20,22,
23 22:3,
4,13,21
26:13
28:11,12,
13,24
31:1,5,7,
11,12
38:6
42:19
48:21,23
50:9,10,
11,22
51:5
53:8,10,
22 54:6
57:3,11
58:17
59:24
60:23
61:9,11,
16 62:4
67:20
74:12
75:2,3,6
76:9
77:3,6
78:11

**loans**
20:12,13
21:17,20
22:7,10,
19 28:7
48:21
61:5,18

**locally**
13:7

**located**
27:13
49:5,6

**logistics**
5:25 6:16
34:7,9

**long**
21:7
46:20
84:19

**longer**
62:9
83:14

**lot**
14:20
35:23
75:1

**lower**
66:23

**M**

**machine**
74:6

**Madam**
5:15

**made**
9:12,14,
15,16,23
10:5,9
19:7
31:2,11
36:8
37:12
38:12,16
54:21,24
61:10
62:4
74:1,24
81:6

**Magistrate**
4:3

**main**
6:6 7:24
50:19
81:5

**maintain**
21:18
31:15

**majority**
7:16
66:12

**make**
5:11,12
6:10
14:14
16:13
21:25
22:8
24:14,20
70:22
71:21
73:10
76:25
78:10
83:22

**makes**
70:19
74:13
75:13,19

**making**
18:12
45:9

**manage**
21:6
34:11

**managed**
19:13
21:7

**management**
47:8,10
63:19

**manager**
45:22
46:24
47:20
48:20,24
49:12
57:18,20
61:4

**March**
35:5

**Marco**
6:24 7:8,
20 12:10
13:21
21:20
22:4,10,
12 27:10,
14 28:4,
9,10
31:1,15
32:7
33:1,18
36:6,9,13
38:2
39:25
40:22
42:4,18,
25 43:4
50:24
62:21
67:3
68:12
69:18
71:7
73:25
74:6,9
79:23

**marked**
23:8
24:1,8
29:8,14
30:9
32:19
33:14
40:19
41:21
43:25
44:20
56:24

**Matt**
4:12
19:17

**matter**
6:12
14:25
80:21
86:4

**Matthew**
19:22
20:5

**meaning**
20:12

**means**
70:8

**measure**
79:17

**meetings**
59:8,19

**memorialize
d**
63:5

**Merger**
25:18

**merits**
15:18,24
16:2,22
76:15

**met**
78:17

**mid-
november**
34:25

**million**
6:23 7:10
8:19 9:3
10:13
12:13,16,
18 13:24
14:23

15:7 16:7 17:19 21:14 28:4,6, 15,19,25 29:1 33:8,20 34:4 35:4 42:16,23 53:1,22 55:8 57:24 60:21 63:3,11 65:23,25 66:1,15 67:4,5,8, 20,22 68:22,23 74:19 75:22 78:5,13 79:1,6, 17,19,21

**millions** 54:12

**mind** 47:5 53:17

**mine** 85:20

**minimum** 9:14 36:1

**minor** 7:17 80:7

**minority** 27:24

**minute** 25:16

**minutes** 65:1 73:13

**missing** 85:5

**mistake** 51:7

**mixed** 7:17

**Modal** 25:13

**modification** 75:2

**moment** 43:16 56:1

**monetary** 41:12

**money** 13:14 14:5 18:19,25 46:13 53:25 54:5,21 62:14 66:21 72:12 78:14 80:18 81:23 82:3

**monies** 28:1

**month** 13:19 59:3 76:23

**monthly** 21:25 28:16 48:4,5,7

**months** 21:8 57:15 59:1

**moot** 83:11

**morning** 36:15 38:25

**mortgage** 6:3,21,22 7:10,24 8:10,13, 21 9:1 10:11 12:12,20 14:6,12, 17,23 15:1,7 16:25 18:13 21:2,20 22:4 28:10,21, 25 29:1, 19 30:1, 21 31:1 33:4,5 34:3 38:10,21 43:10,13 51:19 53:22 54:6 55:9 57:3 58:4 59:24 61:12 62:20 65:25 66:14 67:12 71:5,13, 18 72:5, 13,24 74:14,21 75:17,21 77:3 80:10,19 81:11,12, 17,19 82:8,22 85:10

