**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR COLLIER COUNTY, FLORIDA**

THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent,

Plaintiffs,

v.

R&R EXPRESS PROPERTIES, LLC, RICHARD S. FRANCIS, KATHLEEN L. FRANCIS, and CENTENNIAL BANK,

Defendants.
_______________________________________/

Case No.: 11-2026-CA-000170-00001-01

**PLAINTIFFS' MOTION TO DISMISS COUNTS I, II, AND IV OF DEFENDANTS', RICHARD S. FRANCIS AND KATHLEEN L. FRANCIS, COUNTERCLAIM AGAINST HUNTINGTON NATIONAL BANK**

Plaintiffs, THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent (collectively, the "Plaintiffs" or "Huntington"), by and through undersigned counsel and under Florida Rule of Civil Procedure 1.140, move this Court for dismissal with prejudice of Counts I, II and IV of the Counterclaim filed by Defendants, RICHARD S. FRANCIS ("R. Francis") and KATHLEEN L. FRANCIS ("K. Francis") (collectively, the "Francises") for failure to state a cause of action, and as grounds state:

## I. INTRODUCTION

At first glance, the Francises appear to present a complex case involving tortious interference and a civil conspiracy between Huntington and Centennial whereby the parties agreed to "not apply the [Francises'] wired Payoff Funds to the Huntington Mortgage loan balance." Notwithstanding the 142 paragraphs of allegations, however, the Francises: (1) improperly bring a tortious interference claim against Huntington, who is not a "stranger" to the Francises'

relationship with Centennial; (2) bring a quiet title claim against Huntington without adequately alleging that Huntington's mortgage on the Property is invalid; and (3) improperly bring a claim for civil conspiracy without properly pleading an underlying tort as the basis for same. Because the Counterclaim as pled is inconsistent with Florida law, the Francises fail to state a cause of action as a matter of law, and this Court should dismiss Counts I, II and IV with prejudice.

## II. FACTUAL BACKGROUND

On March 18, 2022, Huntington Bank and another lender, S&T Bank ("S&T"), (together the "Lenders") agreed to provide Defendant R&R and other affiliated borrowers (the Borrowers") with several loans pursuant to a Credit Agreement. The Credit Agreement loans include a revolving loan commitment of up to $85 million ("Revolving Loans"). The Bank and S&T also provided R&R and the other affiliated Borrowers with a term loan in the amount of $3,675,000 ("Term Loan" together with the Revolving Loans, the "Operating Loans").

Pursuant to the Credit Agreement, R&R and the other affiliated Borrowers granted Plaintiff, in its capacity as collateral agent for the Lenders, a lien and security interest in substantially all of their assets as collateral for the Operating Loans. *See* Article 4, Section 4.1 (Security Interest in the Collateral) ("To secure the prompt payment and performance of the Obligations, each Loan Party hereby grants to Agent, for the benefit of the Agent, each Lender, and the benefit of each of their respective Affiliates, a continuing security interest in and a pledge of all of its Collateral."). In addition to the Operating Loans, Huntington issued a mortgage loan (the "Florida Loan") (and together with the Operating Loans the "Loans") to R&R, which was collateralized by a "corporate retreat" residence located at 550 S. Barfield Drive, Marco Island, Florida 34145 (the "Marco Island Property"). The Marco Island Property had been previously appraised at $10.4 million.

R&R and its affiliates are in the logistics industry. During the COVID period, the trucking industry rapidly expanded by adding trucks and drivers. However, as supply chains later stabilized, the entire industry found itself with excess capacity. This excess supply led to a massive drop in prices and a "freight recession," which has persisted from 2022 to the present. R&R and the additional Borrowers' financial condition steadily declined during the freight recession. The deterioration of the Borrowers' financial condition accelerated in late 2025. The Borrowers lacked sufficient liquidity to meet their ongoing obligations and had accrued approximately $65 million in trade payables. By mid-December 2025, Huntington had recommended that the Borrowers' wind down their affairs in an orderly manner. Despite the requests of Huntington, the Borrowers, including R&R, refused to do so and continued to operate and incur debts that they could not pay.