**mortgaged** 22:14

**motion** 5:3 16:20 17:2 69:16 76:20,22, 23,24 83:18

**move** 24:4 30:5 33:9 41:17

**moved** 44:16

**movement** 78:18

**moving** 34:12

**Mullins** 4:22

**multiple** 12:6

**Myers** 70:16

**N**

**named** 6:15 9:8

**names** 40:23

**National** 4:6 20:7, 8 24:17 29:22 30:4

**nature** 23:17

**necessarily** 10:20 24:20 72:3

**needed** 60:9

**neighborhood** 9:2

**Nelson** 4:22 57:5,7,8

**net** 8:9,24 9:3 10:11 65:24 72:21

**newspaper** 18:14

**nexus** 15:13 16:14,23 76:13 78:16

**nice** 18:13

**non-exclusive** 26:9

**norm** 37:7

**normal** 35:9

**note** 11:4 30:1,2,21 62:20

**notice** 11:6 16:6 40:9 44:2 75:20 85:12

**notification** 11:10 36:18 39:1

**notify** 9:24

**November** 59:4,5,18

**number** 6:2,5 25:15 41:2 54:2 71:22 74:16 85:14 86:7

**O**

**object** 10:7 73:9 84:21

**objected** 37:20

**objection** 10:3 24:5,6 30:7 31:16,17 33:11,12 37:16 41:19 44:18 45:10

**obligated** 70:9

**obligation** 12:16,19 62:22 63:1,12 68:16 72:8,9 74:18 75:4

**obligations** 25:25 44:8 62:5 67:3,18 69:12 73:1

**obsolete** 26:5

**obtain** 7:2

**obtaining** 81:9

**occur** 37:13

**occurred** 36:22 55:22

**odd** 12:9

**Oddly** 13:23

**office** 13:14 49:9 83:25 84:5

**officer** 20:9,10, 17 34:24, 25 41:24 57:11 58:17 59:16 77:19

**Ohio** 49:7

**one-off** 36:3

**ongoing** 47:21

**online** 48:1

**open** 23:9

**opening** 5:11 12:3

**openings** 5:6

**operating** 69:9

**operation** 70:20

**operations** 34:19 35:9 69:9

**opposed** 31:2

**opposing** 67:24 68:7 71:15 79:13 81:15 82:7

**opposite** 71:4

**order** 83:21

**ordinary** 26:8,10, 12 32:12

**original** 73:20,21 74:4,7 75:3

**originally** 28:18

**outright** 10:21

**outstanding** 8:10 10:16 42:15 60:10 67:3 69:11,12

**overly** 5:21

**Overruled** 32:1

**oversight** 51:9

**owe** 18:25 28:2 66:24

**owed** 60:11 62:14 73:1

**owes** 28:3,4

**owned** 12:10 80:23

**owner** 7:14,15, 16 27:22 66:12 79:16

**owner/ operator** 26:15

**owners** 7:17

**ownership** 11:11 27:24 50:10

**owns** 27:18 42:21

**P**

**p.m.** 41:6

**packet** 56:19

**pages** 62:21

**paid** 8:24 12:14,17 16:9 20:15 22:1 38:10 63:11 67:25 68:22 73:3 74:17,25

**Pamela** 4:3

**paper** 75:25

**papers** 64:11

**paperweight** 23:21

**paragraph** 25:22

**parent** 50:20

**part**
12:24
15:15
25:18
27:25
37:21,22
41:10
48:19
76:14
80:12

**partially**
70:11,12

**participant**
22:18

**participate**
22:20
28:24

**participating**
6:9 31:5

**parties**
8:4 11:5
17:24
29:21
30:2 36:1
59:11
74:5,8
76:12

**partner**
4:11

**party**
14:12
19:4,8
25:7,24
26:14
54:22
66:9
68:15
81:21,22, 24 82:13, 14

**pass**
23:22

**patents**
26:9

**path**
35:9

**pay**
21:15
43:13
55:9,20
60:21,23
61:12
62:8