In the midst of this financial crisis, and while daily negotiations among Huntington, R&R and the other Borrowers were ongoing, on December 29, 2025, R. Francis (the principal of R&R and the other Borrowers) executed a fraudulent scheme designed to transfer the equity in the Marco Island Property away from R&R to R. Francis and his wife. The first step in this scheme was for R. Francis to cause R&R to secretly transfer title to the Marco Island Property from R&R to R. Francis and his wife, K. Francis (the "Transfer"). Under the parties' governing loan documents, R&R was prohibited from conveying the Marco Island Property without Huntington's consent. The decision to do so constitutes a default under the Florida Loan documents.

Next, on the same day as the Transfer, R. Francis and his wife granted Centennial Bank ("Centennial") a mortgage on the Property. The Closing Disclosure reveals that the Centennial loan amount was approximately $5.3 million. At the time of the Transfer, R&R was insolvent, and it is jointly and severally liable under the Operating Loans that are in default. The balance of the Operating Loans (excluding fees and costs) as of January 5, 2026, totaled $40,878,970.60.

On January 5, 2026, Huntington received a surprise wire in the amount of $5,279.776.20 from a previously unknown source (the Law Office of Ronald Webster) (the "Wire") purportedly as payment on the Florida loan. Prior to receiving the payment, Huntington was not aware of the transfer of the Marco Island Property. After Huntington filed this lawsuit, realizing they were a pawn in the Francises' fraudulent scheme, Centennial contacted Huntington and demanded the return of the funds to satisfy the mortgage held by Huntington. In response to the demand, Huntington returned the funds.

On March 4, 2026, Huntington and Centennial filed their Stipulation for Dismissal of Certain Claims (the "Stipulation"). The Stipulation dismissed Centennial as a Defendant from Huntington's Complaint, as well as dismissed all claims asserted by Centennial against Huntington in Centennial's Counterclaim and Crossclaim. On March 4, 2026, the Court entered its Order Approving the Stipulation.

Out of these allegations, the Francises bring several claims against Huntington based on its purported tortious interference with the banking relationship between the Francises and Centennial, including a claim to quiet title, fraudulent inducement, and civil conspiracy. Because the Francises cannot state a cause of action for tortious interference, quiet title, or civil conspiracy, this Court must dismiss Counts I, II and IV of the Counterclaim with prejudice.

## MEMORANDUM OF LAW

## III. LEGAL STANDARD FOR FAILURE TO STATE A CAUSE OF ACTION

"Whether a complaint is sufficient to state a cause of action is an issue of law." *Crawley-Kitzman v. Hernandez*, 46 Fla. L. Weekly d1469 (Fla. 3d DCA June 23, 2021) (quoting *Kond v. Mudryk*, 769 So. 2d 1073, 1076 (Fla. 4th DCA 2000). "Florida Rule of Civil Procedure 1.110(b)(2) requires that '[a] pleading which sets forth a claim for relief…must state a cause of action and shall

contain…a short and plain statement of the ultimate facts showing that the pleader is entitled to relief.'" *Goldschmidt v. Holman*, 571 So. 2d 422, 423 (Fla. 1990). "Those allegations are then reviewed in light of the applicable substantive law to determine the existence of a cause of action." *Blue Supply Corp. v. Novos Electro Mech., Inc.*, 990 So. 2d 1157, 1159 (Fla. 3d DCA 2008) (quoting *Peeler v. Indep. Life & Acc. Ins. Co.*, 206 So. 2d 34, 36 (Fla. 3d DCA 1967)).

"Florida's pleading rule forces counsel to recognize the elements of their cause of action and determine whether they have or can develop the facts necessary to support it, which avoids a great deal of wasted expense to the litigants and unnecessary judicial effort." *Horowitz v. Laske*, 855 So. 2d 169, 173 (Fla. 5th DCA 2003). And, "[i]t is a fundamental principle of pleading that the complaint, to be sufficient, must allege ultimate facts ***as distinguished from legal conclusions*** which, if proved, would establish a cause of action for which relief may be granted." *Maiden v. Carter*, 234 So. 2d 168, 170 (Fla. 1st DCA 1970) (emphasis added).

A complaint that fails to state a cause of action should be dismissed. *See Maiden*, 234 So. 2d at 170; *see also* Fla. R. Civ. P. 1.140(b)(6). Where the plaintiff cannot state a cause of action as a matter of law, the dismissal should be ***with prejudice***. *See, e.g., Boca Ctr. at Military, LLC v. City of Boca Raton*, 312 So. 3d 920, 921 (Fla. 4th DCA 2021) (affirming dismissal with prejudice because further amendment futile where plaintiff could not state cause of action); *Crawley-Kitzman*, 46 Fla. L. Weekly d1469 (dismissal with prejudice appropriate where it appears there is no possible way to amend the complaint to state a cause of action).