69:4,7
72:13
75:7 77:3
78:11

**paying**
61:5,8
62:2
71:18
77:16

**payment**
39:3 43:9
44:7 77:5
81:20

**payments**
21:25
28:17
61:9,11, 21 62:1, 4,18
63:5,9

**payoff**
13:8
14:16
15:9
36:16,17, 18,20
37:2,4,7
38:1,9, 12,14,18, 21 39:6, 7,9 40:2
43:10
51:18
53:5
56:21
57:3,23
58:3,8,9, 15,21
59:20,23
60:5,7
71:13,22
72:2,5
74:16

**payoffs**
48:23
49:13

**pen**
75:14

**penalty**
51:11

**pendens**
5:3 6:13
10:19,23, 24 11:2, 4,5,12, 15,20,24, 25 14:21, 25 15:5, 22 16:4
18:3
76:25
78:7,19, 23 79:7, 14,16,22
80:5
82:12,17, 21,23
83:6

**pending**
14:5 77:8

**Pennsylvania**
49:10

**people**
21:11

**performance**
34:15

**period**
26:6
43:14
84:6

**perjury**
51:11

**permission**
27:3 42:4
45:15

**permit**
5:3

**permitted**
75:11

**personal**
76:4

**phonetic**
57:7

**piece**
6:19
21:24
65:20,21
69:21
70:9

**pieces**
6:17

**Pittsburgh**
22:22
27:13
28:5
42:20,22
49:10
61:17

**place**
16:3
28:21

**plain**
75:14
82:16

**Plaintiff**
16:14
56:22

**plaintiff's**
15:15
23:8
24:1,4,8
29:8,15
32:19
33:9,14, 19 40:19
41:18,21
43:25
44:17,20
50:3 55:5
62:19,22
65:11
68:5,12, 16 73:21
84:10

**plaintiffs**
4:10 5:22
11:22
30:5,9

**plan**
35:1,7,11
44:6,9
63:14

**planning**
45:9
64:15

**pleaded**
17:8,9,22

**pled**
76:14

**pledge**
26:1
68:17
80:24

**pledged**
27:1

**plenty**
71:6

**PNC**

46:8,19

**point**
36:21
50:11
57:24
62:16
71:10
73:19
81:15
82:4
83:11

**policies**
47:25

**policy**
54:16,19

**position**
12:12,20
14:9 15:7
16:5,7
17:1,11
46:11,12
47:2,22
48:13,16
69:7
76:19
77:13
78:20,21
79:3
82:16

**positions**
83:22

**possibly**
17:15

**posted**
78:8

**posting**
78:24
79:5

**pre-dates**
73:22

**pre-judgment**
18:6
77:14

**pre-marked**
56:8

**pre-try**
15:17

**precedent**
79:7

**precise**
72:16

**prefatory**
25:22

**prefers**
84:24,25

**prejudgment**
17:18

**preliminary**
5:5

**prepare**
83:21

**preparing**
50:5,23

**preserve**
11:20

**preserved**
84:7

**presiding**
4:4

**press**
11:22

**pretty**
26:19
72:1

**prevent**
26:25

**prevents**
11:20

**price**
8:16
28:19

**primarily**
49:22
72:6

**primary**
50:19

**principal**
61:8 62:2
75:6

**print**
40:25

**prior**
44:11
50:9,13
57:12

**problem**
8:7,14
34:21
43:18
67:12,13
72:6

**problems**
7:22

**procedure**
54:16
82:10

**procedures**
47:25

**proceed**
5:5,9
19:25

**proceeding**
65:8

**process**
34:11

**processes**
37:15

**product**
34:12

**prohibited**
38:5
53:8,10
68:9
71:17

**prohibition**
80:24

**prong**
16:23

**prongs**
9:11

**pronounce**
57:6

**proper**
16:4
79:19

**properties**
4:7 6:15,
22 7:7
8:3,17
9:4,24
12:10
21:3
25:6,8
26:3
27:4,8,18
28:2 30:3
36:5,9
39:16,17
40:22
42:3,10,
16 43:5
65:24
66:6
67:9,10,
14 68:15
69:6
71:18
72:9,12
81:1,4
83:9