## IV. ANALYSIS

### A. The Counterclaim Fails to State a Cause of Action for Tortious Interference (Count I) because Huntington Is Not a Stranger to the Banking and Lending Relationship Between the Francises and Centennial.

In order to maintain an action for tortious interference with a business relationship under Florida law, the plaintiff must allege: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference. *See Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship. *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999). A defendant is not a "stranger" to a business relationship if the defendant "has any beneficial or economic interest in, or control over, that relationship." *Palm Beach County Health Care Dist. v. Professional Medical Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (citing *Nimbus Tech., Inc. v. SunnData Prods., Inc.*, 484 F. 3d 1305, 1309 (11th Cir. 2007).

A defendant is also not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed. *Id.* This includes when a defendant has a contractual right to approve or disapprove any proposed transfer of property. *See Genet Co. v. Anheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d DCA 1986). Moreover, a defendant is not a stranger if it is the source of the business opportunity allegedly interfered with. *Id.* This is because "an interested third-party accused of tortious interference is essentially 'interfering' with its own interests. This is not interference; it is freedom of contract." *See Pro. Med.*, 13 So. 3d at 1095. Along these lines, Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998); *see also M*

*& M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1339 (11th Cir. 2020) ("The rationale for the privilege is to allow interested third parties to interfere to protect their own economic interests.").

Here, Huntington was certainly not a stranger to the Francises's lending relationship with Centennial but was an interested third party. Specifically, on the same day as the Transfer of Huntington's own collateral, in violation of Huntington's loan documents, the Francises granted Centennial a mortgage on the Property. The Centennial Loan amount was approximately $5.3 million. The balance due on Huntington's mortgage for the Property also totaled approximately $5.3 million at the time R&R transferred title. Notably, at the time of the Transfer, R&R was insolvent, and it is jointly and severally liable under the Operating Loans that are in default. The balance of the Operating Loans (excluding fees and costs) as of January 5, 2026 totals $40,878,970.60. In fact, the parties, which include R&R and Richard Francis, were in the midst of an extremely complicated commercial loan workout involving aggregate loans in excess of $70 million.

On January 5, 2026, Huntington received a wire in the amount of $5,279,776.20 from a previously unknown source (the Law Office of Ronald Webster) (the "Wire") purportedly as payment on the FL Loan. Because fraud was immediately suspected, given the circumstances and timing of the Transfer, Huntington did not apply the Wire to the FL Loan balance. Thereafter, realizing that they were used to facilitate the Francises' fraudulent scheme, Centennial contacted Huntington and demanded the return of the funds to satisfy the mortgage held by Huntington. In response to the demand, Huntington returned the funds.

Under the law of tortious interference, Huntington is not a "stranger" to the banking relationship between the Francises and Centennial because at the time the Francises granted

Centennial a mortgage on the Property, the Property was also encumbered by a mortgage in favor of Huntington and R&R was a co-borrower on a syndicated loan facility. There is no dispute that Huntington had a financial interest in, and control over, the transaction at issue, because the Property being transferred to the Francises was collateral for the loan and the governing loan documents granted Huntington a consent right over the very transaction at issue.[1] The equity value in the Property – which exceeds $5 million – was available to repay the amounts owed under the Operating Loans. The Francises' requests for payoffs were made secretly around the channels of day-to-day communication between the parties and their counsel. The Francises knew that if Huntington got wind of their fraudulent scheme, the payoff request would have been rejected. This situation is the ***opposite*** of interference because it is subject to, and governed by, a direct contractual relationship among the parties to this case. Thus, if Huntington was in fact "interfering" in the relationship between the Francises and Centennial, it would be interfering with its ***own interests***, which by definition cannot support a claim for interference with contractual relations. *See Pro. Med.*, 13 So. 3d at 1095.

Additionally, as the holder of the first mortgage on the Property, and a creditor of R&R, Huntington had an interest in insuring that the Wire was not the result of a fraudulent scheme conducted by the Francises – which it was. To allow the tort of interference to apply under these facts would prohibit banks from taking appropriate measures to protect against fraud. So long as Huntington does not engage in improper conduct (it did not), the law permits it to protect its business interests (including fraud prevention) without liability for tortious interference. *See*

---

[1] Section 7.1 of the Credit Agreement prohibits R&R Express from selling, pledging or transferring any assets or property except for certain assets described in Section 7.1(b), without the consent of Huntington Bank (the "No Transfer Provision"). *See* Counterclaim, Comp. Exhibit "3."