**property**
6:18,20,
24 7:8,
10,20,21
8:2,11,
14,22
9:1,5
11:8,11,
17,19
12:12,20
13:9,20,
22 15:1,
5,6,14,23
16:1,8,
17,24
17:1,11,
12,19
18:3
21:21,24
22:13
26:10
27:11,14,
15,17
28:4,5,9,
16,17
29:22
31:2,11,
15 32:7
33:1,6,18
36:7,10,
14 38:1,2
39:25
40:23
42:4,18,
19,22,25
43:4
50:24,25
53:8,10
55:19
62:21
63:11
65:21,22
66:10,13,
14 67:4,
13,15,17,
22 68:1,
2,4,12,
17,18,21
69:18,21
70:2,5,9,
11,13,24

71:1,6,7 72:10,16 73:23,25 74:1,7,9, 11 75:22 78:23,25 79:17,21, 22,23 80:1,10, 15,23 81:10 82:20,25 83:8,13

**Property's** 31:9

**proponent** 15:21

**proposal** 35:2

**propose** 34:20

**proposed** 84:22

**protected** 17:12

**prove** 10:21

**provide** 7:4 28:25 35:3 72:4

**providing** 14:16 38:20

**provision** 7:23 26:17

**pulled** 74:16

**purchase** 8:16 13:3 14:5 21:24 28:16,19 81:8

**purchased** 7:8 8:17 55:19

**purchaser** 11:9

**purchasers** 66:19

**purchasing** 73:23 76:2

**purpose** 23:13

**purposes** 16:22 38:13

**put** 10:8 11:5 14:8 28:21 31:13 35:19 38:8 40:9 71:12 79:16 82:18

**putting** 82:5

**Q**

**quarter** 48:6

**question** 15:23 33:24 45:1,14 65:21 70:20

**questionable** 54:17

**questions** 45:4,14 51:14 56:8,20 63:23

**quick** 39:3 45:1 73:19

**quickly** 38:21

**quote** 37:7 57:23 58:4,21

**quotes** 14:16

**R**

**R&r** 4:7 5:24 6:1,10, 15,22 7:1,7 8:3,10,17 9:4,8,19, 24 10:12, 16 12:9 13:4 17:25 20:20,23 21:2,18 22:16,24 25:6,8 27:4,7,8, 18,22 28:2 29:22 30:3 34:6,14, 20 35:13, 21 36:5,9 38:2,20 39:15,17, 21 40:21 42:3,10, 16 43:5 44:3,12 55:7,19, 20 57:23 61:21,23, 24 65:23 66:20 67:9,14 68:14,15 69:6 71:17 72:7,8,9, 12,19 73:22,25 74:6 77:2,16, 24 78:3, 10 80:13 81:4,14 83:9