*Networkip, LLC v. Spread Enters., Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006). For these reasons, Count I must be dismissed with prejudice.

### B. The Counterclaim Fails to State a Cause of Action for Quiet Title (Count II) Because the Francises Fail to Allege that Huntington's Claim to the Title is Invalid.

To state a claim to quiet title, a plaintiff must allege that he or she has title to the subject property, that there is a cloud on the title, and that the defendant's claim to the title is invalid. *See Polycarpe v. Federal National Mortgage Association*, 423 So. 3d 20, 25 (Fla 4th DCA 2025) (citing *George Anderson Training & Consulting, Inc. v. Miller Bey Paralegal & Fin., LLC*, 313 So. 3d 214, 218 (Fla. 2d DCA 2021). Here, the Francises cannot plead ultimate facts showing that Huntington's mortgage on the Property is invalid. The Francises' allegation that Huntington "admittedly received the Homeowners' wired Payoff Funds" is insufficient to show that Huntington's mortgage is invalid. Instead, the Francises generally challenge the circumstances in which Huntington returned the Wire funds to Centennial, instead of applying the funds to satisfy the mortgage loan balance. However, these allegations, even if true, do not show that the mortgage is invalid. Because Plaintiff has failed to properly plead a cause of action for quiet title, Count II must be dismissed with prejudice.

### C. The Counterclaim Fails to State a Cause of Action for Civil Conspiracy (Count IV) Because it is Not Based on an Existing Independent Wrong or Tort that would Constitute a Valid Cause of Action if Committed by One Actor.

An allegation of parallel conduct and a bare assertion of conspiracy will not support a valid conspiracy claim under Florida law. *Euclid Turnaround Opportunity Fund LP v. Amerant Equipment Finance*, 2025 WL 3905174, *14 (S.D. Fla. Oct. 6, 2025). General allegations of conspiracy are inadequate. *GE Real Est. Servs., Inc. v. Mandich Real Est. Advisors, Inc.*, 337 So. 3d 416, 420 (Fla. 3d DCA 2021). To survive a motion to dismiss, the "complaint must set forth

clear, positive, and specific allegations of civil conspiracy." *Id.* "To assume or speculate" that defendants "participated in a conspiracy merely because they ultimately received some benefits from" the scheme "is insufficient for the imposition of liability against them." *Id.* at 421.

Additionally, Florida does not generally recognize "an independent cause of action for civil conspiracy; rather, the plaintiff must allege an underlying illegal act or tort on which conspiracy is based."[2] *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). "The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Liappas v. Augoustis*, 47 So. 2d 582, 582 (Fla. 1950). For that reason, if a claim does not survive a motion to dismiss, it "cannot substantiate" a civil conspiracy claim. *Pro. Med.*, 13 So. 3d at 1096 ("Since the counts regarding the goals of the conspiracy – defamation and tortious interference – fail, so too the conspiracy count must fail.").

In their count for civil conspiracy, the Francises incorporate the same paragraphs 1-73 as every other count in the Counterclaim but fail to identify the underlying tort which forms the basis for the alleged civil conspiracy. This failure is fatal. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1218 ("Under Florida law, '[a]n actionable conspiracy requires an actionable underlying tort or wrong.'") (citing *Florida Fern Growers Ass'n v. Concerned Citizens*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993); *see also Williams Elec. Co. v. Honeywell, Inc.*, 772 F. Supp. 1225, 1239 (N.D.

[2] There is one situation in which Florida has recognized an "independent civil conspiracy tort claim." *See Walters v. Blankenship*, 931 So. 2d 137, 144 (Fla. 5th DCA 2006). That is where the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess. *Id.* at 140. However, the Francises did not allege a "peculiar power of coercion" in their Counterclaim, therefore, the exception does not apply here.

Fla. 1991) ("[A]ctionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.")).