**R&r's** 34:14

**raise** 13:4 17:2 19:20 66:22

**raised** 16:19 17:2 69:15 81:16

**rationale** 70:1,2

**re-direct/ cross** 63:25

**re-hash** 71:11

**re-pay** 35:8

**reached** 40:12

**read** 5:10 10:19 18:14 24:14 25:21 40:25 41:12

**reads** 25:18

**real** 12:10 15:23 27:6,12 28:5 47:17 50:25 61:16 74:2,12 80:23

**realized** 55:18

**reason** 9:25 38:4 72:16 74:4

**reasonable** 9:16 67:21 81:12

**reasons** 76:16

**Rebecca** 4:22

**rebuttal** 73:13 79:10

**recall**
39:6,7
45:6
48:15
49:24
55:14,24

**receivable**
61:7
62:1,6,
10,15
77:16

**receivables**
69:11

**receive**
38:9,22
47:21,24
49:12

**received**
18:16
36:17,18
37:2
38:24
39:1 40:2
49:11
53:4 54:5
55:18
60:20,22
78:5
81:17
82:6

**receiving**
61:20,25

**recent**
48:17

**recess**
65:3,4

**recognize**
29:14
40:20

**recommendation**
9:21

**recommended**
83:21

**record**
4:8 11:10
15:8 66:2
67:6 69:5
77:23
78:1

**recordation**
62:23

**recorded**
15:3,7,12
40:4
41:6,15
63:2
74:14
75:3,21

**records**
11:17

**recovery**
52:22,24

**refer**
5:23 6:1

**referenced**
22:20
32:22

**referred**
22:3
49:25
67:24

**referring**
41:3
46:17
55:4
61:12
67:25
81:21

**refers**
6:2 22:9

**refinance**
8:13,20
67:11

**reflect**
8:21
79:15

**refused**
78:5

**registry**
82:5

**regular**
21:25

**rejected**
15:8

**relate**
56:19

**relation**
38:18

**relationship**
6:6 7:25
20:23,25
21:5,6,7
23:16
27:7 37:8
57:12,14,
19,22
59:1,9,
18,19
63:8 66:9

**relationships**
5:23 12:8
17:6,21
18:1
22:16
61:5

**release**
14:17

**released**
14:7 15:8
19:8 82:8

**relied**
13:8

**relief**
11:21
16:16,23
17:3,5,
10,13,15,
20 79:4

**remain**
11:12

**remaining**
4:18

**remains**
4:17

**remedy**
14:14

**remember**
33:25
51:20,22
59:2

**rents**
29:20

**repaid**
29:2

**repay**
28:16
62:11

**repayment**
44:7

**repeat**
33:24

**rephrase**
10:4
38:19
61:6

**replace**
81:11

**report**
49:8

**Reporter**
5:15,16,
19 19:24

**reports**
78:2

**represent**
24:24

**representatives**
4:12
35:21

**request**
37:2,4,9
38:1,9,
17,22,23,
25 39:7
71:22

**requested**
42:7

**requesting**
15:4

**requests**
38:12
72:2

**required**
75:25

**requirement**
44:15

**requires**
75:10

**rescind**
43:6

**reserve**
83:18

**residential**
6:24
27:16
79:23

**residual**
19:10

**resolution**
80:2

**resolved**

11:13

**resolves**
80:3

**respect**
4:17 19:3 45:14 47:6 58:2 62:19 72:24 73:21 75:16 76:5 82:22

**respectfully**
11:22

**respective**
14:21 15:21 37:10 54:24

**respond**
73:14 80:8

**responded**
71:22

**response**
51:12 54:10

**rest**
41:7

**restated**
23:11 24:16

**restriction**
82:19

**restroom**
64:24

**Restructured**
77:24

**restructuring**
12:21 34:24,25 44:6 59:16 77:25

**return**
13:16,23, 24 54:22 77:9 81:18,19

**returned**
54:17

**Revenue**
12:15,18 63:9 74:18 75:5,10

**review**
15:16 16:3 29:11 40:18 49:18,20 50:5,11, 22 60:14 84:5

**reviewed**
50:8,13

**reviewing**
15:25

**revolver**
42:18 62:3

**revolving**
6:7 21:1, 10,11 22:21,24 28:3,20 61:19 62:3,11

**Richard**
4:9,23 7:13 27:20,21, 25 36:16 40:23 66:11

**rid**
18:6

**rights**
10:7 26:10 40:8

**ringing**
65:19

**rise**
4:2 65:2, 5

**risk**
20:13,14

**Rodriguez**
4:21,22, 24,25 10:3 12:3,4 14:3 24:6 30:7 31:16,18 37:16,21 41:19 44:24,25 45:11,13, 18,20 51:13 56:1,5, 10,13,15, 17 57:1 63:22 64:16,17, 21 73:17, 19 84:14, 18,21 85:10,16, 19,23 86:12