Moreover, as in *Posner*, the Francises here have also not asserted any connection between the purported conspiracy and any of the other torts alleged elsewhere in their Counterclaim. *See Posner*, 178 F.3d at 1218, n. 10 ("Posner's reallegation in the conspiracy count of paragraphs 1-72 of the complaint, R1-1, Compl., ¶ 73, is not sufficient to allege an actionable conspiracy under Florida law. Despite his general 'incorporat[ion] … by reference' of the previous paragraphs, Posner fails to assert any connection between the alleged conspiracy and any of the torts described elsewhere in the complaint."). Instead, the Counterclaim merely alleges that Huntington conspired with Centennial to: (1) not apply the Francises' wired Payoff Funds to the Huntington Mortgage loan balance as required by State law; (2) not return the Payoff Funds to the Closing Agent that wired the funds; and (3) not interplead the Payoff Funds into this Court's registry pending an outcome of the litigation – none of which are an actionable tort under Florida law. *See* Counterclaim ¶¶ 134-136.

Finally, if the underlying tort for the civil conspiracy is the attempted tortious interference claim (Count I), the Francises' failure to state a cause of action for tortious interference is obviously fatal to the conspiracy count. *See generally Blatt v. Green, Rose, Kahn &, Piotrkowski*, 456 So. 2d 949, 951 (Fla. 3d DCA 1984) (alleged conspiracy must show an actionable underlying tort or wrong and that the independent tort or wrong must constitute a cause of action if the wrong were done by one person). Accordingly, this Court should dismiss Count IV of the Counterclaim with prejudice.

## V. MOTION TO STRIKE THE FRANCISES' DEMAND FOR TRIAL BY JURY

Huntington hereby moves to strike the Francises' demand for jury trial pursuant to Section 12.3 of the Credit Agreement. *See* Counterclaim, Comp. Exhibit "3." Under Section 12.3, the parties expressly waive "any right to trial by jury of any claim, demand, action or cause of action…in any way connected with or related or incidental to the dealings of the parties hereto."

Additionally, Huntington moves to specifically strike the Francises' demand for jury trial as to its claim for quiet title (Count II). *See 381651 Alberta, Ltd. v. 279298 Alberta, Ltd.*, 675 So. 2d 1385, 1387 (Fla. Dist. Ct. App. 1996) (holding that the right to a jury trial applies only to legal and not equitable causes of actions).

## VI. CONCLUSION

Because the Francises have failed to (and cannot) state a cause of action for Counts I, II, and IV under the facts of this case, this Court must dismiss Counts I, II and IV against Huntington with prejudice. Additionally, this Court should strike the Francises' demand for jury trial due to the Jury Waiver in the Credit Agreement, as well as the fact that certain claims brought by the Francises are equitable in nature. Huntington reserves the right to file its Answer and Affirmative Defenses to Count III of the Counterclaim but will refrain from doing so until the Court rules on the instant Motion in an effort to avoid piecemeal litigation.

**WHEREFORE,** Plaintiffs, THE HUNTINGTON NATIONAL BANK, as lender, and THE HUNTINGTON NATIONAL BANK, as Administrative Agent and Collateral Agent, respectfully request that this Court: dismiss Counts I, II, and IV against Plaintiffs with prejudice; strike the Francises' demand for jury trial; extend the time for Plaintiffs to respond to Count III (to the extent needed) until after the Court has ruled on this Motion; award the Plaintiffs their attorney fees and costs; and award all other relief as this Court deems just and proper.

**Florida Rule of Civil Procedure 1.202 Certificate of Conferral – Motion to Strike**

I certify that prior to filing this motion, counsel for Plaintiffs, Alexandra Dragovich, discussed Plaintiffs' Motion to Strike the Francises' Demand for Trial by Jury by telephone conference on July 6, 2026 with counsel for the Francises. Counsel for the Francises opposes the relief sought in Plaintiffs' Motion to Strike.

Dated: July 6, 2026

Respectfully submitted,

/s/ John D. Emmanuel

John D. Emmanuel
Florida Bar No: 0475572
john.emmanuel@bipc.com
Alexandra M. Dragovich, Esq.
Florida Bar No. 1025374
alexandra.dragovich@bipc.com
BUCHANAN INGERSOLL & ROONEY PC
401 East Jackson Street, Suite 2400
Tampa, FL 33602
Tel. No. 813 222 8180/Fax No: 813 222 8189
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 6, 2026 pursuant to Florida Rules of Judicial Administration, Rule 2.516, I electronically filed the foregoing Response with the Clerk of Court by using the Florida Court E-Portal Filing System.

/s/ John D. Emmanuel

John D. Emmanuel
FBN: 475572