**Rodriguez's**
73:15

**role**
48:19,24 54:9 75:15

**Ron**
13:6,13 40:11

**Ronald**
39:11,12

**Roscher**
57:7,8, 17,22 58:19,23

**roughly**
6:22 7:9 8:22 33:4 65:24 71:5

**routed**
60:8

**routinely**
49:2

**ruling**
83:18,21 84:7

**S**

**S&t**
22:18,20 28:23 31:4

**Salazar**
4:9 5:2, 4,13,20 10:4 12:5 14:2 19:15,16 20:2 23:3,6, 18,24 24:3,10 29:3,6 30:5,12, 14,16,20, 23,25 31:21,23, 25 32:2, 5,15,17 33:9,16 37:17,19, 23,24 40:15,17 41:17,23 42:2 43:16,20, 23 44:16, 22 45:4,9 51:12,15 63:24 64:1,4, 12,13 65:9,10, 12 79:11, 12 84:3, 10,16,19, 24 85:3, 4,7,17,25 86:2,5,7, 9,13

**sale**
25:19

**sales**
26:3,7

**satisfaction**
25:25

**satisfied**
81:14

**satisfy**
10:16 38:23

67:2,18 69:12 73:11 80:13

**scenarios** 48:24

**Science** 47:9

**scope** 45:2,10, 15

**seated** 4:5 65:7

**Section** 25:14 68:11 80:24

**sections** 24:25

**secure** 19:10

**secured** 6:23 12:11 17:18 22:13,22 28:5 61:16,18 72:23

**security** 6:4 7:24, 25 8:6 10:2 23:1,12 24:17 26:18 29:19 50:20 68:9 71:17 81:5 85:10

**seek** 17:4

**seeking** 15:1,2 17:13,20 78:18

**sell** 26:1 35:6 63:15,19 68:17 80:24

**seller** 17:25

**selling** 26:25 27:1,2

**send** 54:21

**sending** 44:11

**sense** 74:13 76:25

**separate** 74:13,16

**separately** 74:15

**series** 5:22

**service** 37:6 58:9

**serving** 13:14

**session** 4:3 65:6

**set** 85:20

**setting** 66:8

**shared** 33:1

**shipper** 34:13

**shocked** 18:12

**short** 19:11 64:23

**shortfall** 34:17

**show** 11:17 12:9 13:1,13, 16

**showing** 15:22

**side** 78:9

**sides** 16:12 59:12 78:22

**signed** 51:10 55:14,15

**significant** 80:7

**similar** 21:13

**simple** 82:17

**simplest** 58:10

**simply** 62:10 67:10

**sit** 28:1 73:7 75:19 79:20 80:11

**sits** 78:18

**sitting** 81:25

**situation** 35:22

**size** 37:8

**small** 40:25 62:16 80:4 81:1

**sold** 12:25 16:8 66:6

**sole** 7:15 22:15 66:12 67:21

**Solutions** 5:17

**sort** 7:13 20:23 41:1 65:14 71:23

**sotto** 23:5 29:5 43:19 56:16

**sought** 7:2

**soundedly** 72:2

**sounds** 51:14

**South** 33:2

**speak** 54:20 74:5

**special** 7:19 8:23 20:9,10, 17 40:3, 21 45:22 46:24,25 47:20 48:19,24 49:12 57:18 61:4 63:19

**specific** 8:3 21:23 22:23

**specificall y** 21:2 28:17 54:19 68:11

**specifics** 35:8

**squarely** 9:11

**stamp** 41:1

**stance** 12:14 63:4

**stand** 19:19,20, 25

**standard** 10:20 15:11,12 18:13

26:17,19, 21,22 76:10

**standing** 26:22

**standpoint** 84:11

**started** 67:24 68:7 76:16

**starts** 25:23

**state** 20:3 29:17 74:23

**stated** 40:1

**statements** 49:20,22

**status** 35:13

**statute** 74:20,21 75:1,9

**stay** 45:1

**step** 16:13 19:20 64:6

**steps** 40:7

**stipulated** 56:6 64:18

**straight** 5:7 62:8

**strictly** 38:13

**structure** 23:17

**subject** 69:24 70:3,10, 13 71:2,8 78:24

**submit** 9:10 84:1,11

**submitted** 39:9 44:9 60:11 65:17 83:19 84:23

**submitting** 84:22

**Subpart** 69:1

**subsequent** 50:25 53:12,20 58:3 73:23 74:10

**subsidiary** 25:24 26:14

**substantial** 15:24 76:15

**substantially** 26:4

**success** 15:24 16:2 76:15

**sued** 18:12

**sufficient** 11:1 84:2

**suggested** 7:5

**suggestion** 16:8

**suggests** 77:4

**suit** 13:18 14:4

**sum** 26:6 78:13,16

**supplemented** 63:8

**support** 34:19 77:23 78:22

**supports** 83:22

**supposed** 75:14 79:15

**Supreme** 15:20 75:12

**surprise** 36:19 38:16

**surrounding** 54:15,20

**survives** 16:14

**Sustained** 31:24 37:18

**sworn** 19:21,23

**system** 74:15

**T**

**tabs** 24:24 50:16

**taking** 53:25 67:15,16 81:11

**talk** 52:3

**talked** 28:8

**talking** 17:25 35:25 68:7

**talks** 69:1

**tantamount** 18:4,5 77:13

**tapped** 31:8

**tax** 63:9 68:1 74:23

**taxation** 75:10

**taxed** 75:5

**taxes** 12:17 63:5 75:8

**team** 52:9,17, 18,19,20, 21 58:23

**templates** 83:23

**ten** 8:24 24:23 50:4,16, 20 51:5 64:25 74:9

**tendered** 44:23

**term** 21:1,19, 22 22:21 28:9,10, 15 42:19 61:16 81:1

**termination** 26:1

**terms** 10:18 23:16 34:7

**test** 76:13 78:17

**testified** 19:23 45:22 48:20 51:16 52:25 53:7,21 57:13 59:7 60:24 63:14 72:1

**testify**
5:7 9:18

**testifying**
31:18
50:2

**testimony**
5:7 51:4
53:13,18
58:14
59:21
65:16
77:2,5,
15,17

**Thanksgiving**
59:6

**That'll**
41:20

**theory**
73:12
83:12

**thereof**
25:24

**thereon**
74:24

**thereunder**
74:25

**thing**
67:20
69:10
70:18
71:14
82:23

**things**
12:25
23:17
35:6
63:19
65:18
80:8

**third-party**
14:6 19:4
77:11

**thought**
18:12
40:14
50:18

**threshold**
16:2,15

**tie**
15:6
16:16

**time**
9:2,14
32:6,13,
14 33:3,7
34:3
37:13
39:13,18
42:15
43:5,14
46:17,18
47:1
48:16
50:11
51:22
55:15
58:17
72:3 74:6
79:22
80:2 84:2

**timeline**
73:20

**times**
49:3

**timing**
78:3

**title**
24:14
45:22

**titles**
46:23

**today**
4:12
6:20,25
9:18 11:3
15:18
16:20
28:1
35:14
65:18
75:20
76:11,22
78:21
79:3,21
82:8

**told**
52:11

**top**
40:25
41:2
58:11,18
62:21

**tractors**
26:12

**trade**
62:13

**trademarks**
26:9

**trailers**
26:12
61:18

**train**
48:12

**training**
47:21,24
48:8,11,
16 49:4,
11,13

**trainings**
48:1

**transaction**
9:11 10:5
72:4 76:8
83:5

**transactions**
17:7

**transfer**
7:22 8:1,
2,5,7,25
9:2,12,
15,23
10:7,8,9,
11 11:8,
9,22
13:20,24
14:11,15
26:2,15
31:10
36:6,9,13
39:24
40:6,13,
14 42:4,
8,25 43:6
67:13
68:9 69:1
70:10
71:3,24
72:6,10,
18,20
73:10
80:20,25
81:6
83:2,7,9,
12

**transferor**
54:18

**transferred**
7:10 8:11
9:4 36:25
38:2,5
43:15
50:10
65:23
80:16

**transferring**
7:20
40:22
53:8,9
72:16

**Transfers**
9:10
68:25
69:17,25
70:14,21
71:9 73:6
83:3

**transmission**
39:7

**transmitted**
43:9
60:13
82:3

**transpired**
36:23

**traveled**
45:3

**treat**
45:16
67:11
74:9

**trickle**
62:17

**trouble**
7:2 66:21

**troubles**
9:19

**truck**
34:12

**trucking**
34:11

**trucks**
61:18

**true**
12:22
53:4 54:4

**trustee**

74:21

**truth**
71:25

**turn**
23:25 24:11 25:14 29:2 35:6

**type**
20:22 21:17 27:14 45:25 46:11

**typical**
37:14

**typically**
32:13 37:8 38:13,16

**U**

**UFTA**
13:21 14:18 16:23 17:3,9

**Uh-huh**
53:3 85:4

**ultimate**
7:14 27:21 34:13

**ultimately**
7:16 10:15 11:21 16:11 27:20 35:7 40:12 43:12,15 77:12 80:12 83:2

**unable**
69:3

**unbiased**
66:9

**uncontested**
69:6

**underlying**
6:13

**understand**
23:20 32:14 37:3 62:12

**Understood**
19:14

**underwriter**
46:13

**undisputed**
68:19

**uniform**
9:9 68:25 69:17,24 70:14,20 71:2,9 73:6 83:3

**unilaterally**
78:13

**unit**
52:22

**unpaid**
75:6

**unsecured**
10:15 70:3 72:22,25 73:4 80:11

**unusual**
39:4,5 54:11,15

**upwards**
35:3

**utilize**
48:12 83:24

**V**

**valuation**
31:19,20 32:14 79:2

**valuations**
32:13

**valued**
42:23

**varies**
48:5

**varying**
24:25

**vendor**
48:12

**verbal**
51:12 54:10

**verified**
10:25 51:6,11 53:15 65:16

**verify**
49:15,25 50:6,23

**versus**
4:7 15:19

**vetted**
37:12

**view**
17:16 18:7 42:10

**viewed**
31:7

**violate**
81:5

**violation**
8:6 9:9 10:2 69:17 83:2

**virtually**
8:8

**virtue**
75:20

**voce**
23:5 29:5 43:19 56:16

**void**
83:5

**voided**
83:10

**voiding**
11:22

**W**

**wait**
30:17

**wanted**
5:5 23:9 28:23 60:8 80:8

**warranted**
10:24

**warranty**
7:19 8:23 40:4,21

**waterfront**
27:16

**ways**
83:7,12

**Webster**
13:6 39:11,12, 15 40:11

**Webster's**
13:13

**weekly**
36:1 59:8,19

**weeks**
84:1

**weigh**
53:13 78:7

**whichever**
84:6

**wife**
37:1 67:15

**wind**
9:22

**wire**
13:16 51:20,23 52:1 54:17 60:20

**wired**
13:14 36:18 55:8,11 77:10

**witnesses**
64:14,16

**word**
53:1
77:21

**words**
8:10
65:14
70:5,6

**work**
46:1
47:25
49:9,10
76:1

**worked**
46:4,10,
25

**workout**
35:11
46:18
54:12

**workouts**
48:21
52:15

**world**
16:6
75:20

**worn**
26:4

**worth**
8:16
66:15
67:22
70:24
79:1,21,
23 80:1

**worthless**
73:11

**writ**
17:18
77:14

**write**
34:1

**wrote**
51:17
85:14

**Y**

**year**
35:5 49:3

**years**
20:16
25:5
46:1,3,
14,19,22
54:8
63:18

**Z**

**zeroed**
78:12